**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA**

| | |
|---|---|
| In re: | |
| Duke and King Acquisition Corp.<br><br>Debtor. | Case No. 10-38652 (GFK)<br>Chapter 11 |
| Duke and King Missouri, LLC<br><br>Debtor. | Case No. 10-38653 (GFK)<br>Chapter 11 |
| Duke and King Missouri Holdings, Inc.<br><br>Debtor. | Case No. 10-38654 (GFK)<br>Chapter 11 |
| Duke and King Real Estate, LLC<br><br>Debtor. | Case No. 10-38655 (GFK)<br>Chapter 11 |
| DK Florida Holdings, Inc.<br><br>Debtor. | Case No. 10-38656 (GFK)<br>Chapter 11 |

**OBJECTION OF BANK OF AMERICA, N.A. TO DEBTORS' MOTION
(A) AUTHORIZING DEBTORS' USE OF UNENCUMBERED CASH, OR
IN THE ALTERNATIVE, CASH COLLATERAL AND (B) GRANTING
<u>ADEQUATE PROTECTION</u>**

Bank of America, N.A. (the "<u>Bank</u>"), by its undersigned attorneys, hereby submits its objection to the Debtors' Motion (A) Authorizing Debtors Use of Unencumbered Cash, or in the Alternative, Cash Collateral and (B) Granting Adequate Protection (the "<u>Motion</u>"), and respectfully states as follows:

## PRELIMINARY STATEMENT

1. As the Debtors make clear in the Motion and their first day papers, they are in the business of operating Burger King-franchised stores. As the Debtors also make clear, however, there is no possibility of a reorganization of the Debtors' existing business absent an influx of capital which has not been forthcoming. As a result, the Debtors intend to use the chapter 11 process, and the Bank's Collateral, to market and sell their assets.

2. While many of the Debtors' stores may appear to generate positive cash flow (the "Good Stores"), and while the budget attached to the Debtors' Motion may appear on its face to show that the Debtors will generate enough cash flow to remain administratively solvent during the sale process, the Debtors will only achieve that result if they are successful in shifting to the Bank and creditors other than Burger King the burden of their overall negative performance and, in particular, the negative performance of 8 stores which are unquestionably economic losers (the "Loser Stores").[1] If the already outstanding and deferred royalty and advertising costs to Burger King were included in the Debtors' budget as an expense of the estates, the Debtors' cash flow would be negative at the end of four weeks and negative by more than $1.5 million at the end of the 16 week period.

3. This negative performance is based, in part, on the Debtors' inability or refusal to close the Loser Stores. At one point, during discussions pre-petition among management of the Debtors and the financial advisor to the Bank, the Debtors even agreed that the Loser Stores should be closed, but Burger King, which is obviously more interested in preserving its royalty and advertising revenues than the welfare of these estates, objected and prevented the Debtors from closing them. If the Debtors are permitted to use cash collateral and the Bank's other

---

[1] *See* Store Valuation Analysis attached hereto as Exhibit A. The first five stores on the list have already been closed by the Debtors. The eight stores under the heading "Remaining D&K Close List" are the Loser Stores referred to herein. The remaining stores are the Good Stores referred to herein.

collateral in the continued operation, particularly, of the Loser Stores, they will unnecessarily drain value from these estates and materially diminish the recoveries of the Bank and other creditors. As a result, the Bank, which has a lien on substantially all of the Debtors' assets, would in essence be required to fund operations that are exclusively for the benefit of parties who do not have collateral in these cases—in particular, Burger King and certain of the Debtors' insiders who have personally guaranteed the obligations of the Debtors to Burger King.

4. The Debtors have not offered and, in reality, cannot afford to adequately protect the Bank from the destruction in value that is inevitable if the Debtors continue in chapter 11.[2] The Loser Stores should have been closed prior to the commencement of these cases. Instead, the Debtors have continued to operate them at a loss and are now compounding the negative impact on their business and creditors by unnecessarily incurring post-petition administrative expenses for each day that they remain open. As a result, the Bank reluctantly opposes the Motion.

I. **BACKGROUND**

A. **The Debtors' Liability to the Bank and the Bank's Interest in the Debtors' Property**

5. On or about November 1, 2006, the Bank and the Debtors entered into a credit agreement (as amended, the "Credit Agreement").[3] Pursuant to the Credit Agreement, the Bank loaned $33,262,000.00 to the Debtors. As of December 4, 2010 (the "Petition Date"), $10,884,777.65 remains outstanding on account of principal, $111,447.77 on account of interest

---

[2] The Bank will make a separate motion for relief from the automatic stay as a result of the lack of adequate protection afforded with respect to its collateral.

[3] Copies of the Credit Agreement, the Security Agreement and certain related loan documents are annexed hereto as Exhibits B through I. The Leasehold Mortgages and UCC financing and fixture filings are voluminous. Copies of the UCC financing statements that the Bank has filed against the Debtors are attached hereto as Exhibits J through N and examples of a Leasehold Mortgage and a fixture filing are also attached hereto as Exhibits O and P, respectively. A schedule of all the Leasehold Mortgages and UCC Financing and fixture filings is annexed hereto as Exhibit Q and copies of these documents are available upon request.

and $6,685.47 on account of fees and expenses.[4] In addition, the Debtors are liable to the Bank on account of swap exposure in the amount of $704,400 as of December 3, 2010.

6. The Debtors also executed a security agreement (as amended, the "Security Agreement"), pursuant to which the Debtors granted the Bank a security interest in, among other things, all of the Debtors' inventory, accounts, equipment and supplies, licenses, contracts and leases, general intangibles, deposit accounts, negotiable collateral, furniture and fixtures, investment property, cash and miscellaneous items (including, all other property and assets of whatever type or description not included above). In addition, the Debtors executed leasehold mortgages with respect to all or substantially all of their leased locations (all of the collateral described in the Security Agreement and the Leasehold Mortgages is referred to hereafter as the "Collateral"). In addition, the Security Agreement granted to the Bank a security interest in all proceeds and products (collectively, "Proceeds") of any of the Collateral.

7. The Bank perfected its security interest in the Collateral and the Proceeds by duly recording the Leasehold Mortgages and by filing UCC financing and fixture filings in the appropriate jurisdictions. While the Bank did not obtain deposit account control agreements, and the Debtors do not have funds on deposit with the Bank, the Debtors granted to the Bank a security interest in all of the assets that the Debtors use to generate revenues from their stores.

B. **The Debtors' Negative Performance**

8. The Debtors have suffered declining revenues and same store sales for the last two years, and their limited license arrangement with Burger King ends on December 31, 2010. To the extent that the license arrangement is not extended, any incremental value conferred upon

---

[4] Of the amount outstanding, (i) Duke and King Acquisition Corp. is liable for principal in the amount of $9,247,143.89, interest in the amount of $110,285.81 and fees and expenses in the amount of $6,413.28, and (ii) Duke and King Real Estate, LLC is liable for principal in the amount of $1,637,633.76, interest in the amount of $1,161.96 and fees and expenses in the amount of $272.19.

the stores by selling them as Burger King franchises will be lost. Even if the license arrangement is extended, however, the Debtors have substantial outstanding capital expenditure obligations of approximately $7-8 million pursuant to agreements with Burger King ("CapEx Liability"). Indeed, the Debtors admit that CapEx Liability has been a consistent drain on their performance. *See* Motion, ¶ 16. For example, store number 06609 has a CapEx Liability of $318,000.00, and the aggregate CapEx Liability for the Loser Stores is over $2 million. *See* Exhibit A. The Debtors' failure to cover the CapEx Liability, in essence, shifts it to the Bank because any purchaser that wishes to operate a store as a Burger King will have to cure the Debtors' default in failing to perform the required capital improvements. Since the Debtors have no other funds with which to cover those liabilities, they will necessarily result in a reduction to the purchase price and, therefore, a lower recovery for the Bank.

9. Similarly, the Bank understands that the Debtors have already accrued royalty and advertising obligations to Burger King of approximately $2 million. In addition, Burger King has only agreed to defer—i.e., not waive—the royalty and advertising obligations owed by the Debtors under its agreements during the sale process. The effect of this deferral is to shift the burden of those general unsecured obligations, which according to the Debtors total approximately $665,000 per month, to the Bank as well, because they will also have to be paid in order to assign the Burger King-branded operations. Assuming that the Debtors' sale process extends for 90 to 120 days, the aggregate obligations owed to Burger King to cure these franchise agreement defaults would range from $3,995,000 to $4,660,000.

10. Moreover, if the Loser Stores and the Good Stores are included in a marketing and sale process together, which the Bank understands is the Debtors' strategy, such a sale process will yield substantially less for these estates than if the Loser Stores are closed and only

the Good Stores are sold, because any bid on the Loser Stores will necessarily drag down the purchase price. In other words, the Debtors are attempting to force potential buyers to take on the Loser Stores in order to purchase the Good Stores, which will inevitably cause the potential buyers to lower their bids. Such destruction in value will undoubtedly diminish the Bank's recovery while delivering a windfall to Burger King and the Debtors' insiders.

11. The Bank agrees that the Debtors have no practical alternatives other than to proceed, as quickly as possible, with a sale of their assets. The Bank firmly believes, however, that the Debtors' insistence on shifting the burdens of its Burger King-related obligations to other creditors and its continued operation of the Loser Stores will do material damage to—and may eliminate entirely—creditor recoveries. As such, the Bank objects to the Debtors' motion for authority to use cash collateral and intends to seek an order granting relief from the automatic stay with respect to its Collateral.

## II. ARGUMENT

### A. The Bank is Entitled to Adequate Protection of its Interest in the Collateral

12. Bankruptcy Code section 363(e) provides, in relevant part:

> [O]n request of an entity that has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as is necessary to provide adequate protection of such interest.

11 U.S.C. § 363(e).

13. Section 363(e) is mandatory, and, if a debtor is not able to adequately protect a third party's interest in property, the debtor is not permitted to use, sell or lease such property. *See Martin v. Commodity Credit Corp.*, 761 F.2d 472 (8th Cir. 1985); *In re Dewey Ranch Hockey, LLC*, 414 B.R. 577 (Bankr. D. Ariz. 2009) (citing 3 Collier on Bankruptcy ¶ 363.05[2],

at p. 363-42 (15th ed. rev. 2007) ("The requirement of adequate protection in Section 363(e) is mandatory. If adequate protection cannot be provided, such sale must be prohibited.").

14. Moreover, the types of adequate protection described in Bankruptcy Code § 361 are not exhaustive. Rather, adequate protection may take a variety of forms so long as it provides the secured creditor with the indubitable equivalent of its interest. *See* 11 U.S.C. § 361(3); *see also* Collier on Bankruptcy P 361.03[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.).

15. Further, where a secured creditor's collateral is consumed by the ongoing operation of the debtor's business or is expected to decline in value during the cases, preservation of the status quo is impossible without taking some action to provide adequate protection. *See* Collier on Bankruptcy P 361.03[5][b] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.). Here, the Collateral will certainly be consumed by the ongoing operation of the Debtors' business. The Debtors intend to spend approximately $7 million between now and the end of the month, including substantial payments on account of pre-petition employee, tax and critical vendor obligations, and they propose to be able to exceed their budget by 15% and carry over 100% of any savings. While the budget shows an increased cash balance, as set forth above, if the deferred royalty and advertising obligations to Burger King were factored in, it would be clear that the Debtors' overall performance during this period is overwhelmingly negative.

16. The Debtors' continued operations, particularly of the Loser Stores, may literally consume 100% of creditor recoveries and, in any event, will undoubtedly result in a diminution in the value of the Collateral. On these facts, the Debtors have no feasible way of providing the Bank with adequate protection from such diminution in value. The Debtors certainly do not have

the wherewithal to make any sizable cash payment pursuant to Bankruptcy Code § 361(1). Nor do the Debtors have any unencumbered assets in which to grant the Bank replacement or additional liens pursuant to Bankruptcy Code § 361(2).

17. The Debtors admit that the Bank has a security interest in all of the Collateral, but deny that it has any interest in cash. The Debtors have offered adequate protection in the form of replacement liens on the same collateral, and they have no ability to offer any other form of adequate protection. The adequate protection offered is inadequate to protect the Bank against the diminution in value resulting from the Debtors' use, however, because, particularly if the Loser Stores are not closed, the Bank is being offered liens on collateral which is already declining in value.[5] The bottom line is that, absent adequate protection, which the Debtors will not or cannot provide, Bankruptcy Code § 363(e) prohibits the continued use of the Bank's Collateral.

### B. The Debtors Have Not Satisfied the Requirements of Bankruptcy Code § 363(c)(2) and May Not Use the Bank's Cash Collateral

18. Bankruptcy Code § 363(c)(2) provides:

> The trustee may not use, sell, or lease cash collateral under paragraph (1) of this subsection unless—
>
> > (A) each entity that has an interest in such cash collateral consents; or
> >
> > (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

---

[5] The Debtors have the burden of proving that the protection of the Bank's interests is adequate. *See* 11 U.S.C. 363(p)(1) ("[T]he trustee has the burden of proof on the issue of adequate protection.").

19. Thus, use of cash collateral is conditioned by § 363(c)(2) on consent from each entity that has an interest in such cash or, absent such consent, approval of the court, which requires adequate protection of third parties' interest in the cash. *See generally* Collier on Bankruptcy P 363.03[4] (Alan N. Resnick & Henry J. Sommer eds., 16th ed.); *In re Goode*, 235 B.R. 584, 588 (Bankr. E.D. Tex. 1999) ("[I]t becomes incumbent upon the Debtor in this case to prove by a preponderance of the evidence, as a prerequisite to its use of [creditor bank's] cash collateral, that the [creditor bank's] interests are adequately protected.")

20. Here, the Debtors cannot satisfy either prong of Bankruptcy Code § 363(c)(2) because the Bank has not consented to the Debtors' use of cash Proceeds and the Bank's interest in cash Proceeds is not being adequately protected.

   a. *The Bank has a Security Interest in Cash Proceeds*

21. Bankruptcy Code § 552(b)(1) provides:

> [I]f the debtor and an entity entered into a security agreement before the commencement of the case and if the security interest created by such security agreement extends to property of the debtor acquired before the commencement of the case and to proceeds, products, offspring, or profits of such property, then such security interest extends to such proceeds, products, offspring, or profits acquired by the estate after the commencement of the case to the extent provided by such security agreement and by applicable nonbankruptcy law, except to any extent that the court, after notice and a hearing and based on the equities of the case, orders otherwise.

11 U.S.C. § 552(b)(1).

22. Paragraph 1(n) of the Security Agreement explicitly grants the Bank a security interest in Proceeds of the Collateral, including proceeds of inventory. To the extent the Debtors sell any of their inventory or other Collateral post-petition, which presumptively they have already been doing, the Bank has a security interest in the proceeds of such sale, including cash

("Cash Proceeds"), pursuant to Paragraph 1(n) of the Security Agreement and under New York law, which governs the Security Agreement.

23. The Bankruptcy Code does not include a definition of the term "proceeds." However, consistent with § 552(b)(1)'s reference to "applicable nonbankruptcy law" numerous courts have held that, in order to determine whether a debtor's postpetition property is a proceed of its prepetition property, bankruptcy courts are required to look to applicable nonbankruptcy law. *Fin. Sec. Assurance, Inc. v. Days California Riverside Ltd. P'ship (In re Days California Ltd. P'ship)*, 27 F.3d 374, 376 (9th Cir. 1994); *Unsecured Creditors Comm. v. Marepcon Fin. Corp. ((n re Bumper Sales, Inc.)*, 907 F.2d 1430, 1437 (4th Cir. 1990) ("[W]e hold that the UCC's definition and treatment of proceeds applies to Section 552 of the Bankruptcy Code. This is consistent with the unstated rule of the many courts that have looked to the UCC in applying Section 552 of the Code.").

24. The New York Uniform Commercial Code (the "NY UCC") defines proceeds to include, among other property: "(A) whatever is acquired upon the sale, lease, license, exchange or other disposition of, collateral; (B) whatever is collected on, or distributed on account of, collateral; (C) rights arising out of collateral." NY UCC § 9-102(64). The NY UCC also provides that, "a security interest attaches to any identifiable proceeds of collateral" and "[a] security interest in proceeds is a perfected security interest if the security interest in the original collateral was perfected." NY UCC § 9-315(a) and (c).

25. When a customer purchases an item of food at one of the Debtors' restaurants, the Debtor "disposes" of the inventory. NY UCC §9-102(64) provides that "whatever" is acquired upon such disposition of collateral constitutes proceeds of the collateral. It is irrelevant whether cash received in exchange for inventory is paid for the collateral or something else, such as

services. The cash receipts were received upon the disposition of the collateral and, therefore, constitute proceeds to which the Bank's inventory lien attaches. *In re Markos Gurnee P'ship*, 252 B.R. 712, 721 n.4 (Bankr. N.D. Ill. 1997) ("the initial proceeds of the debtors' restaurant operation were unquestionably 'proceeds' of the bank's prepetition collateral (such as the food that constituted the restaurant's inventory)").

26. The Debtors have asserted that caselaw in other jurisdictions limits the Bank's entitlement to a security interest in the Cash Proceeds. *See e.g. In re Cafeteria Operators, L.P.*, 299 B.R. 400 (Bankr. N.D. Tex. 2003). These assertions are wrong on myriad grounds, and the Bank reserves it rights to argue at a hearing on full notice and after discovery that *Cafeteria Operators* and its progeny were wrongly decided, are not binding on this Court and are inapplicable here.

27. Even assuming *arguendo* that those cases are good law, however, they would still not prevent the Bank from obtaining a security interest in Cash Proceeds. At most, the rationale of those cases, if applied to the facts here, would limit the extent of the Bank's security interest in Cash Proceeds, as opposed to the validity and priority of such security interest.[6] Importantly, the Court in *Cafeteria Operators* held that the secured lender did, in fact, have a security interest in a portion of the cash generated from the sale of food, holding:

> The Court disagrees with the result reached by the *Inman* court, however, that none of the revenues generated by a restaurant are proceeds of inventory. In this case, the Bank Group has a security interest in the Debtors' food and beverage inventory. The inventory is being disposed of on a daily basis. Thus, under Massachusetts law, that portion of the revenues acquired as a result

---

[6] The Debtors also cite to *In re Inman* for the proposition that restaurant revenues do not constitute proceeds from the sale of inventory. *See* Debtors' Memorandum of Law, 6 (citing *In re Inman*, 95 B.R. 479, 480-81 (Bankr. W.D. Ky. 1988)). *Inman* is wrong substantively and procedurally. In *Inman* the Court did not even consider the Uniform Commercial Code or other applicable nonbankruptcy law. The Court in *Inman* also attempted to determine the validity, priority, or extent of a lien or other interest in property in a contested matter—not an adversary proceeding as required. *Id.*

> of the disposition of the food and beverage inventory constitutes proceeds of such inventory. Under § 363(a), only that portion of the revenues, then, constitutes the Bank Group's cash collateral.

*Id*. at 409.

28. Assuming it is even applicable here, applying the *Cafeteria Operators* analysis to this case, then, leaves the Court with a triable issue regarding the extent to which the purchase price for the hamburgers, fries and the Cokes (or other inventory) flows from the use of the Bank's Collateral. In practical terms, the Debtors cannot, in good faith, argue that the Bank has zero interest in any Proceeds when such Proceeds are obtained as a result of the Debtors selling hamburgers, fries and Coke, all of which are Collateral under the Security Agreement.

29. Thus, when the Debtors sell their inventory in exchange for cash, Cash Proceeds are generated in which the Bank has a security interest, and the Debtors have not obtained consent from the Bank for the use of such Proceeds. The Debtors cannot, therefore, rely on § 363(c)(2)(a) for the relief sought in the Motion.

    b.    *<u>The Debtors Have Not Established that the Bank's Interest in Cash Proceeds is Adequately Protected</u>*

30. As set forth above, the Bank does have an interest in the Debtors' cash collateral, which should be afforded adequate protection, and, since the Debtors do not recognize that interest, they are unwilling to provide adequate protection. Rather, they assert that the Bank is adequately protected by replacement liens on inventory and other assets which, as set forth above, are declining in value and, therefore, cannot adequately protect the Debtors.

31. Further, the Debtors' own budget illustrates that the Bank is not adequately protected. The budget indicates that the Debtors expect wild swings in their cash position over the coming weeks and months. For example, by the middle of January 2011, the Debtors' cash position will have decreased from the Petition Date by over 50%. Any unforeseen increase in

administrative expenses or operating expense could completely deplete the Debtors' cash position and, as a result, entirely wipe out the value of the Bank's interest in Cash Proceeds.

32. Moreover, the continued operation of the Loser Stores renders the Debtors' offer of replacement liens on inventory as adequate protection for the Bank's interest all the more tenuous and speculative. As set forth above, the Loser Stores will do nothing more than increase the administrative burden on these estates and drag down the purchase price of the sale of the Good Stores to the material detriment of the Bank and other creditors.

33. Where the value of a secured creditor's collateral is being consumed by the debtors' business and/or declining in value, the Debtors cannot simply rely on their ability to maintain the status quo. Rather, tangible, and not speculative, adequate protection must be provided. In the absence of an ability to provide adequate protection, relief from the automatic stay should be granted. As such, the Bank respectfully submits that the Debtors should not be permitted to use cash collateral where the demonstrable result will be a complete dissipation of collateral. The Motion should be denied.

### C. The Debtors' Proposed Form of Order is Flawed

34. To the extent that this Court determines to grant the Motion on an interim basis, the Court should, at a minimum, rectify the flawed provisions contained in the Debtors' proposed form of order. For example, the Debtors propose to subordinate the replacement liens offered as adequate protection to the payment of professional fees and expenses. In order to adequately protect the Bank (and the Bank contends that the offered replacement liens will not adequately protect it), replacement liens must be on collateral sufficient to secure the Bank against diminution in value of its collateral and it is wholly inappropriate for them to be subordinated to professional fees and expenses.

35. In addition, the Motion and the proposed order are fundamentally unclear and misleading with respect to the adequate protection offered to the Bank. The Bank is entitled to adequate protection of its interest in all of the Collateral, a fact that is acknowledged by the Debtors in certain places, but not others.

## CONCLUSION

WHEREFORE, Bank of America, N.A., respectfully requests this Court (i) deny the Motion, and (ii) for such other relief as the Court deems just and proper.

FAEGRE & BENSON

Dated December 7, 2010

   /e/ Stephen M. Mertz
Michael R. Stewart (#122397)
Stephen M. Mertz (#212131)
Michael F. Doty (#0388303)
Christopher J. Harayda (#0390333)
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
Telephone: (612) 766-7000
Facsimile: (612) 766-1600

-and-

MORGAN LEWIS & BOCKIUS, LLP
Jonathan K. Bernstein
225 Franklin Street, 16th Floor
Boston, MA 02110-4104
Phone: (617) 341-7760
Fax: (617) 341-7701

*Attorneys for Bank of America, N.A.*

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Duke and King Acquisition Corp.<br><br>Debtor. | Case No. 10-38652<br>Chapter 11 |
| Duke and King Missouri, LLC<br><br>Debtor. | Case No. 10-38653<br>Chapter 11 |
| Duke and King Missouri Holdings, Inc.<br><br>Debtor. | Case No. 10-38654<br>Chapter 11 |
| Duke and King Real Estate, LLC<br><br>Debtor. | Case No. 10-38655<br>Chapter 11 |
| DK Florida Holdings, Inc.<br><br>Debtor. | Case No. 10-38656<br>Chapter 11 |

## VERIFICATION

    I, Anthony D. Healey, Senior Vice President for Bank of America, N.A., declare under penalty of perjury that the facts set forth in paragraphs __5-7__ of the Objection of Bank of America, N.A. to Debtors' Motion (A) Authorizing Debtors' Use of Unencumbered Cash, or, in the Alternative, Cash Collateral, and (B) Granting Adequate Protection, are true and correct according to the best of my knowledge, information, and belief.

Dated: December 6, 2010

_____
Anthony D. Healey

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

In re:

| | |
|---|---|
| Duke and King Acquisition Corp. | Case No. 10-38652 |
| Debtor. | Chapter 11 |
| Duke and King Missouri, LLC | Case No. 10-38653 |
| Debtor. | Chapter 11 |
| Duke and King Missouri Holdings, Inc. | Case No. 10-38654 |
| Debtor. | Chapter 11 |
| Duke and King Real Estate, LLC | Case No. 10-38655 |
| Debtor. | Chapter 11 |
| DK Florida Holdings, Inc. | Case No. 10-38656 |
| Debtor. | Chapter 11 |

## VERIFICATION

I, Salvatore LoBiondo, Senior Managing Director for Marotta Gund Budd & Dzera, LLC, declare under penalty of perjury that the facts set forth in paragraphs 3, 8-10 of the Objection of Bank of America, N.A. to Debtors' Motion (A) Authorizing Debtors' Use of Unencumbered Cash, or, in the Alternative, Cash Collateral, and (B) Granting Adequate Protection, are true and correct according to the best of my knowledge, information, and belief.

Dated: December 6, 2010

_____
Salvatore LoBiondo, Jr.

**UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA**

In re:

| | |
|---|---|
| Duke and King Acquisition Corp. | Case No. 10-38652 (GFK) |
| Debtor. | Chapter 11 |
| Duke and King Missouri, LLC | Case No. 10-38653 (GFK) |
| Debtor. | Chapter 11 |
| Duke and King Missouri Holdings, Inc. | Case No. 10-38654 (GFK) |
| Debtor. | Chapter 11 |
| Duke and King Real Estate, LLC | Case No. 10-38655 (GFK) |
| Debtor. | Chapter 11 |
| DK Florida Holdings, Inc. | Case No. 10-38656 (GFK) |
| Debtor. | Chapter 11 |

**CERTIFICATE OF SERVICE**

Jessica Anderson of the City of Minneapolis, County of Hennepin, State of Minnesota, under penalty of perjury, states that on December 7, 2010, she served the Objection of Bank of America, N.A. to Debtors' Motion (A) Authorizing Debtors' Use of Unencumbered Cash, or in the Alternative, Cash Collateral and (B) Granting Adequate Protection on the parties who requested electronic service in these cases by Notice of Electronic Filing via ECF with the Bankruptcy Court in the District of Minnesota.

Dated: December 7, 2010         */s/* Jessica Anderson
                                Jessica Anderson