# Exhibit A

# CREDIT AGREEMENT

## DATED AS OF November 1, 2006

## BY AND AMONG

## DUKE AND KING ACQUISITION CORP., and

## DUKE AND KING FLORIDA, LLC
### collectively, as Borrower,

## AND

## THE LENDERS WHICH ARE PARTY HERETO

## AND

## BANK OF AMERICA, N.A.
### as Administrative Agent

CREDIT AGREEMENT ......................................................................................... 1
ARTICLE I. DEFINITIONS ................................................................................... 1
ARTICLE II. THE ADVANCES ........................................................................... 15
2.1      15
2.2      Election by Borrower .................................................................................... 21
2.3      Increased Costs; Capital Adequacy ............................................................. 22
2.4      Liquidation Fee ............................................................................................ 24
2.5      Basis for Determining LIBOR Rate Inadequate or Unfair .......................... 25
2.6      Payments  25
2.7      Setoff; etc ..................................................................................................... 26
2.8      Sharing   26
2.9      Other Fees .................................................................................................... 26
2.10     Lending Branch ............................................................................................ 27
2.11     Application of Payments and Collections ..................................................... 27
2.12     Credit Support .............................................................................................. 28
ARTICLE III. CONDITIONS PRECEDENT ........................................................ 28
3.1      Conditions Precedent to Effectiveness ......................................................... 28
3.2      CONDITIONS PRECEDENT TO ALL ADVANCES \F C \L .......................... 32
ARTICLE IV. REPRESENTATIONS AND WARRANTIES ................................ 33
4.1      Organization; etc .......................................................................................... 33
4.2      Due Authorization ........................................................................................ 33
4.3      Subsidiaries .................................................................................................. 33
4.4      Validity of the Agreement ............................................................................ 34
4.5      Financial Statements .................................................................................... 34
4.6      Business  34
4.7      Litigation; etc ............................................................................................... 34
4.8      Compliance with Law ................................................................................... 34
4.9      ERISA Compliance ....................................................................................... 34
4.10     Title to Assets ............................................................................................... 35
4.11     Indebtedness and Liabilities ......................................................................... 35
4.12     No Investments ............................................................................................. 35
4.13     Use of Proceeds ............................................................................................ 35
4.14     Governmental Regulation ............................................................................. 35
4.15     Margin Stock ................................................................................................ 35
4.16     Investment Company Act .............................................................................. 36
4.17     Unregistered Securities ................................................................................. 36
4.18     Accuracy of Information ............................................................................... 36
4.19     Tax Returns; Audits ...................................................................................... 36
4.20     Environmental and Safety Regulations ......................................................... 36
4.21     Payment of Wages ........................................................................................ 37
4.22     Intellectual Property ..................................................................................... 37
4.23     Projections .................................................................................................... 37
4.24     Solvency 37
4.25     No Default ..................................................................................................... 37
4.26     No Material Adverse Occurrence .................................................................. 38

TABLE OF CONTENTS

4.27    Material Contracts ................................................................................. 38
4.28    Leasehold Mortgages and Lease Units ................................................... 38
ARTICLE V. CERTAIN AFFIRMATIVE COVENANTS ............................................. 38
5.1    Financial Information; etc ..................................................................... 38
5.2    Maintenance of Existence; etc ............................................................... 40
5.3    Maintenance of Properties, Material Contracts and Management
        Agreement 40
5.4    Payment of Taxes; etc ........................................................................... 40
5.5    Compliance with Laws ......................................................................... 40
5.6    Books and Records; etc ......................................................................... 41
5.7    Insurance    41
5.8    Maintain Business and Fiscal Year End ............................................... 41
5.9    ERISA    41
5.10    Changes to GAAP ............................................................................... 42
5.11    Use of Proceeds ................................................................................... 42
5.12    Security Documents ............................................................................. 42
5.13    Payment of Indebtedness; Loans ......................................................... 43
5.15    Survival of Warranties and Representations ......................................... 43
ARTICLE VI. CERTAIN FINANCIAL COVENANTS AND NEGATIVE
                        COVENANTS ...................................................................... 43
6.1    Fixed Coverage Ratio ........................................................................... 43
6.2    Leverage Ratio ..................................................................................... 43
6.3    Limitations on Indebtedness ................................................................. 44
6.4    Liens    45
6.5    Sales of Assets ..................................................................................... 46
6.6    Liquidations, Mergers and Consolidations ........................................... 46
6.7    Investments ........................................................................................... 46
6.8    Transactions with Affiliates ................................................................. 46
6.9    Acquisitions ......................................................................................... 46
6.10    Amendment and Waiver ....................................................................... 46
6.11    Limitation on Guaranties ..................................................................... 46
6.12    Limitation on Distributions ................................................................. 47
6.13    ERISA Liabilities ................................................................................. 47
ARTICLE VII. EVENTS OF DEFAULT ................................................................. 47
7.1    Events of Default ................................................................................. 47
7.2    Action If Event of Default ................................................................... 49
7.3    Remedies    49
ARTICLE VIII. THE ADMINISTRATIVE AGENT ................................................... 50
8.1    Appointment and Authorization ........................................................... 50
8.2    Power    50
8.3    Interest Holders ................................................................................... 51
8.4    Employment of Counsel; etc ................................................................. 51
8.5    Reliance    51
8.6    General Immunity ................................................................................. 51

## TABLE OF CONTENTS

| | | |
|---|---|---|
| 8.7 | Credit Analysis | 52 |
| 8.8 | Administrative Agent and Affiliates | 52 |
| 8.9 | Indemnification | 53 |
| 8.10 | Security Documents | 53 |
| 8.11 | Collateral Matters | 53 |
| 8.12 | Action by the Administrative Agent | 54 |
| 8.13 | Successor Administrative Agent | 55 |
| 8.14 | Administrative Agent's Fees | 55 |
| 8.15 | Legal Representation of Agent | 56 |
| ARTICLE IX. MISCELLANEOUS | | 56 |
| 9.1 | Waivers, Amendments; etc | 56 |
| 9.2 | Payment Dates | 56 |
| 9.3 | Notices | 56 |
| 9.4 | Costs and Expenses | 57 |
| 9.5 | Indemnification | 57 |
| 9.6 | Severability | 58 |
| 9.7 | Headings | 58 |
| 9.8 | Governing Law | 58 |
| 9.9 | Successors and Assigns | 58 |
| 9.10 | Execution in Counterparts | 60 |
| 9.11 | Joint and Several Liability | 60 |
| 9.12 | Financial Information | 60 |
| 9.13 | Entire Agreement | 60 |
| 9.14 | Other Relationships | 60 |
| 9.15 | Directly or Indirectly | 61 |
| 9.16 | Consent to Jurisdiction | 61 |
| 9.17 | Waiver of Jury Trial | 61 |
| 9.18 | Arbitration | 61 |

# TABLE OF CONTENTS

| | |
|---|---|
| SCHEDULE I | Commitments |
| SCHEDULE 2.1(h) | Florida Units |
| SCHEDULE 3.1(b)(1) | Fee and Ground Lease Units |
| SCHEDULE 3.1(b)(2) | Leased Units |
| SCHEDULE 3.1(b)(3) | Sites Without Landlord Consent |
| SCHEDULE 4.1 | List of Jurisdictions in which the Borrower is Qualified to Do Business |
| SCHEDULE 4.3 | List of Subsidiaries; Jurisdictions of Incorporation and Qualification to do Business |
| SCHEDULE 4.28(b) | Leased Units with expiration date prior to Maturity Date |
| SCHEDULE 5.3 | Franchise Agreements to be Extended |
| SCHEDULE 6.5 | Liens |
| SCHEDULE 6.12 | Guarantees |
| | |
| EXHIBIT A | Form of Term Note |
| EXHIBIT B | Form of Acquisition Note |
| EXHIBIT C | Notice of Borrowing |
| EXHIBIT D | Form of Assignment Agreement |
| EXHIBIT E | Compliance Certificate |

## CREDIT AGREEMENT

This Credit Agreement dated as of the 1st day of November, 2006 by and among DUKE AND KING ACQUISITION CORP., a Delaware corporation and DUKE AND KING FLORIDA, LLC, a Delaware limited liability company (collectively, the "Borrower"), the lenders now or hereafter parties hereto (the "Lenders"), and Bank of America, N.A., a national banking association, in its capacity as Administrative Agent for the Lenders (in its capacity as such, and together with any successor administrative agent hereunder, the "Administrative Agent").

**WHEREAS**, the Borrower has requested and the Lenders have agreed to provide, subject to the terms and conditions hereof, certain extensions of credit.

**NOW, THEREFORE**, in consideration of the terms and conditions contained herein, and of any loans or extensions of credit heretofore, now or hereafter made to or for the benefit of the Borrower by the Lenders and the Administrative Agent, the parties hereto agree as follows:

## ARTICLE I.
## DEFINITIONS

The following terms when used in this Agreement shall, except where the context otherwise requires, have the following meanings:

"Acquisition" means (whether by purchase, exchange, issuance of stock, debt or other securities, merger, reorganization, joint venture or otherwise) any transaction, or any series of related transactions by which the Borrower directly or indirectly (i) acquires any Person, which Person shall then become consolidated with the Borrower in accordance with GAAP, or (ii) acquires all or substantially all of the assets of any Person or division thereof, or assets having a value in excess of $1,000,000.

"Acquisition Loan(s)" an Advance or Advances made for the purpose of financing the acquisition of Units subsequent to the Closing Date.

"Acquisition Loan Commitment" shall mean the original principal amount of up to $7,500,000.

"Adjusted LIBOR Rate" shall mean a rate per annum determined pursuant to the following formula:

$$\text{Adjusted LIBOR Rate} = \frac{\text{LIBOR Rate}}{1 - \text{Reserve Requirement}}$$

"Administrative Agent" shall mean Bank of America, N.A., as Administrative Agent for the Lenders, or any successor Administrative Agent hereunder.

"Advance" shall mean one or more advances under the Term Loan or the Acquisition Loan.

"<u>Affiliate</u>" shall include, with respect to any Person, any Person which directly or indirectly controls, is controlled by, or is under common control with such Person. For purposes of this definition, a Person shall be deemed to control another Person if the controlling Person owns or controls directly or indirectly fifty percent (50%) or more of the shares of stock, other equity interests or voting powers of the controlled Person.

"<u>Agreement</u>" shall mean this Credit Agreement as originally executed and as amended, modified or supplemented from time to time.

"<u>Agreement Date</u>" shall mean November 1, 2006.

"<u>Applicable Margin</u>" shall mean the interest rate margin applicable to Advances hereunder as determined in accordance with <u>Section 2.1(g)</u>.

"<u>Asset Purchase Agreement</u>" shall mean the Asset Purchase Agreement dated October 10, 2005 between Borrower, Nath Minnesota Franchise Group, Inc., Nath Illinois Franchise Group, Inc., Nath Florida Franchise Group, Inc., Nath Miami Franchise Group, Inc., Nath Minnesota Operating Group, LLC, and Nath Illinois Operating Group, LLC, as amended.

"<u>Availability Period</u>" shall mean the period from the Agreement Date to the Termination Date.

"<u>Base Rate</u>" shall mean the Prime Rate.

"<u>Borrower</u>" shall mean Duke and King Acquisition Corp., a Delaware corporation ("<u>Acquisition Corp.</u>") and Duke and King Florida, LLC, a Delaware limited liability company ("<u>FL LLC</u>"), jointly and severally.

"<u>Business Day</u>" shall mean any day on which commercial banks and foreign exchange markets are open for business in New York, New York and Atlanta, Georgia and, if such day relates to an event, a transaction or a notice in respect of a LIBOR Rate Loan, a day which is also a day on which dealings in U.S. Dollar deposits are carried out in the London interbank market.

"<u>Capital Lease</u>" shall mean, with respect to any Person, a lease of (or other agreement conveying the right to use) real and/or personal property, which obligation is, or in accordance with GAAP (including Statement of Financial Accounting Standards No. 13 of the Financial Accounting Standards Board) is required to be, classified and accounted for as a capital lease on a balance sheet of such Person.

"<u>Capital Lease Obligations</u>" shall mean, with respect to any Person, any obligation of such Person to pay rent or other amounts under a Capital Lease and for purposes of this Agreement the amount of each Capital Lease Obligation shall be the capitalized amount thereof determined in accordance with GAAP.

"<u>Cash Flow</u>" of any Person shall mean, for any period for which the amount thereof is to be determined, Net Income of such Person for such period, <u>plus</u> (to the extent deducted in determining Net Income and without duplication to adjustments to net income of such Person (determined in accordance with GAAP) made in the determination of Net Income) (i) provisions

2

for any Federal, state or local taxes during such period, (ii) interest expense of such Person during such period and (iii) depreciation and amortization of such Person during such period, and (iv) other non-cash income or expenses of such Person during such period.

"Change of Control" shall mean (i) the ownership, through purchase or otherwise (including the written agreement to act in concert without anything more), by any Person or group of Persons acting in concert, directly or indirectly, in one or more transactions, of (A) beneficial ownership or control of more than 50% of the shares in Acquisition Corp. or the membership interest in FL LLC or (B) all or substantially all of the assets of the Borrower, or (ii) Duke & King Holdings, LLC or its Affiliates shall cease for any reason to own and control at least 51% of the voting power of the Borrower. For purposes of this definition, the terms "Person" and "group" shall include the meanings for such terms as used for purposes of Sections 13(d) and 14(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), whether or not applicable, and "beneficial ownership" shall include the meaning of "beneficial owner" as that term is used in Rules 13d-3 and 13d-5 under the Exchange Act, whether or not applicable, and a Person shall be deemed to have "beneficial ownership" of all shares that such Person has the right to acquire (whether such right is exercisable immediately or with the passage of time or the occurrence of a contingency). Sale of the Florida Units (hereinafter defined) by FL LLC in accordance with the provisions of Section 2.1(h)(3) of this Agreement shall not be deemed a Change of Control.

"Closing Date" shall mean November 1, 2006.

"Code" shall mean the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" shall mean all present and future assets and properties of the Borrower, whether real or personal, tangible or intangible, in which Liens are granted or purported to be granted pursuant to the Security Documents; provided, that "Collateral" shall not include more than 65% of any class of stock of any Subsidiary organized outside of the United States.

"Collateral Assignment of Lease" shall mean a collateral assignment of Borrower's interest, as tenant, in leased Units, in form and substance reasonably acceptable to the Administrative Agent, executed by the Borrower and delivered to the Administrative Agent for the benefit of the Lenders as Collateral for the Obligations.

"Commitment" shall mean, for each Lender, the aggregate amount of such Lender's Credit Commitment as set forth on **Schedule I**; provided, however, that the aggregate Commitments of all Lenders shall not exceed $23,500,000.

"Commitment Ratios" shall mean the percentages of the Advances which each Lender is severally bound from time to time to make in accordance with the terms of this Agreement (giving effect to assignments permitted hereby in accordance with the terms hereof), which percentages (together with the Dollar amounts) for each Lender for its Commitments as of the Agreement Date are as set forth on **Schedule I** and thereafter will be as set forth in the Register.

"Compliance Certificate" a certificate in substantially the form set forth as **Exhibit E**, completed so as to be acceptable to the Administrative Agent signed on behalf of the Borrower by the chief financial officer of the Borrower (1) stating that no Default or Event of Default has

occurred and is continuing, or if a Default or an Event of Default has occurred and is continuing, a statement of the nature thereof and the action which the Borrower proposes to take with respect thereto, and (2) setting forth, in sufficient detail, the information and computations required to establish that the Borrower is in compliance with the requirements of <u>Article 6</u>, during the periods covered by the financial reports then being furnished and as of the end of such periods.

"<u>Consent and Agreement</u>" shall mean any consent and agreement entered into by the Manager in favor of the Administrative Agent for the benefit of the Lenders, as it may be amended, modified, restated or replaced from time to time

"<u>Credit Commitment</u>" shall mean for each Lender the amount appearing opposite such Lender's name under the heading "Credit Commitments" in **Schedule I**, as such amount may be modified from time to time pursuant to the terms hereof.

"<u>Credit Loan</u>" shall mean, individually or collectively, an Effective Fixed Rate Loan or a LIBOR Rate Loan.

"<u>Default</u>" shall mean any event which, regardless of whether there shall have occurred any giving of notice or lapse of time, or both, would be necessary to constitute an Event of Default.

"<u>Default Rate</u>" shall mean a simple interest rate per annum equal to the sum of the otherwise applicable interest rate plus two percent (2%). With respect to amounts (other than principal) bearing interest at the Default Rate, for purposes of the foregoing sentence, the words "otherwise applicable interest rate" shall be deemed to mean the Prime Rate plus the Applicable Margin with respect to Effective Fixed Rate Loans.

"<u>Dollars</u>" or "<u>$</u>" shall mean the basic unit of the lawful currency of the United States of America.

"<u>EBITDA</u>" of Borrower and its consolidated Subsidiaries shall mean, for any period for which the amount thereof is to be determined, Net Income of Borrower and its consolidated Subsidiaries for such period, <u>plus</u> (to the extent deducted in determining Net Income and without duplication to adjustments to net income of Borrower and its consolidated Subsidiaries (determined in accordance with GAAP) made in the determination of Net Income) the sum of (i) Federal, state or local income tax of Borrower and its consolidated Subsidiaries during such period, (ii) Interest Expense of Borrower and its consolidated Subsidiaries during such period, (iii) depreciation and amortization expense of Borrower and its consolidated Subsidiaries during such period, plus non-recurring expenses, plus fees and expenses incurred in connection with the transactions contemplated by this Agreement, plus the cumulative effect of any change in accounting principles, plus non-cash charges and non-cash expenses plus one-time costs, fees and expenses related to future acquisitions and "asset sales".

"<u>Effective Fixed Rate</u>" shall mean the interest rate per annum equal to the Effective Fixed Rate Index plus the Applicable Margin.

"Effective Fixed Rate Index" shall mean the fixed rate index determined by Bank of America-CRT, Derivative Products Group, as of the date Borrower exercises the option to fix rate by executing a Swap Agreement.

"Effective Fixed Rate Loan" shall mean any Advance designated as an Effective Fixed Rate Loan pursuant to Section 2.2.

"Environmental Laws" shall mean all federal, state and local environmental, pollution control, and worker health and safety statutes, laws, regulations, orders, decrees, rules and ordinances, including, without limitation, all those pertaining to air and water quality, hazardous waste, waste disposal and other environmental matters (including, but not limited to, the Clean Water Act, the Clean Air Act, the Federal Water Pollution Control Act, the Solid Waste Disposal Act, the Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation, and Liability Act, as said acts may be amended).

"Equipment" shall mean all equipment, furniture and fixtures held or maintained at any Unit or otherwise used in the ownership or operation of the Units (including, without limitation, food preparation equipment, decorations, seating, signage, furniture, and other machinery and office equipment), together with all additions and accessions thereto and replacements therefore, and specifically pledged as security for the Obligations under any of the Security Documents.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, and any successor statute of similar import, together with the regulations thereunder, in each case as in effect from time to time. References to sections of ERISA shall be construed to also refer to any successor sections.

"ERISA Affiliate" shall mean any Person, including Affiliates or Subsidiaries of the Borrower, that is a member of any group of organizations or a controlled group of trades or businesses, as described in Sections 414(b), 414(c), 414(m) or 414(o) of the Code or Section 4001 of ERISA, of which the Borrower is a member.

"Event of Default" shall mean any Event of Default described in Article VII.

"Excess Cash Flow" shall be defined as Net Income plus depreciation and amortization minus the sum of scheduled principal payments of long term debt, distributions and cash capital expenditures.

"Floating Rate" shall mean the interest rate per annum equal to the 30-day Adjusted LIBOR Rate, plus the Applicable Margin, which Floating Rate shall be fixed for each such Interest Period.

"Florida Units" shall have the meaning set forth in Section 2.1(h)(3).

"Franchise Agreement" shall mean the franchise agreement between Franchisor and Borrower with respect to a Unit.

"Franchisor" shall mean Burger King International Corporation, the franchisor under the applicable Franchise Agreement or its successors or assigns under the Franchise Agreement.

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

"Funded Debt" of any Person shall mean all Indebtedness owed or guaranteed by such Person which by its terms matures more than one year from the date of creation or which is renewable at the option of the obligor for more than one year from such date whether or not theretofore renewed.

"GAAP" shall mean generally accepted accounting principles in the United States consistently applied.

"Guarantee(s)" shall mean all direct and indirect guarantees, sales with recourse, endorsements (other than for collection or deposit in the ordinary course of business) and other obligations (contingent or otherwise) by any Person to pay, purchase, repurchase or otherwise acquire or become liable upon or in respect of any Indebtedness of any other Person, and, without limiting the generality of the foregoing, all obligations (contingent or otherwise) by any Person to purchase products, supplies or other property or services for any Person under agreements requiring payment therefor regardless of the non-delivery or non-furnishing thereof, or to make investments in any other Person, or to maintain the capital, working capital, solvency or general financial conditions of any other Person, or to indemnify any other Person against and hold him harmless from damages, losses and liabilities, all under circumstances intended to enable such other Person or Persons to discharge any Indebtedness or to comply with agreements relating to such Indebtedness or otherwise to assure or protect creditors against loss in respect of such Indebtedness. The amount of any Guarantee shall be deemed to be the amount of the Indebtedness of, or damages, losses or liabilities of, the other Person or Persons in connection with which the Guarantee is made or to which it is related unless the obligations under the Guarantee are limited to a determinable amount, in which case the amount of such Guarantee shall be deemed to be such determinable amount.

"Guarantor" shall mean Kinderhook Capital Fund I, L.P., a Delaware limited partnership.

"Guaranty" shall mean that certain guaranty agreement of even date by Guarantor to and in favor of Lender(s).

"Improvements" shall mean the buildings, and other facilities, amenities and improvements comprising a Unit.

"Indebtedness" of any Person shall mean and include, as of any date as of which the amount thereof is to be determined, and without duplication, (i) all obligations of such Person for borrowed money or which has been incurred in connection with the acquisition of Property or which is represented or evidenced by notes, drafts, bonds, debentures or other similar instruments; (ii) all Guarantees of such Person; (iii) all indebtedness, liabilities and other obligations secured by any Lien on or in respect of Property of such Person, whether or not such liability has been assumed by such Person for the payment of such obligations; (iv) all indebtedness, liabilities and other obligations of such Person arising under any conditional sale or other title retention agreement, (v) the face amount of all undrawn letters of credit and bankers acceptances issued for the account of such Person; (vi) all net obligations of such Person in respect of Rate Hedging Obligations to the extent required to be reflected on such Persons

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

balance sheet and (vii) Capital Lease Obligations (other than leases of Real Property) of such Person; and (viii) all obligations upon which interest charges are customarily paid to the extent required to be classified as debt under GAAP. Indebtedness shall exclude trade payables and accrued obligations incurred in the ordinary course of business of such Person.

"Interest Expense" shall mean, for any period for which the amount thereof is to be determined, the consolidated interest expense of the Borrower, including all interest on Indebtedness (including imputed interest related to Capital Leases), all amortization of debt discount and expense and Rate Hedging Obligations of the Borrower, to the extent required to be reflected on the income statement of the Borrower on a consolidated basis in accordance with GAAP.

"Interest Period" shall mean with respect to any LIBOR Rate Loan, the period commencing on the date the relevant Advance is made and ending on the date which is which is one (1) month thereafter. For purposes of determining an Interest Period, a month means a period starting on one day in a calendar month and ending on a numerically corresponding date in the next calendar month. Notwithstanding the foregoing, however, (i) any applicable Interest Period which would otherwise end on a day which is not a Business Day shall be extended to the next succeeding Business Day unless such Business Day falls in another calendar month, in which case such Interest Period shall end on the next preceding Business Day, (ii) any applicable Interest Period which begins on a day for which there is no numerically corresponding day in the calendar month during which such Interest Period is to end shall (subject to clause (i) above) end on the last day of such calendar month, and (iii) no Interest Period shall extend beyond the Maturity Date, or such earlier date as would interfere with the Borrower's repayment obligations hereunder.

"Investment" shall mean, with respect to any Person, any loan, advance or extension of credit (other than to customers in the ordinary course of business) by such Person to, or any Guarantee or other contingent liability with respect to the capital stock, Indebtedness or other obligations of, or any contributions to the capital of, any other Person, or any ownership, purchase or other acquisition by such Person of any interest in any capital stock, limited partnership interest, general partnership interest, or other securities of any such other Person, other than an Acquisition; and "Invest," "Investing" or "Invested" shall mean the making of an Investment. "Investment" shall also include the maximum possible total cost of any future commitment or other obligation binding on any Person to make an Investment or any subsequent Investment.

"Kinderhook" means Kinderhook Industries, LLC.

"Lease(s)" shall mean a lease or leases (excluding Capital Leases) of Property to which Borrower is a party as lessee having an unexpired term (including any periods of renewal or extension which may be exercised at the option of the lessor or lessee) in excess of one year and any modification, renewal or replacement therefore.

"Leasehold Mortgages" shall mean the leasehold mortgages and deeds of trust, in form and substance reasonably acceptable to the Administrative Agent, executed and delivered by the

Borrower in favor of the Administrative Agent for the benefit of the Lenders, as the same may be amended, supplemented or otherwise modified from time to time.

"Lenders" shall mean the financial institutions whose names appear as "Lenders" on the signature pages hereof and any other Person which becomes a "Lender" hereunder after the Agreement Date or any assignee or successor thereto, and "Lender" shall mean any one of the foregoing Lenders.

"LIBOR Rate Loan" shall mean an Advance designated as a LIBOR Rate Loan pursuant to Section 2.2.

"LIBOR Rate" shall mean, for any applicable Interest Period with respect to a LIBOR Rate Loan, the rate per annum equal to the British Bankers Association LIBOR Rate ("BBA LIBOR"), as published by Reuters (or other commercially available source providing quotations of BBA LIBOR as designated by the Administrative Agent from time to time) at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period, for Dollar deposits (for delivery on the first day of such Interest Period) with a term equivalent to such Interest Period. If such rate is not available at such time for any reason, then the "LIBOR Rate" for such Interest Period shall be the rate per annum determined by the Administrative Agent to be the rate at which deposits in Dollars for delivery on the first day of such Interest Period in same day funds in the approximate amount of the LIBOR Rate Loan being made, continued or converted by Bank of America and with a term equivalent to such Interest Period would be offered by Bank of America's London Branch to major banks in the London interbank eurodollar market at their request at approximately 11:00 a.m. (London time) two Business Days prior to the commencement of such Interest Period.

"Lien" shall mean, with respect to any interest in Property (whether real, personal or mixed and whether tangible or intangible) any interest or right which secures the payment of indebtedness or an obligation owed to, or a claim by, a Person other than the owner of such Property, whether such interest is based on common law, statute or contract, and whether or not choate, vested or perfected, including, without limitation, any such interest or right arising from a mortgage, charge, pledge, negative pledge or other agreement not to lien or pledge, assignments, security interest, conditional sale, levy, execution, seizure, attachment, garnishment, conditional sale, Capital Lease or trust receipt, or arising from a lease, consignment or bailment given for security purposes. For purposes of this Agreement, the Borrower or any Subsidiary shall be deemed to be the owner of any Property which it has acquired or holds subject to a conditional sale agreement, Capital Lease or other arrangement pursuant to which title to the Property has been retained by or vested in some other Person for security purposes.

"Loan" shall mean, individually or collectively, as the case may be, an Effective Fixed Rate Loan or a LIBOR Rate Loan.

"Loan Document(s)" shall mean, individually or collectively, as the case may be, this Agreement, the Note, each Security Document, the Guaranty, and all other documents, agreements and certificates executed or delivered in connection with or contemplated by this Agreement or any other document evidencing or securing a Loan, each as may be amended, modified or supplemented from time to time.

8

"Management Agreement" shall mean that certain management agreement between Borrower and Kinderhook dated November 1, 2006.

"Manager" shall mean Kinderhook.

"Material Adverse Occurrence" shall mean any fact, circumstance or occurrence of any nature whatsoever (including, without limitation, any adverse determination in any litigation, arbitration, governmental investigation or proceeding) which taken alone or in combination with any other fact, circumstance or occurrence (a) materially adversely affects the business, properties, assets, liabilities, operations or financial condition of the Borrower, (b) materially impairs the binding nature, validity or enforceability of this Agreement or any of the other Loan Documents, the ability of the Borrower to perform its obligations under this Agreement or any of the other Loan Documents or the rights of the Administrative Agent and the Lenders hereunder and thereunder, or (c) materially adversely affects the aggregate value of the Collateral, the Liens on the Collateral in favor of the Administrative Agent, for the benefit of the Lenders or the rights, benefits or interests of the Lenders in and to the Loans and the Collateral.

"Material Contract" shall mean, as to the Borrower, any Franchise Agreement, purchase agreement or supply agreement for which the aggregate amount or value of services performed or to be performed for or by, or funds or other property transferred or to be transferred to or by Borrower pursuant to such agreement or contract during any fiscal year exceeds $200,000 or which is otherwise material to the operation of its business.

"Maturity Date" shall mean the earlier of (i) November 1, 2011 or (ii) such earlier date on which payment in full of all outstanding Obligations shall be due (whether by acceleration or otherwise).

"Maximum Rent Adjusted Leverage" shall mean as of the last day of any twelve-month period, the ratio of (i) total Funded Debt of the Borrower as of such date minus the New Unit Adjustment for any New Units as of such date plus 8 times operating rent/lease expenses for such period divided by (ii) EBITDA of the Borrower for such twelve-month period plus operating rent/lease expenses for such period.

"Moody's" shall mean Moody's Investors Service, Inc., or any successor to the rating agency business thereof.

"Mortgages" shall mean the mortgages and deeds of trust, in form and substance reasonably acceptable to the Administrative Agent, executed and delivered by the Borrower in favor of the Administrative Agent for the benefit of the Lenders, as the same may be amended, supplemented or otherwise modified from time to time.

"Multiemployer Plan" shall mean any multiemployer plan as defined in Section 4001(a)(3) of ERISA contributed to by the Borrower, any of its Subsidiaries or any ERISA Affiliate.

"Net Income" shall mean, for any period for which the amount thereof is to be determined, the net income (or net losses) of the Borrower and its Subsidiaries as determined in accordance with GAAP after deducting, to the extent included in computing said net income and

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

without duplication, (i) the income (or deficit) of any Person other than a Subsidiary of Borrower in which a Person other than the Borrower and its Subsidiaries has any ownership interest, except to the extent that any such income has been actually received by the Borrower or its Subsidiaries in the form of cash dividends or similar cash distributions, (ii) the gain or loss (net of any tax effect) resulting from the sale, exchange or disposal of any capital assets, (iii) any gains, losses, charges or other income (net of any tax effect in respect thereof) which is nonrecurring or otherwise properly classified as extraordinary in accordance with GAAP, (v) income resulting from any reappraisal, reevaluation or write-up of any assets, and (vi) the proceeds of any life insurance policy on the life of any officer, director or employee of the Borrower.

"Net Proceeds" shall mean, with respect to any sale, lease, transfer or other disposition of assets or securities, all cash proceeds of such sale or other transaction net of (i) direct, reasonable and customary out-of-pocket costs and expenses of such sale or other transaction not payable to the Borrower, (ii) federal and state income taxes, sales taxes, transfer taxes or similar taxes imposed on the seller on account of such sale or other transaction, and (iii) amounts, if any, paid with respect to Indebtedness secured by any Lien on such assets which is senior in priority to the Lien of the Administrative Agent, if any, on such assets.

"New Unit" shall mean any Unit that has been in operation by Borrower for less than twelve (12) months.

"New Unit Adjustment" shall mean, on any date, an amount determined as follows:

The product of (i) 1 – (number of full months a New Unit has been in operation during the twelve-month period ending on such date/12) X (ii) total Funded Debt incurred to acquire such New Unit outstanding on such date.

"Note(s)" shall mean, individually or collectively, as the case may be, (a) the Term Note, and (b) the Acquisition Note(s) (in form substantially as attached hereto as **Exhibit A and B,** respectively, and (c) such other promissory notes accepted by the Lenders in exchange for or in substitution of any such Notes.

"Notice of Borrowing" shall mean the notice in the form of **Exhibit C** attached hereto to be delivered to the Administrative Agent pursuant to Section 2.1(b)(3).

"Obligations" shall mean (i) all Loans (including Effective Fixed Rate Loans and LIBOR Rate Loans), Advances, debts, liabilities, payment and performance obligations, covenants and duties of every kind, nature and description owing by the Borrower to the Administrative Agent, the Lenders or any Lender of any kind or nature, present or future, arising under this Agreement or any other Loan Document, whether evidenced by any note, guaranty or other instrument, whether for the payment of money or in kind, whether arising by reason of any extension of credit, guaranty, indemnification, contract, tort, operation of law or in any other manner, whether direct or indirect (including those acquired by assignment or purchase), absolute or contingent, liquidated or unliquidated, due or to become due, now existing or hereafter arising and however acquired, (ii) all Rate Hedging Obligations owing at any time or from time to time by the Borrower to the Lenders or any Lender or any Affiliate of a Lender, and (iii) the obligation to pay an amount equal to the amount of any and all damages which the Lenders (or their respective

10

Affiliates in the case of Rate Hedging Obligations), the Administrative Agent, or any of them, may suffer by reason of a breach by the Borrower, or any other obligor, of any obligation, covenant or undertaking with respect to this Agreement or any other Loan Document. The term includes, without limitation, all principal, interest, fees, charges, expenses, reasonable attorneys' fees, and any other sum chargeable to the Borrower under this Agreement or any other Loan Document or in connection with any Rate Hedging Obligation.

"PBGC" shall mean the Pension Benefit Guaranty Corporation and any entity succeeding to any or all of its functions under ERISA.

"Percentage" shall mean, with respect to each Lender, the percentage derived from dividing such Lender's Commitment by the sum of the aggregate Commitments for all Lenders; provided, that after the termination of the Commitments, "Percentage" shall mean, with respect to each Lender, the percentage derived by dividing the principal amount outstanding of such Lender's Note(s) by the aggregate principal amount outstanding of all Notes.

"Permitted Investment" shall mean any of the following Investments made by the Borrower or any of its Subsidiaries in any Person: (i) obligations, with a maturity of less than two years from the date of acquisition thereof, issued by or unconditionally guaranteed by the United States of America or an agency or instrumentality thereof backed by the full faith and credit of the United States of America; (ii) direct obligations of any state of the United States, any subdivision or agency thereof or any municipality therein which are rated by S&P or Moody's in one of the top two rating classifications and maturing within two years of the date of acquisition thereof; (iii) certificates of deposit or banker's acceptances, maturing within two years of the date of acquisition thereof, issued by commercial banks organized under the laws of the United States or any state thereof, having capital, surplus and undivided profits aggregating not less than $100 million and whose unsecured long-term debt is rated in one of the top two rating classifications by S&P or Moody's; (iv) commercial paper of any corporation organized under the laws of the United States or any state thereof, rated in one of the top two rating classifications by S&P or Moody's and with a maturity of less than 270 days from the date of acquisition thereof; (v) Investments by Borrower in any new Subsidiary that is engaged in substantially the same business as Borrower; and (vi) Investments existing as of the date of this Agreement, as disclosed to and approved by Administrative Agent.

"Permitted Lien" shall have the meaning set forth in Section 6.5.

"Person" shall mean any natural person, corporation, firm, joint venture, partnership, limited partnership, limited liability company, association, trust or other entity or organization, whether acting in an individual, fiduciary or other capacity, or any government or political subdivision thereof or any agency, department or instrumentality thereof.

"Plan" shall mean each employee pension benefit plan (as defined in Section 3(2) of ERISA) maintained or contributed to by the Borrower or, solely with respect to an employee pension benefit plan subject to Title IV of ERISA, any ERISA Affiliate, but other than any Multiemployer Plan.

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

"Pledge Agreement" shall mean any pledge agreement entered into by the Borrower in favor of the Administrative Agent for the benefit of the Lenders, as it may be amended, modified, restated or replaced from time to time.

"Pledgor" shall mean each of the Borrower and any other Person which is a party to a Pledge Agreement, the Security Agreement or any other Security Document at any time or from time to time.

"Prime Rate" shall mean the rate announced by Bank of America from time to time as its prime rate, changing as and when such prime rate changes; Bank of America may lend to its customers at rates that are at, above or below the Prime Rate.

"Property" shall mean any interest in any kind of property or asset, whether real, personal or mixed, or tangible or intangible, and any right in respect of any of the foregoing.

"Rate Hedging Obligations" shall mean any and all obligations of such Person, whether absolute or contingent and howsoever and whensoever created, arising, evidenced or acquired (including all renewals, extensions and modifications thereof and substitutions therefor) under (i) any and all agreements, devices or arrangements designed to protect at least one of the parties thereto from the fluctuations of interest rates applicable to such party's assets or liabilities, including but not limited to interest rate swaps, basis swaps, interest rate floors, collars, caps, option, forward agreements or other similar rate protection transactions, or any combination of or option with respect to any of the foregoing, and (ii) any and all cancellations, buy backs, reversals, terminations, assignments, modifications, supplements and amendments of any of the foregoing.

"Real Property" shall mean all real property or interests therein wherever situated now, heretofore or hereafter owned in fee or ground leased or leased pursuant to Leases by the Borrower and pledged to Administrative Agent for the benefit of the Lenders as Collateral under any of the Security Documents.

"Register" shall have the meaning ascribed to it in Section 9.9(d).

"Regulation D," "Regulation T," "Regulation U" and "Regulation X" shall mean Regulation D, Regulation T, Regulation U and Regulation X, respectively, of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Regulatory Change" shall mean any change after the date hereof in any (or the adoption after the date hereof of any new):

(a)     Federal, state or foreign law applying to a class of financial institutions (including the Administrative Agent or one or more of the Lenders); or

(b)     regulation, interpretation, directive or request (whether or not having the force of law) applying to a class of financial institutions (including the Administrative Agent or one or more of the Lenders) of any court, central bank, governmental authority or comparable agency charged with the interpretation or administration of any law

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

referred to in clause (a) of this definition or of any fiscal, monetary or other authority having jurisdiction or authority over the Administrative Agent or any Lender.

"Release Price" shall mean an amount which is the fair market value of the Unit which is payable by Borrower as a condition precedent to the release of any Unit as Collateral. Administrative Agent's and/or Lenders' determination of the Release Price for any Unit shall be final absent manifest error.

"Required Lenders" shall mean Lenders (excluding Lenders whose failure to fund an Advance has not been cured) whose Percentage, in the aggregate, exceeds 51%.

"Reserve Requirement" shall mean, for any Interest Period applicable to any LIBOR Rate Loan, the sum (expressed as a decimal) of (a) the average maximum rate at which reserves (including any marginal, supplemental or emergency reserves) are required to be maintained during such Interest Period under Regulation D by member banks of the Federal Reserve System against "Eurocurrency liabilities" and (b) any other reserves required to be maintained by such member banks by reason of any Regulatory Change against (i) any category of liabilities which includes deposits by reference to which the LIBOR Rate is to be determined or (ii) any category of extensions of credit or other assets which includes a LIBOR Rate Loan.

"Security Agreement" shall mean any Security Agreement entered into by the Borrower in favor of the Administrative Agent for the benefit of the Lenders, as it may be amended, modified, restated or replaced from time to time.

"Security Documents" shall mean and refer to the Security Agreement(s), the Mortgages, the Leasehold Mortgages, the Collateral Assignment of Lease, and Pledge Agreement and each other mortgage, assignment, pledge or security agreement, instrument, certificate, financing statements, filings or document executed from time to time by any person in favor of the Administrative Agent for the benefit of the Lenders, to secure all or any portion of the Obligations whether now or hereafter in existence, as said agreements or documents may be amended, modified, restated or replaced from time to time.

"S&P" shall mean Standard & Poor's Ratings Services, a division of the McGraw Hill Companies, Inc., or any successor to the rating agency business thereof.

"Subsidiary" of any Person shall mean (i) any corporation of which more than 50% of the outstanding shares of capital stock of any class or classes having ordinary voting power for the election of directors (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have voting power by reason of the happening of any contingency) is now or hereafter owned directly or indirectly by such Person, by such Person and one or more of its Subsidiaries, or by one or more of such Person's other Subsidiaries, and (ii) any partnership, association, limited liability company, joint venture or other entity in which such Person, such Person and one or more of its Subsidiaries, or one or more of its Subsidiaries, is either a general partner or has an equity or voting interest of more than 50% at the time, and (iii) any other entity which is directly or indirectly controlled or capable of being controlled by such Person or one or more Subsidiaries of such Person or both.

"Termination Date" shall mean the date that is the earlier of (a) November 1, 2007, or (b) the date upon which the obligation of the Lenders to make Advances is terminated.

"Term Loan" shall mean that certain loan of even date herewith made by Lenders to Borrower in the aggregate principal amount of up to $16,000,000 comprised of (i) Term Loan A in the original principal amount of $15,000,000 and (ii) Term Loan B in the original principal amount of $1,000,000.

"Term Loan A" shall mean that certain loan of even date herewith made by Lenders to Borrower in the original principal amount of up to $15,000,000.

"Term Loan B" shall mean that certain loan of even date herewith made by Lenders to Borrower in the original principal amount of up to $1,000,000.

"Term Loan Commitment" shall mean the original principal amount of up to $16,000,000.

"Term Loan B Maturity Date" shall mean the earlier of (i) April 30, 2007 or (ii) such earlier date on which payment in full of all outstanding Obligations under Term Note B shall be due (whether by acceleration or otherwise).

"Total Leverage Ratio" shall mean as of the last day of any twelve-month period, the ratio of (i) total Funded Debt of the Borrower, determined as of such date, minus the New Unit Adjustment for any New Units as of such date to (ii) EBITDA of the Borrower for such twelve-month period.

"Unit" shall mean a restaurant facility constituting Real Property, Improvements and Equipment owned, leased or ground leased by Borrower, all or substantially all of the assets of which are pledged as Collateral for the Obligations under the Security Documents.

"Unused Fee" shall have the meaning ascribed to it in Section 2.9(b).

"Unused Portion" shall mean, as of any date, the excess of the aggregate Acquisition Loan Commitment on such date over the sum of the aggregate outstanding principal amount of the Borrowings under the Acquisition Loan on such date.

Other terms defined herein shall have the meanings ascribed to them herein. Each definition of an agreement or instrument in this Article I shall include such agreement or instrument, together with all schedules, exhibits, annexes and attachments thereto, all as may be amended, modified, supplemented, renewed or restated from time to time in accordance herewith. Except where the context otherwise requires, definitions imparting the singular shall include the plural and vice versa. Except where otherwise specifically restricted, reference to a party to a Loan Document includes that party and its successors and assigns. Except where the context otherwise requires, each reference herein to an Article, Section or Schedule shall be to an Article, Section or Schedule hereto. In the event that any Accounting Change (as defined below) shall occur and such change results in a change in the method of calculation of financial covenants, standards or terms in this Agreement, then the Borrower and Administrative Agent

agree to enter into negotiations in order to amend such provisions of this Agreement so as to equitably reflect such Accounting Changes with the desired result that the criteria for evaluating the Borrowers' financial condition shall be the same after such Accounting Changes as if such Accounting Changes had not been made.  Until such time as such an amendment shall have been executed and delivered by the Borrowers and Agent, all financial covenants, standards and terms in this Agreement shall continue to be calculated or construed as if such Accounting Changes had not occurred.  "Accounting Changes" refers to changes in accounting principles required by the promulgation of any rule, regulation, pronouncement or opinion by the Financial Accounting Standards Board of the American Institute of Certified Public Accountants or, if applicable, the Securities and Exchange Commission.

## ARTICLE II.
## THE ADVANCES

2.1    Advances.

(a)    Term Loan.  Subject to the terms and conditions set forth herein, the Lenders agree to make Term Loan A and Term Loan B to the Borrower on the Closing Date in an aggregate principal amount not to exceed the Term Loan Commitment to fund the acquisition of Units pursuant to the Asset Purchase Agreement.  In the event that the Term Loan is not fully advanced on the Closing Date, the un-advanced portion of the Term Loan Commitment shall be terminated.  The execution and delivery of this Agreement by the Borrower and the satisfaction or waiver of all conditions precedent pursuant to Article III shall be deemed to constitute the Borrower's request to borrow the Term Loan on the Closing Date.  The Borrower's obligation to pay the principal of, and interest on, the Term Loan shall be evidenced by the records of the Lenders and by a term loan promissory note(s) in form substantially as attached hereto as **Exhibit "A-1"** and **Exhibit "A-2"** (individually and collectively the "Term Note").  The entries made in such records and/or on the schedule annexed to the Term Note shall be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded, absent manifest error; provided, that the failure or delay of the Lenders in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Term Loan (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

(b)    Acquisition Loan.    Subject to the terms and conditions set forth herein, the Lenders agree to make an Acquisition Loan(s) to the Borrower, from time to time during the Availability Period, in an aggregate principal amount outstanding at any time not to exceed the Acquisition Loan Commitment.  During the Availability Period, the Borrower shall be entitled to borrow in accordance with the terms and conditions of this Agreement; provided, that the Borrower may not borrow should there exist an uncured Default that has occurred and is continuing or an Event of Default.

(1)    The Borrower's obligation to pay the principal of, and interest on, the Acquisition Loan shall be evidenced by the records of the Lender and by a promissory note or notes in form substantially as attached hereto as **Exhibit "B"** (the "Acquisition

15

Note"). The entries made in such records and/or on the schedule annexed to the Development Note shall be *prima facie* evidence of the existence and amounts of the obligations of the Borrower therein recorded; provided, that the failure or delay of the Lender in maintaining or making entries into any such record or on such schedule or any error therein shall not in any manner affect the obligation of the Borrower to repay the Acquisition Loan (both principal and unpaid accrued interest) in accordance with the terms of this Agreement.

(2)    Lender intends to advance funds under the Acquisition Loan for acquisition of additional Units.

(3)    Manner of Borrowing.

(i)    Borrower may request an Acquisition Loan Advance by delivering to the Administrative Agent in respect of each requested Advance a written Notice of Borrowing (which may be transmitted by telecopier) or by oral notice to the Administrative Agent confirmed by a written Notice of Borrowing (which may be transmitted by telecopier), indicating thereon the amount of the Advance requested, by not later than 1:00 p.m. (New York, New York time) on the Business Day preceding the Business Day on which an Advance is to be made; provided, however, if such Advance is to be made as a LIBOR Rate Loan, such Borrower shall give such Notice of Borrowing to the Administrative Agent by not later than 1:00 p.m. (New York, New York time) on the second Business Day preceding the Business Day on which an Advance is to be made. Any such Notice of Borrowing given by the Borrower shall be irrevocable.

(ii)    Upon receipt of a Notice of Borrowing and upon satisfaction of the applicable conditions set forth in Article III, the Administrative Agent shall promptly notify each Lender thereof. By not later than 1:00 p.m. (New York, New York time) on the Business Day on which a requested Advance is required to be made, each Lender shall make available to the Administrative Agent, at its address referred to in Section 9.3, in immediately available funds, the amount of such Lender's Advance. After (and subject to) the Administrative Agent's receipt of such funds and upon satisfaction of the applicable conditions set forth in Article III, the Administrative Agent shall make such Advance available not later than 2:00 p.m. (New York, New York time) to the Borrower by transferring the amount thereof in immediately available funds for credit to an account (other than a payroll account) maintained by the Borrower at the Administrative Agent, or otherwise as directed by the Borrower. If the Administrative Agent shall receive less than all the amounts payable by the Lenders in accordance with this Section 2.1, the Administrative Agent shall fund the shortfall and make available to the requesting Borrower the full amount requested. Notwithstanding the foregoing, in no event will Administrative Agent be required to fund any amount which would cause the aggregate amount outstanding under the Acquisition Loan to exceed the Acquisition Loan Commitment.

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

(iii)   Unless the Administrative Agent shall have been notified by any Lender at least one (1) Business Day prior to the date of an Advance that such Lender does not intend to make available to the Administrative Agent its portion of such Advance, the Administrative Agent may assume that each Lender has made such amount available to the Administrative Agent on the date of such Advance and the Administrative Agent may, in reliance upon such assumption, make available to the Borrower a corresponding amount.  If and to the extent that any Lender fails to make available its Advance to the Administrative Agent on the date of any Advance, such Lender agrees to repay to the Administrative Agent forthwith upon demand such corresponding amount together with interest thereon for each day from the date such amount is made available by the Administrative Agent to the date such amount is repaid to the Administrative Agent at the rate applicable to such Advance.  If such Lender shall repay to the Administrative Agent such corresponding amount, such amount so repaid shall constitute such Lender's portion of the applicable Advance for purposes of this Agreement.

(iv)   The failure of any Lender to make any Advance to be made by it shall not relieve any other Lender of its obligation, if any, hereunder to make its Advance on the date of such Advance.  No Lender shall be responsible for the failure of any other Lender to make an Advance to be made by such Lender on the date of any such Advance.  The Administrative Agent shall promptly give the Borrower notice of any Lender's failure to make its Advance.  In the event that, at any time when the Borrower is not in Default and has satisfied all applicable conditions set forth in Article III, a Lender for any reason fails or refuses to fund its portion of an Advance, then, until such time as such Lender has funded its portion of such Advance, or all other Lenders have received payment in full (whether by repayment or prepayment) of the principal and interest due in respect of such Advance, such non-funding Lender shall not have the right (A) to vote regarding any issue on which voting is required or advisable under this Agreement or any other Loan Document and the amount of the Loan Commitment or other Loans, as applicable, held by such Lender shall not be counted as outstanding for purposes of determining such Lender's Percentage hereunder, and (B) to receive payments of principal, interest or fees from the Borrower in respect of its unfunded portion of Advances.

(v)   Acquisition Loan Advances shall be made in minimum amounts of $100,000 and in integral multiples of $100,000 thereafter, or such lesser amount as Borrower and Administrative Agent shall mutually agree.  Advances made under the Acquisition Loan shall be limited to an amount equal to the cost of the acquisition of the Unit purchased with such Advance.

(vi)   Each request for an Advance shall be deemed a representation and warranty by the Borrower, binding upon the Borrower, that all conditions precedent to such Advance under Article III are satisfied or waived as of the date of such request and as of the date of such Advance.

17

(4)    Notwithstanding anything to the contrary in this Agreement, Lenders shall make and Borrower shall accept at Closing an Acquisition Loan in the principal amount of $1,000,000 (the "Initial Acquisition Loan"). Provided that the Initial Acquisition Loan is paid in full prior to the Term Loan B Maturity Date, Borrower shall have the one-time right, to be exercised prior to the expiration of the Availability Period, to re-borrow the $1,000,000 prepaid. This right to re-borrow shall terminate and be of no force and effect on the Termination Date. This provision is not intended nor shall it be construed to convert the Acquisition Loan into a revolving credit facility. Failure of Borrower to pay the Initial Acquisition Loan in full on or prior to the Term Note B Maturity Date shall be an Event of Default hereunder.

(c)    Notes. The Advances made by a Lender shall be evidenced by, and be payable in accordance with the terms of the Note made by the Borrower payable to the order of such Lender in a principal amount equal to the Credit Commitment of such Lender; subject, however, to the provisions of such Note to the effect that the principal amount payable thereunder at any time shall not exceed the then unpaid principal amount of the Advances made by such Lender. The Borrower hereby irrevocably authorizes each Lender to make or cause to be made, at or about the time of each Advance made by such Lender, an appropriate notation on the records of such Lender, reflecting the principal amount of such Advance, and such Lender shall make or cause to be made, upon receipt of payment of any principal of any Advance, an appropriate notation on its records reflecting such payment and such Lender will, prior to any transfer of any of such Note, endorse on the reverse side thereof the outstanding principal amount of the Advances evidenced thereby. Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances. The aggregate amount of all Advances set forth on the records of such Lender shall be conclusive evidence of the principal amount owing and unpaid on such Lender's Note, absent manifest error.

(d)    Promise to Pay.    The Borrower hereby promises to pay in full to the Administrative Agent and the Lenders the amount of all Obligations, including the principal amount of all Loans, together with accrued interest, fees and other amounts due thereon, all in accordance with the terms of this Agreement. All Obligations, including the principal amount of all Loans, together with accrued interest, fees and other amounts due thereon, shall be due and payable in full on the Maturity Date. The Loans shall be payable as follows:

(1)    Term Loan A. On November 1, 2006, a payment of accrued interest only shall be due and payable. Commencing on December 1, 2006 and continuing on the first day of each month thereafter through and including October 1, 2011, monthly payments of principal and interest on the Term Loan shall be due and payable, each such monthly payment shall be in an amount which would be required in order to fully amortize the then outstanding principal balance of the Term Loan, at the rate of interest then in effect, over a period of ten (10) years pursuant to an amortization schedule calling for one hundred twenty (120) substantially equal payments of principal and interest. The unpaid principal balance of the Term Loan, together with accrued but unpaid interest, shall be due and payable in full on the Maturity Date.

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

(2)     Term Loan B.  Commencing on November 1, 2006, and continuing on the first day of each month thereafter through and including October 1, 2007, accrued interest only shall be due and payable.  On the Term Loan B Maturity Date, the unpaid principal balance of Term Loan B, together with accrued but unpaid interest, shall be due and payable in full.

(3)     Acquisition Loans.  From the date of an Advance for an Acquisition through and including the first day of the twelfth month after such Advance of the Acquisition Loan, accrued interest only under the Acquisition Loan shall be due and payable monthly on the first day of each month.  Commencing on the first day of the thirteenth month from the date of an Advance for an Acquisition and continuing on the first day of each month thereafter through and including October 1, 2011, monthly payments of principal and interest on the Acquisition Loan shall be due and payable, such monthly payments shall be determined based on a mortgage-style amortization using a weighted average of fifteen (15) years for real property and ten (10) years for business value.  The unpaid principal balance of the Acquisition Loans, together with accrued but unpaid interest, shall be due and payable in full on the Maturity Date.

(e)     Interest on Advances.  The Borrower agrees to pay interest on the aggregate outstanding principal amount of the Advances until paid in full as follows:

(1)     Term Loan A.  From the date hereof through the Maturity Date, the Term Loan A shall bear interest at the Floating Rate unless and until the Term Loan is converted, in whole or in part, to an Effective Fixed Rate Loan.  Upon such conversion, the portion of the Term Loan converted to an Effective Fixed Rate Loan shall bear interest at the Effective Fixed Rate.  On the Closing Date, Borrower shall convert not less than fifty percent (50%) of the outstanding principal balance of Term Loan A to an Effective Fixed Rate Loan.  To convert all or a portion of Term Loan A to an Effective Fixed Rate Loan, Borrower must have in place an interest rate swap ("Swap").  To that end, Borrower shall execute and deliver to Administrative Agent, on or prior to the Closing Date, a Swap agreement in form and with a Swap provider satisfactory to Administrative Agent in Administrative Agent's sole but reasonable discretion ("Swap Agreement").  The date on which the Swap is effective shall be the "Conversion Date."  For purposes of the foregoing, a Swap Agreement on the International Swap Dealers Association Agreement form shall be acceptable to Administrative Agent.  The portion of Term Loan A converted shall be maintained as an Effective Fixed Rate Loan from the Conversion Date through the Maturity Date (the "Effective Fixed Rate Period").  In the event that the initial Swap Agreement does not remain in effect for the entire Effective Fixed Rate Period, Borrower shall, within thirty (30) days prior to the expiration of the initial Swap Agreement, deliver to Administrative Agent a substitute Swap Agreement, in form and substance reasonably satisfactory to Administrative Agent, which shall be in place for the balance of the Effective Fixed Rate Period.

(2)     Term Loan B.  Interest shall accrue during the entire term of Term Loan B at the Base Rate.

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

(3)    Acquisition Loan.    Interest shall accrue during the initial twelve (12) month period from date of an Advance of the Acquisition Loan term at the Base Rate. From the first day of the thirteenth (13th) month following funding of an Advance of the Acquisition Loan through the Maturity Date, the Acquisition Loan shall bear interest at the Floating Rate unless and until the Acquisition Loan is converted, in whole or in part, to an Effective Fixed Rate Loan.  Upon such conversion, the portion of the Acquisition Loan converted to an Effective Fixed Rate Loan shall bear interest at the Effective Fixed Rate.  Borrower shall convert not less than fifty percent (50%) of the outstanding principal balance of the Acquisition Loan to an Effective Fixed Rate Loan. To convert all or a portion of the Acquisition Loan to an Effective Fixed Rate Loan, Borrower must have the Swap Agreement in place.  The portion of the Acquisition Loan converted shall be maintained as an Effective Fixed Rate Loan during the Effective Fixed Rate Period.

(4)    While an Event of Default exists or after acceleration, at the option of the Administrative Agent, the Borrower shall pay interest ("Default Interest") at the Default Rate.  All Default Interest shall be payable on demand.

The Administrative Agent shall determine each interest rate applicable to the Loan hereunder and, upon any rate change, shall promptly notify the Borrower of such rate in writing (or by telephone, promptly confirmed in writing).  Any such determination shall be conclusive and binding for all purposes, absent manifest error.

(f)    Calculation of Interest.  Interest on each Loan shall be computed on the basis of a 360-year for the actual number of days elapsed including the first day but excluding the last day and shall be payable in arrears on the applicable payment date.  Interest on all Loans then outstanding shall also be due and payable on the Maturity Date.

(g)    Determination of Applicable Margin.

(1)    The applicable margin in respect of any Effective Fixed Rate Loan or LIBOR Rate Loan, as applicable (collectively, the "Applicable Margin"), shall be determined by reference to the table set forth below on the basis of the type of Loan.

| Total Leverage Ratio | Applicable Swap Index or LIBOR Margin |
|---|---|
| Greater than or equal to 3.00:1.00 | 3.25% |
| Less than 3.00:1.00 but greater than or equal to 2.75:1.00 | 3.00% |
| Less than 2.75:1.00 but greater than or equal to 2.50:1.00 | 2.75% |
| Less than 2.50:1.00 | 2.50% |

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

(2)     The Applicable Margin shall be adjusted annually, based on the financial performance of Borrower for the immediately preceding fiscal year. Upon receipt of the financial statements delivered pursuant to Section 5.1(a) or Section 5.1(b), as applicable, the Applicable Margin shall be adjusted, such adjustment being effective on the tenth Business Day after receipt of such financial statements and the Compliance Certificate to be delivered in connection therewith; provided, however, if the Borrower shall not have timely delivered such financial statements in accordance with Section 5.1(a) or Section 5.1(b), as applicable, beginning with the date upon which such financial statements should have been delivered and continuing until three (3) Business Days after such financial statements are delivered, the Applicable Margin shall equal 3.25%.

(3)     The initial Applicable Margin shall equal 3.25%. Administrative Agent shall adjust the Applicable Margin within ten (10) Business Days after receipt of the audited financial statements for Borrower for fiscal year 2006 if the Total Leverage Ratio is such that the margin should be adjusted.

(h)     Prepayment.

(1)     The Borrower shall have the right, by giving written notice to the Administrative Agent by not later than 1:00 p.m. (Atlanta, Georgia time) on the fifth (5th) day preceding the date of such prepayment, to prepay all or any portion of an Advance, without premium or penalty; provided, that each partial prepayment shall be in an aggregate principal amount of not less than $250,000 and shall be accompanied by accrued interest to the date of prepayment on the amount prepaid; further, provided, that Borrower shall reimburse the Lenders and the Administrative Agent on demand for any costs or out-of-pocket expenses incurred in connection with any such prepayment, including, without limitation, any amounts described in Section 2.4.

(2)     At any time that the sum of the aggregate outstanding principal balance of the Loans exceeds the aggregate Credit Commitments, the Borrower shall immediately prepay the outstanding principal amount of the Loans in an amount equal to such excess.

(3)     Upon the sale of any of the Units identified on **Schedule 2.1(h)** attached hereto (the "Florida Units"), all net proceeds from such sale shall be delivered to Administrative Agent to be applied first to the payment in full of the Initial Acquisition Loan, then to the payment in full of Term Note B and the balance, if any, applied as a prepayment of the outstanding principal balance of Term Note A, and Administrative Agent will release its Lien on the Florida Units.

2.2     Election by Borrower.

(a)     Interest Rate for Advances. Subject to the requirement that Borrower shall maintain not less than fifty percent (50%) of the outstanding balance of Term Loan A and the Acquisition Loan as Effective Fixed Rate Loans, the Borrower may elect in accordance with Section 2.1(e) and this Section 2.2 to (1) obtain and maintain all or any portion of an Advance as a Effective Fixed Rate Loan or all or any portion of an Advance which is in an integral multiple of $500,000 as a LIBOR Rate Loan, or (2) convert all or any portion of any Advance from one

21

type of Credit Loan to another type of Credit Loan; provided however, that (i) any conversion to a LIBOR Rate Loan shall be only in an integral multiple of $500,000, (ii) any conversion of any LIBOR Rate Loan into a Effective Fixed Rate Loan shall be made on, and only on, the last day of the Interest Period then applicable thereto and (iii) no Credit Loan may be obtained, continued as, or converted when any Default or Event of Default has occurred and is continuing. In the event that for any reason LIBOR Rate Loans are not available, Advances shall be made or continued as Effective Fixed Rate Loans.

(b)     Conversion of Loans.    Subject to the provisions of Section 2.1 (e) and subsection (a) above, the Borrower may convert a LIBOR Rate Loan into a Effective Fixed Rate Loan upon three (3) Business Day's prior written notice to the Administrative Agent of the Borrower's election to do so. The Borrower, not less than three (3) Business Days prior to the date on which (A) a LIBOR Rate Loan is to be obtained, (B) a Effective Fixed Rate Loan is to be converted into a LIBOR Rate Loan or (C) any LIBOR Rate Loan is to be continued as a LIBOR Rate Loan at the end of the Interest Period then applicable thereto, shall give written notice to the Administrative Agent of the Borrower's election to do so; said notice shall specify the amount of such LIBOR Rate Loan, and the first day of the Interest Period pertaining thereto and shall be irrevocable. If the Borrower shall fail to elect to continue any LIBOR Rate Loan or to designate a Effective Fixed Rate Loan in accordance with this Section 2.2, the Borrower shall be deemed to have elected automatically to convert such LIBOR Rate Loan into a Effective Fixed Rate Loan on the last day of the Interest Period then applicable thereto. On the date on which the aggregate unpaid principal amount of any LIBOR Rate Loan shall be reduced, by payment or prepayments or otherwise, to less than an integral multiple of $500,000, such LIBOR Rate Loan shall automatically convert into a Effective Fixed Rate Loan at the end of the Interest Period then applicable thereto. The conversion of a Effective Fixed Rate Loan to a LIBOR Rate Loan, the continuation of a LIBOR Rate Loan and the conversion of a LIBOR Rate Loan to a Effective Fixed Rate Loan shall not constitute a new borrowing hereunder for purposes of Section 3.2.

(c)     Lenders' Records.   The Borrower hereby irrevocably authorizes each Lender to make, or cause to be made, an appropriate notation on the records of such Lender, reflecting the date and original principal amount of each Advance made by such Lender, the dates for each period when such Advance is being maintained as a Effective Fixed Rate Loan or a LIBOR Rate Loan, the interest rate for each such period and the dates of principal and interest payments on such Advance. The records of each Lender shall be conclusive evidence of the status of such Lender's Advances, absent manifest error. Failure to make any such notation shall not affect the Borrower's obligations in respect of such Advances.

2.3     Increased Costs; Capital Adequacy.

(a)     Increased Costs.   If (1) as a result of any Regulatory Change any reserve (other than the amount of such reserve as has been included in the computation of the Adjusted LIBOR Rate), special deposit or similar requirements relating to any extension of credit or other assets of or any deposits with, or other liabilities of, any Lender which affects the making or maintaining by such Lender of the Loans hereunder are imposed, modified or deemed applicable or (2) any other condition affecting this Agreement or the making or maintaining by any Lender of the Loans hereunder is imposed on such Lender by any applicable governmental authorities; or (3) other circumstances arise affecting any Lender or the position of any Lender in the relevant

22

market, and such Lender in good faith determines that, by reason thereof, the cost to such Lender of making or maintaining the Loans hereunder is increased as a result of such change in circumstances, or any amount receivable hereunder in respect of any Loan hereunder is reduced (and such Lender shall not have been compensated for such increase or reduction by an increase in interest or otherwise by Regulatory Change), then such Lender shall promptly notify the Borrower in writing within ninety (90) days of such change and the Borrower shall pay upon request such additional amount or amounts (which shall be specified in such request) as will (in the good faith determination of such Lender) compensate such Lender for such additional cost or reduction; provided, however, that the Borrower's liability for additional amounts computed in accordance with this Section 2.3(a) shall be neither changed nor waived by any failure to give such notice.

(b)     Capital Adequacy.  If any Regulatory Change after the Closing Date imposes, modifies or deems applicable any capital adequacy, capital maintenance or similar requirement (including a request or requirement which affects the manner in which any Lender allocates capital resources to its commitments, including a Commitment hereunder) and as a result thereof, the rate of return on any Lender's capital as a consequence of a Commitment hereunder or the making or maintaining of any Loans hereunder is reduced to a level below that which such Lender could reasonably have achieved but for such circumstances, then and in each such case upon notice from time to time by a Lender within ninety (90) days of such change to the Borrower, the Borrower shall pay to such Lender such additional amount or amounts as shall compensate such Lender for such reduction in rate of return; provided, however, that the Borrower's liability for additional amounts computed in accordance with this Section 2.3(b) shall be neither changed nor waived by any failure to give such notice.

(c)     Taxes.  If any Regulatory Change after the Closing Date shall subject any Lender or any Loan to any tax (including, without limitation, any United States interest equalization tax or similar tax however named applicable to the acquisition or holding of debt obligations and any interest or penalties with respect thereto), duty, charge, stamp tax, fee, deduction or withholding in respect of this Agreement or any Loan, except such taxes as may be measured by the overall net income of such Lender and imposed by the jurisdiction, or any political subdivision or taxing authority thereof, in which such Lender's principal executive office or its lending branch is located and such Lender in good faith determines that the result thereof is to increase the cost (whether by incurring a cost or adding to a cost) to such Lender of making or maintaining any Loan hereunder or to reduce the amount of principal or interest received by such Lender on any Loan hereunder (without benefit of, or credit for, any prorations, exemptions, credits or other offsets available under any such laws, treaties, regulations, guidelines or interpretations thereof), then such Lender shall promptly notify Borrower in writing within ninety (90) days of such change and the Borrower shall pay, upon request, such additional amount or amounts as will (in the good faith determination of such Lender) compensate such Lender for such additional cost or reduction; provided, however, that the Borrower's liability for additional amounts computed in accordance with this Section 2.3(c) shall be neither changed nor waived by any failure to give such notice.

(d)     Applicable Tax Forms.  On or prior to the Closing Date in the case of each Lender which is a party hereto as of the Closing Date, and on the date of the delivery to the Administrative Agent of the Assignment Agreement pursuant to which it became a Lender in the

23

case of each other Lender, each Lender organized under the laws of a jurisdiction outside the United States shall provide the Administrative Agent and the Borrower with the forms prescribed by the Internal Revenue Service of the United States certifying that such Lender is exempt from United States withholding taxes with respect to all payments to be made to such Lender hereunder and under the Notes. Each Lender which so delivers such a form further undertakes to deliver to each of the Borrower and the Administrative Agent additional copies of such form (or a successor form) on or before the date that such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent forms so delivered by it, and such amendments thereto or extensions or renewals thereof as may be reasonably requested by the Borrower or the Administrative Agent, in each case certifying that such Lender is entitled to receive payments under this Agreement and the Notes without deduction or withholding of any United States federal income taxes. If as a result of a change in United States laws during the term of this Agreement, any Lender becomes unable to submit the forms referred to above or the information or representations contained therein are no longer accurate in any material respect, such Lender shall promptly notify the Administrative Agent and the Borrower in writing to that effect. Unless the Borrower and the Administrative Agent have received forms or other documents satisfactory to them indicating that payments hereunder or under any Note are not subject to United States withholding tax, the Borrower or the Administrative Agent shall withhold taxes from such payments at the applicable statutory rate in the case of payments to or for any Lender organized under the laws of a jurisdiction outside the United States and such withheld amounts shall not result in increased payments by the Borrower pursuant to Section 2.3(c).

(e)     Change in Lending Office.  Any Lender claiming any additional amounts payable pursuant to this Section 2.3 shall use commercially reasonable efforts (consistent with its internal policy and legal and regulatory restrictions) to change the jurisdiction of its lending office or branch if the making of such change would avoid the need for, or reduce the amount of, any such additional amounts which may thereafter accrue and would not, in the reasonable judgment of such Lender, be otherwise disadvantageous to such Lender.

(f)     Conclusive and Binding; Survival.  With respect to any additional amount or amounts owing by the Borrower pursuant to this Section 2.3, a statement of a Lender as to any such additional amount or amounts shall, in the absence of manifest error, be conclusive and binding on the Borrower. In determining such amount, a Lender may use any method of averaging and attribution that it (in its good faith business judgment) shall deem applicable. The obligations of the Borrower under this Section 2.3 shall survive any termination or expiration of this Agreement.

2.4     Liquidation Fee.  The Borrower understands that in connection with the request for a LIBOR Rate Loan, each Lender may enter into funding arrangements with third parties on terms and conditions which could result in substantial losses to such Lender if such LIBOR Rate Loan is not made or does not remain outstanding for the entire Interest Period. Therefore, if either (a) after Borrower requests a LIBOR Rate Loan, the LIBOR Rate Loan is not made on the first day of the Interest Period as a result of the failure of Borrower to comply with its obligations hereunder, or (b) any LIBOR Rate Loan is repaid in whole or in part prior to the last day of its Interest Period (whether as a result of acceleration, operation of law or otherwise), the Borrower agrees to indemnify such Lender upon Lender's written demand with appropriate detail

24

demonstrating the basis for the loss claimed, for any reasonable loss, cost and expense incurred by it resulting directly therefrom, including without limitation any loss of profit and any loss or cost in liquidating or employing deposits acquired to fund or maintain the LIBOR Rate Loan.

2.5    Basis for Determining LIBOR Rate Inadequate or Unfair. If with respect to any Advance or any Interest Period:

(a)    a Lender is advised that deposits in lawful money of the United States of America (in the applicable amounts) are not being offered to such Lender in the Eurodollar market for the relevant Advance or Interest Period, or a Lender otherwise determines (which determination shall be binding and conclusive on all parties absent manifest error) that by reason of circumstances affecting the relevant market adequate and reasonable means do not exist for ascertaining the Adjusted LIBOR Rate;

(b)    a Lender determines that the Adjusted LIBOR Rate will not adequately and fairly reflect the cost to such Lender of maintaining or funding a LIBOR Rate Loan for the relevant Advance or Interest Period, or that the making or funding of a LIBOR Rate Loan has become impracticable as a result of an event occurring after the Agreement Date which in the opinion of such Lender materially adversely affects such LIBOR Rate Loan; or

(c)    a Lender determines that any Regulatory Change makes it unlawful or impracticable for such Lender to make or continue to maintain any LIBOR Rate Loan;

then such Lender shall promptly notify the Borrower and the Administrative Agent of such circumstances and then so long as such circumstances shall continue: (1) the obligation of such Lender to make a LIBOR Rate Loan and to convert any Credit Loan into a LIBOR Rate Loan shall be suspended and (2) all LIBOR Rate Loans of such Lender then outstanding shall automatically be converted into Effective Fixed Rate Loans on the last day of the Interest Period then applicable thereto, provided that if it shall become unlawful or impracticable for such Lender to maintain any LIBOR Rate Loan, such Loan shall automatically and immediately be converted into a Effective Fixed Rate Loan. If any such conversion of a LIBOR Rate Loan occurs on a day which is not the last day of then current Interest Period with respect thereto, the Borrower shall pay such amounts, if any, as may be required pursuant to Section 2.4 hereof. In the event that such Lender determines, in its sole and absolute discretion, that the conditions that prohibited such Lender from making LIBOR Rate Loans are no longer applicable, such Lender shall promptly notify Administrative Agent of such occurrence and shall once again be obligated to make LIBOR Rate Loans in accordance with this Agreement.

2.6    Payments.    Any other provision of this Agreement to the contrary notwithstanding, the Borrower shall make each payment of interest on and principal of the Notes, and fees and other payments due under this Agreement (except as otherwise expressly provided herein), in immediately available funds to the Administrative Agent at its office referred to in Section 9.3 hereof not later than 1:00 p.m. (New York, New York time) on the date when due through ACH Debit. The Borrower hereby authorizes and directs the Administrative Agent and agrees that on the Business Day on which any payment of principal, interest and/or fees are due, the Administrative Agent may automatically charge one or more demand deposit accounts of the Borrower maintained with the Administrative Agent (an "ACH Debit"). All payments by the

25

Borrower under this Agreement shall be made without offset, counterclaim or other deduction and in such amounts as may be necessary in order that all such payments shall not be less than the amounts otherwise specified to be paid under this Agreement and the Notes. The Administrative Agent will promptly thereafter distribute like funds ratably to each Lender (unless such amount is not to be shared ratably in accordance with the terms hereof).

2.7     Setoff; etc.   Upon the occurrence and during the continuance of an Event of Default, each Lender and the Administrative Agent are hereby authorized at any time and from time to time, without notice to the Borrower (any such notice being expressly waived by the Borrower), to set off and apply any and all deposits (general or special, time or demand, provisional or final) at any time held and other indebtedness at any time owing by such Lender or Administrative Agent to or for the credit or the account of the Borrower or any of its Subsidiaries, including specifically any amounts held in any account maintained at such Lender or Administrative Agent, against any and all amounts which may be owed to the Administrative Agent or the Lenders, or any of them, by the Borrower, in connection with this Agreement or any Loan Document. The rights of the Lenders and the Administrative Agent under this Section 2.7 are in addition to other rights and remedies (including, without limitation, other rights of set-off) which the Lenders and the Administrative Agent may have. The Borrower agrees that any holder of a Note or of any participation in a Note may, to the fullest extent permitted by law, exercise all its rights of payment (including set-off) with respect to such participation as fully as if such holder were the direct creditor of the Borrower in the amount of such participation. Each Lender and the Administrative Agent agrees, severally and not jointly, to use reasonable efforts to notify the Borrower of any exercise of its rights pursuant to this Section 2.7, provided, however, that failure to provide such notice shall not affect any Lender's or the Administrative Agent's rights under this Section 2.7 or the effectiveness of any action taken pursuant hereto.

2.8     Sharing.   If any Lender shall obtain any payment (whether voluntary, involuntary, by application of offset or otherwise) on account of the Loans made by it in excess of such Lender's ratable share of payments on account of the Loans obtained by all the Lenders, such Lender shall purchase from the other Lenders such participations in the Loans made by them as shall be necessary to cause such purchasing Lender to share the excess payment ratably with each of them; provided, however, that if all or any portion of the excess payment is thereafter recovered from such purchasing Lender, the purchase shall be rescinded and the purchase price restored pro rata according to the extent of such recovery, but without interest. The Borrower agrees that any Lender so purchasing a participation from another Lender pursuant to this Section 2.8 may, to the fullest extent permitted by law, exercise all its rights of payment (including the right to setoff) with respect to such participation as fully as if such Lender were the direct creditor of the Borrower in the amount of such participation.

2.9     Fees.   The Borrower agrees to pay the following fees:

(a)     Lenders' Upfront. Fee.     On the Closing Date, Borrower shall pay to Administrative Agent for the account of each Lender in accordance with its Commitment Ratio, an upfront fee in an amount equal to one percent (1%) of the total Commitment plus $10,000 ("Upfront Fee"). Borrower has previously paid $117,500 of the Upfront Fee with the balance of $127,500 to be paid on the Closing Date. The Upfront Fee is for the Credit Commitment of each Lender and is fully earned as of the date of this Agreement.

(b)    Unused Fee.  The Borrower agrees to pay an unused fee (the "Unused Fee") for the period commencing on the Closing Date and continuing through the Termination Date, computed on the average daily amount of the Unused Portion during the period for which payment is made at the rate per annum equal to 0.1250%.  Such Unused Fee shall be payable to the Administrative Agent for the ratable benefit of the Lenders in arrears on the first day of each calendar quarter; provided that no portion of the Unused Fee shall be payable to any Lender that has defaulted hereunder.

2.10    Lending Branch.  Subject to the provisions of Section 2.3(e), each Lender may, at its option, elect to make, fund or maintain its Loans hereunder at the branch or office specified on the signature pages hereto or such other of its branches or offices as such Lender may from time to time elect.

2.11    Application of Payments and Collections.

(a)    Order of Application of Payments.  Subject to the provisions of subsection (b) below, all payments and prepayments of the Notes and any other amounts received by the Administrative Agent from, on account of, or for the benefit of the Borrower shall be applied, first to pay principal of and interest on any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower, second to pay all other Obligations in respect of fees, expenses, reimbursements or indemnities then due and payable, third to pay interest then due in respect of the  Credit Loans, and fourth to pay the principal of the  Credit Loans then due and payable.

(b)    Application of Payments After an Event of Default.  After the occurrence of an Event of Default and while the same is continuing, the Administrative Agent shall, unless the Administrative Agent and the Lenders shall agree otherwise, apply all payments and prepayments in respect of any Obligations hereunder in the following order:

(1) to pay interest on and then principal of any portion of the Advances which the Administrative Agent may have advanced on behalf of any Lender for which the Administrative Agent has not then been reimbursed by such Lender or the Borrower;

(2) to pay Obligations in respect of any fees, expense reimbursements or indemnities then due to the Administrative Agent;

(3) to pay Obligations in respect of any fees, expenses, reimbursements or indemnities then due to the Lenders;

(4) to the payment of interest accrued on all Loans and any amounts due pursuant to Sections 2.3 and 2.4, to be allocated among the Lenders pro rata based on the respective aggregate amounts of such accrued interest and amounts owed to them; and

(5) to the payment of the outstanding principal amounts of all Loans, to be allocated among the Lenders, pro rata based on the respective outstanding principal amounts of the Loans.

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

(c)    Each of the Lenders hereby irrevocably designates the Administrative Agent its attorney in fact for the purpose of receiving any and all payments to be made to such Lender in respect of Obligations held by it, and hereby directs each payor of any such payment to make such payment to the Administrative Agent. Each of the Lenders hereby further agrees that if, notwithstanding the foregoing, it should receive any such payment, it shall hold such payment in trust for, and promptly deliver such payment to, the Administrative Agent.

(d)    The Administrative Agent shall promptly distribute to each Lender at its primary address set forth on the appropriate signature page hereof or at such other address as a Lender may request in writing, such funds as such Lender may be entitled to receive.

2.12    Credit Support.

(a)    Security.    The Obligations and all Advances under the Term Loan and the Acquisition Loan shall be secured by the following:

(1)    Any Security Agreement dated of even date hereof or hereafter duly executed by Borrower;

(2)    Any Security Document duly executed by Borrower; and

(3)    Any other Loan Documents.

(b)    Collateral.    All Collateral now or hereafter pledged, mortgaged, hypothecated or assigned to Administrative Agent and/or the Lenders to secure any Loan made pursuant hereto shall secure every Loan made hereunder.

(c)    Further Assurances.    Borrower shall execute and deliver, or cause to be executed and delivered, to Administrative Agent such additional security agreements, pledge agreements and other instruments, agreements, certificates, opinions and documents (including, without limitation, Uniform Commercial Code financing statements and fixture filings and landlord waivers and estoppels) as Administrative Agent may reasonably request in its good faith business judgment to establish, maintain, perfect, protect and evidence the rights provided to Administrative Agent pursuant to the Loan Documents.

## ARTICLE III.
## CONDITIONS PRECEDENT

3.1    Conditions Precedent to Effectiveness.    The obligation of each of the Lenders to make any Advance hereunder, is subject to the following conditions precedent:

(a)    Prior to the initial Advance under the Term Loan or Acquisition Loan, the Administrative Agent shall have received copies of all of the following, each in form and substance reasonably satisfactory to the Administrative Agent in all respects, unless waived by Administrative Agent:

(1) This Agreement, appropriately completed and duly executed by the parties hereto;

(2) The Notes, appropriately completed and duly executed by the Borrower;

(3) The Security Agreement, appropriately completed and duly executed by the parties thereto;

(4) Uniform Commercial Code financing statements authorized by the Borrower as debtor, and naming the Administrative Agent as secured party with respect to the Collateral;

(5) All other Security Documents required by the Administrative Agent and the Lenders, duly executed by the parties thereto;

(6) A legal opinion of counsel to the Borrower;

(7) A closing certificate (the "Closing Certificate"), executed by an authorized officer of the Borrower, certifying in the name of and on behalf of Borrower that (A) the representations and warranties contained in this Agreement and each other Loan Document are true and accurate in all material respects, (B) no Default or Event of Default has occurred and is continuing and (C) no Material Adverse Occurrence has occurred since June 30, 2006, and, to the Borrower's knowledge, no event or circumstance exists which, if continued could cause or constitute a Material Adverse Occurrence;

(8) A certificate executed by an authorized officer of Borrower, certifying in the name of and on behalf of Borrower that (A) a true, correct and complete copy of its Articles of Incorporation or other charter document, with all amendments thereto (as certified by the Secretary of State or similar state official), is attached to the certificate, (B) a true, correct and complete copy of its by-laws, with all amendments thereto, is attached to the certificate, (C) a correct and complete copy of the resolutions of its directors authorizing the execution, delivery and performance of the Loan Documents to which it is a party are attached to the certificate, and such resolutions have not been subsequently modified or repealed, and (D) certificates of good standing dated within a reasonably close period of time prior to the Closing Date for the Borrower issued by the Secretary of State or similar state official for each state in which Borrower is required to be qualified to do business are attached to the certificate, and (E) there are no proceedings pending as to the merger, consolidation, liquidation, dissolution of or similar event with respect to the Borrower;

(9) A certificate executed by the secretary of the Borrower certifying in the name of and on behalf of Borrower the names of the officers of the Borrower authorized to sign the Loan Documents and to give notices and other communications in connection with this Agreement and the transactions contemplated hereby, together with a sample of the true signature of such officers;

(10) A certified copy of all documents evidencing any necessary consent or governmental approvals (if any) with respect to the execution, delivery and performance of the Loan Documents and the consummation of the transactions contemplated hereby;

(11) Duly executed copies of payoff letters and duly executed Lien releases with respect to any Liens, if any, which are not Permitted Liens upon the Unit(s) to be pledged as Collateral hereunder, in connection with an Advance hereunder;

(12) Duly executed copies of each Material Contract, if requested by the Administrative Agent, relating to the Unit being pledged as Collateral;

(13) Evidence of insurance for all insurance required to be maintained by the Borrower pursuant to this Agreement and the Security Documents;

(14) Administrative Agent shall have received, reviewed and approved the financial statements described in <u>Section 4.5</u> hereof (it being acknowledged by Administrative Agent that the financial statements delivered to Administrative Agent prior to the Closing Date satisfy this requirement);

(15) Administrative Agent shall have received a tri-party agreement executed by Borrower, Administrative Agent and Franchisor in form satisfactory to Administrative Agent, or has waived this requirement;

(16) Administrative Agent shall have received a Franchise Agreement executed by Borrower and Franchisor in form reasonably satisfactory to Administrative Agent or such other evidence of approval of the Unit for a Franchise Agreement that the Administrative Agent may reasonably request;

(17) Administrative Agent shall have received an estoppel as to the Franchise Agreements executed by Franchisor in form reasonably satisfactory to Administrative Agent;

(18) Administrative Agent shall have received a Consent and Agreement executed by Manager in form reasonably satisfactory to Administrative Agent;

(19) Such other approvals, agreements, certificates or documents as the Administrative Agent or the Lenders may reasonably request; and

(20) Administrative Agent shall have received the Guaranty.

(b)    In addition to the items set forth in sub-paragraph (a) above, the Administrative Agent shall have received copies of all of the following, each in form and substance satisfactory to the Administrative Agent in all material respects, unless waived by Administrative Agent:

(1)    Mortgage or Leasehold Mortgages relating to each fee or groundleased Unit as set forth on **Schedule 3.1(b)(1)** attached hereto for which a request for an Advance is made, in recordable form, appropriately completed and duly executed by the parties thereto;

(2)    Collateral Assignment of Lease relating to each leased Unit as set forth on **Schedule 3.1(b)(2)** attached hereto for which an Advance is made, appropriately completed and duly executed by the parties thereto;

(3)   Lease due diligence including a copy of the ground lease or Unit lease, memorandum of lease (for any ground lease), subordination, non-disturbance and attornment agreements from fee mortgages and estoppel letters or consents from each of the lessors on each parcel of Real Property or Unit leased by the Borrower that comprises Collateral for the Obligations. Borrower and Lender acknowledge and agree that landlord consents for the Units set forth on **Schedule 3.1(b)(3)** have not been obtained as of the Closing Date and will not subsequently be obtained.

(4)   Mortgagee title insurance policies (or marked commitments to issue the same) for Real Property described in the Mortgages and Leasehold Mortgages issued by a nationally-recognized title insurance company reasonably satisfactory to the Administrative Agent in amounts satisfactory to the Administrative Agent assuring the Administrative Agent that the Mortgages and Leasehold Mortgages on such Real Property are valid and enforceable first priority mortgage liens on such Real Property free and clear of all defects and encumbrances except Permitted Liens, and such policies (or commitments to issue the same) shall otherwise be in form and substance satisfactory to the Administrative Agent; and

(5)   Real Property due diligence including an ALTA survey, zoning approvals, permits and flood zone certification for any fee or ground leased Real Property that comprises Collateral for the Obligations.

(c)   In addition to the items set forth in sub-paragraph (a) and (b) above, prior to each Advance under the Term Loan, the Administrative Agent shall have received the following, in form and substance reasonably satisfactory to the Administrative Agent in all material respects, unless waived by Administrative Agent:

(1)   Evidence of $10,250,000 of equity funded by the Borrower towards the Acquisition; and

(2)   Copies of the Asset Purchase Agreement.

(d)   In addition to the items set forth in sub-paragraph (a) and (b) above, prior to each and every Advance under the Acquisition Loan, the Administrative Agent shall have received the following, in form and substance reasonably satisfactory to the Administrative Agent in all material respects, unless waived by Administrative Agent:

(1)   Evidence of the value and/or cost of the Unit and Equipment for which the Advance is requested; and

(2)   Evidence that (i) Borrower is in full compliance with the terms and conditions of this Agreement and the other Loan Documents at the time of the request for Advance; (ii) after taking into consideration the pro-forma impact of the Acquisition for which the Advance is requested, Borrower will remain in full compliance with this Agreement; and (iii) the acquired Unit or Units will not create a known Material Adverse Occurrence hereunder;

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

(e)     Payment by the Borrower of all fees in accordance with the provisions of Section 2.9 hereof, which payment shall be nonrefundable; and

(f)     Payment by the Borrower of all costs and expenses of the Administrative Agent's counsel (including, without limitation, reasonable legal fees and expenses) reasonably incurred in connection with the preparation and execution of the Loan Documents and incident to all proceedings in connection with, transactions contemplated by, and documents relating to this Agreement and the Loan Documents, which payment shall be nonrefundable.

The making of the Advance hereunder shall not constitute a waiver by the Administrative Agent or any Lender of any right which the Administrative Agent or such Lender may have in the event that any certificate, agreement, financial statement or other document delivered pursuant to this Section 3.1 or otherwise in connection with the transactions contemplated by this Agreement shall prove to have been false or misleading in any respect.

3.2     Conditions Precedent to All Advances. The obligation of each of the Lenders to make any Advance hereunder, shall be further subject to the satisfaction of each of the following conditions immediately prior to or contemporaneously with each such Advance, unless waived in writing by the Administrative Agent:

(a)     A Notice of Borrowing appropriately completed and duly executed by the Borrower;

(b)     The representations and warranties set forth in Article IV hereof and in each of the other Loan Documents are true and correct in all material respects on the Closing Date and on the date of and after giving effect to the making of the Advance, except that the representations and warranties set forth in Section 4.5 as to the financial statements of the Borrower shall be deemed to be updated to refer to the audited and unaudited financial statements of the Borrower, as the case may be, most recently delivered to the Administrative Agent and the Lenders pursuant to Section 5.1;

(c)     No Default or Event of Default shall then have occurred and be continuing on the date of the making of the Advance;

(d)     Each of the Administrative Agent and the Lenders shall have received all such other certificates, reports, statements, opinions of counsel or other documents as the Administrative Agent or any Lender may reasonably request;

(e)     There shall have occurred no event which constitutes or, with notice or passage of time, could reasonably be expected to constitute or cause a Materially Adverse Occurrence; and

(f)     The making of the Advance by such Lender, is not in violation of any applicable law, rule or regulation or any directive, request or order of any court or governmental authority having jurisdiction over such Lender.

The delivery of the Notice of Borrowing by the Borrower shall constitute a certification by the Borrower, binding upon the Borrower, as to the matters set forth in subsections (b), (c) and (e) above.

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

## ARTICLE IV.
## REPRESENTATIONS AND WARRANTIES

Each Borrower represents and warrants to the Administrative Agent and each of the Lenders that as of the Closing Date and as of the date of each Advance, as follows:

4.1     Organization; etc. Each Borrower is validly organized and existing and in good standing under the laws of the state of its organization, has full power and authority to own its property and conduct its business as conducted by it and is duly qualified to do business and is in good standing as a foreign corporation in each jurisdiction where the nature of its business or the character of its property makes such qualification or licensing necessary. A list of jurisdictions in which the Borrower is qualified to do business is set forth in **Schedule 4.1**. The Borrower has full power and authority to enter into and to perform its obligations under the Loan Documents and to request Advances under this Agreement. The Borrower has all licenses, permits and rights necessary to carry on its business as now being conducted and to own and operate its Property, except for permits, licenses, and rights the failure of which to have or obtain, individually or in the aggregate, is not and will not result in a Material Adverse Occurrence.

4.2     Due Authorization. The execution, delivery and performance by the Borrower of the Loan Documents to which it is a party (a) have been duly authorized by all necessary action, (b) do not require any approval or consent of, or any registration, qualification or filing with, any governmental agency or authority or any approval or consent of any other Person, (c) do not and will not conflict with, result in any violation of or constitute any default under, any provision of the organizational, constitutive or governing documents (including, as applicable, articles of incorporation, by-laws, articles of organization and operating agreements) of the Borrower, any agreement binding on or applicable to the Borrower, or any of its Property, or any law or governmental regulation or court decree or order binding upon or applicable to the Borrower or any of its Property and (d) will not result in the creation or imposition of any Lien on any of the Borrower's Property pursuant to the provisions of any agreement binding on or applicable to the Borrower, or any Property, except Permitted Liens.

4.3     Subsidiaries. The Borrower has no Subsidiaries except those listed on **Schedule 4.3**, which correctly sets forth the name of each Subsidiary, the jurisdiction of its incorporation and the percentage ownership of each Subsidiary which is owned, of record or beneficially, by the Borrower and/or one or more of its Subsidiaries. Each of the Borrower and its Subsidiaries has good and marketable title to all of the shares or other equity interests it purports to own in each of its Subsidiaries, free and clear of any Lien (other than Permitted Liens) and all such shares have been duly issued and are fully paid and non-assessable. Each Subsidiary of the Borrower has been duly organized and is validly existing and in good standing under the laws of its jurisdiction of incorporation or organization and is duly licensed or qualified and in good standing in each other jurisdiction where the nature of the business transacted by it or the character of its properties owned or leased makes such qualification or licensing necessary. A list of the jurisdictions in which each Subsidiary of the Borrower is qualified to do business is set forth on the attached Annex II. Each Subsidiary of the Borrower has full power and authority to own and operate its properties, to carry on its business as now conducted and to enter into and perform the Loan Documents to which it is a party. Each Subsidiary of the Borrower has all licenses, permits, and rights necessary to carry on its business as now being and hereafter

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

proposed to be conducted and to own and operate its properties, except for permits, licenses, and rights the failure of which to have or obtain, individually or in the aggregate, is not and will not result in a Material Adverse Occurrence.    Immediately upon the consummation of the transactions contemplated by the Asset Purchase Agreement, Duke and King Florida, LLC will own all of the Florida Units.

4.4    Validity of the Agreement.  Each Loan Document is the legal, valid and binding obligation of the Borrower and is enforceable in accordance with its terms except that, as to enforcement of remedies, enforcement may be limited by bankruptcy, insolvency or similar laws affecting enforcement of creditors' rights generally.

4.5    Financial Statements.  To Borrower's knowledge, the audited financial statements for the 2004 and 2005 fiscal years and the unaudited statement for the period ending August 31, 2006, prepared for the seller under the Asset Purchase Agreement ("Seller"), copies of which have heretofore been delivered by the Borrower to the Administrative Agent, present fairly in all material respects the financial condition and results of operations and cash flows of the Units being purchased by Borrower for and as of the end of each of the periods presented therein.

4.6    Business.    The Borrower is engaged in the business of acquiring, owning, marketing, promoting and operating restaurant facilities and offering services ancillary thereto.

4.7    Litigation; etc.    There is no action, suit, claim, demand, cause of action, proceeding, arbitration or investigation at law or equity, or before or by any federal, state, local or other governmental department, commission, court, tribunal, board, bureau, agency or instrumentality, domestic or foreign, pending, or to the knowledge of the Borrower threatened, against the Borrower or any of its Properties, which if determined adversely would result in a Material Adverse Occurrence.

4.8    Compliance with Law.  Borrower is not (a) in default or breach with respect to any judgment, order, writ, injunction, rule, regulation or decree of any court, governmental authority, department, commission, agency or arbitration board or tribunal or (b) in violation of any law, rule, regulation, ordinance or order relating to its businesses, the breach, default or violation of which could result in a Material Adverse Occurrence.

4.9    ERISA Compliance.  With respect to each Plan intended to be qualified under Section 401(a) of the Code, the Internal Revenue Service has issued (or will issue prior to the implementation of such Plan) a favorable determination or prototype opinion letter, and nothing has occurred since the date of that determination that could reasonably be expected to materially, adversely affect the qualified status of such Plan.  All Plans sponsored by the Borrower comply in all material respects with ERISA and other applicable laws.  Except as could not reasonably be expected to result in a Material Adverse Occurrence, there exist with respect to the Borrower no Multiemployer Plans, for which a withdrawal or termination liability may be incurred.  Except as could not reasonably be expected to result in a Material Adverse Occurrence, there exist with respect to all Plans:  (a) no material accumulated funding deficiency within the meaning of ERISA; (b) no termination of any Plan which would result in any material liability to the PBGC or any "reportable event," as that term is defined in ERISA, which is likely to constitute grounds for termination of any Plan by the PBGC; (c) no "prohibited transaction," as

that term is defined in ERISA, which is likely to subject any party dealing with any Plan to any tax or penalty on prohibited transactions imposed by Section 4975 of the Code, and (d) no pending disputes, arbitrations, claims, suits, grievances or governmental audits involving any Plan (other than routine claims for benefits payable under any such Plan) that could reasonably be expected (individually or in the aggregate) to result in liability of the Borrower.

4.10    Title to Assets. Each Borrower holds or will hold good, legal and marketable title to any Equipment used in its respective business and pledged as Collateral for the Obligations, free and clear of all Liens except for Permitted Liens and other encumbrances permitted pursuant to Section 6.4. Each Borrower holds a valid leasehold in all Real Property ground leased and all Improvements leased by it and pledged as Collateral for the Obligations, and no defaults shall exist under any such leases when pledged as Collateral.  Except for financing statements evidencing Permitted Liens, or financing statements for which terminations will be tendered to the Administrative Agent prior to or contemporaneously with the first Advance for any Unit, no financing statement under the Uniform Commercial Code as in effect in any jurisdiction and no other filing which names the Borrower as debtor or which covers or purports to cover any of the Real Property, Improvements or Equipment pledged as Collateral for the Obligations, will be effective and on file in any state or other jurisdiction, and Borrower will not sign or authorize any such financing statement or filing or any security agreement authorizing any secured party thereunder to file any such financing statement or filing other than in favor of Administrative Agent or the Lenders.

4.11    Indebtedness and Liabilities.  Except for Indebtedness disclosed in the financial statements referred to in Section 4.5, Borrower has no material liabilities, contingent or otherwise, other than as disclosed in the financial statements referred to in Section 4.5, and Indebtedness incurred in the ordinary course of business consistent with past practice since the date of the last such financial statements and there are no material unrealized losses of the Borrower other than those which have been disclosed in writing to the Administrative Agent prior to the Closing Date and identified as such.

4.12    No Investments.  Other than Permitted Investments, or as reflected in the financial statements described in Section 4.5, Borrower has no Investments in any Person.

4.13    Use of Proceeds.  Proceeds of Advances of the Term Loan will used to acquire Units pursuant to the Asset Purchase Agreement. The proceeds of the Advances of the Acquisition Loan will be used by the Borrower to fund the acquisition of additional Units.

4.14    Governmental Regulation.   Borrower is not required to obtain any consent, approval, authorization, permit or license which has not already been obtained from, or effect any material filing or registration which has not already been effected with, any federal, state or local regulatory authority in connection with the execution and delivery of this Agreement or the performance, in accordance with their respective terms, of this Agreement or any other Loan Document.

4.15    Margin Stock.  Borrower is not engaged principally, or as one of its important activities, in the business of extending credit for the purposes of purchasing or carrying any such margin stock.

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement DOC

4.16   Investment Company Act.   Borrower is not an "investment company," or an "affiliated person" of, or a "promoter" or "principal underwriter" for, an "investment company," as such terms are defined in the Investment Company Act of 1940, as amended.  The making of the Advances, the application of the proceeds and repayment thereof by the Borrower and the performance of the transactions contemplated by this Agreement will not violate any provision of said Act, or any rule, regulation or order issued by the Securities and Exchange Commission thereunder.

4.17   Unregistered Securities.   Borrower has not (a) offered, sold or issued any securities in violation of the registration requirements of Section 5 of the Securities Act of 1933, as amended, or any other federal or state law concerning the offer or sale of securities; or (b) violated any rule, regulation or requirement under the Securities Act of 1933, as amended, or the Securities Exchange Act of 1934, as amended, or any state law applicable to securities.

4.18   Accuracy of Information.   All information other than projections, budgets, estimates and general market data heretofore or herewith furnished by or on behalf of the Borrower to the Administrative Agent or the Lenders for purposes of or in connection with this Agreement or any transaction contemplated by this Agreement is, and all other such information hereafter furnished by or on behalf of the Borrower to the Administrative Agent or the Lenders will be, when taken as a whole, true and accurate in all material respects on the date as of which such information is dated or certified and no such information contains any material misstatement of fact or omits to state a material fact necessary to make such information, taken as a whole, not materially misleading in light of the circumstances when made.

4.19   Tax Returns; Audits.   The Borrower has filed all federal, state and local tax returns and other reports which are required to be filed, and has paid all taxes as shown on said returns and on all assessments received by any such Person (except for any assessments which are being contested in good faith by appropriate proceedings that will prevent a forfeiture or sale of any property and for which an adequate reserve has been provided on the books of the Borrower in accordance with GAAP), to the extent that such taxes have become due or has obtained extensions with respect to the filing of such returns and has made provision for the payment of taxes anticipated to be payable in connection with such returns.  The Borrower has made all required withholding deposits.   The Borrower does not have knowledge of any objections to or claims for additional taxes by federal, state or local taxing authorities against it, and there are no pending or to Borrower's knowledge threatened tax audits by any federal, state or local taxing jurisdiction against Borrower.

4.20   Environmental and Safety Regulations.   The Borrower is in compliance with all requirements of applicable Environmental Laws except for any noncompliance which, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Occurrence with respect to the Borrower and, to the knowledge of Borrower, is not the subject of any federal or state investigation evaluating whether any remedial action is needed to respond to a release of any toxic or hazardous waste or substance into the environment, which remedial reaction, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Occurrence.  The Borrower further represents and warrants that (i) any Real Property comprising Collateral for the Obligations complies with all applicable Environmental Laws, except in each case for any noncompliance which, individually or in the aggregate, would

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement DOC

not reasonably be expected to result in a Material Adverse Occurrence and (ii) no notice, demand, request for information, citation, summons or order has been issued, no complaint has been filed, no penalty has been assessed and no investigation or review is pending or to Borrower's knowledge threatened by any governmental or other entity with respect to any alleged failure by the Borrower to comply in any respect with any Environmental Laws, in each case the subject matter of which, individually or in the aggregate, would reasonably be expected to result in a Material Adverse Occurrence. This Section 4.20 sets forth the sole representations and warranties of Borrower with respect to environmental, health and safety matters.

4.21    Payment of Wages.  The Borrower is in compliance with the Fair Labor Standards Act, as amended, in all material respects.

4.22    Intellectual Property.  The Borrower owns, possesses or has the right to use all material licenses and rights to all patents, trademarks, trademark rights, trade names, trade name rights, trade dress, service marks, domain marks and copyrights necessary to conduct their business in all material respects as now being conducted, without, to the knowledge of Borrower, conflict with any patent, trademark, trade name, service mark, license or copyright of any other Person.   All of Borrower's material licenses and rights with respect to patents, trademarks, trademark rights, trade names, trade name rights, service marks and copyrights are in full force and effect in all material respects, and are not subject to any pending or, to the knowledge of the Borrower, threatened challenge or revocation.

4.23    Projections.  The budget projections of the Borrower, furnished annually to the Administrative Agent and each of the Lenders, consisting of balance sheets, cash flow statements and income statements of the Borrower after giving effect to the making of the Advances hereunder and the application of the proceeds thereof, together with appropriate supporting details and a statement of underlying assumptions, have been prepared in the light of the past business history of the Borrower and on the basis of the assumptions set forth therein, which assumptions are in the opinion of the Borrower reasonable, it being understood that projections are no guaranty as to future performance. Such budget projections have been prepared in good faith and represent the good faith opinion of the Borrower as to the most probable course of business of the Borrower on the basis of the assumptions which are set forth therein.

4.24    Solvency.  After giving effect to the transactions contemplated by this Agreement, the Borrower has capital sufficient to carry on its business, is solvent and is able to pay its debts and obligations as they mature in the ordinary course.  After giving effect to the consummation of the transactions contemplated by this Agreement, the Borrower owns Property having a value, both at fair valuation and at present fair saleable value, greater than the amount required to pay its debts, obligations and contingent liabilities.

4.25    No Default.  As of the date hereof, no Default or Event of Default has occurred and is continuing.  Borrower is in compliance in all material respects with all of the provisions of its articles of incorporation and by-laws, and no event has occurred or failed to occur which has not been remedied or waived, the occurrence or non-occurrence of which constitutes, or with the passage of time or giving of notice or both would constitute, (i) an Event of Default or (ii) a material default by the Borrower under any indenture or material agreement relating to any

Indebtedness of Borrower to any Person or any judgment, decree or order to which the Borrower is a party or by which the Borrower or any of its Properties is bound.

4.26    No Material Adverse Occurrence.    Since the date of the most recent audited financial statements submitted to the Administrative Agent and the Lenders as described in Section 4.5, there has occurred no event which is or which, with notice, the passage of time, or both, could be a Material Adverse Occurrence.

4.27    Material Contracts.    All of the Material Contracts are in full force and effect and the Borrower is not in default under any Material Contract and, to the knowledge of the Borrower, no other Person that is a party thereto is in material default under any of the Material Contracts.  None of the Material Contracts prohibits, restricts or is breached by, the transactions contemplated by the Loan Documents.

4.28    Leasehold Units and Lease Units.    With respect to any Unit which comprises (i) the interest of Borrower as tenant under a ground lease of the related Real Property but not by the related fee interest in such Real Property or (ii) the interest of Borrower as tenant under a lease of the Improvements, Borrower represents that:

(a)    The lease (i) is valid, legal and binding and enforceable in accordance with its terms; and (ii) permits the interest of the tenant thereunder to be encumbered or the landlord thereunder has consented to the encumbrance by the related Leasehold Mortgage or assigned by the related Collateral Assignment of Lease; and (iii) does not restrict the use of the Property except as such use may be restricted to a franchised restaurant and related improvements by such tenant, its successors or assigns;

(b)    Except as set forth on **Schedule 4.28(b)**, such lease has an original term (or an original term plus one or more optional renewal terms which under all circumstances may be exercised by Borrower and can be enforced by Lender on behalf of Borrower) which extends not less than one (1) year beyond the Maturity Date.

All representations and warranties made under this Agreement and the other Loan Documents shall be deemed to be made, and shall be true and correct, at and as of the Closing Date and on the date of each Advance.  All representations and warranties made under this Agreement shall survive, and not be waived by, the execution hereof by the Lenders and the Administrative Agent, any investigation or inquiry by any Lender or the Administrative Agent, or the making of any Advance under this Agreement.

### ARTICLE V.
### CERTAIN AFFIRMATIVE COVENANTS

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Loan shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

5.1    Financial Information; etc.    The Borrower will furnish to the Administrative Agent copies of the following financial statements, reports and information:

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

(a)    within one hundred twenty (120) days after the end of each fiscal year of the Borrower, a copy of the audited consolidated financial statements, including balance sheet, related statements of operations, and statements of cash flows, of the Borrower for such fiscal year, with comparative figures for the preceding fiscal year, prepared in accordance with GAAP, certified without qualification or exception, by a firm of independent public accountants which is reasonably acceptable to the Administrative Agent, accompanied by a certificate of the chief financial officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower in accordance with GAAP for such period;

(b)    within forty-five (45) days after the end of each of the first three (3) fiscal quarterly periods of each fiscal year of the Borrower, statements of operations and cash flows of the Borrower for such period and for the period from the beginning of the respective fiscal year to the end of such period, and the related balance sheets as at the end of such period, setting forth in each case in comparative form the corresponding figures for the corresponding period in the preceding fiscal year, accompanied by a certificate of the chief financial officer of the Borrower which shall state, in the name and on behalf of the Borrower, that said financial statements are complete and correct in all material respects and fairly present the financial condition and results of operations of the Borrower in accordance with GAAP for such period, subject to year-end adjustments and the absence of footnotes;

(c)    with each financial statement required by Section 5.1(a) and Section 5.1(b) to be delivered to the Administrative Agent, a Compliance Certificate signed by the chief financial officer of the Borrower;

(d)    promptly after the Borrower knows or has reason to know that any Default or Material Adverse Occurrence has occurred, but in any event not later than five (5) days after any officer of the Borrower becomes aware thereof, a notice of such Default or Material Adverse Occurrence describing the same in reasonable detail and a description of the action that the Borrower has taken and proposes to take with respect thereto;

(e)    promptly following the commencement of any litigation, suit, administrative proceeding or arbitration relating to the Borrower or any of its Properties which if adversely determined could be a Material Adverse Occurrence or otherwise relating in any way to the transactions contemplated by this Agreement, but in any event not later than thirty (30) days after any officer of the Borrower becomes aware thereof, a notice thereof describing the allegations of such litigation, suit, administrative proceeding or arbitration and the Borrower's response thereto;

(f)    promptly upon learning thereof, but in any event not later than thirty (30) days after any officer of the Borrower becomes aware thereof, a notice of the occurrence of any event which constitutes an exception to any representation or warranty or a breach of any covenant or agreement made by the Borrower in any Loan Document regardless of whether such representation or warranty is required to be made as of the date of such event;

(g)    promptly upon learning thereof, any "reportable event" or "prohibited transaction" or the imposition of a withdrawal or termination liability on the Borrower within the meaning of

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

ERISA in connection with any Plan or Multiemployer Plan, and, when known, any action taken by the Internal Revenue Service, Department of Labor or PBGC with respect thereto;

(h)    annually, a certificate of insurance indicating that the Borrower continues to maintain all insurance coverages required under the Loans Documents;

(i)    annually, and in no event later than March 1 of each year, a copy of the updated annual budget and financing projections, in each case, as presented to Borrower's Board of Directors, for the Borrower for such fiscal year; and

(j)    such other information with respect to the financial condition and operations of the Borrower as the Administrative Agent or any Lender may reasonably request.

5.2    <u>Maintenance of Existence; etc.</u>    Borrower shall maintain and preserve its existence, and qualification and good standing in all states in which such qualification and good standing are required in order to conduct its business and own its property as conducted and owned in such states.

5.3    <u>Maintenance of Properties and Material Contracts</u>.    The Borrower will maintain or cause to be maintained in the ordinary course of business in good repair, working order and condition (reasonable wear and tear excepted) all tangible Properties used in its respective business (whether owned or held under lease), and from time to time make or cause to be made all needed and appropriate repairs, renewals, replacements, additions, betterments and improvements thereto.  The Borrower will comply in all material respects with its obligations under all Material Contracts and to continue such Material Contracts in full force and effect without breach thereof, except to the extent non-compliance would not be a Materially Adverse Occurrence.  Borrower shall cause the term of each of the Franchise Agreements set forth on **Schedule 5.3** to be  extended prior to the termination thereof.

5.4    <u>Payment of Taxes; etc.</u>    The Borrower shall pay and discharge as the same may become due and payable, all taxes, assessments and other governmental charges or levies against or on any of its Property, as well as claims of any kind which, if unpaid, might become a Lien upon any of its Property; provided, however, that the foregoing shall not require the Borrower to pay any such tax, assessment, charge, levy or claim so long as the validity thereof shall be contested diligently in good faith by appropriate proceedings that will prevent a forfeiture or sale of any Property and an adequate book reserve in accordance with GAAP shall have been set aside with respect thereto, but only so long as such tax, assessment, charge, levy or claim does not become a Lien on any assets of the Borrower.  The Borrower shall make all required withholding deposits.

5.5    <u>Compliance with Laws</u>.    The Borrower shall carry on its business activities in substantial compliance with all applicable federal or state laws and all applicable rules, regulations and orders of all governmental bodies and offices having power to regulate or supervise its business activities, including, without limitation, all applicable Environmental Laws.  The Borrower shall maintain all material rights, liens, permits, certificates of compliance or grants of authority required or useful in the conduct of its business.  The Borrower agrees that the Units and their intended uses will comply at all times and in all material respects with all

40

applicable laws, governmental regulations and the terms of any enforcement action now or hereafter commenced by any federal, state, regional or local governmental agency.

5.6     Books and Records; etc.  The Borrower shall keep (a) a system of accounting administered in accordance with GAAP and (b) books and records reflecting all of its business affairs and transactions in accordance with GAAP.     The Borrower shall permit the Administrative Agent and its representatives, at reasonable times and intervals and upon reasonable notice to the Borrower, to visit the offices of the Borrower, discuss financial matters with officers of the Borrower and examine any of the Borrower's books and other company records.  With the prior consent of Borrower, not to be unreasonably withheld, Administrative Agent may also discuss Borrower's financial matters with Borrower's independent public accountants; provided, however, that upon the occurrence and continuance of an Event of Default, Borrower's prior consent to contact the accountants shall not be required.

5.7     Insurance.  The Borrower will:

(a)     Maintain insurance including, but not limited to, business interruption coverage and public liability coverage insurance from reputable companies in such amounts and against such risks to the Borrower as is prudent and reasonably satisfactory to the Administrative Agent (including, without limitation, larceny, embezzlement, employee fidelity, and other criminal misappropriation insurance);

(b)     Keep the Collateral insured by reputable companies against loss or damage by fire, theft, burglary, pilferage, loss in transit, explosions and hazards in amounts which are prudent in the business judgment of the Borrower and reasonably satisfactory to the Administrative Agent, all premiums thereon to be paid by the Borrower;

(c)     Require that each insurance policy for the Collateral provide for at least thirty (30) days' prior written notice to the Administrative Agent of any termination of or proposed cancellation or non-renewal of such policy, or material reduction in coverage, and name the Administrative Agent (for itself and for the ratable benefit of the Lenders) as additional named loss payee and/or additional named insured;

(d)     Subject to the specific provisions set forth in the Mortgages or Leasehold Mortgages encumbering Real Property pledged as Collateral regarding the use of insurance proceeds (which Mortgage or Leasehold Mortgage provisions shall control), all proceeds of insurance relating to the Collateral shall be paid to the Administrative Agent and shall be applied to the payment or prepayment of the Obligations as provided under Section 2.12(a) or Section 2.12(b), as applicable.  Any balance thereof remaining after payment in full of the Obligations shall be paid to the Borrower or as otherwise required by law; and

5.8     Maintain Business and Fiscal Year End.  The Borrower shall continue to engage primarily in the business or businesses being conducted on the date of this Agreement.  The Borrower will maintain a fiscal year ending on December 31 of each year.

5.9     ERISA.

(a)     The Borrower will not at any time permit any Plan to:

41

(1) engage in any "prohibited transaction" as such term is defined in Section 4975 of the Code or in Section 406 of ERISA;

(2) incur any "accumulated funding deficiency" as such term is defined in Section 302 of ERISA, whether or not waived;

(3) be terminated under circumstances which are likely to result in the imposition of a lien on the property of the Borrower pursuant to Section 4068 of ERISA, if and to the extent such termination is within the control of the Borrower; or

(4) be operated or administered in a manner which is not in compliance with ERISA or any applicable provisions of the Code;

if the event or condition described in (1), (2), (3) or (4) above is likely to subject the Borrower to a Material Adverse Occurrence.

(b)    Upon the request of the Administrative Agent or any Lender, the Borrower will furnish a copy of the annual report of each Plan (Form 5500) maintained by the Borrower required to be filed with the Internal Revenue Service. Copies of such annual reports shall be delivered no later than thirty (30) days after the date the copy is requested.

5.10    Changes to GAAP.  In the event that the Borrower makes any changes to the accounting principles used in the preparation of the Borrower's books and/or financial statements such that such principles are not applied consistently with any such principles applied during any prior period, (a) such change shall be in accordance with GAAP in effect at the time of such change and shall be concurred in by the certified public accountants certifying the financial statements of the Borrower, and (b) the Borrower shall give the Administrative Agent written notice thereof within fifteen (15) Business Days after such change.  The Administrative Agent is hereby authorized to adjust the financial covenants of this Agreement to reflect the effect of such changes and such adjustments shall become effective as indicated by the Administrative Agent; provided, however, that if the Required Lenders object to such changes or adjustments in writing within thirty (30) days of delivery of notice thereof by the Administrative Agent, then such financial covenants shall be modified to reflect changes approved by the Required Lenders and such modified covenants shall become effective as provided by such Required Lenders.

5.11    Use of Proceeds.  The Borrower will use the proceeds of the Advances only for lawful purposes and in accordance with Sections 4.13 hereof.  No proceeds of any Loans hereunder shall be used for the purchase or carrying or the extension of credit for the purpose of purchasing or carrying any margin stock within the meaning of Regulations T, U and X or to extend credit to others for the purpose of purchasing or carrying any margin stock.  No part of the proceeds of any Advance will be used by the Borrower for any purpose which violates, or which is inconsistent with, any regulations promulgated by the Board of Governors of the Federal Reserve System.

5.12    Security Documents.  If at any time either the Borrower makes an Investment in or creates an entity which is or becomes a Subsidiary (other than an entity organized outside of the United States), Borrower shall take all reasonable action and execute such agreements, documents and instruments, including without limitation execution and delivery of a counterpart

signature page to the Security Agreement and execution and delivery of such other Security Documents, that may be necessary to grant to the Administrative Agent, for the benefit of the Lenders, a first priority, perfected security interest and Lien (subject to the limitations set forth in the Security Agreement) in any Collateral owned by such new Subsidiary.

5.13    Payment of Indebtedness; Loans.    Subject to any provisions regarding subordination herein or as set forth in any other Loan Document, the Borrower will pay any and all of its Indebtedness when and as it becomes due, other than amounts diligently disputed in good faith and for which adequate reserves have been set aside in accordance with GAAP.

5.14    Pledge of Collateral.    All Units acquired with any Advance of Loan proceeds shall be pledged as Collateral (in conformance with the provisions of the Security Agreement), free and clear of any liens or encumbrances (other than Permitted Liens), and all necessary Security Documents shall be executed and delivered to Administrative Agent to secure the Obligations attributable to such Units.

5.15    Survival of Warranties and Representations.    The Borrower covenants, warrants and represents to the Administrative Agent and each Lender that all representations and warranties of the Borrower contained in this Agreement and in the other Loan Documents shall be true in all material respects at the time of Borrower's execution of this Agreement and (except as otherwise agreed to by the Administrative Agent and the Required Lenders, if required, in writing) on the date of each Advance or Loan hereunder and shall survive the execution, delivery and acceptance hereof and thereof by the parties thereto and the closing of the transactions described herein and therein or related hereto and thereto and any investigation at any time made by or on behalf of the Administrative Agent or any of the Lenders shall not diminish their rights to rely thereon.

5.16    Interest Rate Protection.    Borrower shall maintain not less than fifty percent (50%) of Term Loan A and all Acquisition Loans as Effective Fixed Rate Loans.

## ARTICLE VI.
## CERTAIN FINANCIAL COVENANTS AND NEGATIVE COVENANTS

The Borrower agrees with the Administrative Agent and each of the Lenders that, from the date hereof and thereafter for so long as any portion of any Advance, shall be outstanding or any Lender shall have any Commitment hereunder, unless the Required Lenders shall otherwise consent in writing:

6.1    Fixed Coverage Ratio.    For each twelve-month period ending on the last day of each fiscal quarter of the Borrower, the Borrower will not permit the ratio of (i) Net Income after cash taxes paid plus non-cash items reducing Net Income (minus cash items increasing Net Income) plus rent plus total interest expense minus distributions and/or loans or advances to shareholders or Affiliates divided by (ii) scheduled payments of long-term debt and capitalized leases plus total interest expense plus rent to be less than 1.20 to 1.0.

6.2    Leverage Ratio.    For each twelve-month period ending on the last day of each fiscal quarter of the Borrower, the Borrower shall maintain a Total Leverage Ratio not in excess of the ratio set forth below:

MMMBUCKHEAD-#1531405-v12-duke&kmg_credit_agreement.DOC

| Applicable Time Period | Maximum Total Leverage Ratio |
| --- | --- |
| Agreement Date through June 30, 2007 | 3.50:1.00 |
| Commencing July 1, 2007 and each fiscal quarter thereafter | 3.25:1.00 |

6.3    <u>Maximum Rent Adjusted Leverage</u>.  For each twelve-month period ending on the last day of each fiscal quarter of the Borrower, the Borrower shall maintain a Maximum Rent Adjusted Leverage ratio not in excess of the ratio set forth below:

| Applicable Time Period | Maximum Rent Adjusted Leverage Ratio |
| --- | --- |
| Agreement Date through June 30, 2008 | 6.25:1.00 |
| Commencing July 1, 2008 and each fiscal quarter thereafter | 5.75:1.00 |

For purposes of calculating the ratios in Section 6.2 and 6.3 during the period commencing on the Closing Date and ending on the first anniversary date thereof (the "Initial Testing Period"), the Funded Debt used in the numerator of such calculation shall be an assumed number ("Assumed Funded Debt") which is a percentage of the actual Funded Debt based upon the fiscal quarter being tested (i.e. in the first fiscal quarter of the Initial Testing Period the Assumed Funded Debt will be 25% of the actual Funded Debt; in the second fiscal quarter of the Initial Testing Period the Assumed Funded Debt will be 50% of the actual Funded Debt; etc.). After the Initial Testing Period, the actual Funded Debt shall be used in all calculations.

6.4    <u>Limitations on Indebtedness</u>.  Borrower will not create, assume, incur, issue, guarantee or otherwise become or remain obligated in respect of, or permit to be outstanding, any Indebtedness, except:

(a)    Indebtedness existing on the date hereof and disclosed in the financial statements delivered pursuant to <u>Section 4.5</u> hereof and refinancings, refundings, extensions or renewals thereof;

(b)    Indebtedness owed to the Lenders and represented by the Notes or any other Loan Document;

(c)    Rate Hedging Obligations;

(d)    Indebtedness incurred subsequent the date hereof used to refinance Indebtedness owed to the Lenders secured by particular Collateral, the Net Proceeds of which refinancing are used to pay down the Obligations and obtain a release of the Collateral from Lender's Lien so that

44

a Lien in favor of the refinancing lender can be placed on the Collateral to secure repayment of the new Indebtedness; notwithstanding the foregoing, if the Net Proceeds of the refinancing are not sufficient to pay the Release Price for such Collateral, neither Administrative Agent nor any Lender shall be obligated to release the Collateral from the Lien of the Security Documents unless and until Borrower has tendered the balance of the Release Price;

(e)     Any Guaranty permitted by Section 6.12 hereinbelow;

(f)     Insurance premium financing;

(g)     Unsecured overnight drafts with commercial banks;

(h)     Indebtedness, in addition to Indebtedness permitted by clauses (a) through (g) above, in the form of trade payables and accrued expenses incurred in the ordinary course of business consistent with past practice and Indebtedness for borrowed money in an aggregate principal amount at any one time outstanding not to exceed $100,000, which Indebtedness shall not be secured by a Lien on any Property of the Borrower or its Subsidiaries; and

(i)     Loans from Borrower to a Subsidiary.

6.5     <u>Liens</u>. Borrower will not create, incur, assume or permit to exist or to be created or assumed any Lien on Real Property, Improvements or Equipment pledged as Collateral, whether now owned or hereafter acquired, except the following (the "<u>Permitted Liens</u>"):

(a)     Liens arising by operation of law on the Real Property for real estate taxes and Liens securing taxes, assessments or governmental charges or levies or the claims or demands of contractors, material men, mechanics, carriers, warehousemen, landlords and other like Persons, provided the payment thereof is not required to be made pursuant to <u>Section 5.4</u> hereof;

(b)     Liens incurred or deposits made in the ordinary course of business (1) in connection with workmen's compensation, unemployment insurance, social security and other like laws or (2) to secure the performance of letters of credit, bids, tenders, sales contracts, leases, statutory obligations, surety, appeal and performance bonds and other similar obligations not incurred in connection with the borrowing of money, the obtaining of advances or the payment of the deferred purchase price of the Real Property or Equipment and not in excess of $100,000 in the aggregate outstanding at any one time;

(c)     attachments, judgment and other similar Liens arising in connection with court proceedings, provided the execution or other enforcement of such Liens is effectively stayed and the claims secured thereby are being actively contested in good faith and by appropriate proceedings in such manner as not to have the Real Property, Improvements or Equipment subject to such Liens forfeitable in accordance with <u>Section 5.4</u>;

(d)     easements, rights-of-ways, reservations, exceptions, minor encroachments, rights of entry, restrictive covenants, licenses, restrictions and similar charges created or incurred in the ordinary course of business and not in connection with Indebtedness, and which in the aggregate do not materially detract from the value of any Real Property or materially impair or interfere

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

with its use in the business operations of the Borrower; including any such items included as exceptions in the title policy obtained by Administrative Agent related to the Real Property;

    (e)    Liens described on **Schedule 6.5** attached hereto;

    (f)    Liens approved in writing by Administrative Agent; and

    (g)    Liens in favor of the Administrative Agent for the benefit of the Lenders.

    6.6    Sales of Assets.  Borrower will not sell, lease, abandon, transfer or otherwise dispose of all or substantially all of its assets.

    6.7    Liquidations, Mergers and Consolidations.  Borrower will not liquidate or dissolve itself (or suffer any liquidation or dissolution) or otherwise wind up, or consolidate with or merge into any other Person.

    6.8    Investments.  Borrower will not make or permit to exist any Investment, except that, so long as no Default or Event of Default then exists or is caused thereby, the Borrower may make Permitted Investments.

    6.9    Transactions with Affiliates.  Borrower will not enter into any material transaction (including, without limitation, the purchase, sale or exchange of Property, the rendering of any service, the making of any Investment in an Affiliate or the repayment of any Indebtedness owed to an Affiliate) with an Affiliate, except (a) the Management Agreement and (b) transactions in the ordinary course of business and pursuant to the reasonable requirements of the Borrower's business, upon terms which are fair and reasonable to the Borrower and which are not less favorable to the Borrower than would be obtained in a comparable transaction with a Person not an Affiliate.

    6.10    Acquisitions.  Borrower shall not make any Acquisitions, except that, so long as no Default or Event of Default then exists or is caused thereby, the Borrower may make acquisitions of Units to be owned and operated by the Borrower without the prior written consent of the Administrative Agent, provided such acquisition is made in conformance with the terms and conditions of this Agreement.

    6.11    Amendment and Waiver.  Borrower shall not (i) enter into any amendment of, or agree to or accept or consent to any waiver of any of the material provisions of its articles of incorporation or by-laws, or (ii) enter into any amendment of, or agree to any waiver of any of the material provisions of, any Material Contract, in any manner which would result in a Material Adverse Occurrence.

    6.12    Limitation on Guaranties.  The Borrower shall not at any time guaranty, assume, be obligated with respect to, or permit to be outstanding any guaranty of, any obligation for the payment of money for any other Person other than (a) a guaranty by endorsement of negotiable instruments for collection in the ordinary course of business, (b) obligations under agreements of the Borrower entered into in connection with leases of Real Property or the acquisition of services, supplies and equipment in the ordinary course of business of the Borrower, (c) as may be contained in any Loan Document, (d) in connection with any Indebtedness permitted pursuant

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

to Section 6.3, (e) any guaranty required by the Franchisor and (f) the guaranties listed on **Schedule 6.12**.

6.13    Limitation on Distributions  The Borrower will not make or permit to be made any distributions other than to pay taxes.

6.14    Management Fee.    The Borrower will not pay to Kinderhook management fees in excess of $250,000 on an annual basis and payment of such fees shall be subordinated to payment of the Notes.

6.15    ERISA Liabilities.  The Borrower shall not (i) permit the assets of any of its Plans to be less than the amount necessary to provide all accrued benefits under such Plans on an ongoing basis, or (ii) enter into any Multiemployer Plan.

## ARTICLE VII.
## EVENTS OF DEFAULT

7.1    Events of Default.  The term "Event of Default" shall mean any of the following events occurring for whatever reason, whether voluntary or involuntary, effected by operation of law, judgment, order or otherwise:

(a)    A failure to pay when and as due any principal amount or interest due under the Loans;

(b)    A failure to pay within fifteen (15) days of the date due any fees or other amounts payable to the Lenders pursuant to this Agreement (other than amounts due pursuant to Section 7.1(a) above);

(c)    A default in the due performance and observance of any of the covenants or agreements contained in Sections 5.1; 5.2; 5.7; 5.11; and 5.16 or Article VI;

(d)    A default (other than those defaults specifically described in other subsections of this Section 7.1) by the Borrower in the due performance and observance of any of the covenants contained in this Agreement or any other Loan Document which default is not cured within thirty (30) days after written notice of such default is given to Borrower by Administrative Agent;

(e)    A default by the Borrower on any Indebtedness of the Borrower in excess of $250,000, or under any agreement securing or relating to such Indebtedness, the effect of which is (1) to result in the failure to pay when due such Indebtedness or (2) to cause or permit any holder of such Indebtedness or a trustee to accelerate the maturity of such Indebtedness prior to its stated maturity or prior to its regularly scheduled dates of payment, unless Borrower is contesting such action in good faith and by appropriate proceedings and procedures;

(f)    An involuntary case under any applicable federal or state bankruptcy, insolvency or similar laws shall be commenced against the Borrower and the petition shall not be dismissed, stayed, bonded or discharged within sixty (60) days after the commencement of the case; the entry of a decree or order by a court having jurisdiction in the premises in respect of the Borrower under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal

or state bankruptcy, insolvency or other similar law; or the entry of a decree or order by a court having jurisdiction in the premises appointing a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Borrower or of any substantial part of the property of the Borrower, or ordering the winding up or liquidation of its affairs, and the continuance of any such decree or order unstayed and in effect for a period of sixty (60) consecutive days;

(g)    The commencement by the Borrower of or consent to, a voluntary case under the federal bankruptcy laws, as now or hereafter constituted, or any other applicable federal or state bankruptcy, insolvency or other similar law or the request or consent by it to the appointment of a receiver, liquidator, assignee, trustee, sequestrator or other similar official of the Borrower or of any substantial part of the property of the Borrower, or the making by it of a general assignment for the benefit of creditors, or the failure by the Borrower to pay its debts generally as they become due, or the taking of any action by the Borrower in furtherance thereof;

(h)    Any judgments, writs, warrants of attachment, executions or similar process shall be issued or levied against the Borrower or any of the assets of the Borrower where the amount of such judgments, writs, warrants of attachment, executions or similar process exceeds $100,000 in the aggregate and where such judgments, writs, warrants of attachment, executions or similar process are not discharged, released, vacated, suspended, stayed, abated or fully bonded prior to any sale and in any event within thirty (30) days after its issue or levy;

(i)    Any representation or warranty set forth in this Agreement or any other Loan Document shall be untrue, incorrect or misleading in any material respect on the date as of which the matters set forth are stated or certified, or deemed stated or certified;

(j)    There shall occur any default by Borrower (other than defaults described elsewhere in this Section 7.1) under any Material Contract which remains unremedied for any cure period applicable thereto the result of which is a Material Adverse Occurrence;

(k)    A Change of Control shall occur;

(l)    Any Security Document, other Loan Document or provision thereof shall cease to be in full force and effect or Borrower, or other obligor thereon shall seek to establish the invalidity or unenforceability thereof or otherwise deny liability thereunder; or the Administrative Agent, for the benefit of the Lenders, shall cease to have a first priority, perfected security interest and Lien (subject to the limitations in the Security Agreement) on all or any portion of the Collateral subject or purported to be subject to any Security Document; or

(o)    There shall be at any time any "accumulated funding deficiency," as defined in ERISA or in Section 412 of the Code, with respect to any Plan maintained by the Borrower, or to which the Borrower has any liabilities; or a trustee shall be appointed by PBGC or a federal district court to administer such Plan; or PBGC shall institute proceedings to terminate any such Plan; or the Borrower shall incur any liability to PBGC in connection with the termination of any such Plan; or any Plan of the Borrower shall engage in a "prohibited transaction" (as such term is defined in Section 406 of ERISA or Section 4975 of the Code) which would subject any trustee or administrator thereof, or the Borrower dealing with any such Plan to the tax or penalty in any

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC

material amount on "prohibited transactions" imposed by Section 502 of ERISA or Section 4975 of the Code; or

(p)     Borrower shall fail to deliver the Swap Agreement or any replacement or substitute therefore within the specified period.

7.2     Action If Event of Default. If an Event of Default described in Section 7.1(f) or (g) shall occur, the full unpaid principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder shall automatically be due and payable without any declaration, notice, presentment, protest or demand of any kind (all of which are hereby waived) and the obligation of the Lenders to make additional Advances shall automatically terminate.  If any Event of Default other than pursuant to Section 7.1(f) or (g) shall occur and be continuing, the Required Lenders, upon written notice to the Borrower (which shall be given by the Administrative Agent at the request of the Required Lenders), may terminate the Lenders' obligation to make additional Advances, and may declare the outstanding principal amount of and interest on the Loans and all other amounts due and owing and Obligations hereunder to be due and payable without other notice to the Borrower, presentment, protest or demand of any kind (all of which are hereby waived), whereupon the full unpaid amount of the Loans and any and all other amounts, which shall be so declared due and payable shall bear interest at the Default Rate and shall be and become immediately due and payable.

7.3     Remedies.

(a)     Upon acceleration of the Loans, as provided in Section 7.2, the Administrative Agent and the Lenders shall have all of the post-default rights granted to them, or any of them, under the Loan Documents and under applicable law.

(b)     The Administrative Agent, personally or by attorney, may in its discretion, proceed to protect and enforce its rights and the rights of the Lenders by pursuing any available remedy including a suit or suits in equity or at law, whether for damages or for the specific performance of any obligation, covenant or agreement contained in this Agreement or in the Notes, or in aid of the execution of any power herein or therein granted, or for the enforcement of any other appropriate legal or equitable remedy, as the Administrative Agent shall deem most effectual to collect the payments then due and thereafter to become due on the Notes or under this Agreement, to enforce performance and observance of any obligation, agreement or covenant of the Borrower hereunder or under the Notes or to protect and enforce any of the Administrative Agent's or any Lender's rights or duties hereunder.

(c)     Upon acceleration of the Loans, as provided in Section 7.2, the Administrative Agent shall have the right to the appointment of a receiver for the Collateral of the Borrower pledged to secure the Obligations, both to operate and to sell such Collateral, and the Borrower hereby consents to such right and such appointment and hereby waives any objection the Borrower may have thereto or the right to have a bond or other security posted by the Administrative Agent on behalf of the Lenders in connection therewith.

(d)     No remedy herein conferred upon or reserved to the Administrative Agent or any Lender is intended to be exclusive of any other remedy or remedies, and each and every such

MMMBUCKHEAD-#1531405-v12-duke&king_credit_agreement.DOC