Exhibit C

EXECUTION VERSION

## SECOND AMENDMENT TO CREDIT AGREEMENT

This **SECOND AMENDMENT TO CREDIT AGREEMENT** (this "Amendment"), dated as of February 24, 2009, is by and among Duke and King Acquisition Corp., a Delaware corporation ("DK Acquisition"), Duke and King Florida, LLC, a Delaware limited liability company ("DK Florida"), Duke and King Real Estate, LLC, a Delaware limited liability company ("DK Real Estate"), and Duke and King Missouri, LLC, a Delaware limited liability company ("DK Missouri" and, together with DK Acquisition, DK Florida and DK Real Estate, the "Borrowers"), the financial institutions from time to time party to the Credit Agreement referred to below (the "Lenders"), and Bank of America, N.A., a national banking association, in its capacity as Administrative Agent (the "Administrative Agent") for itself and the other Lenders. Capitalized terms used but not defined herein shall have the meanings assigned to such terms in the Credit Agreement.

## RECITALS

**WHEREAS**, the Borrowers, the Lenders and the Administrative Agent are party to that certain Credit Agreement, dated as of November 1, 2006 (as amended by that certain First Amendment to Credit Agreement, dated as of March 1, 2007, and as may be further amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"); and

**WHEREAS**, certain Events of Default have occurred and are continuing under the Credit Agreement as a result of the Borrowers' failure to comply with Sections 6.1, 6.2 and 6.3 of the Credit Agreement for the fiscal quarters ended December 31, 2007 and March 31, 2008 (collectively, the "Covenant Defaults"); and

**WHEREAS**, certain Events of Default have occurred and are continuing under the Credit Agreement as a result of the Borrowers' failure to maintain the Franchise Agreements set forth on Schedule A hereto as required pursuant to Section 5.3 of the Credit Agreement (collectively, the "Franchise Agreement Defaults" and, together with the Covenant Defaults, the "Specified Defaults"); and

**WHEREAS**, at the request of the Borrowers, the Administrative Agent and the Lenders have agreed to (a) waive the Specified Defaults and (b) make certain modifications to the Credit Agreement, but only on the terms and conditions set forth herein;

**NOW THEREFORE**, in consideration of the mutual agreements contained in the Credit Agreement and herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

1.    **Waiver of Specified Defaults.** The Administrative Agent and the Lenders hereby waive the Specified Defaults and the Specified Defaults shall be considered no longer existing, subject to the terms and conditions set forth herein. Nothing contained herein shall (a) be construed to imply a willingness on the part of the Administrative Agent or the Lenders to grant any similar or other future waivers or (b) other than with respect to the Specified Defaults,

in any way prejudice, impair or effect any rights or remedies of the Administrative Agent and the Lenders under the Credit Agreement and the other Loan Documents.

2.      **Other Defaults**.  The waiver set forth in Section 1 shall apply only to the Specified Defaults.  No waiver with respect to any other Default or Event of Default, whether presently existing or hereafter arising, is granted hereby.

3.      **Ratification of Existing Agreements**.  Each of the Borrowers and Duke and King Holdings, LLC, a Delaware limited liability company ("DK Holdings" and, together with the Borrowers, the "Loan Parties"), hereby adopts again, ratifies and confirms in all respects all of the Obligations, all of its respective obligations to the Administrative Agent and the Lenders arising under the Credit Agreement and the other Loan Documents, and all of its respective obligations to the Administrative Agent and the Lenders arising under any other instrument or agreement creating, evidencing or securing any of its obligations to the Administrative Agent and the Lenders.  Each Loan Party confirms that all of the Obligations are secured pursuant to the Security Documents and acknowledges the validity of the Liens granted in favor of the Administrative Agent and the Lenders pursuant thereto.

4.      **Representations and Warranties**.  Each Loan Party hereby jointly and severally represents and warrants to the Administrative Agent and the Lenders as follows:

(a)      The execution and delivery by each Loan Party of this Amendment and the performance by such Loan Party of its obligations and agreements under this Amendment are within the corporate, limited liability company or limited partnership, as applicable, authority of such Loan Party, have been duly authorized by all necessary corporate, limited liability company or limited partnership, as applicable, proceedings on behalf of such Loan Party, and do not contravene any provision of law, statute, rule or regulation to which such Loan Party is subject or their respective charter, other incorporation or formation papers, by-laws, operating agreement, limited partnership agreement or any stock provision or any amendment thereof or of any agreement or other instrument binding upon such Loan Party.

(b)      Each of this Amendment, the Credit Agreement and the other Loan Documents to which any Loan Party is a party constitutes the legal, valid and binding obligation of such Loan Party, enforceable in accordance with their respective terms, except as limited by bankruptcy, insolvency, reorganization, moratorium or other laws relating to or affecting generally the enforcement of creditors' rights.

(c)      No approval or consent of, or filing with, any governmental agency or authority is required to make valid and legally binding the execution, delivery or performance by such Loan Party of this Amendment.

(d)      The representations and warranties contained in Article IV of the Credit Agreement, the other Loan Documents or in any other document or instrument delivered pursuant to or in connection with the Credit Agreement are true and correct at and as of the date made and as of the date hereof, except to the extent of changes resulting from transactions contemplated or permitted by the Credit Agreement, the other Loan

Documents, this Amendment and changes occurring in the ordinary course of business that singly or in the aggregate would not reasonably be expected to have a Material Adverse Occurrence, or to the extent that such representations and warranties relate expressly to an earlier date.

(e)     Each such Loan Party has performed and complied in all material respects with all terms and conditions herein and in the Credit Agreement required to be performed or complied with by it prior to or at the time hereof, and as of the date hereof, after giving effect to the provisions hereof, there exists no Default or Event of Default.

5.     **Amendments to the Credit Agreement.**

(a)     Amendment to Section 1 of the Credit Agreement. Section 1 of the Credit Agreement is hereby amended by inserting the following new definition in the proper alphabetical order therein:

"'Second Amendment Effective Date' shall mean February __, 2009."

(b)     Amendment to Section 2.1 of the Credit Agreement. Section 2.1 of the Credit Agreement is hereby amended by deleting clause (d)(1) thereof in its entirety and substituting the following new clause in the proper alphabetical and numerical order therefor:

"(1)     Term Loan A. Commencing as of the Second Amendment Effective Date and continuing on the first month of each day thereafter through and including October 1, 2011, monthly payments of principal on the Term Loan in an amount equal to $58,524.12 shall be due and payable. The unpaid principal balance of the Term Loan, together with accrued but unpaid interest, shall be due and payable in full on the Maturity Date."

(c)     Amendment to Section 2.1 of the Credit Agreement. Section 2.1 of the Credit Agreement is hereby amended by deleting clause (g) thereof in its entirety and substituting the following new clause in the proper alphabetical and numerical order therefor:

"(g)     Determination of Applicable Margin. The Applicable Margin in respect of any Effective Fixed Rate Loan or LIBOR Rate Loan shall be equal to the applicable percentage per annum set forth below determined by reference to the Total Leverage Ratio as set forth in the most recent Compliance Certificate received by the Administrative Agent pursuant to Section 5.1(c) with respect to the delivery of the Borrowers' financial statements required pursuant to Sections 5.1(a) and (b):

| Applicable Rate | | | |
|---|---|---|---|
| Pricing Level | Consolidated Leverage Ratio | LIBOR Loan | Effective Fixed Rate Loan |
| 1 | Greater than or equal to 3.25:1.00 | 4.25% | 4.25% |
| 2 | Less than 3.25:1.00 but greater than or equal to 3.00:1.00 | 3.75% | 3.75% |
| 3 | Less than 3.00:1.00 | 3.25% | 3.25% |

Notwithstanding the foregoing, Pricing Level 1 shall apply from the Second Amendment Effective Date until receipt by the Administrative Agent of the Compliance Certificate pursuant to Section 5.1(b) in connection with delivery of the Borrowers' audited financial statements pursuant to Section 5.1(a) for the fiscal year ended December 31, 2008.  Any increase or decrease in the Applicable Margin resulting from a change in the Total Leverage Ratio shall become effective as of the first Business Day of the fiscal quarter immediately following the fiscal quarter in which a Compliance Certificate is delivered pursuant to Section 5.1(a); provided, however, that if a Compliance Certificate is not delivered when due in accordance with such Section 5.1(a), then Pricing Level 1 shall apply in respect of any Effective Fixed Rate Loan or LIBOR Loan, in each case as of the first Business Day after the date on which such Compliance Certificate was required to have been delivered until such Compliance Certificate is actually delivered.  In the event either the Borrowers or the  Administrative Agent determine, in good faith, that the calculation of the Total Leverage Ratio on which the Applicable Margin for any particular period was determined is inaccurate and, as a consequence thereof, the Applicable Margin was lower than it would have been, (i) the Borrowers shall immediately upon becoming aware of such shortfall deliver to the Administrative Agent a correct Compliance Certificate for such period (and if such Compliance Certificate is not accurately restated and delivered within ten (10) days after the first discovery by the Borrowers (whether through notification by the Administrative Agent or otherwise) of such inaccuracy, then Pricing Level 1 shall apply retroactively for such period notwithstanding any subsequent restatement thereof after such ten (10) day period), (ii) the Administrative Agent shall determine and notify the Borrowers of the amount of interest that would have been due in respect of any outstanding Obligations during such period had the Applicable Margin been calculated based on the correct Total Leverage Ratio (or the Pricing Level 1 Applicable Margin if such corrected Compliance Certificate was not delivered) and (iii) the Borrowers shall promptly pay to the Administrative Agent the difference between that amount and the amount actually paid in respect of such period."

      (d)     Amendment to Article VI of the Credit Agreement.  Article VI of the Credit Agreement is hereby amended by deleting Sections 6.1, 6.2 and 6.3 therein in their entirety and substituting the following new sections in the proper numerical order therefor:

          "6.1    Fixed Charge Coverage Ratio.  For each twelve month period ending on the last day of each fiscal quarter of the Borrower, the Borrower will not

permit the ratio of (i) Net Income after cash taxes paid plus non-cash items reducing Net Income (minus cash items increasing Net income) plus rent plus total interest expense minus distributions and/or loans or advances to shareholders or Affiliates divided by (ii) scheduled payments of long-term debt and capitalized leases plus total interest expense plus rent to be less than the ratio set forth below opposite such fiscal quarter:

| Fiscal Quarter | Fixed Charge Coverage Ratio |
| --- | --- |
| October 1, 2008 through December 31, 2008 | 1.02 to 1.00 |
| January 1, 2009 through March 31, 2009 | 1.00 to 1.00 |
| April 1, 2009 through June 30, 2009 | 1.03 to 1.00 |
| July 1, 2009 through September 30, 2009 | 1.08 to 1.00 |
| October 1, 2009 through December 31, 2009 | 1.08 to 1.00 |
| January 1, 2010 through March 31, 2010 | 1.10 to 1.00 |
| April 1, 20010 through June 30, 2010 | 1.13 to 1.00 |
| July 1, 2010 through September 30, 20010 | 1.16 to 1.00 |
| October 1, 2010 through December 31, 2010 | 1.20 to 1.00 |

6.2   Leverage Ratio. For each twelve month period ending on the last day of each fiscal quarter of the Borrower, the Borrower shall maintain a Total Leverage Ratio not in excess of the ratio set forth below opposite such fiscal quarter:

| Fiscal Quarter | Leverage Ratio |
| --- | --- |
| October 1, 2008 through December 31, 2008 | 5.29 to 1.00 |
| January 1, 2009 through March 31, 2009 | 3.80 to 1.00 |
| April 1, 2009 through June 30, 2009 | 3.60 to 1.00 |
| July 1, 2009 through September 30, 2009 | 3.40 to 1.00 |
| October 1, 2009 through December 31, 2009 | 3.25 to 1.00 |
| January 1, 2010 through March 31, 2010 | 3.25 to 1.00 |
| April 1, 20010 through June 30, 2010 | 3.25 to 1.00 |
| July 1, 2010 through September 30, 20010 | 3.25 to 1.00 |
| October 1, 2010 through December 31, 2010 | 3.25 to 1.00 |

6.3.   Maximum Adjusted Leverage Ratio. For each twelve month period ending on the last day of each fiscal quarter of the Borrower, the Borrower shall

maintain a Maximum Rent Adjusted Leverage Ratio not in excess of the ratio set forth below opposite such fiscal quarter:

| Fiscal Quarter | Rent Adjusted Leverage Ratio |
|---|---|
| October 1, 2008 through December 31, 2008 | 6.96 to 1.00 |
| January 1, 2009 through March 31, 2009 | 6.75 to 1.00 |
| April 1, 2009 through June 30, 2009 | 6.70 to 1.00 |
| July 1, 2009 through September 30, 2009 | 6.60 to 1.00 |
| October 1, 2009 through December 31, 2009 | 6.60 to 1.00 |
| January 1, 2010 through March 31, 2010 | 6.50 to 1.00 |
| April 1, 20010 through June 30, 2010 | 6.40 to 1.00 |
| July 1, 2010 through September 30, 20010 | 6.30 to 1.00 |
| October 1, 2010 through December 31, 2010 | 6.25 to 1.00" |

6.    **Net Proceeds from Specified Sale-Leasebacks**. Notwithstanding anything to the contrary set forth in the Credit Agreement and the other Loan Documents, the parties hereto acknowledge and agree that the net proceeds from the sale and leaseback by DK Real Estate of each of the Units set forth on Schedule B hereto (the "Specified Units") shall be distributed as follows: (a) of the first $1,366,000 of net proceeds from the sale and leaseback of the Specified Units, (i) 50% shall be delivered to the Administrative Agent for application to the Obligations in accordance with Section 2.11 of the Credit Agreement, and (ii) 50% shall be retained by the Borrowers and (b) of any net proceeds from the sale and leaseback of the Specified Units in excess of $1,366,000 in the aggregate, 100% shall be retained by the Borrowers; provided, that the consent set forth herein shall in no way limit the restrictions on dispositions of assets set forth in Section 6.6 of the Credit Agreement; provided, further, that all net proceeds from any future sale and leaseback transaction (other than the sale and leaseback of the Specified Units) shall be delivered to the Administrative Agent for application to the Obligations in accordance with Section 2.11 of the Credit Agreement.

7.    **Conditions to Effectiveness.** This Amendment shall become effective as of the date (the "Second Amendment Effective Date") upon which each of the following conditions shall have been satisfied:

(a)    Receipt by the Administrative Agent, in form and substance reasonably satisfactory to the Administrative Agent, of a copy of this Agreement duly executed by the Loan Parties, the Administrative Agent and the Lenders.

(b)    No Defaults or Events of Default shall have occurred and be continuing (other than the Specified Defaults).

(c)     Since September 30, 2008, no development or event has occurred that has had or reasonably could be expected to have a Material Adverse Occurrence.

(d)     Receipt by the Administrative Agent, in form and substance satisfactory to the Administrative Agent, of evidence as to the perfection and priority of all of the Administrative Agent's Liens, for the benefit of the Lenders and the Administrative Agent, granted pursuant to the Security Documents.

(e)     To the extent requested by the Administrative Agent, the Administrative Agent's receipt of evidence reasonably satisfactory to the Administrative Agent that all corporate and limited liability action on behalf of each Loan Party necessary to authorize the matters contemplated hereby shall have been taken.

(f)     The Loan Parties shall have paid all expenses of the Administrative Agent, its counsel and its outside professionals for which invoices (or reasonable estimates thereof through the Second Amendment Effective Date) shall have been rendered.

(g)     The Administrative Agent's receipt of evidence that all approvals or consents of, or filings with, any governmental agency or authority or any third party required in connection with the execution, delivery or performance by, or enforcement against, each Loan Party of this Amendment, the Credit Agreement, or any other Loan Document, have been received or made, as the case may be.

**8.     Release**. Each Loan Party hereby remises, releases, acquits, satisfies and forever discharges the Administrative Agent and the Lenders and their respective assignees, participants, funding sources, agents, employees, officers, directors, predecessors, attorneys, affiliates, and all others acting or purporting to act on behalf of or at the direction of the Administrative Agent and the Lenders, of and from any and all manner of actions, causes of action, suit, debts, accounts, covenants, contracts, controversies, agreements, variances, damages, judgments, claims and demands whatsoever, in law or in equity, which any of such parties ever had, now has or, to the extent arising from or in connection with any act, omission or state of facts taken or existing on or prior to the date hereof, may have after the date hereof against the Administrative Agent and the Lenders, their respective assignees, participants, funding sources, agents, employees, officers, directors, predecessors, attorneys, affiliates and all persons acting or purporting to act on behalf of or at the direction of the Administrative Agent and the Lenders (collectively, the "Releasees"), for, upon or by reason of any matter, cause or thing whatsoever arising from, in connection with or in relation to this Agreement, the Credit Agreement or any of the other Loan Documents through the date hereof. Without limiting the generality of the foregoing, each Loan Party waives and affirmatively agrees not to allege or otherwise pursue any defenses, affirmative defenses, counterclaims, claims, causes of action, setoffs or other rights they do, shall or may have as of the date hereof, including, but not limited to, the rights to contest any conduct of the Administrative Agent, the Lenders or any other Releasees on or prior to the date hereof.

**9.     No Waiver**. Except as otherwise expressly provided for in this Amendment, nothing contained in this Amendment shall extend to or affect in any way any of the rights or obligations of the Loan Parties or the Administrative Agent's and the Lenders' obligations, rights and remedies arising under the Credit Agreement and the other Loan Documents. Nothing

contained in this Amendment shall be construed to imply a willingness on the part of the Administrative Agent or the Lenders to grant any similar or other future amendment of any of the terms and conditions of the Credit Agreement or the other Loan Documents. Except as expressly set forth herein, all of the terms and provisions of the Credit Agreement and the other Loan Documents shall remain in full force and effect. Each of the Loan Parties hereby agrees that, other than with respect to the Specified Defaults, the Administrative Agent and the Lenders shall not be deemed to have waived any or all of their remedies with respect to any other Default or Event of Default existing on the date hereof or arising hereafter.

10.    **Miscellaneous**.

(a)    This Agreement shall be governed by and construed in accordance with the laws of the State of New York, without giving effect to the conflicts of laws principles thereof.

(b)    This Agreement shall constitute a Loan Document under the Credit Agreement, and all obligations included in this Agreement (including, without limitation, all obligations for the payment of principal, interest, fees, and other amounts and expenses) shall constitute Obligations under the Credit Agreement and shall be secured by the Collateral.

(c)    Failure to comply with any of the covenants and agreements contained in this Agreement shall constitute an Event of Default under the Credit Agreement.

(d)    Wherever possible, each provision of this Agreement shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Agreement shall be prohibited by or rendered invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity, without invalidating the remainder of such provisions or the remaining provisions of this Agreement.

(e)    This Agreement may be executed in any number of counterparts and by each party on a separate counterpart, each of which when so executed and delivered shall be an original, but all of which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Agreement by facsimile or electronic communication shall be effective as delivery of a manually executed counterpart of this Agreement. In proving this Agreement, it shall not be necessary to produce or account for more than one such counterpart signed by the party against whom enforcement is sought.

*[Remainder of page intentionally left blank.]*

**IN WITNESS WHEREOF**, the parties have executed this Amendment as of the date first above written.

**BANK OF AMERICA, N.A.,**
as Agent and Lender

By: _____
Name:  Anthony D. Healey
Title:  Senior Vice President

ACCEPTED AND AGREED
as of the date first above written:

**DUKE AND KING ACQUISITION CORP.,**
as a Borrower

By: _____
Name: Rodger T. Head
Title: CEO

**DUKE AND KING FLORIDA, LLC,**
as a Borrower

By: _____
Name: Rodger T. Head
Title: CEO

**DUKE AND MISSOURI, LLC**
as a Borrower

By: _____
Name: Rodger T. Head
Title: CEO

**DUKE AND KING REAL ESTATE, LLC**
as a Borrower

By: _____
Name: Rodger T. Head
Title: CEO

The undersigned hereby joins and consents to the foregoing Agreement, and ratifies and confirms its obligations under that certain Guaranty, dated as of March 1, 2007, from the undersigned to, and for the benefit of, the Administrative Agent and the Lenders.

**DUKE AND KING HOLDINGS, LLC**

By: _____

Name: Rodger T. Head

Title: CEO

Schedule A

Franchise Agreements

| 6211 | 1222 42nd Avenue of the Cities | East Moline | IL | 61244 |
|------|--------------------------------|-------------|-----|-------|
| 5960 | 2001 Center Avenue | Janesville | WI | 53545 |
| 5971 | 1710 DeKalb Avenue | Sycamore | IL | 60178 |
| 6030 | 1011 W. Central Avenue | Carthage | MO | 64836 |
| 5382 | 1404 Madison Avenue | Mankato | MN | 56001 |

See attached agreements



January 20, 2009

Via Federal Express - Express Saver

Rodger Head
Duke and King Acquisition Corp.
12281 Nicolet Avenue South
Burnsville, MN 55337

Re:     Burger King Restaurant #6211, 5971, 5960, 6030, 5382

Dear Mr. Head:

Enclosed for your records is a fully executed original of the Agreement to Extend Franchise Agreement for the above referenced restaurants.

Please remember that any future desired change in ownership will also require the prior written consent of Burger King Corporation.  At that time you will need to furnish us with a photocopy of the purchase and sale agreement reflecting the change.

If you have any questions, please do not hesitate to contact me at the telephone number referenced below.

Sincerely,

Burger King Corporation

Cynthia K Hartmann
Franchise Associate

Enclosures

## AGREEMENT TO EXTEND RESTAURANT
## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of this __14__ day of __January__, 200__9__, but effective June 14, 2008, by and among **BURGER KING CORPORATION**, a Florida corporation ("BKC"), **Duke and King Missouri, LLC**, a Missouri limited liability company ("FRANCHISEE"), and Duke and King Missouri Holdings, Inc. and Duke and King Acquisition Corp. (collectively, "GUARANTORS").

### R E C I T A L S

A.    FRANCHISEE and GUARANTORS is/are parties to that certain franchise agreement dated March 2, 2007 (the "Franchise Agreement") with BKC relating to the operation of Burger King® Restaurant #6030 located at 1011 West Central Street, Carthage, Missouri 64836 (the "Restaurant"). The term of the Franchise Agreement will expire by its own terms on June 13, 2008, (the "Original Expiration Date").

B.    GUARANTORS own all of the capital stock of FRANCHISEE and have guaranteed the obligations of FRANCHISEE under the Franchise Agreement.

C.    FRANCHISEE and GUARANTORS have requested that BKC extend the Original Expiration Date of the Franchise Agreement to the close of business on December 31, 2009 (the "Extended Expiration Date").

NOW, THEREFORE, in consideration of the terms, conditions and covenants hereinafter set forth and for other good and valuable consideration which each of the parties hereto acknowledges is sufficient to create a binding agreement, the parties agree as follows:

1.    Extension of Franchise Agreement.

   (a)    Subject to FRANCHISEE and GUARANTORS fully complying with and performing each of the covenants and obligations described in this Agreement, BKC agrees to extend the Original Expiration Date of the Franchise Agreement until the Extended Expiration Date.

   (b)    FRANCHISEE and GUARANTORS hereby agree and acknowledge that BKC is under no obligation whatsoever to allow the Restaurant to continue to operate beyond the Extended Expiration Date and that, unless BKC agrees in writing and in its sole and absolute discretion to further extend the Extended Expiration Date, the Restaurant shall close on the Extended Expiration Date, and FRANCHISEE and GUARANTORS shall comply with all post-termination obligations under the Franchise Agreement, including the obligation to de-identify the Restaurant, within five (5) days of the Extended Expiration Date.

   (c)    FRANCHISEE and GUARANTORS hereby waive and release BKC from any and all claims that BKC has not given FRANCHISEE a reasonable time and opportunity to comply with the requirements for obtaining a renewal or successor agreement.

2.    Compliance.  FRANCHISEE and GUARANTORS agree to be bound by and to comply with all of the terms and conditions of this Agreement and the Franchise Agreement through the Extended Expiration Date.

3.   Representations and Warranties; No Defaults.   FRANCHISEE and GUARANTORS hereby represent and warrant that each of the representations, warranties and affirmative covenants of the FRANCHISEE set forth in the Franchise Agreement is true and correct as of the date hereof and no Event of Default or event, with which the lapse of time, the giving of notice, or both, would become an Event of Default (as defined therein), has occurred and is continuing under the Franchise Agreement.

4.   Conditions of Grant of Extension.

   (a)   As of the date of this Agreement, FRANCHISEE and GUARANTORS shall be in full compliance with the terms of the Franchise Agreement, including, without limitation, the timely payment to BKC of royalty, advertising and other charges thereunder.

   (b)   FRANCHISEE and GUARANTORS shall pay to BKC an extension fee of U.S. $3,876.85 upon the execution of this Agreement.

   (c)   The rights of FRANCHISEE and GUARANTORS to remain in possession of the premises for the Restaurant (the "Premises") through the Extended Expiration Date and to operate the Restaurant thereon shall not be prohibited or restricted in any way and shall not be a violation of, or contrary to, any other agreement to which FRANCHISEE or GUARANTORS are a party, including, without limitation, any lease for the Premises.

5.   Amendments to Franchise Agreement.

   Paragraph 9.A. of the Franchise Agreement is amended to increase the royalty charge payable thereunder from 3.5% to 4.5% of monthly gross sales at the Restaurant, effective June 14, 2008, as such term is defined in the Franchise Agreement.

6.   Termination.

   (a)   If FRANCHISEE defaults in the performance of any of the terms and conditions of this Agreement, which default continues uncured for a period of thirty (30) days after notice of default from BKC to FRANCHISEE, or if any of the representations or warranties of FRANCHISEE and GUARANTORS set forth herein are not true and correct, BKC shall have the right, at its sole discretion and without prejudice to any other rights or remedies available to it under this Agreement, the Franchise Agreement, at law or in equity, to cancel and terminate the Franchise Agreement, it being expressly understood and agreed that a default under this Agreement shall constitute an event of default under the Franchise Agreement, and FRANCHISEE'S rights to use the Burger King Marks and the Burger King System shall also terminate in accordance with the terms of the Franchise Agreement; provided, however, that nothing set forth in this Paragraph 6 shall affect in any way or detract from BKC's right to terminate the Franchise Agreement at any time in accordance with its terms.

   (b)   With respect to the Franchised Restaurant, upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall not thereafter identify themselves as a Burger King franchisee or publicly identify themselves as a former Burger King franchisee or use any of BKC's trade secrets, promotional materials, the Burger King Marks or any mark confusingly similar with the trademarks or service marks of BKC, nor shall FRANCHISEE or

GUARANTORS disclose any of BKC's trade secrets.  Upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall (i) immediately return to BKC the MOD Manual loaned to them, together with all other materials containing trade secrets;  and (ii) comply with all post-termination provisions of the Franchise Agreement.  In the event FRANCHISEE or GUARANTORS fail to comply with the provisions of this subparagraph 6(b), FRANCHISEE grants to BKC a license to enter the building and Premises to make non-structural changes at FRANCHISEE'S and GUARANTORS' expense, and without liability to the FRANCHISEE or GUARANTORS for any incidental or consequential damage to the Premises as a result thereof.

7.    Satisfaction of BKC's Obligations.  Each of the parties hereto acknowledges and agrees that the execution and delivery of this Agreement by BKC shall fully satisfy any statutory, contractual or other requirements imposed on BKC with respect to the extension of the Franchise Agreement, including, without limitation, the giving of any formal notice of early termination by BKC to FRANCHISEE and GUARANTORS as a result of their failure to fully satisfy each of the terms, obligations and conditions set forth in this Agreement or the Franchise Agreement.  FRANCHISEE and GUARANTORS further acknowledge and agree that failure to comply with the terms of this Agreement shall constitute "good cause" for BKC to terminate the Franchise Agreement.

8.    Indemnification.  FRANCHISEE and GUARANTORS are jointly and severally responsible for all losses, damages and/or contractual liabilities to third parties arising out of or relating to any of the obligations, undertakings, promises and representations of FRANCHISEE and GUARANTORS under this Agreement, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom.  FRANCHISEE and GUARANTORS agree to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, accountants, subsidiaries, affiliates and parent company harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages (including, without limitation, reasonable attorneys' fees).  BKC shall notify the FRANCHISEE and GUARANTOR of any such claims, and FRANCHISEE and GUARANTOR shall be given the opportunity to assume the defense of the matter.  If FRANCHISEE and GUARANTORS fail to assume the defense, BKC may defend the action in the manner it deems appropriate, and FRANCHISEE and GUARANTORS shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense.  BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law.

9.    General Release.   In consideration of BKC entering into this Agreement, FRANCHISEE, and GUARANTORS, jointly and for themselves, their respective successors, assigns, heirs, personal representatives and affiliates (collectively, the "Releasing Parties"), remise, release, acquit, satisfy and forever discharge BKC, its successors, predecessors, counsel, insurers, assigns, officers, directors, employees, parent company, affiliates, subsidiaries and agents, past and present (collectively, the "Released Parties") from and against all claims, actions, causes of action, demands, damages, costs, suits, debts, covenants, controversies, and any other liabilities whatsoever, whether known or unknown, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable, which the Releasing Parties ever had, now have, can, shall or may have, against the Released Parties relating to the Franchise Agreement or the operation, licensing or right to continue operation of the Restaurant, from the commencement of any relationship of any kind by the FRANCHISEE and GUARANTORS through the date of this Agreement.

10.    <u>No Modification of Franchise Agreement.</u>  Except as otherwise set forth herein, all other provisions of the Franchise Agreement shall remain in full force and effect.

11.    <u>Time of the Essence.</u>  FRANCHISEE and GUARANTORS agree that time is of the essence with respect to their obligations under this Agreement.

12.    <u>Interpretation.</u>  The introduction and recitals shall be considered a part of this Agreement. Paragraph captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular paragraphs to which they refer.  Words of any gender used in this Agreement shall include any other gender or the neuter, and words in the singular shall include the plural, where the context requires.

13.    <u>Non-Waiver.</u>  The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE and GUARANTORS with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement.  The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

14.    <u>Governing Law; Forum and Compliance.</u>

        (a)    This Agreement shall become valid only after it is executed by BKC.  The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

        (b)    FRANCHISEE, GUARANTORS and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

        (c)    Notwithstanding anything in this Agreement to the contrary, FRANCHISEE and GUARANTORS shall conduct their business in a lawful manner and faithfully comply with applicable laws or regulations of the state, city or other political subdivision in which the Restaurant is located.

15.    <u>Severability.</u>  If one or more provisions contained in this Agreement or in any document contemplated hereby, or any application thereof, shall be invalid, illegal or unenforceable in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein and therein, and any application thereof, shall not in any way be affected or impaired thereby or under the laws of any other jurisdiction.

16.    <u>Notices.</u>

        (a)    All notices to BKC shall be in writing and shall be delivered or send by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, General Mail Facility, Miami, Florida  33102-0783, Attention:  General Counsel, or at such other address as BKC shall from time to time designate in writing.

(b)     All notices to FRANCHISEE or GUARANTORS shall be in writing and shall be hand-delivered or sent by registered or certified mail or telegraph, addressed to FRANCHISEE and GUARANTORS at 12281 Nicollet Avenue, Burnsville, MN 55337, or at such other address as FRANCHISEE shall from time to time designate in writing.

(c)     Notices shall be deemed delivered on the earlier of actual receipt or on the third (3rd) day after being deposited in the U.S. Mail.

17.    Modification.  This Agreement may only be modified or amended by a written document executed by BKC, FRANCHISEE and GUARANTORS.

18.    Binding Effect.  This Agreement shall be binding upon the parties and their successors or assigns.

19.    Survival.  Any provision of this Agreement, including but not limited to the indemnification provision, which imposes an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

20.    Attorneys' Fees.  In any litigation to enforce the terms of this Agreement, all costs and all attorneys' fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

21.    Entire Agreement.  This Agreement, together with the Franchise Agreement, constitute the entire agreement of the parties and supersede all prior agreements, negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

**(This space has been left blank intentionally)**

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date indicated on the first page of this Agreement.

**BURGER KING CORPORATION**

By: _____
    Manager, Franchise Administration

Attest: _____
        Franchise Development Specialist

**FRANCHISEE:**

Duke and King Acquisition Corp.,
a Delaware corporation

By: _____
    Rodger T. Head, Managing Owner

Attest: _____
        Print Name: Becky Moldenhauer
        Title: VP + CFO

**GUARANTORS:**

Duke and King Holdings, LLC

By: _____
    Print Name: Rodger T. Head
    Title: CEO

Attest: _____
        Print Name: Becky Moldenhauer
        Title: VP + CFO

## THIRD AGREEMENT TO EXTEND RESTAURANT
## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of this _14_ day of _January_, 2009, by and among **BURGER KING CORPORATION**, a Florida corporation ("BKC"), **Duke and King Acquisition Corp.**, a Delaware corporation ("FRANCHISEE"), and Duke and King Holdings, LLC, (collectively, "GUARANTORS").

### R E C I T A L S

A.    FRANCHISEE and GUARANTORS is/are parties to that certain franchise agreement dated June 20, 2003 (the "Franchise Agreement") with BKC relating to the operation of Burger King® Restaurant #5382 located at 1404 Madison Avenue, Mankato, MN 56001, (the "Restaurant"). The term of the Franchise Agreement will expire by its own terms on December 27, 2008, (the "Second Extended Expiration Date").

B.    GUARANTORS own all of the capital stock of FRANCHISEE and have guaranteed the obligations of FRANCHISEE under the Franchise Agreement.

C.    FRANCHISEE and GUARANTORS have requested that BKC extend the Second Extended Expiration Date of the Franchise Agreement to the close of business on December 27, 2009 or until the opening date of the offset Burger King Restaurant whichever shall first occur (the "Third Extended Expiration Date").

NOW, THEREFORE, in consideration of the terms, conditions and covenants hereinafter set forth and for other good and valuable consideration which each of the parties hereto acknowledges is sufficient to create a binding agreement, the parties agree as follows:

1.    Extension of Franchise Agreement.

(a)    Subject to FRANCHISEE and GUARANTORS fully complying with and performing each of the covenants and obligations described in this Agreement, BKC agrees to extend the Second Extended Expiration Date of the Franchise Agreement until the Third Extended Expiration Date.

(b)    FRANCHISEE and GUARANTORS hereby agree and acknowledge that BKC is under no obligation whatsoever to allow the Restaurant to continue to operate beyond the Third Extended Expiration Date and that, unless BKC agrees in writing and in its sole and absolute discretion to further extend the Third Extended Expiration Date, the Restaurant shall close on the Third Extended Expiration Date, and FRANCHISEE and GUARANTORS shall comply with all post-termination obligations under the Franchise Agreement, including the obligation to de-identify the Restaurant, within five (5) days of the Third Extended Expiration Date.

(c)    FRANCHISEE and GUARANTORS hereby waive and release BKC from any and all claims that BKC has not given FRANCHISEE a reasonable time and opportunity to comply with the requirements for obtaining a renewal or successor agreement.

2.      Compliance.  FRANCHISEE and GUARANTORS agree to be bound by and to comply with all of the terms and conditions of this Agreement and the Franchise Agreement through the Third Extended Expiration Date.

3.      Representations and Warranties; No Defaults.  FRANCHISEE and GUARANTORS hereby represent and warrant that each of the representations, warranties and affirmative covenants of the FRANCHISEE set forth in the Franchise Agreement is true and correct as of the date hereof and no Event of Default or event, with which the lapse of time, the giving of notice, or both, would become an Event of Default (as defined therein), has occurred and is continuing under the Franchise Agreement.

4.      Conditions of Grant of Extension.

(a)     As of the date of this Agreement, FRANCHISEE and GUARANTORS shall be in full compliance with the terms of the Franchise Agreement, including, without limitation, the timely payment to BKC of royalty, advertising and other charges thereunder.

(b)     FRANCHISEE and GUARANTORS shall pay to BKC an extension fee of U.S. $2,500.00 upon the execution of this Agreement.

(c)     The rights of FRANCHISEE and GUARANTORS to remain in possession of the premises for the Restaurant (the "Premises") through the Third Extended Expiration Date and to operate the Restaurant thereon shall not be prohibited or restricted in any way and shall not be a violation of, or contrary to, any other agreement to which FRANCHISEE or GUARANTORS are a party, including, without limitation, any lease for the Premises.

5.      Termination.

(a)     If FRANCHISEE defaults in the performance of any of the terms and conditions of this Agreement, which default continues uncured for a period of thirty (30) days after notice of default from BKC to FRANCHISEE, or if any of the representations or warranties of FRANCHISEE and GUARANTORS set forth herein are not true and correct, BKC shall have the right, at its sole discretion and without prejudice to any other rights or remedies available to it under this Agreement, the Franchise Agreement, at law or in equity, to cancel and terminate the Franchise Agreement, it being expressly understood and agreed that a default under this Agreement shall constitute an event of default under the Franchise Agreement, and FRANCHISEE'S rights to use the Burger King Marks and the Burger King System shall also terminate in accordance with the terms of the Franchise Agreement; provided, however, that nothing set forth in this Paragraph 6 shall affect in any way or detract from BKC's right to terminate the Franchise Agreement at any time in accordance with its terms.

(b)     With respect to the Franchised Restaurant, upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall not thereafter identify themselves as a Burger King franchisee or publicly identify themselves as a former Burger King franchisee or use any of BKC's trade secrets, promotional materials, the Burger King Marks or any mark confusingly similar with the trademarks or service marks of BKC, nor shall FRANCHISEE or GUARANTORS disclose any of BKC's trade secrets. Upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall (i) immediately return to BKC the MOD Manual loaned to them, together

with all other materials containing trade secrets; and (ii) comply with all post-termination provisions of the Franchise Agreement. In the event FRANCHISEE or GUARANTORS fail to comply with the provisions of this subparagraph 6(b), FRANCHISEE grants to BKC a license to enter the building and Premises to make non-structural changes at FRANCHISEE'S and GUARANTORS' expense, and without liability to the FRANCHISEE or GUARANTORS for any incidental or consequential damage to the Premises as a result thereof.

6.    Satisfaction of BKC's Obligations.    Each of the parties hereto acknowledges and agrees that the execution and delivery of this Agreement by BKC shall fully satisfy any statutory, contractual or other requirements imposed on BKC with respect to the extension of the Franchise Agreement, including, without limitation, the giving of any formal notice of early termination by BKC to FRANCHISEE and GUARANTORS as a result of their failure to fully satisfy each of the terms, obligations and conditions set forth in this Agreement or the Franchise Agreement. FRANCHISEE and GUARANTORS further acknowledge and agree that failure to comply with the terms of this Agreement shall constitute "good cause" for BKC to terminate the Franchise Agreement.

7.    Indemnification.    FRANCHISEE and GUARANTORS are jointly and severally responsible for all losses, damages and/or contractual liabilities to third parties arising out of or relating to any of the obligations, undertakings, promises and representations of FRANCHISEE and GUARANTORS under this Agreement, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. FRANCHISEE and GUARANTORS agree to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, accountants, subsidiaries, affiliates and parent company harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages (including, without limitation, reasonable attorneys' fees). BKC shall notify the FRANCHISEE and GUARANTOR of any such claims, and FRANCHISEE and GUARANTOR shall be given the opportunity to assume the defense of the matter. If FRANCHISEE and GUARANTORS fail to assume the defense, BKC may defend the action in the manner it deems appropriate, and FRANCHISEE and GUARANTORS shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law.

8.    General Release.    In consideration of BKC entering into this Agreement, FRANCHISEE, and GUARANTORS, jointly and for themselves, their respective successors, assigns, heirs, personal representatives and affiliates (collectively, the "Releasing Parties"), remise, release, acquit, satisfy and forever discharge BKC, its successors, predecessors, counsel, insurers, assigns, officers, directors, employees, parent company, affiliates, subsidiaries and agents, past and present (collectively, the "Released Parties") from and against all claims, actions, causes of action, demands, damages, costs, suits, debts, covenants, controversies, and any other liabilities whatsoever, whether known or unknown, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable, which the Releasing Parties ever had, now have, can, shall or may have, against the Released Parties relating to the Franchise Agreement or the operation, licensing or right to continue operation of the Restaurant, from the commencement of any relationship of any kind by the FRANCHISEE and GUARANTORS through the date of this Agreement.

9.    No Modification of Franchise Agreement.    Except as otherwise set forth herein, all other provisions of the Franchise Agreement shall remain in full force and effect.

10. <u>Time of the Essence.</u>  FRANCHISEE and GUARANTORS agree that time is of the essence with respect to their obligations under this Agreement.

11. <u>Interpretation.</u>  The introduction and recitals shall be considered a part of this Agreement. Paragraph captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular paragraphs to which they refer.  Words of any gender used in this Agreement shall include any other gender or the neuter, and words in the singular shall include the plural, where the context requires.

12. <u>Non-Waiver.</u>  The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE and GUARANTORS with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement.  The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

13. <u>Governing Law;  Forum and Compliance.</u>

    (a) This Agreement shall become valid only after it is executed by BKC.  The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

    (b) FRANCHISEE, GUARANTORS and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

    (c) Notwithstanding anything in this Agreement to the contrary, FRANCHISEE and GUARANTORS shall conduct their business in a lawful manner and faithfully comply with applicable laws or regulations of the state, city or other political subdivision in which the Restaurant is located.

14. <u>Severability.</u>  If one or more provisions contained in this Agreement or in any document contemplated hereby, or any application thereof, shall be invalid, illegal or unenforceable in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein and therein, and any application thereof, shall not in any way be affected or impaired thereby or under the laws of any other jurisdiction.

15. <u>Notices.</u>

    (a) All notices to BKC shall be in writing and shall be delivered or send by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, General Mail Facility, Miami, Florida  33102-0783, Attention:  General Counsel, or at such other address as BKC shall from time to time designate in writing.

    (b) All notices to FRANCHISEE or GUARANTORS shall be in writing and shall be hand-delivered or sent by registered or certified mail or telegraph, addressed to

FRANCHISEE and GUARANTORS at 900 American Blvd. East Suite 300 Bloomington, MN 55420, or at such other address as FRANCHISEE shall from time to time designate in writing.

(c)     Notices shall be deemed delivered on the earlier of actual receipt or on the third (3rd) day after being deposited in the U.S. Mail.

16.    Modification.  This Agreement may only be modified or amended by a written document executed by BKC, FRANCHISEE and GUARANTORS.

17.    Binding Effect.  This Agreement shall be binding upon the parties and their successors or assigns.

18.    Survival.  Any provision of this Agreement, including but not limited to the indemnification provision, which imposes an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

19.    Attorneys' Fees.  In any litigation to enforce the terms of this Agreement, all costs and all attorneys' fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

20.    Entire Agreement.  This Agreement, together with the Franchise Agreement, constitute the entire agreement of the parties and supersede all prior agreements, negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

**(This space has been left blank intentionally)**

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date indicated on the first page of this Agreement.

**BURGER KING CORPORATION**

By: _____
        Manager, Franchise Administration

Attest: _____
            Franchise Development Specialist

**FRANCHISEE:**

**Duke & King Acquisition Corp.,**
**a Delaware corporation**

By: _____
Rodger T. Head, Managing Owner

Attest: _____
            Print Name: Becky Moldenhaver
            Title: VP & CFO

**GUARANTOR:**

**Duke & King Holdings, LLC**

By: _____
        Print Name: Rodger T. Head
        Title: CEO

Attest: _____
            Print Name: Becky Moldenhaver
            Title: VP & CFO

**AGREEMENT TO EXTEND RESTAURANT
FRANCHISE AGREEMENT**

THIS AGREEMENT (the "Agreement") is made as of this _14_ day of _January_____, 200_9_, but effective May 28, 2008, by and among **BURGER KING CORPORATION**, a Florida corporation ("BKC"), **Duke and King Acquisition Corp.**, a Delaware corporation ("FRANCHISEE"), and Duke and King Holdings, LLC (collectively, "GUARANTORS").

## R E C I T A L S

A.    FRANCHISEE and GUARANTORS is/are parties to that certain franchise agreement dated April 18, 1996 (the "Franchise Agreement") with BKC relating to the operation of Burger King® Restaurant #5971 located at 1710 Dekalb Avenue, Sycamore, IL 60178, (the "Restaurant"). The term of the Franchise Agreement will expire by its own terms on May 27, 2008, (the "Original Expiration Date").

B.    GUARANTORS own all of the capital stock of FRANCHISEE and have guaranteed the obligations of FRANCHISEE under the Franchise Agreement.

C.    FRANCHISEE and GUARANTORS have requested that BKC extend the Original Expiration Date of the Franchise Agreement to the close of business on December 31, 2009 (the "Extended Expiration Date").

NOW, THEREFORE, in consideration of the terms, conditions and covenants hereinafter set forth and for other good and valuable consideration which each of the parties hereto acknowledges is sufficient to create a binding agreement, the parties agree as follows:

1.    <u>Extension of Franchise Agreement.</u>

(a)    Subject to FRANCHISEE and GUARANTORS fully complying with and performing each of the covenants and obligations described in this Agreement, BKC agrees to extend the Original Expiration Date of the Franchise Agreement until the Extended Expiration Date.

(b)    FRANCHISEE and GUARANTORS hereby agree and acknowledge that BKC is under no obligation whatsoever to allow the Restaurant to continue to operate beyond the Extended Expiration Date and that, unless BKC agrees in writing and in its sole and absolute discretion to further extend the Extended Expiration Date, the Restaurant shall close on the Extended Expiration Date, and FRANCHISEE and GUARANTORS shall comply with all post-termination obligations under the Franchise Agreement, including the obligation to de-identify the Restaurant, within five (5) days of the Extended Expiration Date.

(c)    FRANCHISEE and GUARANTORS hereby waive and release BKC from any and all claims that BKC has not given FRANCHISEE a reasonable time and opportunity to comply with the requirements for obtaining a renewal or successor agreement.

2.    <u>Compliance.</u> FRANCHISEE and GUARANTORS agree to be bound by and to comply with all of the terms and conditions of this Agreement and the Franchise Agreement through the Extended Expiration Date.

3.  <u>Representations and Warranties; No Defaults.</u>  FRANCHISEE and GUARANTORS hereby represent and warrant that each of the representations, warranties and affirmative covenants of the FRANCHISEE set forth in the Franchise Agreement is true and correct as of the date hereof and no Event of Default or event, with which the lapse of time, the giving of notice, or both, would become an Event of Default (as defined therein), has occurred and is continuing under the Franchise Agreement.

4.  <u>Conditions of Grant of Extension.</u>

    (a)  As of the date of this Agreement, FRANCHISEE and GUARANTORS shall be in full compliance with the terms of the Franchise Agreement, including, without limitation, the timely payment to BKC of royalty, advertising and other charges thereunder.

    (b)  FRANCHISEE and GUARANTORS shall pay to BKC an extension fee of U.S. $3,993.30 upon the execution of this Agreement.

    (c)  The rights of FRANCHISEE and GUARANTORS to remain in possession of the premises for the Restaurant (the "Premises") through the Extended Expiration Date and to operate the Restaurant thereon shall not be prohibited or restricted in any way and shall not be a violation of, or contrary to, any other agreement to which FRANCHISEE or GUARANTORS are a party, including, without limitation, any lease for the Premises.

5.  <u>Amendments to Franchise Agreement.</u>

    Paragraph 9.A. of the Franchise Agreement is amended to increase the royalty charge payable thereunder from 3.5% to 4.5% of monthly gross sales at the Restaurant, effective May 28, 2008, as such term is defined in the Franchise Agreement.

6.  <u>Termination.</u>

    (a)  If FRANCHISEE defaults in the performance of any of the terms and conditions of this Agreement, which default continues uncured for a period of thirty (30) days after notice of default from BKC to FRANCHISEE, or if any of the representations or warranties of FRANCHISEE and GUARANTORS set forth herein are not true and correct, BKC shall have the right, at its sole discretion and without prejudice to any other rights or remedies available to it under this Agreement, the Franchise Agreement, at law or in equity, to cancel and terminate the Franchise Agreement, it being expressly understood and agreed that a default under this Agreement shall constitute an event of default under the Franchise Agreement, and FRANCHISEE'S rights to use the Burger King Marks and the Burger King System shall also terminate in accordance with the terms of the Franchise Agreement; <u>provided</u>, <u>however</u>, that nothing set forth in this Paragraph 6 shall affect in any way or detract from BKC's right to terminate the Franchise Agreement at any time in accordance with its terms.

    (b)  With respect to the Franchised Restaurant, upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall not thereafter identify themselves as a Burger King franchisee or publicly identify themselves as a former Burger King franchisee or use any of BKC's trade secrets, promotional materials, the Burger King Marks or any mark confusingly similar with the trademarks or service marks of BKC, nor shall FRANCHISEE or

GUARANTORS disclose any of BKC's trade secrets.  Upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall (i) immediately return to BKC the MOD Manual loaned to them, together with all other materials containing trade secrets;  and  (ii) comply with all post-termination provisions of the Franchise Agreement.  In the event FRANCHISEE or GUARANTORS fail to comply with the provisions of this subparagraph 6(b), FRANCHISEE grants to BKC a license to enter the building and Premises to make non-structural changes at FRANCHISEE'S and GUARANTORS' expense, and without liability to the FRANCHISEE or GUARANTORS for any incidental or consequential damage to the Premises as a result thereof.

7.    Satisfaction of BKC's Obligations.  Each of the parties hereto acknowledges and agrees that the execution and delivery of this Agreement by BKC shall fully satisfy any statutory, contractual or other requirements imposed on BKC with respect to the extension of the Franchise Agreement, including, without limitation, the giving of any formal notice of early termination by BKC to FRANCHISEE and GUARANTORS as a result of their failure to fully satisfy each of the terms, obligations and conditions set forth in this Agreement or the Franchise Agreement.  FRANCHISEE and GUARANTORS further acknowledge and agree that failure to comply with the terms of this Agreement shall constitute "good cause" for BKC to terminate the Franchise Agreement.

8.    Indemnification.  FRANCHISEE and GUARANTORS are jointly and severally responsible for all losses, damages and/or contractual liabilities to third parties arising out of or relating to any of the obligations, undertakings, promises and representations of FRANCHISEE and GUARANTORS under this Agreement, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. FRANCHISEE and GUARANTORS agree to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, accountants, subsidiaries, affiliates and parent company harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages (including, without limitation, reasonable attorneys' fees).  BKC shall notify the FRANCHISEE and GUARANTOR of any such claims, and FRANCHISEE and GUARANTOR shall be given the opportunity to assume the defense of the matter.  If FRANCHISEE and GUARANTORS fail to assume the defense, BKC may defend the action in the manner it deems appropriate, and FRANCHISEE and GUARANTORS shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense.  BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law.

9.    General Release.   In consideration of BKC entering into this Agreement, FRANCHISEE, and GUARANTORS, jointly and for themselves, their respective successors, assigns, heirs, personal representatives and affiliates (collectively, the "Releasing Parties"), remise, release, acquit, satisfy and forever discharge BKC, its successors, predecessors, counsel, insurers, assigns, officers, directors, employees, parent company, affiliates, subsidiaries and agents, past and present (collectively, the "Released Parties") from and against all claims, actions, causes of action, demands, damages, costs, suits, debts, covenants, controversies, and any other liabilities whatsoever, whether known or unknown, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable, which the Releasing Parties ever had, now have, can, shall or may have, against the Released Parties relating to the Franchise Agreement or the operation, licensing or right to continue operation of the Restaurant, from the commencement of any relationship of any kind by the FRANCHISEE and GUARANTORS through the date of this Agreement.

10.    No Modification of Franchise Agreement.  Except as otherwise set forth herein, all other provisions of the Franchise Agreement shall remain in full force and effect.

11.    Time of the Essence.  FRANCHISEE and GUARANTORS agree that time is of the essence with respect to their obligations under this Agreement.

12.    Interpretation.  The introduction and recitals shall be considered a part of this Agreement. Paragraph captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular paragraphs to which they refer.  Words of any gender used in this Agreement shall include any other gender or the neuter, and words in the singular shall include the plural, where the context requires.

13.    Non-Waiver.  The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE and GUARANTORS with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement.  The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

14.    Governing Law; Forum and Compliance.

    (a)    This Agreement shall become valid only after it is executed by BKC.  The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

    (b)    FRANCHISEE, GUARANTORS and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

    (c)    Notwithstanding anything in this Agreement to the contrary, FRANCHISEE and GUARANTORS shall conduct their business in a lawful manner and faithfully comply with applicable laws or regulations of the state, city or other political subdivision in which the Restaurant is located.

15.    Severability.  If one or more provisions contained in this Agreement or in any document contemplated hereby, or any application thereof, shall be invalid, illegal or unenforceable in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein and therein, and any application thereof, shall not in any way be affected or impaired thereby or under the laws of any other jurisdiction.

16.    Notices.

    (a)    All notices to BKC shall be in writing and shall be delivered or send by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, General Mail Facility, Miami, Florida  33102-0783, Attention:  General Counsel, or at such other address as BKC shall from time to time designate in writing.

      (b)     All notices to FRANCHISEE or GUARANTORS shall be in writing and shall be hand-delivered or sent by registered or certified mail or telegraph, addressed to FRANCHISEE and GUARANTORS at 12281 Nicollet Avenue, Burnsville, MN 55337, or at such other address as FRANCHISEE shall from time to time designate in writing.

      (c)     Notices shall be deemed delivered on the earlier of actual receipt or on the third (3rd) day after being deposited in the U.S. Mail.

17.    Modification.  This Agreement may only be modified or amended by a written document executed by BKC, FRANCHISEE and GUARANTORS.

18.    Binding Effect.  This Agreement shall be binding upon the parties and their successors or assigns.

19.    Survival.  Any provision of this Agreement, including but not limited to the indemnification provision, which imposes an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

20.    Attorneys' Fees.  In any litigation to enforce the terms of this Agreement, all costs and all attorneys' fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

21.    Entire Agreement.  This Agreement, together with the Franchise Agreement, constitute the entire agreement of the parties and supersede all prior agreements, negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

**(This space has been left blank intentionally)**

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date indicated on the first page of this Agreement.

**BURGER KING CORPORATION**

By: _____
        Manager, Franchise Administration

Attest: _____
        Franchise Development Specialist

**FRANCHISEE:**

Duke and King Acquisition Corp.,
a Delaware corporation

By: _____
        Rodger T. Head, Managing Owner

Attest: _____
        Print Name: Becky Moldenhauer
        Title: VP + CFO

**GUARANTORS:**

Duke and King Holdings, LLC

By: _____
        Print Name: Rodger T. Head
        Title: CEO

Attest: _____
        Print Name: Becky Moldenhauer
        Title: VP + CFO

## AGREEMENT TO EXTEND RESTAURANT
## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of this __14__ day of ___January___, 200_9_, but effective June 10, 2008, by and among **BURGER KING CORPORATION**, a Florida corporation ("BKC"), **Duke and King Acquisition Corp.**, a Delaware corporation ("FRANCHISEE"), and Duke and King Holdings, LLC (collectively, "GUARANTORS").

## R E C I T A L S

A.     FRANCHISEE and GUARANTORS is/are parties to that certain franchise agreement dated December 31, 1996 (the "Franchise Agreement") with BKC relating to the operation of Burger King® Restaurant #5960 located at 2001 Center Avenue, Janesville, WI 53545 (the "Restaurant"). The term of the Franchise Agreement will expire by its own terms on June 9, 2008, (the "Original Expiration Date").

B.     GUARANTORS own all of the capital stock of FRANCHISEE and have guaranteed the obligations of FRANCHISEE under the Franchise Agreement.

C.     FRANCHISEE and GUARANTORS have requested that BKC extend the Original Expiration Date of the Franchise Agreement to the close of business on December 31, 2009 (the "Extended Expiration Date").

NOW, THEREFORE, in consideration of the terms, conditions and covenants hereinafter set forth and for other good and valuable consideration which each of the parties hereto acknowledges is sufficient to create a binding agreement, the parties agree as follows:

1.     <u>Extension of Franchise Agreement.</u>

    (a)     Subject to FRANCHISEE and GUARANTORS fully complying with and performing each of the covenants and obligations described in this Agreement, BKC agrees to extend the Original Expiration Date of the Franchise Agreement until the Extended Expiration Date.

    (b)     FRANCHISEE and GUARANTORS hereby agree and acknowledge that BKC is under no obligation whatsoever to allow the Restaurant to continue to operate beyond the Extended Expiration Date and that, unless BKC agrees in writing and in its sole and absolute discretion to further extend the Extended Expiration Date, the Restaurant shall close on the Extended Expiration Date, and FRANCHISEE and GUARANTORS shall comply with all post-termination obligations under the Franchise Agreement, including the obligation to de-identify the Restaurant, within five (5) days of the Extended Expiration Date.

    (c)     FRANCHISEE and GUARANTORS hereby waive and release BKC from any and all claims that BKC has not given FRANCHISEE a reasonable time and opportunity to comply with the requirements for obtaining a renewal or successor agreement.

2.     <u>Compliance.</u>  FRANCHISEE and GUARANTORS agree to be bound by and to comply with all of the terms and conditions of this Agreement and the Franchise Agreement through the Extended Expiration Date.

Case 10-38652   Doc 30-4   Filed 12/07/10   Entered 12/07/10 13:02:57   Desc
Exhibit(s) C   Page 34 of 47

3.   <u>Representations and Warranties; No Defaults.</u>   FRANCHISEE and GUARANTORS hereby represent and warrant that each of the representations, warranties and affirmative covenants of the FRANCHISEE set forth in the Franchise Agreement is true and correct as of the date hereof and no Event of Default or event, with which the lapse of time, the giving of notice, or both, would become an Event of Default (as defined therein), has occurred and is continuing under the Franchise Agreement.

4.   <u>Conditions of Grant of Extension.</u>

   (a)   As of the date of this Agreement, FRANCHISEE and GUARANTORS shall be in full compliance with the terms of the Franchise Agreement, including, without limitation, the timely payment to BKC of royalty, advertising and other charges thereunder.

   (b)   FRANCHISEE and GUARANTORS shall pay to BKC an extension fee of U.S. $3,904.25 upon the execution of this Agreement.

   (c)   The rights of FRANCHISEE and GUARANTORS to remain in possession of the premises for the Restaurant (the "Premises") through the Extended Expiration Date and to operate the Restaurant thereon shall not be prohibited or restricted in any way and shall not be a violation of, or contrary to, any other agreement to which FRANCHISEE or GUARANTORS are a party, including, without limitation, any lease for the Premises.

5.   <u>Amendments to Franchise Agreement.</u>

   Paragraph 9.A. of the Franchise Agreement is amended to increase the royalty charge payable thereunder from 3.5% to 4.5% of monthly gross sales at the Restaurant, effective June 10, 2008, as such term is defined in the Franchise Agreement.

6.   <u>Termination.</u>

   (a)   If FRANCHISEE defaults in the performance of any of the terms and conditions of this Agreement, which default continues uncured for a period of thirty (30) days after notice of default from BKC to FRANCHISEE, or if any of the representations or warranties of FRANCHISEE and GUARANTORS set forth herein are not true and correct, BKC shall have the right, at its sole discretion and without prejudice to any other rights or remedies available to it under this Agreement, the Franchise Agreement, at law or in equity, to cancel and terminate the Franchise Agreement, it being expressly understood and agreed that a default under this Agreement shall constitute an event of default under the Franchise Agreement, and FRANCHISEE'S rights to use the Burger King Marks and the Burger King System shall also terminate in accordance with the terms of the Franchise Agreement; provided, however, that nothing set forth in this Paragraph 6 shall affect in any way or detract from BKC's right to terminate the Franchise Agreement at any time in accordance with its terms.

   (b)   With respect to the Franchised Restaurant, upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall not thereafter identify themselves as a Burger King franchisee or publicly identify themselves as a former Burger King franchisee or use any of BKC's trade secrets, promotional materials, the Burger King Marks or any mark confusingly similar with the trademarks or service marks of BKC, nor shall FRANCHISEE or

GUARANTORS disclose any of BKC's trade secrets. Upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall (i) immediately return to BKC the MOD Manual loaned to them, together with all other materials containing trade secrets; and (ii) comply with all post-termination provisions of the Franchise Agreement. In the event FRANCHISEE or GUARANTORS fail to comply with the provisions of this subparagraph 6(b), FRANCHISEE grants to BKC a license to enter the building and Premises to make non-structural changes at FRANCHISEE'S and GUARANTORS' expense, and without liability to the FRANCHISEE or GUARANTORS for any incidental or consequential damage to the Premises as a result thereof.

7.    <u>Satisfaction of BKC's Obligations.</u>  Each of the parties hereto acknowledges and agrees that the execution and delivery of this Agreement by BKC shall fully satisfy any statutory, contractual or other requirements imposed on BKC with respect to the extension of the Franchise Agreement, including, without limitation, the giving of any formal notice of early termination by BKC to FRANCHISEE and GUARANTORS as a result of their failure to fully satisfy each of the terms, obligations and conditions set forth in this Agreement or the Franchise Agreement. FRANCHISEE and GUARANTORS further acknowledge and agree that failure to comply with the terms of this Agreement shall constitute "good cause" for BKC to terminate the Franchise Agreement.

8.    <u>Indemnification.</u>  FRANCHISEE and GUARANTORS are jointly and severally responsible for all losses, damages and/or contractual liabilities to third parties arising out of or relating to any of the obligations, undertakings, promises and representations of FRANCHISEE and GUARANTORS under this Agreement, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. FRANCHISEE and GUARANTORS agree to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, accountants, subsidiaries, affiliates and parent company harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages (including, without limitation, reasonable attorneys' fees). BKC shall notify the FRANCHISEE and GUARANTOR of any such claims, and FRANCHISEE and GUARANTOR shall be given the opportunity to assume the defense of the matter. If FRANCHISEE and GUARANTORS fail to assume the defense, BKC may defend the action in the manner it deems appropriate, and FRANCHISEE and GUARANTORS shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law.

9.    <u>General Release.</u>  In consideration of BKC entering into this Agreement, FRANCHISEE, and GUARANTORS, jointly and for themselves, their respective successors, assigns, heirs, personal representatives and affiliates (collectively, the "Releasing Parties"), remise, release, acquit, satisfy and forever discharge BKC, its successors, predecessors, counsel, insurers, assigns, officers, directors, employees, parent company, affiliates, subsidiaries and agents, past and present (collectively, the "Released Parties") from and against all claims, actions, causes of action, demands, damages, costs, suits, debts, covenants, controversies, and any other liabilities whatsoever, whether known or unknown, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable, which the Releasing Parties ever had, now have, can, shall or may have, against the Released Parties relating to the Franchise Agreement or the operation, licensing or right to continue operation of the Restaurant, from the commencement of any relationship of any kind by the FRANCHISEE and GUARANTORS through the date of this Agreement.

10. <u>No Modification of Franchise Agreement.</u> Except as otherwise set forth herein, all other provisions of the Franchise Agreement shall remain in full force and effect.

11. <u>Time of the Essence.</u> FRANCHISEE and GUARANTORS agree that time is of the essence with respect to their obligations under this Agreement.

12. <u>Interpretation.</u> The introduction and recitals shall be considered a part of this Agreement. Paragraph captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular paragraphs to which they refer. Words of any gender used in this Agreement shall include any other gender or the neuter, and words in the singular shall include the plural, where the context requires.

13. <u>Non-Waiver.</u> The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE and GUARANTORS with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement. The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

14. <u>Governing Law; Forum and Compliance.</u>

   (a) This Agreement shall become valid only after it is executed by BKC. The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

   (b) FRANCHISEE, GUARANTORS and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

   (c) Notwithstanding anything in this Agreement to the contrary, FRANCHISEE and GUARANTORS shall conduct their business in a lawful manner and faithfully comply with applicable laws or regulations of the state, city or other political subdivision in which the Restaurant is located.

15. <u>Severability.</u> If one or more provisions contained in this Agreement or in any document contemplated hereby, or any application thereof, shall be invalid, illegal or unenforceable in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein and therein, and any application thereof, shall not in any way be affected or impaired thereby or under the laws of any other jurisdiction.

16. <u>Notices.</u>

   (a) All notices to BKC shall be in writing and shall be delivered or send by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, General Mail Facility, Miami, Florida 33102-0783, Attention: General Counsel, or at such other address as BKC shall from time to time designate in writing.

    (b)    All notices to FRANCHISEE or GUARANTORS shall be in writing and shall be hand-delivered or sent by registered or certified mail or telegraph, addressed to FRANCHISEE and GUARANTORS at 12281 Nicollet Avenue, Burnsville, MN 55337, or at such other address as FRANCHISEE shall from time to time designate in writing.

    (c)    Notices shall be deemed delivered on the earlier of actual receipt or on the third (3rd) day after being deposited in the U.S. Mail.

17.    Modification.  This Agreement may only be modified or amended by a written document executed by BKC, FRANCHISEE and GUARANTORS.

18.    Binding Effect.  This Agreement shall be binding upon the parties and their successors or assigns.

19.    Survival.  Any provision of this Agreement, including but not limited to the indemnification provision, which imposes an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

20.    Attorneys' Fees.  In any litigation to enforce the terms of this Agreement, all costs and all attorneys' fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

21.    Entire Agreement.  This Agreement, together with the Franchise Agreement, constitute the entire agreement of the parties and supersede all prior agreements, negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

**(This space has been left blank intentionally)**

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date indicated on the first page of this Agreement.

**BURGER KING CORPORATION**

By: _____

Manager, Franchise Administration

Attest: _____

Franchise Development Specialist

**FRANCHISEE:**

Duke and King Acquisition Corp.,
a Delaware corporation

By: _____

Rodger T. Head, Managing Owner

Attest: _____

Print Name: Becky Moldenhauer

Title: VP + CFO

**GUARANTORS:**

Duke and King Holdings, LLC

By: _____

Print Name: Rodger T. Head

Title: CEO

Attest: _____

Print Name: Becky Moldenhauer

Title: VP + CFO

**AGREEMENT TO EXTEND RESTAURANT
FRANCHISE AGREEMENT**

THIS AGREEMENT (the "Agreement") is made as of this __14__ day of ___January___, 200_9_, but effective November 17, 2008, by and among **BURGER KING CORPORATION**, a Florida corporation ("BKC"), **Duke and King Acquisition Corp.**, a Delaware corporation ("FRANCHISEE"), and Duke and King Holdings, LLC (collectively, "GUARANTORS").

### R E C I T A L S

A.    FRANCHISEE and GUARANTORS is/are parties to that certain franchise agreement dated April 18, 1996 (the "Franchise Agreement") with BKC relating to the operation of Burger King® Restaurant #6211 located at 1222 42nd Avenue, East Moline, IL 61244 (the "Restaurant"). The term of the Franchise Agreement will expire by its own terms on November 16, 2008, (the "Original Expiration Date").

B.    GUARANTORS own all of the capital stock of FRANCHISEE and have guaranteed the obligations of FRANCHISEE under the Franchise Agreement.

C.    FRANCHISEE and GUARANTORS have requested that BKC extend the Original Expiration Date of the Franchise Agreement to the close of business on December 31, 2009 (the "Extended Expiration Date").

NOW, THEREFORE, in consideration of the terms, conditions and covenants hereinafter set forth and for other good and valuable consideration which each of the parties hereto acknowledges is sufficient to create a binding agreement, the parties agree as follows:

1.    <u>Extension of Franchise Agreement.</u>

    (a)    Subject to FRANCHISEE and GUARANTORS fully complying with and performing each of the covenants and obligations described in this Agreement, BKC agrees to extend the Original Expiration Date of the Franchise Agreement until the Extended Expiration Date.

    (b)    FRANCHISEE and GUARANTORS hereby agree and acknowledge that BKC is under no obligation whatsoever to allow the Restaurant to continue to operate beyond the Extended Expiration Date and that, unless BKC agrees in writing and in its sole and absolute discretion to further extend the Extended Expiration Date, the Restaurant shall close on the Extended Expiration Date, and FRANCHISEE and GUARANTORS shall comply with all post-termination obligations under the Franchise Agreement, including the obligation to de-identify the Restaurant, within five (5) days of the Extended Expiration Date.

    (c)    FRANCHISEE and GUARANTORS hereby waive and release BKC from any and all claims that BKC has not given FRANCHISEE a reasonable time and opportunity to comply with the requirements for obtaining a renewal or successor agreement.

2.    <u>Compliance.</u>  FRANCHISEE and GUARANTORS agree to be bound by and to comply with all of the terms and conditions of this Agreement and the Franchise Agreement through the Extended Expiration Date.

## AGREEMENT TO EXTEND RESTAURANT
## FRANCHISE AGREEMENT

THIS AGREEMENT (the "Agreement") is made as of this _____ day of _____, 200___, but effective November 17, 2008, by and among **BURGER KING CORPORATION**, a Florida corporation ("BKC"), **Duke and King Acquisition Corp.**, a Delaware corporation ("FRANCHISEE"), and Duke and King Holdings, LLC (collectively, "GUARANTORS").

## R E C I T A L S

A.    FRANCHISEE and GUARANTORS is/are parties to that certain franchise agreement dated April 18, 1996 (the "Franchise Agreement") with BKC relating to the operation of Burger King® Restaurant #6211 located at 1222 42nd Avenue, East Moline, IL 61244 (the "Restaurant"). The term of the Franchise Agreement will expire by its own terms on November 16, 2008, (the "Original Expiration Date").

B.    GUARANTORS own all of the capital stock of FRANCHISEE and have guaranteed the obligations of FRANCHISEE under the Franchise Agreement.

C.    FRANCHISEE and GUARANTORS have requested that BKC extend the Original Expiration Date of the Franchise Agreement to the close of business on December 31, 2009 (the "Extended Expiration Date").

NOW, THEREFORE, in consideration of the terms, conditions and covenants hereinafter set forth and for other good and valuable consideration which each of the parties hereto acknowledges is sufficient to create a binding agreement, the parties agree as follows:

1.    Extension of Franchise Agreement.

    (a)    Subject to FRANCHISEE and GUARANTORS fully complying with and performing each of the covenants and obligations described in this Agreement, BKC agrees to extend the Original Expiration Date of the Franchise Agreement until the Extended Expiration Date.

    (b)    FRANCHISEE and GUARANTORS hereby agree and acknowledge that BKC is under no obligation whatsoever to allow the Restaurant to continue to operate beyond the Extended Expiration Date and that, unless BKC agrees in writing and in its sole and absolute discretion to further extend the Extended Expiration Date, the Restaurant shall close on the Extended Expiration Date, and FRANCHISEE and GUARANTORS shall comply with all post-termination obligations under the Franchise Agreement, including the obligation to de-identify the Restaurant, within five (5) days of the Extended Expiration Date.

    (c)    FRANCHISEE and GUARANTORS hereby waive and release BKC from any and all claims that BKC has not given FRANCHISEE a reasonable time and opportunity to comply with the requirements for obtaining a renewal or successor agreement.

2.    Compliance. FRANCHISEE and GUARANTORS agree to be bound by and to comply with all of the terms and conditions of this Agreement and the Franchise Agreement through the Extended Expiration Date.

**AGREEMENT TO EXTEND RESTAURANT
FRANCHISE AGREEMENT**

THIS AGREEMENT (the "Agreement") is made as of this _____ day of _____, 200___, but effective June 10, 2008, by and among **BURGER KING CORPORATION**, a Florida corporation ("BKC"), **Duke and King Acquisition Corp.**, a Delaware corporation ("FRANCHISEE"), and Duke and King Holdings, LLC (collectively, "GUARANTORS").

# R E C I T A L S

A.    FRANCHISEE and GUARANTORS is/are parties to that certain franchise agreement dated December 31, 1996 (the "Franchise Agreement") with BKC relating to the operation of Burger King® Restaurant #5960 located at 2001 Center Avenue, Janesville, WI 53545 (the "Restaurant"). The term of the Franchise Agreement will expire by its own terms on June 9, 2008, (the "Original Expiration Date").

B.    GUARANTORS own all of the capital stock of FRANCHISEE and have guaranteed the obligations of FRANCHISEE under the Franchise Agreement.

C.    FRANCHISEE and GUARANTORS have requested that BKC extend the Original Expiration Date of the Franchise Agreement to the close of business on December 31, 2009 (the "Extended Expiration Date").

NOW, THEREFORE, in consideration of the terms, conditions and covenants hereinafter set forth and for other good and valuable consideration which each of the parties hereto acknowledges is sufficient to create a binding agreement, the parties agree as follows:

1.    <u>Extension of Franchise Agreement.</u>

    (a)    Subject to FRANCHISEE and GUARANTORS fully complying with and performing each of the covenants and obligations described in this Agreement, BKC agrees to extend the Original Expiration Date of the Franchise Agreement until the Extended Expiration Date.

    (b)    FRANCHISEE and GUARANTORS hereby agree and acknowledge that BKC is under no obligation whatsoever to allow the Restaurant to continue to operate beyond the Extended Expiration Date and that, unless BKC agrees in writing and in its sole and absolute discretion to further extend the Extended Expiration Date, the Restaurant shall close on the Extended Expiration Date, and FRANCHISEE and GUARANTORS shall comply with all post-termination obligations under the Franchise Agreement, including the obligation to de-identify the Restaurant, within five (5) days of the Extended Expiration Date.

    (c)    FRANCHISEE and GUARANTORS hereby waive and release BKC from any and all claims that BKC has not given FRANCHISEE a reasonable time and opportunity to comply with the requirements for obtaining a renewal or successor agreement.

2.    <u>Compliance.</u> FRANCHISEE and GUARANTORS agree to be bound by and to comply with all of the terms and conditions of this Agreement and the Franchise Agreement through the Extended Expiration Date.

3. <u>Representations and Warranties; No Defaults.</u> FRANCHISEE and GUARANTORS hereby represent and warrant that each of the representations, warranties and affirmative covenants of the FRANCHISEE set forth in the Franchise Agreement is true and correct as of the date hereof and no Event of Default or event, with which the lapse of time, the giving of notice, or both, would become an Event of Default (as defined therein), has occurred and is continuing under the Franchise Agreement.

4. <u>Conditions of Grant of Extension.</u>

(a) As of the date of this Agreement, FRANCHISEE and GUARANTORS shall be in full compliance with the terms of the Franchise Agreement, including, without limitation, the timely payment to BKC of royalty, advertising and other charges thereunder.

(b) FRANCHISEE and GUARANTORS shall pay to BKC an extension fee of U.S. $3,904.25 upon the execution of this Agreement.

(c) The rights of FRANCHISEE and GUARANTORS to remain in possession of the premises for the Restaurant (the "Premises") through the Extended Expiration Date and to operate the Restaurant thereon shall not be prohibited or restricted in any way and shall not be a violation of, or contrary to, any other agreement to which FRANCHISEE or GUARANTORS are a party, including, without limitation, any lease for the Premises.

5. <u>Amendments to Franchise Agreement.</u>

Paragraph 9.A. of the Franchise Agreement is amended to increase the royalty charge payable thereunder from 3.5% to 4.5% of monthly gross sales at the Restaurant, effective June 10, 2008, as such term is defined in the Franchise Agreement.

6. <u>Termination.</u>

(a) If FRANCHISEE defaults in the performance of any of the terms and conditions of this Agreement, which default continues uncured for a period of thirty (30) days after notice of default from BKC to FRANCHISEE, or if any of the representations or warranties of FRANCHISEE and GUARANTORS set forth herein are not true and correct, BKC shall have the right, at its sole discretion and without prejudice to any other rights or remedies available to it under this Agreement, the Franchise Agreement, at law or in equity, to cancel and terminate the Franchise Agreement, it being expressly understood and agreed that a default under this Agreement shall constitute an event of default under the Franchise Agreement, and FRANCHISEE'S rights to use the Burger King Marks and the Burger King System shall also terminate in accordance with the terms of the Franchise Agreement; <u>provided</u>, <u>however</u>, that nothing set forth in this Paragraph 6 shall affect in any way or detract from BKC's right to terminate the Franchise Agreement at any time in accordance with its terms.

(b) With respect to the Franchised Restaurant, upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall not thereafter identify themselves as a Burger King franchisee or publicly identify themselves as a former Burger King franchisee or use any of BKC's trade secrets, promotional materials, the Burger King Marks or any mark confusingly similar with the trademarks or service marks of BKC, nor shall FRANCHISEE or

GUARANTORS disclose any of BKC's trade secrets.  Upon expiration or earlier termination of the Franchise Agreement, FRANCHISEE and GUARANTORS shall (i) immediately return to BKC the MOD Manual loaned to them, together with all other materials containing trade secrets;  and (ii) comply with all post-termination provisions of the Franchise Agreement.  In the event FRANCHISEE or GUARANTORS fail to comply with the provisions of this subparagraph 6(b), FRANCHISEE grants to BKC a license to enter the building and Premises to make non-structural changes at FRANCHISEE'S and GUARANTORS' expense, and without liability to the FRANCHISEE or GUARANTORS for any incidental or consequential damage to the Premises as a result thereof.

7.    Satisfaction of BKC's Obligations.  Each of the parties hereto acknowledges and agrees that the execution and delivery of this Agreement by BKC shall fully satisfy any statutory, contractual or other requirements imposed on BKC with respect to the extension of the Franchise Agreement, including, without limitation, the giving of any formal notice of early termination by BKC to FRANCHISEE and GUARANTORS as a result of their failure to fully satisfy each of the terms, obligations and conditions set forth in this Agreement or the Franchise Agreement.  FRANCHISEE and GUARANTORS further acknowledge and agree that failure to comply with the terms of this Agreement shall constitute "good cause" for BKC to terminate the Franchise Agreement.

8.    Indemnification.  FRANCHISEE and GUARANTORS are jointly and severally responsible for all losses, damages and/or contractual liabilities to third parties arising out of or relating to any of the obligations, undertakings, promises and representations of FRANCHISEE and GUARANTORS under this Agreement, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. FRANCHISEE and GUARANTORS agree to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, accountants, subsidiaries, affiliates and parent company harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages (including, without limitation, reasonable attorneys' fees).  BKC shall notify the FRANCHISEE and GUARANTOR of any such claims, and FRANCHISEE and GUARANTOR shall be given the opportunity to assume the defense of the matter.  If FRANCHISEE and GUARANTORS fail to assume the defense, BKC may defend the action in the manner it deems appropriate, and FRANCHISEE and GUARANTORS shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law.

9.    General Release.   In consideration of BKC entering into this Agreement, FRANCHISEE, and GUARANTORS, jointly and for themselves, their respective successors, assigns, heirs, personal representatives and affiliates (collectively, the "Releasing Parties"), remise, release, acquit, satisfy and forever discharge BKC, its successors, predecessors, counsel, insurers, assigns, officers, directors, employees, parent company, affiliates, subsidiaries and agents, past and present (collectively, the "Released Parties") from and against all claims, actions, causes of action, demands, damages, costs, suits, debts, covenants, controversies, and any other liabilities whatsoever, whether known or unknown, liquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal or equitable, which the Releasing Parties ever had, now have, can, shall or may have, against the Released Parties relating to the Franchise Agreement or the operation, licensing or right to continue operation of the Restaurant, from the commencement of any relationship of any kind by the FRANCHISEE and GUARANTORS through the date of this Agreement.

10.    <u>No Modification of Franchise Agreement.</u>  Except as otherwise set forth herein, all other provisions of the Franchise Agreement shall remain in full force and effect.

11.    <u>Time of the Essence.</u>  FRANCHISEE and GUARANTORS agree that time is of the essence with respect to their obligations under this Agreement.

12.    <u>Interpretation.</u>  The introduction and recitals shall be considered a part of this Agreement. Paragraph captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular paragraphs to which they refer.  Words of any gender used in this Agreement shall include any other gender or the neuter, and words in the singular shall include the plural, where the context requires.

13.    <u>Non-Waiver.</u>  The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by FRANCHISEE and GUARANTORS with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement.  The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

14.    <u>Governing Law;  Forum and Compliance.</u>

        (a)    This Agreement shall become valid only after it is executed by BKC.  The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

        (b)    FRANCHISEE, GUARANTORS and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Dade County, Florida, shall be the venue and exclusive proper forum in which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

        (c)    Notwithstanding anything in this Agreement to the contrary, FRANCHISEE and GUARANTORS shall conduct their business in a lawful manner and faithfully comply with applicable laws or regulations of the state, city or other political subdivision in which the Restaurant is located.

15.    <u>Severability.</u>  If one or more provisions contained in this Agreement or in any document contemplated hereby, or any application thereof, shall be invalid, illegal or unenforceable in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein and therein, and any application thereof, shall not in any way be affected or impaired thereby or under the laws of any other jurisdiction.

16.    <u>Notices.</u>

        (a)    All notices to BKC shall be in writing and shall be delivered or send by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, General Mail Facility, Miami, Florida  33102-0783, Attention:  General Counsel, or at such other address as BKC shall from time to time designate in writing.

      (b)      All notices to FRANCHISEE or GUARANTORS shall be in writing and shall be hand-delivered or sent by registered or certified mail or telegraph, addressed to FRANCHISEE and GUARANTORS at 12281 Nicollet Avenue, Burnsville, MN 55337, or at such other address as FRANCHISEE shall from time to time designate in writing.

      (c)      Notices shall be deemed delivered on the earlier of actual receipt or on the third (3rd) day after being deposited in the U.S. Mail.

17.      <u>Modification.</u>  This Agreement may only be modified or amended by a written document executed by BKC, FRANCHISEE and GUARANTORS.

18.      <u>Binding Effect.</u>  This Agreement shall be binding upon the parties and their successors or assigns.

19.      <u>Survival.</u>  Any provision of this Agreement, including but not limited to the indemnification provision, which imposes an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and be binding on the parties.

20.      <u>Attorneys' Fees.</u>  In any litigation to enforce the terms of this Agreement, all costs and all attorneys' fees (including those incurred on appeal) incurred as a result of the legal action shall be paid to the prevailing party by the other party.

21.      <u>Entire Agreement.</u>  This Agreement, together with the Franchise Agreement, constitute the entire agreement of the parties and supersede all prior agreements, negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

**(This space has been left blank intentionally)**

IN WITNESS WHEREOF, the parties have hereunto set their hands and seals as of the date indicated on the first page of this Agreement.

**BURGER KING CORPORATION**

By: _____
      Manager, Franchise Administration

Attest: _____
      Franchise Development Specialist

**FRANCHISEE:**

Duke and King Acquisition Corp.,
a Delaware corporation

By: _____
      Rodger T. Head, Managing Owner

Attest: _____
      Print Name: Becky Moldenhauer
      Title: VP + CFO

**GUARANTORS:**

Duke and King Holdings, LLC

By: _____
      Print Name: Rodger T. Head
      Title: CEO

Attest: _____
      Print Name: Becky Moldenhauer
      Title: VP + CFO

Schedule B

Specified Units

| Restaurant Number | Address |
|---|---|
| 11049 | 3095 Gardner Edgewood Drive, Neosho, MO 64850 |
| 12281 | 220 E Austin Blvd, Nevada, MO 64772 |