# EXHIBIT R



1/25/2007

**VIA FEDERAL EXPRESS**

Thomas Metzger
Duke & King Acquisition Corp.
900 American Boulevard Suite 300
Bloomington, MN 55720

**Re:    Burger King Restaurant #1060**

Dear Mr. Metzger:

Enclosed for your records is a fully executed original of the Burger King Restaurant Successor Franchise
Agreement for the above referenced restaurant.

If you have any questions, please do not hesitate to contact me at the telephone number referenced
below.

Sincerely,

**BURGER KING CORPORATION**

Linda D. Dallas
Franchise Development Specialist


Enclosures

RESTAURANT #   1060
ADDRESS:       1450 4th Street
               Beloit, WI 53511

# SUCCESSOR FRANCHISE AGREEMENT (Entity)

INTRODUCTION ....................................................................................................................... 1
1.  FRANCHISE GRANT: TERM AND LOCATION ............................................................ 1
2.  FRANCHISE FEE ......................................................................................................... 2
3.  ORGANIZATION OF FRANCHISEE .............................................................................. 2
4.  FRANCHISEE ASSOCIATION AND ADVISORY COUNCIL ........................................ 2
5.  STANDARDS AND UNIFORMITY OF OPERATION ...................................................... 3
    A.  M.O.D. Manual ................................................................................................... 3
    B.  Franchised Restaurant ....................................................................................... 3
        1.  Repair and Maintenance ......................................................................... 4
        2.  Current Image. ......................................................................................... 4
    C.  Signs .................................................................................................................. 4
    D.  Equipment .......................................................................................................... 4
    E.  Vending Machines, Etc. ...................................................................................... 5
    F.  Menu and Service ............................................................................................... 5
    G.  Hours of Operation ............................................................................................. 5
    H.  Uniforms ............................................................................................................. 5
    I.  Advertising and Promotional Materials ............................................................... 5
    J.  Right of Entry and Inspection ............................................................................. 5
    K.  Interference with Employment Relations of Others ............................................ 6
    L.  Management of Franchised Restaurant .............................................................. 6
6.  SERVICES AVAILABLE TO FRANCHISEE ................................................................. 6
7.  THE FRANCHISED RESTAURANT ............................................................................. 7
8.  TRAINING ..................................................................................................................... 7
    A.  Managing Owner/Managing Director .................................................................. 7
    B.  Charges and Costs ............................................................................................. 8
    C.  Franchisee Training and Restaurant Staffing ..................................................... 8
9.  ROYALTY AND ADVERTISING CONTRIBUTION ........................................................ 8
    A.  Royalty ............................................................................................................... 8
    B.  Advertising, Sales Promotion and Public Relations ........................................... 8
    C.  Gross Sales ........................................................................................................ 9
    D.  Late Charge ........................................................................................................ 9
    E.  Payment ............................................................................................................. 10
    F.  Audit of Advertising Contributions ..................................................................... 10
    G.  Alternative Method Of Payment ......................................................................... 10
10.  ACCOUNTING PROCEDURES: RIGHT OF AUDIT .................................................... 10
    A.  Accounting .......................................................................................................... 10
    B.  Annual Financial Statements .............................................................................. 11
    C.  Audits ................................................................................................................. 11
    D.  Release of Financial Information ......................................................................... 11
11.  LIMITATIONS OF FRANCHISE ................................................................................... 11
    A.  Trademarks, Trade Names, Service Marks and Trade Secrets .......................... 11
    B.  Independent Contractor ...................................................................................... 12
12.  UNFAIR COMPETITION ............................................................................................... 12
13.  INSURANCE; INDEMNIFICATION ............................................................................... 12
    A.  Insurance ............................................................................................................ 12
    B.  Worker's Compensation ..................................................................................... 13
    C.  Indemnity ............................................................................................................ 13
    D.  Defense of Claims .............................................................................................. 14
14.  TAXES .......................................................................................................................... 14
15.  ASSIGNMENT: CONDITIONS AND LIMITATIONS ...................................................... 14
    A.  Transfer by Franchisee ...................................................................................... 14
    B.  Transfer by Owners ............................................................................................ 15
    C.  Transfer of Equity Securities .............................................................................. 15

|   |   |   |   |
|---|---|---|---|
| | D. | Pledging of Franchise Agreement | 15 |
| | E. | Notice of Proposed Transfer | 15 |
| | F. | Conditions of Consent | 15 |
| | G. | Consent to Transfer | 16 |
| | H. | Continuing Liability | 16 |
| | I. | Right of Re-Entry | 17 |
| | J. | Notices to Transferor | 17 |
| | K. | Acquisition of Additional Franchises | 18 |
| | L. | Death or Mental Incapacity | 18 |
| | M. | No Waiver | 18 |
| 16. | | RIGHT OF FIRST REFUSAL | 18 |
| 17. | | OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT | 19 |
| 18. | | DEFAULT AND EFFECT OF TERMINATION | 20 |
| | A. | Default | 20 |
| | B. | Effect of Termination | 23 |
| 19. | | RESTRICTIVE COVENANT | 23 |
| 20. | | RESOLUTION OF DEVELOPMENT DISPUTES | 23 |
| | A. | Non-Binding Mediation | 23 |
| B. | | BINDING DISPUTE RESOLUTION | 24 |
| C. | | MODIFICATION OF PROCEDURES | 24 |
| D. | | INSTITUTION OF LEGAL PROCEEDINGS | 24 |
| 21. | | MISCELLANEOUS: GENERAL CONDITIONS | 24 |
| | A. | Interpretation | 24 |
| | B. | Non-Waiver | 24 |
| | C. | Governing Law, Forum and Compliance | 24 |
| | D. | Severability | 25 |
| | E. | Notices | 25 |
| | F. | Modification | 25 |
| | G. | Binding Effect | 25 |
| | H. | Survival | 26 |
| | I. | Attorney's Fees | 26 |
| | J. | Entire Agreement | 26 |

**EXHIBIT A - LEGAL DESCRIPTION** ........................................................................ **27**

**EXHIBIT B - OWNERS** ............................................................................................... **28**

**EXHIBIT C - NEW RESTAURANT MARKETING ACCOUNT** ...................................... **29**

## BURGER KING® RESTAURANT
## SUCCESSOR FRANCHISE AGREEMENT
## (ENTITY)

THIS AGREEMENT is made as of the 23rd [30th] day of October [November], 2006, by and between BURGER KING CORPORATION, a Florida corporation ("BKC") and DUKE AND KING ACQUISITION CORP., a Delaware Corporation ("Franchisee").

### INTRODUCTION

A.     BKC is the exclusive licensee of certain trademarks and service marks, including but not limited to BURGER KING® and HOME OF THE WHOPPER®, which are registered or pending with the United States Patent and Trademark Office, and is the owner or exclusive licensee of other trademarks and service marks authorized for use in BURGER KING Restaurants (the "BURGER KING Marks").

B.     BKC is engaged in the business of operating and granting franchises to operate restaurants ("BURGER KING Restaurants") using the BURGER KING Marks and a uniform and comprehensive restaurant format and operating system developed by BKC (the "BURGER KING System"), including a standardized design, decor, equipment system, color scheme, style of building and signage, as well as uniform operating and quality standards, specifications and procedures of operation, and uniformity of product and services offered, including all provisions of the Manual of Operating Data, as amended from time to time (the "MOD Manual").

C.     Franchisee desires to acquire a franchise to operate a BURGER KING  Restaurant at the location for the entire Term specified in this Agreement.  Franchisee acknowledges receipt of a copy of the Uniform Franchise Offering Circular of BKC and Franchisee has had a full and adequate opportunity to be thoroughly advised of the terms and conditions of this Agreement by financial and legal counsel of Franchisee's own choosing at least ten (10) business days, excluding weekends and federal holidays ("Business Days") prior to its execution, and is entering into this Agreement after having made an independent investigation of BKC's operations and not upon any representation as to the profits and/or sales volume which Franchisee might be expected to realize, nor upon any representations or promises by BKC which are not contained in this Agreement.

D.     BKC has previously approved a plan for the distribution of securities of Franchisee (the "Distribution Plan").

In consideration of the mutual covenants contained in this Agreement, the parties agree as follows:

### 1.     FRANCHISE GRANT: TERM AND LOCATION

BKC grants to FRANCHISEE and FRANCHISEE accepts a franchise to use the BURGER KING System and the BURGER KING marks only in the operation of a BURGER KING Restaurant at 1450 4th Street, Beloit, WI, more fully described in Exhibit "A" (the "Franchised Restaurant," the term "Franchised Restaurant" includes the real estate described on Exhibit "A" (the "Premises") and the restaurant "Building" and all other "Improvements" constructed thereon wherever the context permits or requires).  The term of this Agreement commenced as of ~~October 23, 2006~~ (the "Commencement [November 1, 200]  Date") and shall expire on ~~October 22, 2026~~ (the "Term") unless sooner terminated in accordance with [October 31, 202] the provisions of this Agreement.  FRANCHISEE agrees to operate the Franchised Restaurant at the specified location for the entire Term.  FRANCHISEE accepts this franchise with the full and complete understanding that the franchise grant contains no promise or assurance of renewal.  The sole and entire conditions under which FRANCHISEE will have the opportunity of obtaining a Successor BURGER KING Franchise Agreement at expiration are those set forth herein in Paragraph 17. This franchise is for the specified location only and does not in any way grant or imply any area, market or territorial rights proprietary to FRANCHISEE.

2.      **FRANCHISE FEE**

Franchisee acknowledges that the grant of this franchise constitutes the consideration for the payment by Franchisee to BKC of Fifty Thousand and No/100 ($50,000.00) Dollars, and that this sum shall be fully earned by BKC upon the execution and delivery of this Agreement.

3.      **ORGANIZATION OF FRANCHISEE**

A.      The individuals listed in Exhibit B to this Agreement are the "Owners" of Franchisee for purposes of this Agreement.  Franchisee acknowledges its understanding of BKC's requirement that an individual "Managing Owner" be named and  be granted the authority by Franchisee to bind Franchisee in any dealings with  BKC and its affiliates and to direct any action necessary to ensure compliance with this Agreement and any other agreements relating to the Franchised Restaurant. Franchisee  represents and warrants that the Managing Owner designated in Exhibit B presently has and will have, throughout the term of this Agreement, the authority to bind Franchisee in any dealings with BKC and its affiliates and to direct any action necessary to ensure  compliance with this Agreement and any other agreements relating to the Franchised Restaurant.  Franchisee has not taken and agrees that it will not hereafter take, whether directly or indirectly, any action to avoid the authority requirement for the Managing Owner through the entry of limiting board resolutions, management agreements, amendment of governing documents or any other similar device or arrangement.  Franchisee agrees to furnish BKC with such evidence as BKC may request from time  to time for the purpose of assuring BKC that the Managing Owner's authority remains as represented in this Agreement.  No change in the Managing Owner may be made without the prior written consent of BKC.  If the Managing Owner dies or becomes incapacitated, then within sixty (60) days thereafter, Franchisee shall name a new Managing Owner approved by BKC pursuant to BKC's then current criteria for approving Managing Owners.

B.      Franchisee shall notify BKC of, and at BKC's request provide copies of, any amendments to the articles of incorporation, by-laws, partnership agreement, or other governing documents of Franchisee.  No amendment to such governing documents may be made, nor may any resolution be adopted by the board of directors of Franchisee, if Franchisee is a corporation, without the written consent of an authorized officer of BKC, if such amendment or resolution would (1) change the description of the Franchisee's purposes or authorized activities; (2) change the designation of, or the procedures for designating, the Managing Owner; (3) change the authority delegated to the Managing Owner; or (4) materially alter promises or representations contained in the Distribution Plan approved by BKC.

C.      Franchisee shall provide BKC annually with an updated list of all shareholders or general and limited partners of Franchisee and its parent, if any.

4.      **FRANCHISEE ASSOCIATION AND ADVISORY COUNCIL**

BKC shall, on a periodic basis, consult with representatives of an independent association whose membership is comprised of at least fifty-one percent (51%) of all BURGER KING franchise-owned and operated restaurants in the U.S.A. (the "Franchisee Association") relative to those matters expressly described in Sections 5.B, 6, 8, 9 and 20.C of this Agreement.  The representatives of the Franchisee Association shall be referred to herein as the "Franchisee Advisory Council." Membership by a Franchisee in the Franchisee Association shall be voluntary.

Franchisee agrees that BKC may consult with and consider the advice of the Franchisee Advisory Council.

For purposes of this Franchise Agreement, to qualify as the "Franchisee Association," the association must have been formed for the primary purpose of representing the rights of franchisees, and membership in such association must be limited solely to BURGER KING franchisees, or officers, directors, partners or shareholders of BURGER KING franchisees, who in either case are not owned or controlled by BKC or its parent, or any subsidiary or affiliate of BKC.

BKC shall not prohibit nor restrict Franchisee from associating with other franchisees, nor from forming, joining or participating in any franchisee trade association (the "activities"). BKC shall not retaliate against Franchisee because Franchisee engages in the activities. BKC's exercise and enforcement of its rights under any franchise agreement or the law shall not, by itself, constitute a breach of BKC's responsibilities under the preceding sentence.

## 5.    STANDARDS AND UNIFORMITY OF OPERATION

BKC shall establish, and cause approved suppliers to the BURGER KING System to reasonably comply with, product, service and equipment specifications as established by BKC from time to time.

Suggestions from Franchisee for improving elements of the BURGER KING System, such as products, equipment, uniforms, restaurant facilities, service format and advertising, are encouraged and may or may not be considered by BKC when adopting or modifying standards, specifications and procedures for the BURGER KING System. Franchisee acknowledges that any such suggestions made by Franchisee hereunder shall become the exclusive property of BKC. BKC shall have no obligation to utilize suggestions and no obligation to provide compensation for any suggestion. Franchisee may not utilize any such suggestions in the Franchised Restaurant without the prior written consent of BKC.

### A.    M.O.D. Manual

Franchisee acknowledges and agrees that prompt adoption of and adherence to the BURGER KING System, including all of the provisions of the MOD Manual, as amended from time to time, are reasonable, necessary and essential to the image and success of all BURGER KING Restaurants. The MOD Manual, which is comprised of the BURGER KING Operations Manual, the Restaurant Equipment Manual, the RSI Equipment and Facilities E-Red Book, the Approved Brands and Distributors List, the Brand Standards Guide, the Ops Emphasis Guide, alerts and amendments thereto, and applicable policies established by BKC, or the then-current equivalent versions of those documents, contains the official mandatory restaurant operating, equipment and product standards, specifications and procedures prescribed from time to time by BKC for the operation of a BURGER KING Restaurant. The MOD Manual shall be kept at the Franchised Restaurant at all times and all changes or additions made by BKC shall be inserted upon receipt. In the event of any conflict between the MOD Manual kept at the Franchised Restaurant and the master copy maintained by BKC in Miami, Florida (or such other place as may be designated by BKC), the master copy shall control.

Franchisee agrees that changes in the standards, specifications and procedures may become necessary and desirable from time to time and agrees to accept and comply with such modifications, revisions and additions to the MOD Manual which BKC in the good faith exercise of its judgment believes to be desirable and reasonably necessary. The material and information set forth in the MOD Manual is confidential and proprietary to BKC and is to be used by Franchisee only in connection with the operation of the Franchised Restaurant and other franchised BURGER KING Restaurants. The MOD Manual and other specifications, standards and operating procedures communicated in writing to Franchisee shall be deemed a part of this Agreement.

### B.    Franchised Restaurant

The Franchised Restaurant will be constructed and improved in the manner authorized and approved by BKC, and the appearance of the Franchised Restaurant will not thereafter be altered except as may be approved in writing by BKC.

## 1.      Repair and Maintenance.

Franchisee shall, at its expense, continuously throughout the Term of this Agreement maintain the Franchised Restaurant in good condition and repair in accordance with BKC's then current repair and maintenance standards.  During the seventh and seventeenth years of the Term, Franchisee shall provide to BKC such evidence as BKC deems satisfactory, in BKC's reasonable discretion, that the Franchised Restaurant is in good condition and repair and that the Franchised Restaurant is in compliance with BKC's then current repair and maintenance standards for BURGER KING Restaurants.

## 2.      Current Image.

Franchisee shall, improve, alter and remodel the Franchised Restaurant to bring it into conformance with the national and local plans, specifications and/or other standards for new or remodeled BURGER KING Restaurants as may hereafter be reasonably changed and defined from time to time by BKC ("Current Image") in accordance with the following timetable:

(i)      During the tenth year of the Term, Franchisee shall remodel, improve and alter the exterior of the Franchised Restaurant to conform with the Current Image in effect on the ninth anniversary of the date of this Agreement.

(ii)      BKC and the Franchisee Advisory Council shall meet annually to discuss and  establish the components of Current Image for the Franchised Restaurant.  The Current Image as established by BKC and the Franchisee Advisory Council, from time to time, shall be binding upon Franchisee.  If BKC and the Franchisee Advisory Council do not agree on the Current Image, BKC and the Franchisee Association shall settle the matter by Arbitration by a sole arbitrator in accordance with the then current non-administered arbitration rules of the Center for Public Resources.  The arbitration shall be governed by the United States Arbitration Act (U.S.A.A.), and judgment upon the decision rendered by the arbitrator shall be binding on Franchisee and BKC and except as provided in Section 10(a) of the U.S.A.A., shall not be appealable in any forum.  The decision may be entered by any court having jurisdiction thereof.  The place of arbitration shall be Miami, Florida.  Failure of Franchisee to comply with the terms of this Section 5.B shall be deemed a material default of this Agreement.

## C.      Signs

The BURGER KING Marks will only be erected and displayed in the manner and at such locations as are approved and authorized by BKC, in writing.  Franchisee agrees to maintain and display signs reflecting the Current Image of BURGER KING Restaurants and shall not place additional signs or posters at the Franchised Restaurant without the prior written consent of BKC.  Only signs from sources approved by BKC may be utilized at the Franchised Restaurant.  Franchisee shall discontinue the use of and destroy such signs as are declared obsolete by BKC within the reasonable time specified by BKC.  Such signs are fundamental to the BURGER KING Restaurant System and Franchisee hereby grants to BKC the right to enter the Franchised Restaurant to remove and destroy unapproved or obsolete signs in the event that Franchisee has failed to do so within thirty (30) days after the written request of BKC.

## D.      Equipment

Only equipment approved by BKC which meets the criteria and performance standards of the BURGER KING Restaurant System may be used in the Franchised Restaurant, including without limitation, computer software, hardware and electronic data transmission systems for point of sale reporting.  The equipment shall be maintained in a condition that meets operational standards specified in the MOD Manual and, as equipment becomes obsolete or inoperable, Franchisee will replace the equipment with the types  and kinds of equipment as are then approved for use in BURGER KING Restaurants.  If BKC determines that additional or replacement equipment is needed because of a change in menu items or method of preparation and service or because of health or safety

considerations, Franchisee will install the additional equipment or replacement equipment within the reasonable time specified by BKC. Prior to mandating the use of a new or additional piece of equipment, BKC shall use reasonable efforts to field test the proposed new equipment.

### E.    Vending Machines, Etc.

Public telephones, newspaper racks, juke boxes, cigarette, gum and candy machines, rides, lottery ticket terminals, video games or any other games, or vending or amusement machines will not be installed at the Franchised Restaurant without the prior written approval of BKC. In the event such items are installed at the Franchised Restaurant, then all sums received by Franchisee in connection with these items shall be included within "Gross Sales" as defined herein.

### F.    Menu and Service

All menu items, including without limitation, promotional and premium products which BKC may deem appropriate to take full advantage of the potential market and achieve standardization in the BURGER KING Restaurant System will be served, and no items which are not set forth in the MOD Manual or otherwise authorized and approved by BKC in writing will be served. Franchisee shall only sell the approved menu items at retail to consumers from and through the Franchised Restaurant and shall not sell such items for redistribution or resale. Franchisee shall adhere to all specifications contained in the MOD Manual or as otherwise prescribed by BKC as to ingredients, methods of preparation and service, weight and dimensions of products served, and standards of cleanliness, health and sanitation. All food, drink and other items will be served and sold in packaging that meets BKC's specifications. Only food, supplies, paper products and packaging from sources approved by BKC shall be used in the Franchised Restaurant.

### G.    Hours of Operation

The Franchised Restaurant shall be open for business at a minimum from 7:00 A.M. to 11:00 P.M., seven (7) days a week, fifty-two (52) weeks a year, unless otherwise authorized or directed by BKC or unless prohibited by applicable law. The Franchised Restaurant may be closed on Thanksgiving Day and/or Christmas Day if a majority of the BURGER KING Restaurants in the market area (A.D.I.) in which the Franchised Restaurant is located elect to close on the holiday.

### H.    Uniforms

All employees shall only wear uniforms of such design and color as are from time to time specified by BKC.

### I.    Advertising and Promotional Materials

Only those advertising and promotional materials or items which are authorized by BKC in writing prior to use shall be used, sold or distributed, and no display or use of the BURGER KING Marks shall be made without the prior written approval of BKC. All materials on which the BURGER KING Marks are used must include the designation ® or such other designation as BKC may specify.

### J.    Right of Entry and Inspection

BKC shall have the unrestricted right to enter the Franchised Restaurant to conduct such activities as it deems necessary to ascertain Franchisee's compliance with this Agreement. The inspections may be conducted without prior notice at any time when one of Franchisee's employees is at the Franchised Restaurant. The inspections will be performed in a manner which minimizes interference with the operation of the Franchised Restaurant.

K.    **Interference with Employment Relations of Others**

Neither BKC nor Franchisee will attempt, directly or indirectly, to entice or induce, or attempt to entice or induce any employee of the other or of another Franchisee of BKC to leave such employment, or employ such employee within six (6) months after his or her termination of employment with such employer, except with the prior written consent of such employer.

L.    **Management of Franchised Restaurant**

(1)    Franchisee acknowledges its understanding of BKC's requirement that an individual "Managing Director" approved by BKC, trained in the BURGER KING System and periodically retrained in the BURGER KING System, be identified by Franchisee to BKC and be granted the authority by Franchisee to direct any action necessary to ensure that the day-to-day operation of the Franchised Restaurant is in compliance with the MOD Manual, with this Agreement, and with the terms of any lease and any other agreements relating to the Franchised Restaurant. The Managing Director shall devote full time and best efforts to the overall supervision of the Franchised Restaurant and any other BURGER KING Restaurants owned by Franchisee as to which he/she is the Managing Director. The Managing Director shall live in the "vicinity" of the Franchised Restaurant, as the term "vicinity" is defined for Managing Directors by BKC from time to time, in its reasonable discretion. The current Managing Director is designated in Exhibit B. Franchisee represents and warrants that the Managing Director presently has and will have, throughout the term of this Agreement, the authority to direct any action necessary to ensure that the day-to-day operation of the Franchised Restaurant is in compliance with the MOD Manual, with this Agreement, and with the terms of any lease and any other agreements relating to the Franchised Restaurant. Franchisee has not taken and agrees that it will not hereafter take, whether directly or indirectly, any action to avoid the authority requirement for the Managing Director through the entry of limiting board resolutions, management agreements, amendment of governing documents or any other similar device or arrangement. Franchisee agrees to furnish BKC with such evidence as BKC may request from time to time for the purpose of assuring BKC that the Managing Director's authority remains as represented in this Agreement and to require that the Managing Director attend such additional and periodic training as BKC may reasonably require of Managing Directors. If the position of Managing Director becomes vacant for any reason, the vacancy shall be filled within sixty (60) days by a new Managing Director trained in the BURGER KING System and approved by BKC.

(2)    At all times during the Term of this Agreement, Franchisee shall employ at least one (1) individual (the "Restaurant Manager") who is responsible for the direct, personal supervision of the Franchised Restaurant and who, within six (6) months after becoming Restaurant Manager, successfully completes the training program described in Section 8.C.

6.    **SERVICES AVAILABLE TO FRANCHISEE**

BKC agrees to provide the following services to Franchisee and to use reasonable efforts to provide them in a manner reasonably designed for the BURGER KING System, including the use of technology deemed by BKC to be competitive in the quick service restaurant industry. Prior to making material changes to the content of, and manner by which, the following items or services are delivered to Franchisee, BKC shall consult with the Franchisee Advisory Council to receive input as to the proposed change. The content of and manner by which the following services are to be delivered by BKC shall be within BKC's sole reasonable discretion:

A.    A reproducible copy of either (i) the standard architectural building plans and specifications for current approved freestanding buildings or double drive thru buildings, or (ii) such other standard approved restaurant facility, whichever is applicable. Any modifications of the standard plans and specifications, whether requested or required by planning and zoning boards, building codes or otherwise, must be approved in writing by BKC and are to be paid for by Franchisee.

B.    A pre-opening training program conducted at BKC training facilities and certified BURGER KING Restaurants.

~~C.        Pre-opening and opening assistance by personnel of BKC at the Franchised Restaurant for a period of time as BKC deems appropriate under the circumstances.  BKC may, in its reasonable discretion, consider the following factors:  the experience of the Franchisee, the type of facility being operated, whether the assistance is for a new opening or the reopening after a transfer of ownership of an already operating restaurant, the prior BURGER KING System experience of Franchisee's management, the projected volume of the restaurant, as estimated by Franchisee, and any other factors that BKC deems appropriate for consideration.~~

~~D.        Opening promotion program.  A portion of Franchisee's advertising and sales promotion payment shall be  available to implement grand-opening promotions conducted after the Franchised Restaurant opens, in accordance with company policy at the time of opening (Exhibit C).  Any additional costs incurred in implementing the program shall be Franchisee's responsibility.~~

E.        BKC's MOD Manual in an approved format, a copy of which will be loaned to Franchisee for the Term of this Agreement.

F.        Such merchandising, marketing and advertising research data and advice as may be developed from time to time by BKC and deemed by it to be helpful in the operation of a BURGER KING Restaurant.

G.        Communication of new developments, techniques and improvements of BKC in food preparation, equipment, food products, packaging, service and restaurant management which are relevant to the operation of a BURGER KING Restaurant.

H.        Such ongoing support as BKC deems reasonably necessary to continue to communicate and advise Franchisee as to the BURGER KING System including the operation of the Franchised Restaurant.

7.        **THE FRANCHISED RESTAURANT**

The site at which Franchisee shall operate the Franchised Restaurant is more fully described in Exhibit A.  During the Term of this Agreement the site shall be used exclusively for the purpose of operating a franchised BURGER KING Restaurant.

In the event the Franchised Restaurant shall be damaged or destroyed by fire or other casualty, or be required to be repaired or reconstructed by any governmental authority, Franchisee shall, at its own expense, repair or reconstruct the Franchised Restaurant within a reasonable time under the circumstances. The minimum acceptable appearance for the restored Franchised Restaurant will be that which existed just prior to the casualty; however, every effort should be made to have the restored Franchised Restaurant reflect the then Current Image, design and specifications of BURGER KING restaurants. If the Franchised Restaurant is substantially destroyed by fire, or other casualty, Franchisee may, with BKC's agreement, terminate the Agreement in lieu of Franchisee reconstructing the Franchised Restaurant.

8.        **TRAINING**

A.        **Managing Owner/Managing Director**

The Franchised Restaurant shall not open unless the Managing Director, the Restaurant Manager and, at BKC's option, the Managing Owner, have successfully completed BKC's training program in Miami, Florida or at such other locations as may be specified by BKC (the "Initial Training"). BKC may, in its sole discretion, waive the Initial Training requirement for the Restaurant Manager. BKC shall provide, and the Managing Owner and Managing Director shall attend, continuing operations training programs from time to time as may be directed by BKC to re-enforce operational

standards ("Continuing Operations Training"). The required frequency, duration and subject matter of the Continuing Operations Training shall be specified by BKC (the Initial Training and Continuing Operations Training programs are hereinafter collectively referred to as "Training Programs"). BKC and the Franchisee Advisory Council shall periodically review the Training Programs and BKC will consult with the Franchisee Advisory Council prior to making any material changes to the Training Programs. Such programs may be in Miami, Florida or at such other locations as may be specified by BKC.

### B. Charges and Costs

Franchisee shall be responsible for reasonable charges and costs of any sort associated with such training but not limited to all travel and living expenses, compensation of and worker's compensation insurance for the attendees enrolled in the training program, any other personal expenses, course materials, training facility charges, and training staff charges (if any).

### C. Franchisee Training and Restaurant Staffing

Franchisee shall implement a training program for Franchised Restaurant employees in accordance with training standards and procedures prescribed by BKC and shall staff the Franchised Restaurant at all times during the Term of this Agreement with a sufficient number of trained employees including at least one (1) Restaurant Manager who has, within six (6) months after becoming manager, successfully completed BKC's training program for restaurant managers at an accredited location to ensure that the BURGER KING operational standards are met. Requests for exemption from the manager training requirement will be considered on an individual basis and will be granted only in those situations where the employees have prior operational management experience in a BURGER KING Restaurant and demonstrate to BKC a thorough knowledge and understanding of the BURGER KING System.

## 9. ROYALTY AND ADVERTISING CONTRIBUTION

### A. Royalty

During the term of this Agreement, Franchisee agrees to pay to BKC a royalty of 4.5% of Gross Sales ("Royalty") for the use of the BURGER KING System and the BURGER KING Marks. Royalties shall be paid monthly by the tenth (10th) day of each month based upon Gross Sales for the preceding month.

### B. Advertising, Sales Promotion and Public Relations

(i) Franchisee shall pay to BKC an amount equal to four percent (4%) of Franchisee's monthly Gross Sales by the tenth (10th) day of each month based upon Franchisee's Gross Sales for the preceding month (the "Advertising Contribution"). This sum, less direct administrative expenses, will be used for (a) market research expenditures directly related to the development and evaluation of the effectiveness of Advertising and sales promotions, (b) creative, production and other costs incurred in connection with the development of Advertising, sales promotions and public relations (as limited by Section (vi) below), both in the market area of the Franchised Restaurant, as reasonably defined from time to time by BKC, and on a national basis and (c) various methods of delivering the Advertising or promotional message, including without limitation, television, radio, outdoor and print ("Media"). The allocation of the Advertising Contribution between national, regional and local expenditures shall made by BKC in its sole business judgment.

(ii) Periodically, but no less frequently than once per year, BKC shall meet with the Franchisee Advisory Council to discuss and attempt to establish (a) the types of Media to be used by BKC (the "Media Mix") and (b) the percentage of the total annual Advertising Contribution to be expended on Media (the "Media Spending Goal").

(iii)    If BKC and the Franchisee Advisory Council are unable to mutually establish the Media Spending Goal, BKC shall, subject to the limitation set forth in Section (v) below, have the right, in its sole business judgment, to establish the Media Spending Goal.

(iv)    If BKC and the Franchisee Advisory Council are unable to agree on the Media Mix, BKC shall have the right, in its sole business judgment, to establish the Media Mix.  If BKC unilaterally establishes the Media Mix as provided above, BKC shall in no event spend more than ten percent (10%) of the prior fiscal year's national media expenditures for new Media channels and any such new Media channel(s) must be accessible to no less than two-thirds (2/3) of the then established areas of dominant influence ("ADI's") in the United States.

(v)    BKC shall use reasonable efforts to meet the Media Spending Goal, subject to circumstances beyond its control; provided, however, that BKC shall spend no less than sixty-five percent (65%) of the total annual Advertising Contribution on Media.

(vi)    The annual expenditure on public relations shall not exceed one-half of one percent of the total annual Advertising Contribution.

(vii)    ~~Certain Advertising funds shall be allocated for approved grand opening promotions in accordance with current company policy, a copy of which is attached as Exhibit C.~~

(viii)    From time to time, BKC may seek support from FRANCHISEE, and all other franchisees in the Designated Marketing Area ("DMA") where the Franchised Restaurant is located, for an Investment Spending Program ("IS").  In the event that more than 66.7% of the other franchised and BKC-operated company restaurants in the DMA where the Franchised Restaurant exists execute binding IS contracts which commit such other franchisees to place a fixed monthly dollar amount or a percentage of their Gross Sales into an IS account with such money to be spent on local DMA marketing initiatives in a given year, then in such case, Franchisee shall execute an IS contract on exactly the same terms.  Franchisee acknowledges that the terms of the IS contracts may change from year to year but that under no circumstances will any IS contract (1) bind the Franchisee to pay more than 2% of their Gross Sales into an IS fund; or (2) bind the Franchisee for a term longer than one year.

### C.    Gross Sales

The term "Gross Sales" as used in this Agreement includes all sums charged by Franchisee for goods, merchandise or services sold at or from the Franchised Restaurant, including all premiums unless exempted by BKC.  The sale of BURGER KING products away from the Franchised Restaurant is not authorized; however, should any such sales be approved in the future, they will be included within the definition of Gross Sales.  Gross Sales excludes any federal, state, county or city tax, excise tax, or other similar taxes collected by Franchisee from customers based upon sales, and cash received as payment in credit transactions where the extension of credit itself has already been included in the figure upon which the royalty and advertising contribution is computed.

### D.    Late Charge

Any royalty and advertising and sales promotion contribution not paid when due shall bear a late charge at the maximum rate allowed by Florida law or, if no maximum rate relating to this transaction is in effect in the State of Florida, 18% per annum.  Nothing in this Agreement shall be construed to mean that Franchisee is to pay, or has contracted to pay, any sum in excess of that which may lawfully be charged or contracted for under any applicable law.  The intention of the parties is to conform strictly to applicable usury laws and it is agreed that if an excess is inadvertently collected it shall be applied to reduce the amount owed under Sections 9.A. and 9.B. above.

E.    **Payment**

All payments required to be made to BKC under this Agreement shall be made in Miami, Florida, or at such addresses and to such parties as BKC may designate in writing from time to time.

F.    **Audit of Advertising Contributions**

Not more than once annually, the Franchisee Association shall have the right, following reasonable notice to BKC, to audit BKC's fiscal year-end results with regard to the income and expenditures of the Advertising Contribution received by BKC for BURGER KING restaurants located in the U.S.A. The audit shall be conducted in accordance with the criteria established by BKC following consultation with the Franchisee Advisory Council. The audit shall be at the sole cost of the Franchisee Association unless (i) the audit discloses a misappropriation of funds or (ii) a discrepancy resulting from an accounting error, which is in excess of three percent (3%) of the total annual Advertising Contribution received by BKC, in either of which events BKC shall reimburse the Franchisee Association for the reasonable costs of the audit. Only records of the past two fiscal years will be produced for the audit. The results of the audit will be made available, on request, to Franchisee. Franchisee shall have no independent right to audit, provided however, if no Franchisee Association exists, franchisees owning collectively at least thirty percent (30%) or more of all BURGER KING franchisee-owned and operated restaurants in the U.S.A. shall have the right to audit under the same terms and conditions set forth in this Section 9.F.

G.    **Alternative Method Of Payment**

BKC may, at its option, require payment of the royalty or advertising and sales contribution or both by making direct monthly withdrawals in the form of an electronic or similar funds transfer in the appropriate amount(s) from Franchisee's bank account. In the event that this option is exercised, Franchisee agrees to execute and deliver to its bank and to BKC those documents necessary to authorize such withdrawals and to make payment or deposit as directed by BKC. Franchisee further agrees that it will not thereafter terminate such authorization so long as the Franchise Agreement is in effect. Franchisee agrees that it will not close such bank account without prior notice to BKC and the establishment of a substitute bank account permitting such withdrawals. Franchisee also agrees that in the event that a direct electronic funds transfer or other withdrawal program is not available at the bank at which it currently does its business, it will take all reasonable and necessary steps to establish an account at a bank which does have such a program.

10.    **ACCOUNTING PROCEDURES: RIGHT OF AUDIT**

A.    **Accounting**

Franchisee agrees to keep true, accurate and complete records of its business in such form as BKC now or hereafter may require and to furnish BKC with a monthly and fiscal year to date profit and loss statement in the format prescribed by BKC. Franchisee shall also submit to BKC quarterly balance sheets, the first of which shall be for the period ending three (3) months after the Franchised Restaurant opens. All profit and loss statements and balance sheets should be prepared in accordance with generally accepted accounting principles and shall be submitted to BKC within twenty-five (25) days after the end of the period covered by the report. In addition, Franchisee shall retain for a period of at least twenty-four (24) months and upon request submit to BKC copies of all state sales tax returns and all supporting data and records relating to sales made at or from the Franchised Restaurant and such other records as BKC may reasonably request from time to time.

### B.    Annual Financial Statements

Within one hundred twenty (120) days after the close of each fiscal year, Franchisee shall submit a full disclosure of all persons with any interest in the Franchised Restaurant and a complete annual financial statement for the Franchised Restaurant, which statement, if requested by BKC, shall be certified by a Certified Public Accountant.

### C.    Audits

Franchisee agrees that BKC or its representatives, at BKC's expense, shall, at all reasonable times, have the right to examine or audit the books, records, state sales tax returns or accounts of Franchisee. BKC shall similarly have the right to examine or audit the books, records, state sales tax return or accounts of any and all persons or entities who are guarantors of the Franchisee's performance under this Agreement in those instances in which Franchisee has failed to make payments of the royalty or advertising fees in a timely fashion or has otherwise defaulted under this Agreement. In the event the audit discloses an understatement of Gross Sales for any period or periods, Franchisee shall, within 15 days after receipt of the audit report, pay BKC the Royalty and advertising fee (including any IS fee) in the amount of the understatement plus the late charge identified in Section 9.D. of this Agreement from the date such payments were originally due. Additionally, in the event the audit discloses an understatement of Gross Sales which exceeds one percent (1%) for any period or periods, Franchisee shall, within fifteen (15) days after the receipt of the audit report, reimburse BKC for all costs of the audit including travel, lodging and wages, reasonably incurred.

### D.    Release of Financial Information

Except as otherwise provided in any lease between BKC or any of its affiliates and Franchisee, BKC shall not release to third parties financial or operational information specifically relating to Franchisee and/or the Franchised Restaurant without the consent of Franchisee unless otherwise required by judicial or administrative order. If BKC is required to disclose such information, BKC shall use reasonable efforts to give Franchisee notice thereof. Notwithstanding the foregoing however, BKC may release general financial or operational information relating to the BURGER KING System compiled in whole or in part from Franchisee and/or the Franchised Restaurant so long as Franchisee and/or the Franchised Restaurant are not specifically identified.

## 11.   LIMITATIONS OF FRANCHISE

### A.    Trademarks, Trade Names, Service Marks and Trade Secrets

(1)    Franchisee acknowledges that ownership of all right, title and interest to the BURGER KING System and the BURGER KING Marks, are and shall remain vested solely in BKC and/or Burger King Brands, Inc. ("BKB"), and Franchisee disclaims any right or interest therein or the good will derived therefrom. Franchisee agrees that all materials loaned or otherwise made available to it and all disclosures made to Franchisee and not to the general public by or at the direction of BKC at any time before or during the Term of this Agreement relating to the BURGER KING System, including, without limitation, the MOD Manual in its entirety, financial information marketing strategy and marketing programs are to be considered trade secrets of BKC for purposes of this Agreement and shall be kept confidential and used by Franchisee only in connection with the operation of the Franchised Restaurant and other franchised BURGER KING Restaurants. Franchisee agrees not to divulge any of the trade secrets to any person other than its employees and then only to the extent necessary for the operation of the Franchised Restaurant and, specifically, that Franchisee will not, nor permit anyone to, reproduce, copy or exhibit any portion of the MOD Manual or any other trade secrets of BKC. At BKC's request, Franchisee shall require each Owner, and Managing Director to execute an agreement similar in substance to this Section in a form acceptable to BKC and naming BKC as a third party beneficiary with the independent right to enforce such agreement.

(2)    Franchisee will not, directly or indirectly, at any time during the Term of this Agreement or thereafter, do or cause to be done any act or thing disputing, attacking or in any way impairing or tending to impair BKC's or BKB's right, title or interest in the BURGER KING Marks or the BURGER KING System. Franchisee shall immediately notify BKC of all infringements or imitations of the BURGER KING Marks which come to Franchisee's attention or challenges to Franchisee's use of any of the BURGER KING Marks, and BKC shall exercise absolute discretion in deciding what action, if any, should be taken. Franchisee agrees to cooperate in the prosecution of any action to prevent the infringement, imitation, illegal use or misuse of the BURGER KING Marks and agrees to be named as a party in any such action if so requested by BKC. BKC agrees to bear the legal expenses incident to Franchisee's participation in such action, except for fees, expenses and other costs of Franchisee's personal legal counsel if Franchisee elects to be represented by counsel of its own choosing.

(3)    Franchisee shall not use any of the BURGER KING Marks, any variations or abbreviations, or any words confusingly similar to the BURGER KING Marks as part of Franchisee's corporate or partnership name.

### B.    Independent Contractor

Franchisee is an independent contractor and is not an agent, partner, joint venturer, joint employer or employee of BKC, and no fiduciary relationship between the parties exists. Franchisee shall be the sole and exclusive employer of its employees with the sole right to hire, discipline, discharge and establish wages, hours, benefits, employment policies, and other terms and conditions of employment for its employees without consultation with or approval by BKC. Franchisee shall have no right to bind or obligate BKC in any way nor shall Franchisee represent that it has any right to do so. BKC shall have no control over the terms and conditions of employment of Franchisee's employees.

In all public records and in Franchisee's relationship with other persons, on stationery, business forms and checks Franchisee shall indicate independent ownership of the Franchised Restaurant and that it is operated under a Franchise granted by BKC.

Franchisee shall exhibit at the Franchised Restaurant in such places as may be designated by BKC, a notification that the Franchised Restaurant is operated by an independent operator and not by BKC.

### 12.    UNFAIR COMPETITION

Franchisee acknowledges the uniqueness of the BURGER KING System and that BKC is making its knowledge, know-how and expertise available to it for the purpose of operating the Franchised Restaurant. Franchisee agrees that it would be an unfair method of competition for Franchisee to use or duplicate or to allow others to use or duplicate any of the knowledge, know-how and expertise received from BKC for any use other than for the operation of franchised BURGER KING Restaurants. Franchisee, therefore, warrants that during the Term of this Agreement, it will utilize its best and continuing efforts to promote and develop the business at the Franchised Restaurant and during the Term hereof and at all times thereafter will not directly or indirectly engage in the operation of any restaurant, other than the Franchised Restaurant and other BURGER KING Restaurants franchised from BKC, which utilizes or duplicates the BURGER KING System, any trade secrets of BKC, the BURGER KING Marks or the present or any former BURGER KING Current Image.

### 13.    INSURANCE; INDEMNIFICATION

### A.    Insurance

Franchisee agrees to carry at its expense during the Term of this Agreement Comprehensive General Liability insurance, including Products Liability and Broad Form Contractual

Liability, in an amount of not less than ONE MILLION ($1,000,000) DOLLARS per occurrence for bodily injury and FIVE HUNDRED THOUSAND ($500,000) DOLLARS per occurrence for property damage, or in such increased amounts as BKC may reasonably request from time to time during the Term of this Agreement. Each policy will name BKC and its subsidiaries, its affiliated and parent companies as additional insured, will provide that the policy cannot be canceled without thirty (30) days prior written notice to BKC, and will insure the contractual liability of Franchisee under Section 13.C. Additionally, Franchisee agrees to carry, at Franchisee's expense, umbrella coverage in an amount of ONE MILLION ($1,000,000) DOLLARS over the basic Comprehensive General Liability insurance per restaurant except that if Franchisee owns more than ten (10) BURGER KING Restaurants, the umbrella coverage applicable to all such restaurants need not exceed TEN MILLION ($10,000,000) DOLLARS. The insurance afforded by the policy or policies respecting liability shall not be limited in any way by reason of any insurance which may be maintained by BKC. Before the Commencement Date, Franchisee shall furnish to BKC Certificates of Insurance reflecting that the insurance coverage is in effect pursuant to the terms of this Agreement. All policies shall be renewed, and a renewal Certificate of Insurance mailed to BKC in Miami, Florida, or at such other location as may be specified by BKC prior to the expiration date of the policies. This obligation of Franchisee to maintain insurance is separate and distinct from its obligation to indemnify BKC under the provisions of Section 13.C.

### B.    Worker's Compensation

Franchisee agrees to secure and pay premiums on a Worker's Compensation policy covering himself and all his employees, as required by law.

### C.    Indemnity

(1)    Franchisee is responsible for all losses or damages and contractual liabilities to third persons arising out of or in connection with possession, ownership or operation of the Franchised Restaurant, and for all claims or demands for damages to property or for injury, illness or death of persons directly or indirectly resulting therefrom. Franchisee agrees to defend, indemnify and save BKC and its subsidiaries, its affiliated and parent companies harmless of, from and with respect to any such claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages, (including but not limited to reasonable attorney's fees) unless resulting from the negligence of BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law. The indemnification of BKC by Franchisee shall not be limited by the amount of insurance required under Section 13.A. This indemnity obligation shall include, but not be limited to, claims related to the employment of Franchisee's employees. This obligation of Franchisee to indemnify and defend BKC is separate and distinct from its obligation to maintain insurance under the provisions of Section 13.A.

(2)    Franchisee agrees to defend, indemnify and save BKC and BKC's officers, directors, agents, employees, attorneys, and accountants, subsidiaries, affiliated and parent companies, harmless of, from and with respect to any claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages any of them may incur (including, but not limited to, reasonable attorney's fees) arising from or relating to the sale of securities of Franchisee, including but not limited to claims, demands, losses, obligations, costs, expenses, liabilities, debts or damages arising from or related to any alleged violation of any federal or state securities law in connection with a sale of securities of Franchisee. BKC shall notify Franchisee of any claims, and Franchisee shall be given the opportunity to assume the defense of the matter. If Franchisee fails to assume the defense, BKC may defend the action in the manner it deems appropriate, and Franchisee shall pay to BKC all costs, including attorneys fees, incurred by BKC in effecting such defense, in addition to any sum BKC may pay by reason of any settlement or judgment against BKC. BKC's right to indemnity under this Agreement shall arise and be valid notwithstanding that joint or concurrent liability may be imposed on BKC by statute, ordinance, regulation or other law. BKC and the other indemnities shall, in all instances, have the right to be represented by counsel of its/their own choosing, at Franchisee's expense, and to participate in the defense of any such claim.

### D.    Defense of Claims

BKC shall notify Franchisee of any claims, and Franchisee shall be given the opportunity to assume the defense of the matter; however, BKC shall have the right to participate in the defense of any claim or action against it which is assumed by Franchisee, at BKC's own cost and expense.    If Franchisee fails to assume the defense of any claim covered by the indemnification provisions of Section 13.C., BKC may defend the action in the manner it deems appropriate, and Franchisee shall pay to BKC all costs, including attorneys' fees, incurred by BKC in effecting such defense, in addition to any sum which BKC may pay by reason of any settlement or judgment against BKC.    No settlement of any claim against BKC shall be made by Franchisee which is in excess of the amount of insurance referred to in Section 13.A or which would subject BKC to liability in any amount not covered by such insurance without the prior written consent of BKC.

## 14.    TAXES

Franchisee shall pay when due all taxes levied or assessed in connection with the possession, ownership or operation of the Franchised Restaurant or in connection with amounts paid or received under this Agreement, including without limitation any sales, use or other ad valorem taxes (other than any tax that is measured by or related to the net income of BKC or to its corporate status in a state).    If any such tax shall be paid by BKC, Franchisee shall promptly reimburse BKC the amount paid. In the event of any bona fide dispute as to the liability for a tax assessed against Franchisee, Franchisee may contest the validity or the amount of the tax in accordance with procedures of the taxing authority. Franchisee shall not permit a tax sale or seizure against the Franchised Restaurant or equipment.

## 15.    ASSIGNMENT: CONDITIONS AND LIMITATIONS

Any purported assignment or transfer not in full compliance with this Section 15 shall be null and void and shall constitute a material breach of this Agreement, for which BKC may immediately terminate without opportunity to cure pursuant to Section 18.A of this Agreement.

THE GOVERNING DOCUMENTS OF THE FRANCHISEE ENTITY AND THE PARENT, IF APPLICABLE, MUST STATE THAT THE ENTITY'S SOLE BUSINESS ACTIVITY WILL BE THE DEVELOPMENT AND OPERATION OF BURGER KING RESTAURANTS.    IN ADDITION, THE GOVERNING DOCUMENTS MUST MANDATE THE DESIGNATION OF A MANAGING OWNER AND DESCRIBE THE MANAGING OWNER'S AUTHORITY, AS DEFINED IN THE GUIDELINES FOR APPROVAL OF FRANCHISEE OWNERSHIP DISTRIBUTION PLANS, TO BIND THE FRANCHISEE ENTITY AND TO DIRECT ANY ACTIONS NECESSARY TO ENSURE COMPLIANCE WITH A BURGER KING FRANCHISE AGREEMENT OR ANCILLARY AGREEMENT.    NO AMENDMENTS INCONSISTENT WITH THE GUIDELINES FOR APPROVAL OF FRANCHISEE OWNERSHIP DISTRIBUTION PLANS MAY BE MADE TO THE ARTICLES OF INCORPORATION, BY-LAWS, PARTNERSHIP AGREEMENT, OR OTHER GOVERNING DOCUMENTS OF THE FRANCHISEE ENTITY OR THE PARENT, IF APPLICABLE.    EACH SUCH ENTITY MUST NOTIFY BKC, AND AT BKC'S REQUEST PROVIDE COPIES, OF ANY AMENDMENTS TO ITS GOVERNING DOCUMENTS.

### A.    Transfer by Franchisee

Except with the prior written consent of an authorized officer of BKC, Franchisee shall not (1) assign or pledge this Agreement, or assign any of Franchisee's rights or delegate any of its duties hereunder; or (2) sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any equity securities of Franchisee; or (3) sell, assign, transfer, convey or give away substantially all of the assets of the Franchised Restaurant.

### B.    Transfer by Owners

Except with the prior written consent of an authorized officer of BKC, no Owner shall sell, assign, transfer, convey, give away, pledge, mortgage, or otherwise encumber any direct or indirect interest in Franchisee.

### C.    Transfer of Equity Securities

Equity securities of Franchisee may not be transferred by Franchisee or by any Owner unless, in addition to obtaining the prior written consent of an authorized officer of BKC as required above, such transferor complies with all policies or guidelines BKC may then have in effect for approval of a proposed distribution of securities of franchisees. Franchisee and any other participants in any offering of securities of Franchisee shall fully indemnify BKC in connection with such offering, as provided in Section 13.C(2) of this Agreement.

### D.    Pledging of Franchise Agreement

Notwithstanding any consent granted by BKC pursuant to Sections 15.A, B and C above, neither Franchisee nor Owner shall pledge, mortgage, hypothecate, give as security for an obligation or in any manner encumber this Agreement or the franchise granted herein except with the express written consent of BKC given in connection with the execution of BKC's then current third party intercreditor agreement. Franchisee shall pay BKC a transfer fee of Two Thousand ($2,000) Dollars for the costs and expenses incurred by BKC in connection with facilitating the execution of the intercreditor agreement. This fee is in addition to the transfer fee referenced in Section 15.F(8) of this Agreement.

### E.    Notice of Proposed Transfer

The proposed transferor shall notify BKC in writing of any proposed transfer of an interest referred to in Section 15.A or 15.B, as applicable, before the proposed transfer is to take place, and shall provide such information and documentation relating to the proposed transfer as BKC may reasonably require.

### F.    Conditions of Consent

BKC shall use reasonable efforts to provide consent of the proposed transfer, or communicate to Franchisee, notice of disapproval, within ninety (90) days (for transactions involving less than ten (10) restaurants the time frame shall be sixty (60) days) of receipt by BKC of Franchisee's notice of the proposed transfer and the furnishing of all reasonably requested information. BKC may condition its consent to the proposed transfer of an interest referred to in Section 15.A or 15.B of this Agreement on satisfaction of any or all of the following requirements:

(1)    That all of Franchisee's accrued monetary obligations and all other outstanding obligations to BKC and its affiliates, whether arising under this Agreement or otherwise, have been satisfied;

(2)    That Franchisee is not in default of any provision of this Agreement, any amendment hereof or successor hereto, or any other agreement between Franchisee and BKC or its affiliates;

(3)    That the transferee (or, if applicable, such owners of the transferee as BKC may request), in BKC's sole judgment, satisfies all of BKC's business standards and requirements; has the aptitude and ability to operate the Franchised Restaurant; and has adequate financial resources and capital to do so; and that transferee complete and be approved through BKC's standard franchisee application and selection process including satisfactorily demonstrating to BKC that transferee meets the financial, character, managerial, ownership and such other criteria and conditions as BKC shall then be

applying in considering applications for new franchises, including transferee, and/or if applicable, Managing Owner and Managing Director satisfactorily completing all BKC's training requirements.

(4)     That the transferee, at BKC's election, consistent with then current BKC policy, (a) enter into a written assignment, in a form satisfactory to BKC, assuming and agreeing to discharge all of Franchisee's obligations under this Agreement, or (b) execute, for a term ending on the expiration date of this Agreement, BKC's then-current BURGER KING Restaurant Franchise Agreement applicable to such transferee and such other ancillary agreements as BKC may require for the Franchised Restaurant; provided, however, that the royalty and advertising contribution rates shall be the same as stated herein.  If the transferee is required to execute a new franchise agreement, such agreement shall supersede this Agreement in all respects;

(5)     That the transferee (or, if applicable, such owners of the transferee as BKC may request) meet all of the BKC requirements then applicable to ownership of franchises and execute a guarantee of the performance of Franchisee's obligations to BKC and BKC's affiliates.  For the purposes of determining compliance, BKC shall have the right to examine and approve the form and content of all governing documents.

(6)     That the Franchisee and each transferor execute a general release, in a form satisfactory to BKC, of any and all claims against BKC, its affiliates, and their respective officers, directors, agents, and employees, in their corporate and individual capacities.

(7)     That the transferee (or, if applicable, the owners of the transferee and its Restaurant Managers and proposed Managing Director), at the transferee's expense, complete any applicable orientation and training programs then required by BKC;

(8)     That the transferor pay a transfer fee of Two thousand Dollars ($2,000) in consideration of BKC's expenses in reviewing the proposed transfer and Five Hundred ($500.00) Dollars for each additional restaurant involved in the same transaction.  In the event the transferee is not an existing approved BURGER KING franchisee, Franchisee seller shall pay BKC a New Franchisee Training Fee of Two Thousand ($2,000.00) Dollars in connection with the transfer of the first restaurant involved in the transaction.

(9)     Approval by BKC of the terms of the contract of sale which impact the sufficiency of cash flow from the business after payment of debt service to provide for, among other things, any needed repairs to or remodeling of the Franchised Restaurant.

G.     **Consent to Transfer**

If BKC does not accept the offer under Section 16.A below, Franchisee may conclude the sale to the purchaser who made the offer provided BKC's consent to the assignment or sale of stock be first obtained, which consent will not be unreasonably withheld upon compliance with the conditions imposed by BKC on such assignments or sales.  Conditions may include, but are not limited to, the conditions set forth in Section 15.F above.

H.     **Continuing Liability**

In the event of a sale, transfer, or assignment of any interest in this Agreement or the Franchised Restaurant, or merger, consolidation or reorganization of Franchisee or a transfer of all or any part of an Owner's interest in the Franchised Restaurant, Franchisee and/or the Owner (hereinafter collectively "Transferor") shall remain personally liable for all Royalty, Advertising Contribution and other payments which come due during the periods of time hereinafter described, in accordance with the following criteria:

(1)     If Transferor has transferred Transferor's interest pursuant to a contract of sale which provides that installment payments of the purchase price are to be made to the Transferor

or the Transferor's designee, the liability of the Transferor will continue for the longer of (i) twelve (12) months from the date of the transfer, or (ii) such time as the payments are to be made, including any extensions; provided, however, that after the first anniversary of such transfer, the liability of the Transferor shall be limited to the total amount of the original installment payments to be made under the contract for sale or other instrument evidencing the debt.  If the holder of the note or other evidence of debt deems the obligation satisfied, Transferor will simultaneously be released from liability to BKC under this Agreement for Royalty and Advertising payments.   Any contract for sale which provides for installment payments shall provide that such payments are subordinate to the payment of Royalty and Advertising Contributions called for in this Agreement and that the note or other evidence of the obligation shall not be assignable by the holder or payee.

(2)     If Transferor has transferred Transferor's interest pursuant to a contract of sale which provides for cash payment in full, upon transfer of the entire purchase price, the Transferor's liability shall continue for a period of twelve (12) months from the date of the transfer, and shall be limited to the amount of Royalty fees and Advertising fees which accrued during such period and are not paid by Transferee. Upon payment of such amount, Transferor shall be automatically released for any continuing liability under this Agreement for Royalty and Advertising fees.

I.      **Right of Re-Entry**

Following a transfer of all of Franchisee's interest, in the event BKC seeks to enforce continuing liability pursuant to Section 15.H above, the immediately preceding transferor of an interest in the franchise against whom liability is sought, will be afforded an opportunity to cure the default and the right to reassume the position of franchisee under the terms of this Franchise Agreement provided all of the following conditions have been met:

(1)     At the time of transfer, the transferor must have been in good standing with BKC in accordance with the operational criteria then in effect for Franchise Approval;

(2)     At the time of proposed re-entry, the transferor must be in good standing and be able to satisfy BKC's then current Franchise Approval Criteria and Expansion Approval Criteria and deliver to BKC appropriate application forms and such other documents and agreements as BKC may reasonably require evidencing the assumption by transferor of the rights and obligations under the remaining term of the Franchise Agreement.

(3)     At the time of re-entry, BKC shall be paid, in full, all sums past due and owing under this Franchise Agreement and any agreement related to the Franchised Restaurant, as well as any past due sums related to products or supplies sold by BKC for use in the Franchised Restaurant, including without limitation, any pre- and post-petition amounts due from any franchisee with regard to the Franchised Restaurant which is the subject of a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally.

(4)     Transferor must take possession of and acquire control and dominion over substantially all of the tangible real and personal property associated with the operation of the Franchised Restaurant.

J.      **Notices to Transferor**

During the period of time in which transferor remains liable pursuant to Section 15.H above, BKC shall use reasonable efforts to send simultaneous copies of notices of default under this Franchise Agreement to transferor.  Transferor shall use reasonable efforts to send simultaneous copies of notices of default under any installment payment due to transferor from transferee.  Failure of either party to provide copies of the notices of default shall not be an event of default under the terms of this Franchise Agreement.  Transferor shall be afforded the same opportunity to cure as is set forth in the Notice of Default.

**K.    Acquisition of Additional Franchises**

In addition, Franchisee agrees that, prior to acquiring any other BURGER KING Restaurant franchise which may be offered to him for sale or which he may offer to purchase, such franchise will first be offered to BKC on the same terms, conditions and price in accordance with Section 15.

**L.    Death or Mental Incapacity**

Upon the death or mental incapacity of an Owner, the executor, administrator, or personal representative of such Owner shall transfer the Owner's interest in Franchisee or the Parent to a third party approved by BKC within a reasonable time after the Owner's death or mental incapacity. Such transfers, including, without limitation, transfers by devise or inheritance, shall be subject to BKC's right of first refusal under Section 16, or, if such right is not exercised, the same conditions as may be imposed on any inter vivos transfer under this Section 15. In the case of transfer by devise or inheritance, if the heir is not approved or there is no heir, the executor shall use best efforts to transfer the Owner's interest to another party approved by BKC within twenty-four (24) months from the date of the Owner's death. If the conveyance of the Owner's interest to a party acceptable to BKC has not taken place within the twenty-four (24) month period, BKC shall have the option, to purchase the Owner's interest at fair market value.

**M.    No Waiver**

BKC's consent to a transfer shall not constitute a waiver of any claims it may have against the transferring party, nor shall it be deemed a waiver of BKC's right to demand exact compliance with any of the terms of this Agreement by the transferor or transferee.

**16.    RIGHT OF FIRST REFUSAL**

A.    In the event Franchisee or the Owners wish to accept a bona fide offer from a third party to purchase the Franchised Restaurant, or any portion thereof or interest therein, or any of the voting stock of Franchisee, Franchisee shall give BKC written notice setting forth the name and address of the prospective purchaser, the price and terms of the offer together with a franchisee application completed by the prospective purchaser, a copy of the Purchase and Sale Agreement, executed by both Franchisee and purchaser, and all exhibits, copies of any real estate purchase agreement or agreements, proposed security agreements and related promissory notes, assignment documents, title insurance commitment and any other information that BKC may request in order to evaluate the offer. BKC, its subsidiary or affiliated company (herein collectively "BKC") shall then have the prior option to purchase the interests covered by the offer at the price and upon the same terms of the offer. If the consideration is not money, the purchase price shall be cash equal to the fair market value of the consideration. BKC shall have twenty (20) Business Days after receipt of the notice of offer and the furnishing of all reasonably requested information within which to notify Franchisee or the Owners, as applicable, of BKC's intent to exercise its right hereunder. Silence on the part of BKC shall constitute rejection. If the proposed sale includes assets of Franchisee not related to the Franchised Restaurant, or the operation of other franchised BURGER KING Restaurants, BKC may, at its option, elect to purchase only the assets related to the operation of franchised BURGER KING Restaurants and an equitable purchase price shall be allocated to each asset included in the proposed sale. A bona fide offer from a third party includes any transfer, conveyance, assignment, consolidation, merger or any other transaction in which legal or beneficial ownership of Franchised Restaurant or the franchise granted by this Agreement is vested in a party other than Franchisee.

B.    The election by BKC not to exercise its right of first refusal as to any offer shall not affect its right of first refusal as to any subsequent offer.

C.    Any sale, attempted sale, assignment or other transfer of the interests described in Section 16.A. without first giving BKC the right of first refusal described above shall be void and of no force and effect.

**17.    OPTION TO OBTAIN SUCCESSOR FRANCHISE AGREEMENT**

Franchisee shall have, exercisable on the expiration date of the Term of this Agreement, an option to obtain a Successor BURGER KING Franchise Agreement ("Successor Franchise Agreement") for a term of twenty (20) years, provided that:

A.    Franchisee has given BKC written notice ("Notice") of its intention to exercise its Option to Obtain a Successor Franchise Agreement during the fourth year prior to the expiration of the Term of this Agreement.

B.    Franchisee, at the time of the Notice and at the time of the expiration of the Term of this Agreement, is not in default of and has substantially complied with the terms and conditions of this Agreement and all other franchise agreements or other agreements with BKC that Franchisee, Managing Owner or Owners may be a party to consistently and throughout its Term, including but not limited to the following:

(1)    Franchisee has operated the Franchised Restaurant in accordance with the terms and conditions of this Agreement, including, but not limited to, operating the Franchised Restaurant in compliance with the operating standards and specifications established from time to time by BKC as to quality of service, cleanliness, health and sanitation;

(2)    Franchisee has satisfied, in a timely fashion, all financial obligations in accordance with the terms and conditions of this Agreement;

(3)    Franchisee has maintained, improved, altered, replaced and remodeled the Franchised restaurant including without limitation the building, premises, signs and equipment throughout the Term of this Agreement in accordance with the terms and conditions of this Agreement.

(4)    Franchisee shall have completed, not more than three (3) years and not less than three (3) months prior to the expiration of the Term of this Agreement, the improvements, alterations, remodeling or rebuilding of the interior and exterior of the Franchised Restaurant so as to reflect the then Current Image of BURGER KING Restaurants, pursuant to such plans and specifications as BKC reasonably approves.

(5)    Execution by Franchisee of a general release of BKC in a form satisfactory to BKC.

C.    Within one hundred and twenty (120) days after receipt of the Notice, BKC shall advise Franchisee in writing if Franchisee is not eligible to obtain a Successor Franchise Agreement, specifying the reasons for such ineligibility, and identifying whether such deficiencies are capable of cure. Between the date of the Notice and the expiration date of the Term of this Agreement, if any act, circumstance or omission causes Franchisee to become ineligible to obtain a Successor Franchise Agreement then BKC shall advise Franchisee in writing thereof, specifying the deficiency and identifying a cure period if applicable.

D.    Franchisee has the right to remain in possession of the premises for the term of the Successor Franchise Agreement;

E.    Franchisee shall execute the applicable form of the then current Successor Franchise Agreement, which may differ from this Agreement as to royalty, advertising contributions and ownership requirements, as well as other terms and conditions.  Franchisee shall, upon execution of the Successor Franchise Agreement, pay to BKC the then current Franchise Fee.

## 18.    DEFAULT AND EFFECT OF TERMINATION

### A.    Default

If an act of default hereunder is committed by Franchisee, and Franchisee fails to cure the default after any required notice and within the cure period applicable, BKC may, at its option and without prejudice to any other rights or remedies provided for hereunder or by law, terminate this Franchise Agreement by written notice or otherwise. The applicable cure period shall be as described below but, if a cure period is not specifically mentioned, it shall be thirty (30) days. In some cases, as identified below, no cure period is allowed and no notice may be required. If any applicable law or rule requires a longer notice period or a longer cure period than that provided herein, then the period required under the law or rule shall be substituted for the requirements herein. The following are material acts of default and shall be good cause for termination:

(1)    Franchisee fails to operate the Franchised Restaurant in accordance with the operating standards and specifications established from time to time by BKC as to service, cleanliness, health and sanitation. Franchisee shall have five (5) days after notice to cure the default. In the event that such default is deemed by BKC, in its reasonable discretion, to be of a nature so serious as to threaten the immediate safety or health of customers or employees of Franchisee, then, in such case, Franchisee will, after verbal notice from BKC to Franchisee, immediately cease operation of the Franchised Restaurant until such time as the serious health or safety default is rectified to BKC's satisfaction. Failure to close the Franchised Restaurant under these circumstances shall be an act of default. If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement, such termination to be effective immediately and with no opportunity to cure.

(2)    Franchisee sells any product which does not conform to BKC's specifications. Franchisee shall have five (5) days after notice to cure the default.

(3)    Franchisee fails to sell products designated by BKC as required to be sold in the Franchised Restaurant. Franchisee shall have five (5) days after notice to cure the default, provided, however, if for reasons beyond the control of Franchisee, Franchisee is unable to obtain such products within the cure period, the default cure period shall be extended for a reasonable period of time provided Franchisee initiates and actively pursues substantial and continuing action within the cure period to cure such default.

(4)    Franchisee sells products not approved by BKC. Franchisee shall have five (5) days after notice to cure the default.

(5)    Franchisee uses equipment, uniforms or decor not approved by BKC.

(6)    Franchisee fails to maintain the Franchised Restaurant in good condition and repair, or fails to make all improvements, alterations or remodelings as may be determined by BKC to be reasonably necessary to reflect the Current Image as provided in Section 5.B. of this Agreement, as and when required.

(7)    Franchisee fails to pay when due any royalty or advertising and sales promotion contribution required to be paid under this Agreement. Franchisee shall have ten (10) days after notice to cure the delinquency.

(8)    Franchisee (i) fails to submit any information required by Section 10 of this Agreement ("Accounting Procedures") or (ii) knowingly submits a financial statement or other sales report which understates Gross Sales. If Franchisee knowingly and intentionally submits a financial statement or other sales report which understates Gross Sales, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(9)     Franchisee abandons the franchise relationship without the prior consent of BKC at any time during the Term of this Agreement. Franchisee shall have five (5) days after notice to cure the default. The cessation of operation of the Franchised Restaurant on the premises other than with the consent of BKC, whether the premises remain vacant or are converted to another use, shall be considered abandonment of the franchise relationship provided, however, that the Franchised Restaurant shall not be deemed abandoned if the cessation is due to circumstances beyond Franchisee's reasonable control (such as lack of electrical power, weather conditions, earthquakes, strikes and the like) and Franchisee diligently undertakes to resume operations after the reason for such cessation has been abated.

.

(10)     Franchisee ceases to occupy the premises. Franchisee shall have five (5) days after notice to cure the default. If the loss of possession is the result of governmental exercise of eminent domain, Franchisee may, with BKC's consent and subject to availability, relocate to other premises in the same market area for the balance of the Term of this Agreement.

(11)     Franchisee files a petition or application seeking any type of relief under the Bankruptcy Code or any state insolvency or similar law, or someone files a petition or application seeking to have Franchisee adjudicated a bankrupt, or seeking other relief against Franchisee under the Bankruptcy Code or any state insolvency or similar law and the petitioner application is not dismissed within ninety (90) days after it is filed. Subject to the applicable law, this Agreement shall terminate without notice or cure period upon the occurrence of this act of default as if that date were the expiration date and Franchisee expressly and knowingly waives any rights that it may have under the provisions of the Bankruptcy Code and consents to the termination of this Agreement or any other relief which may be sought in a Complaint filed by BKC to lift the provisions of the automatic stay of the Bankruptcy Code. Additionally, Franchisee agrees not to seek an Injunctive Order from any court in any jurisdiction relating to insolvency, reorganization or arrangement proceedings which would have the effect of staying or enjoining this provision.

(12)     Franchisee admits in writing its inability to pay its debts as they mature or makes an assignment for the benefit of creditors, or a receiver (permanent or temporary) for any part of its property is appointed by a court of competent authority. If this act of default shall occur, BKC shall have the right to immediately terminate this Agreement without notice or cure period.

(13)     A final judgment against Franchisee (including a final judgment in favor of BKC or any affiliated party of BKC) remains unsatisfied of record for thirty (30) days (unless a supersede as or other appeal bond has been filed), or if a levy of execution is made upon the franchise granted by this Agreement or upon any property used in the Franchised Restaurant, and said levy it is not discharged within five (5) days of said levying.

(14)     Conviction of either Franchisee or the Managing Owner in a court of competent jurisdiction of (i) an indictable offense punishable by a term of imprisonment in excess of one (1) year, or (ii) any offense, regardless of how punishable, for which a material element is fraud, dishonesty or moral turpitude. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(15)     Franchisee or any Owner uses or duplicates the BURGER KING System or engages in unfair competition in violation of Section 12 of this Agreement or discloses any trade secrets of BKC in violation of Section 11.A(1) of this Agreement. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee but with no opportunity to cure.

(16)     Franchisee denies BKC the right to inspect the Franchised Restaurant or to audit the sales and accounting records of the Franchised Restaurant.

(17)     Conduct by Franchisee, the Managing Owner or the Managing Director which is deleterious to or reflects unfavorably on Franchisee or the BURGER KING Restaurant System by

exhibiting a reckless disregard for the physical and mental well being of employees, customers, BKC representatives or the public at large including, but not limited to, battery, assault, sexual harassment or other forms of threatening, outrageous, willfully discriminatory or unacceptable behavior. An act of default under this Section 18.A.(17) does not require any criminal action to be brought against Franchisee. If this act of default shall occur, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee and with no opportunity to cure.

(18)    Failure by Franchisee to maintain a responsible credit rating by failing to make prompt payment of undisputed bills, invoices and statements from suppliers of goods and services to the Franchised Restaurant.

(19)    Any sale, assignment, merger or transfer in violation of Sections 15 or 16 of this Agreement including without limitation, a change of control of Franchisee which occurs by means of a tender offer for publicly-traded securities of Franchisee or at the direction of a receiver or trustee in bankruptcy.  If this act of default shall occur, BKC shall have the right to terminate this Agreement effective upon notice to Franchisee without opportunity to cure.  Failure by Franchisee to effect a transfer of an Owner's interest in accordance with Section 15.L. of this Agreement shall be a transfer in violation of Section 15 for purposes of this Section18.A.(19).

(20)    Franchisee, without the written consent of BKC, enters into a management agreement or consulting arrangement relating to the Franchised Restaurant.

(21)    Failure to restore the Franchised Restaurant after damage or destruction as provided in Section 7 of this Agreement.

(22)    The submission by Franchisee, Managing Owner, or Owners of any application and/or management commitment form and/or other form or report which contains any false or misleading material statement or omits any material fact.  If this act of default occurs, BKC shall have the right to terminate this Agreement, such termination to be effective upon notice to Franchisee but with no opportunity to cure.

(23)    Repeated breaches of provisions of this Agreement.  If BKC intends to terminate this Agreement under this Section 18.A.(23), BKC shall provide notice to Franchisee that BKC considers that Franchisee has repeatedly breached this Agreement, and that BKC intends to terminate this Agreement if Franchisee breaches the Agreement at any time after said notice.  If Franchisee after receiving such notice, subsequently breaches this Agreement in any manner, BKC shall have the right to terminate this Agreement upon notice with no further opportunity to cure.

(24)    The acquisition of an interest in a restaurant business in violation of Section 19 of this Agreement.

(25)    Failure by Franchisee to conduct the business of the Franchised Restaurant in compliance with all laws and regulations as required under Section 21.C.(3) of this Agreement.

(26)    Failure by Franchisee to comply with any other provisions of this Agreement or any other agreement with BKC relating to the Franchised Restaurant..

(27)    Any false or misleading representation of Franchisee or the Owners with respect to the Distribution Plan (including, without limitation, any representation regarding the uses of equity capital raised pursuant to the Distribution Plan) or Franchisee or any Owner fails in any undertaking pursuant to the Distribution Plan.  If this act of default shall occur, BKC shall have the right to terminate this Agreement, effective immediately upon notice to Franchisee and without opportunity to cure.

The failure of BKC to terminate this Agreement upon the occurrence of one or more acts of default will not constitute a waiver or otherwise affect the right of BKC to terminate this Agreement because of a continuing or subsequent failure to cure one or more of the aforesaid acts of default or any other default.

### B.    Effect of Termination

(1)    Upon termination or expiration of this Agreement, Franchisee's right to use the BURGER KING Marks and the BURGER KING System shall terminate. Franchisee shall not thereafter identify itself as a BURGER KING franchisee or publicly identify itself as a former BURGER KING franchisee or use any of BKC's trade secrets, promotional materials, the BURGER KING Marks or any mark confusingly similar, nor shall Franchisee disclose any of BKC's trade secrets. Upon termination or expiration of this Agreement, Franchisee will immediately return to BKC the MOD Manual loaned to it, together with all other material containing trade secrets.

(2)    Franchisee grants to BKC, upon termination or expiration of this Agreement, the option to purchase all usable paper goods, containers and printed menus bearing the BURGER KING Marks at Franchisee's cost, and to purchase the restaurant equipment, furniture, fixtures and signs at fair market value.

(3)    If the parties do not enter into a Successor Franchise Agreement, Franchisee agrees to immediately upon termination or expiration of this Agreement, make such removals or changes in signs and the building as BKC shall request, so as to effectively distinguish the building and premises from its former appearance and from any other BURGER KING Restaurant. In the event Franchisee fails to make the changes, Franchisee consents to BKC entering the building and premises to make non-structural changes at Franchisee's expense.

(4)    In the event of termination for any default of Franchisee, any damage suffered by BKC shall be a lien in favor of BKC against the personal property, machinery, fixtures and equipment owned by Franchisee on the premises at the time of default.

(5)    The foregoing shall be in addition to any other rights or remedies of BKC that exist under statute, regulation or common law.

### 19.    RESTRICTIVE COVENANT

Franchisee covenants and agrees for itself, its parent, subsidiaries and affiliated companies that during the Term of this Agreement they will not own, operate or have any interest in any hamburger business except other franchised BURGER KING Restaurants. Franchisee further covenants and agrees that for a period of one (1) year after any sale, assignment, transfer, termination or expiration of this Agreement, these entities will not own, operate or have any interest in any hamburger business, except other franchised BURGER KING Restaurants, either at or within two (2) miles of the premises of the Franchised Restaurant. At BKC's request, Franchisee shall require each Owner, and Managing Director to execute an agreement similar in substance to this Section in a form acceptable to BKC and naming BKC as a third party beneficiary with the independent right to enforce such agreement.

### 20.    RESOLUTION OF DEVELOPMENT DISPUTES

### A.    Non-Binding Mediation

BKC and Franchisee agree that they shall attempt to resolve any dispute ("Development Dispute") that arises out of a decision by BKC to develop or authorize development of a new restaurant ("Development Decision"), by negotiation between Franchisee and representatives of BKC who have authority to settle the Development Dispute. The BKC representative shall be at a higher level of management than the person with direct responsibility for the initial Development Decision. If the

matter has not been resolved within Thirty (30) days of referral of the Development Dispute to the BKC representative for negotiation, BKC and Franchisee shall attempt to settle the Development Dispute by non-binding mediation. The mediation procedure to be followed by the parties shall be set forth in BKC's then current Procedures for Resolving Development Disputes (the "Procedures").

### B.      Binding Dispute Resolution

The Procedures shall also set forth a binding dispute resolution process which may be initiated pursuant to the Procedures at the sole election of Franchisee in the event the dispute is not resolved through the mediation process. Subject to modifications made pursuant to the following Section, the Procedures shall remain valid and enforceable by Franchisee and BKC for the term of this Agreement.

### C.      Modification of Procedures

The terms and conditions of the Procedures shall not be materially modified by BKC without the express written approval of the Franchisee Advisory Council.

### D.      Institution of Legal Proceedings

Franchisee shall not institute any legal or administrative proceeding for claims arising out of a Development Decision without first attempting to resolve the Development Dispute through negotiation and non-binding mediation. If the Development Dispute has not been resolved through negotiation or mediation pursuant to Sections 20.A and Franchisee has not timely elected the optional binding dispute resolution pursuant to 20.B above, either party may initiate litigation.

## 21.      MISCELLANEOUS: GENERAL CONDITIONS

### A.      Interpretation

The Introduction shall be considered a part of this Agreement. Section captions are used only for convenience and are in no way to be construed as part of this Agreement or as a limitation of the scope of the particular Sections to which they refer. Words of any gender used in this Agreement shall include any other gender, and words in the singular shall include the plural, where the context requires.

### B.      Non-Waiver

The failure of BKC to exercise any right or option given to it under this Agreement, or to insist upon strict compliance by Franchisee with the terms and conditions of this Agreement shall not constitute a waiver of any terms or conditions of this Agreement with respect to any other or subsequent breach, nor a waiver by BKC of its right at any time thereafter to require exact and strict compliance with the terms and conditions of this Agreement. The rights or remedies set forth in this Agreement are in addition to any other rights or remedies which may be granted by law.

### C.      Governing Law, Forum and Compliance

(1)      This Agreement shall become valid when executed and accepted by BKC. The parties agree that it shall be deemed made and entered into in the State of Florida and shall be governed and construed under and in accordance with the laws of the State of Florida.

(2)      Franchisee and BKC acknowledge and agree that the U.S. District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Circuit (or its successor) in and for Miami-Dade County, Florida, shall be the venue and exclusive proper forum in

which to adjudicate any case or controversy arising either, directly or indirectly, under or in connection with this Franchise Agreement except to the extent otherwise provided in this Agreement and the parties further agree that, in the event of litigation arising out of or in connection with this Agreement in these courts, they will not contest or challenge the jurisdiction or venue of these courts.

(3)     Anything in this Agreement to the contrary notwithstanding, Franchisee shall conduct its business in a lawful manner and faithfully comply with applicable laws or regulations of the United States and the state, city or other political subdivision in which the Franchised Restaurant is located.

**D.     Severability**

BKC and Franchisee agree that if any provision of this Agreement may be construed in two ways, one of which would render the provision illegal or otherwise voidable or unenforceable and the other of which would render the provision valid and enforceable, such provision shall have the meaning which renders it valid and enforceable.   The language of all provisions of this Agreement shall be construed according to its fair meaning and not strictly against BKC or Franchisee.   It is the desire and intent of BKC and Franchisee that the provisions of this Agreement be enforced to the fullest extent, and should any provision be invalid or unenforceable under Florida law, but valid under the laws of the state where the Franchised Restaurant is located, the provision shall be governed by the law of that state.   In the event any court shall determine that any provision in this Agreement is not enforceable as written, BKC and Franchisee agree that the provision shall be amended so that it is enforceable to the fullest extent permissible under the laws of the jurisdiction in which enforcement is sought.   The provisions of this Agreement are severable and this Agreement shall be interpreted and enforced as if all completely invalid or unenforceable provisions were not contained in the Agreement, and partially valid and enforceable provisions shall be enforced to the extent that they are valid and enforceable.

**E.     Notices**

(1)     All notices to BKC shall be in writing and shall be delivered or sent by registered or certified mail, postage fully prepaid, addressed to it at its offices at P.O. Box 020783, General Mail Facility, Miami, Florida 33102-0783, Attention: General Counsel, or at such other address as BKC shall from time to time designate in writing.

(2)     All notices to Franchisee shall be in writing and shall be hand delivered or sent by registered or certified mail or telegraph, addressed to Franchisee at the Franchised Restaurant premises or Franchisee's last designated in writing mailing address.

(3)     Notices shall be deemed delivered on the earlier of actual receipt or the third (3rd) day after being deposited in the U.S. Mail.

**F.     Modification**

This Agreement may only be modified or amended by a written document executed by BKC and Franchisee.

**G.     Binding Effect**

This Agreement shall be binding upon the parties and their successors or assigns.

### H.    Survival

Any provisions of this Agreement, including but not limited to the insurance and indemnification provisions of Section 13, which impose an obligation after termination or expiration of this Agreement shall survive the termination or expiration of this Agreement and  be binding on the parties.

### I.    Attorney's Fees

In any litigation to enforce the terms of this Agreement, all costs and all attorney's fees (including those incurred on appeal) incurred as a result of the legal action  shall be paid to the prevailing party by the other party.

### J.    Entire Agreement

This Agreement, together with the ~~Target Reservation Agreement~~, Franchise Application, Capitalization Plan, the Distribution Plan, and Guarantee, Indemnification, and Acknowledgment executed by Owners, and Contribution Agreement, if applicable, submitted by Franchisee to BKC upon which BKC is relying in granting this franchise, constitute the entire agreement of the parties and supersedes all prior agreements, negotiations, commitments, representations and undertakings of the parties with respect to the subject matter of this Agreement.

BURGER KING CORPORATION

By: _____
Manager, Franchise Administration

Attest: _____
Franchise Development Specialist

DUKE AND KING ACQUISITION CORP., a Delaware Corporation

By: _____
Print Name: Tom Metzger
Title: Managing Owner

Attest: _____
Print Name: Babette Kittel
Title: Accounting manager

## EXHIBIT A - LEGAL DESCRIPTION

The North 259.5 feet of Block 1, Dow's Addition to the City of Beloit, Rock County, Wisconsin, further described as follows:  Beginning at an iron pipe monument found at the Northeast corner of said Block 1; thence South along the East line of said block; also being the West line of Fourth Street, 259.50 feet to a cross found in the concrete walk; thence S. 88° 00' W., Parallel to the North line of said block, 220.43 feet to an iron pipe monument set on the original East margin of the Chicago and Northwestern Railroad; thence N. 0°05'E. along said East margin, 259.50 feet to the said North line of said block; thence N. 88°00'E. along said North line, 220.00 feet to the place of beginning.

EXCEPT the following described parcel:  Part of Block 1, Dow's Addition to the City of Beloit, Rock County, Wisconsin, described as follows:  Beginning at an iron pipe monument found at the Northeast corner of said Block 1; thence S. 88°00'W. along the North line of said block 220.00 feet to the place of beginning of parcel to be conveyed; thence S. 0°05'W. along the East margin of the original Chicago and Northwestern Railroad land, 90.00 feet; thence Easterly parallel with the North line of said Block 1, 25 feet; thence N.0°05'E. to the North line of said block 1; thence S. 88°00'W. along the North line of said block 25.00 feet to the place of beginning of parcel conveyed.

ALSO INCLUDING that part of Government Lot 3 of Section 26, T.1N.,R.12E. of the 4th P.M., bounded and described as follows:  Beginning at a point on the North line of said Government Lot 3 (also the East and West Quarter section line of Section 26), distant 50 feet easterly of, as measured at right angles from the center line of the main track of Chicago and North Western Railway Company (formerly the Beloit and Madison Railway Company) as located across said Section 26; thence Southerly parallel with said main track centerline, a distance of 90 feet to place of beginning of parcel to be conveyed; thence continuing on the same line Southerly parallel with said main track centerline a distance of 110 feet; thence Westerly at right angles to the last described course, a distance of 25 feet, more or less, to a point distance 25 feet Easterly, measured at right angles, from said main track center line, thence Northerly parallel with said main track center line, a distance of 110 feet, more or less; thence Easterly a distance of 25 feet, more or less, to place of beginning of parcel conveyed.

**EXHIBIT B - OWNERS**


Managing Owner                         Thomas Metzger


Owners                                 Duke and King Holdings, LLC


Managing Director                      Thomas Metzger
                                       Brad Mailoux

## EXHIBIT C - NEW RESTAURANT MARKETING ACCOUNT

~~EFFECTIVE DATE JUNE 1, 1991 FOR NEW RESTAURANT OPENINGS~~

~~A new Restaurant Marketing Account will be established for each new restaurant in the BURGER KING USA system. Its purpose shall be to reimburse the franchisee/manager for advertising and promotion expenses incurred in executing a marketing program for a new restaurant.~~

~~Burger King Corporation through its Marketing Account shall contribute $2,500 to the New Restaurant Marketing Account. The $2,500 New Restaurant Marketing Account will be charged to the National Marketing Fund in the quarter in which the restaurant opens.~~

~~The Account may not be used to promote another restaurant and expenditures from the Account must be for advertising or promotion. Examples of expenditures which would not qualify for payment from the Account are:~~

~~1.      Food cost related to redemption of promotion coupons.~~

~~2.      Hourly or management labor provided by restaurant employees.~~

~~3.      Permanent decor items.~~

~~4.      Membership fees.~~

~~5.      Donations, unless publicity results are documented.~~

~~6.      WHOPPER® cards.~~

~~These are examples and not meant to be all inclusive.~~

~~The franchisee/manager will submit a new Restaurant Marketing plan for approval by the Franchise Business Leader or Marketing Manager. An approved plan must be on file prior to any restaurant activities, since no reimbursements will be made until the approved plan has been received. The New Restaurant Marketing program must be completed within 210 days (seven months) of the restaurant's opening day. If an approved New Restaurant Marketing program is not conducted within the 210-day period, all monies will revert to the National Marketing Fund on the 211th day. Two additional months will be allowed to present reimbursement requests to Marketing Account Administration. The expenses must be for advertising or promotion which occurred during the prescribed seven month period. Any balances remaining at the end of the nine month period will revert to the National Marketing Fund.~~

~~Request for reimbursement along with copies of all invoices must be forwarded on the prescribed form. Marketing Account Administration will reimburse the restaurant for qualifying expenditures. The Division Assistant shall have the responsibility of screening invoices submitted by the franchisee/manager and rejecting those which do not qualify as advertising or promotion and/or which do not constitute a normal New Restaurant Marketing Account expense.~~

## SUCCESSOR FRANCHISE AGREEMENT
## ADDENDUM

This Successor Franchise Agreement Addendum ("Addendum") is being entered into by the undersigned concurrently with the BURGER KING Restaurant Successor Franchise Agreement for Burger King Restaurant #1060 dated ~~October 23, 2006~~ *November 30, 2006* ("Successor Franchise Agreement").

1.    **Background and Purpose**.  This Addendum is being executed in order to modify certain provisions of the Successor Franchise Agreement as necessary to reflect accurately the terms on which a successor franchise is being granted to FRANCHISEE.  FRANCHISEE acknowledges that, as of the date of this Addendum, FRANCHISEE has not completed the remodeling of the Franchised Restaurant that FRANCHISEE was to have completed before the execution of the Successor Franchise Agreement, and that this Addendum reflects material conditions to the grant of the successor franchise to FRANCHISEE.

2.    **Successor Remodel Requirements**.  FRANCHISEE acknowledges and agrees that FRANCHISEE is required to complete certain renovations, repairs, replacements, remodelings and/or rebuildings of the Franchised Restaurant that will conform the Franchised Restaurant with the standards set forth in Schedule 10 ("Successor Remodel") of the Conditional Consent to Assignment of Franchise Agreement and Leases by and between Duke and King Acquisition Corp., a Delaware corporation ("Buyer") and Nath Minnesota Group, Inc., a Minnesota corporation ("Seller One"), Nath Illinois Franchise Group, Inc., a Minnesota corporation ("Seller Two"), Nath Florida Franchise Group, Inc., a Minnesota corporation ("Seller Three"), Nath Miami Franchise Group, Inc., a Minnesota corporation ("Seller Four"), Nath Minnesota Operating Group, LLC, a Minnesota limited liability company ("Seller Five") and Nath Illinois Operating Group, LLC, a Minnesota limited liability company ("Seller Six") dated *October 31, 2006* (the "**Consent**").  FRANCHISEE acknowledges and agrees that completion of the Successor Remodel in accordance with the Scope of Work is a material consideration for and inducement to BKC to enter into the Successor Franchise Agreement and this Addendum.  FRANCHISEE agrees to complete the Successor Remodel in a professional, workmanlike manner in accordance with BKC and industry standards, and to complete the Successor Remodel in its entirety in accordance with the timeframe set forth in the Consent (**the "Remodel Completion Date"**).  FRANCHISEE further agrees that equitable relief requiring the performance of FRANCHISEE's obligations under this Addendum would be appropriate in the event that FRANCHISEE fails to comply with its obligations herein, and that in the event of FRANCHISEE's noncompliance, BKC shall be entitled to such relief without bond and to recover all costs of enforcement of FRANCHISEE's obligations under this Addendum, including without limitation its attorneys' fees and costs.  Equitable relief will be in addition to and will not preclude other remedies.  Failure to complete the Successor Remodel in its entirety, as determined by BKC, by the Remodel Completion Date shall be a material default under and cause for termination of the Successor Franchise Agreement.

3.    **ADA Compliance**.  In connection with the Successor Remodel, FRANCHISEE shall submit to BKC a completed ADA (Americans with Disabilities Act) Certificate of Inspection, in the form attached hereto as Schedule 1, by the Remodel Completion Date.  Such Certificate must certify that the restaurant is in substantial compliance with Title III of the Americans with Disabilities Act and the "ADAAG" as defined therein.  FRANCHISEE's failure to comply with the requirements of this paragraph shall constitute a material default under and cause for termination of the Successor Franchise Agreement.

4.      **Effect and Construction**.   This Addendum modifies and is part of the Successor Franchise Agreement.   The Successor Franchise Agreement, as modified by this Addendum, replaces and supersedes all previous licenses and franchise agreements entered into by the parties or their predecessors in interest with respect to the Franchised Restaurant.   Terms used in this Addendum have the same meanings given to them in the Successor Franchise Agreement except as this Addendum may otherwise provide.   Paragraph captions in this Addendum are for convenience only and do not affect the construction of its provisions.   In the event of any inconsistency between the provisions of the Successor Franchise Agreement and the provisions of this Addendum, the provisions of this Addendum shall govern.

**BURGER KING CORPORATION**

By: _____
       Manager, Franchise Administration

Attest: _____
       Franchise Development Specialist

**FRANCHISEE:**

DUKE AND KING ACQUISITION CORP., a
Delaware Corporation

By: _____
Print Name: _Tom Metzger_
Title: _Managing owner_

Attest: _Babette Kittel_
Print Name: _Babette Kittel_
Title: _Accounting manager_

**Schedule 1**

**ADA
CERTIFICATE OF INSPECTION**

My name is _____. I am employed by the firm of
_____ whose address is _____
and whose telephone number is ( ) _____.

I am making the following representations at the request of _____. I
understand that these representations are being made for the benefit of Burger King Corporation
("BKC") and that BKC will be relying on my representations.

I hereby certify to BKC as follows:

1.      I am a licensed ____ architect ____ engineer in the State of _____. I am
familiar with the requirements of Title III of the Americans With Disabilities Act of 1992
("ADA") and with the Americans With Disabilities Act Accessibility Guidelines ("ADAAG")
which is part of the ADA .

2.      On_____, 200___, I inspected the newly constructed or altered
building and other improvements known as Burger King Restaurant # _____ with a
street address of _____ in the
City of _____, State of _____.

3.      My inspection was for compliance of the building and other  improvements with Title III of
the ADA and with ADAAG.

4.      My inspection disclosed that Burger King Restaurant # _____ is [check one]:

        _____ In substantial compliance with Title III of the ADA and the ADAAG

or

        _____ In compliance with Title III of the ADA and the ADAAG except for the
items listed on Schedule A attached hereto.

                        Name:_____

                        Date:_____, 20_____

                        License # or Seal:

## BURGER KIN_ _ORPORATION
## FACILITY INSPECTION REPORT

THE FIR IS INTENDED TO BE USED, AND MAY ONLY BE USED, BY THE FRANCHISEE OF THE BURGER KING RESTAURANTS REFERENCED IN THE FIR (THE "RESTAURANTS") TO ANALYZE THE FINANCIAL CONDITION AND PROSPECTS OF THE RESTAURANTS IN CONNECTION WITH A PROPOSED FINANCIAL RESTRUCTURE. THIS INFORMATION MAY NOT BE GIVEN TO, NOR USED OR RELIED ON BY, ANY PROSPECTIVE BURGER KING® FRANCHISEES, INCLUDING ANY PROSPECTIVE BUYERS OF THE RESTAURANTS.

NEITHER BKC NOR ANY OF ITS OFFICERS, EMPLOYEES OR AGENTS MAKE ANY REPRESENTATIONS OR WARRANTIES WITH REGARD TO THE COSTS THAT WILL ACTUALLY BE INCURRED TO COMPLETE ANY REMODEL OR REPAIR AND MAINTENANCE WORK DESCRIBED IN THIS DOCUMENT. THE ACTUAL REMODELING OR REPAIR AND MAINTENANCE COSTS EXPERIENCED AT THE RESTAURANTS ARE LIKELY TO BE DIFFERENT FROM THE FIR ESTIMATES.

IN THE EVENT YOU ELECT TO EXERCISE YOUR OPTION TO OBTAIN A SUCCESSOR FRANCHISE AT ANY OF THE RESTAURANTS IN ACCORDANCE WITH THE TERMS OF THE RELEVANT FRANCHISE AGREEMENTS, YOU SHOULD NOT RELY ON THE INFORMATION REFERENCED IN THE FIR, BUT SHOULD INSTEAD COMPLETE YOUR OWN DUE DILIGENCE INVESTIGATION AND MAKE YOUR OWN FINANCIAL PROJECTIONS IN CONNECTION THEREWITH. BKC DOES NOT MAKE ANY "EARNINGS CLAIMS," OTHER THAN THOSE, IF ANY, DESCRIBED IN BKC'S THEN-CURRENT UNIFORM FRANCHISE OFFERING CIRCULAR. FURTHER, YOU SHOULD NOT RELY ON ANY REMODELING OR REPAIR AND MAINTENANCE COST INFORMATION REFERENCED IN THE FIR BUT SHOULD INSTEAD COMPLETE YOUR OWN COST ESTIMATES IN CONSULTATION WITH LOCAL CONTRACTORS IN THE MARKET AREA. BKC DOES NOT MAKE COST ESTIMATES REGARDING REMODELING BURGER KING RESTAURANTS IN CONNECTION WITH SUCCESSORS, OTHER THAN THOSE, IF ANY, DESCRIBED IN ITEM 7 OF BKC'S THEN-CURRENT UNIFORM FRANCHISE OFFERING CIRCULAR.

**THE ITEMS OF REMODELING AND REPAIR AND MAINTAINENCE ("R&M") REFERENCED ON THIS FACILITY INSPECTION REPORT/SCOPE OF WORK ("FIR") ARE ACCURATE AS OF THE DATE OF THE WALK THRU CONDUCTED BY BKC FOR THE PURPOSE OF CREATING THE FIR. FRANCHISEE ACKNOWLEDGES THAT THE CONDITION OF THE RESTAURANT MAY DETERIORATE OR CHANGE AFTER THIS DATE AND THEREFORE ADDITIONAL ITEMS OF R&M AND CURRENT IMAGE REMODELING MAY BE NEEDED TO BE COMPLETED PRIOR TO BKC GRANTING A NEW FRANCHISE AGREEMENT OR SUCCESSOR FRANCHISE AGREEMENT TO THE FRANCHISEE.**

# REMODEL SC^ ^E OF WORK

NOTE: This facility ....pection Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

**Entry Date:** 10/24/05
**BK#:** 1060
**ADI:** Madison, WI 460
**Operator:** Nath, Majendra
**Deal Type:** DTL
**Agmt. Exp. Date:** mm/dd/yy
**Bldg. Type:** BK - 1
**Seats:** 99

**Walkthrough Date:** 10/24/05
**Deal Marker's Selected Walkthrough Level:**   <<Select>>
**Construction Manager's Walkthrough Level:**   4
**Construction Manager:** Boyle

**Project Total**

**Scope:** This Facility Inspection report was done as a level 4 inspection. However, all levels were considered during the inspection. The overall condition of this location is fair at best. Full Image - 99 will be required. The restrooms are the original single use restrooms, which do not meet ADA standards. The dining room is old and tired, with wood booths, and dark brown ceiling grid and tiles. The

## 1. Signage

*Construction Manager's Walkthrough Level*

**INSTRUCTIONS:**
Level 1: Requires existing signage to be operational and free of severely broken or missing parts and light leaks.
Level 2: Requires all signage to be compliant with current standards by not later than June 30, 2004.
Level 3: Requires all signage to be compliant with current standards by not later than June 30, 2004.
Level 4: Requires all signage to be compliant with current standards by not later than June 30, 2004.

**ADDITIONAL NOTES:**

### 1.e - Roof and Wall Mounted Channel Letter Signs

| | | **Comments** |
|---|---|---|
| 1.e.2 | X   Replace Letters | Existing orange letters - roof to be blue |
| | | *List appropriate photo numbers in the cell above.* |

### 1.g - Parapet Light Band

| | | **Comments** |
|---|---|---|
| 1.g.2 | X   Replace Parapet Light Band Lenses | Continuous lens is required |
| | | *List appropriate photo numbers in the cell above.* |

### 1.h - Drive Thru 2000 Elements

*Construction Manager's Walkthrough Level*

**INSTRUCTIONS:**
Level 1: Only requires existing signage of any vintage to be operational and free of severely broken or missing parts and light leaks.
Level 2: Requires Drive Thru elements must be compliant with current standards by not later than June 30, 2003.
Level 3: Requires Drive Thru elements must be compliant with current standards by not later than June 30, 2003.
Level 4: Requires Drive Thru elements must be compliant with current standards by not later than June 30, 2003.

BK 1060 Workbench--Remodel(Nov 18 04).xls

Page 1 of 16

**Consolidated Scope**

# REMODEL SCOPE OF WORK

NOTE: This facility ___ ___ection Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level:     <<Select>>
Construction Manager's Walkthrough Level:     4
Construction Manager: Boyle

**Project Total**

ADDITIONAL NOTES:

**Comments**

1.h.1     X     Install Complete Clearance Sign     | None existing - building has been hit |

*List appropriate photo numbers in the cell above.*

1.1 - Additional Signage Expenses

**Comments**

1.i.1     X     Permits, Secural, SED, Survey, Taxes, Freight

*List appropriate photo numbers in the cell above.*

2.  Parking Lot and Site Conditions

2.a - Parking Lot Pavement     Construction Manager's Walkthrough Level

INSTRUCTIONS:
Level 1: Requires elimination of all trip hazards (by a minimum of cold patching and sealing).
Level 2: Requires all pavement pot holes to be filled, and cracks over 1/2-inch to be patched, filled and sealed, seal coated and striped (See Patching Instructions for Level 4).
Level 3: Requires all pavement pot holes to be filled, and cracks over 1/2-inch to be patched, filled and sealed, seal coated and striped (See Patching Instructions for Level 4).
Level 4: Requires parking lot pavement to be returned to as-new condition (Patching of more than 25% requires overlay, more than 50% requires repaving).

ADDITIONAL NOTES:

**Comments**

2.a.1     X     Apply Liquid Crack Sealer
2.a.3     X     Seal & Stripe Parking Lot
2.a.7     X     Remove & Replace all Asphalt     | Outside edge of drive thru lane |

# REMODEL SC^^E OF WORK

NOTE: This facility ...pection Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level:    <<Select>>
Construction Manager's Walkthrough Level:    4
Construction Manager: Boyle

Project Total

## 2.b - Concrete

*Construction Manager's Walkthrough*

List appropriate photo numbers in the cell above.

INSTRUCTIONS:
Level 1: Requires elimination of all trip hazards from all Public accessible areas.  Patch or replace as required.
Level 2: Requires elimination of all trip hazards.  Repair or replace as required.
Level 3: Requires elimination of all trip hazards.  Repair or replace as required.  Failed Drive-Thru lane pavement requires 10' x 20' pads at Menu and DT Windows.
Level 4: Requires return of all on-site concrete to as-new condition, eliminating all broken and pitted concrete. DT Menu and windows must have 10' x 20' concrete pads.

ADDITIONAL NOTES: The existing ramps do not comply with ADA codes.  Additionally, the path of travel requires a person to walk behind a parked car, which does not meet codes.

### Comments

| | | |
|---|---|---|
| 2.b.6 | X | Restripe Accessible Parking Stalls to ADA Guidelines | Included in lot striping |
| 2.b.8 | X | Replace / Install Accessible Ramps to ADA Guidelines | See comment above |
| 2.b.9 | X | Replace / Secure Wheel Stops | Replace damaged blocks, and secure all blocks |
| 2.b.11 | X | Paint Bollards | |
| 2.b.12 | X | Repair Concrete Pad at Menu Board | Crack filler only is required |

## 2.c - Trash Enclosure

*Construction Manager's Walkthrough*

List appropriate photo numbers in the cell above.

INSTRUCTIONS:
Level 1: Only requires Trash Enclosures, gates and aprons to be clean and in good condition.  Clean and/or repair as necessary.
Level 2: Only requires Trash Enclosures large enough for all Trash, and Grease containers.  Walls must be in good condition (any material).  Gates must be solid.  Aprons must be in good condition.
Level 3: Only requires Trash Enclosures large enough for all Trash, and Grease containers.  Walls must be masonry or approved wood.  Gates must be solid.  Aprons must be in good condition.
Level 4: Requires Trash Enclosures large enough for all Trash, Recycling, and Grease containers.  Walls must be masonry or approved wood.  Gates must be solid.  Concrete aprons required.

ADDITIONAL NOTES:

# REMODEL SCOPE OF WORK

NOTE: This facility Inspection Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level: 10/24/05
Construction Manager's Walkthrough Level:    <<Select>>
Construction Manager's Walkthrough Level:    4
Construction Manager: Boyle

Project Total

## 2.d - Site Lighting

| | | | Comments |
|---|---|---|---|
| 2.c.4 | X | Repair Gates | |
| 2.c.5 | X | Paint Gates | Included in building painting |
| 2.c.6 | X | Paint Trash Enclosure | Included in building painting |
| 2.c.8 | X | Clean Trash Enclosure Apron | Clean existing apron |
| 2.c.10 | X | Install / Replace Trash Enclosure Apron | Apron & slab is not existing in 2nd enclosure |

*List appropriate photo numbers in the cell above.*

Construction Manager's Walkthrough Level

INSTRUCTIONS:
Level 1: Only requires site lighting fixtures providing any level of lighting be clean and in good condition (operable and safe, with no missing parts).
Level 2: Requires site lighting to be Metal Halide, spaced to provide levels compliant with Image standards. Heads, poles, lenses and bases must be in good condition.
Level 3: Requires site lighting to be Metal Halide, spaced to provide levels compliant with Image standards. Heads, poles, lenses and bases must be in good condition.
Level 4: Requires site lighting to be Metal Halide, spaced to provide levels compliant with Image standards. Heads, poles, lenses and bases must be in good condition.

ADDITIONAL NOTES:

## 2.e - Landscaping / Walls / Fences

| | | | Comments |
|---|---|---|---|
| 2.d.2 | X | Replace Damaged Metal Base | Pole at rear of building |
| 2.d.4 | X | Paint Light Poles / Heads | Rusting |
| 2.d.9 | X | Submit Photometric Plan For Approval | Required |

*List appropriate photo numbers in the cell above.*

Construction Manager's Walkthrough Level

INSTRUCTIONS:

BK 1060 Workbench--Remodel(Nov 18 04).xls

Page 4 of 16

Consolidated Scope

# REMODEL SCOPE OF WORK

NOTE: This facility Inspection Report (FIR) is valid for 1 year from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level:    <<Select>>
Construction Manager's Walkthrough Level:    4
Construction Manager: Boyle

Project Total

## 2.f - Miscellaneous Site Issues

Level 1: Only requires beds to be well maintained, with no dead plantings.
Level 2: Only requires beds to be well maintained and mulched, with no dead plantings.
Level 3: Requires all lawn areas, trees, shrubs, planting beds, landscape ties, fences, and decorative walls to be in good condition. Irrigations systems must be operational.
Level 4: Requires all lawn areas, trees, shrubs, planting beds, landscape ties, fences, and decorative walls to be in good condition. Irrigations systems must be operational.

*Construction Manager's Walkthrough Level*

INSTRUCTIONS:
Level 1: Requires that each of the items listed below must be in good condition.    Branded logos, if present, must be current.
Level 2: Requires that each of the items listed below must be in good condition.    Branded logos, if present, must be current.
Level 3: Requires that each of the items listed below must be in good condition.    Branded logos, if present, must be current.
Level 4: Requires that each of the items listed below must be in good condition.    Branded logos, if present, must be current.

## 2.g - Outdoor Seating

*Construction Manager's Walkthrough Level*

INSTRUCTIONS:
Level 1: Requires that each of the items listed below must be in good condition, and free of deterioration, weather damage.  ADA Access should be provided.
Level 2: Requires that each of the items listed below must be in good condition, and free of deterioration, weather damage.  ADA Access should be provided.
Level 3: Requires that each of the items listed below must be in good condition, compliant with ADA Access Guidelines, and free of deterioration, weather damage.
Level 4: Requires that each of the items listed below must be in good condition, compliant with ADA Access Guidelines, and free of deterioration, weather damage.

## 3. Playgrounds

## 3.a - All Playgrounds

*Construction Manager's Walkthrough Level*

INSTRUCTIONS:
Level 1: Requires that all items listed below to be present, and in good condition.  Fences must be at least 5' high, painted per Image standards, and have no spaces more than 4 1/2".
Level 2: Requires that all items listed below to be present, and in good condition.  Fences must be at least 5' high, painted per Image standards, and have no spaces more than 4 1/2".
Level 3: Requires that all items listed below to be present, and in good condition.  Fences must be at least 5' high, painted per Image standards, and have no spaces more than 4 1/2".
Level 4: Requires that all items listed below to be present, and in good condition.  Fences must be at least 5' high, painted per Image standards, and be replaced if spaces more than 4 1/2"

## 4. Building Exterior

# REMODEL SCOPE OF WORK

NOTE: This facility, _ection Report (IR) is valid for 1 year
from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level:    <<Select>>
Construction Manager's Walkthrough Level:    4
Construction Manager: Boyle

Project Total

## 4.a - Exterior Walls

*Construction Manager's Walkthrough Level*

INSTRUCTIONS:
Level 1: Allows individual walls to be painted to match existing in good condition. If entire building needs painting, comply with Level 3 requirements.
Level 2: Allows individual walls to be painted to match existing in good condition. If entire building needs painting, comply with Level 3 requirements.
Level 3: Requires Exterior Walls to be painted to current image standards after installation of required Horizontal Trim Band. Diagonal siding may remain if in good condition.
Level 4: Requires Exterior Walls to be painted to current image standards after installation of required Horizontal Trim Band. Diagonal siding may remain if in good condition.

ADDITIONAL NOTES:

| | | Comments | |
|---|---|---|---|
| 4.a.1 | X | Paint Brick / Block Walls | Per Image - 99 requirements |
| 4.a.9 | X | Install Red Trim Band | Per Image - 99 requirements |

*List appropriate photo numbers in the cell above.*

## 4.b - Mansard Roof

*Construction Manager's Walkthrough Level*

INSTRUCTIONS:
Level 1: Only requires that the existing roofing must be in good condition. Patch loose or missing shingles as required to match existing surrounding material.
Level 2: Only requires that existing roofing must be in good condition (wood shakes not allowed). If more than 25% require repair / replacement, replace (painting to current image not required).
Level 3: Allows existing standing seam metal or asphalt shingles in good condition to be painted the required color per Corporate Image standards. Repair loose or missing shingles first.
Level 4: Allows existing standing seam metal or asphalt shingles in good condition to be painted to the required color per Corporate Image standards. Repair loose or missing shingles first.

ADDITIONAL NOTES:

Comments

# REMODEL SCOPE OF WORK

NOTE: This facility ____pection Report (FIR) is valid for 1 year from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level: <<Select>>
Construction Manager's Walkthrough Level: 4
Construction Manager: Boyle

Project Total

| 4.b.1 | X | Install Blue Standing Seam Metal Roof | Existing wood shake shingle's - fair at best |
|---|---|---|---|

## 4.c - Doors & Windows

INSTRUCTIONS:
Level 1: Requires windows to be free of broken, cracked and severely fogged panels. Door and DT window frames may not be field painted.
Level 2: Requires windows to be free of broken, cracked and fogged panels. Frames must be free of fading and scratches. Door and DT window frames may not be field painted.
Level 3: Requires windows to be free of broken, cracked and fogged panels. Frames must be free of fading and scratches. Door and DT window frames may not be field painted.
Level 4: Requires windows to be free of broken, cracked and fogged panels. Frames must be free of fading and scratches. Door and DT window frames may not be field painted.

ADDITIONAL NOTES:

List appropriate photo numbers in the cell above.

## 4.d - Miscellaneous Exterior Elements

| 4.c.2 | X | Replace Customer Entry Doors | Replace exterior entrance doors |
| 4.c.7 | X | Refinish Entry Vestibule to Match Décor | |
| 4.c.15 | X | Paint Rear Delivery Door | Included in building painting |

List appropriate photo numbers in the cell above.

INSTRUCTIONS:
Level 1: Requires Light Bands to be operational, in good repair. Parapet Caps, Fascias Soffits must be in good repair. All Exterior lights must be operational, in good repair.
Level 2: Requires Light Bands to be operational, in good repair. Parapet Caps, Fascias, Soffits must be in good repair. All Exterior lights must be operational, in good repair.
Level 3 & 4: Requires Light Bands to be operational, and in good repair with continuous lenses. Parapet Caps, Fascias Soffits must be in good repair, and painted per Image stds. All Exterior lights must be operational, in good repair. Soffit lights must to Metal Halide. Color of Wall Packs must match Exterior Image.

ADDITIONAL NOTES:

Comments

Soffit lights must be M

Construction Manager Walkthrough

Construction Manager Walkthrough

# REMODEL SCOPE OF WORK

NOTE: This facility inspection Report (FIR) is valid for 1 year from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK- 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level: <<Select>>
Construction Manager's Walkthrough Level: 4
Construction Manager: Boyle

Project Total

| | | | Comments |
|---|---|---|---|
| 4.d.2 | X | Paint Parapet Cap | Included in building painting |
| 4.d.3 | X | Repair Fascia | Hit by car & other locations |
| 4.d.4 | X | Paint Fascia | Included in building painting |
| 4.d.6 | X | Repair Soffit | At rear dining room door |
| 4.d.8 | X | Paint Soffit | Included in building painting |

*List appropriate photo numbers in the cell above.*

**4.e - Greenhouse**

Construction Manager's Walkthrough Level

INSTRUCTIONS:
Level 1: Requires all existing Greenhouses to be in good condition, free of leaks, fogged glass, damaged bases and damaged knee walls. Repair, otherwise cover, or remove.
Level 2: Requires all existing Greenhouses to be in good condition, free of leaks, fogged glass, damaged bases and damaged knee walls. Repair, otherwise cover, or remove.
Level 3 & 4: Require all existing Greenhouses to be in good condition, free of leaks, fogged glass, with knee walls finished both sides to match adjoining finishes.
No brick permitted to be left exposed inside restaurant. Failed glass and/or framing systems must be addressed.

ADDITIONAL NOTES:

| | | | Comments |
|---|---|---|---|
| 4.e.6 | X | Cover Wood Ceiling With Painted Drywall | Include entrance ceiling |

*List appropriate photo numbers in the cell above.*

**5. Building Interior**

**5.a - Service Area**

Construction Manager's Walkthrough Level

INSTRUCTIONS:
Level 1: Requires only that the elements listed below must be free of severe damage. Materials must only be replaced if in poor condition and not fixable.

BK 1060 Workbench--Remodel(Nov 18 04).xls

Page 8 of 16

Consolidated Scope

# REMODEL SCOPE OF WORK

NOTE: This facility Inspection Report (FIR) is valid for 1 year from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level:    <<Select>>
Construction Manager's Walkthrough Level:    4
Construction Manager: Boylo

Project Total

Level 2: Requires only that the elements listed below must be in good condition. Materials must only be replaced if in poor condition and not fixable.
Level 3 & 4: Require Solid Surface [ex - Corian] or SSV countertops. Knee walls must be faced with tile or wainscoting to match Dining Room walls. Queue Rail
Caps must match knee wall accent tiles or complement Décor. Menu Board must be DT 2000 compliant. Service area walls must be durable, cleanable.

ADDITIONAL NOTES:

| | | Comments | |
|---|---|---|---|
| 5.a.1 | X | Replace Service Counter with Corian | P-lam - fair condition at best |
| 5.a.2 | X | Lower Front Counter Knee Wall | |
| 5.a.4 | X | Replace Wainscoat on Service Counter Kneewall | |
| 5.a.5 | X | Replace Queue Rail Caps | Existing wood dowels |
| 5.a.6 | X | Replace Queue Rail Support Steel | Existing brass / does not comply with ADA |
| 5.a.8 | X | Replace Service Area Wall Covering | |
| 5.a.10 | X | Replace Service Area Wainscoat | |
| 5.a.12 | X | Replace Service Area Ceiling | Existing dark brown |
| 5.a.13 | X | Replace Service Area Ceiling Grid | Existing dark brown |

*List appropriate photo numbers in the cell above.*

Construction Manager's Walkthrough Level

**5.b - Dining Room**

INSTRUCTIONS:
Level 1: Requires that Equipment, Décor, Tables, Chairs, Window Sills, Chair Rails, Artifacts, Ceiling Tiles must be clean and safe. Repair as necessary.
Level 2: Requires that Equipment, Décor, Tables, Chairs, Window Sills, Chair Rails, Artifacts, Ceiling Tiles must be free of visible damage. Repair as necessary.
Level 3: Requires that Equipment, Décor, Tables, Chairs, Window Sills, Chair Rails, Artifacts, Ceiling Tiles must be complementary to one another, and in good condition.
Open Truss Ceilings may remain if clean and well maintained and light in color. Lighting must be current [50fc min.=72sf/fixture].
Level 4: Requires Service equipment to be current. Décor, Tables, Chairs must be new, currently approved. Window sills, Chair Rails may be solid surface, laminate or painted wood. Open Truss
may remain if clean and well maintained and light in color. Ceiling tiles (if applicable) must be white or light colored. Lighting must be current [50 fc min.=72sf /fixture].

ADDITIONAL NOTES:

BK 1060 Workbench-Remodel(Nov 18 04).xls

Page 9 of 16

Consolidated Scope

# REMODEL SCOPE OF WORK

NOTE: This facility ...pection Report (HR) is valid for 1 year from the Walkthrough date if the subject inspection.

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level: <<Select>>
Construction Manager's Walkthrough Level: 4
Construction Manager: Boyle

Project Total

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

| | | | Comments |
|---|---|---|---|
| 5.b.1 | X | Replace Self Service Drink Bar | |
| 5.b.15 | X | Replace Interior Trash Receptacles | |
| 5.b.18 | X | Full Décor Package (excludes Counter and Q-line) | Existing p-lam and wood |
| 5.b.21 | X | Replace Chair Rails | Existing old wood booths to be replaced |
| 5.b.24 | X | Repair Window Sills | Refinish window sills at minimum |
| 5.b.25 | X | Replace Wainscoting | |
| 5.b.27 | X | Replace Wall covering | New décor |
| 5.b.32 | X | Replace Dining Room Floor | Existing dark brown |
| 5.b.36 | X | Replace Dining Room Ceiling Tile | Existing dark brown |
| 5.b.37 | X | Replace Dining Room Ceiling Grid | |

*List appropriate photo numbers in the cell above.*

**5.c - Interior Miscellaneous - Dining Room**
Construction Manager's Walkthrough Level

INSTRUCTIONS:
Level 1: Requires only that the Music Speakers, if present, be fully operational and that Exit Signs and Emergency Lights be fully working and in good condition.
Level 2: Requires only that the Music Speakers, if present, be fully operational and that Exit Signs and Emergency Lights be fully working and in good condition.
Level 3: Requires only that the Music Speakers, if present, be fully operational and that Exit Signs and Emergency Lights be fully working and in good condition.
Level 4: Requires only that the Music Speakers, if present, be fully operational and that Exit Signs and Emergency Lights be fully working and in good condition.

ADDITIONAL NOTES:

| | | | Comments |
|---|---|---|---|
| 5.c.1 | X | Remove & Replace Music Speakers | New ceiling system |
| 5.c.8 | X | Remove All Oak Trim | |

*List appropriate photo numbers in the cell above.*

**5.d - Women's Restroom**

Consolidated Scope

# REMODEL SCOPE OF WORK

NOTE: This facility ...ection Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level: <<Select>>
Construction Manager's Walkthrough Level: 4
Construction Manager: Boyle

Project Total

**Construction Manager Walkthrough Level 4**

INSTRUCTIONS:
Level 1: Requires only that equipment, fixtures, fittings, lighting and finishes to be operable (as appropriate), clean and in good condition.
Level 2: Requires only that equipment, fixtures, fittings, lighting and finishes to be operable (as appropriate), clean and in good condition.
Level 3 & 4: Require full Image '99 compliance. Paper towel dispensers and wall mounted trash receptacles are required.
Tile or Symmmetrix (Scored FRP) is required on walls to not less than 5 1/2 feet above floor. Lighting must be current (50fc = 75sf/fixture)

ADDITIONAL NOTES: The restrooms are the origional single use restrooms, which do not meet ADA standards.

Comments

| | Included in dining room |
| | See comments above |

*List appropriate photo numbers in the cell above.*

5.d.1    X    Refinish Corridor / Alcove / Vestibule
5.d.49   X    Enlarge Space to Meet ADA Guidelines

**5.e - Men's Restroom**

**Construction Manager Walkthrough Level 4**

INSTRUCTIONS:
Level 1: Requires only that equipment, fixtures, fittings, lighting and finishes to be operable (as appropriate), clean and in good condition.
Level 2: Requires only that equipment, fixtures, fittings, lighting and finishes to be operable (as appropriate), clean and in good condition.
Level 3 & 4: Require full Image '99 compliance. Paper towel dispensers and wall mounted trash receptacles are required.
Tile or Symmmetrix (Scored FRP) is required on walls to not less than 5 1/2 feet above floor. Lighting must be current (50fc = 75sf/fixture)

ADDITIONAL NOTES: The restrooms are the origional single use restrooms, which do not meet ADA standards.

Comments

| | Included in dining room |
| | See comments above |

5.e.1    X    Refinish Corridor / Alcove / Vestibule
5.e.50   X    Enlarge Space to Meet ADA Guidelines

# REMODEL SCOPE OF WORK

NOTE: This facility    pection Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

**Entry Date:** 10/24/05
**BK#:** 1060
**ADI:** Madison, WI 460
**Operator:** Nath, Majendra
**Deal Type:** DTL
**Agmt. Exp. Date:** mm/dd/yy
**Bldg. Type:** BK - 1
**Seats:** 99

**Walkthrough Date:** 10/24/05
**Deal Marker's Selected Walkthrough Level:** <<Select>>
**Construction Manager's Walkthrough Level:** 4
**Construction Manager:** Boyle

**Project Total**

---

**5.f - Kitchen - General**

*Construction Manager's Walkthrough Level*

*List appropriate photo numbers in the cell above.*

**INSTRUCTIONS:**
General: No field painting of any Kitchen surfaces allowed. Ceiling tiles must be vinyl-coated, white. Grids must be factory-painted, white. Face walls with ceramic tile or FRP to ceiling.
Level 1: Requires Kitchen floors, walls, ceilings and lighting to be clean, in good repair, free of slip or trip hazards, with no missing/broken parts or peeling paint.
Level 2: Requires Kitchen floors, walls, ceilings and lighting to be clean, free of visible damage, free of slip/trip hazards, with no missing/broken parts or peeling paint.
Level 3: Requires Kitchen floors, walls, ceilings to be clean, free of visible damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (75fc=48sf/fixture).
Level 4: Requires Kitchen floors, walls, ceilings to be clean, free of visible damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (75fc=48sf/fixture).

**ADDITIONAL NOTES:**

| | | Comments |
|---|---|---|
| 5.f.9 | X | Repair Base Tile | At ice machine, etc. |
| 5.f.12 | X | Repair Wall Tile | Replace missing and damaged tiles with holes |
| 5.f.15 | X | Replace Ceiling Tile | It's time |
| 5.f.17 | X | Replace Ceiling Grid | Rusting & damaged |
| 5.f.19 | X | Replace A/C Grilles & Vents | Rusting |
| 5.f.25 | X | Replace Drive Thru Counter | Starting to fall apart |
| 5.f.27 | X | Raise Floor Drain | At drive thru - Major Risk! |

*List appropriate photo numbers in the cell above.*

**5.g - Office**

**INSTRUCTIONS:**
Level 1: Requires Office floors, walls, ceilings and lighting to be clean, in good repair, free of slip or trip hazards, with no missing/broken parts or peeling paint.
Level 2: Requires Office floors, walls, ceilings and lighting to be clean, free of visible damage, free of slip/trip hazards, with no missing/broken parts or peeling paint.
Level 3: Requires Office floors, walls, ceilings to be clean, free of visible damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (75fc=48sf/fixture).
Level 4: Requires Office floors, walls, ceilings to be current, clean, free of damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (75fc=48sf/fixture).

# REMODEL SCOPE OF WORK

NOTE: This facility ...ction Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level:    <<Select>>
Construction Manager's Walkthrough Level:    4
Construction Manager: Boyle

Project Total

ADDITIONAL NOTES:

Comments

List appropriate photo numbers in the cell above.

| | | | |
|---|---|---|---|
| 5.g.1 | X | Replace Door | |
| 5.g.2 | X | Paint Door Frame | |
| 5.g.14 | X | Replace Ceiling Tile | |
| 5.g.16 | X | Replace Ceiling Grid | |

**5.h - Crew Room**

INSTRUCTIONS:
Level 1: Requires Crew Room floors, walls, ceilings and lighting to be clean, in good repair, free of slip or trip hazards, with no missing/broken parts or peeling paint.
Level 2: Requires Crew Room floors, walls, ceilings and lighting to be clean, free of visible damage, free of slip/trip hazards, with no missing/broken parts or peeling paint.
Level 3: Requires Crew Room floors, walls, ceilings to be clean, free of visible damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (75fc=48sf/fixture).
Level 4: Requires Crew Room floors, walls, ceilings to be current, clean, free of damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (75fc=48sf/fixture).

ADDITIONAL NOTES:

Comments

Exist. wood in fair – poor condition - (May P-lam)

List appropriate photo numbers in the cell above.

| | | | |
|---|---|---|---|
| 5.h.1 | X | Replace Door | |
| 5.h.2 | X | Paint Door Frame | |
| 5.h.13 | X | Replace Ceiling Tile | |
| 5.h.15 | X | Replace Ceiling Grid | |

**5.I - Storage Room**

INSTRUCTIONS:

BK 1060 Workbench–Remodel(Nov 18 04).xls

Consolidated Scope

# REMODEL SCOPE OF WORK

NOTE: This feasibility Inspection Report (FIR) is valid for 1 year from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level: 10/24/05
Construction Manager's Walkthrough Level: <<Select>>    4
Construction Manager: Boyle

Project Total

| | | Comments |
|---|---|---|

Level 1: Requires Kitchen floors, walls, ceilings and lighting to be clean, in good repair, free of slip or trip hazards, with no missing/broken parts or peeling paint.
Level 2: Requires Kitchen floors, walls, ceilings and lighting to be clean, free of visible damage, free of slip/trip hazards, with no missing/broken parts or peeling paint.
Level 3: Requires Kitchen floors, walls, ceilings to be clean, free of visible damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (30c=96sf/fixture).
Level 4: Requires Kitchen floors, walls, ceilings to be clean, free of visible damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (30fc=96sf/fixture).

ADDITIONAL NOTES:

| | | |
|---|---|---|
| 5.l.13 | X | Replace Ceiling Tile |
| 5.l.15 | X | Replace Ceiling Grid |

5.j - Utility Room

| | | |
|---|---|---|
| | | |
| $ | - | |

*List appropriate photo numbers in the cell above.*

INSTRUCTIONS:
Level 1: Requires Kitchen floors, walls, ceilings and lighting to be clean, in good repair, free of slip or trip hazards, with no missing/broken parts or peeling paint.
Level 2: Requires Kitchen floors, walls, ceilings and lighting to be clean, free of visible damage, free of slip/trip hazards, with no missing/broken parts or peeling paint.
Level 3: Requires Kitchen floors, walls, ceilings to be clean, free of visible damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (30c=96sf/fixture).
Level 4: Requires Kitchen floors, walls, ceilings to be clean, free of visible damage, slip/trip hazards, with no missing/broken parts. Lighting must be current (30fc=96sf/fixture).

5.k - Interior Miscellaneous - Kitchen

INSTRUCTIONS:
Level 1: Requires only that miscellaneous systems present be in working order. Repair or replace as required.
Level 2: Requires only that miscellaneous systems present be in working order. Repair or replace as required.
Level 3: Requires only that miscellaneous systems present be in working order. Repair or replace as required.
Level 4: Requires only that miscellaneous systems present be in working order. Repair or replace as required.

6. - Roof Top

6.a. - Flat Roof

Construction Manager

Consolidated Scope

# REMODEL SCOPE OF WORK

NOTE: This facility, ...spection Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg. Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level:    <<Select>>
Construction Manager's Walkthrough Level:    4
Construction Manager: Boyle

Project Total

**6.b. - H.V.A.C.**

INSTRUCTIONS:
Level 1: Requires Flat Roofing to be clean and free of debris and leaks.  Repair/replace roof as required.  Replace stained/missing ceiling tiles.  Paint soffits/walls as required.
Level 2: Requires Flat Roofing to be clean and free of debris and leaks.  Repair/replace roof as required.  Replace stained/missing ceiling tiles.  Paint soffits/walls as required.
Level 3: Requires Flat Roofing to be clean and free of debris and leaks.  Repair/replace roof as required.  Replace stained/missing ceiling tiles.  Paint soffits/walls as required.
Level 4: Requires Flat Roofing to be free of debris and leaks and Warranted.  Repair/replace roof as required.  Replace stained/missing ceiling tiles.  Paint soffits/walls as required.

Construction Manager's Walkthrough Level

INSTRUCTIONS:
Level 1: Requires HVAC systems to be operational in both heating & cooling cycles.
Level 2: Requires HVAC systems to be operational in both heating & cooling cycles.
Level 3: Requires HVAC systems to be operational in both heating & cooling cycles.
Level 4: Requires HVAC systems to be fully operational in both heating & cooling cycles.  Curbs, cabinets, P-Traps, drains and electrical disconnects must be in good condition.

**7.a - Phase I Kitchen Equipment**

Construction Manager's Walkthrough Level

INSTRUCTIONS:
Level 1: Requires that all existing equipment be fully operational.
Level 2: All restaurants must have all required Phase I Kitchen Equipment in place, fully operational and in good condition.
Level 3: All restaurants must have all required Phase I Kitchen Equipment in place, fully operational and in good condition.
Level 4: All restaurants must have all required Phase I Kitchen Equipment in place, fully operational and in good condition.

**8. Kitchen Equipment**

Construction Manager's Walkthrough Level

INSTRUCTIONS:
Level 1: Requires that all equipment be fully operational.
Level 2: Requires that all equipment be fully operational and in good condition.
Level 3: Requires all equipment to be fully operational and free of any damage that might be visible to the Customers.
Level 4: Requires all equipment to be current, approved, and in good condition.  Repair or replace as necessary and appropriate.

ADDITIONAL NOTES:

Consolidated Scope

# REMODEL SCOPE OF WORK

NOTE: This facility Inspection Report (FIR) is valid for 1 year
from the Walkthrough date if the subject inspection.

Entry Date: 10/24/05
BK#: 1060
ADI: Madison, WI 460
Operator: Nath, Majendra
Deal Type: DTL
Agmt. Exp. Date: mm/dd/yy
Bldg Type: BK - 1
Seats: 99

Walkthrough Date: 10/24/05
Deal Marker's Selected Walkthrough Level:    <<Select>>
Construction Manager's Walkthrough Level:    4
Construction Manager: Boyle

Project Total

## 8.a - Equipment - Miscellaneous Outdoor / Building Exterior

| | | | Comments |
|---|---|---|---|
| 8.a.1 | X | Replace Walk In Freezer Door | Damaged at bottom |
| 8.a.2 | X | Replace Broiler Side Panel | Major damage – Risk! |
| 8.a.3 | X | Replace Biscuit Holding Cabinet Door Gasket | |

*List appropriate photo numbers in the cell above.*

## 9.a - Design & Permitting

Construction Numbers (Walkthrough Level)

INSTRUCTIONS:
Level 1: Requires BKL Operators to obtain Permits as necessary, and to request Legal Clearance for all remodels, requiring plans as necessary. DTL Operators use discretion.
Level 2: Requires BKL Operators to obtain Permits as necessary, and to request Legal Clearance for all remodels, requiring plans as necessary. DTL Operators use discretion.
Level 3: Requires BKL Operators to obtain Permits as necessary, and to request Legal Clearance for all remodels, requiring plans as necessary. DTL Operators use discretion.
Level 4: Requires BKL Operators to obtain Permits as necessary, and to request Legal Clearance for all remodels, requiring plans as necessary. DTL Operators use discretion.

ADDITIONAL NOTES:

| | | | Comments |
|---|---|---|---|
| 9.a.2 | X | ADA Certification of Compliance Letter | Architect must certify restaurant meets ADA after remodel. |

*List appropriate photo numbers in the cell above.*

Consolidated Scope

## OWNER'S GUARANTY

This Owner's Guaranty is made and executed by the undersigned as of the _30_ day of _November_, 2006. You, the undersigned (and each of you, if more than one) (hereinafter referred to as "you" or as "GUARANTOR") have an interest in DUKE AND KING ACQUISITION CORP., a Delaware corporation (hereinafter referred to as "FRANCHISEE"). FRANCHISEE is the franchisee under that certain BURGER KING® Restaurant Franchise Agreement (Entity) dated as of the _30_ day of _November_, 2006 (the "Franchise Agreement") with respect to BURGER KING Restaurant #1060 (the "Restaurant") and, if applicable, that certain Lease/Sublease for the Restaurant premises (the "Lease") with Burger King Corporation, a Florida corporation (hereinafter referred to as "BKC"). This Owner's Guaranty is incorporated and made a part of the Franchise Agreement and Lease and will be attached thereto.

1.    _Acknowledgments._    You acknowledge and agree that BKC has entered into the Franchise Agreement and Lease with FRANCHISEE solely on the condition that each Owner of FRANCHISEE (as defined in the Franchise Agreement) be personally obligated and jointly and severally liable with FRANCHISEE (and with each other Owner of FRANCHISEE) for the performance of each and every obligation of FRANCHISEE (and its Owners) under the Franchise Agreement, Lease, any amendments or modifications to the Franchise Agreement or Lease, any extensions or renewals of the Franchise Agreement or Lease, and under each and every agreement ancillary to the Franchise Agreement or Lease that has been or hereafter may be entered by FRANCHISEE with BKC (all such agreements are collectively referred to as the "BKC Agreements").

2.    _GUARANTOR'S Covenants, Representations and Guaranty._    In consideration of and as an inducement to the execution of the Franchise Agreement and Lease by BKC, you hereby personally, irrevocably and unconditionally:

    (a)    represent and warrant to BKC that Exhibit B to the Franchise Agreement is accurate and complete;

    (b)    agree to guarantee the prompt payment and performance of all Obligations (as hereinafter defined) of FRANCHISEE to BKC and its successors and assigns; and

    (c)    agree to be personally bound by, and personally liable for the breach of, each and every provision in the Franchise Agreement and each and every provision in any other BKC Agreement, as if you were the FRANCHISEE, including, without limitation, the provisions of Sections 12 (Unfair Competition), 15 (Assignment) and 19 (Restrictive Covenant) of the Franchise Agreement.

The term "Obligations" means the payment of all debts, liabilities and obligations of FRANCHISEE to BKC arising under the BKC Agreements, whether direct, indirect, absolute, contingent, matured or unmatured, extended or renewed, wherever and however incurred, together with all costs of collection, compromise and enforcement, including reasonable attorneys' fees, and the prompt performance of each and every covenant, agreement and condition set forth in any of the BKC Agreements.

3.    _Waivers by GUARANTOR._  You hereby waive:

    (a)    acceptance and notice of acceptance by BKC of the foregoing guaranty;

    (b)    notice of demand for payment of any indebtedness or nonperformance by FRANCHISEE of any of the Obligations;

(c)     presentment or protest of any instrument and notice thereof; and notice of default or intent to accelerate with respect to the indebtedness or nonperformance of any of the Obligations;

(d)     any right you may have to require that an action be brought against FRANCHISEE or any other person as a condition of liability;

(e)     the defense of the statute of limitations in any action hereunder or for the collection or performance of any Obligation;

(f)     any and all rights to payments, indemnities and claims for reimbursement or subrogation that you may have against FRANCHISEE arising from your execution of and performance under this Guaranty;

(g)     any defense based on any irregularity or defect in the creation of any of the Obligations or modification of the terms and conditions of performance thereof;

(h)     any defense based on the failure of BKC or any other party to take, protect, perfect or preserve any right against and/or security granted by the FRANCHISEE or any other party;

(i)     any and all other notices and legal or equitable defenses to which you may be entitled; and/or

(j)     the right to trial by jury in respect of any litigation based on, or arising out of, under or in connection with this Guaranty.

4.     <u>Further Agreements and Understandings</u>.  You hereby consent and agree that:

(a)     Your direct and immediate liability under this Guaranty will be joint and several with FRANCHISEE and each other GUARANTOR of FRANCHISEE;

(b)     The death or incapacity of any GUARANTOR will not modify, amend or terminate this Guaranty;

(c)     If you should die, become incapacitated, become insolvent or make a general assignment for the benefit of creditors, or if a proceeding under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally shall be filed or commenced by, against or in respect of you or any other GUARANTOR hereunder, any and all obligations of the GUARANTOR shall, at BKC's option, immediately become due and payable without notice;

(d)     If any payment or transfer to BKC which has been credited against any Obligation is voided or rescinded or required to be returned by BKC, whether or not in connection with any event or proceeding described in Section 4(c), this Guaranty will continue in effect or be reinstated as though such payment, transfer or recovery had not been made;

(e)     You will render any payment or performance required under the Franchise Agreement or any other BKC Agreement upon demand if FRANCHISEE fails or refuses punctually to do so;

(f)     Your liability hereunder will be construed as an absolute, unconditional, continuing and unlimited obligation without regard to the regularity, validity or enforceability of any of the Obligations, and without regard to whether any Obligation is limited, modified, voided, released or discharged in any proceeding

under the United States Bankruptcy Code or any similar law affecting the rights of creditors generally;

(g) Your liability hereunder will not be contingent or conditioned upon BKC's pursuit of any remedies against FRANCHISEE or any other person;

(h) This Guaranty will continue in full force and effect for and as to any extension of or modification or amendment to the Franchise Agreement or any other BKC Agreement and you waive notice of any and all such extensions, modifications or amendments;

(i) Your liability hereunder will not be diminished, relieved or otherwise affected by any extension of time, credit or other indulgence, or any waiver that BKC may from time to time grant to FRANCHISEE or to any other person, including without limitation, the acceptance of any partial payment or performance, or the compromise or release of any claims (including the release of other Owners or guarantors), or the taking of any action by BKC which may have the effect of increasing your obligations, none of which will in any way modify or amend this Guaranty, which will be continuing and irrevocable during the term of the Franchise Agreement and so long as any performance is or may be owed under any of the BKC Agreements by FRANCHISEE or its Owners and so long as BKC may have any cause of action against FRANCHISEE or its Owners, subject to paragraph (k) below;

(j) Any and all present and future debts and obligations of the FRANCHISEE to you or any other GUARANTORS are hereby subordinated to the full payment and performance of the Obligations; and

(k) If you transfer, in compliance with the Franchise Agreement, any interest in the Franchise Agreement or FRANCHISEE in an installment sale, your liability for the Obligations under the Franchise Agreement will terminate upon the later of (i) one year from the date of transfer or (ii) the date of payment of the final installment of any purchase money debt, provided that, after the first anniversary of such transfer, your liability will be limited to the original amount of the purchase money debt. If you transfer, in compliance with the Franchise Agreement, any interest in the Franchise Agreement or FRANCHISEE for payment in cash, your liability for the Obligations under the Franchise Agreement will terminate one year from the date of transfer, and your liability will be limited to the amount of accrued but unpaid royalty and advertising fees due and payable under the Franchise Agreement during such period. Notwithstanding the foregoing, your liability hereunder for Obligations under the Lease or the other BKC Agreements will continue in full force and effect until FRANCHISEE has fully paid and performed all obligations thereunder.

  5. <u>Choice of Law; Jurisdiction and Venue</u>.  This Guaranty shall be governed by and construed in accordance with the laws of the State of Florida.  You hereby irrevocably submit to the jurisdiction of the Federal District Court for the Southern District of Florida, or if such court lacks jurisdiction, the 11th Judicial Court (or its successor) in and for Dade County, Florida, and any appellate court thereof in any action or proceeding arising out of or relating to the Guaranty.  You hereby irrevocably waive, to the fullest extent you may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding and any right to jurisdiction on account of your place of residence or domicile.  You agree that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

6.    Severability.    If one or more provisions contained in this Owner's Guaranty shall be invalid, illegal or unenforceable, in any respect under the laws of any jurisdiction, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

You now execute this Guaranty on the date shown above.

WITNESS                                                    GUARANTOR(S):

DUKE & KING HOLDINGS, LLC., a
Delaware limited liability corporation

By: _____
Print Name: _Tom Metzger_
Title: _managing owner_

Attest: _Babette Kittel_
Print Name: _Babette Kittel_
Title: _Accounting Manager_