## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

|  |  |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## DEBTORS' MOTION FOR AN ORDER
## APPROVING SALE AND BIDDING PROCEDURES

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

TO:     The Parties in Interest as Specified in Local Rule 9013-3(a)(2).

The above-referenced debtors and debtors in possession (collectively, the "Debtors")

move the Court for the relief requested below and give notice of hearing.

1.      The Court will hold a hearing (the "Procedures Hearing") on this motion (the

"Procedures Motion") at 9:30 a.m. on January 24, 2011, in Courtroom No. 2A, United States

Courthouse, 316 North Robert Street, St. Paul, Minnesota.

2.      Any response to the Procedures Motion must be filed and served not later than

January 19, 2011, which is five days before the time set for the hearing (including Saturdays,

Sundays, and holidays). **UNLESS A RESPONSE OPPOSING THE PROCEDURES**

**MOTION IS TIMELY FILED, THE COURT MAY GRANT THE PROCEDURES**

**MOTION WITHOUT A HEARING.**

3.     This Court has jurisdiction over the Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P. 5005 and Local Rules 1070-1 and 1073-1.  This is a core proceeding.  The petitions commencing the Debtors' chapter 11 cases were filed on December 4, 2010 (the "Petition Date").  The cases are now pending in this Court.

4.     The relief sought in the Procedures Motion is based upon 11 U.S.C. §§ 105(a) and 363 and Fed. R. Bankr. P. 2002(a)(2) and 6004.  The Debtors propose to establish procedures for selling substantially all of their assets to the highest and best bidder(s) in accordance with the form attached hereto as <u>Exhibit A</u> (collectively, the "Sale Procedures").  The approval of the Sale Procedures is a critical step to achieving the ultimate goal of the chapter 11 reorganization process – maximizing value available to all stakeholders, including by preserving the going concern value of the Debtors' business.  To that end, the Debtors believe that this Court's approval of the Sale Procedures will enable them to solicit competing offers for substantially all of their assets in a controlled manner that will ensure maximum recovery for their estates. Moreover, to preserve going concern value and obtain the anticipated benefits of a proposed sale transaction, it is imperative that the sale process be completed within the timeframes established in the Sale Procedures.  Given the continuing uncertainty in the overall economy and the Debtors' impending slow season, in addition to the Debtors' long-term liquidity needs, the timeframe for consummating a sale of assets set forth in the Sale Procedures is appropriate.

5.     The Debtors hereby move the Court for the entry of an order approving the Sale Procedures, including, but not limited to (a) authorizing the Debtors to select and negotiate a protection fee to be paid to one or more "stalking horse" bidders for the sale of Debtors' assets; (b) segregating the restaurant locations for sale; and (c) formulating auction guidelines.

## BACKGROUND

6. On the Petition Date, each of the Debtors filed a voluntary petition for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"). The Debtors have continued in possession of their property and are managing their business as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

7. The Debtors currently operate 87 separate franchise locations: 37 in Minnesota; 19 in Missouri; 15 in Illinois; 12 in Wisconsin; 3 in Iowa; and 1 in Kansas.

8. Duke and King Acquisition Corp. ("D&K Acquisition") was formed in November 2006, to acquire 88 Burger King franchise restaurants from the Nath Companies ("Nath"). The acquisition was funded by approximately $11.2 million in equity contributions from Kinderhook Capital Fund I and $17 million of debt provided by Bank of America, N.A. ("BofA"). At the time of the acquisition, Burger King Corporation ("BKC") and Kinderhook Industries ("Kinderhook") recognized that the restaurants being purchased were significantly behind on both successor and CAPEX commitments. Notwithstanding the significant CAPEX requirements, D&K Acquisition decided to move forward with the Nath acquisition, based in part, on guidance from BKC that there would be opportunities in the near future to bolster its platform with additional acquisitions. The Nath acquisition also included 12 restaurants in Florida which D&K Acquisition planned on divesting shortly after closing the transaction so that it could focus on its core Midwest market.[1]

9. Shortly after the Nath acquisition, D&K Acquisition formed Duke and King Missouri, LLC ("D&K Missouri" and with D&K Acquisition, the "Company") to purchase 24

---

[1] In July 2007, D&K Acquisition sold four of the 12 Florida restaurants purchased as part of the Nath acquisition. Ten months later, BKC acquired seven of the Company's remaining Florida locations and converted them to corporate restaurants.

restaurants in Missouri, known at the time as the Swisshelm Group ("Swisshelm").  Like the Nath restaurants, the Swisshelm assets were in poor condition and were also in need of significant operational and capital improvements.  For example, in the first six months following the Swisshelm acquisition, 20 of the 23 regional managers and three of the four area managers were replaced in that market.  This high turnover, while ultimately improving on-going operations, initially hurt productivity and added significant replacement and training costs.  Additionally, the CAPEX required to bring the restaurants to acceptable conditions exceeded original estimates by over 140%.

10.     After the Swisshelm acquisition, the Company continued to seek additional growth opportunities in an effort to "average in" low CAPEX and "clean EBITDA" to bolster the overall strength and value of its portfolio.  In May 2007, the Company signed a letter of intent to purchase 66 restaurants from Simmonds Restaurants in the Omaha and Des Moines markets.  However, BKC did not approve the Company's purchase of the Omaha and Des Moines markets.  Unfortunately, this development set back the Company's business plan and handcuffed its ability to "average in" better-conditioned restaurants with advantageous operating results.  Its plan to use cash flow from stronger locations to fund CAPEX at older restaurants could not, as a result, work.  The Company was left with increasingly troubled assets requiring high CAPEX dollars without the ability to leverage better performing stores.

11.     The need to spend CAPEX dollars has been a constant drain on the Company.  Since its inception, the Company has reinvested all of its excess cash flow into the restaurants and spent over $8.75 million on CAPEX ($4.0 million in 2007, $1.9 million in 2008, $2.3 million in 2009 and approximately $600 thousand year-to-date in 2010).  Moreover, to meet additional CAPEX obligations, the Company performed sale-leasebacks of all of its real property

holdings — 10 restaurants in 2008 and 3 restaurants in 2009 — generating approximately $13.3 million. Of that amount, approximately $10.5 million was used to pay down debt and approximately $2.8 million was reinvested in the restaurants.

12. The Company's chapter 11 filing is driven by both macroeconomic factors and the Company's acute short-term liquidity problems. The Company finds itself in a situation in which its growth opportunity is limited by economic reality and its agreements with Burger King. The prolonged recession has greatly reduced customer traffic in its restaurants, driving down cash flow. In short, the Company's year-to-date financials have fallen short of projections. For the eleven periods[2] ended November 4, 2010, sales are $81.7 million, which is $5.4 million short of projections. Through this fiscal year, the BKC system has experienced same restaurant sales declines for the past several quarters. Over the past four periods, the Company has experienced sales declines of 4.4% (period 8), 10% (period 9), 2.7% (period 10), 5.2% (period 11) and 11.1% (period 12 to date). Furthermore, through period eleven, the Company's same restaurant sales are down 4.0% from 2009. Restaurant margins have come under increased pressure with the impacts of winter weather, value promotions such as the "$1 Double Cheeseburger" and fluctuations in commodity prices, which have contributed to a decline in EBITDAR (Earnings before Interest, Taxes, Depreciation, Amortization and Rent) of over 9% in the past two years. Although the Company continues to maintain a high level of operating efficiency, and 90% of its restaurants have received "excellent" or "good" ratings from BKC, operating margins have not been sufficient to meet the restaurants' required CAPEX.

13. Earlier this year, as it addressed its liquidity problems, the Company was sued by BKC for breach of post-termination obligations under certain of BKC's franchise agreements.

---

[2] The Company uses "periods" rather than "months" in its financial reporting. A "period" is equal to 4 weeks.

The litigation was resolved by the Company executing a Limited License Agreement with BKC, which, among other things, requires a sale of 52 of the Company's franchise locations on or before December 30, 2010. After that date, the Company's rights under 52 of their BKC franchise agreements will terminate, absent an extension from BKC.[3]

14. Since October, 2010, the Company has been working on a short-term solution of its liquidity issues with BKC, as well as a long-term plan that would align the Company with BKC's new vision for improving the Burger King brand name. The Company also reached out to BofA to discuss the Company's financial condition. The Company, BKC and BofA (and their respective advisors) met several times leading up to the Petition Date. As a result of these meetings, the parties agreed to a deferral of principal and interest payments to BofA and the deferral of franchise, advertising and royalty fees to BKC. Among other conditions, and similar to the requirement of the Limited License Agreement, the Company was required to engage the services of an investment banker to market the assets and sell the business. The Company moved to retain an investment banker to commence a professional process to find a buyer or buyers for the business in order to maximize the value of the enterprise. Through the parties' collaborative efforts, the Company was able to continue to operate until a consensual long-term deal could be finalized. However, the Company's acute cash needs — obligations to BofA, BKC, landlords and vendors — coupled with lagging revenues and the beginning of the Company's slow season, necessitated a filing under chapter 11 of the Bankruptcy Code in order to preserve the value of the business. The filing will also provide time and liquidity to market and sell the business.

---

[3] BKC has further extended the termination date for the Limited License Agreement through January 31, 2011. The Debtors anticipate that BKC will further extend the deadline once the Sale Procedures are approved to a date consistent with the timeline in the Sale Procedures.

15.     D&K Acquisition and its subsidiaries (excluding D&K Missouri Holdings, Inc.) included in the chapter 11 filing are all borrowers under the credit facility with BofA.  D&K Acquisition and its subsidiaries fall into the following categories:

***Operating Companies***

16.     <u>Duke and King Acquisition Corp.</u>  Headquartered in Burnsville, MN, it is a Delaware corporation and 100% owner of both Duke and King Missouri Holdings, Inc. and DK Florida Holdings, Inc.  It employs senior executive management and operates restaurants in Minnesota, Wisconsin, Iowa and Illinois.

17.     <u>Duke and King Missouri, LLC</u>.  Headquartered in Burnsville, MN, it is a Delaware limited liability company and operates restaurants in Missouri and Kansas, but is wholly owned by Duke and King Missouri Holdings, Inc.

***Holding Companies***

18.     <u>Duke and King Missouri Holdings, Inc.</u>  It is a Delaware corporation holding company that owns 100% of D&K Missouri and 100% of Duke and King Real Estate, LLC.

19.     <u>DK Florida Holdings, Inc.</u>  It is a Delaware corporation that serves as a holding company that formerly owned 100% of DK Florida, LLC (which was cancelled in September 2009).

20.     <u>Duke and King Real Estate, LLC.</u>  It is a Delaware limited liability company that used to own real estate in fee for certain locations, but divested itself of those holdings as of 2009.

21.     A chart depicting the Debtors' organizational structure is as follows:



---

[1] Duke and King Acquisition Corp. is 100% owned by Duke and King Holdings, Inc.

22.     The Debtors' primary secured financing is through a credit facility with BofA, with obligations totaling approximately $11,000,000 as of December 1, 2010.

### BACKGROUND RELEVANT TO THE RELIEF REQUESTED

**A.     Introduction**

23.     The Debtors, through the filing of the Procedures Motion, are not seeking authorization to sell their assets; rather, they are seeking authorization to conduct a marketing and sale process.  Once a leading bidder (or bidders) is identified, the Debtors will evaluate such bids in accordance with the terms of the Sale Procedures.  If sales to such bidder (or bidders) will result in a recovery for creditors, then the Debtors will file a motion for authorization to sell their assets.

24.     In the months leading up to the filing of their bankruptcy petitions, the Debtors reviewed their reorganization options and prospects and concluded that a stand-alone reorganization represented a difficult option.  During that time, the Debtors discussed with both

BKC and BofA possible restructuring scenarios, including a sale or sales of substantially all of their assets. The Sale Procedures are the culmination of those discussions, the input provided by the Debtors' professionals, and the Debtors' analysis of each of the restaurants.

**B.      Segregation of Restaurants**

25.     The Debtors are seeking offers for the sale of two sets of assets. The "Group One Restaurants" consist of 74 BURGER KING® restaurant locations set forth on <u>Schedule 1</u> to the Sale Procedures. The "Group Two Restaurants" consist of 13 BURGER KING® restaurant locations set forth on <u>Schedule 2</u> to the Sale Procedures. The Debtors propose to market and sell the Group One Restaurants and Group Two Restaurants concurrently, but hold two separate auctions. Qualified Bidders (as defined in the Sale Procedures) are not required to bid for both the Group One Restaurants and the Group Two Restaurants; however, any bidder that bids for both sets must bid separately for each set. Nevertheless, bidders may bid for subsets of Group One Restaurants and Group Two Restaurants (or vice versa). The sales will be on an "as is, where is" and "with all faults" basis.[4]

26.     The Debtors have segregated the restaurants as an exercise of their sound business judgment. Prior to the Petition Date, the Debtors conducted an internal review of each restaurant's operations and profitability measures. Through this analysis, they determined that five restaurants were losing money and, with BKC's approval, the Debtors closed these five restaurant locations the day before the Petition Date. The Debtors also designated an additional 13 restaurants as containing potential impediments to achieving maximum sale value. Eight of those 13 restaurants operated on a break-even basis or at a loss, had past-due CAPEX obligations, and were slated for closing. However, BKC did not consent to a closure of those

---

[4] This paragraph is not intended to be descriptive nor as a substitute for the provisions of the Sale Procedures, which control.

eight locations. The Debtors identified another five locations that have minimal profit and significant past-due CAPEX obligations (about $319,000 per restaurant) that (a) put those restaurants at risk of having long-term negative cash flow (making them potentially less attractive in a sale) and (b) if grouped with the healthier Group One Restaurants, may cause buyers to lower their bids on the entirety to offset these five restaurants' past-due CAPEX obligations. It is these five restaurants plus the previous eight identified for closure that make up the Group Two Restaurants. The Debtors believe that segregating the restaurants into two groups will result in a higher price for all the restaurants. If all 87 restaurants were marketed as one group, the Debtors believe that potential bidders might submit a bid or bids that would be lowered to compensate for poorly performing Group Two Restaurants. By requiring bidders to offer separate bids on each group, however, the Sale Procedures will maximize the bids on the Group One Restaurants. At the same time, separating the Group Two Restaurants will allow the Debtors to determine their market value, if any. In the Debtors' business judgment, the separate auction of the Group Two Restaurants provides a reasonable mechanism to ensure maximum value for the business enterprise because doing so limits the possibility that restaurants with negative enterprise value will reduce the bids on the overall business enterprise.

27. Both before and after the Petition Date, the Debtors have met and negotiated with BKC and BofA in an attempt to achieve unanimous consent on a sale process. The parties discussed both closing certain restaurant locations and auctioning restaurants in groups, as the Debtors are proposing in the Sale Procedures. In support of the separate auction approach, BofA has agreed that for any of the Group Two Restaurants that are not sold, it would permit any costs associated with shutting down, de-identification, restaurant-level accrued and unpaid administrative operating liabilities, or otherwise closing those restaurants to be paid out of the

proceeds from the sale prior to such proceeds being distributed to BofA on account of its claim against the Debtors. Such costs will not include any unpaid franchise, licensing and national advertising fees due to BKC.

28.     The Debtors, after significant internal deliberation and discussions with key parties in interest, determined in their business judgment that the pursuit of "dual-track" sale of substantially all of their assets, through two separate groupings of restaurant locations, is the best path to maximize value for all consistencies.

**C.     Debtors' Marketing Efforts**

29.     Prepetition, on November 18, 2010, the Debtors engaged Mastodon Ventures Inc. ("Mastodon") as investment banker, to assist the Debtors in their efforts to market and sell substantially all of their operating assets. The Debtors have filed an application to retain Mastodon as investment banker in the chapter 11 bankruptcy cases.[5]

30.     With the assistance of their professionals, the Debtors have commenced concurrent processes — one for the Group One Restaurants and the other for the Group Two Restaurants (collectively, the "Sale Assets") — to solicit bids for the sale of the Sale Assets. The Debtors and Mastodon began the sale process for the Sale Assets in mid-November, 2010, by preparing an in-depth confidential offering memorandum with descriptions of the business and financial projections and by providing teaser materials to prospective purchasers.

31.     Mastodon identified several potential operating, strategic and financial buyers for the Sale Assets and approached such potential purchasers to solicit their interest in the Sale Assets. Confidentiality agreements will be sent to potential purchasers who express interest. Upon execution of a confidentiality agreement, interested parties will receive the confidential

---

[5] As of the filing of the Procedures Motion, Mastodon's retention had not been formally approved by the Court.

offering memorandum and will be provided access via computer to a virtual "data room" established by the Debtors and Mastodon with respect to the proposed sale.

32.     The Debtors anticipate that Mastodon's efforts will yield multiple expressions of interest for all or portions of the Sale Assets.  The Debtors, with the assistance of Mastodon and their other professionals, intend to market and seek higher and better bids for the Sale Assets pursuant to the terms of the Sale Procedures and hold auctions accordingly.  The Debtors believe that the additional time to market the Sale Assets afforded under the Sale Procedures will result in the highest and best bids for the Sale Assets.  The Debtors recognize that the sale process may result in bids for less than all of the restaurants in each group, or bids for only certain of the restaurants in each group.  The Debtors likewise realize that separate sales may result in a greater overall recovery for the Debtors' creditors.

**D.      Approval of the Sale Procedures**

33.     The Sale Procedures attached hereto as Exhibit A are designed to allow for the Debtors' consideration of a "stalking horse" bid or other alternative bids, while providing structure to that consideration and to allow for multiple auctions, if necessary.  Once approved, the Sale Procedures will govern the submission of all bids and the selection or approval of the highest and best offer for the restaurants in separate groups.  The Debtors believe that, if the restaurants are to be sold, they will obtain the maximum recovery for their creditors if they are sold pursuant to the Sale Procedures.  The Debtors expect that the Sale Procedures, if approved by the Court, will result in a bidding process involving several interested parties leading to one or multiple purchasers for the restaurants.

34.     In short, the Sale Procedures contemplate that, with the assistance of their retained professionals, the Debtors will:

- Work with the Debtors' investment banker to market the restaurants through the date of the Group One Auction and Group Two Auction (defined below);

- Assist each potential bidder in conducting its respective due diligence investigations through the Bid Deadline;

- Potentially select one or more parties as a stalking horse bidder — depending upon whether such parties are bidding for one, several or all of the restaurants — that offer the highest and best offer(s) prior to the Group One Auction and the Group Two Auction;

- If there is a stalking horse bidder or more than one qualified bidder for the Group One Restaurants or Group Two Restaurants, conduct separate auctions consistent with the procedures described in the Sale Procedures;

- Select a Successful Bidder or Successful Bidders at the Group One Auction and the Group Two Auction; and

- Work on closing the sales to a Successful Bidder or Successful Bidders after Court approval.

35.     The Debtors submit that the Sale Procedures are fair and reasonable and are necessary to allow the Debtors to evaluate their sale options through a controlled structure. The Sale Procedures will also provide potential purchasers with predictability and orderliness in the process. Finally, the Debtors believe that, if implemented, the Sale Procedures will result in the highest offer(s) for the restaurants.

**E.     Burger King Approval Process**

36.     BKC will not consent to the issuance of a new franchise agreement or the assignment of any existing franchise agreement to any person unless that person satisfies all of BKC's standard and customary requirements and the criteria BKC has established for approval of any new franchisees or expansion by any existing franchisees in BKC's entire system. To that end, the Sale Procedures require that to become a Qualified Bidder, such bidder must seek the appropriate BKC approvals. As summary of some of the principal criteria typically utilized by

BKC in the ordinary course of its business in evaluating franchisee candidates, as contained in

the Sale Procedures, is as follows:

a. <u>New Franchisee Approval Process</u>:  New franchisee candidates must obtain approval by all of the following:

   o <u>Operations Review</u>:  Criteria includes: directly comparable experience in a multi-unit retail environment preferably in the restaurant sector.  Candidate must pass interviews with BKC's Franchise Operations leadership.

   o <u>Legal Review</u>: Criteria include background checks.

   o <u>Credit Review</u>: Criteria include reliable credit history.

   o <u>Financial Review</u>: Criteria includes net worth of at least $1.5M or 3-5x the equity required to complete the targeted deal, whichever is greater.

   o <u>Franchising Review</u>:  Franchisee must obtain approval of BKC's franchise leadership team.  Criteria includes alignment with BKC's franchising guiding principles, including a focus on growth via organic development and an understanding of BKC's policies on maximum restaurant count and contiguous geography.

b. <u>Deal Approval</u>: Transfers of BURGER KING® restaurants are subject to case-by-case deal approval by BKC's Operations, Franchising, Legal and Finance groups.  Being approved to become a franchisee does not in any way give the approved candidate a path around this process.

c. <u>Approval Process for Existing Franchisee Acquisitions</u>:  Existing franchisees seeking to acquire any particular set of existing BURGER KING® restaurants must obtain approval by all of the following:

   o <u>Operations Review</u>:  BKC's Field Operations must support the buyer based on their operations track-record and organizational capacity.

   o <u>Financial Review</u>:  The proposed buyer must demonstrate the financial capacity to handle the transaction in addition to any required capital expenditures.  Buyers must be current in all payments due to BKC.

   o <u>Franchising Review</u>:  In general terms, the buyer must be aligned with all BKC goals and initiatives.  Check-points include whether the franchisee is compliant with all equipment and remodeling obligations in their existing business; whether the buyer

has supported local marketing initiatives; and whether the buyer has developed new restaurants. In addition, the acquisition will be reviewed for whether it is in the same geographical areas as the proposed buyer's existing base of operations; and whether it causes the buyer to be at or near the 100-restaurant ceiling.

Given that all potential bidders need pre-approval, the Debtors submit that the BKC approval process set forth above adds additional certainty to the Debtors' sale process.

**F.**     <u>**Form of Asset Purchase Agreement**</u>

37.     Pursuant to the Sale Procedures, Qualified Bidders will be required to enter into an asset purchase agreement to consummate a sale. The proposed asset purchase agreement will be straightforward. It will designate which of the Debtors' restaurants will be sold to a BKC-approved purchaser and will include provisions relating to: advertising materials and distributor and marketing rights; inventory and supplies; prepaid expenses and deposits; receivables and rights to reimbursement; certain insurance benefits; certain records; certain licenses; and the assumption and assignment of certain non-residential real property leases and executory contracts. Finally, the asset purchase agreement will provide for the assumption and assignment of the BKC's franchise agreements, subject to BKC's consent. In exchange for those assets, a purchaser will pay the Debtors cash and assume certain liabilities as of the closing date. To the extent, however, a purchaser will not be purchasing certain of the Debtors' remaining assets, such remaining assets will be defined as "Excluded Assets" in the asset purchase agreement. The asset purchase agreement will also contain limited representations and warranties by the Debtors.

**G.**     <u>**Authorization to Designate a Stalking Horse Protection Fee**</u>

38.     Pursuant to, and as described in greater detail in the Sale Procedures, the Debtors propose as part of the Sale Procedures to solicit parties to serve as and to designate one or more bidders as Stalking Horse Bidder(s) for some or all of the Sale Assets. The Debtors anticipate

that they will identify and designate certain Stalking Horse Bidder(s) for some or all of the Sale Assets (in whole or for certain groupings) prior to March 7, 2011. As the Debtors identify and designate Stalking Horse Bidder(s), they will file a motion with the Court (in each case, a "Stalking Horse Motion") that will identity of the party designated as Stalking Horse Bidder and will seek expedited approval of the (i) proposed Stalking Horse Protection Fee, the (ii) applicable Stalking Horse asset purchase agreement and (iii) establish cure costs for the executory contracts and unexpired leases to be assumed and assigned to the Stalking Horse Bidder. Further details regarding the selection of the Stalking Horse Bidder(s) and the procedures in general are included in the Sale Procedures.

39. Pursuant to Local Rule 9013-2(a), the Procedures Motion is verified and is accompanied by a Memorandum, Proposed Order and proof of service.

40. Pursuant to Local Rule 9013-2(c), the Debtors give notice that it may, if necessary, call Robert Hersch of Mastodon Ventures Inc., the Debtors' proposed investment banker, whose business address is 515 Congress Avenue, Suite 1400, Austin, TX 78701, and Joseph Geraghty of Conway Mackenzie Company, the Debtors' financial advisor, whose business address is 109 North Main St., 500 Performance Place, Dayton, OH 45402, to testify regarding the facts set out in the Procedures Motion.

WHEREFORE, the Debtors request that the Court enter an order (a) establishing the Sale Procedures set forth in Exhibit A and (b) granting such other and further relief as is necessary and proper.

FREDRIKSON & BYRON, P.A.

Dated:  January 7, 2011

 _/s/ Douglas W. Kassebaum_____
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
ccutler@fredlaw.com
dkassebaum@fredlaw.com

– and –

McDONALD HOPKINS LLC

Shawn M. Riley (OH 0037235)
Scott N. Opincar (OH 0064027)
Michael J. Kaczka (OH 0076548)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Phone (216) 348-5400
Fax (216) 348-5474
sriley@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com

CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

## VERIFICATION

I, Robert Hersch, am the proposed investment banker for Duke and King Acquisition Corp. and Duke and King Missouri, LLC. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: January 7, 2011         Signed: _____

                                          Robert Hersch

## <u>VERIFICATION</u>

I, Joseph Geraghty, am the financial advisor of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: January 7, 2011          Signed: _____
                                        Joseph Geraghty

**EXHIBIT A**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## SALE AND BIDDING PROCEDURES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

These sale and bidding procedures (the "Sale Procedures") shall govern the sale of substantially all of the operating assets of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. The Debtors contemplate that the composition of the sale of their assets may take various forms, including, but not limited to sales to one purchaser or the sales of different groupings of assets to multiple purchasers.

By motion (the "Procedures Motion"), dated January 7, 2011, the above-captioned debtors and debtors in possession (collectively, the "Debtors") sought, among other things, approval of these Sale Procedures governing the process and procedures for the sale of substantially all of the Debtors' operating assets through two separate auctions. On January __, 2011, the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), entered an order approving these Sale Procedures (the "Procedures Order"). Pursuant to the Procedures Order, the Bankruptcy Court has scheduled a hearing (the "Sale Hearing") **on March 31, 2011, at 9:00 a.m. (Central Time),** to consider the sales.

I.     <u>**Assets to Be Sold**</u>

The assets to be sold consist of the Debtors' 87 BURGER KING® franchise locations and related assets situated in the states of Minnesota, Illinois, Missouri, Wisconsin, Kansas and Iowa (each restaurant, an "Individual Restaurant" and collectively, the "Sale Assets").

Any Potential Bidder (as defined herein) may obtain a detailed description of each Individual Restaurant through the process described in Section III below entitled "Due Diligence."

The Debtors may sell Individual Restaurants in bulk or in piecemeal through two separate groupings described below, such decisions being made to maximize the value to be paid by the successful bidder(s) for the Sale Assets. Accordingly, Potential Bidders may submit bids to purchase any Individual Restaurant, all of the Sale Assets, or any subset of the Sale Assets, subject to the Group One Restaurants/Group Two Restaurants split as set forth below.

The Debtors will have a form of asset purchase agreement (in each case, the "APA") to consummate the transactions contemplated. The APA will include the terms and conditions upon which the Debtors expect (subject to reasonable revisions by the Qualified Bidders (as defined herein)) the Sale Assets to be sold.

Pursuant to these Sale Procedures and 11 U.S.C. § 363, the Sale Assets will be sold free and clear of all liens, claims, encumbrances and interests, other than liabilities expressly assumed. Bank of America, N.A. ("BofA") has agreed not to object to any sales that are consummated in accordance with the terms of these Sale Procedures, including, without limitation, objections under 11 U.S.C. § 363(f); except that BofA reserves the right to object to any sale that, in the judgment of BofA, is (i) not consummated in accordance with these procedures, (ii) does not represent the highest and best price when compared with other bids, or (iii) is not a bona fide arms' length transaction. BofA further reserves the right to object to the Debtors' determinations regarding Qualified Bidders (as defined herein) (including, without limitation, the designation of Qualified Bidders, whether deficiencies in bids have been cured and the waiver of any condition precedent to becoming a Qualified Bid set forth in the Sale Procedures); the selection of any Stalking Horse Bidder(s) (as defined herein); the payment of any Stalking Horse Protection Fees (as defined herein); the Debtors' selection of the Baseline Bid (as defined herein); any modifications or adjournments to the Group One Auction (as defined herein); or any modification of the Sale Procedures without BofA's consent.

The Sale Assets will be sold without warranty or representation of any kind or nature, and are being purchased by the Successful Bidder(s) (as defined herein) on an "As Is, Where Is" basis and are being sold "Without Faults."

## II.  **Segregation of Restaurant Locations**

The Sale Assets shall be split into two groups: (i) 74 Individual Restaurants located on Schedule 1 to these Sale Procedures (collectively, the "Group One Restaurants"); and (ii) 13 Individual Restaurants located on Schedule 2 to these Sale Procedures (collectively, the "Group Two Restaurants"). The Group One Restaurants and the Group Two Restaurants will be marketed simultaneously pursuant to these Sale Procedures. If a Potential Bidder for the Sale Assets desires to make a bid for all or a portion of the Group One Restaurants and for all or a portion of the Group Two Restaurants, the Potential Bidder must separately designate the amount it is bidding for the Group One Restaurants and the Group Two Restaurants; provided, however, that any such Potential Bidder shall not submit a bid on the Group One Restaurants that is

contingent upon, tied to or in any other way a combined offer for any Group Two Restaurants. The Group One Restaurants and the Group Two Restaurants will be auctioned separately and the Group One Restaurants will be auctioned first.

III.   **Due Diligence**

Until the Bid Deadline (as defined below), the Debtors will afford to each interested party (i) determined by the Debtors to be reasonably likely to make a Qualified Bid (defined below), and (ii) who delivers an executed confidentiality agreement in form and substance satisfactory to the Debtors (each, a "Potential Bidder") reasonable access, during normal business hours and subject to confidentiality requirements, to the books and records of the Debtors reasonably requested by such Potential Bidder, including access to the Debtors' designated due diligence website, to the extent provision of such access or information is not prohibited by applicable law and relates to the Sale Assets. The Debtors will furnish (subject to applicable law) as promptly as practicable to such Potential Bidder any and all such information as such Potential Bidder may reasonably request related to the Sale Assets.

Burger King Corporation ("BKC") is the Debtors' franchisor. In the event that a Potential Bidder's bid is contingent upon being approved as a BKC "approved operator", such Potential Bidder is advised to contact a representative of BKC to discuss and negotiate such Potential Bidder's status as an "approved operator." The BKC representative's information is available upon request to Robert Hersch at Mastodon Ventures, Inc. ("Mastodon"), the Debtors' investment banker, by phone at 512.498.1212 or via email at rhersch@mastodonventures.com.

IV.   **Initial Determinations by the Debtors**

The Debtors shall (a) determine (with the assistance of their respective financial advisors and investment banker) whether any person or entity is a Potential Bidder; (b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Sale Assets; (c) receive bids from Qualified Bidders; (d) select a stalking horse bidder or bidders; and (e) negotiate and enter into one or more asset purchase agreements with one or more Qualified Bidder(s) (collectively, the "Bidding Process").

Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Sale Assets to any person or entity who is not a Potential Bidder and who does not comply with the participation requirements below.

V.   **Bid Deadline**

A Qualified Bidder that desires to make a bid shall deliver written and electronic copies of such bid to the Debtors' investment banker, Mastodon Ventures, Inc., Attention: Robert Hersch, 515 Congress Ave., Suite 1400, Austin, TX 78701, email: rhersch@mastodonventures.com, so as to be received by no later than **5:00 p.m. (Central Time) on or before March 22, 2011** (the "Bid Deadline"). The Debtors' attorneys will send copies any bids to counsel for BofA, BKC and the Official Committee of Unsecured Creditors (the

"Committee") within 24 hours of receipt of such bid.

## VI.    **Determination of "Qualified Bidder" Status**

Any Potential Bidder desiring to participate in the Bidding Process must be deemed a "Qualified Bidder." To be deemed a Qualified Bidder, a Potential Bidder must deliver to the parties set forth in Section V above the most current audited (if available) and the latest unaudited financial statements and/or financial information evidencing the Potential Bidder's ability to close the transaction that meets the Debtors' satisfaction or such other information as reasonably determined by the Debtors to support the Potential Bidder's ability to close the transaction.

Upon the Debtors' determination that a party is a Qualified Bidder, the Debtors shall provide each Qualified Bidder with access to all relevant business and financial information necessary to enable such Qualified Bidder to evaluate the Sale Assets, for the sole purpose of submitting an offer.

## VII.    **Requirements of a "Qualified Bid"**

To be deemed a "Qualified Bid" that may be considered at the Group One Auction or the Group Two Auction (as defined in Section XI and Section XII below), a bid must:

a.    be in writing;

b.    be submitted by a Qualified Bidder;

c.    identify clearly the Group One Restaurants and/or Group Two Restaurants that are included in the purchase and related segregated purchase price for the Group One Restaurants and the Group Two Restaurants, if applicable;

d.    provide that the purchase price shall be paid in full in cash upon closing;

e.    be accompanied by a cash deposit equal to 10% of the proposed purchase price (such cash deposit will be applied to the purchase price);

f.    confirm the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the proposed transaction;

g.    be irrevocable until the earlier of (i) the Qualified Bidder's bid being determined by the Debtors not to be a Qualified Bid, or (ii) another Qualified Bidder's bid for (some or all of) the same assets being approved by the Bankruptcy Court;

h.    be accompanied by a fully executed APA (and demonstrating any modifications as necessary) and such Qualified Bidder's terms relating to the assumption of any executory contracts or unexpired leases, operating liabilities relating to the Group One Restaurants and/or the Group Two Restaurants to be purchased;

i.      designate all executory contract and unexpired leases the Qualified Bidder seeks to have assumed and assigned to it;

j.      indicate (i) whether the Debtors or the Qualified Bidder is responsible for payment of "cure costs" for executory contracts and unexpired leases to be assumed and assigned, (ii) the source of the funds for payment of such amounts, and (iii) the amount that the Qualified Bidder believes is required to be paid in order to consummate its transaction;

k.      demonstrate the capacity to provide adequate assurance of future performance under all executory contracts and unexpired leases that are being assumed and assigned;

l.      not contain any financing contingencies of any kind, including but not limited to (i) evidence that such Qualified Bidder (and any related guarantors has financial resources readily available sufficient in the aggregate to finance the purchase of the Sale Assets (either some or all), (ii) evidence that such Qualified Bidder (and any related guarantor) has the ability to provide adequate assurance of future performance under any unexpired leases and executory contracts, and (iii) evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms provided in the APA;

m.      to the extent a Qualified Bidder intends to operate as a BURGER KING® franchisee, provide evidence of the BKC Approval (defined in Section VIII below) to become an authorized operator of BURGER KING® franchises or evidence that a Request for BKC Approval remains pending; and

n.      be accompanied by an affirmative statement from such Qualified Bidder that it will be and completely comply with these Sale Procedures.

For the avoidance of doubt, any party that submits a bid for all or a portion of the Group One Restaurants and all or a portion of the Group Two Restaurants shall provide a separate allocation for the amount of the consideration to be paid under such bid between the Group One Restaurants and the Group Two Restaurants. Such allocation shall be due no later than the Bid Deadline.

The Debtors will make a determination regarding whether a bid is a Qualified Bid and shall notify all Qualified Bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (Central Time) on March 24, 2011. The Debtors reserve the right to reject any bid on any grounds. Notwithstanding anything contained in this Section VII, should a Qualified Bidder fail to meet the qualifications to become a Qualified Bid, the Debtors may allow a Qualified Bidder who has failed to meet the requirements of a Qualified Bid an additional 24 hours to cure any deficiencies to such bid.

The Debtors reserve the right, subject to consultation with BofA and the Committee, to waive compliance with any identified requirement for a bid to become a Qualified Bid; provided, however, BKC's approval process set forth in Section VIII below cannot be waived.

## VIII.  **BKC Approval Process**

If a Qualified Bid is contingent on the Qualified Bidder being a BKC "approved operator", such Qualified Bidder must deliver to BKC a written request for approval to become an authorized operator of a BKC franchise (a "Request").  Such Request shall include all relevant financial information and relevant documentation required by BKC for making a determination as to whether such Qualified Bidder may become an authorized operator of a BURGER KING® franchise.  In considering a Request, BKC shall apply the standards consistent with its normal business practice for approval or rejection of such requests as set forth on Schedule 3 to these Sale Procedures (collectively referred to as a "BKC Approval").

Upon receiving a Request from a Qualified Bidder, BKC shall use its reasonable best efforts to deliver to such Qualified Bidder a letter indicating BKC Approval prior to the Bid Deadline.

Nothing in these Sale Procedures shall impair, affect or waive any (i) right of first refusal available to BKC in connection with its BURGER KING® franchise agreements; and (ii) BKC's right to object to any sale and/or assumption and assignment of BKC's franchise agreements or BKC's leases, all such rights preserved to BKC through the Sale Hearing.

## IX.  **Stalking Horse Bidder(s)**

Although the Debtors have had discussions with parties interested in submitting bids to purchase the Sale Assets (both as Individual Restaurants and in total) on a stalking horse basis (in each instance, a "Potential Stalking Horse Bidder"), the Debtors have not yet determined whether they will enter into stalking horse bid arrangements or identified any specific Potential Stalking Horse Bidder(s) for any of the Sale Assets to serve as an actual stalking horse bidder for any of the Sale Assets (in each case, as identified, a "Stalking Horse Bidder").

The Debtors will continue to consider whether to enter into stalking horse bid agreements, selecting one or more Stalking Horse Bidder(s) and which parties to serve as the Stalking Horse Bidder(s).  Any party seeking such consideration should immediately contact the Debtors' investment bankers, Mastodon, to express such interest.  Any party seeking designation as a Stalking Horse Bidder shall be required to (i) have received the BKC Approval, (ii) submit a bid (in each instance, a "Stalking Horse Bid"), (iii) agree to an APA memorializing the transaction such party proposes (in each instance, a "Stalking Horse APA"), and (iv) provide a list of all executory contracts and unexpired leases to be assumed and assigned.  The Debtors may name Stalking Horse Bidder(s).  To the extent that the Debtors name Stalking Horse Bidder(s), the Debtors will do so on a rolling basis as Stalking Horse Bids are submitted, negotiated and agreed to.  The Debtors will consider proposed Stalking Horse Bids initially through February 28, 2011, with the expectation of naming a Stalking Horse Bidder or Stalking Horse Bidders no later than March 7, 2011.  To the extent that any of the Sale Assets are not

included in a Stalking Horse Bid, the Debtors reserve the right to identify Stalking Horse Bid(s) after March 7, 2011. The Debtors also reserve the right to name a Stalking Horse Bidder(s) for any Individual Restaurants or for all of the Sale Assets (subject to the Group One and Group Two split).

Each Stalking Horse Bid, memorialized by Stalking Horse APA(s), shall be subject to higher and better bids. As noted in Section XI of these Sale Procedures, the Debtors may negotiate a break-up fee and reimbursement of reasonable expenses (the "Stalking Horse Protection Fee"). The Debtors shall be under no obligation to designate and name a Stalking Horse Bidder or accept any Stalking Horse Bid(s) for any or all of the Sale Assets.

X.      **Negotiation of Stalking Horse Protection Fee(s)**

In the event that a Stalking Horse Bidder) is named and designated, the Debtors may negotiate a reasonable Stalking Horse Protection Fee payable to such Stalking Horse Bidder in the event that such Stalking Horse Bidder are not the Successful Bidder (whether as initial Successful Bidder or as successor as a Reserve Bidder). The Stalking Horse Protection Fee shall be approved by the Bankruptcy Court. At the Group One Auction or the Group Two Auction, as the case may be, any Qualified Bidder wishing to enter a bid in excess of the Stalking Horse Bid must enter an amount equal to the Stalking Horse Bid plus the Stalking Horse Protection Fee, plus any minimum bid amount to advance their bid(s).

If a Stalking Horse Bidder is identified and named in accordance with these Sale Procedures, the Debtors shall file a motion with the Court (in each case, a "Stalking Horse Motion") naming the Stalking Horse Bidder, seeking expedited approval of the Stalking Horse APA and Stalking Horse Protection Fee. Mastodon will contact all parties that have expressed an interest (in writing or otherwise) in any portion of the Sale Assets being purchased under the respective Stalking Horse APA and provide such parties with a copy of the Stalking Horse Motion and a copy of the respective Stalking Horse APA.

XI.     **Group One Auction Process**

In the event that the Debtors receive more than one Qualified Bid for all or a portion of the Group One Restaurants, the Debtors will conduct an auction (the "Group One Auction") for the Group One Restaurants. The Group One Auction will take place at **10:00 a.m. (Central Time) on March 28, 2011** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than March 24, 2011.

The Debtors will have the right to publish detailed procedures consistent with these Sale Procedures for the conduct at the Group One Auction at any time prior to the start of the Group One Auction. Parties entitled to attend the Group One Auction shall include the Debtors, BofA, the Committee, BKC, the Qualified Bidders and the Stalking Horse Bidder(s) (if any), and each of those parties' representatives. The Stalking Horse Bidder and each Qualified Bidder shall appear at the Group One Auction in person, or through a representative who provides appropriate evidence of such person's authority. Only a Qualified Bidder who has timely submitted a

Qualifying Bid, and the Stalking Horse Bidder(s) (if any), shall be entitled to make bids at the Group One Auction.

In the event that a Stalking Horse Bidder is not selected prior to the Group One Auction and no Stalking Horse Bid(s) are tendered, the Debtors will select the highest and best bid or bids (a "Baseline Bid") to serve as the negotiating point with the other Qualified Bidders at the Group One Auction. There may be more than one Baseline Bid if the Debtors determine that multiple Baseline Bids for less than all of the Group One Restaurants are higher and better than one Baseline Bid. The Debtors reserve the right to aggregate bids for Individual Restaurants and compare such aggregated bids with bids for all of the Group One Restaurants in determining the then current best bid.

As soon as practicable, the Debtors will provide all Qualified Bidders, BofA, BKC and the Committee with a copy of the Baseline Bid(s). At the Group One Auction, Qualified Bidders will be permitted to revise, increase, and/or enhance their bid(s) based upon the terms of the Stalking Horse Bid or the Baseline Bid(s), as the case may be (except to the extent otherwise authorized by the Debtors). All Qualified Bidders will have the right to make additional modifications to the APA at the Group One Auction.

The Group One Auction will be conducted in rounds and in any order the Debtors determine. At the end of every round, the Debtors shall declare the highest and best bid or bids at that time for the assets under consideration pursuant to the Baseline Bid(s). Each Qualified Bidder shall have the right to continue to improve its respective bid at the Group One Auction. The initial minimum overbid shall be the Baseline Bid established prior to the Group One Auction plus the lesser of 10% of the Baseline Bid or $200,000 (the "Initial Overbid"). Thereafter, Qualified Bidders may increase their Qualified Bids in any manner that they deem fit; provided, however, that each subsequent increase must include a minimum of the lesser of 5% of the Baseline Bid or $100,000 in additional consideration. The Debtors reserve the right to approach any Qualified Bidder(s) and seek clarification to bids at any time, including without limitation, inviting Qualified Bidder(s) to communicate with other Qualified Bidder(s) if such communication would be beneficial to the Group One Auction.

The Group One Auction will continue with the Qualified Bidders until the Debtors determine, and subject to Bankruptcy Court approval, that they have received the highest and best offer for the Group One Restaurants (either as a whole or in certain portions) from the Qualified Bidders or the Stalking Horse Bidder(s) (the "Successful Bid") and the next highest and best Qualified Bid submitted at the Group One Auction (a "Reserve Bid"). The Qualified Bidder(s) submitting the Successful Bid(s) shall become a "Successful Bidder(s)," and the Qualified Bidder(s) submitting the Reserve Bid(s) shall become a "Reserve Bidder(s)." The Successful Bidder(s) and the Reserve Bidder(s) may be named for individual Group One Restaurants or for all of the Group One Restaurants, or any combination thereof, as determined by the Debtors. In making this decision, the Debtors shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the particular groupings of Group One Restaurants, the Qualified Bidder's ability to close a transaction and the timing thereof, the type and nature of the APA, its requirements as to the assumption and assignment of

executory contracts, licenses, and unexpired leases relating to the Group One Restaurants, and the net benefit to the Debtors' estates.

The Debtors' procedures for the Group One Auction require the following: (i) if a Stalking Horse Bidder(s) is selected prior to the Group One Auction, the initial overbid by a Qualified Bidder(s) shall be greater than the sum of (a) the Stalking Horse Protection Fee, and (ii) the Initial Overbid. If there is no Stalking Horse Bidder(s) selected prior to the Group One Auction, no Stalking Horse Protection Fee(s) will be awarded and the initial overbid amount will not include such an amount.

The Debtors reserve the right, in their business judgment, to make one or more modifications and/or adjournments to the Group One Auction to, among other things: (i) facilitate discussions between the Debtors, on the one hand, and individual Qualified Bidders, on the other hand; (ii) allow individual Qualified Bidders to consider how they wish to proceed; and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their business judgment may require.

In the event that a Qualified Bidder's Successful Bid or Reserve Bid materially changes as a result of the Group One Auction, such Qualified Bidder may need to seek additional approvals from BKC beyond such Qualified Bidder's initial BKC Approval.

## XII.    **Group Two Auction Process**

In the event that the Debtors receive more than one Qualified Bids for all or a portion of the Group Two Restaurants, the Debtors will conduct an auction (the "Group Two Auction") for the Group Two Restaurants. The Group Two Auction will take place, subject to the Debtors' discretion, either immediately following the closing of the Group One Auction or at **10:00 a.m. (Central Time) on March 29, 2011,** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than March 24, 2011.

All of the procedures set forth in Section XI of these Sales Procedures relating to the Group One Auction shall be expressly applicable to the Group Two Auction; provided, however, that a Qualified Bidder(s) bidding on the Group One Restaurants that has also submitted a Qualified Bid(s) for the Group Two Restaurants shall not withdraw such bid regardless of such Qualified Bidder's success or lack of success at the Group One Auction.

## XIII.    **The Sale Hearing**

At the Sale Hearing, which will be held **on March 31, 2011, at 9:00 a.m. (Central Time)**, the Debtors will seek entry of an order or orders authorizing and approving the sale(s) to the Successful Bidder(s) for the Group One Restaurants and/or Group Two Restaurants. No later than one business day prior to the Sale Hearing, all objections to the relief requested at the Sale Hearing shall be filed and served in the manner prescribed in the motion to approve the sale of the Group One Restaurants and the Group Two Restaurants. The Sale Hearing may be adjourned or rescheduled from time to time. The Debtors shall provide notice of such adjournment or rescheduling to: (i) the U.S. Trustee; (ii) counsel to BofA; (iii) counsel to the Committee; (iv)

counsel to BKC; (v) all Qualified Bidders; (vi) all parties that have filed a timely objection to the sale; (vii) all persons or entities known or reasonably believed to have asserted a lien in any of the Sale Assets; and (viii) all parties that have requested notice in the Debtors' bankruptcy cases.

XIV.   **Failure to Consummate Purchase**

Following the Sale Hearing, if the Successful Bidder(s) fail to consummate the closing of the sale because of a breach or failure to perform on the part of such Successful Bidder(s), the Debtors will be authorized, but not required, to consummate the sale with Reserve Bidder(s) without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. Additionally, the Debtors shall be entitled to seek all available damages from the defaulting Successful Bidder.

XV.   **Return of Deposit**

The deposits of the Successful Bidder(s) shall be applied to the Successful Bidder's obligations under the Successful Bid upon closing of the transactions contemplated thereby. If a Successful Bidder fails to close the transactions contemplated by the Successful Bidder then such Successful Bidder shall forfeit its deposit (and any right to any Stalking Horse Protection Fee, if applicable).

The deposit(s) of the Reserve Bidder(s) shall be returned to the Reserve Bidder(s) upon closing of the transactions contemplated by the Successful Bidder(s); provided, however, that if a Successful Bidder fails to close the transactions when and as provided in the Successful Bid, then the deposit of the Reserve Bidder(s) shall be applied to the Reserve Bidder's obligations under the Reserve Bid upon closing of the transactions contemplated thereby. If a Reserve Bidder fails to close the transactions contemplated by a Reserve Bid, then such Reserve Bidder shall forfeit its deposit.

All other deposits of Qualified Bidders who are not the Successful Bidder(s) or the Reserve Bidder(s) shall be returned within three business days after the conclusion of the Group One Auction or the Group Two Auction, as the case may be.

The Debtors reserve all of their rights regarding any return of deposits, and the failure by the Debtors to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

XVI.   **Modification of Amended Sale Procedures**

The Debtors may amend these Sale Procedures, in their reasonable business judgment, at any time in any manner that will best promote the goals of the Bidding Process, including but not limited to extending or modifying any of the dates described herein. Notwithstanding the foregoing, the Debtors may modify the requirements set forth in Section II of these Sale Procedures only (i) with the consent of BofA or (ii) pursuant to an order of the Bankruptcy Court.

XVII.  **Miscellaneous**

BofA shall be entitled to exercise its right under 11 U.S.C. § 363(k) at the Group One Auction or the Group Two Auction (as the case may be) to credit bid the indebtedness owed to BofA.  For the purpose of these Sale Procedures, BofA shall be deemed a Qualified Bidder and shall be entitled to participate in the Group One Auction and the Group Two Auction if BofA's bid complies with all of the provisions of these Sale Procedures, subject to the following modifications: (i) with respect to the cash deposit required under Section VII(e) of these Sale Procedures, BofA shall deposit cash equal to 10% of the cash component (if any) of the bid; and (ii) with respect to Section VII(d) of these Sale Procedures, BofA need not provide that the credit bid portion of its purchase price be paid in cash at closing.  BofA need not provide for a cash deposit as to the credit component of its bid.

XVIII. **Debtors' Consultation with Key Parties**

In the context of these Sale Procedures, the Debtors will consult with BKC, BofA and the Committee with respect to issues relating to (i) designating a Qualified Bidder; (ii) determining whether a bid is a Qualified Bid; (iii) curing deficiencies to become a Qualified Bid; (iv) identifying any Stalking Horse Bid(s) and whether to accept any Stalking Horse Bid(s); (v) establishing procedures for the Group One Auction and the Group Two Auction; (vi) selecting the Baseline Bid(s); (vii) choosing the Successful Bid(s) and Reserve Bid(s); and (viii) modifying these Sale Procedures.

# SCHEDULE 1

## GROUP ONE RESTAURANTS

| | Store # | Address | City | State |
|---|---|---|---|---|
| 1 | 00111 | 18459 South Halsted Street | Glenwood | IL |
| 2 | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| 3 | 00437 | 1138 East State Street | Rockford | IL |
| 4 | 01060 | 1450 4th Street | Beloit | WI |
| 5 | 01227 | 935 W. Kearney | Springfield | MO |
| 6 | 01326 | 2434 11th Street | Rockford | IL |
| 7 | 01747 | 209 Norris Drive | Ottawa | IL |
| 8 | 01752 | 723 Shooting Park | Peru | IL |
| 9 | 01764 | 2655 East Washington | Madison | WI |
| 10 | 01888 | 2624 Milton Avenue | Janesville | WI |
| 11 | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| 12 | 02641 | 2011 E Main Street | Albert Lea | MN |
| 13 | 03232 | 3009 S. Campbell Avenue | Springfield | MO |
| 14 | 03475 | 2138 N. Glenstone Avenue | Springfield | MO |
| 15 | 03792 | 4980 South 76th Street | Greenfield | WI |
| 16 | 04009 | 14251 Nicollet Avenue | Burnsville | MN |
| 17 | 04043 | 229 West Kimberly Road | Davenport | IA |
| 18 | 04116 | 2651 County Road I | Mounds View | MN |
| 19 | 04122 | 5020 160th Street SE | Prior Lake | MN |
| 20 | 04151 | 1150 East Highway 13 | Burnsville | MN |
| 21 | 04201 | 5231 N Brady Street | Davenport | IA |
| 22 | 04297 | 4040 38th Avenue | Moline | IL |
| 23 | 04507 | 13840 Grove Drive | Maple Grove | MN |
| 24 | 04513 | 1077 S. Jefferson Avenue | Lebanon | MO |
| 25 | 04553 | 1501 NW 7th Street | Faribault | MN |
| 26 | 04857 | 822 Windsor Street | Sun Prairie | WI |
| 27 | 05012 | 2025 Northdale Blvd | Coon Rapids | MN |
| 28 | 05357 | 1022 Kings Highway Street | Rolla | MO |
| 29 | 05539 | 1101 S. Limit Avenue | Sedalia | MO |
| 30 | 05591 | 2535 Division Street | North St Paul | MN |
| 31 | 05713 | 1501 Weir Drive | Woodbury | MN |
| 32 | 05879 | 1830 Southwest Avenue | Freeport | IL |
| 33 | 06211 | 1222 Avenue of the Cities | East Moline | IL |
| 34 | 06270 | 8510 Edinburgh Center Drive | Brooklyn Park | MN |
| 35 | 06299 | 10801 Bloomington Ferry Road | Bloomington | MN |
| 36 | 06530 | 7051 Tenth Street North | Oakdale | MN |
| 37 | 06545 | 1022 E Blue Earth Avenue | Fairmont | MN |
| 38 | 06590 | 1215 Gun Club Road | White Bear Lake | MN |
| 39 | 06615 | 1318 Riverfront Drive | Mankato | MN |
| 40 | 07203 | 525 S. National Avenue | Springfield | MO |
| 41 | 07444 | 735 Bridge Street | Owatonna | MN |
| 42 | 07466 | 330 North Garden | Bloomington | MN |
| 43 | 07557 | 8501 Springbrook Drive NW | Coon Rapids | MN |
| 44 | 07937 | 2411 Center Drive | Hudson | WI |

|    | Store # | Address | City | State |
|----|---------|---------|------|-------|
| 45 | 08004 | 3333 Rice Street | Shoreview | MN |
| 46 | 08224 | 5105 Edina Industrial Blvd | Edina | MN |
| 47 | 08384 | 1911 S. Springfield Avenue | Bolivar | MO |
| 48 | 09081 | 1409 4th Street NW | Austin | MN |
| 49 | 09095 | 106 Ninth Avenue Circle South | Princeton | MN |
| 50 | 09256 | 255 Triangle Lane N Ste 2 | Jordan | MN |
| 51 | 09272 | PO 264    403 Fire Monument Road | Hinckley | MN |
| 52 | 09331 | 1317 Preacher Roe Blvd | West Plains | MO |
| 53 | 09332 | 5358 West Broadway Ave | Crystal | MN |
| 54 | 09366 | 400 Center Way | Janesville | WI |
| 55 | 09934 | 120 Meridian Drive | New Richmond | WI |
| 56 | 09993 | 10861 University Avenue NE | Blaine | MN |
| 57 | 09994 | 318 East Kraft Drive | Melrose | MN |
| 58 | 10234 | 7510 East State Street | Rockford | IL |
| 59 | 10239 | 244 Grand Avenue | St Paul | MN |
| 60 | 10284 | 695 7th Street East | St Paul | MN |
| 61 | 11049 | 3095 Gardner Edgewood Drive | Neosho | MO |
| 62 | 11243 | 1560 West 4th Street | Rush City | MN |
| 63 | 11254 | 9896 Norma Lane | Woodbury | MN |
| 64 | 11284 | 1500 Stinson Blvd NE | Minneapolis | MN |
| 65 | 11535 | 8481 SE Point Douglas Road | Cottage Grove | MN |
| 66 | 11682 | 38711 Tanger Drive | North Branch | MN |
| 67 | 11877 | 504 West Blackhawk Drive | Byron | IL |
| 68 | 12250 | 925 Washington Ave SE | Minneapolis | MN |
| 69 | 12281 | 2200 E. Austin Blvd | Nevada | MO |
| 70 | 12413 | 315 N. Massey Blvd | Nixa | MO |
| 71 | 12415 | 875 E. Highway 60 | Monett | MO |
| 72 | 12757 | 1287 N Main St | River Falls | WI |
| 73 | 13091 | 289 57th Avenue NE | Fridley | MN |
| 74 | 16573 | 2320 Route 34 | Oswego | IL |

# SCHEDULE 2

## GROUP TWO RESTAURANTS

|     | Store # | Address                | City        | State |
|-----|---------|------------------------|-------------|-------|
| 1   | 00106   | 901 North Lake Street  | Aurora      | IL    |
| 2   | 01558   | 1411 S. Range Line Road | Joplin     | MO    |
| 3   | 04111   | 3500 South Moorland Road | New Berlin | WI    |
| 4   | 04334   | 2423 Rockingham Road   | Davenport   | IA    |
| 5   | 05960   | 2001 Center Avenue     | Janesville  | WI    |
| 6   | 05971   | 1710 DeKalb Avenue     | Sycamore    | IL    |
| 7   | 06030   | 1011 W. Central Avenue | Carthage    | MO    |
| 8   | 06609   | 3020 E. Sunshine Street | Springfield | MO   |
| 9   | 07204   | 1699 W. Jackson Street | Ozark       | MO    |
| 10  | 08964   | 1220 E. Republic Road  | Springfield | MO    |
| 11  | 09744   | 1429 Main Street       | Parsons     | KS    |
| 12  | 11191   | 2789 Milwaukee Road    | Beloit      | WI    |
| 13  | 11751   | 808 S Illinois Avenue  | Republic    | MO    |

**SCHEDULE 3**

**DESCRIPTION OF BURGER KING CORPORATION'S APPROVAL PROCESS**

a.  <u>New Franchisee Approval Process</u>:  New franchisee candidates must obtain approval by all of the following:

  o  <u>Operations Review</u>:  Criteria includes: directly comparable experience in a multi-unit retail environment preferably in the restaurant sector.  Candidate must pass interviews with BKC's Franchise Operations leadership.

  o  <u>Legal Review</u>: Criteria include background checks.

  o  <u>Credit Review</u>: Criteria include reliable credit history.

  o  <u>Financial Review</u>: Criteria includes net worth of at least $1.5M or 3-5x the equity required to complete the targeted deal, whichever is greater.

  o  <u>Franchising Review</u>:  Franchisee must obtain approval of BKC's franchise leadership team.  Criteria includes alignment with BKC's franchising guiding principles, including a focus on growth via organic development and an understanding of BKC's policies on maximum restaurant count and contiguous geography.

b.  <u>Deal Approval</u>: Transfers of BURGER KING® restaurants are subject to case-by-case deal approval by BKC's Operations, Franchising, Legal and Finance groups.  Being approved to become a franchisee does not in any way give the approved candidate a path around this process.

c.  <u>Approval Process for Existing Franchisee Acquisitions</u>:  Existing franchisees seeking to acquire any particular set of existing BURGER KING® restaurants must obtain approval by all of the following:

  o  <u>Operations Review</u>:  BKC's Field Operations must support the buyer based on their operations track-record and organizational capacity.

  o  <u>Financial Review</u>:  The proposed buyer must demonstrate the financial capacity to handle the transaction in addition to any required capital expenditures.  Buyers must be current in all payments due to BKC.

  o  <u>Franchising Review</u>:  In general terms, the buyer must be aligned with all BKC goals and initiatives.  Check-points include whether the franchisee is compliant with all equipment and remodeling obligations in their existing business; whether the buyer has supported local marketing initiatives; and whether the buyer has developed new restaurants.  In addition, the acquisition will be reviewed for whether it is in the same geographical areas as the proposed buyer's existing base of operations; and whether it causes the buyer to be at or near the 100-restaurant ceiling.

*********************************************************************************

| In re: | **JOINTLY ADMINISTERED UNDER** |
|        | **CASE NO. 10-38652** |

DUKE AND KING ACQUISITION CORP.,                    Court File No. 10-38652

Debtors.

Court File Nos:

(includes:
Duke and King Missouri, LLC;                         10-38653 (GFK)
Duke and King Missouri Holdings, Inc.;               10-38654 (GFK)
Duke and King Real Estate, LLC;                      10-38655 (GFK)
DK Florida Holdings, Inc.)                           10-38656 (GFK)

Chapter 11 Cases
Judge Gregory F. Kishel

*********************************************************************************

## MEMORANDUM IN SUPPORT OF DEBTORS' MOTION FOR
## AN ORDER APPROVING SALE AND BIDDING PROCEDURES

*********************************************************************************

The Debtors submit this Memorandum in Support of Their Motion for an Order

Approving Sale and Bidding Procedures (the "Procedures Motion").[1]

### A.    Factual Background

The factual support for this Memorandum is set forth in the verified Procedures Motion

and may be supplemental by testimony at the hearing on the Procedures Motion.

### B.    Legal Argument

The Debtors request entry of any order that will establish (i) the auctions and sale

procedures governing the sale of substantially all of their assets, (ii) schedule a hearing to

approve the sale of substantially all of their assts to the bidder(s) that submit bids that are

---

[1] Capitalized term used, but not otherwise defined, have the meanings given to them in the Procedures Motion.

deemed the highest and best bids; and (iii) authorizing, but not directing, the Debtors to name a Stalking Horse Bidder.

**C.**     **The Sale Procedures Are an Appropriate Exercise of the Debtors' Business Judgment**

The Debtors believe that the Sale Procedures attached to the Procedures Motion as Exhibit A are in the best interest of their estates and all parties in interests.  As set forth more fully below, a sale pursuant to the Sale Procedures is essential and will result in a greater value to the Debtors' estates then a piecemeal liquidation.

To ensure that the Debtors can maximize the value of their assets, the Debtors have formulated the Sale Procedures in the context of the best way to sell 87 fast food restaurants located in six different states.  After receiving input from BofA and BKC and in consultation with their professional advisors, the Debtors have determined, in their business judgment, that the process and timeline set forth in the Sale Procedures provides the best and most efficient way to maximize sale value.  This process includes the segregation of the 87 restaurants into 74 Group One Restaurants and 13 Group Two Restaurants.  The segregation of the assets by these groups will enable the Debtors to consider bids on a level playing field while, at the same time, making sure that the bids on the assets will yield the highest possible offers.

Courts have made it clear that a debtor's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets from an estate.  See, e.g., Myers v. Martin (In re Martin), 91 F.3d 389, 395 (3d Cir. 1996) (citing Fulton State Bank v. Schipper (In re Schipper), 933 F.2d 513, 515 (7th Cir. 1991); Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 656-57 (Bankr. S.D.N.Y. 1992) (noting that overbid procedures and break-up fee arrangements that have been negotiated by a debtor are to be reviewed according to the deferential "business

judgment" standard, under which such procedures and arrangements are "presumptively valid"); In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (same).

The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. See, e.g., Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (in bankruptcy sales, "a primary objective of the Code (is to enhance the value of the estate at hand)"); Integrated Resources, 147 B.R. at 659 ("It is well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bag Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Products, Inc.), 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988).

To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. See, e.g., Integrated Resources, 147 B.R. at 659 (such procedures "encourage bidding and to maximize the value of the debtor's assets"); In re Financial News Network, Inc., 126 B.R. 152, 156 (Bankr. S.D.N.Y. 1991), ("court-imposed rules for the disposition of assets…[should] provide an adequate basis for comparison of offers, and [should] provide for a fair and efficient resolution of bankrupt estates").

In this instance, the Sale Procedures establish clear parameters through which the value of bids for the restaurants will be enhanced. By creating certainty and properly categorizing the assets to be sold, the Sale Procedures will increase the likelihood that the Debtors will receive the highest offers for the restaurants because they ensure a competitive and fair bidding process. Additionally, the Sale Procedures will enable the Debtors to review, analyze and compare all

bids received to determine which bid or bids, if accepted, would be in the best interests of the Debtors' estates and in the best interests of creditors. Finally, the Sale Procedures are consistent with other procedures previously approved under the relevant standards governing auction proceedings and bidding incentives in other bankruptcy proceedings. See Integrated Resources, 147 B.R. at 659; 995 Fifth Avenue Assocs., 96 B.R. at 28.

The Debtors have segregated the restaurant locations into the Group One Restaurants and the Group Two Restaurants in order to achieve a maximum sale price. Moreover, the Sale Procedures establish parameters under which the value of the Group One Restaurants and the Group Two Restaurants may be tested at separate auctions. Such procedures were developed in the context of each restaurant's store level profitability and attractiveness in the market. To otherwise have procedures that would combine bids for all of the restaurants would serve only to diminish the entire purchase price submitted by Qualified Bidders. Rather, the Sale Procedures incentivize buyers to make separate bids that adequately distinguish the Group One Restaurants from the Group Two Restaurants by separately allocating value. Separate auctions will be conducted to ensure that parties have a fair playing field in which to bid that also allows the Debtors to evaluate such bids effectively.

Therefore, the Sale Procedures are supported by ample business justification and are reasonable and appropriate under the circumstances of the Debtors' chapter 11 cases. The proposed Sale Procedures are designed to foster an open, competitive and fair sale process, while maximizing the value to the Debtors' estates and preserving opportunity for the Debtors, the Debtors' customers, creditors, vendors and employees. The Debtors respectfully request the Bidding Procedures be approved as fair and reasonable under the circumstances and authorize and direct the Debtors to proceed in accordance with them.

FREDRIKSON & BYRON, P.A.

Dated:  January 7, 2011

_/s/ Douglas W. Kassebaum_
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
ccutler@fredlaw.com
dkassebaum@fredlaw.com

– and –

McDONALD HOPKINS LLC

Shawn M. Riley (OH 0037235)
Scott N. Opincar (OH 0064027
Michael J. Kaczka (OH 0076548)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Phone (216) 348-5400
Fax (216) 348-5474
sriley@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com

CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION, CORP., | Court File No. 10-38652 |
| Debtors. | |
| (includes: | Court File Nos: |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

### CERTIFICATE OF SERVICE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Douglas W. Kassebaum, under penalty of perjury, states that on January 7, 2011, he caused to be served the following:

1.      Debtors' Motion for an Order Approving Sale and Bidding Procedures;

2.      Memorandum of Law in Support of Debtors' Motion for an Order Approving Sale and Bidding Procedures;

3.      Proposed Order; and

4.      Certificate of Service

by sending true and correct copies via ECF, electronic mail and by U.S. Mail to the parties listed on the attached service list.


Dated:  January 7, 2011                    */s/ Douglas W. Kassebaum*
                                           Douglas W. Kassebaum

4859579_1/062204.0888

Duke and King Acquisition Corp. and Related Debtors
Bky No. 10-38652
SERVICE LIST
Served via U.S. Mail except those parties whose contact information includes an e-mail address were served via e-mail

| _US Trustee and Other Required Parties_ |
| --- |

U.S. Trustee's Office
1015 US Courthouse
300 S Fourth St
Minneapolis MN 55415
ustpregion12.mn.ecf@usdoj.gov

U.S. Trustee's Office
1015 US Courthouse
300 South Fourth Street
Minneapolis MN 55415
michael.fadlovich@usdoj.gov

_Attorneys for Duke and King Acquisition Corp._
Michael J. Kaczka
Scott N. Opincar
Shawn M. Riley
McDonald Hopkins LLC
mkaczka@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
sriley@mcdonaldhopkins.com

IRS District Counsel
380 Jackson St, Ste 650
St Paul MN 55101-4804

Internal Revenue Service
Wells Fargo Place
30 E 7th St, Mail Stop 5700
St Paul MN 55101

MN Department of Revenue
Collection Enforcement
551 Bankruptcy Section
600 North Robert Street
PO Box 64447
St Paul MN 55101-2228

US Attorney
600 US Courthouse
300 S Fourth St
Minneapolis MN 55415

Minnesota Department of Economic
Security
332 Minnesota St, Ste E200
St. Paul MN 55101-1351

_Debtors_

Duke and King Acquisition Corp.
Attn: Becky Moldenhauer
12281 Nicollet Ave S
Burnsville, MN 55337
bmoldenhauer@dukeandking.com

| _Official Committee of Unsecured Creditors_ |
| --- |

The Coca-Cola Company
Attn: William Kaye
31 Rose Lane
East Rockaway, NY 1158

K-Two, LLC
Attn: Kathleen Kahn
3 Silver Queen Court
Park City, UT 84060

Gilbert Mechanical Contractors
Attn: Ed Dahlgren
4451 West 76th Street
Edina, MN 55435

Julie Oanh T. Nguyen
350 Santa Helena
Solana Beach, CA 92075

P&C Rental, LLP
P.O. Box 14366
Scottsdale, AZ 85267

| _Major Secured Creditors_ |
| --- |

_Attorneys for Bank of America_
Stephen M. Mertz
Michael R. Stewart
Michael F. Doty
Christopher J. Harayda
Faegre & Benson LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402-3901
SMertz@faegre.com
MStewart@faegre.com
MDoty@faegre.com
CHarayda@faegre.com

_Attorneys for Bank of America_
Wendy S. Walker
Jonathan K. Bernstein
Patrick D. Fleming
Annie C. Wells
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
wwalker@morganlewis.com
jbernstein@morganlewis.com
pfleming@morganlewis.com
awells@morganlewis.com

| _Meadowbrook Meat Company_ _d/b/a MBM Corp._ |
| --- |

c/o Larry B. Ricke
Ricke & Sweeney, PA
325 Cedar Street
St. Paul, MN 55101
rickel@srsg.net

| _Appearance Parties_ |
| --- |

_Attorneys for Burger King Corporation_
Paul J. Battista
Genovese Joblove & Battista, P.A.
100 Southeast Second Street, 44th Floor
Miami, FL 33131
pbattista@gjb-law.com

_Attorneys for Burger King Corporation_
Kenneth Corey-Edstrom
Larkin, Hoffman, Daly & Lindgren Ltd.
1500 Wells Fargo Plaza
7900 Xerxes Avenoue South
Bloomington, MN 55431-1194
kcoreyedstrom@larkinhoffman.com

_Attorneys for Pan-O-Gold Baking Co._
c/o John L. Greer
Hughes Mathews, PA
110 Sixth Avenue South, #200
P.O. Box 548
St. Cloud, MN 56302-0548
jgreer@hughesmathews.com

_Attorney for Bruce Swisshelm_
c/o Gordon B. Conn, Jr.
Carole Clark Isakson
Kalina, Wills, Gisvold & Clark PLLP
6160 Summit Drive, #560
Minneapolis, MN 55430
conn@kwgc-law.com
isakson@kwgc-law.com

_Reinhart Foodservice, LLC_
c/o Jeffrey D. Klobucar
Foley & Mansfield PLLP
250 Marquette Avenue, #1200
Minneapolis, MN 55401
jklobucar@foleymansfield.com

_Reinhart Foodservice, LLC_
c/o Thomas F. Blakemore
Winston & Strawn, LLP
35 West Wacker Drive
Chicago, IL 60601-9703
tblakemore@winston.com

Duke and King Acquisition Corp. and Related Debtors
Bky No. 10-38652
SERVICE LIST
Served via overnight mail except those parties whose contact information includes an e-mail address were served via e-mail

*Missouri Department of Revenue*
c/o Steven A. Ginther
Missouri Dept. of Revenue
General Counsel's Office
301 W. High Street, Room 670
P.O. Box 475
Jefferson City, MO 65105-0475
mn@dor.mo.gov

Duke Manufacturing Co.
Attn: Officer or Agent
2305 North Broadway
Saint Louis, MO 63102
Fax No. 314-231-5074

GreatAmerica Leasing Corporation
Attn: Officer or Agent
625 1st Street, SE, Suite 800
Cedar Rapids, IA 52401-2031
Fax No. 319-365-8607

Coca-Cola Financial Corporation
Attn: Amber Meyer
1410 SW Morrison St., #750
Portland, OR 97205
amber_meyer@leasedimensions.com

Warren Capital Corporation
Attn: Scott Shapiro
100 Rowland Way #205
Novato, CA 94945
Fax No. 415-892-7075

*The Lakes Adventure, LLC, f/k/a*
*The Lakes at Raintree Village, LLC*
c/o Eoin L. Kreditor
Friedman Stroffe & Gerard, P.C.
19800 MacArthur Blvd., #1100
Irvine, CA 92612
ekreditor@fsglawyers.com

*Mark and Helen Kim*
c/o Jane H. Park
John H. Kim
Mirae Law, LLC
1701 Golf Road, Suite 1-1106
Rolling Meadows, IL 60008
jane@miraelaw.com
johnkim@1012@gmail.com

*Travelers*
Travelers
Attn: Chantel Pinnock
Account Resolution
One Tower Square, 5MN
Hartford, CT 06183
Fax No. 877-399-8479

*Sunflower Square Shopping Center, LLC*
c/o Richard C. Salmen
Felhaber, Larson, Fenlon & Vogt, PA
220 South Sixth Street, #2200
Minneapolis, MN 55402
rsalmen@felhaber.com

*Angelo Cappas, Mary Cappas, Cappas*
*Family Limited Partnership and Pamela*
*Karabatsos*
c/o Steven C. Opheim
Dudley and Smith, PA
2602 US Bank Center
101 East Fifth Street
St. Paul, MN 55101
sopheim@dudleyandsmith.com

*Pooya Incorporated*
c/o Matthew R. Burton
Leonard, O'Brien, Spencer, Gale &
Sayre, Ltd.
100 South Fifth Street, #2500
Minneapolis, MN 55402
mburton@losgs.com

4859579_1/062204.0888

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## ORDER APPROVING SALE AND BIDDING PROCEDURES

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

This case came before the Court on the Debtors' Motion for an Order Approving Sale and Bidding Procedures (the "Procedures Motion").[1]

Based on the Procedures Motion, all the files, records and proceedings herein, the Court being advised in the premises:

## IT IS HEREBY FOUND AND DETERMINED THAT:[2]

1.     The Court has jurisdiction over the Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Procedures Motion.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. 7052.

2.     The Debtors have articulated good and sufficient reasons for approving the Procedures Motion.

3.     Due and proper notice of the Procedures Motion was provided and no other or further notice need be provided.

4.     The Sale Procedures, substantially in the form attached as <u>Exhibit A</u> to the Procedures Motion, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' assets.

5.     The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

**IT IS HEREBY ORDERED:**

1.     The Procedures Motion is granted to the extent set forth herein.

2.     All objections filed in response to the Procedures Motion are resolved as set forth herein and to the extent not resolved, are hereby overruled.

3.     The Sale Procedures, in the form attached as <u>Exhibit A</u> to the Procedures Motion, are hereby incorporated herein and approved in their entirety.

4.     The Debtors are authorized to conduct separate auctions for the sale of all or substantially all of their assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds in the same order and priority as existed at the commencement of the case, subject to a further hearing and final court approval following such auctions.

5.     As provided by Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon its entry.

6.      This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

Dated: _____, 2011          _____
                                          Gregory F. Kishel
                                          United States Bankruptcy Judge