**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

**************************************************************************

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | |
| | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

**************************************************************************

**OBJECTION OF THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS TO THE DEBTORS' MOTION FOR AN ORDER
APPROVING SALE AND BIDDING PROCEDURES**

**************************************************************************

The Official Committee of Unsecured Creditors (the "*Committee*"), appointed in the above-captioned jointly administered chapter 11 cases, by and through its undersigned counsel, submits this Objection (the "*Objection*") to the motion of Duke and King Acquisition Corp. and its affiliated debtor entities (collectively, the "*Debtors*") *Motion For An Order Approving Sale and Bidding Procedures* (the "*Sale Procedures Motion*"). In support of its Objection, the Committee states as follows:

<u>PRELIMINARY STATEMENT</u>

The Committee supports the Debtors' efforts to sale substantially all of their assets through an auction process, but the procedures (the "*Sale Procedures*") offered in the Sale Procedures Motion likely will not maximize the asset values without material modification.

Notably, the expedited sale schedule the Debtors propose may chill the auction process to the detriment of unsecured creditors, and the structure of the process may only benefit the Debtors' senior secured lender, Bank of America, N.A. ("*BofA*"), if not modified as set forth below. Additionally, the Committee should be actively involved in the sale process and given more than "consulting" rights for certain aspects of the process to ensure a robust and effective process. Finally, certain rights granted to BofA under the proposed Sale Procedures are highly problematic and may chill bidding or otherwise harme these estates. For these reasons, the Committee objects to the Sale Procedures as proposed.

That stated, the Committee does not oppose the sale of the Debtors' assets and, thus, would consent to a process that does not include the aforementioned objectionable aspects. As such, the Committee has prepared revised Sale Procedures, a copy of which are attached hereto as <u>Exhibit 1</u>, and submits that the proposed modifications afford unsecured creditors the most meaningful opportunity to recover something in these cases and for the Committee to best assist in the process.

<b><u>RELEVANT FACTUAL AND PROCEDURAL HISTORY</u></b>

**A.      The Commencement of the Debtors' Chapter 11 Cases.**

On December 4, 2010 (the "*Petition Date*"), the Debtors filed voluntary petitions for relief under chapter 11 of title 11 of the United States Code (the "*Bankruptcy Code*"). The Debtors' cases are jointly administered pursuant to this Court's Order authorizing the joint administration of the Debtors' cases. (*See* Dkt. No. 40).

The Debtors are operating their businesses and managing their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. The Debtors

currently operate 87 separate franchise locations: 37 in Minnesota, 19 in Missouri, 15 in Wisconsin, 3 in Iowa and 1 in Kansas.

**B.    The Debtors' Previous Sale Efforts and Proposed Sale Procedures.**

Prior to the Petition Date, on November 18, 2010, the Debtors engaged Mastodon Ventures Inc. ("*Mastodon*") as investment banker, to assist the Debtors in their efforts to market and sell substantially all of their operating assets (the "*Sale Assets*").  In furtherance of their sale efforts, the Debtors filed the Sale Procedures Motion on January 7, 2011, proposing to establish sale procedures for the Sale Assets to the highest and best bidder(s) in accordance with certain Sale Procedures set forth in Exhibit A to the Sale Procedures Motion.  The hearing on the Sale Procedures Motion is set for January 24, 2011.

Underlying the Sale Procedures is the Debtors' decision to divide its 87 remaining Burger King franchise restaurants into two groups.  Group One includes 74 individual restaurants, and Group Two includes 13 individual restaurants.  The Debtors indicate in the Sale Procedures Motion that Group Two restaurants contained financial impediments which would net a smaller return than those in Group One.  The Sale Procedures further require that, although the Debtors will auction both groups simultaneously, any bidder who wishes to bid on both Groups must bid separately for each set.  Additionally, the Debtors may sell the individual restaurants in bulk or in piecemeal through the two separate groupings.[1]

Pursuant to the Sale Procedures and section 363 of the Bankruptcy Code, the Debtors will sell the assets free and clear of all liens, claims, encumbrances and interests, other than liabilities

---

[1]    The Committee acknowledges that the Debtors and Burger King Corporation ("*BKC*") have been in discussion with respect to certain modifications to the proposed Sale Procedures, some of which the Committee believes may help enhance value and facilitate estate administration, such as the proposal to group restaurants by geographic location.  The Committee, however, expressly reserves its right to consider – and possibly oppose – any future revisions to the Sale Procedures as may be proposed by the Debtors in advance of the January 24, 2011 hearing on the Sale Procedures Motion.

expressly assumed. BofA has purportedly agreed not to object to any sale, unless, in BofA's judgment, one of the following occurs: (i) a sale is not consummated in accordance with the Sale Procedures; (ii) a sale does not represent the highest and best price when compared to other bids; or (iii) a sale is not a bona fide arms' length transaction.

In order to partake in the sale process, a bidder must be deemed qualified (a "*Qualified Bidder*"), as must the bid ("*Qualified Bid*"). To be deemed a Qualified Bidder, the bidder must deliver to the Debtors financial information supporting their ability to close the transaction. A Qualified Bid further requires, among other things, a 10% cash deposit of the purchase price, accompanied by a fully executed asset purchase agreement ("*APA")*, and, to the extent the Qualified Bidder intends to operate as a Burger King franchisee, evidence of the approval of the franchisor, BKC, or evidence that a request for BKC approval is pending. All bids are due by 5:00 pm on March 22, 2011. Additionally, pursuant to the Sale Procedures, BofA is deemed a Qualified Bidder and is entitled to exercise its right under section 363(k) of the Bankruptcy Code to credit bid the indebtedness owed to BofA in both auctions.

Prior to the auction, the Debtors will consider whether to enter into stalking horse bid agreements with one or more Stalking Horse Bidder(s). The Debtors anticipate naming any Stalking Horse Bidders by no later than March 7, 2011. The Stalking Horse Bidder(s) will set the baseline bid for each Group.

The Debtors propose to conduct the auction of Group One on March 28, 2011 and the auction of Group Two on March 29, 2011. Both auctions will be conducted in rounds and in any order the Debtors determine. According to the Sale Procedures, the initial minimum overbid shall be the baseline bid plus the lesser of 10% or $200,000.00. Each subsequent increase must

include the minimum of the lesser of 5% of the baseline bid or $100,000.00. The Sale Hearing on both Auctions will be held on March 31, 2011.

The Sale Procedures reserve the Debtors' right to modify the Sale Procedures in their reasonable business judgment with either the consent of BofA or pursuant to an order of this Court.

## OBJECTION

Pursuant to section 363(b)(1), "the Trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. § 363(b)(1). However, "[a]lthough the bankruptcy court need not turn every § 363(b) hearing into a mini-confirmation hearing, the bankruptcy court must not authorize a § 363(b) transaction if the transaction would effectively evade the 'carefully crafted scheme' of the chapter 11 plan confirmation process, such as by denying §§ 1125, 1126, 1129(a)(7), and 1129(b)(2) rights." *In re Gulf Coast Oil Corp.*, 404 B.R. 407, 422 (Bankr. S.D. Tex. 2009).

The Court has broad discretion in considering sales and bid procedures proposed for a specific case, *e.g.*, *In re Bethlehem Steel Corp.*, 2003 WL 21738964, at *8 (S.D.N.Y. July 28, 2003) (citing cases in which courts rejected some or all terms of proposed sale procedures), but its discretion should be guided by evidence as to what is likely to maximize value. *See e.g. Four B Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.)*, 107 F.3d 558, 564-565 (8th Cir. 1997); *see also Official Committee of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.)*, 147 B.R. 650, 659 (Bankr. S.D.N.Y. 1992) ("It is well-established principle of bankruptcy law that the . . . [debtors'] duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") *quoting Cello Bag*

*Co. Inc. v. Champion Int'l Corp. (In re Atlanta Packaging Products, Inc.*, 99 B.R. 124, 130 (Bankr. N.D. Ga. 1988).

The Committee objects to the Sale Procedures set forth in the Sale Procedures Motion on three primary grounds: (i) the lack of the Committee's meaningful involvement in the Sale Procedures; (iii) the extensive rights granted to BofA by the Sale Procedures; and (iii) that the schedule proposed by the Debtors is too short given the size and complexity of the Debtors and the need to more fully market their assets for sale.

**A.       The Committee Must Be Afforded Broader Participation in the Sale Process**

Although the Debtors' proposed Sale Procedures seek to include the Committee in certain aspects of the process, the Committee submits that the Debtors have not gone far enough in doing so.   Consequently, the Sale Procedures should not be approved unless modified in accordance with the Committee's proposed revisions, as attached hereto as Exhibit 1.

Sections 1102 and 1103 of the Bankruptcy Code establish the statutory grounds for the creation and authority of a creditors' committee.  This District has reasoned that:

> The creditors' committee is not merely a conduit through whom the debtor speaks to and negotiates with creditors generally.   On the contrary, it is purposely intended to represent the necessarily different interests and concerns of the creditors it represents.   It must necessarily be adversarial in a sense, though its relation with the debtor may be supportive and friendly.   There is simply no other entity established by the Code to guard those interests.   The committee as the sum of its members is not intended to be merely an arbiter but a partisan which will aid, assist, and monitor the debtor pursuant to its own self-interest.

*In re Daig Corp.*, 17 B.R. 41, 43 (Bankr. D. Minn. 1981).

The Sale Procedures afford BKC and BofA a substantial role in the sale process.  While the Committee certainly understands and supports the need for these parties involvement, the Committee submits that it should also be given a meaningful role in the sale process.  Indeed, as

currently drafted, the Sale Procedures only require the Debtors to "consult" with the Committee on certain aspects of the process, thus giving the Committee no real authority or meaningful role in the disposition of essentially all of the estates' assets.

The wide breadth of authority provided to BofA and BKC throughout the Sale Procedures is indicative of their influence in these cases, and to deprive the Committee of its right to advocate on behalf of the unsecured creditor body runs contrary to the Bankruptcy Code. The Committee, therefore, requests that the Sale Procedures be revised in accordance with the proposed amendments set forth in Exhibit 1.

**B.      The Sales Procedures Grant BofA Unnecessarily Extensive Rights**

The purpose of a sale under section 363 of the Bankruptcy Code is to maximize value for the entire estate, not just the secured lender.  Accordingly, "the § 363(b) movant should be prepared to prove, not just allege, why it is appropriate to provide extraordinary bankruptcy authority and remedies solely for the benefit of a party whose contract under state law does not provide those remedies and benefits." *In re Gulf Coast Oil*, 404 B.R. at 427.  Indeed, nothing in the Bankruptcy Code gives BofA the power to control the sale process. *See In re Lionel Corp.*, 722 F.2d 1063, 1070 (2d Cir. 1983) (stating "there must be some articulated business justification, *other than appeasement of major creditors*, for using, selling or leasing property out of the ordinary course of business . . . ." (emphasis added)).

In the present case, the Sale Procedures provide a clear advantage to BofA with its ability to credit bid its entire claim of approximately $11 million.  The Committee is in the process of evaluating the validity, priority and extent of BofA's security interests in the Debtors' assets, pursuant to which counsel for the Committee recently received thousands of pages of relevant documentation.  Although the Committee's evaluation remains ongoing, it has already identified

several potentially significant defects in BofA's alleged secured position, including its secured interest in the Debtors' cash and leasehold interests. Given the compressed timeframe for the sale process, allowing BofA to credit bid could effectively moot, or at the very least severely hinder, the Committee's potential challenges to BofA's alleged claims and liens.

Moreover, the Sale Procedures provide that BofA is already considered a Qualified Bidder. The Sale Procedures thus allow BofA to effectively foreclose on its collateral at no cost to the lender – all, of course, at a time when BofA's alleged claims and liens are under examination and may be subject to considerable dispute. In short, when coupled with a compressed sale schedule, the lack of a stalking horse bidder at present, and numerous requirements to becoming a Qualified Bidder, the Sale Procedures unfairly tilt in favor of BofA.

The Sale Procedures also unfairly allow BofA to control the sale process by allowing the lender to challenge the Debtors' determinations regarding Qualified Bidders, Stalking Horse Protection Fees, the selection of a Baseline Bid, the modification of or adjournment of the Group One Action or any modifications to the Sale Procedures without BofA's consent. The Sale Procedures are thus crafted to benefit one creditor (*i.e.,* BofA), rather than benefitting the estates as a whole. This Court should not sanction such a process.

## C. The Debtors Have Failed to Show Why This Court Should Approve the Proposed Accelerated Auction Process

The Committee recognizes the potential value of expediency in conducting a sale under section 363 of the Bankruptcy Code, but "[t]he need for expedition, however, is not a justification for abandoning proper standards." *Committee of Equity Security Holders v. Lionel Corp. (In re Lionel Corp.*), 722 F.2d 1063, 1071; *quoting Protective Committee for Independent Stockholders of TMT Trailer Ferry v. Anderson*, 390 U.S. 414, 450 (1968). Additionally, while

time is a factor in deciding whether to grant a motion to sell pursuant to 363(b), "[n]ot every sale is an emergency, and . . . the reliability of uncontested (and particularly the reliability of testimony that is not adequately cross-examined) is suspect." *See Gulf Coast Oil Corp.*, 404 B.R. at 423.

According to the Sale Procedures Motion and the proposed Sale Procedures, the Debtors have proposed the following accelerated scheduled:

| Milestone | Proposed Date | Number of Days after Bidding Procedures Hearing |
|---|---|---|
| Consideration of Stalking Horse Bids | Feb. 28, 2011 | 35 |
| Stalking Horse Bidder Named | March 7, 2011 | 42 |
| Bid Deadline | March 22, 2011 | 57 |
| Notice Given to Qualified Bidders | March 24, 2011 | 59 |
| Group One Auction | March 28, 2011 | 63 |
| Group Two Auction | March 29, 2011 | 64 |
| Hearing on Approval of Sales | March 31, 2011 | 66 |

The sale process should be as robust as possible and potential bidders must be afforded sufficient time to conduct due diligence and submit preliminary bid documents. Given the magnitude and complexity of the Debtors' business, the Committee submits that the timetable set forth above does not allow sufficient time for potential bidders to evaluate the Sale Assets or provide enough time for the Debtors to properly assess the value of all bids that are submitted. Additionally, the requirement that BKC approve prospective bidders in order for those parties to

continue operating each franchise as a Burger King restaurant, while understandably necessary, adds further delay and complexity to the process.

The Debtors' proposed schedule all but precludes the occurrence of any of the foregoing, and is too truncated to be meaningful in the context of these large and complex cases. Indeed, the schedule strongly suggests that the Debtors (and, upon information and belief, more likely BofA) are seeking an expeditious sale without regard to maximizing the value for the Sale Assets.

The Committee further submits that an extended sale process would not only allow for a more robust sale process, but would also allow the Debtors to generate additional revenue through ongoing operations. Upon information and belief, the winter months are traditionally sluggish in terms of cash flow for the Debtors, and the Debtors' cash flow will increase if they are still operating in the early months of Spring. If, however, the Sale Procedures are not changed, the Debtors will be auctioning their restaurants just as their revenues are posed to rise. Moreover, although the Debtors and BKC may challenge the extended sale process based upon additional royalty and advertising charges that will accrue if the sale process is extended, this reality fails to account for the fact that amounts owed to BKC are guaranteed by several insiders of the Debtors and, thus, the additional amounts due to BKC are recoverable from third parties.

The Sale Procedures Motion also states that their efforts to market and sell substantially all of their operating assets began in mid-November, 2011, but the actual marketing efforts that were undertaken are not disclosed in the Sale Procedures Motion. The Sale Procedures Motion further states that "the additional time to market the Sale Assets afforded under the Sale Procedures will result in the highest and best bids for the Sale Assets." The Sale Procedures Motion, however, does not contain sufficient information for the Committee to evaluate the

Debtors' prior marketing efforts, and the compressed schedule is insufficient to allow a robust and thorough marketing effort between now and the deadline for submitting bids.

## <u>CONCLUSION</u>

For the reasons set forth herein, the Committee respectfully requests that the Court deny the Sale Procedures Motion as proposed, and authorize the revised Sale Procedures proposed by the Committee, as attached hereto as <u>Exhibit 1</u>.

Dated:  January 20, 2011

**OFFICIAL COMMITTEE OF**
**UNSECURED CREDITORS OF DUKE**
**AND KING ACQUISITION CORP.**, *et al*.

By:   /s/ Aaron L. Hammer
      One of Its Attorneys

Aaron L. Hammer, Esq.
Richard S. Lauter, Esq.
FREEBORN & PETERS LLP
311 South Wacker Drive, Ste. 3000
Chicago, Illinois 60606-6677
Telephone: 312.360.6000
Facsimile:  312.360.6995
ahammer@freebornpeters.com
rlatuer@freebornpeters.com

and

Amy J. Swedberg, Esq.
MASLON EDELMAN BORMAN &
BRAND, LLP
330 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-4140
Telephone: 612.672.8200
Facsimile: 612.672.8397
amy.swedberg@maslon.com

# EXHIBIT 1

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

**************************************************************************

In re:                                                JOINTLY ADMINISTERED UNDER
                                                            CASE NO. 10-38652

DUKE AND KING ACQUISITION CORP.,                  Court File No. 10-38652

                          Debtors.
                                                        Court File Nos:
(includes:
Duke and King Missouri, LLC;                        10-38653 (GFK)
Duke and King Missouri Holdings, Inc.;              10-38654 (GFK)
Duke and King Real Estate, LLC;                     10-38655 (GFK)
DK Florida Holdings, Inc.)                           10-38656 (GFK)

                                                        Chapter 11 Cases
                                                      Judge Gregory F. Kishel

          *********************************************************
          **SALE AND BIDDING PROCEDURES**
          *********************************************************

These sale and bidding procedures (the "Sale Procedures") shall govern the sale of substantially all of the operating assets of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. The Debtors contemplate that the composition of the sale of their assets may take various forms, including, but not limited to sales to one purchaser or the sales of different groupings of assets to multiple purchasers.

By motion (the "Procedures Motion"), dated January 7, 2011, the above-captioned debtors and debtors in possession (collectively, the "Debtors") sought, among other things, approval of these Sale Procedures governing the process and procedures for the sale of substantially all of the Debtors' operating assets through two separate auctions. On January ___, 2011, the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), entered an order approving these Sale Procedures (the "Procedures Order"). Pursuant to the Procedures Order, the Bankruptcy Court has scheduled a hearing (the "Sale Hearing") on ~~March 31,~~ April 28, 2011, at ~~9:00~~ _____ a.**m. (Central Time),** to consider the sales.

I.    **Assets to Be Sold**

The assets to be sold consist of the Debtors' 87 BURGER KING® franchise locations and related assets situated in the states of Minnesota, Illinois, Missouri, Wisconsin, Kansas and Iowa (each restaurant, an "Individual Restaurant" and collectively, the "Sale Assets").

Any Potential Bidder (as defined herein) may obtain a detailed description of each Individual Restaurant through the process described in Section III below entitled "Due Diligence."

The Debtors may sell Individual Restaurants in bulk or in piecemeal through two separate groupings described below, such decisions being made to maximize the value to be paid by the successful bidder(s) for the Sale Assets. Accordingly, Potential Bidders may submit bids to purchase any Individual Restaurant, all of the Sale Assets, or any subset of the Sale Assets, subject to the Group One Restaurants/Group Two Restaurants split as set forth below.

The Debtors and the official committee of unsecured creditors (the "Committee" and together with the Debtors, the "Sale Proponents") will have a form of asset purchase agreement (in each case, the "APA") to consummate the transactions contemplated. The APA will include the terms and conditions upon which the ~~Debtors~~Sale Proponents expect (subject to reasonable revisions by the Qualified Bidders (as defined herein)) the Sale Assets to be sold.

Pursuant to these Sale Procedures and 11 U.S.C. § 363, the Sale Assets will be sold free and clear of all liens, claims, encumbrances and interests, other than liabilities expressly assumed. Bank of America, N.A. ("BofA") , the Debtors' senior secured lender, has agreed not to object to any sales that are consummated in accordance with the terms of these Sale Procedures, including, without limitation, objections under 11 U.S.C. § 363(f); except that BofA reserves the right to object to any sale that, in the judgment of BofA, is (i) not consummated in accordance with these ~~procedures~~Sale Procedures, (ii) does not represent the highest and best price when compared with other bids, or (iii) is not a bona fide arms' length transaction. ~~BofA further reserves the right to object to the Debtors' determinations regarding Qualified Bidders (as defined herein) (including, without limitation, the designation of Qualified Bidders, whether deficiencies in bids have been cured and the waiver of any condition precedent to becoming a Qualified Bid set forth in the Sale Procedures); the selection of any Stalking Horse Bidder(s) (as defined herein); the payment of any Stalking Horse Protection Fees (as defined herein); the Debtors' selection of the Baseline Bid (as defined herein); any modifications or adjournments to the Group One Auction (as defined herein); or any modification of the Sale Procedures without BofA's consent.~~

The Sale Assets will be sold without warranty or representation of any kind or nature, whether express or implied, and are being purchased by the Successful Bidder(s) (as defined herein) on an "As Is, Where Is" basis and are being sold "Without Faults."

II.    **Segregation of Restaurant Locations**

The Sale Assets shall be split into two groups: (i) 74 Individual Restaurants located on Schedule 1 to these Sale Procedures (collectively, the "Group One Restaurants"); and (ii) 13 Individual Restaurants located on Schedule 2 to these Sale Procedures

(collectively, the "Group Two Restaurants"). The Group One Restaurants and the Group Two Restaurants will be marketed simultaneously pursuant to these Sale Procedures. If a Potential Bidder for the Sale Assets desires to make a bid for all or a portion of the Group One Restaurants and for all or a portion of the Group Two Restaurants, the Potential Bidder must separately designate the amount it is bidding for the Group One Restaurants and the Group Two Restaurants; provided, however, that any such Potential Bidder shall not submit a bid on the Group One Restaurants that is contingent upon, tied to or in any other way a combined offer for any Group Two Restaurants. The Group One Restaurants and the Group Two Restaurants will be auctioned separately and the Group One Restaurants will be auctioned first.

III.  **Due Diligence**

Until the Bid Deadline (as defined below), the Debtors will afford to each interested party (i) jointly determined by the ~~Debtors~~Sale Proponents to be reasonably likely to make a Qualified Bid (defined below), and (ii) who delivers an executed confidentiality agreement in form and substance satisfactory to the ~~Debtors~~Sale Proponents (each, a "Potential Bidder") reasonable access, during normal business hours and subject to confidentiality requirements, to the books and records of the Debtors reasonably requested by such Potential Bidder, including access to the Debtors' designated due diligence website, to the extent provision of such access or information is not prohibited by applicable law and relates to the Sale Assets. The Debtors will furnish (subject to applicable law) as promptly as practicable to such Potential Bidder any and all such information as such Potential Bidder may reasonably request related to the Sale Assets.

Burger King Corporation ("BKC") is the Debtors' franchisor. In the event that a Potential Bidder's bid is contingent upon being approved as a BKC "approved operator", such Potential Bidder is advised to contact a representative of BKC to discuss and negotiate such Potential Bidder's status as an "approved operator." The BKC representative's information is available upon request to Robert Hersch at Mastodon Ventures, Inc. ("Mastodon"), the Debtors' investment banker, by phone at 512.498.1212 or via email at rhersch@mastodonventures.com.

IV.  **Initial Determinations by the Debtors**

The ~~Debtors~~Sale Proponents shall (a) determine (with the assistance of their respective financial advisors and investment banker) whether any person or entity is a Potential Bidder; (b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Sale Assets; (c) receive bids from Qualified Bidders; (d) select a stalking horse bidder or bidders; and (e) negotiate and enter into one or more asset purchase agreements with one or more Qualified Bidder(s) (collectively, the "Bidding Process").

Except as provided by applicable law or court order, neither the ~~Debtors~~Sale Proponents nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Sale Assets to any person or entity who is not a Potential

Bidder and who does not comply with the participation requirements below.

V. **Bid Deadline**

A Qualified Bidder that desires to make a bid shall deliver written and electronic copies of such bid to the Debtors' investment banker, Mastodon Ventures, Inc., Attention: Robert Hersch, 515 Congress Ave., Suite 1400, Austin, TX 78701, email: rhersch@mastodonventures.com, so as to be received by no later than **5:00 p.m. (Central Time) on or before ~~March 22,~~April 20, 2011** (the "Bid Deadline"). The Debtors' attorneys will send copies of any bids to counsel for BofA~~, BKC and the Official Committee of Unsecured Creditors (the "Committee")~~ and BKC within 24 hours of receipt of such bid.

VI. **Determination of "Qualified Bidder" Status**

Any Potential Bidder desiring to participate in the Bidding Process must be deemed a "Qualified Bidder." To be deemed a Qualified Bidder, a Potential Bidder must deliver to the parties set forth in Section V above the most current audited (if available) and the latest unaudited financial statements and/or financial information evidencing the Potential Bidder's ability to close the transaction that meets the ~~Debtors~~Sale Proponents' satisfaction or such other information as reasonably determined by the ~~Debtors~~Sale Proponents to support the Potential Bidder's ability to close the transaction.

Upon the ~~Debtors~~Sale Proponents' determination that a party is a Qualified Bidder, the Debtors shall provide each Qualified Bidder with access to all relevant business and financial information necessary to enable such Qualified Bidder to evaluate the Sale Assets, for the sole purpose of submitting an offer.

VII. **Requirements of a "Qualified Bid"**

To be deemed a "Qualified Bid" that may be considered at the Group One Auction or the Group Two Auction (as defined in Section XI and Section XII below), a bid must:

   a. be in writing;

   b. be submitted by a Qualified Bidder;

   c. identify clearly the Group One Restaurants and/or Group Two Restaurant that are included in the purchase and related segregated purchase price for the Group One Restaurants and the Group Two Restaurants, if applicable;

   d. provide that the purchase price shall be paid in full in cash upon closing;

   e. be accompanied by a cash deposit equal to 10% of the proposed purchase price (such cash deposit will be applied to the purchase price);

f.  confirm the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the proposed transaction;

g.  be irrevocable until the earlier of (i) the Qualified Bidder's bid being determined by the ~~Debtors~~Sale Proponents not to be a Qualified Bid, or (ii) another Qualified Bidder's bid for (some or all of) the same assets being approved by the Bankruptcy Court;

h.  be accompanied by a fully executed APA (and demonstrating any modifications as necessary) and such Qualified Bidder's terms relating to the assumption of any executory contracts or unexpired leases, operating liabilities relating to the Group One Restaurants and/or the Group Two Restaurants to be purchased;

i.  designate all executory contract and unexpired leases the Qualified Bidder seeks to have assumed and assigned to it;

j.  indicate (i) whether the Debtors or the Qualified Bidder is responsible for payment of "cure costs" for executory contracts and unexpired leases to be assumed and assigned, (ii) the source of the funds for payment of such amounts, and (iii) the amount that the Qualified Bidder believes is required to be paid in order to consummate its transaction;

k.  demonstrate the capacity to provide adequate assurance of future performance under all executory contracts and unexpired leases that are being assumed and assigned;

l.  not contain any financing contingencies of any kind, ~~including but not limited to~~and shall include (i) evidence that such Qualified Bidder (and any related ~~guarantors~~guarantor) has financial resources readily available sufficient in the aggregate to finance the purchase of the Sale Assets (either some or all), (ii) evidence that such Qualified Bidder (and any related guarantor) has the ability to provide adequate assurance of future performance under any unexpired leases and executory contracts, and (iii) evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms provided in the APA;

m.  to the extent a Qualified Bidder intends to operate as a BURGER KING® franchisee, provide evidence of the BKC Approval (defined in Section VIII below) to become an authorized operator of BURGER KING® franchises or evidence that a Request for BKC Approval remains pending; and

n.  be accompanied by an affirmative statement from such Qualified Bidder that it has and will ~~be and~~continue to completely comply with these Sale Procedures.

For the avoidance of doubt, any party that submits a bid for all or a portion of the Group One Restaurants and all or a portion of the Group Two Restaurants shall provide a separate allocation for the amount of the consideration to be paid under such bid between the Group One Restaurants and the Group Two Restaurants. Such allocation shall be due no later than the Bid Deadline.

The ~~Debtors~~Sale Proponents will make a determination regarding whether a bid is a Qualified Bid and shall notify all Qualified Bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (Central Time) on ~~March 24,~~April 22, 2011. The ~~Debtors~~Sale Proponents reserve the right to reject any bid on any grounds. Notwithstanding anything contained in this Section VII, should a Qualified Bidder ~~fail~~submit a bid that fails to meet the qualifications to become a Qualified Bid, the Debtors may allow a Qualified Bidder who has failed to meet the requirements of a Qualified Bid an additional 24 hours to cure any deficiencies to such bid.

The ~~Debtors~~Sale Proponents reserve the right, subject to consultation with BofA ~~and the Committee~~, to waive compliance with any identified requirement for a bid to become a Qualified Bid; provided, however, BKC's approval process set forth in Section VIII below cannot be waived.

VIII. **BKC Approval Process**

If a Qualified Bid is contingent on the Qualified Bidder being a BKC "approved operator", such Qualified Bidder must deliver to BKC a written request for approval to become an authorized operator of a BKC franchise (a "Request"). Such Request shall include all relevant financial information and relevant documentation required by BKC for making a determination as to whether such Qualified Bidder may become an authorized operator of a BURGER KING® franchise. In considering a Request, BKC shall apply the standards consistent with its normal business practice for approval or rejection of such requests as set forth on Schedule 3 to these Sale Procedures (collectively referred to as a "BKC Approval").

Upon receiving a Request from a Qualified Bidder, BKC shall use its reasonable best efforts to deliver to such Qualified Bidder a letter indicating BKC Approval prior to the Bid Deadline.

Nothing in these Sale Procedures shall impair, affect or waive any (i) right of first refusal available to BKC in connection with its BURGER KING® franchise agreements; and (ii) BKC's right to object to any sale and/or assumption and assignment of BKC's franchise agreements or BKC's leases, all such rights preserved to BKC through the Sale Hearing.

IX. **Stalking Horse Bidder(s)**

Although the Debtors have had discussions with parties interested in submitting bids to purchase the Sale Assets (both as Individual Restaurants and in total) on a stalking

horse basis (in each instance, a "Potential Stalking Horse Bidder"), the Debtors have not yet determined whether they will enter into stalking horse bid arrangements or identified any specific Potential Stalking Horse Bidder(s) for any of the Sale Assets to serve as an actual stalking horse bidder for any of the Sale Assets (in each case, as identified, a "Stalking Horse Bidder").

The ~~Debtors~~Sale Proponents will continue to consider whether to enter into stalking horse bid agreements, selecting one or more Stalking Horse Bidder(s) and which parties to serve as the Stalking Horse Bidder(s). Any party seeking such consideration should immediately contact the Debtors' investment bankers, Mastodon, to express such interest. Any party seeking designation as a Stalking Horse Bidder shall be required to (i) have received the BKC Approval, (ii) submit a bid (in each instance, a "Stalking Horse Bid"), (iii) agree to an APA memorializing the transaction such party proposes (in each instance, a "Stalking Horse APA"), and (iv) provide a list of all executory contracts and unexpired leases to be assumed and assigned. The ~~Debtors~~Sale Proponents may name Stalking Horse Bidder(s). To the extent that the ~~Debtors~~Sale Proponents name Stalking Horse Bidder(s), the ~~Debtors~~Sale Proponents will do so on a rolling basis as Stalking Horse Bids are submitted, negotiated and agreed to. The ~~Debtors~~Sale Proponents will consider proposed Stalking Horse Bids initially through ~~February 28,~~March 31, 2011, with the expectation of naming a Stalking Horse Bidder or Stalking Horse Bidders no later than ~~March 7,~~April 8, 2011. To the extent that any of the Sale Assets are not included in a Stalking Horse Bid, the ~~Debtors~~Sale Proponents reserve the right to identify Stalking Horse Bid(s) after ~~March 7,~~April 8, 2011. The ~~Debtors~~Sale Proponents also reserve the right to name a Stalking Horse Bidder(s) for any Individual Restaurants or for all of the Sale Assets (subject to the Group One and Group Two split).

Each Stalking Horse Bid, memorialized by Stalking Horse APA(s), shall be subject to higher and better bids pursuant to the terms of these Sale Procedures and applicable law. As noted in Section XI of these Sale Procedures, the ~~Debtors~~Sale Proponents may negotiate a break-up fee and reimbursement of reasonable expenses (the "Stalking Horse Protection Fee"). The ~~Debtors~~Sale Proponents shall be under no obligation to designate and name a Stalking Horse Bidder or accept any Stalking Horse Bid(s) for any or all of the Sale Assets.

## X.    **Negotiation of Stalking Horse Protection Fee(s)**

In the event that a Stalking Horse Bidder) is named and designated, the ~~Debtors~~Sale Proponents may negotiate a reasonable Stalking Horse Protection Fee payable to such Stalking Horse Bidder in the event that such Stalking Horse Bidder are not the Successful Bidder (whether as initial Successful Bidder or as successor as a Reserve Bidder). The Stalking Horse Protection Fee shall be approved by the Bankruptcy Court. At the Group One Auction or the Group Two Auction, as the case may be, any Qualified Bidder wishing to enter a bid in excess of the Stalking Horse Bid must enter an amount equal to the Stalking Horse Bid plus the Stalking Horse Protection Fee, plus any minimum bid amount to advance their bid(s).

If a Stalking Horse Bidder is identified and named in accordance with these Sale Procedures, the Debtors shall file a motion with the Court (in each case, a "Stalking Horse Motion") naming the Stalking Horse Bidder, seeking expedited approval of the Stalking Horse APA and Stalking Horse Protection Fee. Mastodon will contact all parties that have expressed an interest (in writing or otherwise) in any portion of the Sale Assets being purchased under the respective Stalking Horse APA and provide such parties with a copy of the Stalking Horse Motion and a copy of the respective Stalking Horse APA.

XI. **Group One Auction Process**

In the event that the ~~Debtors~~Sale Proponents receive more than one Qualified Bid for all or a portion of the Group One Restaurants, the ~~Debtors~~Sale Proponents will conduct an auction (the "Group One Auction") for the Group One Restaurants. The Group One Auction will take place at **10:00 a.m. (Central Time) on** ~~March 28,~~April 26, 2011 at a place as will be designated in writing by the ~~Debtors~~Sale Proponents in a notice to be given to all Qualified Bidders no later than ~~March 24,~~April 22, 2011.

The ~~Debtors~~Sale Proponents will have the right to publish detailed procedures consistent with these Sale Procedures for the conduct at the Group One Auction at any time prior to the start of the Group One Auction. Parties entitled to attend the Group One Auction shall include the Debtors, BofA, the Committee, BKC, the Qualified Bidders and the Stalking Horse Bidder(s) (if any), and each of those parties' representatives. The Stalking Horse Bidder and each Qualified Bidder shall appear at the Group One Auction in person, or through a representative who provides appropriate evidence of such person's authority. Only a Qualified Bidder who has timely submitted a Qualifying Bid, and the Stalking Horse Bidder(s) (if any), shall be entitled to make bids at the Group One Auction.

In the event that a Stalking Horse Bidder is not selected prior to the Group One Auction and no Stalking Horse Bid(s) are tendered, the ~~Debtors~~Sale Proponents will select the highest and best bid or bids (a "Baseline Bid") to serve as the negotiating point with the other Qualified Bidders at the Group One Auction. There may be more than one Baseline Bid if the ~~Debtors~~Sale Proponents determine that multiple Baseline Bids for less than all of the Group One Restaurants are higher and better than one Baseline Bid. The ~~Debtors~~Sale Proponents reserve the right to aggregate bids for Individual Restaurants and compare such aggregated bids with bids for all of the Group One Restaurants in determining the then current best bid.

As soon as practicable, the ~~Debtors~~Sale Proponents will provide all Qualified Bidders, BofA~~,~~, and BKC ~~and the Committee~~ with a copy of the Baseline Bid(s). At the Group One Auction, Qualified Bidders will be permitted to revise, increase, and/or enhance their bid(s) based upon the terms of the Stalking Horse Bid or the Baseline Bid(s), as the case may be (except to the extent otherwise authorized by the ~~Debtors~~Sale Proponents). All Qualified Bidders will have the right to make additional modifications to the APA at the Group One Auction.

The Group One Auction will be conducted in rounds and in any order the

~~Debtors~~Sale Proponents determine. At the end of every round, the ~~Debtors~~Sale Proponents shall declare the highest and best bid or bids at that time for the assets under consideration pursuant to the Baseline Bid(s). Each Qualified Bidder shall have the right to continue to improve its respective bid at the Group One Auction. The initial minimum overbid shall be the Baseline Bid established prior to the Group One Auction plus the lesser of 10% of the Baseline Bid or $200,000 (the "Initial Overbid"). Thereafter, Qualified Bidders may increase their Qualified Bids in any manner that they deem fit; provided, however, that each subsequent increase must include a minimum of the lesser of 5% of the Baseline Bid or $100,000 in additional consideration. The ~~Debtors~~Sale Proponents reserve the right to approach any Qualified Bidder(s) and seek clarification to bids at any time, including without limitation, inviting Qualified Bidder(s) to communicate with other Qualified Bidder(s) if such communication would be beneficial to the Group One Auction.

The Group One Auction will continue with the Qualified Bidders until the ~~Debtors~~Sale Proponents determine, and subject to Bankruptcy Court approval, that they have received the highest and best offer for the Group One Restaurants (either as a whole or in certain portions) from the Qualified Bidders or the Stalking Horse Bidder(s) (the "Successful Bid") and the next highest and best Qualified Bid submitted at the Group One Auction (a "Reserve Bid"). The Qualified Bidder(s) submitting the Successful Bid(s) shall become a "Successful Bidder(s)," and the Qualified Bidder(s) submitting the Reserve Bid(s) shall become a "Reserve Bidder(s)." The Successful Bidder(s) and the Reserve Bidder(s) may be named for individual Group One Restaurants or for all of the Group One Restaurants, or any combination thereof, as determined by the ~~Debtors~~Sale Proponents. In making this decision, the ~~Debtors~~Sale Proponents shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the particular groupings of Group One Restaurants, the Qualified Bidder's ability to close a transaction and the timing thereof, the type and nature of the APA, its requirements as to the assumption and assignment of executory contracts, licenses, and unexpired leases relating to the Group One Restaurants, and the net benefit to the Debtors' estates.

~~The Debtors'~~Notwithstanding the foregoing, the Sale Proponents' procedures for the Group One Auction require the following: (i) if a Stalking Horse Bidder(s) is selected prior to the Group One Auction, the initial overbid by a Qualified Bidder(s) shall be greater than the sum of (a) the Stalking Horse Protection Fee, and (ii) the Initial Overbid. If there is no Stalking Horse Bidder(s) selected prior to the Group One Auction, no Stalking Horse Protection Fee(s) will be awarded and the initial overbid amount will not include such an amount.

The ~~Debtors~~Sale Proponents reserve the right, in their business judgment, to make one or more modifications and/or adjournments to the Group One Auction to, among other things: (i) facilitate discussions between the ~~Debtors~~Sale Proponents, on the one hand, and individual Qualified Bidders, on the other hand; (ii) allow individual Qualified Bidders to consider how they wish to proceed; and (iii) give Qualified Bidders the opportunity to provide the ~~Debtors~~Sale Proponents with such additional evidence as the ~~Debtors~~Sale Proponents in their business judgment may require.

In the event that a Qualified Bidder's Successful Bid or Reserve Bid materially changes as a result of the Group One Auction, such Qualified Bidder may need to seek additional approvals from BKC beyond such Qualified Bidder's initial BKC Approval.

XII. **Group Two Auction Process**

In the event that the Debtors receive more than one Qualified ~~Bids~~Bid for all or a portion of the Group Two Restaurants, the Debtors will conduct an auction (the "Group Two Auction") for the Group Two Restaurants. The Group Two Auction will take place, subject to the ~~Debtors'~~ Sale Proponents' discretion, either immediately following the closing of the Group One Auction or at 10:00 a.m. (Central Time) on ~~March 29,~~April 27, 2011, at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than ~~March 24,~~April 22, 2011.

All of the procedures set forth in Section XI of these Sales Procedures relating to the Group One Auction shall be expressly applicable to the Group Two Auction; provided, however, that a Qualified Bidder(s) bidding on the Group One Restaurants that has also submitted a Qualified Bid(s) for the Group Two Restaurants shall not withdraw ~~such~~its bid for the Group Two Restaurants regardless of such Qualified Bidder's success or lack of success at the Group One Auction.

XIII. **The Sale Hearing**

At the Sale Hearing, which will be held on ~~March 31,~~April 28, 2011, at ~~9:00~~_____ a.m. (Central Time), the ~~Debtors~~Sale Proponents will seek entry of an order or orders authorizing and approving the sale(s) to the Successful Bidder(s) for the Group One Restaurants and/or Group Two Restaurants. No later than one business day prior to the Sale Hearing, all objections to the relief requested at the Sale Hearing shall be filed and served in the manner prescribed in the motion to approve the sale of the Group One Restaurants and the Group Two Restaurants. The Sale Hearing may be adjourned or rescheduled from time to time. The ~~Debtors~~Sale Proponents shall provide notice of such adjournment or rescheduling to: (i) the U.S. Trustee; (ii) counsel to BofA; (iii) counsel to ~~the Committee~~BKC; (iv) ~~counsel to BKC; (v)~~ all Qualified Bidders; (~~vi~~v) all parties that have filed a timely objection to the sale; (~~vii~~vi) all persons or entities known or reasonably believed to have asserted a lien in any of the Sale Assets; and (~~viii~~vii) all parties that have requested notice in the Debtors' bankruptcy cases.

XIV. **Failure to Consummate Purchase**

Following the Sale Hearing, if the Successful Bidder(s) ~~fail~~fails to consummate the closing of the sale because of a breach or failure to perform on the part of such Successful Bidder(s), the ~~Debtors~~Sale Proponents will be authorized, but not required, to consummate the sale with Reserve Bidder(s) without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. Additionally, the ~~Debtors~~Sale Proponents shall be entitled to seek all available

damages from the defaulting Successful Bidder.

## XV. **Return of Deposit**

The deposits of the Successful Bidder(s) shall be applied to the Successful Bidder's obligations under the Successful Bid upon closing of the transactions contemplated thereby. If a Successful Bidder fails to close the transactions contemplated by the Successful Bidder then such Successful Bidder shall forfeit its deposit (and any right to any Stalking Horse Protection Fee, if applicable).

The deposit(s) of the Reserve Bidder(s) shall be returned to the Reserve Bidder(s) upon closing of the transactions contemplated by the Successful Bidder(s); provided, however, that if a Successful Bidder fails to close the transactions when and as provided in the Successful Bid, then the deposit of the Reserve Bidder(s) shall be applied to the Reserve Bidder's obligations under the Reserve Bid upon closing of the transactions contemplated thereby. If a Reserve Bidder fails to close the transactions contemplated by a Reserve Bid, then such Reserve Bidder shall forfeit its deposit.

All other deposits of Qualified Bidders who are not the Successful Bidder(s) or the Reserve Bidder(s) shall be returned within three business days after the conclusion of the Group One Auction or the Group Two Auction, as the case may be.

The ~~Debtors~~Sale Proponents reserve all of their rights regarding any return of deposits, and the failure by the Debtors to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

## XVI. **Modification of Amended Sale Procedures**

The ~~Debtors~~Sale Proponents may amend these Sale Procedures, in their reasonable business judgment, at any time in any manner that will best promote the goals of the Bidding Process, including but not limited to extending or modifying any of the dates described herein. Notwithstanding the foregoing, the ~~Debtors~~Sale Proponents may modify the requirements set forth in Section II of these Sale Procedures only (i) with the consent of BofA or (ii) pursuant to an order of the Bankruptcy Court.

## XVII. **Miscellaneous**

BofA shall be entitled to exercise its right under 11 U.S.C. § 363(k) at the Group One Auction or the Group Two Auction (as the case may be) to credit bid the secured portion of the indebtedness owed to BofA, which shall remain subject to any challenge brought by the Committee or any other party-in-interest to the validity, priority or extent of BofA's secured interest in the Sale Assets. For the purpose of these Sale Procedures, BofA shall be deemed a Qualified Bidder and shall be entitled to participate in the Group One Auction and the Group Two Auction if BofA's bid complies with all of the provisions of these Sale Procedures, subject to the following modifications: (i) with

respect to the cash deposit required under Section VII(e) of these Sale Procedures, BofA shall deposit cash equal to 10% of the cash component (if any) of the bid; and (ii) with respect to Section VII(d) of these Sale Procedures, BofA need not provide that the credit bid portion of its purchase price be paid in cash at closing. BofA need not provide for a cash deposit as to the credit component of its bid.

XVIII. **Debtors' Consultation with Key Parties**

In ~~addition to the other provisions of these Sale Procedures, in~~ the context of these Sale Procedures, the ~~Debtors~~Sale Proponents will consult with BKC~~,~~ and BofA ~~and the Committee~~ with respect to issues relating to (i) designating a Qualified Bidder; (ii) determining whether a bid is a Qualified Bid; (iii) curing deficiencies to become a Qualified Bid; (iv) identifying any Stalking Horse Bid(s) and whether to accept any Stalking Horse Bid(s); (v) establishing procedures for the Group One Auction and the Group Two Auction; (vi) selecting the Baseline Bid(s); (vii) choosing the Successful Bid(s) and Reserve Bid(s); and (viii) modifying these Sale Procedures.

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 (GFK) |
| Debtors. | |

Includes:

| | |
|---|---|
| Duke and King Missouri, LLC | 10-38653 |
| Duke and King Missouri Holdings, Inc. | 10-38654 |
| Duke and King Real Estate, LLC | 10-38655 |
| Duke and King Florida Holdings, Inc. | 10-38656 |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

## CERTIFICATE OF SERVICE

I, Aaron L. Hammer, under penalty of perjury, state that, on January 20, 2011, I caused to be served the following:

1. Objection of the Official Committee of Unsecured Creditors to the Debtors' Motion for an Order Approving Sale and Bidding Procedures; and

2. Certificate of Service.

by sending true and correct copies of the aforementioned documents upon the following parties by the manner listed below.

Dated: January 20, 2011

*/s/ Aaron L. Hammer*
Aaron L. Hammer

**Via First Class Mail**

Douglas W. Kassebaum
Clinton E. Cutler
Fredrikson & Byron, P.A.
200 South Sixth Street, Ste 4000
Minneapolis, MN 55402
Email: dkassebaum@fredlaw.com; ccutler@fredlaw.com
*Counsel to Debtors*

Michael J. Kaczka
Scott N. Opincar
Shawn M. Riley
McDonald Hopkins LLC
600 Superior Ave E Ste 2100
Cleveland, OH 44114
Email:  mkaczka@mcdonaldhopkins.com; sopincar@mcdonaldhokins.com;
sriley@mcdonaldhopskins.com
*Counsel to Debtors*

Michael Fadlovich
US Trustee Office
1015 US Courthouse
300 South Fouth St
Minneapolis, MN 55415
Email: michael.fadlovich@usdoj.gov
*Office of the U.S. Trustee*

**Via ECF**

Paul J. Battista:  pbattista@gjb-law.com
Thomas F. Blakemore:  tblakemore@winston.com
Matthew R. Burton:  mburton@losgs.com
Gordon B. Conn:  conn@kwgc-law.com
Kenneth Corey-Edstrom:  kcoreyedstrom@larkinhoffman.com
Clinton E. Cutler:  ccutler@fredlaw.com
Michael F. Doty:  mdoty@faegre.com
Devon J. Eggert:  deggert@freebornpeters.com
Jonathan T. Edwards:  jonathan.edwards@alston.com
Michael Fadlovich:  michael.fadlovich@usdoj.gov; ustpregion12.mn.ecf@usdoj.gov
Steven A. Ginther:  jgreer@hughesmathews.com
John L. Greer:  jgreer@hughesmathews.com
Aaron L. Hammer:  ahammer@freebornpeters.com
Christopher J. Harayda:  charayda@faegre.com
Carole Clark Isakson:  isakson@kwgc-law.com
Michael J. Kaczka:  mkaczka@mcdonaldhopkins.com

Douglas W. Kassebaum:  dkassebaum@fredlaw.com
Jeffrey D. Klobucar:  jklobucar@foleymansfield.com
Eoin L. Kreditor:  ekreditor@fsglawyers.com
Richard S. Lauter:  rlauter@freebornpeters.com
Stephen M. Mertz:  smertz@faegre.com
Steven C. Opheim:  sopheim@dudleyandsmith.com
Scott N. Opincar:  sopincar@mcdonaldhopkins.com
Larry B. Ricke:  rickel@srsg.net
Shawn M. Riley:  sriley@mcdonaldhopkins.com
Richard C. Salmen:  rsalmen@felhaber.com
Wendy S. Walker:  wwalker@morganlewis.com
Annie C. Wells:  awells@morganlewis.com