UNITED STATES BANKRUPTCY COURT
DISTRICT OF MINNESOTA

*********************************************************************************

| | |
|---|---|
| In re: | JOINTLY ADMINISTERED UNDER CASE NO. 10-38652 |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

*********************************************************************************

### ORDER APPROVING SALE AND BIDDING PROCEDURES

*********************************************************************************

This case came before the Court on the Debtors' Motion for an Order Approving Sale and Bidding Procedures dated January 7, 2010 (the "Procedures Motion").[1]

Based on the Procedures Motion, all the files, records and proceedings herein, the Court being advised in the premises:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

1. The Court has jurisdiction over the Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Procedures Motion.

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Fed. R. Bankr. 7052.

{2575006:2}

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *01/24/2011*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

2. The Debtors have articulated good and sufficient reasons for approving the Procedures Motion.

3. Due and proper notice of the Procedures Motion was provided and no other or further notice need be provided.

4. The Sale Procedures, substantially in the form attached as <u>Exhibit A</u> to this Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' assets.

5. The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

**IT IS HEREBY ORDERED:**

1. The Procedures Motion is granted to the extent set forth herein.

2. All objections filed in response to the Procedures Motion are resolved as set forth herein or on the record at the hearing on the Procedures Motion, and to the extent not resolved, are hereby overruled.

3. The Sale Procedures, in the form attached as <u>Exhibit A</u> to this Order, are hereby incorporated herein and approved in their entirety.

4. In accordance with the terms of the Sale Procedures, the Debtors are authorized to conduct separate auctions for the sale of all or substantially all of their assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds in the same order and priority as existed at the commencement of the Debtors' chapter 11 cases, subject to a further hearing and final court approval following such auctions.

5. As provided by Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon its entry.

6. This Court shall retain jurisdiction over any matters related to or arising from the implementation of this Order.

Dated: January 24, 2011.

*/e/ Gregory F. Kishel*

Gregory F. Kishel
United States Bankruptcy Judge

# **EXHIBIT A**

{2575006:2}

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| **DUKE AND KING ACQUISITION CORP.,** | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SALE AND BIDDING PROCEDURES**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

These sale and bidding procedures (the "Sale Procedures") shall govern the sale of substantially all of the operating assets of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. The Debtors contemplate that the composition of the sale of their assets may take various forms, including, but not limited to a sale of all the assets to one purchaser or the sales of geographic regions of assets to separate purchasers as more particularly set forth below.

By motion (the "Procedures Motion"), dated January 7, 2011, the above-captioned debtors and debtors in possession (collectively, the "Debtors") sought, among other things, approval of these Sale Procedures governing the process and procedures for the sale of substantially all of the Debtors' operating assets through two separate auctions. On January 24, 2011, the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), entered an order approving these Sale Procedures (the "Procedures Order"). Pursuant to the Procedures Order, the Bankruptcy Court has scheduled a hearing (the "Sale Hearing") **on April 14, 2011, at 9:30 a.m. (Central Time),** to consider the sales.

**I.    Assets to Be Sold**

The assets to be sold consist of the Debtors' 87 BURGER KING® franchise locations and related assets situated in the states of Minnesota, Illinois, Missouri, Wisconsin, Kansas and Iowa (each restaurant, an "Individual Restaurant" and collectively, the "Sale Assets").

Any Potential Bidder (as defined herein) may obtain a detailed description of each Individual Restaurant and the geographic regions in which such Individual Restaurants are located through the process described in Section III below entitled "Due Diligence."

The Debtors may sell Individual Restaurants in regions (Group One) or in piecemeal (Group Two) through two separate groupings described below, such decisions being made to maximize the value to be paid by the successful bidder(s) for the Sale Assets. Accordingly, subject to the Group One Restaurants/Group Two Restaurants split as set forth below, Potential Bidders may submit bids to purchase (i) one, some or all of the Group One Regions (defined below), (ii) all of the Sale Assets, or (iii) any subset of Individual Restaurants in Group Two.

The Debtors will have a form of asset purchase agreement (in each case, the "APA") to consummate the transactions contemplated. The APA will include the terms and conditions upon which the Debtors expect (subject to reasonable revisions by the Qualified Bidders (as defined herein)) the Sale Assets to be sold.

Pursuant to these Sale Procedures and 11 U.S.C. § 363, the Sale Assets will be sold free and clear of all liens, claims, encumbrances and interests, other than liabilities expressly assumed. Bank of America, N.A. ("BofA"), the Debtors' senior secured lender, has agreed not to object to any sales that are consummated in accordance with the terms of these Sale Procedures, including, without limitation, objections under 11 U.S.C. § 363(f); except that BofA reserves the right to object to any sale that, in the judgment of BofA, is (i) not consummated in accordance with these Sales Procedures, (ii) does not represent the highest and best price when compared with other bids, or (iii) is not a bona fide arms' length transaction. BofA further reserves the right to object to the Debtors' determinations regarding Qualified Bidders (as defined herein) (including, without limitation, the designation of Qualified Bidders, whether deficiencies in bids have been cured and the waiver of any condition precedent to becoming a Qualified Bid set forth in the Sale Procedures); the selection of any Stalking Horse Bidder(s) (as defined herein); the payment of any Stalking Horse Protection Fees (as defined herein); the Debtors' selection of the Baseline Bid (as defined herein); any modifications or adjournments to the Group One Auction (as defined herein); or any modification of the Sale Procedures without BofA's consent.

The Sale Assets will be sold without warranty or representation of any kind or nature, whether expressed or implied, and are being purchased by the Successful Bidder(s) (as defined herein) on an "As Is, Where Is" basis and are being sold "Without Faults."

## II.    Segregation of Restaurant Locations

The Sale Assets shall be split into two groups: (i) 74 Individual Restaurants located on Schedule 1 to these Sale Procedures (collectively, the "Group One Restaurants"); and (ii) 13 Individual Restaurants located on Schedule 2 to these Sale Procedures (collectively, the "Group Two Restaurants"). The Group One Restaurants will be further segregated into five separate regions for marketing and sale: Minnesota Region; Missouri Region; Davenport Region; Wisconsin Region; and Illinois Region (collectively, the "Group One Regions"), each of which are set forth on Schedule 1 to these Sale Procedures. The Group One Regions will not be marketed as Individual Restaurants, but rather, as all-inclusive regions. The Group One Regions and the Group Two Restaurants will be marketed simultaneously pursuant to these Sale Procedures.

If a Potential Bidder for the Sale Assets desires to make a bid for some or all of the Group One Regions and for all or a portion of the Group Two Restaurants, the Potential Bidder must separately designate the amount it is bidding for the Group One Regions and the Group Two Restaurants; provided, however, that any such Potential Bidder shall not submit a bid on any Group One Region that is contingent upon, tied to or in any other way a combined offer for any Group Two Restaurants. The Group One Regions and the Group Two Restaurants will be auctioned separately and the Group One Regions will be auctioned first.

### III. Due Diligence

Until the Bid Deadline (as defined below), the Debtors will afford to each interested party (i) determined by the Debtors to be reasonably likely to make a Qualified Bid (defined below), and (ii) who delivers an executed confidentiality agreement in form and substance satisfactory to the Debtors (each, a "Potential Bidder") reasonable access, during normal business hours and subject to confidentiality requirements, to the books and records of the Debtors reasonably requested by such Potential Bidder, including access to the Debtors' designated due diligence website, to the extent provision of such access or information is not prohibited by applicable law and relates to the Sale Assets. The Debtors will furnish (subject to applicable law) as promptly as practicable to such Potential Bidder any and all such information as such Potential Bidder may reasonably request related to the Sale Assets.

Burger King Corporation ("BKC") is the Debtors' franchisor. Potential Bidders should contact a representative of BKC in order to apply for BKC's consent and approval for its bid. The BKC representative's information is available upon request to Robert Hersch at Mastodon Ventures, Inc. ("Mastodon"), the Debtors' investment banker, by phone at 512.498.1212 or via email at rhersch@mastodonventures.com.

### IV. Initial Determinations by the Debtors

The Debtors shall (a) determine (with the assistance of their respective financial advisors and investment banker) whether any person or entity is a Potential Bidder; (b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Sale Assets; (c) receive bids from Qualified Bidders; (d) select a stalking horse bidder or bidders; and (e) negotiate and enter into one or more asset purchase agreements with one or more Qualified Bidder(s) (collectively, the "Bidding Process").

Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Sale Assets to any person or entity who is not a Potential Bidder and who does not comply with the participation requirements below.

### V. Bid Deadline

A Qualified Bidder that desires to make a bid shall deliver written and electronic copies of such bid to the Debtors' investment banker, Mastodon Ventures, Inc., Attention: Robert Hersch, 515 Congress Ave., Suite 1400, Austin, TX 78701, email: rhersch@mastodonventures.com, so as to be received by no later than **5:00 p.m. (Central Time) on or before April 5, 2011** (the "Bid Deadline"). The Debtors' attorneys will send copies of

any bids and information submitted under Section VI below to counsel for BofA, BKC and the Official Committee of Unsecured Creditors (the "Committee") within 24 hours of receipt of such bid.

## VI. Determination of "Qualified Bidder" Status

Any Potential Bidder desiring to participate in the Bidding Process must be deemed a "Qualified Bidder." To be deemed a Qualified Bidder, a Potential Bidder must deliver to the Debtors (care of Mastodon) the most current audited (if available) and the latest unaudited financial statements and/or financial information evidencing the Potential Bidder's ability to close the transaction that meets the Debtors' satisfaction or such other information as reasonably determined by the Debtors to support the Potential Bidder's ability to close the transaction.

Upon the Debtors' determination that a party is a Qualified Bidder, the Debtors shall provide each Qualified Bidder with access to all relevant business and financial information necessary to enable such Qualified Bidder to evaluate the Sale Assets, for the sole purpose of submitting an offer.

## VII. Requirements of a "Qualified Bid"

To be deemed a "Qualified Bid" that may be considered at the Group One Auction or the Group Two Auction (each as defined in Section XI and Section XII below), a bid must:

    a.    be in writing;

    b.    be submitted by a Qualified Bidder;

    c.    identify clearly the Group One Region(s) and/or Group Two Restaurant(s) that are included in the purchase and related segregated purchase price for each Group One Region and the Group Two Restaurant(s), if applicable;

    d.    provide that the purchase price shall be paid in full in cash upon closing;

    e.    be accompanied by a cash deposit equal to 10% of the proposed purchase price (such cash deposit will be applied to the purchase price);

    f.    confirm the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the proposed transaction;

    g.    be irrevocable until the earlier of (i) the Qualified Bidder's bid being determined by the Debtors not to be a Qualified Bid, or (ii) another Qualified Bidder's bid for (some or all of) the same assets being approved by the Bankruptcy Court;

    h.    be accompanied by a fully executed APA (and demonstrating any modifications as necessary) and such Qualified Bidder's terms relating to the assumption of any executory contracts or unexpired leases or operating liabilities relating to the Individual Restaurants located in the respective Group One Region(s) to be purchased and/or the Group Two Restaurants to be purchased;

i. designate all executory contracts and unexpired leases the Qualified Bidder seeks to have assumed and assigned to it;

j. indicate (i) whether the Debtors or the Qualified Bidder is responsible for payment of "cure costs" for executory contracts and unexpired leases to be assumed and assigned, (ii) the source of the funds for payment of such amounts, and (iii) the amount that the Qualified Bidder believes is required to be paid in order to consummate its transaction;

k. demonstrate the capacity to provide adequate assurance of future performance under all executory contracts and unexpired leases that are being assumed and assigned;

l. not contain any financing contingencies of any kind, and shall include (i) evidence that such Qualified Bidder (and any related guarantor) has financial resources readily available sufficient in the aggregate to finance the purchase of the Sale Assets (either some or all), (ii) evidence that such Qualified Bidder (and any related guarantor) has the ability to provide adequate assurance of future performance under any unexpired leases and executory contracts, and (iii) evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms provided in the APA;

m. to the extent a Qualified Bidder intends to operate as a BURGER KING® franchisee, provide evidence of the BKC Approval (defined in Section VIII below) or evidence that a Request (as defined in Section VIII below) for BKC Approval remains pending; and

n. be accompanied by an affirmative statement from such Qualified Bidder that it has and will continue to completely comply with these Sale Procedures.

For the avoidance of doubt, any party that submits a bid for one, some or all of the Group One Regions and all or a portion of the Group Two Restaurants shall provide a separate allocation for the amount of the consideration to be paid under such bid between the particular Group One Regions and the Group Two Restaurants. Such allocation shall be due no later than the Bid Deadline. Any bid for one, some or all of the Group One Regions must be a bid for all Individual Restaurants located in the particular Group One Region being bid upon. No party may submit a bid for Individual Restaurants in a particular Group One Region that does not include all Individual Restaurants in such region and any such bid will not be deemed a Qualified Bid.

The Debtors will make a determination regarding whether a bid is a Qualified Bid and shall notify all Qualified Bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (Central Time) on April 7, 2011. The Debtors reserve the right to reject any bid on any grounds. Notwithstanding anything contained in this Section VII, should a Qualified Bidder submit a bid that fails to meet the qualifications to become a Qualified Bid, the

Debtors may allow a Qualified Bidder who has failed to meet the requirements of a Qualified Bid an additional 24 hours to cure any deficiencies to such bid.

The Debtors reserve the right, subject to consultation with BofA and the Committee, to waive compliance with any identified requirement for a bid to become a Qualified Bid; provided, however, BKC's approval process set forth in Section VIII below cannot be waived or modified.

### VIII. BKC Approval Process

If a Qualified Bid is contingent on the Qualified Bidder receiving approvals from BKC, then such Qualified Bidder must deliver to BKC a written request for approval to become an authorized operator of a BKC franchise in accordance with BKC's customary approval process (a "Request"). BKC agrees to provide each Qualified Bidder with notice of its approval (the "BKC Approval") or disapproval as soon as reasonably possible after the receipt of all required information from any such Qualified Bidder consistent with its normal approval process. For purposes of disclosure in considering a Request, BKC may apply, in its sole discretion, some or all of the standards set forth on Schedule 3 to these Sale Procedures.

Nothing in these Sale Procedures shall impair, affect or waive any (i) right of first refusal available to BKC in connection with its BURGER KING® franchise agreements; and (ii) BKC's right to object to any sale and/or assumption and assignment of BKC's franchise agreements or BKC's leases, all such rights preserved to BKC through the Sale Hearing.

### IX. Stalking Horse Bidder(s)

Although the Debtors have had discussions with parties interested in submitting bids to purchase the Sale Assets (both as Individual Restaurants and in total) on a stalking horse basis (in each instance, a "Potential Stalking Horse Bidder"), the Debtors have not yet determined whether they will enter into stalking horse bid arrangements or identified any specific Potential Stalking Horse Bidder(s) for any of the Sale Assets to serve as an actual stalking horse bidder for any of the Sale Assets (in each case, as identified, a "Stalking Horse Bidder").

The Debtors will continue to consider whether to enter into stalking horse bid agreements, selecting one or more Stalking Horse Bidder(s) and which parties to serve as the Stalking Horse Bidder(s). Any party seeking such consideration should immediately contact the Debtors' investment banker, Mastodon, to express such interest. Any party seeking designation as a Stalking Horse Bidder shall be required to (i) have received the BKC Approval, (ii) submit a bid (in each instance, a "Stalking Horse Bid"), (iii) agree to an APA memorializing the transaction such party proposes (in each instance, a "Stalking Horse APA"), and (iv) provide a list of all executory contracts and unexpired leases to be assumed and assigned. The Debtors may name Stalking Horse Bidder(s). To the extent that the Debtors name Stalking Horse Bidder(s), the Debtors will do so on a rolling basis as Stalking Horse Bids are submitted, negotiated and agreed to. The Debtors will consider proposed Stalking Horse Bids initially through March 14, 2011, with the expectation of naming a Stalking Horse Bidder or Stalking Horse Bidders no later than March 21, 2011. To the extent that any of the Sale Assets are not included in a Stalking Horse Bid, the Debtors reserve the right to identify Stalking Horse Bid(s) after March 21, 2011. The Debtors also reserve the right to name a Stalking Horse Bidder(s) for

any Group One Region or for all of the Sale Assets (subject to the Group One and Group Two split).

Each Stalking Horse Bid, memorialized by Stalking Horse APA(s), shall be subject to higher and better bids pursuant to the terms of these Sale Procedures and applicable law. As noted in Section XI of these Sale Procedures, the Debtors may negotiate a break-up fee and reimbursement of reasonable expenses (the "Stalking Horse Protection Fee"). The Debtors shall be under no obligation to designate and name a Stalking Horse Bidder or accept any Stalking Horse Bid(s) for any or all of the Sale Assets.

X.      **Negotiation of Stalking Horse Protection Fee(s)**

In the event that a Stalking Horse Bidder is named and designated, the Debtors may negotiate a reasonable Stalking Horse Protection Fee payable to such Stalking Horse Bidder in the event that such Stalking Horse Bidder are not the Successful Bidder (whether as initial Successful Bidder or as successor as a Reserve Bidder). The Stalking Horse Protection Fee shall be approved by the Bankruptcy Court. At the Group One Auction or the Group Two Auction, as the case may be, any Qualified Bidder wishing to enter a bid in excess of the Stalking Horse Bid must enter an amount equal to the Stalking Horse Bid plus the Stalking Horse Protection Fee, plus any minimum bid amount to advance their bid(s).

If a Stalking Horse Bidder is identified and named in accordance with these Sale Procedures, the Debtors shall file a motion with the Court (in each case, a "Stalking Horse Motion") naming the Stalking Horse Bidder, seeking expedited approval of the Stalking Horse APA and Stalking Horse Protection Fee. Mastodon will contact all parties that have expressed an interest (in writing or otherwise) in any portion of the Sale Assets being purchased under the respective Stalking Horse APA and provide such parties with a copy of the Stalking Horse Motion and a copy of the respective Stalking Horse APA.

XI.     **Group One Auction Process**

In the event that the Debtors receive more than one Qualified Bid for one, some or all of the Group One Regions, the Debtors will conduct an auction (the "Group One Auction") for the Group One Regions. The Group One Auction will take place at **10:00 a.m. (Central Time) on April 11, 2011** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than April 7, 2011.

The Debtors will have the right to publish detailed procedures consistent with these Sale Procedures for the conduct at the Group One Auction at any time prior to the start of the Group One Auction. Parties entitled to attend the Group One Auction shall include the Debtors, BofA, the Committee, BKC, the Qualified Bidders and the Stalking Horse Bidder(s) (if any), and each of those parties' representatives. The Stalking Horse Bidder(s) (if any) and each Qualified Bidder shall appear at the Group One Auction in person, or through a representative who provides appropriate evidence of such person's authority. Only a Qualified Bidder who has timely submitted a Qualifying Bid, and the Stalking Horse Bidder(s) (if any), shall be entitled to make bids at the Group One Auction.

In the event that a Stalking Horse Bidder is not selected prior to the Group One Auction and no Stalking Horse Bid(s) are tendered, the Debtors will select the highest and best bid or bids (a "Baseline Bid") to serve as the negotiating point with the other Qualified Bidders at the Group One Auction. There may be more than one Baseline Bid if the Debtors determine that multiple Baseline Bids for certain of the Group One Regions are higher and better than one Baseline Bid. The Debtors reserve the right to aggregate bids for separate Group One Regions and compare such aggregated bids with bids for all of the Group One Regions in determining the then current best bid.

As soon as practicable, the Debtors will provide all Qualified Bidders, BofA, BKC and the Committee with a copy of the Baseline Bid(s). At the Group One Auction, Qualified Bidders will be permitted to revise, increase, and/or enhance their bid(s) based upon the terms of the Stalking Horse Bid or the Baseline Bid(s), as the case may be (except to the extent otherwise authorized by the Debtors). All Qualified Bidders will have the right to make additional modifications to the APA at the Group One Auction.

The Group One Auction will be conducted in rounds and in any order the Debtors determine. At the end of every round, the Debtors shall declare the highest and best bid or bids at that time for the assets under consideration pursuant to the Baseline Bid(s). Each Qualified Bidder shall have the right to continue to improve its respective bid at the Group One Auction. The initial minimum overbid shall be the Baseline Bid established prior to the Group One Auction plus the lesser of 10% of the Baseline Bid or $200,000 (the "Initial Overbid"). Thereafter, Qualified Bidders may increase their Qualified Bids in any manner that they deem fit; provided, however, that each subsequent increase must include a minimum of the lesser of 5% of the Baseline Bid or $100,000 in additional consideration. The Debtors reserve the right to approach any Qualified Bidder(s) and seek clarification to bids at any time, including without limitation, inviting Qualified Bidder(s) to communicate with other Qualified Bidder(s) if such communication would be beneficial to the Group One Auction.

The Group One Auction will continue with the Qualified Bidders until the Debtors determine, and subject to Bankruptcy Court approval, that they have received the highest and best offer for the Group One Regions (either as a whole or separately) from the Qualified Bidders or the Stalking Horse Bidder(s) (the "Successful Bid") and the next highest and best Qualified Bid submitted at the Group One Auction (a "Reserve Bid"). The Qualified Bidder(s) submitting the Successful Bid(s) shall become a "Successful Bidder(s)," and the Qualified Bidder(s) submitting the Reserve Bid(s) shall become a "Reserve Bidder(s)." The Successful Bidder(s) and the Reserve Bidder(s) may be named for separate Group One Regions or for all of the Group One Regions, or any combination thereof, as determined by the Debtors. In making this decision, the Debtors shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the particular groupings of Group One Regions, the Qualified Bidder's ability to close a transaction and the timing thereof, the type and nature of the APA, its requirements as to the assumption and assignment of executory contracts, licenses, and unexpired leases relating to the Individual Restaurants located in the Group One Region(s) to be purchased, and the net benefit to the Debtors' estates.

The Debtors' procedures for the Group One Auction require the following: (i) if a Stalking Horse Bidder(s) is selected prior to the Group One Auction, the initial overbid by a

Qualified Bidder(s) shall be greater than the sum of (a) the Stalking Horse Protection Fee, and (ii) the Initial Overbid. If there is no Stalking Horse Bidder(s) selected prior to the Group One Auction, no Stalking Horse Protection Fee(s) will be awarded and the initial overbid amount will not include such an amount.

The Debtors reserve the right, in their business judgment, to make one or more modifications and/or adjournments to the Group One Auction to, among other things: (i) facilitate discussions between the Debtors, on the one hand, and individual Qualified Bidders, on the other hand; (ii) allow individual Qualified Bidders to consider how they wish to proceed; and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their business judgment may require.

In the event that a Qualified Bidder's Successful Bid or Reserve Bid changes as a result of the Group One Auction, then such Qualified Bidder may need to seek additional approvals from BKC beyond such Qualified Bidder's initial BKC Approval. Qualified Bidders are encouraged to address any such matters with BKC as early in the process as possible.

## XII. Group Two Auction Process

In the event that the Debtors receive more than one Qualified Bids for all or a portion of the Group Two Restaurants, the Debtors will conduct an auction (the "Group Two Auction") for the Group Two Restaurants. The Group Two Auction will take place, subject to the Debtors' discretion, either immediately following the closing of the Group One Auction or at **10:00 a.m. (Central Time) on April 12, 2011,** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than April 7, 2011.

All of the procedures set forth in Section XI of these Sales Procedures relating to the Group One Auction shall be expressly applicable to the Group Two Auction; provided, however, that a Qualified Bidder(s) bidding on one, some or all of the Group One Regions that has also submitted a Qualified Bid(s) for the Group Two Restaurants shall not withdraw such its bid for the Group Two Restaurants regardless of such Qualified Bidder's success or lack of success at the Group One Auction.

## XIII. The Sale Hearing

At the Sale Hearing, which will be held **on April 14, 2011, at 9:30 a.m. (Central Time)**, the Debtors will seek entry of an order or orders authorizing and approving the sale(s) to the Successful Bidder(s) for the Group One Regions and/or Group Two Restaurants. No later than 11:59 p.m. (Central Time) on April 12, 2011, all objections to the relief requested at the Sale Hearing shall be filed and served in the manner prescribed in the motion to approve the sale of the Group One Regions and the Group Two Restaurants. The Sale Hearing may be adjourned or rescheduled from time to time. The Debtors shall provide notice of such adjournment or rescheduling to: (i) the U.S. Trustee; (ii) counsel to BofA; (iii) counsel to the Committee; (iv) counsel to BKC; (v) all Qualified Bidders; (vi) all parties that have filed a timely objection to the sale; (vii) all persons or entities known or reasonably believed to have asserted a lien in any of the Sale Assets; and (viii) all parties that have requested notice in the Debtors' bankruptcy cases.

XIV. **Failure to Consummate Purchase**

Following the Sale Hearing, if the Successful Bidder(s) fails to consummate the closing of the sale because of a breach or failure to perform on the part of such Successful Bidder(s), the Debtors will be authorized, but not required, to consummate the sale with Reserve Bidder(s) without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. Additionally, the Debtors shall be entitled to seek all available damages from the defaulting Successful Bidder.

XV. **Return of Deposit**

The deposits of the Successful Bidder(s) shall be applied to the Successful Bidder's obligations under the Successful Bid upon closing of the transactions contemplated thereby. If a Successful Bidder fails to close the transactions contemplated by the Successful Bidder then such Successful Bidder shall forfeit its deposit (and any right to any Stalking Horse Protection Fee, if applicable).

The deposit(s) of the Reserve Bidder(s) shall be returned to the Reserve Bidder(s) upon closing of the transactions contemplated by the Successful Bidder(s); _provided_, _however_, that if a Successful Bidder fails to close the transactions when and as provided in the Successful Bid, then the deposit of the Reserve Bidder(s) shall be applied to the Reserve Bidder's obligations under the Reserve Bid upon closing of the transactions contemplated thereby. If a Reserve Bidder fails to close the transactions contemplated by a Reserve Bid, then such Reserve Bidder shall forfeit its deposit.

All other deposits of Qualified Bidders who are not the Successful Bidder(s) or the Reserve Bidder(s) shall be returned within three business days after the conclusion of the Group One Auction or the Group Two Auction, as the case may be.

The Debtors reserve all of their rights regarding any return of deposits, and the failure by the Debtors to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

XVI. **Modification of Amended Sale Procedures**

The Debtors may amend these Sale Procedures, in their reasonable business judgment, at any time in any manner that will best promote the goals of the Bidding Process, including but not limited to extending or modifying any of the dates described herein. Notwithstanding the foregoing, the Debtors may modify the requirements set forth in Section II of these Sale Procedures only (i) with the consent of both BofA and BKC or (ii) pursuant to an order of the Bankruptcy Court.

XVII. **Miscellaneous**

BofA shall be entitled to exercise its right under 11 U.S.C. § 363(k) at the Group One Auction or the Group Two Auction (as the case may be) to credit bid the indebtedness owed to BofA. For the purpose of these Sale Procedures, BofA shall be deemed a Qualified Bidder and shall be entitled to participate in the Group One Auction and the Group Two Auction if BofA's

bid complies with all of the provisions of these Sale Procedures, subject to the following modifications: (i) with respect to the cash deposit required under Section VII(e) of these Sale Procedures, BofA shall deposit cash equal to 10% of the cash component (if any) of the bid; and (ii) with respect to Section VII(d) of these Sale Procedures, BofA need not provide that the credit bid portion of its purchase price be paid in cash at closing. BofA need not provide for a cash deposit as to the credit component of its bid. Notwithstanding anything herein to the contrary, BofA's status as a Qualified Bidder does not exempt BofA from seeking and obtaining the BKC Approval for the operation of the Sale Assets as BURGER KING® restaurants.

**XVIII. Debtors' Consultation with Key Parties**

In the context of these Sale Procedures, the Debtors will consult with BKC, BofA and the Committee with respect to issues relating to (i) designating a Qualified Bidder; (ii) determining whether a bid is a Qualified Bid; (iii) curing deficiencies to become a Qualified Bid; (iv) identifying any Stalking Horse Bid(s) and whether to accept any Stalking Horse Bid(s); (v) establishing procedures for the Group One Auction and the Group Two Auction; (vi) selecting the Baseline Bid(s); (vii) choosing the Successful Bid(s) and Reserve Bid(s); and (viii) modifying these Sale Procedures.

# SCHEDULE 1

# GROUP ONE RESTAURANTS BY REGION

| | Store # | Address | City | State |
|---|---|---|---|---|
| | **Minnesota Region** | | | |
| 1 | 04116 | 2651 County Road I | Mounds View | MN |
| 2 | 06270 | 8510 Edinburgh Center Drive | Brooklyn Park | MN |
| 3 | 07557 | 8501 Springbrook Drive NW | Coon Rapids | MN |
| 4 | 09095 | 106 Ninth Avenue Circle South | Princeton | MN |
| 5 | 09993 | 10861 University Avenue NE | Blaine | MN |
| 6 | 09994 | 318 East Kraft Drive | Melrose | MN |
| 7 | 02641 | 2011 E Main Street | Albert Lea | MN |
| 8 | 04553 | 1501 NW 7th Street | Faribault | MN |
| 9 | 06545 | 1022 E Blue Earth Avenue | Fairmont | MN |
| 10 | 06615 | 1318 Riverfront Drive | Mankato | MN |
| 11 | 07444 | 735 Bridge Street | Owatonna | MN |
| 12 | 09081 | 1409 4th Street NW | Austin | MN |
| 13 | 04009 | 14251 Nicollet Avenue | Burnsville | MN |
| 14 | 04122 | 5020 160th Street SE | Prior Lake | MN |
| 15 | 04151 | 1150 East Highway 13 | Burnsville | MN |
| 16 | 09256 | 255 Triangle Lane N Ste 2 | Jordan | MN |
| 17 | 04507 | 13840 Grove Drive | Maple Grove | MN |
| 18 | 05012 | 2025 Northdale Blvd | Coon Rapids | MN |
| 19 | 06299 | 10801 Bloomington Ferry Road | Bloomington | MN |
| 20 | 07466[1] | 330 North Garden | Bloomington | MN |
| 21 | 08224 | 5105 Edina Industrial Blvd | Edina | MN |
| 22 | 09332 | 5358 West Broadway Ave | Crystal | MN |
| 23 | 05591 | 2535 Division Street | North St Paul | MN |
| 24 | 06590 | 1215 Gun Club Road | White Bear Lake | MN |
| 25 | 08004 | 3333 Rice Street | Shoreview | MN |
| 26 | 09272 | PO 264   403 Fire Monument Road | Hinckley | MN |
| 27 | 11243 | 1560 West 4th Street | Rush City | MN |
| 28 | 11682 | 38711 Tanger Drive | North Branch | MN |
| 29 | 05713 | 1501 Weir Drive | Woodbury | MN |
| 30 | 06530 | 7051 Tenth Street North | Oakdale | MN |
| 31 | 07937 | 2411 Center Drive | Hudson | WI |
| 32 | 09934 | 120 Meridian Drive | New Richmond | WI |
| 33 | 11254 | 9896 Norma Lane | Woodbury | MN |
| 34 | 12757 | 1287 N Main St | River Falls | WI |
| 35 | 10239 | 244 Grand Avenue | St Paul | MN |
| 36 | 10284 | 695 7th Street East | St Paul | MN |
| 37 | 11284 | 1500 Stinson Blvd NE | Minneapolis | MN |
| 38 | 11535 | 8481 SE Point Douglas Road | Cottage Grove | MN |
| 39 | 12250 | 925 Washington Ave SE | Minneapolis | MN |
| 40 | 13091 | 289 57th Avenue NE | Fridley | MN |
| | **Missouri Region** | | | |
| 1 | 03232 | 3009 S. Campbell Avenue | Springfield | MO |
| 2 | 05357 | 1022 Kings Highway Street | Rolla | MO |
| 3 | 07203 | 525 S. National Avenue | Springfield | MO |
| 4 | 12281 | 2200 E. Austin Blvd | Nevada | MO |
| 5 | 11049 | 3095 Gardner Edgewood Drive | Neosho | MO |
| 6 | 12413 | 315 N. Massey Blvd | Nixa | MO |
| 7 | 12415 | 875 E. Highway 60 | Monett | MO |
| 8 | 01227 | 935 W. Kearney | Springfield | MO |
| 9 | 03475 | 2138 N. Glenstone Avenue | Springfield | MO |

---

[1] The Debtors reserve the right to exclude Restaurant # 7466 from the restaurants to be sold in the Minnesota Region.

|    | **Store #** | **Address**              | **City**     | **State** |
|----|-------------|--------------------------|--------------|-----------|
| 10 | 04513       | 1077 S. Jefferson Avenue | Lebanon      | MO        |
| 11 | 05539       | 1101 S. Limit Avenue     | Sedalia      | MO        |
| 12 | 08384       | 1911 S. Springfield Avenue | Bolivar    | MO        |
| 13 | 09331       | 1317 Preacher Roe Blvd   | West Plains  | MO        |

**Davenport Region**

|   | Store # | Address | City | State |
|---|---------|---------|------|-------|
| 1 | 04043 | 229 West Kimberly Road | Davenport | IA |
| 2 | 04201 | 5231 N Brady Street | Davenport | IA |
| 3 | 04297 | 4040 38th Avenue | Moline | IL |
| 4 | 06211 | 1222 Avenue of the Cities | East Moline | IL |

**Wisconsin Region**

|   | Store # | Address | City | State |
|---|---------|---------|------|-------|
| 1 | 01764 | 2655 East Washington | Madison | WI |
| 2 | 01888 | 2624 Milton Avenue | Janesville | WI |
| 3 | 03792 | 4980 South 76th Street | Greenfield | WI |
| 4 | 04857 | 822 Windsor Street | Sun Prairie | WI |
| 5 | 09366 | 400 Center Way | Janesville | WI |

**Illinois Region**

|    | Store # | Address | City | State |
|----|---------|---------|------|-------|
| 1  | 01752 | 723 Shooting Park | Peru | IL |
| 2  | 00111 | 18459 South Halsted Street | Glenwood | IL |
| 3  | 01747 | 209 Norris Drive | Ottawa | IL |
| 4  | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| 5  | 05879 | 1830 Southwest Avenue | Freeport | IL |
| 6  | 11877 | 504 West Blackhawk Drive | Byron | IL |
| 7  | 16573 | 2320 Route 34 | Oswego | IL |
| 8  | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| 9  | 00437 | 1138 East State Street | Rockford | IL |
| 10 | 01060 | 1450 4th Street | Beloit | WI |
| 11 | 01326 | 2434 11th Street | Rockford | IL |
| 12 | 10234 | 7510 East State Street | Rockford | IL |

# SCHEDULE 2

## GROUP TWO RESTAURANTS

|    | Store # | Address | City | State |
|----|---------|---------|------|-------|
| 1  | 00106 | 901 North Lake Street | Aurora | IL |
| 2  | 01558 | 1411 S. Range Line Road | Joplin | MO |
| 3  | 04111 | 3500 South Moorland Road | New Berlin | WI |
| 4  | 04334 | 2423 Rockingham Road | Davenport | IA |
| 5  | 05960 | 2001 Center Avenue | Janesville | WI |
| 6  | 05971 | 1710 DeKalb Avenue | Sycamore | IL |
| 7  | 06030 | 1011 W. Central Avenue | Carthage | MO |
| 8  | 06609 | 3020 E. Sunshine Street | Springfield | MO |
| 9  | 07204 | 1699 W. Jackson Street | Ozark | MO |
| 10 | 08964 | 1220 E. Republic Road | Springfield | MO |
| 11 | 09744 | 1429 Main Street | Parsons | KS |
| 12 | 11191 | 2789 Milwaukee Road | Beloit | WI |
| 13 | 11751 | 808 S Illinois Avenue | Republic | MO |

# SCHEDULE 3

# DESCRIPTION OF BURGER KING CORPORATION'S APPROVAL PROCESS

a. <u>New Franchisee Approval Process</u>: New franchisee candidates must obtain approval by all of the following:

   o <u>Operations Review</u>: Criteria includes: directly comparable experience in a multi-unit retail environment preferably in the restaurant sector. Candidate must pass interviews with BKC's Franchise Operations leadership.

   o <u>Legal Review</u>: Criteria include background checks.

   o <u>Credit Review</u>: Criteria include reliable credit history.

   o <u>Financial Review</u>: Criteria includes net worth of at least $1.5M or 3-5x the equity required to complete the targeted deal, whichever is greater.

   o <u>Franchising Review</u>: Franchisee must obtain approval of BKC's franchise leadership team. Criteria includes alignment with BKC's franchising guiding principles, including a focus on growth via organic development and an understanding of BKC's policies on maximum restaurant count and contiguous geography.

b. <u>Deal Approval</u>: Transfers of BURGER KING® restaurants are subject to case-by-case deal approval by BKC's Operations, Franchising, Legal and Finance groups. Being approved to become a franchisee does not in any way give the approved candidate a path around this process.

c. <u>Approval Process for Existing Franchisee Acquisitions</u>: Existing franchisees seeking to acquire any particular set of existing BURGER KING® restaurants must obtain approval by all of the following:

   o <u>Operations Review</u>: BKC's Field Operations must support the buyer based on their operations track-record and organizational capacity.

   o <u>Financial Review</u>: The proposed buyer must demonstrate the financial capacity to handle the transaction in addition to any required capital expenditures. Buyers must be current in all payments due to BKC.

   o <u>Franchising Review</u>: In general terms, the buyer must be aligned with all BKC goals and initiatives. Check-points include whether the franchisee is compliant with all equipment and remodeling obligations in their existing business; whether the buyer has supported local marketing initiatives; and whether the buyer has developed new restaurants. In addition, the acquisition will be reviewed for whether it is in the same geographical areas as the proposed buyer's existing base of operations; and whether it causes the buyer to be at or near the 100-restaurant ceiling.