# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | |
| (includes: | Court File Nos: |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**NOTICE OF EXPEDITED MOTION AND MOTION FOR ORDERS (I) SCHEDULING A
HEARING ON STALKING HORSE BIDS; (II) APPROVING STALKING HORSE
PROTECTION FEES; (III) APPROVING FORM OF STALKING HORSE ASSET
PURCHASE AGREEMENTS; (IV) APPROVING FORM AND MANNER OF SALE
NOTICE AND CURE NOTICE; (V) AUTHORIZING DEBTORS TO SELL ASSETS FREE
AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; AND
(VI) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND
EXECUTORY CONTRACTS AND ESTABLISHING CURE COSTS**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

TO:     The Parties in Interest as Specified in Local Rule 9013-3(a)(2).

1.      The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby move the Court for the relief requested below and give notice of hearings.

2.      The Court will hold a hearing (the "Stalking Horse Hearing") on an expedited basis on a portion of the relief requested in this Motion at 9:30 a.m. (CT) on April 14, 2011, in Courtroom No. 2A, United States Courthouse, 316 North Robert Street, St. Paul, Minnesota 55101. In addition, the Court will hold a further hearing (the "Sale Approval Hearing") on the remaining relief requested in this Motion at 9:30 a.m. (CT) on May 10, 2011, at the same location.

3.     Local Rule 9006-1(b) provides deadlines for responses to this Sale Motion.  Any response to the expedited relief sought at the Stalking Horse Hearing must be filed and served by delivery not later than 9:30 a.m. (CT) on April 14, 2011, which is the time of the Stalking Horse Hearing.  Any response to the relief sought at the Sale Approval Hearing must be filed and served by delivery not later than May 5, 2011, which is the date set forth in the revised Sale Procedures (defined below).  **UNLESS A RESPONSE OPPOSING THE SALE MOTION IS TIMELY FILED, THE COURT MAY GRANT THE SALE MOTION WITHOUT A HEARING.**

4.     This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334, Fed. R. Bankr. P.5005 and Local Rules 1070-1 and 1073-1.  This is a core proceeding.  The petitions commencing the above-captioned chapter 11 cases were filed on December 4, 2010 (the "Petition Date").  The Debtors' chapter 11 cases are now pending in this Court.

5.     The relief sought in this Motion is based upon 11 U.S.C. §§ 105, 363, 365, 503, 507, 541 and 554 and Fed. R. Bankr. P. 2002(a)(2), 6004, 6004(h), 6006 and 6006(d).  The Debtors are seeking the following relief bifurcated between two hearings:  (i) the expedited approval of stalking horses bids for each of the Group One Regions (defined below), multiple stalking horse protection fees and forms of asset purchase agreement; and, at a later date, (ii) the sale of substantially all of their assets and the assumption and assignment of certain related unexpired leases and executory contracts to the highest and best bidder or bidders at the Group One Auction or the Group Two Auction (depending upon the particular asset groups being bid upon).

6.     The sale of assets to the respective proposed stalking horse bidders or the ultimate successful bidders at auction is an important step to achieve the primary goal of the Debtors'

chapter 11 process — maximizing value for all stakeholders, including by preserving the going concern value of the Debtors' businesses. In order to obtain the anticipated benefits of the proposed sale transaction, however, it is imperative that this process be completed expeditiously. Given the continuing stress on the Debtors' liquidity and the accrual of administrative costs, the Debtors may be adversely affected if the sale process cannot be concluded in a manner requested in this Motion.

## I.  BACKGROUND

7.  The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 157 and § 1334. Consideration of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(L). The venue of the Debtors' chapter 11 cases and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409 and Local Bankruptcy Rules.

8.  The Debtors' chapter 11 cases are being jointly administered for procedural purposes pursuant to an order entered December 8, 2010, Docket No. 40.

## II.  BACKGROUND RELEVANT TO THE RELIEF REQUESTED

9.  Both prior to and after the filing of their chapter 11 cases, the Debtors began exploring their options for exiting bankruptcy. The Debtors, after discussions with their franchisor, Burger King Corp. ("BKC"), and secured lender, Bank of America, N.A. ("BofA"), concluded that a sale of substantially all of their assets was the best way to maximize value. Subsequently, after its formation, the Debtors discussed the sale with the Official Committee of Unsecured Creditors (the "Committee"), who also support the process. As a result, and after significant negotiations with the primary parties in interest, the Debtors were able to commence the comprehensive sale process.

10.  At the Debtors' request, and consistent with the Debtors' sale efforts, on January 24, 2011, the Court entered the Order Approving Sale and Bidding Procedures, Docket No. 137

(the "Sale Procedures Order"), which, among other things, authorized the Sale and Bidding Procedures (the "Sale Procedures"). The Sale Procedures[1] also establish the protocol for the marketing and sale of the Debtors' assets to a proposed purchaser(s) — whether to a stalking horse or otherwise — that will be selected at an auction for one or all of the Group One Regions[2] (the "Group One Auction") and, if there is interest in the Group Two Restaurants, a separate auction (the "Group Two Auction"). The Sale Procedures further authorize the Debtors to select one or more stalking horse bidders, negotiate stalking horse protection fees, and execute forms of asset purchase agreements with the proposed stalking horse bidders.

11. Through the efforts of their investment banker, the Debtors have been able to sign up three separate proposed stalking horse bidders that have submitted bids in the aggregate for each of the five Group One Regions. As described in more detail later in this Motion, the following parties have signed stalking horse asset purchase agreements for the following Group One Regions:

> i. Strategic Restaurants Acquisition Company II, LLC ("SRAC") for the Missouri Region;
>
> ii. Crown Ventures Iowa, Inc. ("Crown") for the Davenport Region; and
>
> iii. Heartland Food Corp. ("Heartland," and with SRAC and Crown, the "Stalking Horse Bidders") for the Minnesota Region, and separately for the Illinois Region and Wisconsin Region.

12. A summary description of each respective Stalking Horse Bidder's proposed form of asset purchase agreement, stalking horse protection fee, and bid description is explained herein. The respective Stalking Horse Bidders were chosen for each of the five regions because

---

[1] The timelines set forth in the Sale Procedures were amended by stipulation of the Debtors, BKC, BofA and the Committee.

[2] Capitalized terms used, but not otherwise defined herein, have the meanings given to them in the Sale Procedures.

each was, at this point in the process, the highest and best bidder with the best bid per Group One Region based on price, terms and likelihood of closing.

## III.    LIENHOLDERS

13.    The proposed sale of the Debtors' assets will be a sale free and clear of all liens, claims, interests and encumbrances.  The following summarizes the nature, extent and amount of all such secured interests in the Debtors' property (unless otherwise subsequently challenged and/or determined by the Court to be invalid).

### A.    Bank of America's Secured Credit Facilities

14.    Debtor, Duke and King Acquisition Corp. ("D&K Acquisition"), and Debtor, Duke and King Florida, LLC ("D&K Florida" and sometimes together with D&K Acquisition referred to herein as the "Original BofA Borrowers"), as borrowers, entered into a Credit Agreement dated as of November 1, 2006, with BofA, as Lender and Administrative Agent (the "Credit Agreement").  The original commitment amount under the Credit Agreement was $23.5 million, consisting of:  (i) a term loan in the initial principal amount of $15 million ("Term Loan A"); (ii) a term loan in the initial principal amount of $1 million ("Term Loan B"); and (iii) an acquisition note in the initial principal amount of $7.5 million (the "Acquisition Note," and collectively with Term Loan A and Term Loan B, the "Original BofA Notes").  The maturity date of each of the Original BofA Notes is November 1, 2011.

15.    On March 1, 2007, the Original BofA Borrowers, Debtor, Duke and King Real Estate, LLC ("D&K Real Estate"), and Duke and King Missouri, LLC ("D&K Missouri", and with the Original BofA Borrowers and D&K Real Estate, these parties are collectively referred to herein as the "BofA Borrowers"), entered into a First Amendment to Credit Agreement with BofA (the "First Amendment").  The commitment amount under the Credit Agreement, as amended by the First Amendment, was increased to $33.262 million, consisting of: (i) Term

Loan A in the initial principal amount of $15 million; (ii) Term Loan B in the initial principal amount of $1 million; (iii) a reduction in the principal amount of the Acquisition Note to $3.5 million; (iv) a new term loan in the initial principal amount of $5.826 million ("Term Loan C"); and (v) a new term loan in the initial principal amount of $7.936 million ("Term Loan D"). Term Loan A, Term Loan B, Term Loan C, Term Loan D and the Acquisition Note are collectively referred to herein as the "BofA Notes."

16.    On February 24, 2009, the BofA Borrowers and BofA entered into a Second Amendment to Credit Agreement.  On December 17, 2009, the BofA Borrowers and BofA entered into a Third Amendment to Credit Agreement.  As part of these amendments, BofA consented to the sale and leaseback of certain real property and the sale of certain restaurants located in Florida.

17.    As of December 1, 2010, according to the books and records of the Debtors the BofA Borrowers' outstanding obligations to BofA under the BofA Notes total approximately: (a) $9,247,144 on Term Loan A; (b) $0.00 on Term Loan B; (c) $1,655,283 on Term Loan C; and (d) $24,037 in principal, $280.60 in interest and $272.19 in late charges, on the Acquisition Note.  Term Loan D is paid in full.  In addition, D&K Acquisition and BofA were parties to an ISDA Master Agreement and Schedule dated November 10, 2006 pursuant to which D&K Acquisition and BofA have entered into three swap transactions, as evidenced by a confirmation dated as of March 2, 2007 and two confirmations dated as of March 6, 2007.

18.    In the Credit Agreement, as amended and modified, the BofA Borrowers granted BofA a security interest in certain of the Debtors' assets, which were those assets listed on an exhibit to the Debtors' Motion for (I) Expedited Relief, and (II) Interim and Final Orders (A) Authorizing Debtors' Use for Unencumbered Cash or, in the Alternative, Cash Collateral

and (B) Granting Adequate Protection, Docket No. 138 (collectively, the "BofA Collateral"). Currently, the Committee and BofA have executed a Stipulation extending the Committee's challenge rights against BofA's security interests in the BofA Collateral through May 3, 2011.

**B.      Warren Capital Corporation**

19.      In 2009 and 2010, D&K Acquisition and D&K Missouri entered into various equipment financing agreements with Warren Capital Corporation ("Warren"). Warren is claiming a security interest in the equipment and proceeds of such equipment, but not the Debtors' inventory. In addition, the Debtors are current in their payments to Warren under the terms of the financing agreements.

**C.      The Coca-Cola Company**

20.      In 2008 and 2009, D&K Acquisition entered into various security agreements and notes with the Coca-Cola Company ("Coca-Cola") to finance the purchase of certain post-mix beverage dispensing equipment, icemakers, ice dispensers, and other related equipment (collectively, the "Coca-Cola Equipment"). Coca-Cola is claiming a security interest in the Coca-Cola Equipment and proceeds thereof, but not in the Debtors' inventory. The Debtors remain current in their obligations to Coca-Cola.

**D.      Duke Manufacturing Company**

21.      In 2009, D&K Acquisition entered into various equipment agreements with Duke Manufacturing Co. ("Duke") to purchase certain kitchen equipment. Duke is claiming a purchase money security interest in the Duke equipment and the proceeds thereof, but not the Debtors' inventory. In addition, the Debtors had paid for the Duke equipment in full as of the Petition Date.

E.    **Meadowbrook Meat Company, Inc.**

22.    In 2006, Meadowbrook Meat Company, Inc. ("MBM") filed a financing statement covering all of D&K Acquisition's right, title and interest in all current and after-acquired inventory at restaurants located in the State of Missouri.  MBM is claiming a security interest in D&K Acquisition's food and supply inventory and the product and proceeds thereof located at those Missouri restaurants.  Currently, the Committee and MBM have executed a stipulation extending the Committee's challenge rights against MBM's security interest through April 30, 2011.

F.    **Burger King Corporation**

23.    D&K Acquisition and D&K Missouri (together, the "BKC Licensees") have entered into various BURGER KING® Restaurant Franchise Agreements with BKC.  As noted above, the BKC Licensees operate 87 BURGER KING® restaurants in Iowa, Illinois, Kansas, Minnesota, Missouri and Wisconsin.  Of those 87 restaurants, the franchise agreements for 52 of them have been modified by the terms of a Limited License Agreement with BKC (as amended).

IV.    **MARKETING AND SALE PROCESS**

24.    The Debtors have completed an extensive marketing and sale process.  During the past several months, the Debtors, with the assistance of their professionals, have been actively engaged in soliciting interest in a sale of all of their assets.  The Debtors engaged Mastodon Ventures, Inc. ("Mastodon") to serve as their investment banker for this process.

25.    As set forth in more detail in the Unsworn Declaration of Robert Hersch in Support of Debtors' Sale Motion (the "Hersch Declaration") attached hereto as Exhibit A, Mastodon and the Debtors undertook an intensive effort to identify and track entities interested in purchasing the Debtors' businesses, facilitate potential buyers' due diligence, and assist in negotiating multiple asset purchase agreements.

26.     Mastodon reviewed information provided to it by the Debtors and interviewed the Debtors' senior management and their other professional advisors.   With that information, Mastodon and the Debtors prepared a transaction introduction teaser for distribution to potential purchasers, which summary provided a brief overview of the Debtors and their operations. Mastodon then completed a confidential information memorandum (the "Memorandum"), which included a more comprehensive analysis of the Debtors' history, operations, strategy and financial performance.   Mastodon set up an electronic data room (the "Data Room"), which contains significant financial information as well as leases, contracts and other documents pertaining to the Debtors' operations and financial performance, all of which may be instantly accessed by certain potential bidders via password through the Data Room website.

27.     During the week of February 7, 2011, Mastodon began communicating with potential purchasers.  To date, Mastodon has contacted approximately 130 potential purchasers, consisting of both financial purchasers and strategic buyers.  Any interested potential purchaser received a one page transaction introduction teaser along with a request to sign a confidentiality agreement as a prerequisite to receive the 79-page Memorandum.   To date, 58 parties have executed confidentiality agreements and have been provided with the Memorandum.

28.     Copies of the Memorandum were also provided to the attorneys for BofA, BKC and the Committee.   Mastodon and the Debtors' other professionals have conducted regular conference calls with attorneys and client representatives of those parties as well as others to keep them informed of the sale process.  Mastodon identified potential buyers whose investment criteria and track record made them likely to pursue a transaction with the Debtors.   Potential buyers were sent copies of the Memorandum upon execution of a confidentiality agreement.

Approximately 58 copies of the Memorandum were distributed to private equity groups, hedge funds, and strategic buyers approved by the Debtors.

29.     Officers and employees of the Debtors, professionals of Conway McKenzie and principals and employees of Mastodon participated in due diligence conference calls and in-person meetings with approximately 40 potential purchasers.  As of the filing of this Motion, 13 indications of interest to purchase some or all of the Debtors' assets were submitted to Mastodon. Pursuant to Section XVIII of the Sale Procedures, the Debtors have consulted with representatives of BofA, BKC and the Committee regarding bids prior to the filing of this Motion.  Mastodon subsequently entered into negotiations with several potential purchasers chosen by the Debtors with the advice of Mastodon and the Debtors' professionals.  The negotiations advanced to the point that the three separate Stalking Horse Bidders became the Debtors' focus.

30.     Pursuant to the Sale Procedures, potential purchasers of the Debtors' assets are required to satisfy certain criteria to become "Qualified Bidders" for the Debtors' assets.  The Sale Procedures, as amended, further authorize the Debtors to select a stalking horse bidder or bidders at any time prior to April 11, 2011.  The Sale Procedures further provide that the Debtors may grant to a stalking horse bidder certain protections, including a break-up fee and/or expense reimbursement should such stalking horse bidder be unsuccessful at the Group One Auction (a "Stalking Horse Protection Fee").  Finally, the Sale Procedures provide for all potential bidders to make qualifying bids by April 19, 2011 (the "Bid Deadline").

31.     The Debtors' marketing efforts are described in greater detail in the accompanying Hersch Declaration.  As a result of these efforts, the Debtors believe there may be

parties in addition to the Stalking Horse Bidders interested in pursuing a transaction for some or all of the Debtors' assets.

## V.    REQUEST TO APPROVE THE STALKING HORSE, STALKING HORSE APA AND STALKING HORSE PROTECTION FEE

32.    The Debtors' and their professionals' efforts have culminated in four separate asset purchase agreements with the Stalking Horse Bidders who, collectively, are submitting Qualified Bids for each of the Group One Regions.  Attached to this Motion are copies of each of the proposed asset purchase agreements with the respective Stalking Horse Bidders (to the extent applicable, with schedules and exhibits) and the Debtors.  The Debtors will not repeat here, word for word, all of the critical language in each asset purchase agreement.  Instead, set out below are the highlights of each agreement.

### A.    Stalking Horse Bid for Missouri Region

33.    On or about April 8, 2011, SRAC and D&K Missouri executed an asset purchase agreement for the assets in the Missouri Region in Group One (the "Missouri APA"), attached hereto as Exhibit B.

(a)    Assets to be Sold.  The Missouri APA provides that SRAC will acquire substantially all of the Debtors' operating assets located in the Missouri Region.  The Missouri APA also contemplates that SRAC will acquire most of the Debtors' non-operating assets, including inventory, cash on hand at the restaurants, machinery, equipment, prepaid expenses, certain acquired contracts, including BKC franchise agreements and real property leases, goodwill and permits.

(b)    Excluded Assets.  The Missouri APA excludes from the purchase all cash, cash in transit, or cash equivalents in the Debtors' accounts and all accounts receivable.  It also excludes Bankruptcy Code-related causes of action, utility deposits, insurance recoveries and corporate-level assets.

(c)    Assumed Liabilities.  The Missouri APA provides that SRAC will assume only liabilities that occur or arise after the closing and specifically relate to the Acquired Assets, including any Acquired Contracts (as defined in the Missouri APA).

(d) <u>Purchase Price</u>. The Missouri APA provides that SRAC will, in addition to assuming any of the Debtors' obligations described above, pay to the Debtors $3,100,000 plus the amount of on-hand cash and on-hand inventory. The purchase price is subject to adjustment for certain prorations related to the leased real property as set forth in the Missouri APA.

(e) <u>Key Conditions</u>. SRAC's obligation to purchase assets pursuant to the Missouri APA is not subject to financing. Certain conditions to a closing exist in the Missouri APA, including, but not limited to, entry of an order approving the sale by the Court, payment of cure costs, and other closing deliveries. The Missouri APA further provides for two separate escrows to be used to pay (i) all postpetition, pre-closing payroll liabilities to store level employees in the Group One Missouri Region; and (ii) all postpetition, pre-closing trade obligations related to the Group One Missouri Region.

(f) <u>Deposit</u>. The Missouri APA provides for a deposit of $310,000 into an interest bearing escrow account.

(g) <u>Termination</u>. The Missouri APA allows for termination by SRAC under certain limited circumstances. SRAC may terminate if the Debtor fails to remedy a material breach of any representation or warranty within three business days of notice; or the Debtors' cases are converted by motion of the Debtors.

34. To the extent that any description of the Missouri APA contained in this Motion is inconsistent with the Missouri APA, the Missouri APA shall control.

35. SRAC, headquartered in San Ramon, California, is an affiliate of Strategic Restaurants Acquisition Group ("Strategic"), which is a fast-food company focused on franchise development and acquisition. Strategic is a franchisee of BKC, having more than 250 restaurants across six states. Strategic, a portfolio of Cerberus Capital Management, also operates nearly 20 TGI Friday's franchises.

**B.    Stalking Horse Bid for Davenport Region**

36. On or about April 11, 2011, Crown and D&K Acquisition executed an asset purchase agreement for the assets in the Davenport Region in Group One (the "Davenport APA"), attached hereto as <u>Exhibit C</u>.

(a)     <u>Assets to be Sold</u>.  The Davenport APA provides that Crown will acquire substantially all of the Debtors' operating assets located in the Davenport Region.  The Davenport APA also contemplates that Crown will acquire most of the Debtors' non-operating assets, including inventory, cash on hand at the restaurants, machinery, equipment, prepaid expenses, certain acquired contracts, including BKC franchise agreements and real property leases, goodwill and permits.

(b)     <u>Excluded Assets</u>.  The Davenport APA excludes from the purchase all cash, cash in transit, or cash equivalents in the Debtors' accounts.  It also excludes Bankruptcy Code-related causes of action, accounts receivable, utility deposits, insurance recoveries and corporate-level assets.

(c)     <u>Assumed Liabilities</u>.  The Davenport APA provides that Crown will assume accounts payable, accrued expenses and property taxes arising after the Petition Date all relating to Acquired Assets in the Davenport Region, as well as all liabilities that occur or arise after the closing and specifically relate to the Acquired Assets, including any Acquired Contracts (as defined in the Davenport APA).

(d)     <u>Purchase Price</u>.  The Davenport APA provides that Crown will, in addition to assuming the Debtors' obligations described above, pay to the Debtors $500,000 plus the assumption of the assumed liabilities less a credit for any prepaid rebates.  The purchase price is subject to adjustment for certain prorations.

(e)     <u>Key Conditions</u>.  Crown's obligation to purchase assets pursuant to the Davenport APA is not subject to financing.  Certain conditions to a closing exist in the Davenport APA, including, but not limited to, entry of an order approving the sale by the Court, Debtors' payment of cure costs, and other closing deliveries.  The Davenport APA further provides for an escrow to be used to pay all postpetition, pre-closing payroll obligations related to the Group One Davenport Region.

(f)     <u>Deposit</u>.  The Davenport APA provides for a deposit of $50,000 into an interest bearing escrow account.

(g)     <u>Termination</u>.  The Davenport APA allows for termination by Crown under certain limited circumstances.  Crown may terminate if the Debtor fails to remedy a breach of any material representation or warranty or any material failure to perform a pre-closing covenant within three business days of notice; or the Debtors' cases are converted by motion of the Debtors.

37.     To the extent any description of the Davenport APA contained in this Motion is inconsistent with the Davenport APA, the Davenport APA shall control.

38.     Crown is a Michigan corporation that owns and operates five BKC restaurants located in Michigan.  Crown purchased the five units and entered the BKC system in January 2009.

**C.     Stalking Horse Bid for Minnesota Region**

39.     On or about April 11, 2011, Heartland and D&K Acquisition executed an asset purchase agreement for the assets in the Minnesota Region in Group One (the "Minnesota APA"), attached hereto as Exhibit D.

(a)     Assets to be Sold.  The Minnesota APA provides that Heartland will acquire substantially all of the Debtors' operating assets located in the Minnesota Region.  The Minnesota APA also contemplates that Heartland will acquire most of the Debtors' non-operating assets, including inventory, cash on hand at the restaurants, machinery, equipment, prepaid expenses, certain acquired deposits, certain acquired contracts, including BKC franchise agreements and real property leases, goodwill, permits and certain Bankruptcy Code-related causes of action related to the Debtors' critical vendors.

(b)     Excluded Assets.  The Minnesota APA excludes from the purchase all cash, cash in transit, or cash equivalents in the Debtors' accounts.  It also excludes Bankruptcy Code-causes of action related to the Debtors' non-critical vendors, accounts receivable, pre-closing rebates, utility deposits, insurance recoveries, tax refunds, and corporate-level assets.

(c)     Assumed Liabilities.  The Minnesota APA provides that Heartland will assume certain accounts payable, certain accrued expenses, certain property taxes and certain payroll liabilities, as well as all liabilities that occur or arise after the closing and specifically relate to the Acquired Assets, including any Acquired Contracts (as defined in the Minnesota APA).

(d)     Purchase Price.  The Minnesota APA provides that Heartland will, in addition to assuming the Debtors' obligations described above, pay to the Debtors $7,161,000 plus the assumption of the assumed liabilities.  The purchase price is subject to adjustment for certain adjustments post-closing relating to net working capital.

(e)     Key Conditions.  Heartland's obligation to purchase assets pursuant to the Minnesota APA is not subject to financing.  Certain conditions to a closing exist in the Minnesota APA, including, but not limited to, entry of an order approving the sale by the Court, payment of cure costs, and other

closing deliveries. The Minnesota APA further provides for two separate escrows related to the Group One Minnesota Region to be used to pay (i) nay post-closing working capital adjustments to the purchase price and (ii) any cure costs post-closing that remain subject to dispute at the time of closing.

(f) Deposit. The Minnesota APA provides for a deposit of $716,000 into an interest bearing escrow account.

(g) Termination. The Minnesota APA allows for termination by Heartland under certain limited circumstances. Heartland may terminate if the Debtors fail to remedy a breach of any material representation or warranty or any material failure to perform a pre-closing covenant within ten business days of notice; the Debtors' cases are converted by motion of the Debtors; or the parties fail to consummate a sale within 120 days of the Minnesota APA execution date.

40. To the extent any description of the Minnesota APA contained in this Motion is inconsistent with the Minnesota APA, the Minnesota APA shall control.

41. Heartland, based in Dowers Grove, Illinois, is the second/third largest BKC franchisee with annual revenues exceeding $280 million. Heartland's BKC restaurants are located in four Midwest states and Canada. Heartland is majority owned by GSO Capital Partners, LP, a New York based investment group.

**D. Stalking Horse Bid for Illinois Region and Wisconsin Region**

42. On or about April 11, 2011, Heartland and D&K Acquisition executed an asset purchase agreement for the combined assets of both the Illinois Region and the Wisconsin Region located in Group One (the "IL/WI APA"), attached hereto as Exhibit E.

(a) Assets to be Sold. The IL/WI APA provides that Heartland will acquire substantially all of the Debtors' operating assets located in both the Illinois Region and the Wisconsin Region. The IL/WI APA also contemplates that Heartland will acquire most of the Debtors' non-operating assets, including inventory, cash on hand at the restaurants, machinery, equipment, prepaid expenses, certain acquired deposits, certain acquired contracts, including BKC franchise agreements and real property leases, goodwill, permits, and Bankruptcy Code-related causes of action against the Debtors' critical vendors.

(b)     Excluded Assets.  The IL/WI APA excludes from the purchase all cash, cash in transit, or cash equivalents in the Debtors' accounts.  It also excludes Bankruptcy Code-related causes of action related to the Debtors' non-critical vendors, accounts receivable, pre-closing rebates, utility deposits, insurance recoveries, and corporate-level assets.

(c)     Assumed Liabilities.  The IL/WI APA provides that Heartland will assume certain accounts payable, certain accrued expenses, certain property taxes and certain payroll liabilities as well as all liabilities that occur or arise after the closing and specifically relate to the Acquire Assets, including any Acquired Contracts (as defined in the IL/WI APA).

(d)     Purchase Price.  The IL/WI APA provides that Heartland will, in addition to assuming the Debtors' obligations described above, pay to the Debtors (i) $500,000 plus the assumption of the assumed liabilities for the Illinois Region, and (ii) $1 plus the assumption of the liabilities for the Wisconsin Region.   The purchase price is subject to adjustment for certain adjustments relating to net working capital.

(e)     Key Conditions.  Heartland's obligation to purchase assets pursuant to the IL/WI APA is not subject to financing.   The sales of each of the Wisconsin Region is and the Illinois Region are cross contingent upon on another (Heartland will not purchase the assets of only one of these regions). Certain conditions to a closing exist in the IL/WI APA, including, but not limited to, entry of an order approving the sale by the Court, payment of cure costs, and other closing deliveries.  The IL/WI APA further provides for two separate escrows related to the Group One Illinois Region and Wisconsin Region to be used to pay (i) any post-closing working capital adjustments to the purchase price and (ii) any cure costs post-closing that remain subject to dispute at the time of closing.

(f)     Deposit.  The IL/WI APA provides for a deposit of $50,000 into an interest bearing escrow account.

(g)     Termination.  The IL/WI APA allows for termination by Heartland under certain limited circumstances.  Heartland may terminate if the Debtors fail to remedy a breach of any material representation or warranty or any material failure to perform a pre-closing covenant within ten business days of notice; the Debtors' cases are converted by motion of the Debtors; or the parties fail to consummate a sale within 120 days of the IL/WI APA execution date.

43.     To the extent any description of the IL/WI APA contained in this Motion is inconsistent with the IL/WI APA, the IL/WI APA shall control.

44.     None of the sales to the Stalking Horse Bidders include any of the Group Two Restaurants. The Debtors, however, anticipate that there may be some interest for at least a portion of the Group Two restaurants.

**E.     Proposed Stalking Horse Protection Fees**

45.     As provided in Section X of the Sale Procedures, the Debtors have the ability to negotiate a break-up fee and reimbursement of reasonable expenses (collectively, a "Stalking Horse Protection Fee'). The following chart sets forth the requested break-up fees and expense reimbursements making up each party's aggregate Stalking Horse Protection Fee:

| Region | Stalking Horse Bidder | Sale Price | Break-Up Fee | Expense Reimbursement |
|---|---|---|---|---|
| Missouri | SRAC | $3,100,000 plus the value of on-hand cash and the value of on-hand inventory | $93,000 | Up to $100,000 |
| Davenport | Crown | $500,000 plus assumption of certain liabilities | $15,000 | Up to $20,000 |
| Minnesota | Heartland | $7,161,000 plus assumption of certain liabilities | 3% of Total Consideration (as defined in the Minnesota APA) | Up to $150,000 |
| Illinois | Heartland | $500,000 plus assumption of certain liabilities | 1.5% of Total Consideration (as defined in the IL/WI APA) | Up to $40,000 |
| Wisconsin | Heartland | $1 plus assumption of certain liabilities | 1.5% of Total Consideration (as defined in the IL/WI APA) | Up to $10,000 |

46.     SRAC's Stalking Horse Protection Fee under the Missouri APA would be paid to SRAC from the proceeds of an "Alternative Transaction" (as defined in the Missouri APA) or, if the Alternative Transaction is a successful credit bid, then from such secured party making a credit bid. Similarly, the Davenport APA provides that within two business days after the

closing of an Alternative Transaction (as defined in the Davenport APA), Crown's Stalking Horse Protection Fee will be paid to Crown out of the proceeds of such Alternative Transaction.

47.     The Heartland Stalking Horse Protection Fee under the Minnesota APA would be paid to Heartland from the proceeds of an Alternative Transaction (as defined in the Minnesota APA) within two business days of the closing of such Alternative Transaction.  Heartland also requests that its Stalking Horse Protection Fee under the Minnesota APA receive administrative superpriority under section 364(c)(1) of the Bankruptcy Code.  The Heartland Stalking Horse Protection Fee under the IL/WI APA would also be paid to Heartland from the proceeds of an Alternative Transaction (as defined in the IL/WI APA) within two business days of the closing of such Alternative Transaction; provided, however, that Heartland agrees to waive its Stalking Horse Protection Fee under the IL/WI APA in the event BofA exercises its credit bid rights and is the successful bidder for either the Illinois Region or the Wisconsin Region.  Heartland also requests that its Stalking Horse Protection Fee under the IL/WI APA receive administrative superpriority under section 364(c)(1) of the Bankruptcy Code.

48.     The Debtors believe that the amount of the respective Stalking Horse Protection Fees and the conditions under which each is payable to the Stalking Horse Bidder are reasonable under the circumstances.  The respective Stalking Horse Protection Fees are generally no greater than 3% of the purchase price of the respective Stalking Horse Bid.  Additional monetary value is also provided through the contemplated assumed liabilities, assumption of contracts and leases and associated cure costs, and continued operation of the businesses and attendant preservation of the relationships with suppliers, landlords, employees and other business partners.  The respective Stalking Horse Protection Fees are also necessary to ensure that the respective Stalking Horse Bidders will continue to pursue each proposed acquisition of the acquired assets

under the terms of their respective asset purchase agreements. Such continued participation allows for the maximization of value of the Debtors' estates by, among other things, establishing a bid standard and minimum bid for other bids and to attract additional bidders for the Debtors' respective regions. The amounts of the Stalking Horse Protection Fees are also commensurate with the substantial efforts that have been and will be expended by the Stalking Horse Bidders, the size of each of the transaction, and benefits to the Debtors' estates. Finally, as described in the Hersch Declaration, the Stalking Horse Protection Fees are customary in both nature and amount given the size of the transactions

**F.      Clarification of the Sale Procedures Regarding Overbids**

49.      Section XI of the Sale Procedures provides that the Debtors will select Baseline Bids (as defined in the Sale Procedures) to "serve as the negotiating point with the other Qualified Bidders at the Group One Auction." <u>See</u> Sale Procedures ¶ XI. Moreover, the Debtors may name more than one Baseline Bid. The Sale Procedures further provide that the initial minimum overbid shall be the "Baseline Bid established prior to the Group One Auction plus the lesser of 10% of the Baseline Bid or $200,000 (the "Initial Overbid"). <u>Id.</u> In the event that the Stalking Horse Bidders are approved by the Court, the Debtors intend to name each as the Baseline Bid for the respective Group One Region. As a result, the Debtors request that any other party seeking to submit a Qualified Bid must take into account the Initial Overbid required for each Group One Region that is subject to the bid of the respective Stalking Horse Bidder.

50.      The Debtors seek authority to sell the their assets to the respective Stalking Horse Bidders and to any other prospective purchasers for the Group One Region or Group Two Restaurants pursuant to section 363 of the Bankruptcy Code, subject to higher and better bids received at the Group One Auction (or the Group Two Auction) and by a process described in the proposed Sale Procedures. Because the Stalking Horse Bidders do not have any interest

materially adverse to the Debtors or the estates, the Debtors submit that the Stalking Horse Bidders are entitled to the protections afforded a good faith buyer under section 363(m), as the Missouri APA, Davenport APA, the Minnesota APA and the IL/WI APA are each a product of good-faith, arms' length negotiations. Under all circumstances, however, the Stalking Horse Bidder's bids remain subject to any overbid at the Group One Auction.

## VI. DEBTORS' REQUEST TO SELL SUBSTANTIALLY ALL OF THEIR ASSETS FREE AND CLEAR OF LIENS

51.    As set forth in detail in the Sale Procedures and earlier in this Motion, the Debtors are seeking offers for the sale of two different sets of assets. The "Group One Restaurants" consist of 74 BURGER KING® restaurant locations (as set forth on <u>Schedule 1</u> to the Sale Procedures) to be sold on a regional basis. The "Group Two Restaurants" consist of 13 BURGER KING® restaurant locations (as set forth on <u>Schedule 2</u> to the Sale Procedures) to be sold on a restaurant-by-restaurant basis. The Debtors have marketed the Group One and Group Two Restaurants concurrently, but, if necessary, will hold two separate auctions. Qualified Bidders (as defined in the Sale Procedures) are not required to bid for both the Group One Restaurants and the Group Two Restaurants; however, any bidder that bids for both must not condition a Group Two bid on a Group One bid. Nevertheless, bidders may bid for individual regions within the Group One Region and individual Group Two Restaurants. The sales will be on an "as is, where is" and "with all faults" basis.[3]

52.    The Debtors have segregated the Group One Restaurants into five regions as an exercise of their sound business judgment. Prior to the Petition Date, the Debtors conducted an internal review of each restaurant's operations and profitability measures. The Debtors also

---

[3] This paragraph is not intended to be descriptive nor as a substitute for the provisions of the Sale Procedures, which control.

designated an additional 13 restaurants as containing potential impediments to achieving maximum sale value, which appear as the Group Two Restaurants. The Stalking Horse Bidders are bidding only on the Group One Regions. Nevertheless, to the extent parties submit Qualified Bids for any Group Two Restaurants by the Bid Deadline, the Debtors are requesting in this Motion that the Court approve the sale of the Group Two Restaurants at the Sale Approval Hearing.

53.     In accordance with section 363(f) of the Bankruptcy Code, a debtor in possession may sell property under section 363 of the Bankruptcy Code "free and clear of any interest in such property of an entity other than the estate" if one of the following conditions is satisfied:

> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding to accept a money satisfaction of such interest.

11 U.S.C. § 363(f)(1)-(5).

54.     Because the Debtors expect they will satisfy one or more of the requirements of section 363(f) of the Bankruptcy Code, they submit that approval of the sale of the Debtors' assets free and clear of all interests is warranted. Moreover, BofA, in Section I of the Sale Procedures, has agreed to waive any objection to a sale that is based on section 363(f) of the Bankruptcy Code.

55.     To the extent that any of the Debtors' secured creditors, including but not limited to BofA, assert a lien in the assets to be sold, the Debtors believe that they will obtain the

consent of such parties to the sale of such assets free and clear of all liens, claims and encumbrances. If such consent is not obtained prior to the Sale Approval Hearing, the Debtors request that the liens, claims and encumbrances asserted against the affected assets by any creditor be transferred and attached to the net proceeds from any sale received by the Debtors in the same validity, extent, priority as such parties have as of the Petition Date, subject to the rights, claims, defenses and objections, if any, of any and all interested parties with respect thereto. The Debtors propose that all proceeds from the sales of assets be placed into an appropriate escrow account to be distributed upon further approval of the Court. Accordingly, the Debtors request that the order approving the sale of the assets provide that all such sales are free and clear of all liens, claims and encumbrances in accordance with section 363(f) of the Bankruptcy Code.

56.     In addition, the Debtors request that an order approving the sale to the Stalking Horse Bidders or any other higher and better bidder include the protections as provided in section 363(m) of the Bankruptcy Code. The Debtors submit, and will demonstrate at the Sale Approval Hearing, that the Stalking Horse Bidders and any such higher and better bidder does not have an interest clearly adverse to the Debtors, their estates, or their creditors.

## VII. DEBTORS' REQUEST FOR APPROVAL OF THE ASSUMPTION AND ASSIGNMENT OF LEASES AND CONTRACTS AND ESTABLISHING CURE COSTS

57.     The Debtors are parties to a number of executory contracts and unexpired leases, including, but not limited to, franchise agreements with BKC, non-residential real property leases with various landlords, and other miscellaneous agreements. In accordance with the terms of the Missouri APA, the Davenport APA, the Minnesota APA and the IL/WI APA (or any asset purchase agreement of a successful bidder), the Debtors will be required to assume and assign to such parties, or any other successful bidders, certain of those executory contracts and unexpired

leases (collectively, the "Contracts and Leases").  A list of the Contracts and Leases is attached hereto as Exhibit F, which sets forth the type of contract or lease, the counterparty and the proposed cure amounts owing (the "Cure Costs").  The Debtors propose to provide the counterparties with a separate notice of the Contracts and Leases in the form of the notice attached hereto as Exhibit G (the "Cure Notice").

58.     The Debtors caution that only a certain portion of their executory contracts or unexpired leases may be assumed and assigned to the respective Stalking Horse Bidders or the successful bidders for assets.  Rather, this Motion operates to: (i) identify substantially all the Contracts and Leases that may be assumed and assigned; (ii) provide adequate notice of the proposed Cure Costs to all counterparties (*i.e.*, the non-debtor parties) to the Contracts and Leases; and (iii) allow all such counterparties the opportunity to dispute the amount of the Cure Costs.  The resulting process will ensure that the Debtors can timely address any Cure Costs and other related issues on or before the Sale Approval Hearing — even if not all of the Contracts and Leases listed on the Cure Notice will ultimately be assumed by the Debtors and assigned to the respective Stalking Horse Bidders or the ultimate successful bidders, as the case may be.  All of the Contracts and Leases that will be assumed and assigned to the Stalking Horse or the successful bidders will be identified on a schedule to the respective Missouri APA, Davenport APA, Minnesota APA, IL/WI APA or similar asset purchase agreement of such successful bidder(s).  The Debtors and/or the respective Stalking Horse Bidders, or ultimate successful bidders, reserve the right to remove any Contract or Lease off of any list of contracts or leases to be assumed and assigned up to the closing of the respective Stalking Horse Bidders or successful bidders' purchase of the assets.

59. Pursuant to section 541 of the Bankruptcy Code, the Contracts and Leases constitute property of the Debtors' estates that may be sold consistent with section 363 of the Bankruptcy Code. In accordance with the provisions of section 365 of the Bankruptcy Code, the Debtors may assume and assign the Contracts and Leases and recover value from such assets. In pertinent part, section 365(f) of the Bankruptcy Code provides:

> (f)(1) [N]otwithstanding a provision in an executory contract or unexpired lease of the debtor, or in applicable law, that prohibits, restricts, or conditions the assignment of such contract or lease, the trustee may assign such contract or lease under paragraph (2) of this subsection.
>
> • • •
>
> (2) The trustee may assign an executory contract or unexpired lease of the debtor only if-
>
> > (A) the trustee assumes such contract or lease in accordance with the provisions of this section; and
> >
> > (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f).

60. The Debtors believe cause exists to approve the sale and the assumption and assignment of the Contracts and Leases pursuant to sections 363 and 365(f) of the Bankruptcy Code. As noted previously, the Debtors have determined, in the exercise of their sound business judgment, that the sale of their business operations is in the best interests of the Debtors and their estates. The Contracts and Leases are an integral part of those business operations.

61. The proposed assumption and assignment of the Contracts and Leases will comply with section 365 of the Bankruptcy Code. Upon the assumption and assignment, the Debtors (and/or the respective Stalking Horse Bidder or the respective successful bidder of such Contracts and Leases) will pay the Cure Costs. In addition, where required, the Debtors and/or

the respective Stalking Horse Bidders or the ultimate successful bidder will provide adequate assurance of future performance at the Sale Approval Hearing.

62.     The Cure Notice sets forth all amounts the Debtors believe are owed to each counterparty to a Contract and Lease.  The Debtors propose that the deadline for any counterparty to object to the proposed Cure Costs be no later than May 5, 2011 (which is the objection deadline set in the Sale Procedures).  To the extent no objection is filed with respect to a particular Cure Cost, such Cure Cost shall be deemed binding on the applicable counter-party to the Contract and Lease.  The payment of the Cure Cost (or a different amount either agreed to by the Debtors or resolved by the Court as a result of a timely-filed objection filed by a counterparty) will be in full and final satisfaction of all the Debtors' obligations to cure defaults and compensate the counterparties for any pecuniary losses under such Contracts and Leases pursuant to section 365(b)(1) of the Bankruptcy Code.[4]   Any Cure Costs disputed by a counterparty will be resolved by the Court at the Sale Approval Hearing.

63.     Accordingly, the Debtors request authority, pursuant to sections 363 and 365 of the Bankruptcy Code for the sale, assumption and assignment of the Contracts and Leases to the respective Stalking Horse Bidders or the highest and best acceptable bidder for the assets at the Group One Auction or the Group Two Auction, as the case may be.

## VIII.   REQUEST FOR RELIEF UNDER BANKRUPTCY RULES 6004(G) AND 6006(D)

64.     Bankruptcy Rules 6004(h) and 6006(d) provide, in substance, that an order authorizing the sale of a debtor's property or assumption/rejection of a lease or contract is stayed for a period of 14 days after entry of the order unless the court orders otherwise.  The Debtors

---

[4]   The Debtors reserve the right to argue (i) that any particular Contract and Lease is not truly executory in nature, or (ii) that cure is not a precondition to the transfer of assets to the respective Stalking Horse Bidders (or the ultimate successful purchasers).

request that any order approving the relief requested herein be effective immediately, by providing that the 14 day stay is inapplicable. The Debtors need to effectuate the asset disposition transactions described herein without waiting the period provided for under Bankruptcy Rules 6004(h) and 6006(d). The failure to consummate the transactions expeditiously likely will have a significant adverse affect on the value to be realized upon the disposition of the assets at issue and will cause a greater administrative burden on the estates. In addition, the Debtors' liquidity concerns also compel the Debtors to effectuate the transaction as expeditiously as possible so as to insure that they will have sufficient funds available to administer the chapter 11 cases.

## IX. REQUEST FOR EXPEDITED HEARING ON THE STALKING HORSE PORTION OF THE RELIEF REQUESTED IN THE MOTION

65. The Debtors seek an expedited hearing on the following relief requested in this Motion: (i) the approval of the Stalking Horse Bidders; (ii) the approval of stalking horse status of the Missouri APA, the Davenport APA, the Minnesota APA and the IL/WI APA; (iii) the approval of the respective Stalking Horse Protection Fees for SRAC, Crown and Heartland, respectively, and (iv) approval of the form and manner of the Sale Notice. As the Debtors have noted and previously discussed with the Court, BofA, BKC and the Committee, the Sale Procedures (as amended) set the a timeline for the sale process, including the naming of Stalking Horse Bidders by April 11, 2011. The Court has been very accommodating and has held open a hearing date on April 14, 2011, to hear the portion of the relief requested in the Motion relating to the Stalking Horse Bidders. The Debtors understand that three days' notice is exceedingly quick and a substantial deviation from the timeframes set forth in the Bankruptcy Rules and the Local Rules. However, the Debtors submit that an expedited hearing on April 14 is appropriate in light of the April 19 Bid Deadline. If the Debtors receive approval of the Stalking Horse

Bidders on April 14, they will have five days to allow all other interested bidders to consider the respective Stalking Horse Bidders' asset purchase agreements in advance of the Bid Deadline. The Debtors believe that the need for Stalking Horse Bidders to set the price floor for each region will allow them a more controlled auction. In addition, the Debtors will entertain objections to the initial relief up the April 14 hearing. Thus, the Debtors submit that an expedited hearing on a portion of the relief requested in the Motion is appropriate under the circumstances.

## X. APPROVAL OF SALE NOTICE AND CURE NOTICE

66.     The Debtors seek approval of the notice in substantially the form attached on Exhibit H (the "Sale Notice"). The Sale Notice will be mailed to each entity listed on the creditor matrix maintained pursuant to Local Rule 1007-2, to the entities identified in Local Rule 9013-3(a)(2), to counterparties to the Contracts and Leases, to each shareholder and to each entity identified by Mastodon as a potential purchaser. In addition, the Debtors seek approval of the form of the Sale Notice that will also be served on all the counterparties to the Contracts and Leases and which sets forth the amounts of the Debtors' proposed cure costs.

67.     Upon the filing of this Motion, the Debtors, with the assistance of Mastodon, will continue to solicit each party known by the Debtors to have indicated an interest in the Debtors' and to facilitate due diligence requirements. Mastodon will build upon its marketing efforts leading up to negotiations with the Stalking Horse Bidders. Through these efforts, Mastodon believes it may identify other parties who will be interested in participating in the Group One Auction or the Group Two Auction with such parties issuing Qualified Bids, as described in the Hersch Declaration.

## XI. CONCLUSION

68.     Pursuant to Local Rule 9013-2(a), this Motion is accompanied by a memorandum of law, proposed orders, and proof of service.

69.     Pursuant to Local Rule 9013-2(c), the Debtors give notice that they may, if necessary, call the Debtors' investment banker, Robert Hersch, Mastodon Ventures Incorporated, 515 Congress Avenue, Suite 1400, Austin, TX 78701, Tel: 512-498-1212; the Debtors' financial advisor, Joseph M. Geraghty, Conway MacKenzie, Inc., 109 N. Main Street, 500 Performance Place, Dayton, OH 45402 Phone: 937-222-7317; and the Debtors' Chief Financial Officer, Becky Moldenhauer, 12281 Nicollet Avenue, Burnsville, MN 55337, Tel: 952-288-2326, about the factual matters raised in and relevant to this Motion.

WHEREFORE, the Debtors respectfully request that the Court enter its order:

A.     Approving the Stalking Horse Bidders and their respective forms of asset purchase agreements;

B.     Scheduling the Stalking Horse Hearing on an expedited basis for April 14, 2011 at 9:30 a.m. (CT);

C.     Approving the Stalking Horse Protection Fees;

D.     Approving the Sale Notice and Cure Notice and the parties to be served;

E.     Authorizing, subject to a final hearing, the Debtors to sell substantially all of their assets in accordance with the Sale Procedures, free and clear of all liens, claims, interests and encumbrances, which liens, claims, interests and encumbrances will attach to the proceeds of sale in the same validity, extent priority and manner that existed prior to such sale;

F.     Authorizing, subject to a final hearing, the Debtors to establish Cure Costs and assume and assign in connection with the above-described sale, those Contracts and Leases to

the respective Stalking Horse Bidders or the ultimate successful purchasers of the Debtors' assets; and

G.    Granting such other and further relief as the Court may deem just and equitable.

FREDRIKSON & BYRON, P.A.

Dated:  April 11, 2011                    _/e/ Douglas W. Kassebaum_____
                                          Clinton E. Cutler (#158094)
                                          Douglas W. Kassebaum (#386802)
                                          200 South Sixth Street, Suite 4000
                                          Minneapolis, MN 55402
                                          Phone (612) 492-7000
                                          Fax (612) 492-7077
                                          ccutler@fredlaw.com
                                          dkassebaum@fredlaw.com

                                          – and –

                                          McDONALD HOPKINS LLC

                                          Shawn M. Riley (OH 0037235)
                                          Scott N. Opincar (OH 0064027
                                          Michael J. Kaczka (OH 0076548)
                                          600 Superior Avenue, East, Suite 2100
                                          Cleveland, OH 44114-2653
                                          Phone (216) 348-5400
                                          Fax (216) 348-5474
                                          sriley@mcdonaldhopkins.com
                                          sopincar@mcdonaldhopkins.com
                                          mkaczka@mcdonaldhopkins.com

                                          CO-COUNSEL FOR DEBTORS
                                          AND DEBTORS IN POSSESSION

## <u>VERIFICATION</u>

I, Becky Moldenhauer, am the Chief Financial Officer of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: April 11, 2011                    Signed: _Becky . Moldenhau_
                                                 Becky Moldenhauer

## VERIFICATION

I, Joseph M. Geraghty, am a Senior Managing Director of Conway MacKenzie, Inc., the Debtors' financial advisor. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Motion are true and correct, according to the best of my knowledge, information and belief.

Dated: April 11, 2011

Signed: _____

Joseph M. Geraghty

**EXHIBIT A**

**TO SALE MOTION**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | |
| | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## UNSWORN DECLARATION OF ROBERT S. HERSCH IN SUPPORT OF DEBTORS' SALE MOTION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Under penalty of perjury, Robert S. Hersch states:

1.      I am the President of the firm of Mastodon Ventures, Inc. ("Mastodon")  By Order entered January 28, 2011, the Court authorized the above-captioned debtors and debtors in possession (collectively, the "Debtors") to employ Mastodon as the Debtors' investment banker. In that role, our responsibilities include identifying and tracking entities interested in pursuing a transaction with the Debtors, facilitating buyers' due diligence and assisting in negotiating an asset purchase agreement.  In performing these duties, I have spent a substantial portion of my time on this project.  In addition, certain other Mastodon employees have dedicated considerable time and effort to this transaction.

2.      I am duly authorized to submit this declaration in support of Motion for Orders (i) Scheduling a Hearing on Stalking Horse Bids; (ii) Approving Stalking Horse Protection Fees; (iii) Approving Form of Stalking Horse Asset Purchase Agreements; (iv) Approving Form and

Manner of Sale Notice and Cure Notice; (v) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (vi) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs (the "Sale Motion").

3.      Except as otherwise noted, the facts set forth in this Declaration and personally known to me, and, if called as a witness, I could and would testify thereto.

4.      The first stage of Mastodon's engagement consisted of gathering financial, industry and corporate information which were used to create a teaser memorandum (the "Teaser") followed by a 79-page confidential memorandum for the purposes of marketing the Debtors' business (the "Memorandum").  Through that process, as well as through additional due diligence, I became familiar with the Debtors, their officers and employees, and their financial circumstances.  Mastodon sent 130 copies of the Teaser to private equity groups, hedge funds and strategic buyers as approved by the Debtors.

5.      The second stage of Mastodon's engagement was to identify potential buyers whose investment criteria and track record made them likely to pursue a transaction with the Debtors.  To date, 58 of those potential buyers executed a confidentiality agreement, and each of those parties received the Memorandum as well as process letters.

6.      In addition, copies of the Memorandum were provided to the attorneys for the Burger King Corp., Bank of America, N.A. and the Official Committee of Unsecured Creditors. I have conducted regular conference calls and/or in-person meetings with the attorneys, financial advisors, and client representatives of these respective parties to keep them informed of the sale process.

7.      Beginning in February, 2011, officers and financial advisors, and counsel for the Debtors and employees and representatives of Mastodon have participated in due diligence meetings and conference calls with approximately 40 potential buyers.

8.      During March, 2011, Mastodon received 13 indications of interest from parties interested in purchasing a portion or substantially all of the assets of the Debtors.

9.      The Debtors and Mastodon began negotiations with several prospective buyers. Since approximately early-March, 2011, Mastodon has focused the negotiations on ascertaining one or more Stalking Horse Bidders.[1]

10.     After extensive negotiations, on or about April 11, 2011, the Debtors, in consultation with their counsel, their financial advisors and Mastodon, finalized four separate asset purchase agreements and selected the following parties to serve as Stalking Horse Bidders for the respective regions:

- Strategic Restaurants Acquisition Corp II, LLC ("SRAC") — Missouri Region

- Crown Ventures Iowa, Inc. ("Crown") — Davenport Region

- Heartland Food Corp. ("Heartland") — Minnesota Region, Wisconsin Region/Illinois Region (Combined Bid)

11.     The designation of the Stalking Horse Bidders will enable an auction process in which other parties can submit bids for the same assets or a different combination of Group One Regions pursuant to the Sale Procedures, provided that it results in higher and better value to the estates.

---

[1] Capitalized terms used, but not otherwise defined, have the meanings given to them in the Sale Motion.

12.     Following submission to the Court of each of the Stalking Horse Bidders' respective asset purchase agreements, Mastodon will continue the marketing process, seeking out potential buyers to compete in the Group One Auction or the Group Two Auction (as case may be), and facilitating their due diligence.  Several parties in the initial marketing process were reluctant to pursue being a stalking horse bidder, but expressed an interest in participating in an auction.  Mastodon will continue to market the excluded assets, and will entertain bids for these assets during the stage of the marketing process leading up to the Group One Auction or Group Two Auction (as the case may be).  Qualified Bids that are deemed by the Debtors and their advisors to provide sufficient value to the estates will be considered pursuant to the Sale Procedures.

13.     Under the respective Missouri APA, Davenport APA, Minnesota APA and the Sale Motion, each of the Stalking Horse Bidders would be entitled to receive a break-up fee and reimbursement of expenses (for each Stalking Horse Bidder, a "Stalking Horse Protection Fee").

14.     A Stalking Horse Protection Fee is a customary element of a stalking horse asset purchase agreement that offsets the substantial investment necessary to become the stalking horse bidder, and compensates the stalking horse for providing a floor on value.  Typically, these break-up fees range from 1%-5% of the purchase price, along with reimbursement of capped reasonable expenses.  A chart depicting each Stalking Horse Protection Fee is set forth below:

| Region | Stalking Horse Bidder | Sale Price | Break-Up Fee | Expense Reimbursement |
|---|---|---|---|---|
| Missouri | SRAC | $3,100,000 plus the value of on-hand cash and the value of on-hand inventory | $93,000 | Up to $100,000 |
| Davenport | Crown | $500,000 plus assumption of certain liabilities | $15,000 | Up to $20,000 |
| Minnesota | Heartland | $7,161,000 plus assumption of certain liabilities | 3% of Total Consideration (as defined in the Minnesota APA) | Up to $150,000 |
| Illinois | Heartland | $500,000 plus assumption of certain liabilities | 1.5% of Total Consideration (as defined in the IL/WI APA) | Up to $40,000 |
| Wisconsin | Heartland | $1 plus assumption of certain liabilities | 1.5% of Total Consideration (as defined in the IL/WI APA) | Up to $10,000 |

15.     In my opinion, entry into the Missouri APA, Davenport APA, Minnesota APA, and IL/WI APA and the agreement to pay the respective Stalking Horse Protection Fees were negotiated at arms' length and in good faith and are the highest consideration offered to the Debtors.

16.     The Stalking Horse Bidders provide the market with certainty that the Debtors' restaurants will continue to operate, while still allowing the potential opportunity for higher value to be delivered to the estates through a competitive auction process.

17.     The Stalking Horse Bidders will establish the bar for other bidders and could serve as a catalyst for other parties to submit competing Qualified Bids.  Absent approval of the Stalking Horse Protection Fees, each Stalking Horse Bidder would be able to withdraw each party's present offer, and if so desired, submit to bid for less consideration.  Thus, the respective Stalking Horse Protection Fees are designed to maximize the value of the Debtors' estates by

ensuring that the highest and best price will be obtained for the respective Group One Regions and that the current price will not fall by establishing a floor for bidding without chilling the bidding process. Thus, the respective Stalking Horse Protection Fees lead to value to the Debtors' estates.

18. For the foregoing reasons, I respectfully submit that the relief sought in the Sale Motion is necessary and appropriate, and I support the Debtors' requested relief.

Date: April 11, 2011

_____
Robert S. Hersch

# EXHIBIT B

## TO SALE MOTION

**ASSET PURCHASE AGREEMENT**

**between**

**STRATEGIC RESTAURANTS ACQUISITION COMPANY II, LLC,**

**as "Buyer,"**

**and**

**DUKE AND KING MISSOURI, LLC**

**as "Seller"**

**Dated as of April 8, 2011**

---

# Table of Contents

ARTICLE I.      PURCHASE AND SALE OF THE ACQUIRED ASSETS .............................1

    Section 1.1    Transfer of Acquired Assets.............................................................1
    Section 1.2    Excluded Assets. ............................................................................3
    Section 1.3    Assumption of Liabilities. ..............................................................4
    Section 1.4    Excluded Liabilities. ......................................................................4

ARTICLE II.     CONSIDERATION ..............................................................................4

    Section 2.1    Purchase Price. ...............................................................................4
    Section 2.2    On-Hand Inventory; On-Hand Cash. ..............................................4
    Section 2.3    Prorations. ......................................................................................5
    Section 2.4    Closing Payments ...........................................................................5

ARTICLE III.    CLOSING AND DELIVERIES.............................................................6

    Section 3.1    Closing. ..........................................................................................6
    Section 3.2    Seller's Deliveries. .........................................................................6
    Section 3.3    Buyer's Deliveries. .........................................................................7

ARTICLE IV.    REPRESENTATIONS AND WARRANTIES.........................................7

    Section 4.1    Representations and Warranties of Seller. ......................................7
    Section 4.2    Representations and Warranties of Buyer........................................8
    Section 4.3    Warranties Are Exclusive. ............................................................10

ARTICLE V.     COVENANTS AND OTHER AGREEMENTS.....................................10

    Section 5.1    Covenants of Seller. .....................................................................10
    Section 5.2    Covenants of Buyer.......................................................................12
    Section 5.3    Other Covenants...........................................................................13

ARTICLE VI.    TAXES; AllOCATION......................................................................13

    Section 6.1    Taxes Related to Purchase of Acquired Assets.............................13
    Section 6.2    Allocation of Purchase Price. .......................................................13

ARTICLE VII.   CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES ............14

    Section 7.1    Conditions Precedent to Performance by Seller.............................14
    Section 7.2    Conditions Precedent to the Performance by Buyer. .....................14

ARTICLE VIII.  TERMINATION ................................................................................15

    Section 8.1    Conditions of Termination. ..........................................................15
    Section 8.2    Effect of Termination; Remedies. .................................................16
    Section 8.3    Specific Performance ....................................................................17
    Section 8.4    Exclusive Remedy; Waiver. ..........................................................17

ARTICLE IX.    SURVIVAL AND INDEMNIFICATION ..............................................17

    Section 9.1    Survival; Indemnification..............................................................17
    Section 9.2    Specific Performance. ...................................................................17
    Section 9.3    Exclusive Remedy.........................................................................18

ARTICLE X.     MISCELLANEOUS ...................................................................................18

    Section 10.1    Allowed Administrative Expenses. ............................................18
    Section 10.2    Employees;    Escrow    of    Employee    Payables;
    Minimum Offers of Employment. ...........................................................................18
    Section 10.3    Risk of Loss. .............................................................................19
    Section 10.4    Payment to Post-Petition Trade Creditors ................................19
    Section 10.5    Exclusion of Restaurants. ..........................................................20
    Section 10.6    Alternative Transaction. ............................................................20
    Section 10.7    Further Assurances. ...................................................................20
    Section 10.8    Successors and Assigns. ............................................................20
    Section 10.9    Governing Law; Jurisdiction. ....................................................21
    Section 10.10   Expenses. ...................................................................................21
    Section 10.11   Broker's and Finder's Fees. .......................................................21
    Section 10.12   Severability. ..............................................................................21
    Section 10.13   Notices. .....................................................................................21
    Section 10.14   Amendments; Waivers. .............................................................23
    Section 10.15   Public Announcements. .............................................................23
    Section 10.16   Entire Agreement. .....................................................................23
    Section 10.17   No Third Party Beneficiaries. ...................................................23
    Section 10.18   Headings. ..................................................................................23
    Section 10.19   Counterparts; Delivery. .............................................................24
    Section 10.20   Construction. .............................................................................24

ARTICLE XI.    DEFINITIONS .................................................................................24

**EXHIBITS**

Exhibit A ........................................................................................................ Sale Order

Exhibit B ..........................................................................Group One Missouri Restaurants

**SCHEDULES**

Schedule 1.1(g) ........................................................................... Acquired Contracts

Schedule 4.1(f) ..........................................................................................Litigation

Schedule 4.1(g) ..............................................................................................Leases

Schedule 6.2 .........................................................................Purchase Price Allocation

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 8, 2011 (the "**Execution Date**"), is made by and between Duke and King Missouri, LLC ("**Seller**"), and Strategic Restaurants Acquisition Company II, LLC, a Delaware limited liability company ("**Buyer**"). Unless otherwise set forth, capitalized terms used in this Agreement are defined or cross-referenced in Article XI.

## RECITALS

WHEREAS, on December 4, 2010 (the "**Petition Date**"), Seller commenced a voluntary case under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. § 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**");

WHEREAS, this Agreement shall constitute the APA (as such term is defined in the Sale Procedures);

WHEREAS, Seller has informed Buyer that Buyer is a "Qualified Bidder" pursuant to the terms of the Sale Procedures, and Buyer, pursuant to the terms of this Agreement, desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, assign, transfer and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order (defined below) and in accordance with sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code; and

WHEREAS, Buyer has made, or will make concurrent with the execution of this Agreement, a deposit in an amount equal to $310,000 (the "**Deposit**") into an interest bearing escrow account (the "**Deposit Escrow Account**") to be established and governed by the terms of the Deposit Escrow Agreement executed concurrently herewith..

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE I.    PURCHASE AND SALE OF THE ACQUIRED ASSETS

Section 1.1 Transfer of Acquired Assets.

At the Closing, and upon the terms and conditions set forth herein, Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase from Seller, all of Seller's right, title and interest in, to and under the following properties, assets and rights owned by Seller located at or used solely in connection with the Group One Missouri Restaurants, free and clear of all Liens, liabilities, claims, interests and encumbrances, other than Permitted Liens (collectively the "**Acquired Assets**"):

(a)     All cash on-hand at each of Seller's Group One Missouri Restaurants on the Closing Date, in an amount no less than $1,000 per restaurant, and provided that such cash must be in United States currency (the "**On-Hand Cash**") (for clarity, checks or similar cash equivalents and cash in transit are not included in On-Hand Cash);

(b)     The real property leased pursuant to the leases included in the Acquired Contracts, including all Leasehold Improvements thereon (collectively, the "**Leased Real Property**");

(c)     All machinery, equipment, furniture, fixtures, office equipment, computer hardware, uniforms, Supplies and other related tangible personal property owned or leased by Seller, and all warranties and licenses of Seller thereunder or related thereto;

(d)     All prepaid expenses of Seller;

(e)     All deposits paid by Seller relating to or arising from the Acquired Assets, including, without limitation, the deposits under the Real Property Leases, but excluding Utility Deposits and Corporate Level deposits;

(f)     All advertising and promotional materials relating to the Business and any rights thereto possessed, or entitled to be used, by Seller;

(g)     The Franchise Agreements and those other Contracts listed in Schedule 1.1(g) (collectively, the "**Acquired Contracts**");

(h)     All Inventory on-hand in the Group One Missouri Restaurants as determined pursuant to Section 2.2 (the "**On-Hand Inventory**");

(i)     All permits, authorizations, approvals, options, consents, and licenses, and all pending applications therefor (collectively, the "**Permits**") issued or to be issued to Seller as of Closing by any Government, in each case to the extent transferable;

(j)     All insurance benefits, rights and proceeds arising from or relating to any event or incident that affects, impacts or alters any Acquired Asset between the Execution Date and the Closing Date;

(k)     All rebates or "pre-bates," including without limitation those on account of, accrued by or due from The Coca Cola Company, Dr. Pepper/Seven Up Company, Restaurant Services, Inc., or any affiliate therefrom (the "**Rebates**"), but only to the extent allocable to the post-Closing period;

(l)     To the extent relating to the Leased Real Property, any and all building, architectural and engineering plans, specifications and drawings, surveys, and environmental and soils reports in Seller's possession or control;

(m)   All of Seller's goodwill, including but not limited to all franchise rights, relating to, or in connection with, the Business;

(n)   All other items of trade fixtures and personal property located at and/or used in connection with the ownership, use, occupancy or operation of the Business, including signage, telephone numbers, facsimile numbers, listings and directories, photographs, group files, credit records, labels, promotional literature, security codes, all records in sales and catering databases, all customer data, and all other books, records, files and papers, in whatever format, but in each case excluding Employee Records; and

(o)   Except as otherwise excluded under Section 1.2, all rights, claims, rights of offset, causes of action, lawsuits, judgments and other claims or demands of any nature against any third party arising out of, and only with respect to, the Acquired Assets or Assumed Liabilities.

Section 1.2  Excluded Assets.

Notwithstanding anything to the contrary in this Agreement, Seller shall retain its right, title and interest in, to and under all of its properties, assets and rights not otherwise an Acquired Asset (collectively, the "**Excluded Assets**"), including without limitation:

(a)   All Seller's cash, checks, cash equivalents, and cash in transit, but excluding any On-Hand Cash;

(b)   All trade accounts receivable of Seller in existence as of the Closing Date (collectively, the "**Accounts Receivable**");

(c)   All equity ownership interests in Seller;

(d)   All rights to refunds of or credits for Taxes of Seller previously paid by Seller prior to the Closing Date, and any records relating to Taxes of Seller;

(e)   Subject to Section 1.1(j) and Section 10.3, all insurance premiums, policies, contracts and coverage obtained by Seller and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries;

(f)   All avoidance claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing;

(g)   All rights of and benefits to Seller under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement;

(h)     The Contracts to which Seller is a party that are not an Acquired Contract and all deposits, claims, rebates or refunds thereunder or related thereto;

(i)     All Rebates but only to the extent allocable to the pre-Closing period;

(j)     All utility deposits paid by Seller prior to the Closing Date and all rights to the refund of all or any portion thereof (the "**Utility Deposits**");

(k)     Employee Records and Corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of any Seller; and

(l)     All Corporate Level assets, properties and rights.

Section 1.3 <u>Assumption of Liabilities</u>.

At the Closing, Buyer shall assume, and thereafter pay, perform and discharge when due, only such liabilities that first occur or arise after the Closing Date and that relate to any of the Acquired Assets, including without limitation, any Acquired Contract (collectively, the "**Assumed Liabilities**").

Section 1.4 <u>Excluded Liabilities</u>.

Notwithstanding anything to the contrary in this Agreement, Seller shall retain, and remain liable and obligated for any of its respective liabilities not otherwise expressly included in the Assumed Liabilities (collectively, the "**Excluded Liabilities**").

## ARTICLE II.     <u>CONSIDERATION</u>

Section 2.1 <u>Purchase Price</u>.

The aggregate consideration for the Acquired Assets shall be (a) the sum of (i) $3,100,000 in cash, <u>plus</u> (ii) the amount of On-Hand Cash and the On-Hand Inventory, each as determined pursuant to <u>Section 2.2</u> (the amounts described in clauses (i) and (ii) together, the "**Unadjusted Purchase Price**"), subject to adjustment as provided in <u>Section 2.3</u> (as so adjusted, the "**Final Purchase Price**"); and (b) the assumption by Buyer of the Assumed Liabilities (such assumption, together with the Final Purchase Price, the "**Total Consideration**").

Section 2.2 <u>On-Hand Inventory; On-Hand Cash</u>.

Immediately after the close of business on the day before the Closing Date, but in no event later than 8:00 p.m. local time, Seller and Buyer shall perform a physical count of all Inventory and will count the On-Hand Cash, in each case at each of the Group One Missouri Restaurants. Seller shall create a written summation of the amount of (i) Inventory counted and its value, each subtotaled by restaurant and by type, and (ii) On-Hand Cash, all as reasonably approved by Buyer. A copy of the approved summations shall be provided to Buyer. The physical count of the

Inventory and the Inventory valuation shall be reasonable, but otherwise shall be based on and in accordance with Seller's prior practices and methodologies. The mutually agreed upon valuation of the Inventory shall be the value of the On-Hand Inventory for purposes of this Agreement. The mutually agreed amount of On-Hand Cash shall be the value of the On-Hand Cash for purposes of this Agreement.

Section 2.3 Prorations.

Seller shall calculate, in good faith, prorated amounts (the "**Proration**") for (a) rent under the Real Property Leases, (b) prepaid expenses, (c) Rebates, (d) Property Taxes, (e) common area maintenance charges, and (f) charges for sewer, water, fuel, telephone, electricity and other utilities (items (a) through (f) together, the "**Prorated Amounts**"), as of the Closing Date for the Group One Missouri Restaurants. For the Proration, Seller shall be liable to the extent the Prorated Amounts relate to any time period up to but not including the Closing Date and Buyer shall be liable to the extent the Prorated Amounts relate to periods including and after the Closing Date. The Proration shall credit Seller for any deposits included in the Acquired Assets. Seller shall provide Buyer the Proration, and reasonable supporting documentation, at least three (3) days prior to the Closing Date. The Proration shall be based on the latest available rates, valuations, readings, or such other information or documents that most accurately reflect current charges, if known, or otherwise reasonably estimate the outstanding charges for the Prorated Amounts as of the Closing Date. Notwithstanding that the Proration may contain Seller's good faith estimates to prorate one or more of the Prorated Amounts, the Proration shall be final unless based on materially incorrect information. The Unadjusted Purchase Price shall be (i) increased by the net amount of the Proration if such amount is in Seller's favor, and (ii) decreased by the net amount of the Proration if such amount is in Buyer's favor.

Section 2.4    Closing Payments    At the Closing, Buyer shall pay the Unadjusted Purchase Price as follows:

(a)    by instruction to the Escrow Agent to release the Deposit from the Deposit Escrow Account, by wire transfer of immediately available funds to an account specified by Seller, or by the Bankruptcy Court, as the case may be; and

(b)    by deposit of the Trade Credit Escrow Amount into the Trade Credit Escrow Account;

(c)    by deposit of the Payroll Escrow Amount into the Payroll Escrow Account; and

(d)    by wire transfer of immediately available funds of the remaining balance of the Unadjusted Purchase Price to an account specified by Seller, or the Bankruptcy Court, as the case may be.

# ARTICLE III.   CLOSING AND DELIVERIES

Section 3.1 Closing.

The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place no later than ten (10) days following entry by the Bankruptcy Court of the Sale Order, provided that such order conforms to the criteria specified in the definition of Sale Order in Article XI hereof, or at such other time as may be mutually agreed to by the parties (the "**Closing Date**"), and shall be effective as of 12:01 a.m. on the Closing Date.  Subject to such different procedures agreed upon by the parties in writing, the Closing shall take place via a "paper" close wherein Buyer and Seller shall exchange such documents and instruments or copies thereof sufficient to effect the Closing by electronic or other means without the use of a "roundtable" closing at a particular location. All proceedings to be taken and all documents to be executed and delivered by the parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

Section 3.2 Seller's Deliveries.

Seller shall execute (as appropriate) and deliver to Buyer or shall deposit with the Escrow Agent for the benefit of Buyer, at or prior to the Closing or such other time as set forth in this Agreement:

(a)    A bill of sale for all of the Acquired Assets that are tangible personal property, without representation, warranty or covenant of any kind, and any such other good and sufficient instruments of sale, transfer, conveyance and assignment as shall be necessary or appropriate to sell, transfer, convey and assign to Buyer, in accordance with the terms hereof, title to the Acquired Assets free and clear of all Liens, liabilities, claims, interests and encumbrances, other than Permitted Liens;

(b)    An agreement for the assumption of the Assumed Liabilities, without representation, warranty or covenant of any kind;

(c)    For all intangible Acquired Assets, including all Acquired Contracts, (i) an agreement of assumption and assignment, without any representation, warranty or covenant of any kind, or (ii) an Assignment Order effecting the same;

(d)    For the Leased Real Property, including all Real Property Leases, (i) an agreement of assignment and assumption, without any representation, warranty or covenant of any kind, or (ii) an Assignment Order effecting the same, in each case, sufficient to sell, transfer, convey and assign to Buyer, the Leased Real Property, including all Real Property Leases, free of all Liens, liabilities, claims, interests and encumbrances, other than Permitted Liens and the Assumed Liabilities;

(e)    A certificate, dated the Closing Date, signed by its Secretary, certifying to the accuracy of the matters set forth in Section 7.2(a);

(f)     All consents, orders and approvals of the Bankruptcy Court, including, without limitation, a certified copy of the Sale Order;

(g)     The Closing Day Escrow Agreement, duly executed by Seller;

(h)     Such other agreements, documents or instruments that Buyer or the Escrow Agent may reasonably request, the form and substance of which are acceptable to Buyer.

Section 3.3 Buyer's Deliveries.

Buyer shall deliver to Seller or shall deposit with the Escrow Agent for the benefit of Seller at or prior to the Closing or such other time as set forth:

(a)     The Unadjusted Purchase Price in accordance with Section 2.4;

(b)     A duly executed counterpart by Buyer of each of the documents listed in Sections 3.2(b), (c), (d)(i) and (g);

(c)     A certificate, dated the Closing Date, signed by its Secretary, certifying the accuracy of the matters set forth in Section 7.1(a); and

(d)     Such other agreements, documents or instruments that Seller may reasonably request, the form and substance of which are acceptable to Seller.

## ARTICLE IV.     REPRESENTATIONS AND WARRANTIES

Section 4.1 Representations and Warranties of Seller.

Seller hereby represents and warrants to Buyer as of the Execution Date as follows:

(a)     Authorization and Validity. Subject to the Bankruptcy Court's entry of the Sale Order, (i) Seller has all requisite power and authority to enter into this Agreement and any Ancillary Agreements to which Seller is a party and to perform its obligations hereunder and thereunder; and (ii) this Agreement constitutes Seller's valid and binding obligation, enforceable against Seller in accordance with its respective terms.

(b)     No Conflict or Violation. The execution, delivery and performance by Seller of this Agreement and any Ancillary Agreement to which Seller is a party does not violate or conflict with any provision of Seller's certificate of organization, operating agreement, or similar organizational documents.

(c)     Title to Assets.  Seller owns, and has good, valid, and marketable title to, all of the Acquired Assets.

(d)     Consents and Approvals.  Other than such consents, waivers, authorizations or approvals that have been obtained, and subject to Buyer's receipt of the Sale

Order, no consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in connection with the execution and delivery by Seller of this Agreement or the performance by Seller of its obligations hereunder.

(e) <u>Contracts</u>. Seller has provided Buyer access to a correct and complete copy of each Acquired Contract (and all amendments, modifications, and supplements thereto). Subject to laws of general application relating to bankruptcy, insolvency and the relief of debtors, each of the Acquired Contracts is valid and in full force and effect in accordance with its terms, and no option to renew or extend such Acquired Contracts has been missed or will lapse before the Closing.

(f) <u>Litigation</u>. Except as set forth on <u>Schedule 4.1(f)</u> and for the Chapter 11 Cases and proceedings therein, there is no action, suit, or proceeding, in equity or at law, arbitration or administrative or other proceeding by or before any Person (including, without limitation, any Government), pending, or to Seller's knowledge, threatened in writing against Seller which, if adversely determined, would result in a material adverse effect on the Business or the Acquired Assets at any time before or after the Closing Date, and Seller has not received written notice that any of the Acquired Assets are subject to any judgment, order or decree entered in any material lawsuit or proceeding that would continue to affect the Acquired Assets after Closing, nor be binding on Buyer.

(g) <u>Leases</u>. Except as set forth on <u>Schedule 4.1(g)</u>, Seller owns and holds all the leasehold estates purported to be granted by each Real Property Lease, and all Real Property Leases are in full force and effect and constitute valid and binding obligations of Seller, and no option to renew or extend such Real Property Leases has been missed or will lapse before the Closing.

Section 4.2 <u>Representations and Warranties of Buyer.</u>

Buyer hereby represents and warrants to Seller as of the Execution Date as follows:

(a) <u>Corporate Organization</u>. Buyer is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

(b) <u>Qualification to Conduct Business</u>. Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business conducted by it makes such qualification necessary.

(c) <u>Authorization and Validity</u>. Buyer has all requisite corporate power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is a

party and the performance of Buyer's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement has been, and any Ancillary Agreement to which Buyer is a party has been duly executed by Buyer and constitutes Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms, except as may be limited by bankruptcy or other laws affecting creditors' rights and by equitable principles.

(d)     No Conflict or Violation.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is a party do not (i) violate or conflict with any provision of Buyer's certificate of organization, operating agreement or similar organizational documents; (ii) violate any provision of law, or any order, judgment or decree of any court or Government applicable to Buyer or any of its properties or assets; or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

(e)     Consents and Approvals.   Other than the Sale Order, no consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in connection with the execution and delivery by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party or the performance by Buyer of its obligations hereunder or thereunder.

(f)     Adequate Assurances Regarding Acquired Contracts.   To the best of its knowledge, Buyer is capable of satisfying the conditions contained in sections 365(b) and 365(f) of the Bankruptcy Code with respect to the Acquired Contracts. Throughout this Agreement, the term "knowledge" means in the case of Buyer, the actual knowledge of Buyer's Responsible Officers.

(g)     Franchise Agreements.  As of the Execution Date, Buyer has obtained, and at the Closing will provide Seller written evidence of, Franchisor's consent for the assignment to, and assumption by, Buyer of the Franchise Agreements (or alternatively, consent for the execution of new Franchise Agreements as may be required by Franchisor), and waiver by Franchisor of its rights of first refusal with respect to the transactions contemplated by this Agreement ("**Franchisor's Consent**").

(h)     Litigation.   There are no claims, actions, suits, proceedings or investigations pending, or to Buyer's knowledge, threatened against Buyer, or any Related Person of Buyer, that would reasonably be expected to affect the ability of Buyer to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.

(i)     <u>Adequacy of Funds</u>.  Buyer has cash on hand, existing availability under existing lines of credit, or other immediately available financial resources sufficient to pay the balance of the Unadjusted Purchase Price at Closing, and any adjustments thereto pursuant to <u>Section 2.3</u> thereafter.

Section 4.3<u>Warranties Are Exclusive.</u>

The parties acknowledge that the representations and warranties contained in this <u>Article IV</u> are the only representations or warranties given by the parties and that all other express or implied warranties are disclaimed.  Without limiting the foregoing, Buyer acknowledges that, except for the representations and warranties contained in <u>Section 4.1</u>, the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>SECTION 4.1</u>, SELLER AND ITS RELATED PERSONS AND AFFILIATES HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING ANY (A) USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES OR (C) OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS.  Buyer further acknowledges that Buyer has conducted, or has had an adequate opportunity to conduct, all necessary due diligence related to the Business, the Acquired Assets, the Assumed Liabilities, and all such other matters relating to or affecting any of the foregoing. In proceeding with the transactions contemplated in this Agreement, except for any representations and warranties expressly set forth in <u>Section 4.1</u>, Buyer is doing so based solely upon its own due diligence and review, all of which has been completed to the satisfaction of Buyer, and Buyer has not relied upon any oral or written statements, representations or guaranties whatsoever, whether express or implied, made by Seller or its agents and representatives.

## ARTICLE V.      COVENANTS AND OTHER AGREEMENTS

Section 5.1<u>Covenants of Seller.</u>

Seller covenants to Buyer that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)     <u>Conduct of Business Before the Closing</u>.  Unless otherwise agreed by Seller and Buyer in writing, Seller shall use commercially reasonable efforts to conduct its Business in all material respects in the manner in which it has been conducted since the Petition Date and in accordance with the reasonable requirements of the Franchisor, and to preserve intact its Business, organization and relationships with third parties.

(b)    Cooperation. Seller shall use commercially reasonable efforts to (i) reasonably cooperate with Buyer's effort to obtain the Consents; (ii) take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated hereby; and (iii) assist Buyer in the transfer of or obtaining renewals of any Permits required to own the Acquired Assets, and to otherwise assist in the timely consummation of the transactions contemplated by this Agreement.

(c)    Bankruptcy Court Matters.  Seller shall:

(i)    Promptly provide Buyer with drafts of all documents, motions, orders, filings, pleadings and service lists that Seller is required to, or that are prudent to file with the Bankruptcy Court that relate to the consummation or approval of this Agreement and will provide Buyer with reasonable opportunity to review and comment on such before service and filing; provided, however, that Seller shall not be required to provide to Buyer any non-public, confidential information relating to third party bidders or their bids.

(ii)    Use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable.

(iii)    Promptly provide Buyer with written notice and copies of any notice of appeal, motion or application filed in connection with any appeal from or application for reconsideration of, any of such orders and any related briefs.

(iv)    Be solely responsible for the payment or satisfaction of any amounts (the "**Cure Costs**") necessary to cure any defaults and arrearages that exist on the Closing Date with respect to the Acquired Contracts.

(d)    Due Diligence.  Seller shall provide Buyer and its representatives with reasonable access to the Leased Real Property and the Group One Missouri Restaurants, subject to reasonable rules and guidelines established by Seller.  Seller shall also provide Buyer and its representatives with access to all due diligence materials relating directly to the Business, the Acquired Assets, the Assumed Liabilities, and all other matters reasonably related thereto, to the extent such materials are in Seller's possession or control and subject to any restrictions of applicable law (collectively referred to herein as the "**Due Diligence Materials**").  In addition, Buyer shall have the right, but not the obligation, to contact the Franchisor and the counterparties to all Acquired Contracts, and such governmental agencies and authorities as it may elect in connection with the transactions contemplated hereunder, and Seller shall reasonably cooperate with Buyer in such regard.

(e)    <u>Due Diligence Period</u>.  Buyer shall have until 9 A.M. Eastern Standard Time on April 11, 2011 (the "**Due Diligence Deadline**"), to conduct its due diligence investigation of the Business, the Acquired Assets and the Assumed Liabilities including, without limitation, the environmental condition, physical condition and location, condition of title, compliance with laws, financial performance of the Group One Missouri Restaurants, applicable third party consents, terms of contracts related to the Acquired Assets, the capital expenditure requirements of the Franchisor, and the terms of the Real Property Leases, and all other matters determined by Buyer in its sole and absolute discretion. Buyer may terminate this Agreement at any time during the Due Diligence Period by providing written notice to Seller in the manner specified in Section 10.13(ii) prior to the Due Diligence Deadline, if any such investigation reveals conditions or facts unacceptable to Buyer in its sole and absolute discretion, in which case the Deposit, with interest, shall be refunded to Buyer, and neither Buyer nor Seller shall have any further obligation to the other.

(f)    <u>Release of Information by Franchisor</u>.  Seller hereby authorizes Franchisor to provide directly to Buyer all information and documents in Franchisor's possession or control relating to Seller and the Business, subject to notification to Seller of the information and documents provided.

(g)    <u>Continuing Information</u>.  Seller shall provide Buyer with (i) updated current financial information relating to the Group One Missouri Restaurants, (ii) access to Seller's records regarding employee pay history at the Group One Missouri Restaurants, and (iv) reasonable access to, and assistance generally from, Seller's employees (direct hires or otherwise), accounting and systems personnel, and other representatives designated by Seller and subject to ongoing business demands on such personnel, to enable Buyer to obtain assignments or the transfer of Permits included in the Acquired Assets, to obtain information generally relevant to the Group One Missouri Restaurants (including but not limited to IT and accounting systems), in each case as reasonably requested by Buyer and as such information reasonably relates to Buyer's acquisition and post-Closing operation of the Group One Missouri Restaurants.

Section 5.2 <u>Covenants of Buyer.</u>

Buyer covenants to Seller that, during the period from the Execution Date through and including the Closing or the earlier termination of this Agreement:

(a)    <u>Cooperation</u>.  Buyer shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)     <u>Communications</u>. Buyer shall keep Seller reasonably informed of the status of discussions between Buyer and Franchisor in connection with the transactions contemplated hereunder.

(c)     <u>Adequate Assurances Regarding Acquired Contracts and Required Orders</u>.  With respect to each Acquired Contract, Buyer shall provide what it reasonably believes are adequate assurances of its future performance of such Acquired Contract.  Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of a Sale Order, an Assignment Order, and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

(d)     <u>Franchise Agreements</u>.  At the Closing Buyer will provide Seller written evidence of, Franchisor's consent for the assignment to, and assumption by, Buyer of the Franchise Agreements (or alternatively, consent for the execution of new Franchise Agreements as may be required by Franchisor), and waiver by Franchisor of its rights of first refusal with respect to the transactions contemplated by this Agreement ("**Franchisor's Consent**").

Section 5.3<u>Other Covenants.</u>

(a)     <u>Improper Receipt of Payment</u>.  From and after the Closing, (i) Seller shall promptly forward to Buyer any and all payments received by it that constitutes part of the Acquired Assets; and (ii) Buyer shall promptly forward to Seller any and all payments received by Buyer that constitute part of the Excluded Assets.

# ARTICLE VI.   TAXES; ALLOCATION

Section 6.1<u>Taxes Related to Purchase of Acquired Assets.</u>

Seller is responsible for the payment of all Taxes in connection with the transactions contemplated hereunder, other than Transaction Taxes, which Transaction Taxes shall be paid by Buyer.  Buyer and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement; (b) provide all requisite exemption certificates; and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Government taxing authorities.

Section 6.2<u>Allocation of Purchase Price.</u>

Seller and Buyer have allocated the Total Consideration among the Acquired Assets as set forth in <u>Schedule 6.2</u> (the "**Allocation**").  The Allocation is binding upon Buyer and Seller and their respective successors and assigns, and none of the parties to this Agreement will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation; provided, however, that the parties shall cooperate and agree to reallocate to the extent necessary to satisfy the requirements of any taxing authority.  Buyer and Seller will report the purchase and

sale of the Acquired Assets on all tax returns, including without limitation Form 8594 as provided for in section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594.

## ARTICLE VII.   CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

Section 7.1 Conditions Precedent to Performance by Seller.

The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 7.1(c), may be waived by Seller, in its discretion:

(a)     Representations and Warranties of Buyer.  The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made by Buyer as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date.

(b)     Performance of the Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required under this Agreement and any Ancillary Agreement to which Buyer is party which are to be performed by it on or before the Closing Date.

(c)     Sale Order.  The Bankruptcy Court shall have entered the Sale Order, which shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date.

(d)     Closing Deliveries.  Buyer shall have made the deliveries contemplated under Section 3.3.

Section 7.2 Conditions Precedent to the Performance by Buyer.

The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing (or in the case of Section 7.2(h), on or immediately before the Closing), of the following conditions, any one or more of which, other than the condition contained in Section 7.2(c), may be waived by Buyer, in its discretion:

(a)     Representations and Warranties of Seller.  The representations and warranties of Seller made in Section 4.1 of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made by Seller again as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date.

(b)     Performance of the Obligations of Seller.  Seller shall have performed in all material respects all obligations required under this Agreement and any Ancillary Agreement to which Seller is party to be performed by Seller on or before the Closing Date.

(c)     Sale Order.  The Bankruptcy Court shall have entered the Sale Order, the Sale Order shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending the Sale Order shall be in effect on the Closing Date, and the Sale Order shall otherwise conform to the criteria specified in the definition of Sale Order in Article XI hereof.

(d)     Cure Costs.  Seller shall provide evidence that it has paid or has otherwise satisfied the Cure Costs.

(e)     Closing Deliveries.  Seller shall have made the deliveries contemplated under Section 3.2.

(f)     Termination of Employees.  All employees working at the Group One Missouri Restaurants shall have been terminated and made available for hire by Buyer.

## ARTICLE VIII.  TERMINATION

Section 8.1 Conditions of Termination.

This Agreement may be terminated only in accordance with this Section 8.1.  This Agreement may be terminated at any time before the Closing as follows:

(a)     By mutual consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, if Seller has previously provided Buyer with notice of any material inaccuracy of any representation or warranty contained in Section 4.2, or of a material failure to perform any covenant or obligation of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and Buyer has failed, within three (3) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Seller of Buyer's ability to remedy such inaccuracy or perform such covenant or obligation; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 8.1(b) if Seller is then in material breach of this Agreement;

(c)     By either Seller or Buyer, if the Bankruptcy Court dismisses the Seller's Chapter 11 Case or converts the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code; provided, however, that termination under this subsection shall be at Buyer's discretion only should conversion to a case under chapter 7 occur by motion by Seller;

(d)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with notice of any material inaccuracy of any representation or warranty of Seller contained in Section 4.1 or a material failure to perform any covenant or obligation of Seller contained in this Agreement or any Ancillary Agreement to which Seller is a party, and Seller has failed, within three (3) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Seller's ability to remedy such inaccuracy or perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 8.1(c) if Buyer is then in material breach of this Agreement;

(e)     Automatically, upon the consummation of an Alternative Transaction; and

(f)     By Buyer, by written notice to Seller pursuant to Section 5.1(e), if prior to the Due Diligence Deadline, Buyer determines, in its sole and absolute discretion, that it is unwilling or unable to proceed with the transactions contemplated by this Agreement.

Section 8.2    Effect of Termination; Remedies.

(a)     In the event of termination pursuant to Section 8.1, this Agreement shall become null and void and have no effect (other than Article VIII and Article X, which shall survive termination), with no liability on the part of Seller, Buyer, or their respective Affiliates or respective Related Persons, with respect to this Agreement or any Ancillary Agreement, except for any liability provided for in this Article VIII.

(b)     If this Agreement is terminated pursuant to Section 8.1(a), 8.1(c), 8.1(d), or 8.1(f) then, within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Buyer from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer.

(c)     If this Agreement is terminated pursuant to Section 8.1(b) then all right, title and interest to the Deposit shall automatically vest in Seller as liquidated damages, which shall constitute Seller's sole and exclusive remedy. Within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Seller from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Seller.

(d)     If this Agreement is terminated pursuant to Section 8.1(e) then, subject to the approval of the Bankruptcy Court, (i) Seller shall pay Buyer (A) a break-up fee equal to $93,000 (the "**Break-Up Fee**"); and (B) Buyer's reasonable transaction expenses related to the negotiation, execution and performance of this Agreement not to exceed $100,000 (the "**Buyer Expenses**"), as evidenced in writing to Seller

in reasonable detail, and (ii) Seller and Buyer shall, within two (2) Business Days of such termination, jointly instruct the Escrow Agent to distribute to Buyer the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer. Any payment of the Break-Up Fee and Buyer Expenses under this Section 8.2 shall be made by Seller from the proceeds of the Alternative Transaction by wire transfer of immediately available funds to an account designated in writing by Buyer within two (2) Business Days from the closing of such Alternative Transaction. Should the Alternative Transaction result from the exercise by a secured party of its lien rights in the Acquired Assets, the Break-Up Fee and Buyer Expenses shall instead be paid to Buyer by such secured party within two (2) Business Days of the transfer of any portion of the Acquired Assets or other closing of that transaction in satisfaction of the Break-Up Fee Lien.

Section 8.3 Specific Performance

Provided that Buyer is not then in material breach of this Agreement, this Agreement has not been terminated in accordance with its terms and an Alternative Transaction has not been approved by the Bankruptcy Court, Buyer shall be entitled to seek specific performance of this Agreement.

Section 8.4 Exclusive Remedy; Waiver.

Other than as set forth in Section 8.3, prior to the Closing, the parties' sole and exclusive remedies for any claim arising out of or in connection with this Agreement shall be termination in accordance with, and obtaining the remedies provided in, this Article VIII. The failure by either Seller or Buyer to pursue or foreclose on any right or remedy against the other party, by itself, shall not constitute a waiver, and any waiver under this Article VIII shall be effective only if made in a writing signed by the party charged with such waiver.

## ARTICLE IX. SURVIVAL AND INDEMNIFICATION

Section 9.1 Survival; Indemnification.

None of the representations and warranties of Seller and of Buyer made in this Agreement shall survive the Closing Date, and all of such representations and warranties shall be extinguished by the Closing. All covenants and agreements of the parties contained in this Agreement shall survive the Closing, unless otherwise expressly stated therein. Seller shall have no monetary obligation to Buyer for breach of any covenant or agreement except in the event of termination pursuant to Section 8.1(e), which obligation shall be limited as set forth in Section 8.2(d). If the Closing occurs, Buyer shall indemnify and hold harmless Seller and its Affiliates and Related Persons against any and all losses, liability, expense or damage first arising after the Closing Date that result from or arise out of the Assumed Liabilities.

Section 9.2 Specific Performance.

Seller and Buyer acknowledge that in case of any breach of their respective covenants after the Closing, the other would suffer immediate and irreparable harm, which money damages would be inadequate to remedy, and accordingly, in case of any such breach each non-breaching party shall be entitled to obtain specific performance.

Section 9.3 Exclusive Remedy.

Following the Closing, the parties' sole and exclusive remedies for any claim arising out of or in connection with this Agreement shall be those set forth in this Article IX.

## ARTICLE X. MISCELLANEOUS

Section 10.1    Allowed Administrative Expenses.

Except as to (i) the Deposit, which amount shall not be estate property and shall be segregated and held in trust for Buyer, and (ii) the Break-Up Fee and Buyer Expenses owing to Buyer upon the closing of an Alternative Transaction, which amount shall be paid upon the closing and from the proceeds of such Alternative Transaction, any and all amounts owed to Buyer by Seller hereunder or under any Ancillary Agreement after the Execution Date shall constitute allowed administrative expenses in Seller's Chapter 11 Case under section 503(b)(1) of the Bankruptcy Code.

Section 10.2    Employees; Escrow of Employee Payables; Minimum Offers of Employment.

(a)    On or immediately before the Closing, Seller shall have terminated all employees working for the Business, and with respect to employees working for the Business that are employed by one or more third parties, shall cause such third party or parties to then terminate such employees.

(b)    Seller and Buyer agree that an amount sufficient to pay all wages, salaries, benefits and accrued vacation owed by Seller for the period after the Petition Date, to Seller's employees working for the Business immediately prior to Closing (the "**Payroll Escrow Amount**") shall be withheld from the Unadjusted Purchase Price due to Seller at Closing and be deposited into an escrow account (the "**Payroll Escrow Account**") to be established pursuant to the Closing Day Escrow Agreement. The Payroll Escrow Amount shall be held and disbursed by the Escrow Agent pursuant to the terms of the Closing Day Escrow Agreement to the extent Seller does not otherwise pay the full amount of such wages, salaries, benefits and accrued vacation owed to such employees within three (3) Business Days of the Closing Date. Seller shall pay all other wages, benefits and accrued vacation owed to its terminated employees, subject to the priorities and allowances as required under the Bankruptcy Code and as ordered by the Bankruptcy Court, and Seller shall cause such third party employers to do the same with respect to its terminated employees. To the extent Seller makes full payment of such wages, salaries, benefits and accrued vacation to its employees, the parties shall instruct the Escrow Agent to disburse to Seller the full amount of

the Payroll Escrow Amount, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Seller.

(c)     Buyer shall offer to hire at least seventy percent (70%) of Seller's employees that are working for the Business immediately before the Closing Date, under whatever terms Buyer may determine in its sole and absolute discretion, provided that Buyer may select in its discretion the employees it chooses to hire. Subject to the foregoing, Buyer shall not be obligated to hire any additional terminated employees. Seller shall reasonably cooperate with Buyer in Buyer's efforts to hire terminated employees. Subject to limitations imposed by the Bankruptcy Code or the Bankruptcy Court, Seller shall bear all financial and other responsibility for compliance with the federal WARN Act and any similar laws of any applicable jurisdiction to the extent applicable.

Section 10.3    <u>Risk of Loss</u>.

At all times prior to the Closing, the risk of loss for all of the Acquired Assets shall be retained by Seller. In the case of any Material Adverse Effect with respect to any Leased Real Property prior to the Closing, Buyer shall have the option to: (a) delete the affected Leased Real Property and the Acquired Asset(s) located thereon from the scope of this Agreement and proceed with the purchase of the remainder of the Acquired Assets and reduce the Final Purchase Price by an amount equal to the Allocation for such affected Acquired Asset(s) as set forth on <u>Schedule 6.2,</u> or (b) accept the affected Acquired Asset(s) in the condition in which they are in following the occurrence of the Material Adverse Effect, and receive either the insurance proceeds or condemnation award which Seller shall have received (or be entitled to receive), or in the event the proceeds or award have not been received by Seller at the time of Closing, an assignment by Seller of all of its rights in and to adjust and receive the insurance proceeds or award. In the event Buyer chooses option (b) above, Seller shall credit to Buyer the amount of any insurance deductible at Closing from the Final Purchase Price, and Seller shall not have the right to participate in any insurance adjustment, settlement or claim or condemnation proceeding, but will, at all times, reasonably cooperate with Buyer in pursuing any claim settlement, adjustment or prosecution, and any and all insurance proceeds and condemnation awards shall be the sole property of Buyer. Notwithstanding the foregoing, if the insurance proceeds or award are payable to the landlord or mortgagee for any such Leased Real Property and either such party (i) has no obligation to rebuild the affected Acquired Asset(s) and (ii) has determined not to so rebuild, Buyer shall be deemed to have elected option (a) above. Moreover, in the event of a taking of the whole of the affected Leased Real Property by a Government authority, Buyer shall be deemed to have elected option (a) above.

Section 10.4    <u>Payment to Post-Petition Trade Creditors</u>

Seller and Buyer agree that an amount reasonably estimated by Seller as of Closing, subject to Buyer's approval, sufficient to pay all amounts owed by Seller arising after the Petition Date, to trade creditors and other vendors that provided services, supplies or materials to the Group One Missouri Restaurants (which, for clarity, does not include Corporate Level accounts payable of

Seller) (the "**Trade Credit Escrow Amount**") shall be withheld from the Unadjusted Purchase Price due to Seller at Closing and be deposited into an escrow account (the "**Trade Credit Escrow Account**") to be established pursuant to the Closing Day Escrow Agreement.  The Trade Credit Escrow Amount shall be held by the Escrow Agent and paid to such trade creditors and vendors on or within three (3) Business Days of the Closing Date.

Section 10.5    Exclusion of Restaurants.

Notwithstanding anything herein to the contrary, at any time prior to Auction, and if no such Auction occurs, then at any time prior to the Closing, Buyer may elect to exclude up to two (2) restaurants from the Group One Missouri Restaurants by providing Seller with reasonable evidence of a Material Defect with respect to the Excluded Store (defined below), provided, however, that to the extent an Excluded Store is restaurant no. 12413 (as identified in attached Exhibit B) Buyer may exclude such restaurant for any reason, or no reason, in its sole discretion. Such election shall be effective upon notice by Buyer to Seller and shall identify the excluded restaurant(s) (each as so identified, an "**Excluded Store**").  Should such election be made, this Agreement shall thereby be automatically modified to give full effect to such exclusion, provided, however, that the $3,100,000 cash component of the Final Purchase Price shall be unaffected and shall be paid by Buyer pursuant to the terms of this Agreement as if such election had not been made.  However, and without limitation, the definitions of Acquired Assets, the Group One Missouri Restaurants, the Business and the Assumed Liabilities, shall each be revised to exclude each such Excluded Store, and the definition of Excluded Assets shall be revised to include each such Excluded Store, including any Franchise Agreement, Real Property Lease, and other contract, agreement and liability or other obligation relating to each such Excluded Store. At the Closing, Buyer shall pay Seller $10,000 for each Excluded Store in consideration of Seller's estimated costs of closing each such Excluded Store, which payment shall be included as part of the Total Consideration.

Section 10.6    Alternative Transaction.

Notwithstanding anything herein or in the Ancillary Agreement to the contrary, Seller may furnish information concerning Seller, the Acquired Assets and the Assumed Liabilities to any Person in connection with a potential Alternative Transaction, and subject to Article VIII of this Agreement and the Sale Procedures, negotiate, enter into and consummate an Alternative Transaction.

Section 10.7    Further Assurances.

At the request and the sole expense of the requesting party, Buyer or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Buyer or Seller, as applicable, or their respective counsel, may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.  Such parties shall also reasonably cooperate and take such actions prior to Closing as are reasonably necessary or desirable to effectuate a smooth transition of operations at Closing. This Section 10.5 shall survive Closing.

Section 10.8    Successors and Assigns.

This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties hereto.

Section 10.9    Governing Law; Jurisdiction.

This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.   For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

Section 10.10    Expenses.

Except as otherwise provided in this Agreement, Seller and Buyer shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.   Buyer shall pay the cost of all surveys, title insurance policies and title reports ordered or requested by Buyer or any Related Person thereto.

Section 10.11    Broker's and Finder's Fees.

Neither Seller nor Buyer has engaged any broker or finder in connection with any of the transactions contemplated by this Agreement other than Mastodon Ventures, Inc., whose fees and expenses shall, as between the parties, be the sole responsibility of Seller, and, insofar as such party knows, no other broker or other Person is entitled to any commission or finder's fee in connection with any of the transactions contemplated by this Agreement.

Section 10.12    Severability.

In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as set forth on the Execution Date.

Section 10.13    Notices.

All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the time and day of transmission (as indicated on the time stamp of the email or the "successful transmission" receipt by facsimile), if sent via facsimile transmission to the facsimile number given below or by electronic mail to the electronic mail address given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service

addressed to the party to whom notice is to be given; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

Duke and King Missouri, LLC
12281 Nicollet Avenue, South
Burnsville, MN 55337
Attention: Becky Moldenhauer, CFO
Email: bmoldenhauer@dukeandking.com
Facsimile: 952-288-2327


With a copy to (which shall not constitute notice):

McDonald Hopkins LLC
600 Superior Avenue, E.
Suite 2100
Cleveland, OH 44114
Attention:  Scott N. Opincar, Esq.
Email: sopincar@mcdonaldhopkins.com
Facsimile:  216.348.5474

If to Buyer:

Strategic Restaurants Acquisition Company II, LLC
3000 Executive Parkway, Suite 515
San Ramon, CA  94583
Attention: David L. Kanel
Facsimile: (925) 328-3318
Email: dkanel@Strategicrestaurants.com

With a copy to:

Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104-1500
Attention: Robert Trodella, Esq.
Facsimile: 415-875-5700
Email: rtrodella@jonesday.com


(b)      Any party may change its address, facsimile number or email address for the purpose of this Section 10.13 by giving the other party written notice of its new address in the manner set forth above.

Section 10.14 <u>Amendments; Waivers</u>.

This Agreement may only be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may only be waived, by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

Section 10.15 <u>Public Announcements</u>.

Promptly after the Closing, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein. Except as provided in the foregoing sentence, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without first coordinating their communications strategy with the other party, unless a press release or public announcement is required by law, the rules of any stock exchange, or is permitted by, or required by an order of, the Bankruptcy Court. If any such announcement or other disclosure is required by law, the rules of any stock exchange or is permitted by, or required by an order of, the Bankruptcy Court, the disclosing party shall use reasonable efforts to give the non-disclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure; provided, there shall be no liability to the disclosing party for failure to notify the other party. The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and that Franchisor may provide or release its own press release or announcement without the consent or input of either Buyer or Seller.

Section 10.16 <u>Entire Agreement</u>.

This Agreement and the Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. The Recitals, the Exhibits and all Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

Section 10.17 <u>No Third Party Beneficiaries</u>.

Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligation or liability of any third Persons to Seller or to Buyer. This Agreement is not intended and shall not give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 10.18 <u>Headings</u>.

The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 10.19  Counterparts; Delivery.

This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute the same agreement.  The signature of any of the parties may be delivered and made by facsimile, portable document format ("**pdf**") or other electronic means capable of creating a printable copy, and each such signature shall be treated as original signatures for all purposes.

Section 10.20  Construction.

Any reference to any law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation.  Any reference to the singular in this Agreement shall also include the plural and vice versa.

## ARTICLE XI.    DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

"**Accounts Receivable**" has the meanings set forth in Section 1.2(b).

"**Acquired Assets**" has the meaning set forth in Section 1.1.

"**Acquired Contracts**" has the meaning set forth in Section 1.1(g).

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly owning, controlling, owned by, controlled by or under direct or indirect common ownership or control with such Person.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allocation**" has the meaning set forth in Section 6.2.

"**Alternative Transaction**" means any transaction (regardless of the form thereof) involving (a) a sale of any portion of the Acquired Assets by Seller to a purchaser or purchasers other than Buyer, including without limitation by auction, foreclosure, deed-in-lieu of foreclosure, or other secured creditor enforcement right, or (b) confirmation by the Bankruptcy Court of a plan of reorganization under which Seller fails to sell any portion of the Acquired Assets to Buyer.

"**Ancillary Agreements**" means the Confidentiality Agreement, the Closing Day Escrow Agreement and any bill of sale, assignment or assumption agreement or other related agreements by and between Seller and Buyer effecting or evidencing the transactions contemplated under this Agreement.

"**Assignment Order**" means an order of the Bankruptcy Court pursuant to sections 105 and 365 of the Bankruptcy Code, [which order shall be in a form satisfactory to Buyer], and which shall (i) authorize the assumption by Seller and assignment to Buyer of the Acquired Contracts, (ii) establish the Cure Costs relating to the Acquired Contracts, and (iii) provide that the Buyer has demonstrated adequate assurance of future performance under the Acquired Contracts.

"**Assumed Liabilities**" has the meaning set forth in <u>Section 1.3</u>.

"**Auction**" shall mean the Group One Auction as that term is defined in the Seller's Sale and Bidding Procedures (Updated Timeline), as entered on the docket in the Chapter 11 Case on March 25, 2011.

"**Bankruptcy Code**" has the meaning set forth in the Recital.

"**Bankruptcy Court**" has the meaning set forth in the Recital.

"**Break-Up Fee**" has the meaning set forth in Section 8.2(d).

"**Break-Up Fee Lien**" shall mean the grant to Buyer of a first priority priming lien in the Acquired Assets to secure repayment of the Break-Up Fee and Buyer Expenses in the event that Bank of America or any other secured creditor acquires any portion of the Acquired Assets through an Alternative Transaction as described in Section 8.2(d).

"**Burger King®**" means any Person operating a Burger King® restaurant, whether Franchisor or any franchisee thereof.

"**Business**" means any and all business activities of Seller solely relating to or connected with the operation of the Group One Missouri Restaurants.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a federal legal holiday.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer Expenses**" has the meaning set forth in <u>Section 8.2(d)</u>.

"**Buyer's Responsible Officers**" means the Buyer's chief executive officer, Jerry Comstock, chief financial officer, Steven Grossman, and its general counsel, David Kanel.

"**Chapter 11 Case**" means the Chapter 11 case of Seller, case number 10-38653, jointly administered under bankruptcy case number 10-38652.

"**Closing**" has the meaning set forth in <u>Section 3.1</u>.

"**Closing Date**" has the meaning set forth in <u>Section 3.1</u>.

**"Closing Day Escrow Agreement"** means that certain escrow agreement, dated as of the Closing Date, by and Buyer, Seller and Escrow Agent, in a form to be mutually agreed upon by the parties thereto.

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Confidentiality Agreement"** means the confidentiality agreement Buyer executed in conjunction with its review of Seller's records.

**"Consent"** means any consent, approval or waiver required pursuant to Bankruptcy Code Section 365(c)(1).

**"Contract"** means any contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking, whether in written form or otherwise.

**"Corporate Level"** means, as applicable, any assets, properties, expenses, costs, commitments, Contracts, obligations, liabilities or other operational activities or items conducted or owned by Seller and its Affiliates primarily for the collective benefit of the restaurant enterprise owned and maintained by Seller and its Affiliates, and their employees, including, but not limited to, all Seller Employee Benefit Plans, if any, and all liabilities and obligations of Seller and its Affiliates thereunder, in each case, so long as same are not an Acquired Asset.

**"Deposit"** has the meaning set forth in the Recitals.

**"Deposit Escrow Account"** has the meaning set forth in the Recitals.

**"Deposit Escrow Agreement"** means that certain escrow agreement, dated as of the Execution Date, by and among Buyer, Seller and Escrow Agent, governing the funding and disbursement of the Deposit Escrow Account.

"**Due Diligence Materials**" has the meaning set forth in Section 5.1(d).

**"Due Diligence Period"** means the period between the Execution Date and the Due Diligence Deadline.

**"Employee Records"** means all books, files and records held or otherwise owned by Seller that relate to current or former employees and other personnel of Seller.

 **"Escrow Agent"** means U.S. Bank National Association.

**"Excluded Assets"** has the meaning set forth in Section 1.2.

**"Excluded Liabilities"** has the meaning set forth in Section 1.4.

**"Excluded Store"** has the meaning set forth in Section 10.5.

**"Execution Date"** has the meaning set forth in the Preamble.

**"Final Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

**"Franchise Agreements"** means those franchise agreements for the Group One Missouri Restaurants entered into between Franchisor and Seller and listed in <u>Schedule 1.1(g)</u>.

**"Franchisor"** means Burger King Corporation, a Florida corporation, or its successors-in-interest, whether by merger, acquisition of equity or acquisition of all or substantially all of its assets.

**"Franchisor's Consent"** has the meaning set forth in <u>Section 4.2(g)</u>.

**"Government"** means any agency, division, subdivision or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state or territory thereof.

"**Group One Missouri Restaurants**" means the thirteen (13) Burger King® franchised restaurants owned by Seller located in the state of Missouri and identified in <u>Exhibit B</u>.

**"Inventory"** means all of Seller's consumable food and beverages, including without limitation condiments, paper products and promotional items that are usable or salable by Buyer in the ordinary course of Buyer's operation of the Group One Missouri Restaurants as a Burger King® restaurant, provided, however, Inventory shall exclude, and Buyer shall not be obligated to purchase, more than ten (10) cases of promotional items at a price not to exceed $50 per case.

**"Leased Real Property"** has the meaning set forth in Section 1.1(b).

**"Leasehold Improvements"** means those fixtures, structures and other improvements located on any Leased Real Property used in the operation of the Business.

**"Lien"** means any mortgage, pledge, security interest, encumbrance, lien (statutory or other), conditional sale agreement, claim or liability.

**"Material Adverse Effect"** means any material adverse change, event, circumstance or development with respect to, or material adverse effect on, the physical condition of the Acquired Assets. For purposes of the use of this term in the definition of Material Defect, the Material Adverse Effect shall include any such event, circumstance, development, or material adverse effect, in each case, whenever occurring or first arising.

**"Material Defect"** means an environmental condition that is or would reasonably be expected to have a Material Adverse Effect upon the Excluded Store.

**"On-Hand Cash"** has the meaning set forth in <u>Section 1.1(a)</u>.

**"On-Hand Inventory"** has the meaning set forth in <u>Section 1.1(h)</u>.

**"Payroll Escrow Account"** has the meaning set forth in <u>Section 10.2(b)</u>.

**"Payroll Escrow Amount"** has the meaning set forth in <u>Section 10.2(b)</u>.

**"Permits"** has the meaning set forth in <u>Section 1.1(i)</u>.

**"Permitted Liens"** mean: (a) Liens for Taxes, assessments and Government or other similar charges that are not yet due and payable; (b) easements, licenses, restrictions and other matters of record that do not adversely affect the operation of the Leased Real Property in question as currently operated; (c) any state of facts a survey or other visual inspection would show that do not adversely affect the operation of the Leased Real Property in question as currently operated; and (d) Liens arising from the Assumed Liabilities.

**"Person"** means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

**"Petition Date"** has the meaning set forth in the Recitals.

**"Property Taxes"** means all real estate and personal property Taxes, and other related assessments and fees, arising from the Acquired Assets.

**"Prorated Amounts"** has the meaning set forth in <u>Section 2.3</u>.

**"Proration"** has the meaning set forth in <u>Section 2.3</u>.

**"Real Property Leases"** means all of the real property leases covering the Leased Real Property identified in <u>Schedule 1.1(g)</u>.

**"Rebates"** has the meaning set forth in <u>Section 1.1(k)</u>.

**"Related Person"** means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

**"Sale Order"** means an order of the Bankruptcy Court in a form satisfactory to Buyer, approving the sale and transfer of the Acquired Assets and Assumed Liabilities to Buyer pursuant to sections 105, 363 and 365 of the Bankruptcy Code, the operation or effect of which has not been stayed, reversed or amended (including any revisions, modifications or amendment thereof), and at Buyer's election, which may be exercised in its sole discretion, the time to appeal or seek review or rehearing has expired and no appeal or petition for review or rehearing was filed, or if filed, remains pending. The Sale Order shall include (i) authorization of the assumption by Seller and assignment to Buyer of the Acquired Contracts, (ii) terms and conditions consistent with the terms and conditions of this Agreement, and (iii) such other terms and conditions acceptable to Seller and Buyer. The Sale Order will be substantially in the form attached hereto as <u>Exhibit A</u> (provided, that, any material changes to such form of order must be approved by Seller and Buyer).

**"Sale Procedures"** means the Sale Procedures approved by the Bankruptcy Court by its Order Approving Sale and Bidding Procedures, entered on January 24, 2011.

**"Seller"** has the meaning set forth in the Preamble.

**"Supplies"** means all tangible property, other than Inventory, used in the preparation of serving, cleaning-up from meals, including without limitation smallwares, cooking and cleaning supplies and utensils, and other related items.

**"Tax Return"** means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

**"Taxes"** means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

**"Total Consideration"** has the meaning set forth in <u>Section 2.1</u>.

**"Trade Credit Escrow Account"** has the meaning set forth in <u>Section 10.4.</u>

**"Trade Credit Escrow Amount"** has the meaning set forth in <u>Section 10.4.</u>

**"Transaction Taxes"** means all state and local transfer taxes that are actually imposed solely by reason of the sale, transfer, assignment and delivery of the Acquired Assets to Buyer and that are not exempt under section 1146(a) of the Bankruptcy Code. Solely for the purpose of clarity, Transaction Taxes shall not include any taxes imposed on the basis of income, profit, or gross receipts of the Business.

**"Unadjusted Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

**"WARN Act"** shall mean the Worker Adjustment and Retraining Notification Act of 1988.

*[Signature Page Follows]*

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Execution Date.

BUYER:

**Strategic Restaurants Acquisition Company II, LLC**

By:_____

Name:_____

Title:_____

SELLER:

**Duke and King Missouri, LLC**

By:_____

Name: _Rodger T. Head_____

Title: _President / CEO_____

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be executed as of the Execution Date.

**BUYER:**

**Strategic Restaurants Acquisition Company II, LLC**

By: _____

Name: _STEVEN GROSSMAN_

Title: _CFO_

**SELLER:**

**Duke and King Missouri, LLC**

By: _____

Name: _____

Title: _____

# **EXHIBIT A**

## **Sale Order**

See attached.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | |
| Debtors. | Court File No. 10-38652 |
| | Court File Nos. |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ORDER GRANTING DEBTOR'S MOTION FOR ORDER (1) AUTHORIZING SALE OF ACQUIRED ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (2) DETERMINING BUYER TO BE A GOOD FAITH PURCHASER; (3) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF CERTAIN UNEXPIRED LEASES OF NON-RESIDENTIAL REAL PROPERTY AND EXECUTORY CONTRACTS DESIGNATED BY BUYER; AND (5) WAIVING THE 14-DAY STAY PURSUANT TO FEDERAL RULE OF BANKRUPTCY PROCEDURE 6004(h) AND 6006(d).**

On _____, 2011, at ___ [a/p].m. Central Time, in the above-captioned cases, a hearing was held on the Motion for [Insert name of motion] (the "Sale Motion"), filed by Duke and King Missouri, LLC, as one of the debtors and debtors-in-possession (the "Debtor", and together with each of the other debtors-in-possession in these administratively consolidated cases, the "Debtors"). Strategic Restaurants Acquisition Company II, LLC (the "Buyer") has been named as the Successful Bidder at the Group One Auction for the Acquired Assets that are identified in that certain Asset Purchase Agreement dated April 8, 2011, by and between the Debtor and the

Buyer (together with all exhibits and schedules thereto, the "Purchase Agreement").[1] The Purchase Agreement is attached hereto as Exhibit 1.

Appearances were noted on the record.

Based on the notice of Sale Motion and Sale Motion, the memorandum of points and authorities and declarations in support thereof, the documents and pleadings on file herein, all judicially noticeable facts, the arguments and representations of counsel, and such other evidence as was presented at the scheduled hearing:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

A.     This Court has jurisdiction to consider, determine and approve the sale (the "Sale") of the Acquired Assets (as defined in the Purchase Agreement), free and clear of all liens, liabilities, claims, interests, and encumbrances identified in the Purchase Agreement, and to authorize and direct the Debtor, on behalf of its bankruptcy estate, to enter into and perform in accordance with the Purchase Agreement.

B.     This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157(b)(1) and 1334.  The Sale Motion is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (N), and (O).  Venue of the Chapter 11 Case and the Sale Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C.     The statutory predicates for the relief requested in the Sale Motion are 11 U.S.C. §§ 105, 363 and 365, and Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure.

D.     This Court entered the Order Approving Sale and Bidding Procedures on January 24, 2011 [Docket No. 137] (the "Sale Procedures Order") which provided, among other things, for an auction of the Acquired Assets should qualified bidders comply with the Sale Procedures

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Purchase Agreement and the Sale Motion, as applicable.

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. *See* Fed. R. Bankr. 7052.

Order and submit competing bids (the "Group One Auction"). The Debtor and the Buyer have complied with the Sale Procedures Order in all respects.

E.      Pursuant to the Sale Procedures Order, the Debtors timely received __ Qualified Bids on or before April 19, 2011, and the Group One Auction was conducted on April 26, 2011, by the Debtors, in consultation with their advisors and investment banker, Mastodon Ventures, Inc. The Sale Procedures Order (as amended)[3] set May 10, 2011 as the date of the hearing (the "Sale Approval Hearing") for approval of the Sale as contemplated by the Purchase Agreement.

F.      On April __, 2011, the Debtor filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2).

G.      On April __, 2011, this Court entered the Order (A) Approving Stalking Horse Bidders; (B) Approving Form of Stalking Horse Asset Purchase Agreement, and (C) Approving Stalking Horse Protection Fee, which, among other things, approved the Buyer as the stalking horse bidder for the Acquired Assets located in the Group One Region (the "Stalking Horse Order").

H.      On April __, 2011, the Debtor duly and timely served the Notice of Sale Approval Hearing (the "Sale Notice") in compliance with the Stalking Horse Order. On April __, 2011, the Debtor duly and timely served the Notice Concerning Unexpired Leases and Executory Contracts and Establishing Cure Costs on the counterparties to such leases and contracts, including all counterparties to the Acquired Contracts.

I.      Based upon the foregoing and the certificates of service and publication filed with this Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the Sale of the Acquired Assets, the proposed assumption and assignment of the Acquired Contracts and the proposed rejection of the contracts has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008 and in compliance with the Sale Procedures Order and no other or further notice of the Sale Motion, the

---

[3] The timeline set forth in the Sale Procedures Order was subsequently amended by stipulation.

initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the Sale of the Acquired Assets, the proposed assumption and assignment of the Acquired Contracts or the entry of this Sale Approval Order is required or necessary.

J.        The Sale Notice was duly served by the Debtor on (i) all creditors and interested parties, including parties requesting special notice, required to receive notice pursuant to Bankruptcy Rule 2002(i), (ii) each entity or person known to the Debtor to assert a lien, encumbrance, claim or other interest in or to the assets to be affected by this Order, (iii) all Acquired Contract counterparties including notice regarding the relevant Cure Costs; (iv) the Internal Revenue Service and all state and local taxing authorities in jurisdictions where the Debtor has or may have any tax liability, and (v) the Office of the United States Trustee, all in accordance with Bankruptcy Rules 2002(a)(2), 2002(c)(1), 2002(i), 2002(k), 6004(a) and 6004(c).  The Sale Notice (i) complied in all respects with the requirements of the Bankruptcy Code and the Bankruptcy Rules and any applicable local rule, (ii) fully and adequately described the relief requested in the Sale Motion, (iii) provided fair and reasonable notice under the circumstances of the Chapter 11 Case with respect to the deadlines and procedures for objecting to the relief requested in the Sale Motion, and (iv) set forth the time, date and place for the hearing on the Sale Motion, and an opportunity to request a hearing.

K.        All parties in interest, including, without limitation, Bank of America, Burger King Corporation, all parties who claim an interest in or lien upon the Acquired Assets, all counterparties to the Acquired Contracts, all shareholders of the Debtors, all federal, state and local environmental authorities, and all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the Sale of Acquired Assets may have, claims, contingent or otherwise against the Debtors, have been given a reasonably opportunity to object and be heard, regarding the relief requested in the Sale Motion (including assumption and assignment of the Acquired Contracts and the Cure Costs).  All objections to the Sale Motion and to approval of the Purchase Agreement, including the transactions contemplated thereby, were resolved, withdrawn or overruled at the Sale Approval Hearing.

L.      As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (i) the offer from the Buyer constitutes the highest and best offer for the Acquired Assets; (ii) the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Sale Procedures Order; (iii) the auction process set forth in the Sale Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets; and (iv) the Group One Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

M.      The Group One Auction was held in accordance with the Sale Procedures Order.

N.      The Debtor engaged in fair and reasonable marketing, advertising and other sales efforts and procedures in connection with the Sale of the Acquired Assets, which efforts and procedures have enabled the estate to obtain a fair and reasonable price for the Acquired Assets under the circumstances of the Chapter 11 Case.

O.      In accordance with the Sale Procedures Order, the Purchase Agreement was deemed a Qualified Bid (as defined in the Sale Procedures) and the Buyer was eligible to participate at the Group One Auction.

P.      The Purchase Agreement constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtor's estate than would be provided by any other available alternative for the Acquired Assets.  The Debtor's determination that the Purchase Agreement constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtor's business judgment.

Q.      The Purchase Agreement represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Case.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtor's estates than the Buyer.

R.    The purchase price as set forth in the Purchase Agreement (the "<u>Purchase Price</u>") for the Acquired Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession, and the District of Columbia.  Approval of the Purchase Agreement and the Sale of the Acquired Assets in accordance with this Order and the Purchase Agreement are in the best interest of the Debtor's estate, creditors and other parties in interest.  The terms of the Purchase Agreement were negotiated at arms' length and are fair and reasonable under the circumstances.

S.    The Purchase Agreement was not entered into for the purpose of hindering, delaying or defrauding creditors or any other party under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtor nor the Buyer is entering into the transactions contemplated by the Purchase Agreement fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

T.    The Debtor has demonstrated compelling circumstances and good, sufficient and sound business purposes for the Sale of the Acquired Assets pursuant to section 363(b) of the Bankruptcy Code outside of a plan of reorganization.

U.    The Debtor (i) has full corporate, limited liability or other power to execute, deliver and perform its obligations under the Purchase Agreement and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Acquired Assets by the Debtor has been duly and validly authorized by all necessary corporate, limited liability or similar action, and (ii) has taken all action necessary to authorize and approve the Purchase Agreement and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.  No third-party approvals, other than those expressly provided for in the Purchase Agreement, if any, are required by the Debtor to consummate such transactions.

V.     The Debtor is authorized and directed to sell and transfer the Acquired Assets free and clear of the Released Liens, Claims and Interests (as defined in paragraph 12 below) because it has satisfied the requirements of section 363(f) of the Bankruptcy Code.

W.     Those holders of Claims (as defined in paragraph 12 below) against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the Sale or the Sale Motion are deemed to have consented to the Sale pursuant to section 363(f)(2) of the Bankruptcy Code.  The Debtor has met the requirements of section 363(f) with respect to all other holders of Claims as such Claim holders will have their Claims, if any, in each instance against the Debtor, or the Debtors, as applicable, including their estates or any of the Acquired Assets, attach to the net cash proceeds of the Sale ultimately attributable to the Acquired Assets, in which such creditor alleges a Claim, in the same order of priority, with the same validity, force and effect that such Claims had prior to the Sale, subject to any claims and defenses the Debtor, or the Debtors and their estates, as applicable, may possess with respect thereto.

X.     The Buyer would not have entered into the Purchase Agreement and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtor, its estate and its creditors, if the Sale of the Acquired Assets to the Buyer, the assumption of liabilities and obligations as set forth in the Purchase Agreement by the Buyer and the assignment of the Assumed Leases and Acquired Contracts were not free and clear of all Released Liens, Claims and Interests.

Y.     The Purchase Agreement was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion.

Z.     The Debtor has complied with the procedures for notice and Sale of the Acquired Assets as set forth in the Sale Procedures Order.

AA.     The Buyer is not an "insider" or "affiliate" of the Debtors (as each such term is defined in the Bankruptcy Code).  Neither the Debtor nor the Buyer, nor any of its and their respective affiliates or representatives, have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n)

of the Bankruptcy Code to the Sale and the transactions contemplated by the Purchase Agreement. Specifically, the Buyer has not acted in a collusive manner with any person or entity and the aggregate Purchase Price paid by the Buyer for the Acquired Assets was not controlled by any agreement among the bidders, or otherwise.

BB.    The Buyer is entitled to the protections afforded under section 363(m) of the Bankruptcy Code because the Buyer is a good faith purchaser in that, *inter alia*:  (i) except as set forth in the Sale Procedures Order, the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Buyer complied with the provisions in the Sale Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Sale Procedures Order; (iv) the Buyer in no way induced or caused the chapter 11 filings by the Debtors; (v) all payments to be made by the Buyer in connection with the Sale have been disclosed; (vi) no common identity of directors or controlling stockholders exists between the Buyer and any of the Debtors; and (vii) the negotiation and execution of the Purchase Agreement was at arms' length and in good faith.

CC.    In the absence of a stay pending appeal, if any, if the Closing occurs at any time after entry of this Order, then, with respect to the Purchase Agreement, the Buyer, as a purchaser in good faith of the Acquired Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Order or any authorization contained herein is reversed or modified on appeal.

DD.    The Debtor is the sole and lawful owner of the Acquired Assets.  Effective as of the Closing, the transfer of the Acquired Assets is or will (i) be legal, valid and effective transfers of property of the Debtor's estate to the Buyer, as more particularly set forth in the Purchase Agreement, and (ii) vest the Buyer with all right, title, and interest of the Debtor and the Debtor's estate in and to the Acquired Assets free and clear of all Released Liens, Claims and Interests (as defined in paragraph 12 herein) under sections 363(f) and 105 of the Bankruptcy Code.

EE.    The Debtor has demonstrated that it is an exercise of its sound business judgment to assume and assign the Acquired Contracts, each as defined in the Purchase Agreement and

described in Schedule 1.1(g) to the Purchase Agreement and as identified in <u>Exhibit 2</u> to this Order, including any amendments or modifications to such exhibits as agreed to by the Debtor and Buyer pursuant to the Purchase Agreement, in connection with the consummation of the Sale of Acquired Assets, and the assumption and assignment of the Acquired Contracts is in the best interests of the Debtor, its estate, its creditors and its equity holders.

FF.     The Acquired Contracts being assigned to the Buyer as set forth in the Purchase Agreement are an integral part of the Debtor's businesses being purchased by the Buyer and, accordingly, such assumption and assignment of the Acquired Contracts is reasonable, enhances the value of the Debtor's estate, and does not constitute unfair discrimination.

GG.     The Acquired Contracts are unexpired leases and executory contracts, as applicable, within the meaning of the Bankruptcy Code.

HH.     All amounts that are required to be paid in connection with the assumption and assignment of the Acquired Contracts that are due or owing under sections 365(b)(1)(A) and (B), and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under the Acquired Contracts specified in this Order or (ii) pay all actual or pecuniary losses that have resulted from such defaults, are set forth on <u>Exhibit 2</u> hereto (the "<u>Cure Costs</u>").

II.     Any objections to the Cure Costs associated with such Acquired Contracts are resolved as set forth on <u>Exhibit 2</u> to this Order.  To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Acquired Contract, or (ii) the Cure Cost associated with the applicable Acquired Contract, such counterparty is deemed to have consented to such Cure Cost and the assumption and assignments of its respective Acquired Contract to the Buyer as expressly set forth on <u>Exhibit 2</u> to this Order.

JJ.     The promises of the Debtor to pay the Cure Costs (in accordance with the Purchase Agreement) and the Buyer's promise to perform the obligations under the Acquired Contracts after the Closing (in accordance with the Purchase Agreement) shall constitute adequate assurance of the Buyer's future performance under the Acquired Contracts specified in this Order that are being assigned to the Buyer within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

KK.    Adequate notice and opportunity to be heard was provided to counterparties to executory contracts and unexpired leases to be assumed and assigned pursuant to this Order. Further, counterparties received adequate notice and an opportunity to object to the amount of any Cure Costs owed by the Debtor's estate on account of the Real Property Leases and the Acquired Contracts to be assumed and assigned to the Buyer under the Purchase Agreement, and as identified in attached <u>Exhibit 2</u>.

LL.    The assumption and assignment of the  Acquired Contracts is integral to the Purchase Agreement and is in the best interests of the Debtor and its estates, creditors and equity holders and represents the exercise of the Debtor's sound business judgment.

MM.    Any objections to the assumption and assignment of any of the Acquired Contracts to the Buyer are hereby overruled.

NN.    Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the Purchase Agreement); (ii) have, *de facto* or otherwise, merged with or into any of the Debtors; (iii) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Buyer and the Debtors); or (iv) be holding itself out to the public as a continuation of the Debtors.  The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the Purchase Agreement with respect to the Assumed Liabilities.

OO.    The Debtor has good, valid and marketable title to all of the Acquired Assets. The Acquired Assets are to be transferred free and clear of any and all Released Liens, Claims and Interests (as defined in paragraph 12 below).  All of the Acquired Assets are, or will on the Closing Date, be owned by the Debtor and will be transferred to the Buyer under and pursuant to the terms of the Purchase Agreement.

PP.    All objections, if any, to the Sale Motion and to approval of the Purchase Agreement, including the transactions contemplated thereby, have been withdrawn, resolved or overruled.

Accordingly, and for good cause appearing therefor,

**IT IS HEREBY ORDERED**:

## General Provisions

1.      The Sale Motion is granted in its entirety, subject to the terms and conditions set forth in this Order.

2.      This Court's findings of fact and conclusions of law, set forth in the Sale Procedures Order, are incorporated herein by this reference.

3.      Any objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled as announced to this Court at the Sale Approval Hearing, and all reservations of rights included therein, are hereby denied and overruled on the merits with prejudice.

4.      Notice of the Sale Approval Hearing was fair, proper and sufficient under the circumstances and complied in all respects with 11 U.S.C. § 102(1) and Bankruptcy Rules 2002, 6004, and 6006 and the local rules.

## Approval of the Purchase Agreement and Sale

5.      The terms, conditions, and transactions contemplated by the Purchase Agreement and all other ancillary documents are hereby approved in all respects.

6.      The Debtor is hereby authorized and directed under 11 U.S.C. §§ 105(a) and 363(b), (c), (f), (m) and (n) to sell the Acquired Assets to the Buyer without further order of this Court.

7.      The Debtor is hereby authorized, empowered, and directed to (i) perform under, consummate, and implement the Purchase Agreement, (ii) execute all additional instruments and documents that may be reasonably necessary or desirable to implement the Purchase Agreement and the transactions contemplated thereby, (iii) take all further actions as may be necessary or appropriate for the purposes of assigning, transferring, granting, conveying, encumbering or transferring the Acquired Assets as contemplated by the Purchase Agreement, and (iv) take such other and further steps as are contemplated by the Purchase Agreement or reasonably required to

fulfill the Debtor's obligations under the Purchase Agreement, all without further order of this Court.

8.      The Sale of the Acquired Assets and the assumption and assignment of the Acquired Contracts identified in attached <u>Exhibit 2</u> and the consideration provided by Buyer under the Purchase Agreement is fair and reasonable and shall be deemed for all purposes to constitute a transfer for reasonably equivalent value and fair consideration under the Bankruptcy Code, the Uniform Fraudulent Transfer Act, the Uniform Fraudulent Conveyance Act, and any other laws, rules or regulations of the United States, any state, county, township city, municipality, territory or possession, and the District of Columbia.

9.      The Buyer shall not be required to seek or obtain relief from the automatic stay under Bankruptcy Code section 362 to enforce any of its remedies under the Purchase Agreement or any other Sale related document.  The automatic stay imposed by Bankruptcy Code section 362 is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Order.

10.     The validity of the Sale approved hereby shall not be affected by the appointment of a trustee or successor trustee, the dismissal of the Chapter 11 Case, or its conversion to another chapter under title 11 of the United States Code.  This Order shall be binding in all respects upon the Debtor, its bankruptcy estate, all creditors of, and holders of equity interests in, the Debtor, all holders of liens, claims or other interests in, against or on all or any portion of the Acquired Assets (whether known or unknown), the Buyer, and all successors and assigns of the Buyer upon conversion of the Debtor's Chapter 11 Case from chapter 11 to chapter 7.  This Order and the Purchase Agreement shall inure to the benefit of the Debtor's estate and its creditors, the Buyer and the respective successors, assigns and grantees.

11.     The Sale of the Acquired Assets is not subject to avoidance pursuant to section 363(n) of the Bankruptcy Code, or any other provision of the Bankruptcy Code, or otherwise.

## Transfer of Acquired Assets

12.     Pursuant to sections 105(a), 363(b), 363(f), 365(b) and 365(f) of the Bankruptcy Code, the Debtor is authorized to sell the Acquired Assets to the Buyer in accordance with the Purchase Agreement, and to transfer, assign and convey the Acquired Assets to the Buyer on the "Closing Date" (as defined in the Purchase Agreement).  Upon the Debtor's receipt of the Total Consideration, such Sale, transfer, assignment and conveyance shall constitute a legal, valid, binding, and effective sale, transfer, assignment and conveyance of such Acquired Assets, which shall vest Buyer with all right, title, and interest of the Debtor to the Acquired Assets, free and clear of all (i) deeds of trust, mortgages, liens (as defined in section 101(37) of the Bankruptcy Code, and including but not limited to, mechanics', materialmens' and other consensual or statutory liens), financing statements and any other encumbrance accruing or arising at any time prior to the Closing Date (collectively, "Liens"), (ii) all debts arising under, relating to, or in connection with any act of the Debtors, all claims (as that term is defined in section 101(5) of the Bankruptcy Code), liabilities, obligations, demands, guaranties, options, rights, contractual commitments, interests, duties, covenants, actions, restrictions (including, but not limited to, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Acquired Assets and all debts arising in any way in connection with any acts of the Debtors), personal injury and other tort claims, covenants, defects, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, conditional sale or other title retention agreements, options, contracts, offsets, recoupment, rights of recovery, judgments, orders, and decrees of any court or governmental entity, successor, transferee, product liability, environmental, tax and other liabilities and claims of any kind or nature, any claims arising under the Workers Adjustment Restraining and Notification Act, 29 U.S.C. § 2101, et seq., or any collective bargaining agreements or other applicable law, and all causes of action and liabilities of any kind and nature, whether arising prior to or subsequent to the commencement of the Chapter 11 Case, in each case whether known or unknown, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, secured or unsecured, senior or subordinate, legal or equitable, or created or imposed by agreement, understanding, judgment, law, equity or otherwise, including pursuant to environmental law, anti-trust law, labor law, *de facto* merger,

mere continuation, or substantial continuity (collectively, "Claims"), relating to, accruing or arising at any time prior to the Closing Date, and (iii) other interests or any other claim of any kind or nature whatsoever, including but not limited to, any theory of successor liability, successor-in-interest liability and claims, transferee liability (collectively, "Interests"). Such Liens, Claims and Interests shall exclude the Assumed Liabilities (as defined in the Purchase Agreement) and are collectively referred to as the "Released Liens, Claims and Interests."

13.     Except as explicitly authorized for payment by this Order, the Released Liens, Claims and Interests shall attach, as adequate protection to the holder thereof pursuant to 11 U.S.C. § 363(e), to the proceeds of the Sale, with the same priority, validity, force, effect and scope as of the petition date of the Debtor's Chapter 11 Case, subject to any and all defenses, offsets, counterclaims and/or other rights of any party relating thereto; provided, however, that the Debtor shall disburse, or cause to be disbursed, the Sale proceeds directly from escrow to satisfy (i) the employee and vendor claims (as described in sections 10.2 and 10.4 of the Purchase Agreement), (ii) any outstanding property taxes relating to the Acquired Assets, subject to requirements of sections 2.3 and 6.1 of the Purchase Agreement), and (iii) Cure Costs, if any, with each such payment to be made concurrent with the Closing.

14.     On or before the Closing Date, each of the creditors of the Debtor's estate is authorized and directed, and the Buyer is hereby authorized, on behalf of each of the estate's creditors, to execute and deliver such documents and take all other actions as may be reasonably necessary to release the Released Liens, Claims and Interests, if any, as such Released Liens, Claims or Interests may have been recorded or may otherwise exist.

15.     Each of the Debtor's creditors is hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release such creditor's Liens, Claims or Interests in the Acquired Assets, if any, as such Liens, Claims or Interests may have been recorded or may otherwise exist. If any person or entity that has filed or recorded financing statements, mortgages, deeds of trust, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Liens, Claims or Interests in, against or upon the Acquired Assets prior to the Closing Date of the Sale, in proper form for filing and executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction,

releases of all Liens, Claims or Interest that the person or entity has with respect to the Acquired Assets, then on the Closing Date, or as soon as possible thereafter, (a) the Debtors are hereby authorized and directed to execute and file, or as appropriate record, such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Buyer is hereby authorized on behalf of each of the Debtor's creditors, to file, register, or otherwise record a certified copy of this Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims, Liens and Interests in, against, or upon the Acquired Assets of any kind or nature whatsoever.

16.     All entities who are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets (other than the Deposit and the Excluded Assets under the terms of the Purchase Agreement) are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date, with the Liens, Claims and Interests of such entity to be satisfied solely from the proceeds of the Sale of the Acquired Assets.

17.     On the Closing Date, this Order shall be construed and shall constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Acquired Assets or a bill of sale transferring good and marketable title in the Acquired Assets to Buyer. Each and every federal, state, and local governmental agency or department is hereby directed to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement. A certified copy of this Order may be filed with the appropriate clerk and/or recorded with the recorder to act to cancel any Released Liens, Claims or Interests of record.

18.     This Order is and shall be binding upon and shall govern the acts of all persons and entities, including, without limitation, (i) all filing agents, (ii) filing officers, (iii) title agents, (iv) title insurers, (v) recorders of mortgages, (vi) recorders or registrars of deeds, deeds of trust, financing statements and security agreements, (vii) administrative agencies, (viii) secretaries of state, (ix) federal, state and local governmental authorities, agencies, departments, and (x) all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or

who may be required to report or insure any title or state of title in or to any lease. Each of the foregoing persons and entities is hereby directed to accept for filing and recordation any and all of the documents and instruments necessary and appropriate to consummate the transactions contemplated by the Purchase Agreement. If any such person or entity fails to comply with the provisions of this paragraph, such person or entity shall nonetheless be bound to any and all documents necessary or desirable to effect the transactions contemplated under the Purchase Agreement.

19. All persons and entities, including, but not limited to, all debt security holders, equity security holders, governmental, tax, police and regulatory authorities, lenders, trade creditors, judgment holders, litigation claimants and other creditors, holding Liens, Claims or other Interests of any kind or nature whatsoever against or in all or any portion of the Acquired Assets (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or non-contingent, liquidated or unliquidated, senior or subordinate), arising under or out of, in connection with, or in any way relating to the Debtor, the Acquired Assets, the operation of the Debtor's business prior to the Closing Date or the transfer of the Acquired Assets to the Buyer, hereby are permanently barred, estopped and enjoined from asserting against the Buyer, the Buyer's successors or assigns, or the Acquired Assets, any such persons' or entities' Released Liens, Claims or Interests in and to the Acquired Assets, including, without limitation, the following actions: (i) commencing or continuing in any manner any action or other proceeding against the Buyer, any of its affiliates, its successors, assets or properties; (ii) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Buyer, any of its affiliates, its successors, assets or properties; (iii) creating, perfecting, or enforcing any Lien or other Claim or Interest against the Buyer, any of its affiliates, its successors, assets, or properties; (iv) asserting any setoff, right of subrogation, or recoupment of any kind against any obligation due the Buyer, any of its affiliates or its successors; (v) commencing or continuing any action, in any manner or place, that does not comply or is inconsistent with the provisions of this Order or other orders of this Court, or the agreements or actions contemplated or taken in respect thereof; or (vi) revoking, terminating or failing or refusing to transfer or renew any license, permit or authorization to operate any of the Acquired

Assets or conduct any of the businesses operated on or through the Acquired Assets. All persons and entities are hereby forever prohibited and enjoined from taking any action that would adversely affect or interfere with the ability of the Debtor to sell and transfer the Acquired Assets to the Buyer in accordance with the terms of the Purchase Agreement and this Order.

## Acquired Contracts and Real Property Leases

20.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale as contemplated under the Purchase Agreement, the Debtor's assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the Purchase Agreement, of the Acquired Contracts specified in this Order and as identified in Exhibit 2 hereto is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

21.     The Debtor is authorized in accordance with sections 105(a) and 365(a),(f) and other relevant provisions of the Bankruptcy Code to (a) assume and assign to Buyer, effective upon the Closing of the Sale as contemplated under the Purchase Agreement, the Acquired Contracts specified in Exhibit 2 to in this Order; and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and  the Acquired Contracts specified in this Order.

22.     Any Cure Costs due and owing on account of the assumption and assignment of the Acquired Contracts set forth in the Purchase Agreement and specified in Exhibit 2 to this Order, shall be paid by the Debtor out of the Sale proceeds in accordance with paragraph 13 of this Order.  The payment of the applicable Cure Costs, in the amounts set forth in Exhibit 2 hereto, shall (a) effect a cure of all defaults existing thereunder as of the date that such Acquired Contract is assumed and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.  To the extent that any counterparty to an Acquired Contract did not object timely to its Cure Costs in accordance with the Procedures Order, such counterparty is deemed to have consented to such Cure Cost and the assignments of its respective Acquired Contract to the Buyer.

23.	The failure of the Debtor or the Buyer to enforce at any time one or more terms or conditions of any of the Acquired Contracts set forth in <u>Exhibit 2</u> hereto shall not be a waiver of such terms or conditions, or of the Debtor's and Buyer's rights to enforce every term and condition of the such leases and contracts.

24.	Except as expressly provided for in this Order or the Purchase Agreement, the Buyer shall not have any liability for any obligations of the Debtor arising under or related to the Acquired Assets.  Without limiting the generality of the foregoing, and except as otherwise specifically provided herein, in the Purchase Agreement, the Buyer shall not be liable for any Claims against the Debtor or any of its predecessors or affiliates, and the Buyer shall have no successor or vicarious liabilities of any kind or character, including, but not limited to, under any theory of antitrust, environmental, successor or transferee liability, labor law, *de facto* merger, mere continuation, or substantial continuity, whether known or unknown as of the Closing Date, now existing or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, but not limited to, liabilities on account of warranties, liabilities relating to or arising from any environmental laws, and any taxes arising, accruing or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to the Closing Date.

25.	Other than as authorized by the Bankruptcy Code, any provisions in any of the Acquired Contracts identified in attached <u>Exhibit 2</u> that prohibit or condition the assignment of such Real Property Leases or Acquired Contracts, or that allow the counterparty to such leases and contracts to terminate, recapture, impose any penalty, condition on renewal or extension or modify any term or condition upon the assignment of such lease or contract, constitute unenforceable anti-assignment provisions that are void and of no force and effect.  There shall be no rent accelerations, assignment fees, increases or any other fees, amounts or costs charged to the Buyer or the Debtor as a result of the assumption and assignment of the Acquired Contracts. All other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtor and assignment to the Buyer of the Acquired Contracts have been satisfied.  On the Closing Date, in accordance with sections 363 and 365 of the Bankruptcy

Code, the Buyer shall be fully and irrevocably vested with all right, title and interest of the Debtor under the Acquired Contracts.

26.     On the Closing Date (i) the Acquired Contracts identified in attached Exhibit 2 will remain in full force and effect, (ii) no default shall exist under the Acquired Contracts nor shall there exist any event or condition which, with the passage of time or giving of notice, or both, would constitute such a default, (iii) the Buyer shall be deemed to be substituted for the Debtor as a party to the applicable Acquired Contracts, and (iv) the Debtor shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, from any further liability under the Acquired Contracts.

27.     The Buyer has provided adequate assurance of future performance under the relevant Acquired Contracts within the meaning of sections 365(b)(1)(C), 365(b)(3) (to the extent applicable) and 365(f)(2)(B) of the Bankruptcy Code.

28.     Pursuant to sections 105(a), 363 and 365 of the Bankruptcy Code, all counterparties to the Acquired Contracts identified in attached Exhibit 2 are forever barred and permanently enjoined from raising or asserting against the Debtor or the Buyer any assignment fee, default, breach or claim or pecuniary loss, or condition to assignment, arising under or related to the Acquired Contracts existing as of the Closing Date or arising by reason of the Closing.

### Other Provisions

29.     The procedures set forth in the Sale Motion whereby the Debtor may solicit, evaluate, and accept or reject overbids are approved in their entirety and are deemed to have been complied with in all respects relating to the Sale transaction contemplated by the Purchase Agreement.

30.     The Sale, as contemplated by the Purchase Agreement, is undertaken by the Buyer without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the Sale shall not affect the validity of such Sale, unless and solely to the extent such authorization and such Sale are duly stayed pending such appeal.  The

Buyer is a good-faith buyer of the Acquired Assets within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to the full protections of section 363(m) of the Bankruptcy Code.

31.     Nothing contained in any plan of reorganization or liquidation, or order of any type or kind entered in (i) the Chapter 11 Case, (ii) any subsequent chapter 7 case into which the Chapter 11 Case may be converted, or (iii) any related proceeding subsequent to entry of this Order, shall conflict with or derogate from the provisions of the Purchase Agreement or the terms of this Order.

32.     To the extent that this Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Chapter 11 Case, the terms of this Order shall govern.

33.     This Order shall govern if there is any inconsistency between the Purchase Agreement (including all ancillary documents executed in connection therewith) and this Order. All of the provisions of this Order are non-severable and mutually dependent.

34.     The Purchase Agreement and any related agreements, documents or instruments may be modified, amended or supplemented by the parties thereto, in a writing signed by such parties, and in accordance with the terms and conditions of the Purchase Agreement, without further order of this Court; provided that any such modification, amendment or supplement does not have a material adverse effect on the Debtor or its bankruptcy estate.

35.     So long as the Chapter 11 Case remains open, this Court shall retain jurisdiction to, among other things, interpret, implement, and enforce the terms and provisions of this Order and the Purchase Agreement, all amendments thereto and any waivers and consents thereunder and each of the agreements executed in connection therewith to which the Debtor is a party or that has been assigned by the Debtor to the Buyer, and to adjudicate, if necessary, any and all disputes, controversies or claims concerning or relating in any way to the Sale, including, but not limited to, retaining jurisdiction to (i) compel delivery of the Acquired Assets to the Buyer; (ii) interpret, implement and enforce the provisions of this Order; (iii) resolve disputes concerning the Purchase Agreement, (iv) protect the Buyer against any Released Liens, Claims

or Interest, and (v) enter any orders under sections 363 or 365 of the Bankruptcy Code with respect to the Acquired Contracts identified in attached <u>Exhibit 2</u>.

36.     The failure specifically to include any particular provision of the Purchase Agreement in this Order shall not diminish or impair the effectiveness of such provisions, it being the intent of this Court that the Purchase Agreement be authorized and approved in its entirety.

37.     No bulk sales law or any similar law of any state or other jurisdiction applies in any way to the Sale transactions contemplated by the Purchase Agreement.

38.     All time periods set forth in this Order shall be calculated in accordance with Bankruptcy Rule 9006(a).

39.     This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, and any other applicable rule or law, this Court expressly finds that there is no just reason for delay in the implementation of this Order, waives any stay, and expressly directs entry of this Order as set forth herein.

40.     The Debtor shall execute whatever documents are reasonably requested or required by Buyer and any other parity to effectuate the terms, conditions, and obligations of this Order.

**IT IS SO ORDERED**.


Dated: _____, 2011          _____
                                       Honorable Gregory F. Kishel
                                       United States Bankruptcy Judge

## EXHIBIT B

### Group One Missouri Restaurants

| No. | Rest. # | Address | City/State/Zip |
| --- | --- | --- | --- |
| 1 | 03232 | 3009 S. Campbell Avenue | Springfield, MO |
| 2 | 05357 | 1022 Kings Highway Street | Rolla, MO |
| 3 | 07203 | 525 S. National Avenue | Springfield, MO |
| 4 | 12281 | 2200 E. Austin Blvd. | Nevada, MO |
| 5 | 11049 | 3095 Gardner Edgewood Dr. | Neosho, MO |
| 6 | 12413 | 315 N. Massey Blvd. | Nixa, MO |
| 7 | 12415 | 875 E. Highway 60 | Monett, MO |
| 8 | 01227 | 935 W. Kearney | Springfield, MO |
| 9 | 03475 | 2138 N. Glenstone Avenue | Springfield, MO |
| 10 | 04513 | 1077 S. Jefferson Avenue | Lebanon, MO |
| 11 | 05539 | 1101 S. Limit Avenue | Sedalia, MO |
| 12 | 08384 | 1911 S. Springfield Avenue | Bolivar, MO |
| 13 | 09331 | 1317 Preacher Roe Blvd | West Plains, MO |

**Acquired Contracts**

Real Property Leases

1.      Store No. 3232 – Triple Net Lease dated as of December 30, 2003 between South Campbell Street Investment Company, LLC, as landlord, and Seller (as assignee of Swisshelm Group, Inc.), as tenant.

2.      Store No. 5357 – Lease Agreement dated as of June 24, 2008 between University Park Development, LLC, as landlord, and Seller, as tenant.

3.      Store No. 7203 – Lease Agreement dated as of June 2, 2008 between MO.BK., LLC, as landlord, and Seller, as tenant.

4.      Store No. 12281 – Lease Agreement dated as of December 18, 2009 between AWWRE III LLC, as landlord, and Seller, as tenant.

5.      Store No. 11049 – Lease Agreement dated as of December 29, 2009 between AWWRE III LLC, as landlord, and Seller, as tenant.

6.      Store No. 12413 – Ground Lease Agreement dated as of September 21, 1998 by and between Wood Family Limited Partnership, as landlord, and Seller (as assignee of Swisshelm Family Limited Partnership), as tenant.

7.      Store No. 12415 – Lease Agreement dated as of November 6, 2008 by and among Bryan E. Weiner, a single man, and Alan B. Wiener and Olga B. Wiener, husband and wife, as joint tenants, collectively as landlord, and Seller, as tenant.

8.      Store No. 1227 – Lease Agreement dated as of October 7, 2008 by and between Spring Investment LLC, as landlord, and Seller, as tenant.

9.      Store No. 3475 – Lease Agreement dated as of September 16, 2008 between Johanna Lomonaco Tacci and Christopher John Tacci, Trustees of the Thomas Joseph Tacci Family Trust, as landlord, and Seller, as tenant.

10.     Store No. 4513 – Ground Lease Agreement dated as of October 15, 1984 between Sutter Development Corp., as landlord, and Seller (as assignee of Swisshelm Group, Inc., successor in interest to Schuster-Swisshelm, Inc.), as tenant.

11.     Store No. 5539 – Lease Agreement dated as of July 31, 2008 between Glen Harris Farms, as landlord, and Seller, as tenant.

12.     Store No. 8384 – Lease Agreement dated as of December 28, 2004 between Altibano R. Parenti and Rosa M. Parenti, Trustees of the Altibano R. Parenti and Rosa M. Parenti Living

Trust dated 8/27/84, as landlord, and Seller (as assignee of Point Guard Enterprises, Inc.), as tenant.

13. Store No. 9331 – Ground Lease dated as of May 12, 1995 between Clyde Stewart, Jr. and Kathy Stewart, his wife, and David Stewart and Joyce Stewart, his wife, collectively as landlord, and Seller (as assignee of Swisshelm Group, Inc.), as tenant.

Franchise Agreements

1. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #12413).

2. Successor Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated April 4, 2007, as amended by that First Amendment to Successor Franchise Agreement, dated December 10, 2007, as same may have been thereafter amended (Store #5539).

3. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as amended by that First Agreement to Extend Restaurant Franchise Agreement, dated May 13, 2009, and that Second Agreement to Extend Restaurant Franchise Agreement, dated January 11, 2010, as same may have been thereafter amended (Store #1227).

4. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #9331).

5. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #3232).

6. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #7203).

7. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #3475).

8. Successor Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated April 13, 2007, as same may have been thereafter amended (Store #5357).

9. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #8384).

10. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #4513).

11. Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #12281).

12.     Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #12415).

13.     Franchise Agreement between Burger King Corporation and Duke and King Missouri, LLC, dated March 2, 2007, as same may have been thereafter amended (Store #11049).

## Schedule 4.1(f)

### Litigation

Bruce D. Swisshelm, Sr., Plaintiff vs. Duke and King Missouri, LLC, Duke and King Real Estate, LLC, and Duke and King Acquisition Corporation, Defendants/Counterclaim Plaintiffs, vs. The Swisshelm Group, Inc., Swisshelm Family Limited Partnership, Pointguard Enterprises, Inc., and Bruce D. Swisshelm Sr., Counterclaim Defendants (Case No. 0831-CV13985, Circuit court of Greene County, Missouri).

## Schedule 4.1(g)

## Leases

None.

## Schedule 6.2

## Purchase Price Allocation

| No. | Rest. # | Address | City/State/Zip | Allocation | | |
|-----|---------|---------|----------------|------------|------------|------------|
| | | | | Equipment | Goodwill | |
| 1 | 3232 | 3009 S. Campbell Avenue | Springfield, MO | 75000 | | 111,054 |
| 2 | 5357 | 1022 Kings Highway Street | Rolla, MO | 75000 | | 170,948 |
| 3 | 7203 | 525 S. National Avenue | Springfield, MO | 75000 | | 223.356 |
| 4 | 12281 | 2200 E. Austin Blvd. | Nevada, MO | 75000 | | 213,373 |
| 5 | 11049 | 3095 Gardner Edgewood Dr. | Neosho, MO | 75000 | | 244,568 |
| 6 | 12413 | 315 N. Massey Blvd. | Nixa, MO | 75000 | | 19,965 |
| 7 | 12415 | 875 E. Highway 60 | Monett, MO | 75000 | | 244,568 |
| 8 | 1227 | 935 W. Kearney | Springfield, MO | 75000 | | 153,479 |
| 9 | 3475 | 2138 N. Glenstone Avenue | Springfield, MO | 75000 | | 147,241 |
| 10 | 4513 | 1077 S. Jefferson Avenue | Lebanon, MO | 75000 | | 173,444 |
| 11 | 5539 | 1101 S. Limit Avenue | Sedalia, MO | 75000 | | 155,975 |
| 12 | 8384 | 1911 S. Springfield Avenue | Bolivar, MO | 75000 | | 167,205 |
| 13 | 9331 | 1317 Preacher Roe Blvd. | West Plains, MO | 75000 | | 99,824 |
| | | | | 975,000 | | 2,125,000 |

Total Purchase Price                    3,100,000

\*    Plus, in each case, any additional amounts paid pursuant to Section 2.2, and subject in each case to adjustment pursuant to Section 2.3.

\*\*   This Schedule 6.2 shall not be binding on or relied upon by any third parties of Seller, including but not limited to, the Official Committee of Unsecured Creditors appointed in the Seller's bankruptcy case, with respect to any lien investigation rights or determination of value of any collateral held by Seller.

**EXHIBIT C**

**TO SALE MOTION**

**ASSET PURCHASE AGREEMENT**

between

**CROWN VENTURES IOWA, INC.,**

**as "Buyer,"**

**and**

**DUKE AND KING ACQUISITION CORP.,**

**as "Seller"**

**Dated as of April 11, 2011**

# TABLE OF CONTENTS

**ARTICLE I.     PURCHASE AND SALE OF THE ACQUIRED ASSETS** ............................1

Section 1.1     Transfer of Acquired Assets..........................................................1
Section 1.2     Excluded Assets. ........................................................................3
Section 1.3     Assumption of Liabilities. ............................................................4
Section 1.4     Excluded Liabilities. ...................................................................4
Section 1.5     Post-Closing Liabilities. ..............................................................5

**ARTICLE II.     CONSIDERATION** ..................................................................5

Section 2.1     Purchase Price. ...........................................................................5
Section 2.2     Purchase Price Adjustment. ..........................................................5
Section 2.3     Closing Payments. .......................................................................7
Section 2.4     Payment of Cure Costs..................................................................7
Section 2.5     On-Hand Cash. ............................................................................7
Section 2.6     On-Hand Inventory. .....................................................................7
Section 2.7     Transaction Taxes. .......................................................................8
Section 2.8     Allocation of Total Consideration. ................................................8

**ARTICLE III.     CLOSING AND DELIVERIES** ..............................................8

Section 3.1     Closing. .....................................................................................8
Section 3.2     Seller's Deliveries. ......................................................................8
Section 3.3     Buyer's Deliveries.......................................................................9

**ARTICLE IV.     REPRESENTATIONS AND WARRANTIES** ........................9

Section 4.1     Representations and Warranties of Seller. ......................................9
Section 4.2     Representations and Warranties of Buyer......................................10
Section 4.3     Warranties Are Exclusive. ..........................................................11

**ARTICLE V.     COVENANTS AND OTHER AGREEMENTS** ..........................11

Section 5.1     Covenants of Seller. ...................................................................11
Section 5.2     Covenants of Buyer....................................................................12
Section 5.3     Other Covenants.........................................................................12

**ARTICLE VI.     CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES** .......13

Section 6.1     Conditions Precedent to Performance by Seller.............................13
Section 6.2     Conditions Precedent to the Performance by Buyer. .....................13

**ARTICLE VII.     TERMINATION** .................................................................14

Section 7.1     Conditions of Termination. .........................................................14
Section 7.2     Effect of Termination; Remedies. ................................................15
Section 7.3     Exclusive Remedy; Waiver. ........................................................16

**ARTICLE VIII.     SURVIVAL AND INDEMNIFICATION** ...........................16

Section 8.1     Survival; Indemnification............................................................16
Section 8.2     Specific Performance. .................................................................16

**ARTICLE IX.    MISCELLANEOUS**.................................................................................**16**

    Section 9.1    Alternative Transaction.............................................................16
    Section 9.2    Further Assurances....................................................................17
    Section 9.3    Successors and Assigns.............................................................17
    Section 9.4    Governing Law; Jurisdiction....................................................17
    Section 9.5    Expenses...................................................................................17
    Section 9.6    Broker's and Finder's Fees. .....................................................17
    Section 9.7    Severability. .............................................................................17
    Section 9.8    Notices......................................................................................17
    Section 9.9    Amendments; Waivers. .............................................................18
    Section 9.10   Public Announcements..............................................................19
    Section 9.11   Entire Agreement. ....................................................................19
    Section 9.12   No Third Party Beneficiaries. ..................................................19
    Section 9.13   Headings...................................................................................19
    Section 9.14   Counterparts; Delivery. ............................................................19
    Section 9.15   Construction. ............................................................................19
    Section 9.16   Bulk Sales.................................................................................20

**ARTICLE X.    DEFINITIONS** .................................................................................**20**

<u>**EXHIBITS**</u>

Exhibit A ................................................................................................Sale Procedures

Exhibit B ..........................................................................Form of Deposit Escrow Agreement

Exhibit C ........................................................................................ Form of Sale Order

<u>**SCHEDULES**</u>

Schedule A ..........................................................................Davenport Regional Stores

Schedule 1.1(h) ....................................................................Acquired Contracts List

Schedule 1.2 ............................................................................................Excluded Assets

Schedule 2.8...........................................................................Total Consideration Allocation

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 11, 2011 (the "**Execution Date**"), is made by and between Duke and King Acquisition Corp., a Delaware corporation ("**Seller**"), and Crown Ventures Iowa, Inc., a Michigan corporation ("**Buyer**"). Unless otherwise set forth herein, capitalized terms used in this Agreement are defined or cross-referenced in Article X.

### RECITALS

WHEREAS, on December 4, 2010 (the "**Petition Date**"), Seller commenced voluntary cases under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**");

WHEREAS, this Agreement shall constitute the APA (as such term is defined in the Sale Procedures);

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, assign, transfer and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code; and

WHEREAS, Buyer has made, or will make concurrent with the execution of this Agreement, a deposit in an amount equal to ten percent (10%) of the Unadjusted Purchase Price (the "**Deposit**") into an escrow account (the "**Deposit Escrow Account**") to be established and governed by the terms of the Deposit Escrow Agreement executed concurrently herewith.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

### ARTICLE I.      PURCHASE AND SALE OF THE ACQUIRED ASSETS

**Section 1.1      Transfer of Acquired Assets**. At the Closing, and upon the terms and conditions set forth herein, Seller shall sell, assign, transfer and deliver to Buyer, and Buyer shall purchase from Seller, free and clear of all Liens, possessory rights of any person, claims (as defined in Section 101(5) of the Bankruptcy Code), interest and encumbrance of any nature whatsoever, all of Seller's right, title and interest in, to and under the following properties, assets and rights owned by Seller in each of the Davenport Regional Stores identified in Schedule A (collectively the "**Acquired Assets**"):

(a)      Petty and other restaurant operating cash (excluding cash in-transit) on-hand at Seller's restaurants on the Closing Date in the amount determined pursuant to Section 2.5 (the "**On-Hand Cash**");

(b)     Intentionally Omitted;

(c)     The real property leased pursuant to the leases included in the Acquired Contracts, to the extent assignable and transferable, including all Leasehold Improvements thereon (collectively, the "**Leased Real Property**");

(d)     All machinery, equipment, furniture, fixtures, office equipment, computer hardware and other related tangible personal property owned or leased by Seller, and all warranties and licenses of Seller thereunder or related thereto, including, without limitation, all equipment purchased from Coca-Cola Company;

(e)     All prepaid expenses of Seller ("**Prepaid Expenses**");

(f)     All deposits paid by Seller related to or arising from the Acquired Assets, including, without limitation, any deposits under the Real Estate Leases (**"Acquired Deposits"**), but excluding Utility Deposits and Corporate Level deposits;

(g)     All advertising and promotional materials and any rights thereto possessed, or entitled to be used, by Seller;

(h)     The Contracts listed on Schedule 1.1(h) to which Seller is a party, to the extent assignable and transferable (collectively, the "**Acquired Contracts**");

(i)     All Inventory on-hand in Seller's restaurants as determined pursuant to Section 2.6 (the "**On-Hand Inventory**");

(j)     All permits, authorizations and licenses (collectively, the "**Permits**") issued to Seller by any Government, to the extent assignable;

(k)     All insurance benefits, rights and proceeds arising from or relating to any event or incident that affects, impacts or alters any Acquired Asset between the Execution Date and the Closing Date;

(l)     Except as otherwise excluded under Section 1.2, all rights, claims, rights of offset, causes of action, lawsuits, judgments and other claims or demands of any nature against any third party arising out of, and only with respect to, the Acquired Assets or Assumed Liabilities;

(m)     All books, files and records held or otherwise owned by Seller that relate to current or former employees and other personnel, including, without limitation, books, files and records that are related to medical history, medical insurance or other medical matters and to workers' compensation and to the evaluation, appraisal or performance of current or former employees and other personnel of Seller (collectively, the "**Employee Records**");

(n)     Copies of all books, files and records of sales and general business operations, and Seller's supplier lists; and

(o)     All amounts and funds (rebates and dividends) prepaid by the Coca-Cola Company, Dr. Pepper/7-Up Company or Restaurant Services, Inc. or any affiliate thereof, to Seller pursuant to any agreement or arrangement for such companies for all periods subsequent to Closing (collectively the "**Prepaid Rebates**").

**Section 1.2     Excluded Assets**.  Notwithstanding anything to the contrary in this Agreement, Seller shall retain its right, title and interest in, to and under all of its properties, assets and rights not otherwise an Acquired Asset (collectively, the "**Excluded Assets**"), including, without limitation, Seller's assets not included in the Davenport Regional Stores and:

(a)     All Seller's cash, checks, cash equivalents, and cash in-transit, but excluding On-Hand Cash;

(b)     All trade accounts receivable of Seller in existence as of the Closing Date (collectively, the **"Accounts Receivable"**);

(c)     All amounts and funds (rebates and dividends) on account of, accrued by or due from The Coca-Cola Company, Dr. Pepper/Seven Up Company or Restaurant Services, Inc., or any affiliate thereof, to Seller pursuant to any agreement or arrangement with such companies for all periods prior to the Closing (collectively, the "**Rebates**");

(d)     All equity ownership interests in Seller;

(e)     All rights to refunds of or credits for Taxes of Seller previously paid by Seller prior to the Closing Date, and any records relating to Taxes of Seller;

(f)     Subject to <u>Section 1.1(k)</u>, all insurance premiums, policies, contracts and coverage obtained by Seller and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries;

(g)     All avoidance claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing;

(h)     All rights of and benefits to Seller under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement;

(i)     The Contracts to which Seller is a party that is not an Acquired Contract and all deposits, claims, rebates or refunds thereunder or related thereto;

(j)     All utility deposits paid by Seller prior to the Closing Date and all rights to the refund of all or any portion thereof ("**Utility Deposits**");

(k)     All Corporate Level assets, properties and rights;

(l)     The assets listed on <u>Schedule 1.2</u>; and

(m)     Corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of Seller.

**Section 1.3     <u>Assumption of Liabilities</u>**. At the Closing, Buyer shall assume, and thereafter pay, perform and discharge when due, the following liabilities of Seller (collectively, the "**Assumed Liabilities**"):

(a)     All accounts payable of the Davenport Regional Stores arising after the Petition Date (which, for clarity, does not include Corporate Level accounts payable of Seller) (collectively, the "**Accounts Payable**");

(b)     All accrued operating expenses of the Davenport Regional Stores arising after the Petition Date (which, for clarity, does not include Corporate Level accrued expenses of Seller) ("**Accrued Expenses**");

(c)     All accrued but unpaid real estate and personal property Taxes, and other related assessments and fees, if any, related to or arising from the ownership of the Acquired Assets included in the Davenport Regional Stores (the "**Property Taxes**"); and

(d)     Those liabilities and obligations assumed by or made the responsibility of Buyer as set forth elsewhere in this Agreement.

**Section 1.4     <u>Excluded Liabilities</u>**.  Notwithstanding anything to the contrary in this Agreement, Seller shall retain, and remain liable and obligated for any of its liabilities not otherwise included in the Assumed Liabilities (collectively, the "**Excluded Liabilities**"), including without limitation:

(a)     Any liability arising from or related to the Excluded Assets, including without limitation the Excluded Contracts;

(b)     All Employee Benefit Plan liabilities and obligations;

(c)     Any liabilities and obligations that relate solely to Seller's Corporate Level operations and employees;

(d)     Any liability for income, franchise, sales, or similar Taxes arising out of or resulting from Seller's operations prior to the Closing Date;

(e)     All franchise royalties or other payments arising out of or resulting from Seller's operations prior to the Closing Date;

(f)     All liabilities and obligations under the Acquired Contracts, including, without limitation, (i) all pre-petition cure costs required to be paid pursuant to section

365 of the Bankruptcy Code in connection with the assumption and assignment of the Acquired Contracts (such pre-petition cure costs are, collectively, the "**Cure Costs**"); and (ii) the liability and obligations pursuant to the transfer provisions of the Franchise Agreements, whether such liability or obligation is set forth in the Franchise Agreements as the responsibility of Franchisee (as defined in the Franchise Agreements) or the transferee thereunder;

(g)    All accrued but unpaid wages, salaries, benefits, vacation pay, employee-related Taxes, temporary labor and related liabilities of the Davenport Regional Stores as of the Closing (collectively "**Payroll Liabilities**");

(h)    All liability to Coca-Cola Company in connection with the purchase of equipment by Seller from Coca-Cola Company including any offsets against rebates and dividends from Coca-Cola accruing subsequent to Closing; and

(i)    Any liability not expressly assumed by Buyer or made the responsibility of Buyer in this Agreement.

**Section 1.5   Post-Closing Liabilities**. Buyer acknowledges that Buyer shall be responsible for all liabilities and obligations relating to Buyer's ownership or use of, or right to use, the Acquired Assets and the Assumed Liabilities after the Closing Date, including without limitation all Taxes arising out of or related to the Acquired Assets or the operation or conduct of the business acquired pursuant to this Agreement for all Tax periods beginning on or after the Closing Date.

## ARTICLE II.    CONSIDERATION

**Section 2.1   Purchase Price**.

The aggregate consideration for the Acquired Assets shall be: (a) an aggregate amount in cash equal to $500,000.00 (the "**Unadjusted Purchase Price**"), subject to adjustment as provided in Section 2.2 (as so adjusted, the "**Final Purchase Price**"); *plus* (b) the assumption by Buyer of the Assumed Liabilities; *less* (c) credit for the Prepaid Rebates (such assumption and credit, together with the Final Purchase Price, the "**Total Consideration**"). Simultaneously with the execution and delivery of this Agreement, Buyer shall deliver the Deposit to the Escrow Agent to be held by Escrow Agent in an escrow account in accordance with that certain Escrow Agreement entered into by Buyer, Seller and Escrow Agent as of the Execution Date (the "**Escrow Agreement**").

**Section 2.2   Purchase Price Adjustment**.

(a)    As promptly as practicable, but in no event later than twenty-one (21) days after the Closing Date, Seller shall prepare and deliver to Buyer a calculation of Seller's Net Working Capital associated with the Davenport Regional Stores as of the close of business on the day before the Closing Date (which, for purposes of clarity, may extend into the Closing Date for accounting purposes due to restaurants closing after midnight) (the "**Initial Net Working Capital**"), with appropriate supporting documentation.

(b)    If Buyer disagrees with the Initial Net Working Capital, Buyer may, within ten (10) days after receipt of the Initial Net Working Capital, deliver a notice to Seller disagreeing with such calculation and setting forth Buyer's calculation of such amount ("**Buyer's Notice**").  Buyer's Notice shall specify those items or amounts as to which Buyer specifically disagrees and the reasons for Buyer's disagreements, and Buyer shall be deemed to have agreed with all other items and amounts contained in the Initial Net Working Capital.

(c)    If Buyer's Notice is duly delivered, Buyer and Seller shall work in good faith and use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Net Working Capital associated with the Davenport Regional Stores as of the close of business on the day before the Closing Date.  If Buyer and Seller are unable to reach such agreement within ten (10) days from Seller's receipt of Buyer's Notice, the Bankruptcy Court shall determine the amount of the disputed items and the final Net Working Capital for the Davenport Regional Stores, provided, such final Net Working Capital shall not be less than the amount thereof shown in Seller's calculation, nor more than the amount thereof shown in Buyer's calculation.  In making such calculation, the Bankruptcy Court shall consider only those items or amounts in the Initial Net Working Capital with which Buyer disagreed.  The cost of such review shall be borne by Buyer.  The amount of the Net Working Capital of the Davenport Regional Stores as of the close of business on the day before the Closing Date as determined pursuant to this Section 2.2(c) shall be referred to as the "**Closing Net Working Capital**."

(d)    Buyer and Seller shall, and shall cause their respective Related Persons to, cooperate and assist in the calculation of Closing Net Working Capital and in the conduct of the reviews referred to in this Section 2.2, including, without limitation, the making available, to the extent necessary, their respective books, records, work papers and personnel.  All amounts to be determined pursuant to this Section 2.2 shall be determined in accordance with generally accepted accounting principles in the United States consistently applied using Seller's historical methodologies and practices.

(e)    The date upon which the Closing Net Working Capital shall be deemed final shall be the earlier to occur of the following:  (i) Buyer's failure to provide a Buyer Notice within ten days of its receipt of the Initial Net Working Capital from Seller; (ii) the mutual written agreement of Buyer and Seller; or (iii) a final determination by the Bankruptcy Court in accordance with Section 2.2(c) (such date, "**Final Determination Date**").

(f)    If Closing Net Working Capital exceeds Target Net Working Capital, Buyer shall pay Seller an amount equal to such excess by wire transfer of immediately available funds within one (1) Business Day of the Final Determination Date in accordance with this Section 2.2.

(g)      If Target Net Working Capital exceeds Closing Net Working Capital, then Seller shall pay Buyer an amount equal to such excess by wire transfer of immediately available funds within one (1) Business Day of the Final Determination Date in accordance with this <u>Section 2.2</u>.

Section 2.3    **Closing Payments**   At the Closing, Buyer shall pay the Unadjusted Purchase Price as follows:

(a)      by instruction to the Escrow Agent to release the Deposit from the Deposit Escrow Account, by wire transfer of immediately available funds to an account specified by Seller, or by the Bankruptcy Court, as the case may be;

(b)      by deposit of the Payroll Escrow Amount into the Payroll Escrow Account; and

(c)      by wire transfer of immediately available funds of the remaining balance of the Unadjusted Purchase Price (after credit for the Deposit and the Payroll Escrow Amount) to an account specified by Seller, or the Bankruptcy Court, as the case may be.

Section 2.4    **Payment of Cure Costs**.  On or before the Closing, Seller shall pay any Cure Costs as determined by the Bankruptcy Court in the Assignment Order directly to the appropriate counterparties to the Acquired Contracts; <u>provided,</u> <u>however,</u> that in the event any such cure amount remains the subject of a dispute at the Closing Date, Seller shall pay any such cure amount upon the entry of an order of the Bankruptcy Court settling such dispute.

Section 2.5    **On-Hand Cash**.  Immediately after the close of business on the day before the Closing Date (which for clarity, may be on the Closing Date if the close of business of a restaurant is later than midnight), Seller will count the On-Hand Cash at each of the Davenport Regional Stores and create a written summation of such On-Hand Cash, subtotaled by currency denomination.  Copies of such summations will be promptly provided to Buyer.  The amount of On-Hand Cash determined by Seller shall be the value of the On-Hand Cash for purposes of this Agreement. For additional clarity, checks or similar cash equivalents, cash in-transit and non-operating cash are not included in "On-Hand Cash."

Section 2.6    **On-Hand Inventory**.  Immediately after the close of business on the day before the Closing Date (which, for clarity, may be on the Closing Date if the close of business is later than midnight), Seller shall, at its cost, perform a physical count of all useable and saleable Inventory at each of the Davenport Regional Stores. Buyer or its representatives may observe any physical count at Buyer's expense. Seller shall create a written summation of the amount of Inventory counted and its value, each subtotaled by restaurant and by type of Inventory. The physical count and the Inventory valuation shall be based on and in accordance with Seller's prior practices and methodologies; provided, however, such valuation shall not exceed Seller's cost for any such Inventory. A copy of the summation will be promptly provided to Buyer. The amount so calculated shall be the value of the On-Hand Inventory for purposes of this Agreement.

**Section 2.7** **Transaction Taxes**. All Taxes, including without limitation all state and local Taxes in connection with the transfer of the Acquired Assets and all recording and filing fees (collectively, "**Transaction Taxes**"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and that are not exempt under §1146(a) of the Bankruptcy Code, shall be borne by Buyer. Buyer and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement; (b) provide all requisite exemption certificates; and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Government taxing authorities.

**Section 2.8** **Allocation of Total Consideration**. Buyer and Seller shall allocate the Total Consideration among the Acquired Assets in accordance with Schedule 2.8 (the "**Allocation**"). The Allocation will be binding upon Buyer and Seller and their respective successors and assigns, and none of the parties to this Agreement will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation. Buyer and Seller will report the purchase and sale of the Acquired Assets on all tax returns, including without limitation Form 8594 as provided for in section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594.

## ARTICLE III. CLOSING AND DELIVERIES

**Section 3.1** **Closing**. The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place on the second Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article VI or at such other time as may be mutually agreed to by the parties (the "**Closing Date**") and shall be effective as of 12:01 a.m. on the Closing Date. Subject to such different procedures agreed upon by the parties, the Closing shall take place via a "paper" close wherein Buyer and Seller shall exchange such documents and instruments or copies thereof sufficient to effect the Closing by electronic or other means without the use of a "roundtable" closing at a particular location. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

**Section 3.2** **Seller's Deliveries**. Seller shall deliver to Buyer at or prior to the Closing or such other time as set forth in this Agreement:

(a)    A bill of sale for all of the Acquired Assets that are tangible personal property, without representation, warranty or covenant of any kind;

(b)    An agreement for the assumption of the Assumed Liabilities, without representation, warranty or covenant of any kind;

(c)    For all intangible Acquired Assets, including all Acquired Contracts, (i) an agreement of assumption and assignment, without any representation, warranty or covenant of any kind, or (ii) an Assignment Order effecting the same;

(d)     A certificate, dated the Closing Date, signed by its Secretary, certifying to the accuracy of the matters set forth in Section 6.2(a);

(e)     The Payroll Escrow Agreement, duly executed by Seller; and

(f)     Such other agreements, documents or instruments of assignment and transfer that Buyer may reasonably request; the form and substance of which are acceptable to Seller.

**Section 3.3     Buyer's Deliveries**.  Buyer shall deliver to Seller at or prior to the Closing or such other time as set forth:

(a)     The Unadjusted Purchase Price in accordance with Section 2.3;

(b)     A duly executed counterpart of Buyer to each of the documents listed in Section 3.2(b), (c) and (e);

(c)     A certificate, dated the Closing Date, signed by its Secretary, certifying the accuracy of the matters set forth in Section 6.1(a);

(d)     Evidence of receipt of Franchisor's Consent; and

(e)     Such other agreements, documents or instruments of assignment and transfer that Seller may reasonably request; the form and substance of which are acceptable to Buyer.

# ARTICLE IV.     REPRESENTATIONS AND WARRANTIES

**Section 4.1     Representations and Warranties of Seller**.  Seller hereby severally represents and warrants to Buyer as of the Execution Date as follows:

(a)     Authorization and Validity. Subject to the Bankruptcy Court's entry of the Sale Order and the accuracy of the representation made in Section 4.2(g), (i) Seller has all requisite power and authority to enter into this Agreement and any Ancillary Agreements to which Seller is a party and to perform its obligations hereunder and thereunder; and (ii) this Agreement constitutes Seller's valid and binding obligation, enforceable against Seller in accordance with its respective terms.

(b)     No Conflict or Violation. The execution, delivery and performance by Seller of this Agreement and any Ancillary Agreement to which Seller is a party does not violate or conflict with any provision of Seller's certificate of incorporation or bylaws or similar organizational documents.

(c)     Title to Assets.  Seller owns, and has good, valid, and marketable title to, all of the Acquired Assets owned by it.

**Section 4.2     Representations and Warranties of Buyer**.  Buyer hereby represents and warrants to Seller as of the Execution Date as follows:

(a)     Corporate Organization. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Michigan and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

(b)     Qualification to Conduct Business.  Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business conducted by it makes such qualification necessary.

(c)     Authorization and Validity.  Buyer has all requisite corporate power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is a party and the performance of Buyer's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement has been, and any Ancillary Agreement to which Buyer is a party has been duly executed by Buyer and constitutes Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms.

(d)     No Conflict or Violation.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is a party does not (i) violate or conflict with any provision of Buyer's certificate of incorporation or bylaws or similar organizational documents; (ii) violate any provision of law, or any order, judgment or decree of any court or Government applicable to Buyer or any of its properties or assets; or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

(e)     Consents and Approvals.  No consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in connection with the execution and delivery by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party or the performance by Buyer of its obligations hereunder or thereunder.

(f)     Adequate Assurances Regarding Acquired Contracts.  Buyer is capable of satisfying the conditions contained in sections 365(b) and 365(f) of the Bankruptcy Code with respect to the Acquired Contracts.

(g)     <u>Franchise Agreements</u>. Buyer has obtained, and at the Closing will provide Seller written evidence of, Franchisor's consent for the assignment to, and assumption by, Buyer of the Franchise Agreements (or alternatively, consent for the execution of new Franchise Agreements as may be required by Franchisor), and waiver by Franchisor of its rights of first refusal with respect to the transactions contemplated by this Agreement ("**Franchisor's Consent**").

(h)     <u>Litigation</u>. There are no claims, actions, suits, proceedings or investigations pending, threatened in writing or against Buyer, or any Related Person of Buyer, that could affect the ability of Buyer to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.

(i)     <u>Adequacy of Funds</u>. Buyer has cash on hand, existing availability under existing lines of credit, or other immediately available financial resources sufficient to pay the balance of the Unadjusted Purchase Price at Closing, and any adjustment thereto pursuant to <u>Section 2.2</u> thereafter.

**Section 4.3**     <u>**Warranties Are Exclusive**</u>. The parties acknowledge that the representations and warranties contained in this <u>Article IV</u> are the only representations or warranties given by the parties and that all other express or implied warranties are disclaimed. Without limiting the foregoing, Buyer acknowledges that, except for the representations and warranties contained in <u>Section 4.1</u>, the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN SECTION 4.1, SELLER AND ITS RELATED PERSONS AND AFFILIATES HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING ANY (A) USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES OR (C) OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS. Buyer further acknowledges that Buyer has conducted, or has had an adequate opportunity to conduct, all necessary due diligence related to Seller's business, the Acquired Assets, the Assumed Liabilities, and all such other matters relating to or affecting any of the foregoing. In proceeding with the transactions contemplated in this Agreement, except for any representations and warranties expressly set forth in <u>Section 4.1</u>, Buyer is doing so based solely upon its own due diligence and review, all of which has been completed to the satisfaction of the Buyer, and Buyer has not relied upon any oral or written statements, representations or guaranties whatsoever, whether express or implied, made by Seller or its agents and representatives.

**ARTICLE V.**     <u>**COVENANTS AND OTHER AGREEMENTS**</u>

**Section 5.1**     <u>**Covenants of Seller**</u>. Seller covenants to Buyer that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement, and to the extent applicable to the Purchased Region:

(a) <u>Conduct of Business Before the Closing</u>. Unless otherwise agreed by Seller and Buyer, Seller shall use commercially reasonable efforts to conduct its business in all material respects in the manner in which it has been conducted since the Petition Date and to preserve intact their respective business or organization and relationships with third parties.

(b) <u>Cooperation</u>. Seller shall use commercially reasonable efforts to (i) take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated hereby; and (ii) assist Buyer's efforts to transfer any Permits required to own the Acquired Assets.

(c) <u>Sale Order</u>. Without limiting <u>Section 5.1(b)(ii)</u>, Seller shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable and in substantially the form of <u>Exhibit C</u>.

**Section 5.2** **<u>Covenants of Buyer</u>**. Buyer covenants to Seller that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a) <u>Cooperation</u>. Buyer shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b) <u>Communications</u>. Buyer shall keep Seller reasonably informed of the status of discussions between Buyer and Franchisor in connection with the transactions contemplated herein.

(c) <u>Adequate Assurances Regarding Acquired Contracts and Required Orders</u>. With respect to each Acquired Contract, Buyer shall provide adequate assurance of the future performance of such Acquired Contract by Buyer. Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of an assumption and assignment order and any other order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 5.3** **<u>Other Covenants</u>**.

(a) <u>Improper Receipt of Payment</u>. From and after the Closing, (i) Seller shall promptly forward to Buyer any and all payments received by it that constitutes part of the Acquired Assets; and (ii) Buyer shall promptly forward to Seller any and all payments received by Buyer that constitute part of the Excluded Assets.

(b) <u>Records</u>. From and after the Closing, Buyer shall provide Seller, and its agents and representatives, as the case may be, access to, reasonable means of copying, i.e., provide a copy machine, or copies of, the Employee Records for use by Seller in any dispute, claim, action or controversy regarding any employee matter, and

permit Seller to either make copies or, as may be necessary to fully comply with any law, regulation or court mandate, borrow the original Employee Records for such time as may be reasonably needed by Seller. Buyer shall provide Seller at least ninety (90) days written notice prior to the destruction or permanent deletion of any Employee Records, upon which Seller may consent to such destruction, request copies, or obtain possession of such Employee Records, or any combination thereof, by written notice delivered to Buyer before the expiration of such ninety (90) day period.

(c) <u>Employee Matters</u>. Immediately prior to the Closing, Seller shall terminate the employment of all employees of the restaurants included in the Davenport Regional Stores. At or prior to the Closing, Buyer shall offer post-Closing employment to substantially all of Seller's employees at the Davenport Regional Stores on substantially the same terms and conditions as provided by Seller prior to the Closing.

## ARTICLE VI.    <u>CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES</u>

**Section 6.1    <u>Conditions Precedent to Performance by Seller</u>**. The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in <u>Section 6.1(c)</u>, may be waived by Seller, in its discretion:

(a) <u>Representations and Warranties of Buyer</u>. The representations and warranties of Buyer made in <u>Section 4.2</u> of this Agreement, in each case, shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made by Buyer as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date.

(b) <u>Performance of the Obligations of Buyer</u>. Buyer shall have performed in all material respects all obligations required under this Agreement and any Ancillary Agreement to which Buyer is a party and which are to be performed by Buyer on or before the Closing Date.

(c) <u>Governmental Consents and Approvals</u>. The Bankruptcy Court shall have entered the Sale Order and the Assignment Order, and such orders shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending such orders shall be in effect on the Closing Date.

(d) <u>Closing Deliveries</u>. Buyer shall have made the deliveries contemplated under <u>Section 3.3</u>.

**Section 6.2    <u>Conditions Precedent to the Performance by Buyer</u>**. The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in <u>Section 6.2(c)</u>, may be waived by Buyer, in its discretion:

(a)     Representations and Warranties of Seller.  The representations and warranties of Seller made in Section 4.1 of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made by Seller as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct on and as of such earlier date.

(b)     Performance of the Obligations of Seller.  Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which Seller is a party and which are to be performed by Seller on or before the Closing.

(c)     Governmental Consents and Approvals.  The Bankruptcy Court shall have entered the Sale Order and the Assignment Order, and such orders shall be in full force and effect, and no order staying, reversing, modifying, vacating or amending such orders shall be in effect on the Closing Date.

(d)     Closing Deliveries.  Seller shall have made the deliveries contemplated under Section 3.2.

## ARTICLE VII.   TERMINATION

**Section 7.1     Conditions of Termination.**  This Agreement may be terminated only in accordance with this Section 7.1.  This Agreement may be terminated at any time before the Closing as follows:

(a)     By mutual consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, if Seller has provided Buyer with notice of any inaccuracy of any representation or warranty contained in Section 4.2, or of a failure to perform any covenant or obligation of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and Buyer has failed, within three (3) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Seller of Buyer's ability to remedy such inaccuracy or perform such covenant or obligation; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 7.1(b) if Seller is then in material breach of this Agreement;

(c)     By Seller, if the Bankruptcy Court dismisses Seller's chapter 11 cases or converts the chapter 11 cases to cases under chapter 7 of the Bankruptcy Code; if the Bankruptcy Court confirms a chapter 11 plan in Seller's chapter 11 cases; or if the Bankruptcy Court appoints a chapter 11 trustee or a examiner with expanded powers;

(d)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with notice of any material inaccuracy of any representation or warranty of Seller contained in Section 4.1 or a material failure to perform any pre-Closing covenant of Seller

contained in this Agreement or any Ancillary Agreement to which Seller is party, either of which would have a material adverse effect upon the Acquired Assets after Closing, and Seller has failed, within three (3) Business Days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Seller's ability to remedy such inaccuracy or perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 7.1(d) if Buyer is then in material breach of this Agreement; or

(e)     Automatically, upon the consummation of an Alternative Transaction.

**Section 7.2     Effect of Termination; Remedies**.

(a)     In the event of termination pursuant to Section 7.1, this Agreement shall become null and void and have no effect (other than Article VII, Article VIII and Article IX, which shall survive termination), with no liability on the part of Seller, Buyer, or their respective Affiliates or respective Related Persons, with respect to this Agreement or any Ancillary Agreement, except for any liability provided for in this Article VII.

(b)     If this Agreement is terminated pursuant to Section 7.1(a), 7.1(c), or 7.1(d) then, within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Buyer from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer.

(c)     If this Agreement is terminated pursuant to Section 7.1(b) then, within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Seller from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Seller.

(d)     If this Agreement is terminated pursuant to Section 7.1(e) then, subject to the approval of the Bankruptcy Court, Seller shall (1) pay to Buyer (A) a break-up fee equal to $15,000.00 (the "**Break-Up Fee**"); and (B) Buyer's reasonable transaction expenses related to the negotiation, execution and performance of this Agreement up to an amount equal to $20,000.00 ("**Buyer Expenses**"), as evidenced in writing to Seller in reasonable detail and (2) together with Buyer, within two (2) Business Days of such termination, jointly instruct the Escrow Agent to distribute to Buyer the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer.  Any payments of the Break-Up Fee or Buyer Expenses under this Section 7.2 shall be made by Seller from the proceeds of the Alternative Transaction by wire transfer of immediately available funds to an account designated in writing by Buyer within two (2) Business Days from the closing of such Alternative Transaction.

(e)    Seller acknowledges that the Break-Up Fee and Buyer Expenses (or any portion thereof) are necessary and appropriate expenses for the administration of its estate, pursuant to sections 503 and 507 of the Bankruptcy Code, and that the Break-Up Fee and Buyer Expenses (or any portion thereof) are allowed administrative expenses against its estate.

Section 7.3    **Exclusive Remedy; Waiver**. Prior to the Closing, the parties' sole and exclusive remedies for any claim arising out of or in connection with this Agreement shall be termination in accordance with, and obtaining the remedies provided in, this Article VII. The failure by either Seller or Buyer to pursue or foreclose on any right or remedy against the other party, by itself, shall not constitute a waiver, and any waiver under this Article VII shall be effective only if made in writing.

## ARTICLE VIII.  SURVIVAL AND INDEMNIFICATION

Section 8.1    **Survival; Indemnification**.  None of the representations and warranties of Seller and of Buyer made in this Agreement shall survive the Closing Date, and all of such representations and warranties shall be extinguished by the Closing.    All covenants and agreements of the parties contained in this Agreement shall survive the Closing, unless otherwise expressly stated therein.  Seller shall have no monetary obligation to Buyer for breach of any covenant or agreement, except in the event of termination pursuant to Section 7.1(e), which obligation shall be limited as set forth in Section 7.2(c). If the Closing occurs, Buyer shall indemnify and hold harmless Seller and its respective Affiliates and Related Persons against any and all losses, liability, expense or damage that result from or arise out of the Assumed Liabilities, and shall promptly pay such Assumed Liabilities as they become due and payable.

Section 8.2    **Specific Performance**.  Buyer acknowledges that in case of any breach of its respective covenants after the Closing, Seller would suffer immediate and irreparable harm, which money damages would be inadequate to remedy, and accordingly, in case of any such breach, Seller shall be entitled to obtain specific performance.

## ARTICLE IX.    MISCELLANEOUS

Section 9.1    **Payroll Liabilities**

 Seller and Buyer agree that an amount sufficient to pay the Payroll Liabilities (the "**Payroll Escrow Amount**") shall be withheld from the Unadjusted Purchase Price due to Seller at Closing and be deposited into an escrow account (the "**Payroll Escrow Account**") to be established pursuant to the Payroll Escrow Agreement. Within two (2) Business Days of the Closing, Buyer and Seller shall jointly instruct the Escrow Agent to distribute the Payroll Escrow Amount to Seller's existing payroll account or to its third party payroll provider, as determined in Seller's discretion.

Section 9.2    **Alternative Transaction**.  Notwithstanding anything herein or in any Ancillary Agreement to the contrary, Seller may furnish information concerning Seller, the Acquired Assets and the Assumed Liabilities to any Person in connection with a potential Alternative Transaction and negotiate, enter into and consummate an Alternative Transaction.

**Section 9.3**    **Further Assurances**.    At the request and the sole expense of the requesting party, Buyer or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Buyer or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

**Section 9.4**    **Successors and Assigns**.  This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties hereto.

**Section 9.5**    **Governing Law; Jurisdiction**.    This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Seller is subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

**Section 9.6**    **Expenses**.  Except as otherwise provided in this Agreement, Seller and Buyer shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including, without limitation, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

**Section 9.7**    **Broker's and Finder's Fees**.  Neither Seller nor Buyer has engaged any broker or finder in connection with any of the transactions contemplated by this Agreement other than Mastodon Ventures, Inc., whose fees and expenses shall, as between the parties, be the sole responsibility of Seller, and, insofar as such party knows, no other broker or other Person is entitled to any commission or finder's fee in connection with any of the transactions contemplated by this Agreement.

**Section 9.8**    **Severability**.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as set forth on the Execution Date.

**Section 9.9**    **Notices**.    (a) All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below or by electronic mail to the electronic mail address given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

      Duke and King Acquisition Corp.
      12281 Nicollet Avenue, South
      Burnsville, MN 55337
      Attention: Becky Moldenhauer
      Email: bmoldenhauer@dukeandking.com
      Facsimile: 952-288-2327

With a copy to (which shall not constitute notice):

      McDonald Hopkins LLC
      600 Superior Avenue, E.
      Suite 2100
      Cleveland, OH 44114
      Attention:  Scott N. Opincar, Esq.
      Email: sopincar@mcdonaldhopkins.com
      Facsimile:  216.348.5474

If to Buyer:

      Crown Ventures, Inc.
      9265 Apple Crest Drive
      Saline, Michigan 48176
      Attention: John Gross
      Facsimile: (630) 553-2927
      Email: jgross@c-vcorp.com

With a copy to (which shall not constitute notice):

      James A. Schriemer
      Conlin, McKenney & Philbrick, P.C.
      350 S. Main St., Suite 400
      Ann Arbor, Michigan 48104-2131
      Facsimile: (734) 761-9001
      Email: schriemer@cmplaw.com

(b)      Any party may change its address, facsimile number or email address for the purpose of this Section 9.9 by giving the other parties written notice of its new address in the manner set forth above.

**Section 9.10   Amendments: Waivers**.   This Agreement may only be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may only be waived, by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing

waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

**Section 9.11  Public Announcements**.  Promptly after the Closing, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein.  Except as provided in the foregoing sentence, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without first coordinating their communications strategy with the other party, unless a press release or public announcement is required by law, the rules of any stock exchange, or is permitted by, or required by an order of, the Bankruptcy Court. If any such announcement or other disclosure is required by law, the rules of any stock exchange or is permitted by, or required by an order of, the Bankruptcy Court, the disclosing party shall use reasonable efforts to give the non-disclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure; provided, there shall be no liability to the disclosing party for failure to notify the other party.  The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and that Franchisor may provide or release its own press release or announcement without the consent or input of either Buyer or Seller.

**Section 9.12  Entire Agreement**.  This Agreement and the Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  The Recitals and all Exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

**Section 9.13  No Third Party Beneficiaries**.  Nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligator or liability of any third Persons to Seller or to Buyer.  This Agreement is not intended and shall not give any third Persons any right of subrogation or action over or against Seller or Buyer.

**Section 9.14  Headings**.  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**Section 9.15  Counterparts; Delivery**.  This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute the same agreement.  The signature of any of the parties may be delivered and made by facsimile, portable document format ("pdf") or other electronic means capable or creating a printable copy, and each such signature shall be treated as original signatures for all purposes.

**Section 9.16  Construction**.  Any reference to any law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word "including" shall mean including without limitation.  Any reference to the singular in this Agreement shall also include the plural and vice versa. The phrase "to which Seller is a party,"

or similar construction, is intended to limit the applicable listing of any items, properties, assets, or Contracts to only those items that Seller actually owns or to which Seller is actually a party, as the case may be, and is meant to exclude any listed property or Contract otherwise.

Section 9.17 **Bulk Sales**. Buyer waives compliance with any laws governing bulk sales, including any applicable provisions of the Uniform Commercial Code.

## ARTICLE X. DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

**"Accrued Expenses"** has the meaning set forth in Section 1.3(b).

**"Acquired Deposits"** has the meaning set forth in Section 1.1(f).

**"Accounts Payable"** has the meaning set forth in Section 1.3(a).

**"Accounts Receivable"** has the meanings set forth in Section 1.2(b).

**"Acquired Assets"** has the meaning set forth in Section 1.1.

**"Acquired Contracts"** has the meaning set forth in Section 1.1(h).

**"Affiliate"** means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person.

**"Agreement"** has the meaning set forth in the Preamble.

**"Allocation"** has the meaning set forth in Section 2.8.

**"Alternative Transaction"** means any transaction (regardless of the form thereof) involving a sale of all or any substantial portion of the Acquired Assets by Seller, or any one or more of them, to a purchaser or purchasers other than Buyer; provided, that such transaction is undertaken pursuant to section 363 of the Bankruptcy Code.

**"Ancillary Agreements"** means the Confidentiality Agreement, any bill of sale, assignment or assumption agreement or other related agreements by and between Seller and Buyer effecting or evidencing the transactions contemplated under this Agreement.

**"Assignment Order"** means an order of the Bankruptcy Court pursuant to sections 105 and 365 of the Bankruptcy Code, which order shall (i) authorize the assumption by Seller and assignment to Buyer of the Acquired Contracts, (ii) establish the Cure Costs relating to the Acquired Contracts, and (iii) provide that the Buyer has demonstrated adequate assurance of future performance under the Acquired Contracts.

**"Assumed Liabilities"** has the meaning set forth in Section 1.3.

**"Bankruptcy Code"** has the meaning set forth in the Recitals.

**"Bankruptcy Court"** has the meaning set forth in the Recitals.

**"Break-Up Fee"** has the meaning set forth in Section 7.2(c).

**"Burger King®"** means any Person operating a Burger King® restaurant, whether Franchisor or any franchisee thereof.

**"Business Day"** means any day other than Saturday, Sunday and any day that is a federal legal holiday.

**"Buyer"** has the meaning set forth in the Preamble.

**"Buyer Expenses"** has the meaning set forth in Section 7.2(c).

**"Closing"** has the meaning set forth in Section 3.1.

**"Closing Date"** has the meaning set forth in Section 3.1.

**"Closing Net Working Capital"** has the meaning set forth in Section 2.2(c).

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Confidentiality Agreement"** means the confidentiality agreement Buyer executed in conjunction with its review of Seller's records.

**"Contract"** means any contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking, whether in written form or otherwise.

"**Corporate Level**" means, as applicable, any assets, properties, expenses, costs, commitments, Contracts, obligations, liabilities or other operational activities or items conducted or owned by Seller and its Affiliates primarily for the collective benefit of the restaurant enterprise owned and maintained by Seller and its Affiliates, and their employees, including, but not limited to, all Seller Employee Benefit Plans, if any, and all liabilities and obligations of Seller thereunder.

**"Cure Costs"** has the meaning set forth in Section 1.4(f).

**"Davenport Regional Stores"** means the four Burger King franchised restaurants owned by Seller and listed on Schedule A.

**"Deposit"** has the meaning set forth in the Recitals.

**"Deposit Escrow Account"** has the meaning set forth in the Recitals.

**"Deposit Escrow Agreement"** means that certain escrow agreement, dated as of the Execution Date, by and among Buyer, Seller and Escrow Agent, governing the funding and disbursement of the Deposit Escrow Account in the form attached hereto as Exhibit B.

**"Employee Records"** has the meaning set forth in Section 1.1(m).

**"Employee Benefit Plans"** means (i) all employee benefit plans as defined in section 3(3) of ERISA; (ii) all compensation, pay, severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, Contracts, programs, funds or arrangements of any kind; and (iii) all other employee benefit plans, programs, funds or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

**"Escrow Agent"** means U.S Bank, N.A.

**"Escrow Agreement"** has the meaning set forth in Section 2.1.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Excluded Assets"** has the meaning set forth in Section 1.2.

**"Excluded Contracts"** means any Contract to which a Seller is a party that is not an Acquired Contract.

**"Excluded Liabilities"** has the meaning set forth in Section 1.4.

**"Execution Date"** has the meaning set forth in the Preamble.

**"Final Purchase Price"** has the meaning set forth in Section 2.1.

**"Franchise Agreements"** means those franchise agreements for the Davenport Regional Stores entered into with Franchisor and listed on Schedule 1.1(h) to which Seller is a party.

**"Franchisor"** means Burger King Corporation, a Florida corporation, or its successors-in-interest, whether by merger, acquisition of equity or acquisition of all or substantially all of its assets.

**"Franchisor's Consent"** has the meaning set forth in Section 4.2(g).

**"Government"** means any agency, division, subdivision or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state or territory thereof.

**"Initial Net Working Capital"** has the meaning set forth in Section 2.2.

**"Inventory"** means all of Seller's consumable food and beverages and all of Seller's all tangible property used in the preparation of, serving, and cleaning-up from meals, including without limitation napkins, silverware, plates and dining ware, cups, mugs, cooking and cleaning utensils, and other related items.

**"Leased Real Property"** has the meaning set forth in Section 1.1(c).

**"Leasehold Improvements"** means those fixtures, structures and other improvements located on any Leased Real Property used in the operation of Seller's business.

**"Lien"** means any mortgage, pledge, security interest, encumbrance, lien (statutory or other), conditional sale agreement, claim or liability.

**"Net Working Capital"** means an amount equal to: (a) the sum of On-Hand Cash, On-Hand Inventory, Acquired Deposits, and Prepaid Expenses, *less* (b) the sum of Accounts Payable, Accrued Expenses, and Property Taxes. Payroll Liabilities will not be considered to be part of Net Working Capital.

**"On-Hand Cash"** has the meaning set forth in Section 1.1(a).

**"On-Hand Inventory"** has the meaning set forth in Section 1.1(b).

**"Payroll Escrow Account"** has the meaning set forth in Section 9.1.

**"Payroll Escrow Agreement"** means that certain escrow agreement, dated as of the Closing Date, by and Buyer, Seller and Escrow Agent, in a form to be mutually agreed upon by the parties thereto.

**"Payroll Escrow Amount"** has the meaning set forth in Section 9.1.

**"Payroll Liabilities"** has the meaning set forth in Section 1.4(g).

**"Permits"** has the meaning set forth in Section 1.1(j).

**"Permitted Liens"** mean: (a) Liens for Taxes, assessments and Government or other similar charges that are not yet due and payable; (b) easements, licenses, unrecorded real estate agreements, restrictions and other matters of record which do not adversely effect the operation of the Leased Real Property in question as currently operated; (c) any state of facts a survey or other visual inspection would show that do not adversely effect the operation of the Leased Real Property in question as currently operated; (d) Liens arising from the Assumed Liabilities.

**"Person"** means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

**"Petition Date"** has the meaning set forth in the Recitals.

**"Prepaid Expenses"** has the meaning set forth in Section 1.1(e).

**"Property Taxes"** means all real estate and personal property Taxes, and other related assessments and fees, arising from the Acquired Assets.

**"Real Property Lease"** means any lease arrangement or agreement for the Leased Real Property identified and included in the Acquired Contracts.

**"Related Person"** means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents,

professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

 **"Sale Order"** means an order of the Bankruptcy Court approving the sale and transfer of the Acquired Assets and Assumed Liabilities to Buyer pursuant to §§ 105 and 363 of the Bankruptcy Code, which order shall be substantially in the form attached hereto as <u>Exhibit C</u> or with such changes and modifications as are reasonably acceptable to Buyer and Seller.

 **"Sale Procedures"** means the Sale Procedures in substantially the form attached hereto as <u>Exhibit A</u>.

**"Seller"** has the meaning set forth in the Preamble.

**"Target Net Working Capital"** means ($124,463.)

**"Tax Return"** means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

**"Taxes"** means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

**"Total Consideration"** has the meaning set forth in <u>Section 2.1</u>.

**"Transaction Taxes"** has the meaning set forth in <u>Section 2.7</u>.

**"Unadjusted Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**CROWN VENTURES IOWA, INC.**

By: _~Holmn~Gross~ 4/11/11_
Name: _JOHN L. GROSS_
Title: _PRESIDENT_


**SELLER:**

**DUKE AND KING ACQUISITION CORP.**


By:_____
Name:_____
Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**CROWN VENTURES IOWA, INC.**

By:_____

Name:_____

Title:_____

**SELLER:**

**DUKE AND KING ACQUISITION CORP.**

By:_____

Name:_____Rodger T Head_____

Title:___PRESIDENT/CED_____

## Exhibit A

## Sale Procedures

Please see attached.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER APPROVING SALE AND BIDDING PROCEDURES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This case came before the Court on the Debtors' Motion for an Order Approving Sale and Bidding Procedures dated January 7, 2010 (the "Procedures Motion").[1]

Based on the Procedures Motion, all the files, records and proceedings herein, the Court being advised in the premises:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

1. The Court has jurisdiction over the Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]  All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Procedures Motion.

[2]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. <u>See</u> Fed. R. Bankr. 7052.

{2575006:2}

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *01/24/2011*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

2.      The Debtors have articulated good and sufficient reasons for approving the Procedures Motion.

3.      Due and proper notice of the Procedures Motion was provided and no other or further notice need be provided.

4.      The Sale Procedures, substantially in the form attached as <u>Exhibit A</u> to this Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' assets.

5.      The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

**IT IS HEREBY ORDERED:**

1.      The Procedures Motion is granted to the extent set forth herein.

2.      All objections filed in response to the Procedures Motion are resolved as set forth herein or on the record at the hearing on the Procedures Motion, and to the extent not resolved, are hereby overruled.

3.      The Sale Procedures, in the form attached as <u>Exhibit A</u> to this Order, are hereby incorporated herein and approved in their entirety.

4.      In accordance with the terms of the Sale Procedures, the Debtors are authorized to conduct separate auctions for the sale of all or substantially all of their assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds in the same order and priority as existed at the commencement of the Debtors' chapter 11 cases, subject to a further hearing and final court approval following such auctions.

5.      As provided by Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon its entry.

2

{2575006:2}

6.     This Court shall retain jurisdiction over any matters related to or arising from the

implementation of this Order.

Dated:   January 24, 2011.

*/e/ Gregory F. Kishel*

_____
Gregory F. Kishel
United States Bankruptcy Judge

3

## **EXHIBIT A**

{2575006:2}

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

|  |  |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## SALE AND BIDDING PROCEDURES

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

These sale and bidding procedures (the "Sale Procedures") shall govern the sale of substantially all of the operating assets of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. The Debtors contemplate that the composition of the sale of their assets may take various forms, including, but not limited to a sale of all the assets to one purchaser or the sales of geographic regions of assets to separate purchasers as more particularly set forth below.

By motion (the "Procedures Motion"), dated January 7, 2011, the above-captioned debtors and debtors in possession (collectively, the "Debtors") sought, among other things, approval of these Sale Procedures governing the process and procedures for the sale of substantially all of the Debtors' operating assets through two separate auctions. On January 24, 2011, the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), entered an order approving these Sale Procedures (the "Procedures Order"). Pursuant to the Procedures Order, the Bankruptcy Court has scheduled a hearing (the "Sale Hearing") **on April 14, 2011, at 9:30 a.m. (Central Time),** to consider the sales.

## I.  <u>Assets to Be Sold</u>

The assets to be sold consist of the Debtors' 87 BURGER KING® franchise locations and related assets situated in the states of Minnesota, Illinois, Missouri, Wisconsin, Kansas and Iowa (each restaurant, an "Individual Restaurant" and collectively, the "Sale Assets").

Any Potential Bidder (as defined herein) may obtain a detailed description of each Individual Restaurant and the geographic regions in which such Individual Restaurants are located through the process described in Section III below entitled "Due Diligence."

{2522615:9}

The Debtors may sell Individual Restaurants in regions (Group One) or in piecemeal (Group Two) through two separate groupings described below, such decisions being made to maximize the value to be paid by the successful bidder(s) for the Sale Assets. Accordingly, subject to the Group One Restaurants/Group Two Restaurants split as set forth below, Potential Bidders may submit bids to purchase (i) one, some or all of the Group One Regions (defined below), (ii) all of the Sale Assets, or (iii) any subset of Individual Restaurants in Group Two.

The Debtors will have a form of asset purchase agreement (in each case, the "APA") to consummate the transactions contemplated. The APA will include the terms and conditions upon which the Debtors expect (subject to reasonable revisions by the Qualified Bidders (as defined herein)) the Sale Assets to be sold.

Pursuant to these Sale Procedures and 11 U.S.C. § 363, the Sale Assets will be sold free and clear of all liens, claims, encumbrances and interests, other than liabilities expressly assumed. Bank of America, N.A. ("BofA"), the Debtors' senior secured lender, has agreed not to object to any sales that are consummated in accordance with the terms of these Sale Procedures, including, without limitation, objections under 11 U.S.C. § 363(f); except that BofA reserves the right to object to any sale that, in the judgment of BofA, is (i) not consummated in accordance with these Sales Procedures, (ii) does not represent the highest and best price when compared with other bids, or (iii) is not a bona fide arms' length transaction. BofA further reserves the right to object to the Debtors' determinations regarding Qualified Bidders (as defined herein) (including, without limitation, the designation of Qualified Bidders, whether deficiencies in bids have been cured and the waiver of any condition precedent to becoming a Qualified Bid set forth in the Sale Procedures); the selection of any Stalking Horse Bidder(s) (as defined herein); the payment of any Stalking Horse Protection Fees (as defined herein); the Debtors' selection of the Baseline Bid (as defined herein); any modifications or adjournments to the Group One Auction (as defined herein); or any modification of the Sale Procedures without BofA's consent.

The Sale Assets will be sold without warranty or representation of any kind or nature, whether expressed or implied, and are being purchased by the Successful Bidder(s) (as defined herein) on an "As Is, Where Is" basis and are being sold "Without Faults."

## II.    **Segregation of Restaurant Locations**

The Sale Assets shall be split into two groups: (i) 74 Individual Restaurants located on Schedule 1 to these Sale Procedures (collectively, the "Group One Restaurants"); and (ii) 13 Individual Restaurants located on Schedule 2 to these Sale Procedures (collectively, the "Group Two Restaurants"). The Group One Restaurants will be further segregated into five separate regions for marketing and sale: Minnesota Region; Missouri Region; Davenport Region; Wisconsin Region; and Illinois Region (collectively, the "Group One Regions"), each of which are set forth on Schedule 1 to these Sale Procedures. The Group One Regions will not be marketed as Individual Restaurants, but rather, as all-inclusive regions. The Group One Regions and the Group Two Restaurants will be marketed simultaneously pursuant to these Sale Procedures.

If a Potential Bidder for the Sale Assets desires to make a bid for some or all of the Group One Regions and for all or a portion of the Group Two Restaurants, the Potential Bidder must separately designate the amount it is bidding for the Group One Regions and the Group Two Restaurants; provided, however, that any such Potential Bidder shall not submit a bid on any Group One Region that is contingent upon, tied to or in any other way a combined offer for any Group Two Restaurants.  The Group One Regions and the Group Two Restaurants will be auctioned separately and the Group One Regions will be auctioned first.

### III.    **Due Diligence**

Until the Bid Deadline (as defined below), the Debtors will afford to each interested party (i) determined by the Debtors to be reasonably likely to make a Qualified Bid (defined below), and (ii) who delivers an executed confidentiality agreement in form and substance satisfactory to the Debtors (each, a "Potential Bidder") reasonable access, during normal business hours and subject to confidentiality requirements, to the books and records of the Debtors reasonably requested by such Potential Bidder, including access to the Debtors' designated due diligence website, to the extent provision of such access or information is not prohibited by applicable law and relates to the Sale Assets.  The Debtors will furnish (subject to applicable law) as promptly as practicable to such Potential Bidder any and all such information as such Potential Bidder may reasonably request related to the Sale Assets.

Burger King Corporation ("BKC") is the Debtors' franchisor.  Potential Bidders should contact a representative of BKC in order to apply for BKC's consent and approval for its bid.  The BKC representative's information is available upon request to Robert Hersch at Mastodon Ventures, Inc. ("Mastodon"), the Debtors' investment banker, by phone at 512.498.1212 or via email at rhersch@mastodonventures.com.

### IV.    **Initial Determinations by the Debtors**

The Debtors shall (a) determine (with the assistance of their respective financial advisors and investment banker) whether any person or entity is a Potential Bidder; (b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Sale Assets; (c) receive bids from Qualified Bidders; (d)  select a stalking horse bidder or bidders; and (e) negotiate and enter into one or more asset purchase agreements with one or more Qualified Bidder(s) (collectively, the "Bidding Process").

Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Sale Assets to any person or entity who is not a Potential Bidder and who does not comply with the participation requirements below.

### V.    **Bid Deadline**

A Qualified Bidder that desires to make a bid shall deliver written and electronic copies of such bid to the Debtors' investment banker, Mastodon Ventures, Inc., Attention: Robert Hersch, 515 Congress Ave., Suite 1400, Austin, TX 78701, email: rhersch@mastodonventures.com, so as to be received by no later than **5:00 p.m. (Central Time) on or before April 5, 2011** (the "Bid Deadline").  The Debtors' attorneys will send copies of

any bids and information submitted under Section VI below to counsel for BofA, BKC and the Official Committee of Unsecured Creditors (the "Committee") within 24 hours of receipt of such bid.

## VI.   Determination of "Qualified Bidder" Status

Any Potential Bidder desiring to participate in the Bidding Process must be deemed a "Qualified Bidder."  To be deemed a Qualified Bidder, a Potential Bidder must deliver to the Debtors (care of Mastodon) the most current audited (if available) and the latest unaudited financial statements and/or financial information evidencing the Potential Bidder's ability to close the transaction that meets the Debtors' satisfaction or such other information as reasonably determined by the Debtors to support the Potential Bidder's ability to close the transaction.

Upon the Debtors' determination that a party is a Qualified Bidder, the Debtors shall provide each Qualified Bidder with access to all relevant business and financial information necessary to enable such Qualified Bidder to evaluate the Sale Assets, for the sole purpose of submitting an offer.

## VII.   Requirements of a "Qualified Bid"

To be deemed a "Qualified Bid" that may be considered at the Group One Auction or the Group Two Auction (each as defined in Section XI and Section XII below), a bid must:

a.    be in writing;

b.    be submitted by a Qualified Bidder;

c.    identify clearly the Group One Region(s) and/or Group Two Restaurant(s) that are included in the purchase and related segregated purchase price for each Group One Region and the Group Two Restaurant(s), if applicable;

d.    provide that the purchase price shall be paid in full in cash upon closing;

e.    be accompanied by a cash deposit equal to 10% of the proposed purchase price (such cash deposit will be applied to the purchase price);

f.    confirm the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the proposed transaction;

g.    be irrevocable until the earlier of (i) the Qualified Bidder's bid being determined by the Debtors not to be a Qualified Bid, or (ii) another Qualified Bidder's bid for (some or all of) the same assets being approved by the Bankruptcy Court;

h.    be accompanied by a fully executed APA (and demonstrating any modifications as necessary) and such Qualified Bidder's terms relating to the assumption of any executory contracts or unexpired leases or operating liabilities relating to the Individual Restaurants located in the respective Group One Region(s) to be purchased and/or the Group Two Restaurants to be purchased;

i.     designate all executory contracts and unexpired leases the Qualified Bidder seeks to have assumed and assigned to it;

j.     indicate (i) whether the Debtors or the Qualified Bidder is responsible for payment of "cure costs" for executory contracts and unexpired leases to be assumed and assigned, (ii) the source of the funds for payment of such amounts, and (iii) the amount that the Qualified Bidder believes is required to be paid in order to consummate its transaction;

k.     demonstrate the capacity to provide adequate assurance of future performance under all executory contracts and unexpired leases that are being assumed and assigned;

l.     not contain any financing contingencies of any kind, and shall include (i) evidence that such Qualified Bidder (and any related guarantor) has financial resources readily available sufficient in the aggregate to finance the purchase of the Sale Assets (either some or all), (ii) evidence that such Qualified Bidder (and any related guarantor) has the ability to provide adequate assurance of future performance under any unexpired leases and executory contracts, and (iii) evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms provided in the APA;

m.    to the extent a Qualified Bidder intends to operate as a BURGER KING® franchisee, provide evidence of the BKC Approval (defined in Section VIII below) or evidence that a Request (as defined in Section VIII below) for BKC Approval remains pending; and

n.     be accompanied by an affirmative statement from such Qualified Bidder that it has and will continue to completely comply with these Sale Procedures.

For the avoidance of doubt, any party that submits a bid for one, some or all of the Group One Regions and all or a portion of the Group Two Restaurants shall provide a separate allocation for the amount of the consideration to be paid under such bid between the particular Group One Regions and the Group Two Restaurants. Such allocation shall be due no later than the Bid Deadline. Any bid for one, some or all of the Group One Regions must be a bid for all Individual Restaurants located in the particular Group One Region being bid upon. No party may submit a bid for Individual Restaurants in a particular Group One Region that does not include all Individual Restaurants in such region and any such bid will not be deemed a Qualified Bid.

The Debtors will make a determination regarding whether a bid is a Qualified Bid and shall notify all Qualified Bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (Central Time) on April 7, 2011. The Debtors reserve the right to reject any bid on any grounds. Notwithstanding anything contained in this Section VII, should a Qualified Bidder submit a bid that fails to meet the qualifications to become a Qualified Bid, the

Debtors may allow a Qualified Bidder who has failed to meet the requirements of a Qualified Bid an additional 24 hours to cure any deficiencies to such bid.

The Debtors reserve the right, subject to consultation with BofA and the Committee, to waive compliance with any identified requirement for a bid to become a Qualified Bid; provided, however, BKC's approval process set forth in Section VIII below cannot be waived or modified.

## VIII.   **BKC Approval Process**

If a Qualified Bid is contingent on the Qualified Bidder receiving approvals from BKC, then such Qualified Bidder must deliver to BKC a written request for approval to become an authorized operator of a BKC franchise in accordance with BKC's customary approval process (a "Request").  BKC agrees to provide each Qualified Bidder with notice of its approval (the "BKC Approval") or disapproval as soon as reasonably possible after the receipt of all required information from any such Qualified Bidder consistent with its normal approval process.  For purposes of disclosure in considering a Request, BKC may apply, in its sole discretion, some or all of the standards set forth on Schedule 3 to these Sale Procedures.

Nothing in these Sale Procedures shall impair, affect or waive any (i) right of first refusal available to BKC in connection with its BURGER KING® franchise agreements; and (ii) BKC's right to object to any sale and/or assumption and assignment of BKC's franchise agreements or BKC's leases, all such rights preserved to BKC through the Sale Hearing.

## IX.    **Stalking Horse Bidder(s)**

Although the Debtors have had discussions with parties interested in submitting bids to purchase the Sale Assets (both as Individual Restaurants and in total) on a stalking horse basis (in each instance, a "Potential Stalking Horse Bidder"), the Debtors have not yet determined whether they will enter into stalking horse bid arrangements or identified any specific Potential Stalking Horse Bidder(s) for any of the Sale Assets to serve as an actual stalking horse bidder for any of the Sale Assets (in each case, as identified, a "Stalking Horse Bidder").

The Debtors will continue to consider whether to enter into stalking horse bid agreements, selecting one or more Stalking Horse Bidder(s) and which parties to serve as the Stalking Horse Bidder(s).  Any party seeking such consideration should immediately contact the Debtors' investment banker, Mastodon, to express such interest.  Any party seeking designation as a Stalking Horse Bidder shall be required to (i) have received the BKC Approval, (ii) submit a bid (in each instance, a "Stalking Horse Bid"), (iii) agree to an APA memorializing the transaction such party proposes (in each instance, a "Stalking Horse APA"), and (iv) provide a list of all executory contracts and unexpired leases to be assumed and assigned.  The Debtors may name Stalking Horse Bidder(s).  To the extent that the Debtors name Stalking Horse Bidder(s), the Debtors will do so on a rolling basis as Stalking Horse Bids are submitted, negotiated and agreed to.  The Debtors will consider proposed Stalking Horse Bids initially through March 14, 2011, with the expectation of naming a Stalking Horse Bidder or Stalking Horse Bidders no later than March 21, 2011.  To the extent that any of the Sale Assets are not included in a Stalking Horse Bid, the Debtors reserve the right to identify Stalking Horse Bid(s) after March 21, 2011.  The Debtors also reserve the right to name a Stalking Horse Bidder(s) for

any Group One Region or for all of the Sale Assets (subject to the Group One and Group Two split).

Each Stalking Horse Bid, memorialized by Stalking Horse APA(s), shall be subject to higher and better bids pursuant to the terms of these Sale Procedures and applicable law. As noted in Section XI of these Sale Procedures, the Debtors may negotiate a break-up fee and reimbursement of reasonable expenses (the "Stalking Horse Protection Fee"). The Debtors shall be under no obligation to designate and name a Stalking Horse Bidder or accept any Stalking Horse Bid(s) for any or all of the Sale Assets.

## X.      Negotiation of Stalking Horse Protection Fee(s)

In the event that a Stalking Horse Bidder is named and designated, the Debtors may negotiate a reasonable Stalking Horse Protection Fee payable to such Stalking Horse Bidder in the event that such Stalking Horse Bidder are not the Successful Bidder (whether as initial Successful Bidder or as successor as a Reserve Bidder). The Stalking Horse Protection Fee shall be approved by the Bankruptcy Court. At the Group One Auction or the Group Two Auction, as the case may be, any Qualified Bidder wishing to enter a bid in excess of the Stalking Horse Bid must enter an amount equal to the Stalking Horse Bid plus the Stalking Horse Protection Fee, plus any minimum bid amount to advance their bid(s).

If a Stalking Horse Bidder is identified and named in accordance with these Sale Procedures, the Debtors shall file a motion with the Court (in each case, a "Stalking Horse Motion") naming the Stalking Horse Bidder, seeking expedited approval of the Stalking Horse APA and Stalking Horse Protection Fee. Mastodon will contact all parties that have expressed an interest (in writing or otherwise) in any portion of the Sale Assets being purchased under the respective Stalking Horse APA and provide such parties with a copy of the Stalking Horse Motion and a copy of the respective Stalking Horse APA.

## XI.      Group One Auction Process

In the event that the Debtors receive more than one Qualified Bid for one, some or all of the Group One Regions, the Debtors will conduct an auction (the "Group One Auction") for the Group One Regions. The Group One Auction will take place at **10:00 a.m. (Central Time) on April 11, 2011** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than April 7, 2011.

The Debtors will have the right to publish detailed procedures consistent with these Sale Procedures for the conduct at the Group One Auction at any time prior to the start of the Group One Auction. Parties entitled to attend the Group One Auction shall include the Debtors, BofA, the Committee, BKC, the Qualified Bidders and the Stalking Horse Bidder(s) (if any), and each of those parties' representatives. The Stalking Horse Bidder(s) (if any) and each Qualified Bidder shall appear at the Group One Auction in person, or through a representative who provides appropriate evidence of such person's authority. Only a Qualified Bidder who has timely submitted a Qualifying Bid, and the Stalking Horse Bidder(s) (if any), shall be entitled to make bids at the Group One Auction.

In the event that a Stalking Horse Bidder is not selected prior to the Group One Auction and no Stalking Horse Bid(s) are tendered, the Debtors will select the highest and best bid or bids (a "Baseline Bid") to serve as the negotiating point with the other Qualified Bidders at the Group One Auction.  There may be more than one Baseline Bid if the Debtors determine that multiple Baseline Bids for certain of the Group One Regions are higher and better than one Baseline Bid. The Debtors reserve the right to aggregate bids for separate Group One Regions and compare such aggregated bids with bids for all of the Group One Regions in determining the then current best bid.

As soon as practicable, the Debtors will provide all Qualified Bidders, BofA, BKC and the Committee with a copy of the Baseline Bid(s).  At the Group One Auction, Qualified Bidders will be permitted to revise, increase, and/or enhance their bid(s) based upon the terms of the Stalking Horse Bid or the Baseline Bid(s), as the case may be (except to the extent otherwise authorized by the Debtors).  All Qualified Bidders will have the right to make additional modifications to the APA at the Group One Auction.

The Group One Auction will be conducted in rounds and in any order the Debtors determine.  At the end of every round, the Debtors shall declare the highest and best bid or bids at that time for the assets under consideration pursuant to the Baseline Bid(s).  Each Qualified Bidder shall have the right to continue to improve its respective bid at the Group One Auction. The initial minimum overbid shall be the Baseline Bid established prior to the Group One Auction plus the lesser of 10% of the Baseline Bid or $200,000 (the "Initial Overbid"). Thereafter, Qualified Bidders may increase their Qualified Bids in any manner that they deem fit; provided, however, that each subsequent increase must include a minimum of the lesser of 5% of the Baseline Bid or $100,000 in additional consideration.  The Debtors reserve the right to approach any Qualified Bidder(s) and seek clarification to bids at any time, including without limitation, inviting Qualified Bidder(s) to communicate with other Qualified Bidder(s) if such communication would be beneficial to the Group One Auction.

The Group One Auction will continue with the Qualified Bidders until the Debtors determine, and subject to Bankruptcy Court approval, that they have received the highest and best offer for the Group One Regions (either as a whole or separately) from the Qualified Bidders or the Stalking Horse Bidder(s) (the "Successful Bid") and the next highest and best Qualified Bid submitted at the Group One Auction (a "Reserve Bid").  The Qualified Bidder(s) submitting the Successful Bid(s) shall become a "Successful Bidder(s)," and the Qualified Bidder(s) submitting the Reserve Bid(s) shall become a "Reserve Bidder(s)."  The Successful Bidder(s) and the Reserve Bidder(s) may be named for separate Group One Regions or for all of the Group One Regions, or any combination thereof, as determined by the Debtors.  In making this decision, the Debtors shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the particular groupings of Group One Regions, the Qualified Bidder's ability to close a transaction and the timing thereof, the type and nature of the APA, its requirements as to the assumption and assignment of executory contracts, licenses, and unexpired leases relating to the Individual Restaurants located in the Group One Region(s) to be purchased, and the net benefit to the Debtors' estates.

The Debtors' procedures for the Group One Auction require the following: (i) if a Stalking Horse Bidder(s) is selected prior to the Group One Auction, the initial overbid by a

Qualified Bidder(s) shall be greater than the sum of (a) the Stalking Horse Protection Fee, and (ii) the Initial Overbid. If there is no Stalking Horse Bidder(s) selected prior to the Group One Auction, no Stalking Horse Protection Fee(s) will be awarded and the initial overbid amount will not include such an amount.

The Debtors reserve the right, in their business judgment, to make one or more modifications and/or adjournments to the Group One Auction to, among other things: (i) facilitate discussions between the Debtors, on the one hand, and individual Qualified Bidders, on the other hand; (ii) allow individual Qualified Bidders to consider how they wish to proceed; and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their business judgment may require.

In the event that a Qualified Bidder's Successful Bid or Reserve Bid changes as a result of the Group One Auction, then such Qualified Bidder may need to seek additional approvals from BKC beyond such Qualified Bidder's initial BKC Approval. Qualified Bidders are encouraged to address any such matters with BKC as early in the process as possible.

## XII.   **Group Two Auction Process**

In the event that the Debtors receive more than one Qualified Bids for all or a portion of the Group Two Restaurants, the Debtors will conduct an auction (the "Group Two Auction") for the Group Two Restaurants. The Group Two Auction will take place, subject to the Debtors' discretion, either immediately following the closing of the Group One Auction or at **10:00 a.m. (Central Time) on April 12, 2011,** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than April 7, 2011.

All of the procedures set forth in Section XI of these Sales Procedures relating to the Group One Auction shall be expressly applicable to the Group Two Auction; provided, however, that a Qualified Bidder(s) bidding on one, some or all of the Group One Regions that has also submitted a Qualified Bid(s) for the Group Two Restaurants shall not withdraw such its bid for the Group Two Restaurants regardless of such Qualified Bidder's success or lack of success at the Group One Auction.

## XIII.   **The Sale Hearing**

At the Sale Hearing, which will be held **on April 14, 2011, at 9:30 a.m. (Central Time)**, the Debtors will seek entry of an order or orders authorizing and approving the sale(s) to the Successful Bidder(s) for the Group One Regions and/or Group Two Restaurants. No later than 11:59 p.m. (Central Time) on April 12, 2011, all objections to the relief requested at the Sale Hearing shall be filed and served in the manner prescribed in the motion to approve the sale of the Group One Regions and the Group Two Restaurants. The Sale Hearing may be adjourned or rescheduled from time to time. The Debtors shall provide notice of such adjournment or rescheduling to: (i) the U.S. Trustee; (ii) counsel to BofA; (iii) counsel to the Committee; (iv) counsel to BKC; (v) all Qualified Bidders; (vi) all parties that have filed a timely objection to the sale; (vii) all persons or entities known or reasonably believed to have asserted a lien in any of the Sale Assets; and (viii) all parties that have requested notice in the Debtors' bankruptcy cases.

## XIV. **Failure to Consummate Purchase**

Following the Sale Hearing, if the Successful Bidder(s) fails to consummate the closing of the sale because of a breach or failure to perform on the part of such Successful Bidder(s), the Debtors will be authorized, but not required, to consummate the sale with Reserve Bidder(s) without further order of the Bankruptcy Court. In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors. Additionally, the Debtors shall be entitled to seek all available damages from the defaulting Successful Bidder.

## XV. **Return of Deposit**

The deposits of the Successful Bidder(s) shall be applied to the Successful Bidder's obligations under the Successful Bid upon closing of the transactions contemplated thereby. If a Successful Bidder fails to close the transactions contemplated by the Successful Bidder then such Successful Bidder shall forfeit its deposit (and any right to any Stalking Horse Protection Fee, if applicable).

The deposit(s) of the Reserve Bidder(s) shall be returned to the Reserve Bidder(s) upon closing of the transactions contemplated by the Successful Bidder(s); provided, however, that if a Successful Bidder fails to close the transactions when and as provided in the Successful Bid, then the deposit of the Reserve Bidder(s) shall be applied to the Reserve Bidder's obligations under the Reserve Bid upon closing of the transactions contemplated thereby. If a Reserve Bidder fails to close the transactions contemplated by a Reserve Bid, then such Reserve Bidder shall forfeit its deposit.

All other deposits of Qualified Bidders who are not the Successful Bidder(s) or the Reserve Bidder(s) shall be returned within three business days after the conclusion of the Group One Auction or the Group Two Auction, as the case may be.

The Debtors reserve all of their rights regarding any return of deposits, and the failure by the Debtors to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

## XVI. **Modification of Amended Sale Procedures**

The Debtors may amend these Sale Procedures, in their reasonable business judgment, at any time in any manner that will best promote the goals of the Bidding Process, including but not limited to extending or modifying any of the dates described herein. Notwithstanding the foregoing, the Debtors may modify the requirements set forth in Section II of these Sale Procedures only (i) with the consent of both BofA and BKC or (ii) pursuant to an order of the Bankruptcy Court.

## XVII. **Miscellaneous**

BofA shall be entitled to exercise its right under 11 U.S.C. § 363(k) at the Group One Auction or the Group Two Auction (as the case may be) to credit bid the indebtedness owed to BofA. For the purpose of these Sale Procedures, BofA shall be deemed a Qualified Bidder and shall be entitled to participate in the Group One Auction and the Group Two Auction if BofA's

bid complies with all of the provisions of these Sale Procedures, subject to the following modifications: (i) with respect to the cash deposit required under Section VII(e) of these Sale Procedures, BofA shall deposit cash equal to 10% of the cash component (if any) of the bid; and (ii) with respect to Section VII(d) of these Sale Procedures, BofA need not provide that the credit bid portion of its purchase price be paid in cash at closing.  BofA need not provide for a cash deposit as to the credit component of its bid.  Notwithstanding anything herein to the contrary, BofA's status as a Qualified Bidder does not exempt BofA from seeking and obtaining the BKC Approval for the operation of the Sale Assets as BURGER KING® restaurants.

## XVIII.   Debtors' Consultation with Key Parties

In the context of these Sale Procedures, the Debtors will consult with BKC, BofA and the Committee with respect to issues relating to (i) designating a Qualified Bidder; (ii) determining whether a bid is a Qualified Bid; (iii) curing deficiencies to become a Qualified Bid; (iv) identifying any Stalking Horse Bid(s) and whether to accept any Stalking Horse Bid(s); (v) establishing procedures for the Group One Auction and the Group Two Auction; (vi) selecting the Baseline Bid(s); (vii) choosing the Successful Bid(s) and Reserve Bid(s); and (viii) modifying these Sale Procedures.

## <u>SCHEDULE 1</u>

## GROUP ONE RESTAURANTS BY REGION

| | Store # | Address | City | State |
|---|---|---|---|---|
| | **Minnesota Region** | | | |
| 1 | 04116 | 2651 County Road I | Mounds View | MN |
| 2 | 06270 | 8510 Edinburgh Center Drive | Brooklyn Park | MN |
| 3 | 07557 | 8501 Springbrook Drive NW | Coon Rapids | MN |
| 4 | 09095 | 106 Ninth Avenue Circle South | Princeton | MN |
| 5 | 09993 | 10861 University Avenue NE | Blaine | MN |
| 6 | 09994 | 318 East Kraft Drive | Melrose | MN |
| 7 | 02641 | 2011 E Main Street | Albert Lea | MN |
| 8 | 04553 | 1501 NW 7th Street | Faribault | MN |
| 9 | 06545 | 1022 E Blue Earth Avenue | Fairmont | MN |
| 10 | 06615 | 1318 Riverfront Drive | Mankato | MN |
| 11 | 07444 | 735 Bridge Street | Owatonna | MN |
| 12 | 09081 | 1409 4th Street NW | Austin | MN |
| 13 | 04009 | 14251 Nicollet Avenue | Burnsville | MN |
| 14 | 04122 | 5020 160th Street SE | Prior Lake | MN |
| 15 | 04151 | 1150 East Highway 13 | Burnsville | MN |
| 16 | 09256 | 255 Triangle Lane N Ste 2 | Jordan | MN |
| 17 | 04507 | 13840 Grove Drive | Maple Grove | MN |
| 18 | 05012 | 2025 Northdale Blvd | Coon Rapids | MN |
| 19 | 06299 | 10801 Bloomington Ferry Road | Bloomington | MN |
| 20 | 07466[1] | 330 North Garden | Bloomington | MN |
| 21 | 08224 | 5105 Edina Industrial Blvd | Edina | MN |
| 22 | 09332 | 5358 West Broadway Ave | Crystal | MN |
| 23 | 05591 | 2535 Division Street | North St Paul | MN |
| 24 | 06590 | 1215 Gun Club Road | White Bear Lake | MN |
| 25 | 08004 | 3333 Rice Street | Shoreview | MN |
| 26 | 09272 | PO 264   403 Fire Monument Road | Hinckley | MN |
| 27 | 11243 | 1560 West 4th Street | Rush City | MN |
| 28 | 11682 | 38711 Tanger Drive | North Branch | MN |
| 29 | 05713 | 1501 Weir Drive | Woodbury | MN |
| 30 | 06530 | 7051 Tenth Street North | Oakdale | MN |
| 31 | 07937 | 2411 Center Drive | Hudson | WI |
| 32 | 09934 | 120 Meridian Drive | New Richmond | WI |
| 33 | 11254 | 9896 Norma Lane | Woodbury | MN |
| 34 | 12757 | 1287 N Main St | River Falls | WI |
| 35 | 10239 | 244 Grand Avenue | St Paul | MN |
| 36 | 10284 | 695 7th Street East | St Paul | MN |
| 37 | 11284 | 1500 Stinson Blvd NE | Minneapolis | MN |
| 38 | 11535 | 8481 SE Point Douglas Road | Cottage Grove | MN |
| 39 | 12250 | 925 Washington Ave SE | Minneapolis | MN |
| 40 | 13091 | 289 57th Avenue NE | Fridley | MN |
| | **Missouri Region** | | | |
| 1 | 03232 | 3009 S. Campbell Avenue | Springfield | MO |
| 2 | 05357 | 1022 Kings Highway Street | Rolla | MO |
| 3 | 07203 | 525 S. National Avenue | Springfield | MO |
| 4 | 12281 | 2200 E. Austin Blvd | Nevada | MO |
| 5 | 11049 | 3095 Gardner Edgewood Drive | Neosho | MO |
| 6 | 12413 | 315 N. Massey Blvd | Nixa | MO |
| 7 | 12415 | 875 E. Highway 60 | Monett | MO |
| 8 | 01227 | 935 W. Kearney | Springfield | MO |
| 9 | 03475 | 2138 N. Glenstone Avenue | Springfield | MO |

---

[1] The Debtors reserve the right to exclude Restaurant # 7466 from the restaurants to be sold in the
Minnesota Region.

| | Store # | Address | City | State |
|---|---|---|---|---|
| *10* | 04513 | 1077 S. Jefferson Avenue | Lebanon | MO |
| *11* | 05539 | 1101 S. Limit Avenue | Sedalia | MO |
| *12* | 08384 | 1911 S. Springfield Avenue | Bolivar | MO |
| *13* | 09331 | 1317 Preacher Roe Blvd | West Plains | MO |

**Davenport Region**

| | | | | |
|---|---|---|---|---|
| *1* | 04043 | 229 West Kimberly Road | Davenport | IA |
| *2* | 04201 | 5231 N Brady Street | Davenport | IA |
| *3* | 04297 | 4040 38th Avenue | Moline | IL |
| *4* | 06211 | 1222 Avenue of the Cities | East Moline | IL |

**Wisconsin Region**

| | | | | |
|---|---|---|---|---|
| *1* | 01764 | 2655 East Washington | Madison | WI |
| *2* | 01888 | 2624 Milton Avenue | Janesville | WI |
| *3* | 03792 | 4980 South 76th Street | Greenfield | WI |
| *4* | 04857 | 822 Windsor Street | Sun Prairie | WI |
| *5* | 09366 | 400 Center Way | Janesville | WI |

**Illinois Region**

| | | | | |
|---|---|---|---|---|
| *1* | 01752 | 723 Shooting Park | Peru | IL |
| *2* | 00111 | 18459 South Halsted Street | Glenwood | IL |
| *3* | 01747 | 209 Norris Drive | Ottawa | IL |
| *4* | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| *5* | 05879 | 1830 Southwest Avenue | Freeport | IL |
| *6* | 11877 | 504 West Blackhawk Drive | Byron | IL |
| *7* | 16573 | 2320 Route 34 | Oswego | IL |
| *8* | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| *9* | 00437 | 1138 East State Street | Rockford | IL |
| *10* | 01060 | 1450 4th Street | Beloit | WI |
| *11* | 01326 | 2434 11th Street | Rockford | IL |
| *12* | 10234 | 7510 East State Street | Rockford | IL |

## SCHEDULE 2

### GROUP TWO RESTAURANTS

|    | Store # | Address | City | State |
|----|---------|---------|------|-------|
| 1  | 00106 | 901 North Lake Street | Aurora | IL |
| 2  | 01558 | 1411 S. Range Line Road | Joplin | MO |
| 3  | 04111 | 3500 South Moorland Road | New Berlin | WI |
| 4  | 04334 | 2423 Rockingham Road | Davenport | IA |
| 5  | 05960 | 2001 Center Avenue | Janesville | WI |
| 6  | 05971 | 1710 DeKalb Avenue | Sycamore | IL |
| 7  | 06030 | 1011 W. Central Avenue | Carthage | MO |
| 8  | 06609 | 3020 E. Sunshine Street | Springfield | MO |
| 9  | 07204 | 1699 W. Jackson Street | Ozark | MO |
| 10 | 08964 | 1220 E. Republic Road | Springfield | MO |
| 11 | 09744 | 1429 Main Street | Parsons | KS |
| 12 | 11191 | 2789 Milwaukee Road | Beloit | WI |
| 13 | 11751 | 808 S Illinois Avenue | Republic | MO |

## SCHEDULE 3

**DESCRIPTION OF BURGER KING CORPORATION'S APPROVAL PROCESS**

a. <u>New Franchisee Approval Process</u>:  New franchisee candidates must obtain approval by all of the following:

  o    <u>Operations Review</u>:  Criteria includes: directly comparable experience in a multi-unit retail environment preferably in the restaurant sector.  Candidate must pass interviews with BKC's Franchise Operations leadership.

  o    <u>Legal Review</u>: Criteria include background checks.

  o    <u>Credit Review</u>: Criteria include reliable credit history.

  o    <u>Financial Review</u>: Criteria includes net worth of at least $1.5M or 3-5x the equity required to complete the targeted deal, whichever is greater.

  o    <u>Franchising Review</u>:  Franchisee must obtain approval of BKC's franchise leadership team.  Criteria includes alignment with BKC's franchising guiding principles, including a focus on growth via organic development and an understanding of BKC's policies on maximum restaurant count and contiguous geography.

b. <u>Deal Approval</u>: Transfers of BURGER KING® restaurants are subject to case-by-case deal approval by BKC's Operations, Franchising, Legal and Finance groups.  Being approved to become a franchisee does not in any way give the approved candidate a path around this process.

c. <u>Approval Process for Existing Franchisee Acquisitions</u>:  Existing franchisees seeking to acquire any particular set of existing BURGER KING® restaurants must obtain approval by all of the following:

  o    <u>Operations Review</u>:  BKC's Field Operations must support the buyer based on their operations track-record and organizational capacity.

  o    <u>Financial Review</u>:  The proposed buyer must demonstrate the financial capacity to handle the transaction in addition to any required capital expenditures.  Buyers must be current in all payments due to BKC.

  o    <u>Franchising Review</u>:  In general terms, the buyer must be aligned with all BKC goals and initiatives.  Check-points include whether the franchisee is compliant with all equipment and remodeling obligations in their existing business; whether the buyer has supported local marketing initiatives; and whether the buyer has developed new restaurants.  In addition, the acquisition will be reviewed for whether it is in the same geographical areas as the proposed buyer's existing base of operations; and whether it causes the buyer to be at or near the 100-restaurant ceiling.

{2522615:9}

## **Exhibit B**

## **Form of Deposit Escrow Agreement**

See attached.

# DEPOSIT ESCROW AGREEMENT

THIS DEPOSIT ESCROW AGREEMENT ("Escrow Agreement") is entered into as of April 11, 2011, by and among Duke and King Acquisition Corp., a Delaware corporation ("Seller"), Crown Ventures Iowa, Inc., a Michigan corporation ("Buyer"), and U.S. Bank National Association, a national banking association ("Escrow Agent").

## RECITALS

A.      Buyer has submitted a bid to Seller to purchase certain of the assets and business of Seller pursuant to the terms of certain "Sale and Bidding Procedures" issued by the United States Bankruptcy Court for the District of Minnesota pursuant to order in the case captioned *In re Duke and King Acquisition Corp.,* Case No. 10-38652 (Bankr. Minn.) (the "Sale Procedures"); and

B.      As part of that bid, Buyer has submitted to Seller an Asset Purchase Agreement, dated April 11, 2011 (the "Purchase Agreement"); and

C.      Pursuant to the Sale Procedures, to qualify as a Qualified Bidder, Buyer is required to submit a cash deposit equal to 10% of the purchase price into escrow (the "Deposit") to be disbursed in accordance with the terms of this Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Certain Defined Terms. Capitalized terms used but not otherwise defined herein shall have the respective meanings given such terms in the Purchase Agreement or the Sale Procedures.  The Escrow agent shall be furnished copies of the Purchase Agreement and the Sale Procedures for reference purposes only, provided that the Escrow Agent shall have no duties, obligations or liabilities arising under the Purchase Agreement or Sale Procedures.

2.      Designation of the Escrow Agent. Buyer and Seller hereby designate and appoint the Escrow Agent for the purposes set forth in this Escrow Agreement. The Escrow Agent hereby accepts such appointment under the terms and conditions set forth in this Escrow Agreement.

3.      Creation of the Escrow. On even date herewith, Buyer has delivered, or shall deliver, the sum of $50,000 to the Escrow Agent, as the Deposit, by wire transfer of immediately available funds to be held in an escrow account specified by the Escrow Agent (the "Escrow Funds"). The escrow account name and account number are as follows: Duke & King Acq/Crown Ventures IA - # 146720000.

4.      Investment. From the date hereof until otherwise directed in writing by Buyer and Seller, the Escrow Agent shall invest the Escrow Funds in its U.S. Bank Money Market Account as described on Exhibit A attached hereto.  In no event shall the Escrow Agent be liable for the results of any investment, including without limitation any loss, cost or penalty resulting from any investment made in accordance with the terms hereof.

5.    Disbursement of the Escrow Funds.    The Escrow Agent shall distribute the Escrow Funds and interest accrued thereon in accordance with the joint written instructions executed by Buyer and Seller pursuant to the terms of the Purchase Agreement ("Joint Instruction").

6.    Termination. This Escrow Agreement, and the escrow created hereby, shall terminate upon the date that the Escrow Funds are fully and finally disbursed pursuant to Joint Instruction of Buyer and Seller.

7.    Fees and Expenses. In consideration for its services hereunder, Buyer and Seller agree to equally divide the payment (1/2 paid by Seller and 1/2 paid by Buyer) of the annual administrative escrow fee of the Escrow Agent set forth in Exhibit B attached hereto, and of all other fees, costs, charges and expenses of the Escrow Agent, if any, including reasonable attorneys' fees, which are incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, provided, however, that the Escrow Agent complies with Section 8(a) of this Escrow Agreement.

8.    Conditions of the Escrow Agent's Obligations.

(a)    Legal Counsel. The Escrow Agent shall be entitled to employ legal counsel and other experts as it may deem reasonably necessary to advise it in connection with its obligations hereunder, may rely on the advice of such counsel, and may pay them reasonable compensation therefore, provided, however, that the fees of such legal counsel shall have been approved in advance by the parties hereto if reimbursement of such fees is to be sought from the parties; provided that such approval shall not be unreasonably withheld and in no event shall it be withheld if the Escrow Agent is subject to actual or threatened litigation not directly caused by its own negligence or willful misconduct .

(b)    Resignation. The Escrow Agent may resign by giving written notice thereof to Buyer and Seller. In the event of any such notice of resignation, the Escrow Agent shall refrain from taking any action with respect to the Escrow Funds until it receives joint written instructions from Buyer and Seller designating a successor depository which shall be a national bank authorized to exercise corporate trust powers, and having a combined capital and surplus of at least $5,000,000,000. Upon receipt of such joint instructions, the Escrow Agent shall promptly deliver the Escrow Funds then held by it to such successor. Any successor depository shall have all the rights, obligations, and immunities of the Escrow Agent set forth herein. If the Buyer and Seller have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation from the Escrow Agent, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

(c)    Liability Limitations. Except as to its obligation to keep the Escrow Funds safely in its custody as the Escrow Agent pursuant to the terms of this Escrow Agreement, the Escrow Agent shall be indemnified, on a several basis, by Buyer and Seller and shall not be liable to anyone whatsoever by reason of any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law or for anything which it may do or

refrain from doing in connection herewith unless caused by or arising out of its own negligence or willful misconduct. IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION, UNLESS ARISING IN WHOLE OR IN PART OUT OF ITS OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     Reliance. The Escrow Agent shall be entitled to rely and shall be protected in acting in reliance upon any Joint Instruction and shall be entitled to treat as genuine, and as the document it purports to be, any letter, paper or other document furnished to it and reasonably believed by it to be genuine and to have been signed and presented by the proper party or parties.

(e)     Tax Matters. The Escrow Agent does not have any interest in the Escrow Funds deposited hereunder but is serving only as escrow holder and having only possession thereof. All interest or other income from all investments and reinvestments of the Escrow Funds shall be paid as directed in the Joint Instruction or upon the earlier of: (i) termination of this Agreement and the escrow established hereby, or (ii) the disbursement of the Escrow Funds. For income tax purposes, income from all investments and reinvestments of the Escrow Funds shall be for the benefit of the party to whom such funds are disbursed, shall be recognized by such party and paid by such party.

(f)     Disputes. In the event that (i) any dispute shall arise between the parties with respect to the disposition or disbursement of any of the assets held hereunder or (ii) the Escrow Agent shall be uncertain as to how to proceed in a situation not explicitly addressed by the terms of this Agreement whether because of conflicting demands by the other parties hereto or otherwise, the Escrow Agent shall be permitted to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Funds until such dispute or conflicting demands shall have been (i) determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or (ii) settled by agreement between the conflicting parties as evidenced in a writing reasonably satisfactory to the Escrow Agent. Notwithstanding anything herein to the contrary, in no event shall the Escrow Agent be required to institute legal proceedings of any kind, or be required to defend any legal proceedings which may be instituted against it with respect to this Agreement unless requested to do so in writing by the other parties hereto and until it is indemnified by such requesting party(ies) to the sole satisfaction of the Escrow Agent, against the cost and expense of such defense, including without limitation the reasonable fees and expenses of its legal counsel.

9.     Action by the Escrow Agent. Nothing herein contained shall be deemed to impose upon Buyer or Seller any obligation or liability on account of the failure of the Escrow Agent to fulfill its obligations under this Escrow Agreement. The Escrow Agent will not be responsible for determining or calculating amounts to be disbursed from the escrow established hereunder.

10.     Headings. The headings in this Escrow Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation hereof.

11. <u>Governing Law</u>. This Escrow Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota without giving effect to the principles of conflicts of laws thereof.

12. <u>Notices</u>. All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered by hand, overnight delivery service, electronic mail or facsimile transmitter (with confirmed receipt) to the physical address, electronic address or facsimile number set forth in this section, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given on the date received.

|  |  |
|---|---|
| If to Buyer: | Crown Ventures, Inc.<br>9265 Apple Crest Drive<br>Saline, Michigan 48176<br>Attention: John Gross<br>Facsimile: (630) 553-2927<br>Email: jgross@c-vcorp.com |
| With a copy to: | James A. Schriemer<br>Conlin, McKenney & Philbrick, P.C.<br>350 S. Main St., Suite 400<br>Ann Arbor, Michigan 48104-2131<br>Facsimile: (734) 761-9001<br>Email: schriemer@cmplaw.com |
| If to Seller: | Duke and King Acquisition Corp.<br>12281 Nicollet Avenue, South<br>Burnsville, MN  55337<br>Attention:       Becky Moldenhauer<br>E-Mail           bmoldenhauer@dukeandking.com<br>Facsimile:      952-288-2327 |
| With a copy to | McDonald Hopkins LLC<br>600 Superior Avenue, East<br>Suite 2100<br>Cleveland, Ohio 44114<br>Attention:       Scott N. Opincar<br>E-Mail           sopincar@mcdonaldhopkins.com<br>Facsimile:      (216) 348-5474 |
| If to the Escrow Agent: | U.S. Bank National Association<br>Mail Code EP-MN-WS3C<br>60 Livingston Avenue<br>St. Paul, MN  55107<br>Attention       Georgette Kleinbaum |

or to such other address as may have been designated in a prior notice. Notices sent by registered or certified mail, postage prepaid, return receipt requested, shall be deemed to have been given two business days after being mailed; notices sent by a nationally recognized commercial overnight carrier shall be effective the next business day after receipted delivery to such courier specifying overnight delivery; notices sent by facsimile shall be effective upon confirmation of receipt at the number specified above otherwise, notices shall be deemed to have been given when delivered to the address specified above (or other address specified in accordance with the foregoing). The applicable persons designated on Exhibit C attached hereto are duly authorized signatories for Buyer and Seller, respectively, and have authority on behalf of the respective parties to execute and deliver this Agreement and any Joint Instruction contemplated by this Agreement. Any modification of such authorized signatories shall be provided by written notice delivered to the Escrow Agent.

13. Execution in Counterparts. This Escrow Agreement and any related Joint Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

14. Modification. This Escrow Agreement may be modified or amended only by joint written instructions to the Escrow Agent, signed by Buyer and Seller, or by a subsequent writing signed by Buyer, Seller and the Escrow Agent.

15. Binding Effect. This Escrow Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of Buyer, Seller and the Escrow Agent, and their respective successors and assigns.

16. Severability. If any provision of this Escrow Agreement, or the application thereof to any person or circumstance, should, for any reason and to any extent, be invalid or unenforceable, the remainder of this Escrow Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

17. Patriot Act Disclosure. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each individual or entity that opens an account. Therefore, the Escrow Agent must obtain the name, address, taxpayer or other government identification number, and other information, such as date of birth for individuals, for each individual and business entity that is a party to this Escrow Agreement. For individuals signing this Escrow Agreement on their own behalf or on behalf of another, the Escrow Agent requires a copy of a driver's license, passport or other form of photo identification. For business and other entities that are parties to this Escrow Agreement, the Escrow Agent will require such documents as it deems necessary to confirm the legal existence of the entity. At the time of or prior to execution of this Escrow Agreement, any party providing a tax identification number for tax reporting purposes shall provide to the Escrow Agent a completed IRS Form W-9, and every individual executing this Agreement on behalf of party shall provide to the Agent a copy of a driver's

license, passport or other form of photo identification acceptable to the Agent. The parties hereto agree to provide to the Escrow Agent such organizational documents and documents establishing the authority of any individual acting in a representative capacity as the Escrow Agent may require in order to comply with its established practices, procedures and policies. The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Funds in accordance with the Form W-9 information provided to the Escrow Agent. Buyer and Seller understand that, in the event one or more tax identification numbers are not certified to the Escrow Agent, the Internal Revenue Code, as amended from time to time, may require withholding of a portion of any interest or other income earned on the Escrow Funds

[Signature page follows.]

IN WITNESS WHEREOF, this Escrow Agreement has been executed by Buyer, Seller and the Escrow Agent on the date and year first written above.

**SELLER**

DUKE AND KING ACQUISITION CORP.

By:_____

Name:_____

Title:_____

**BUYER**

CROWN VENTURES IOWA, INC.

By:_____

Name:_____

Title:_____

**ESCROW AGENT**

U.S. BANK National Association

By:_____

Name:_____

Title:_____

<u>**EXHIBIT A**</u>

**U.S. BANK NATIONAL ASSOCIATION
MONEY MARKET ACCOUNT AUTHORIZATION
DESCRIPTION AND TERMS**

The U.S. Bank Money Market account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as Agent for its trust customers. U.S. Bank's trust department performs all account deposits and withdrawals. Deposit accounts are FDIC Insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

**AUTOMATIC AUTHORIZATION**

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Account. The U.S. Bank Money Market Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

# EXHIBIT B

## ESCROW AGENT'S FEE SCHEDULE

I.      Acceptance Fee:                                    Waived

The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing. This is a flat one-time fee, payable at closing.

II.     Annual Administration Fee:                         $1,000.00

Annual administration fee for performance of the routine duties of the escrow agent associated with the management of the account. Administration fees are payable in advance without pro-ration for partial years.

III.    Out-of-Pocket Expenses:                            At Cost

Reimbursement of actually incurred expenses associated with the performance of our duties under this Agreement, including but not limited to fees and expenses of legal counsel, accountants and other agents, tax preparation, reporting and filing, publications, and filing fees. Out-of-pocket expenses are subject to prior written approval by both Buyer and Seller, which approval shall not be unreasonably withheld.

IV.     Extraordinary Fees or Expenses:

Extraordinary fees are payable to the Agent for duties or responsibilities not expected to be incurred at the outset of the transaction, not routine or customary, and not incurred in the ordinary course of business, subject to prior written approval by both Buyer and Seller, which approval shall not be unreasonably withheld. Extraordinary services might include amendments, specialized reporting, use investments not automated with the Escrow Agent's trust accounting system, and actual or threatened litigation or arbitration proceedings.

<u>IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT</u>

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

EXHIBIT C

**Authorized Signatories:**

**Buyer:**

The following person(s) are hereby designated and appointed as authorized representatives of Buyer **(only one signature shall be required for any direction):**

_____
Name

_____
Specimen signature

_____
Name

_____
Specimen signature

_____
Name

_____
Specimen signature

**Seller:**

The following person(s) are hereby designated and appointed as authorized representatives of Seller **(only one signature shall be required for any direction):**

_____
Name

_____
Specimen signature

_____
Name

_____
Specimen signature

_____
Name

_____
Specimen signature

## **Exhibit C**

## **Form of Sale Order**

See attached.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**************************************************************************

In re:

DUKE AND KING ACQUISITION CORP.,

Debtors.

(includes:
Duke and King Missouri, LLC;
Duke and King Missouri Holdings, Inc.;
Duke and King Real Estate, LLC;
DK Florida Holdings, Inc.)

**JOINTLY ADMINISTERED UNDER
CASE NO. 10-38652**

Court File No. 10-38652

Court File Nos:

10-38653 (GFK)
10-38654 (GFK)
10-38655 (GFK)
10-38656 (GFK)

Chapter 11 Cases
Chief Judge Gregory F. Kishel

**************************************************************************

**ORDER AUTHORIZING DEBTORS TO (I) SELL ASSETS FREE AND CLEAR OF
LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) ASSUME AND ASSIGN
CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND
(III) ESTABLISH CURE COSTS**

**************************************************************************

The sale motion of above-referenced Debtors for Orders (I) Authorizing Debtors to Sell

Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing

Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing

Cure Costs; (III) Scheduling a Hearing on Stalking Horse; (IV) Approving Stalking Horse

Protection Fee; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further

Hearing (the "Sale Motion") came before the undersigned on May 10, 2011. [_____] (the

"Buyer")has been named as the Successful Bidder[1] at the Group One Auction for the Acquired

Assets that are identified in that certain asset purchase agreement dated April __, 2011, by and

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale
Motion or the APA, as applicable.

among [_____] and [_____] (the "APA"), as attached hereto as <u>Exhibit 1</u>. Appearances were noted on the record.

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS HEREBY FOUND THAT:**[2]

A.     This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.     Venue of the Debtors' chapter 11 cases (the "Chapter 11 Cases") in this District is proper pursuant to 28 U.S.C. § 1409(a).

C.     Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N). The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

D.     This Sale Approval Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Approval Order, and expressly directs entry of judgment as set forth herein.

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. <u>See</u> Bankruptcy Rule 7052.

E.     A hearing on the Debtors' Motion for an Order Approving Sale and Bidding Procedures was held by this Court on January 24, 2011, and, on that date, the Court entered the Order Approving Sale and Bidding Procedures (the "Procedures Order").  The Debtors and the Buyer have complied with the Procedures Order in all respects.

F.     Pursuant to the Procedures Order, the Debtors timely received __ Qualified Bids on or before April 19, 2011, and the Group One Auction was conducted on April 26, 2011, by the Debtors, in consultation with their advisors and investment banker, Mastodon Ventures, Inc. The Sale Procedures Order (as amended)[3] set May 10, 2011 as the date of the hearing (the "Sale Approval Hearing") for an order to approve the sale (the "Sale Approval Order").

G.     On April __, 2011, the Debtors filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2).  On April __, 2011, the Debtors served the Notice of Sale and Bidding Procedures in compliance with the Sale Procedures Order.  On April __, 2011, the Debtors served the Notice Concerning Unexpired Leases and Executory Contracts and Establishing Cure Costs on the counterparties to such leases and contracts.

H.     On April __, 2011, the Court entered the Order (A) Approving Stalking Horse Bidders; (B) Approving Form of Stalking Horse Asset Purchase Agreement, and (C) Approving Stalking Horse Protection Fee, which, among other things, approved a stalking horse bidder for the Acquired Assets located in the _____ Region.

I.     Based upon the foregoing and the certificates of service and publication filed with the Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired

Contracts and the proposed rejection of the contracts has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008 and in compliance with the Procedures Order and no other or further notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts or the entry of this Sale Approval Order is required or necessary.

J.      All parties in interest, including, without limitation, all parties who claim an interest in or lien upon the Acquired Assets, all shareholders of the Debtors, all federal, state and local environmental authorities, and all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the sale of Acquired Assets may have, claims, contingent or otherwise against the Debtors, have been given a reasonably opportunity to object and be heard, regarding the relief requested in the Sale Motion.   All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Approval Hearing.

K.      As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (i) the offer from the Buyer constitutes the highest and best offer for the Acquired Assets; (ii) the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Procedures Order; (iii) the auction process set forth in the Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets; and (iv) the Group One Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and

---

[3]  The timeline set forth in the Procedures Order was subsequently amended by stipulation.

a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

L.     In accordance with the Procedures Order, the APA was deemed a Qualified Bid (as defined in the Sale Procedures) and was eligible to participate at the Group One Auction.

M.     The APA constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

N.     The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.

O.     The purchase price as set forth in the APA (the "Purchase Price") for the Acquired Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  Approval of the APA and the sale of the Acquired Assets in accordance with this Sale Approval Order and the APA are in the best interests of the Debtors' estates, creditors and other parties in interest.  The terms of the APA were negotiated at arms' length and are fair and reasonable under the circumstances.

P.     The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state,

territory, possession or the District of Columbia. Neither the Debtors nor the Buyer is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q.    The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes for the sale of the Acquired Assets pursuant to section 363(b) of the Bankruptcy Code outside of a plan of reorganization.

R.    Each of the Debtors, as applicable, (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Acquired Assets by the Debtors has, in each case, been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.   No third-party approvals, other than those expressly provided for in the APA, if any, are required by the Debtors to consummate such transactions.

S.    The Debtors are authorized and directed to sell and transfer the Acquired Assets free and clear of all Claims (as that term is defined in paragraph 7 hereof) because they have satisfied the requirements of section 363(f) of the Bankruptcy Code.

T.    Those holders of Claims against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the sale or the Sale Motion are deemed to have consented to the sale pursuant to section 363(f)(2) of the Bankruptcy Code.  The Debtors have met the requirements of section 363(f) with respect to all other holders of Claims as such Claim holders will have their Claims, if any, in each instance against the Debtors, their

estates or any of the Acquired Assets, attach to the net cash proceeds of the sale ultimately attributable to the Acquired Assets, in which such creditor alleges a Claim, in the same order of priority, with the same validity, force and effect that such Claims had prior to the sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

U.     The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Acquired Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Assumed Leases and Acquired Contracts were not free and clear of all Claims.

V.     The APA was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion.

W.     The Debtors have followed in good faith the procedures for notice and sale of the Acquired Assets as set forth in the Procedures Order.

X.     The Buyer is not an "insider" or "affiliate" of the Debtors (as each such term is defined in the Bankruptcy Code).  Neither the Debtors nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) of the Bankruptcy Code to the sale and the transactions contemplated by the APA. Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate price paid by Buyer for the Acquired Assets was not controlled by any agreement among the bidders.

Y.     The Buyer is entitled to the protections afforded under section 363(m) of the Bankruptcy Code because the Buyer is a good faith purchaser in that, *inter alia*:  (i) except as set forth in the Procedures Order, the Buyer recognized that the Debtors were free to deal with any

other party interested in acquiring the Acquired Assets; (ii) the Buyer complied with the provisions in the Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Procedures Order; (iv) the Buyer in no way induced or caused the chapter 11 filings by the Debtors; (v) all payments to be made by the Buyer in connection with the sale have been disclosed; (vi) no common identity of directors or controlling stockholders exists between the Buyer and any of the Debtors; and (vii) the negotiation and execution of the APA was at arms' length and in good faith.

Z. In the absence of a stay pending appeal, if any, if the Closing occurs at any time after entry of this Sale Approval Order, then, with respect to the APA, the Buyer, as a purchaser in good faith of the Acquired Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Sale Approval Order or any authorization contained herein is reversed or modified on appeal.

AA. The Debtors are the sole and lawful owners of the Acquired Assets. Effective as of the Closing, the transfer of the Acquired Assets is or will (i) be legal, valid and effective transfers of property of the Debtors' estates to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the Debtors and the Debtors' estates in and to the Acquired Assets free and clear of all Claims (as defined in paragraph 7 herein) under sections 363(f) and 105 of the Bankruptcy Code.

BB. The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign those Assumed Leases and Acquired Contracts, as defined in the APA and described on **[Schedules ____ and ____]** to the APA, including any amendments or modifications to such exhibits as agreed to by the Debtors and Buyer pursuant to the APA, in connection with the consummation of the sale of Acquired Assets, and the assumption and

assignment of the Assumed Leases and Acquired Contracts is in the best interests of the Debtors, their estates, their creditors and their equityholders.

CC.    The Assumed Leases and Acquired Contracts being assigned to the Buyer as set forth in the APA are an integral part of the Debtors' businesses being purchased by the Buyer and, accordingly, such assumption and assignment of Assumed Leases and Acquired Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

DD.    The Assumed Leases and Acquired Contracts are unexpired leases or executory contracts within the meaning of the Bankruptcy Code.

EE.    All amounts which are required to be paid in connection with the assumption and assignment of the Assumed Leases and Acquired Contracts that are due or owing under sections 365(b)(1)(A) and (B), and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or (ii) pay all actual or pecuniary losses that have resulted from such defaults (except with respect to those liabilities expressly assumed by the Buyer pursuant to the APA) are set forth on Exhibit 2 hereto (the "Cure Costs").

FF.    Any objections to the Cure Costs associated with such Assumed Leases and Acquired Contracts are resolved as set forth on Exhibit 2 to this Sale Approval Order.  To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Assumed Lease or Acquired Contract or (ii) the Cure Cost associated with the applicable Assumed Lease or Acquired Contract, such counterparty is deemed to have consented to such Cure Cost and the assumption and assignments of its

respective Assumed Lease or Acquired Contract to the Buyer as expressly set forth on <u>Exhibit 2</u> to this Sale Approval Order.

GG.    The promises of Buyer and/or the Debtors to pay the Cure Costs and the Buyer's promise to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order that are being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

HH.    Adequate notice and opportunity to be heard was provided to counterparties to executory contracts and unexpired leases to be assumed and assigned pursuant to this Sale Approval Order.  Further, counterparties received adequate notice and an opportunity to object to the amount of any Cure Costs owed by the Debtors' estates on account of any executory contract or unexpired lease to be assumed and assigned to the Buyer under the APA.

II.    The assumption and assignment of the Assumed Leases and Acquired Contracts is integral to the APA and is in the best interests of the Debtors and their estates, creditors and equityholders and represents the exercise of the Debtors' sound business judgment.

JJ.    Any objections to the assumption and assignment of any of the Assumed Leases and Acquired Contracts to the Buyer are hereby overruled.

KK.    Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (ii) have, de facto or otherwise, merged with or into any of the Debtors; (iii) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Buyer and the Debtors); or (iv) be holding itself out to the public as a

continuation of the Debtors.  The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the APA with respect to the Assumed Liabilities.

LL.     The Debtors have good, valid and marketable title to all of the Acquired Assets. The Acquired Assets are to be transferred free and clear of any and all Claims.  All of the Acquired Assets are, or will on the Closing Date, be owned by the Debtors and will be transferred under the APA.

**IT IS HEREBY ORDERED:**

<u>**General Provisions**</u>

1.      The Sale Motion is hereby granted to the extent provided herein.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Approval Order, are overruled on the merits.

<u>**Approval of the APA**</u>

3.      Each and every term of the APA (attached hereto as <u>Exhibit 1</u>) and all other ancillary documents is hereby approved.

4.      The sale of the Acquired Assets to Buyer pursuant to the APA is hereby authorized under section 363(b) of the Bankruptcy Code and the entry of the Debtors into the APA is hereby approved.  The proceeds from the sale of the Acquired Assets as provided in the APA shall be paid directly to **[_____]**, pending further order of the Court.

5.      The Debtors, through any corporate officer, are authorized and directed to execute and deliver, and empowered to fully perform under, consummate, implement and close the APA,

together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, including taking any actions that otherwise would require further approval by shareholders or their respective boards of directors (without the need of obtaining such approvals) and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations of the Debtors under the APA, including effectuating amendments to the APA in furtherance thereof. All Persons necessary to effect the transactions contemplated by the APA are hereby ordered to execute any and all documents necessary to effect such transactions. If any Person fails to comply with the provisions of this paragraph 5 prior to the Closing Date, such Person (or Persons, as the case may be) shall nonetheless be deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

6.      The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Approval Order.

**<u>Transfer of the Acquired Assets</u>**

7.      Pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Buyer, in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest the Buyer with title to the Acquired Assets, free and clear of all Interests (as described in

section 363(f) of the Bankruptcy Code) and claims (as defined in section 101(5) of the Bankruptcy Code), including claims of equity security holders (as defined in section 101(17) of the Bankruptcy Code), security interests, liens (as defined in section 101(37) of the Bankruptcy Code, and including but not limited to, mechanics', materialmens' and other consensual or statutory liens), obligations, mortgages, demands, guaranties, options, rights (including, but not limited to, rights of first refusal, rights of way and rights of recovery), contractual commitments, pledges, restrictions (including, but not limited to, any restriction on the use, transfer, receipt of income or other exercise of any attributes of ownership of the Acquired Assets and all debts arising in any way in connection with any acts of the Debtors), encumbrances, personal injury and other tort claims, covenants, defects, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, conditional sale or other title retention agreements, options, contracts, offsets, recoupment, rights of recovery, judgments, orders, and decrees of any court or governmental entity, interests, successor, transferee, products liability, environmental, tax and other liabilities and claims of any kind or nature, mechanics' liens, financing statements or any claims arising under the Workers Adjustment Restraining and Notification Act, 29 U.S.C. § 2101, et seq., or any collective bargaining agreements or other applicable law, whether arising prior to or subsequent to the commencement of the Chapter 11 Cases, whether arising in connection with the transactions authorized by this Sale Approval Order, and whether imposed by agreement, understanding, law, equity or otherwise, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown (the foregoing collectively referred to as "Claims" herein; provided, however, the term Claims shall not include Assumed Liabilities), except as

otherwise set forth in the APA and arising as the Closing Date. All such Claims released, terminated and discharged as to the Acquired Assets shall attach to the sale proceeds with the same validity, force and effect which they now have as against the Debtors, the estates or the Acquired Assets.

8.     All persons and entities (including, but not limited to, the Debtors, creditors, equityholders, including, without limitation, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees thereof, shall be and are hereby permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquired Assets or the Buyer and its successors or assigns as alleged successor or otherwise with respect to any Claims of any kind and nature with respect to the Acquired Assets other than Assumed Liabilities, except as otherwise provided in the APA. If the proposed sale to the Buyer fails to close for any reason, then Claims shall continue against the Acquired Assets unaffected by this Sale Approval Order.

9.     Except for Assumed Liabilities as set forth in the APA, the transfer of the Acquired Assets pursuant to this Sale Approval Order shall not subject the Buyer to any liability with respect to any obligations incurred in connection with, or in any way related to the Acquired Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

**Assumption and Assignment to Buyer of Assumed Leases and Acquired Contracts**

10.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the APA, of the Assumed Leases and Acquired Contracts specified in this Sale Approval Order is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

11.     The Debtors are authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Assumed Leases and Acquired Contracts specified on Exhibit 2 to in this Sale Approval Order; and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Leases and Acquired Contracts specified in this Sale Approval Order.

12.     With respect to the Assumed Leases and Acquired Contracts: (a) each Assumed Lease and Acquired Contract, as applicable, is an unexpired lease or executory contract under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assumed Leases and Acquired Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assumed Lease and Acquired Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Lease or Acquired Contract that prohibit or condition the assignment of such Assumed Lease or Acquired Contract or allow the party to such Assumed Lease or Acquired Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Lease or Acquired Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under

sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Lease and Acquired Contract have been satisfied; and (e) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Lease and Acquired Contract set forth on Exhibit 2 hereto.

13.     Each of the Assumed Leases and Acquired Contracts specified on Exhibit 2 to this Sale Approval Order, upon assignment to the Buyer, shall be deemed to be valid and binding on the Buyer and in full force and effect and enforceable in accordance with their terms, and following such assignment, the Debtors and the estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, any liability for any breach of such Assumed Leases and Acquired Contracts occurring after such assignment.

14.     Each non-Debtor party to an Assumed Lease and Acquired Contract specified in this Sale Approval Order is hereby barred and enjoined from asserting against the Buyer, the Debtors or the Debtors' estates (a) any default existing as of the date of the Sale Approval Hearing if such default was not raised or asserted in a timely manner prior to the entry of this Sale Approval Order or (b) any objection to the assumption and assignment of such non-Debtor party's Assumed Leases and Acquired Contracts or the Cure Cost, if any, of which the non-Debtor party was given notice prior to the Sale Hearing.  The assignment of each such Assumed Leases and Acquired Contracts to the Buyer will not cause a default or otherwise allow the non-Debtor party thereto to terminate or adversely affect the Buyer's rights thereunder.

15.     All defaults or other obligations of the Debtors under the Assumed Leases and Acquired Contracts arising or accruing prior to the satisfaction of the terms and conditions of the APA and the closing of the transactions contemplated under the APA (without giving effect to

any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer or the Debtors (in accordance with the APA) by payment of the applicable Cure Costs (such amounts as established in accordance with this Sale Approval Order and set forth hereto on Exhibit 2) at the closing or as soon thereafter as practicable, and the Buyer shall have no liability or obligation with respect to defaults, breaches or other obligations incurred, arising or accruing prior to the Closing Date, except as otherwise expressly provided herein or in the APA.

16.     The payment of the applicable Cure Costs, in the amounts set forth on Exhibit 2 hereto and in accordance with the APA, shall (a) effect a cure of all defaults existing thereunder as of the date that such Assumed Lease or Acquired Contract is assumed and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.  To the extent that any counterparty to an Assumed Lease or Acquired Contract did not object timely to its Cure Costs in accordance with the Procedures Order, such counterparty is deemed to have consented to such Cure Cost and the assignments of its respective Assumed Lease or Acquired Contract to the Buyer.

17.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption, assignment and/or transfer of the Assumed Leases and Acquired Contracts.

18.     The Debtors' or the Buyer's (or its designated affiliate's) promise to pay the Cure Costs and to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing Date shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order being assigned to it within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

19. Notwithstanding anything to the contrary in this Sale Approval Order, no Acquired Contract or Assumed Lease shall be deemed to be assumed and assigned to the Buyer until the Closing of the sale.

20. The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Lease or Acquired Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Leases and Acquired Contracts.

## Additional Provisions

21. The transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale to the Buyer. The Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

22. The consideration provided by the Buyer for the Acquired Assets under the APA (a) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of Columbia and (b) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

23. Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (a) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities

as expressly stated in the APA); (b) have, de facto or otherwise, merged with or into any of the Debtors; (c) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Buyer and the Debtors); or (d) be holding itself out to the public as a continuation of the Debtors.

24.     Each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be reasonably necessary to release such creditor's Claims in the Acquired Assets, if any, as such Claims may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Claims in, against or upon the Acquired Assets prior to the Closing Date of the sale, in proper form for filing and executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction, releases of all Claims which the person or entity has with respect to the Acquired Assets, then on the Closing Date, or as soon as possible thereafter, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Buyer is hereby authorized on behalf of each of the Debtors' creditors, to file, register, or otherwise record a certified copy of this Sale Approval Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Claims in, against, or upon the Acquired Assets of any kind or nature whatsoever.

25.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date, or as otherwise directed by the Buyer, with the Claims of such entity to be satisfied solely from the proceeds of the sale.

26.     Subject to the APA, this Sale Approval Order (a) is and shall be effective as a determination that, at Closing, all Claims (except Assumed Liabilities) existing as to the Acquired Assets prior to the date of the Closing have been and hereby are unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyance described in this Sale Approval Order has been effected; (b) is and shall be effective to cause all Claims (except Assumed Liabilities) to attach to and be perfected in the proceeds of the Sale of the Acquired Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, without the need to file any financing statements or other evidence of perfection; and (c) is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

27.     The Debtors or the Buyer and any agent or representative of either of them, are each hereby authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation. deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Sale Approval Order and the APA to evidence and implement this paragraph of this Sale Approval Order. All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments,

modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Sale Approval Order or the APA and the various documents related thereto.

28. This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (b) compel delivery of the Acquired Assets to the Buyer, (c) resolve any disputes arising under or related to the APA and related agreements, (d) enjoin and adjudicate the assertion of any Claims against the Buyer or the Acquired Assets, and (e) interpret, implement and enforce the provisions of this Sale Approval Order.

29. As of the Closing, all agreements and all orders of this Court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Approval Order and the APA.

30. Nothing contained (a) in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, (b) the order of confirmation confirming any plan of reorganization (or liquidation), (c) any order dismissing the Chapter 11 Cases or converting it to a chapter 7 liquidation or (d) any order appointing an examiner or trustee in the case shall conflict with or derogate from the provisions of the APA or the terms of this Sale Approval Order and no such plan or order shall discharge the obligations of the Debtors under this Sale Approval Order or the APA or any documents or agreements delivered in connection therewith.

31. The terms and provisions of the APA, together with the terms and provisions of this Sale Approval Order, shall be binding in all respects upon, and inure to the benefit of, the Buyer, the Debtors, the Debtors' estates, any of Debtors' affiliates, successors and assigns, the Debtors' creditors, equityholders, including, without limitation, minority equityholders of the

Debtors, and third parties, including, but not limited to persons asserting a Claim against or interest in the Debtors' estates or any of the Acquired Assets to be sold to the Buyer pursuant to the APA or any persons that are party to any Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date, and their respective successors and assigns. If a trustee or examiner is subsequently appointed in the Chapter 11 Cases, such trustee or examiner shall likewise be bound, in all respects, to the terms and provisions of this Sale Approval Order.

32.    The failure specifically to include any particular provisions of the APA in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

33.    The provisions of Bankruptcy Rules 6004(h) and 6006(d) staying the effectiveness of this Sale Approval Order for fourteen days are hereby waived, and this Sale Approval Order shall be effective immediately upon entry.

34.    To the extent that this Sale Approval Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Chapter 11 Cases, the terms of this Sale Approval Order shall govern.

Dated:                                          _____
                                                Gregory F. Kishel
                                                United States Chief Bankruptcy Judge

## <u>Schedule A</u>
## Davenport Regional Stores

| | | | | |
|---|---|---|---|---|
| *1* | 04043 | 229 West Kimberly Road | Davenport | IA |
| *2* | 04201 | 5231 N Brady Street | Davenport | IA |
| *3* | 04297 | 4040 38th Avenue | Moline | IL |
| *4* | 06211 | 1222 Avenue of the Cities | East Moline | IL |

**Schedule 1.1(h)**
**Acquired Contracts List**

1. Store 4043 -   Lease dated August 11, 2005, between Seller, as assignee of Nath Illinois Operating Group, LLC, and Christopher K. Guthrie, as Trustee of the Keith Guthrie Trust under Trust Agreement dated February 8, 2001, Landlord, as assignees of CNL Net Lease Funding 2003, LLC.

2. Store 4201 -   Lease dated August 11, 2005, between Seller, as assignee of Nath Illinois Operating Group, LLC, and Gabe Fazzini and Karen Fazzini, Landlord, as assignees of CNL Net Lease Funding 2003, LLC.

3. Store 4297 -   Lease dated June 30, 2006, between Seller, as assignee of Nath Illinois Franchise Group, and Mihailo Chukalovich, Landlord, as assignee of RAI Restaurants, Inc.

4. Store 6211 -   Lease dated August 11, 2005, between Seller, as assignee of Nath Illinois Operating Group, LLC, and Vanowen Street, LLC and Moche Chalem and Elizabeth Chalem, Landlord, as assignees of CNL Net Lease Funding 2003, LLC.

5. Store 4043 -   Burger King Franchise Agreement dated June 30, 2000 between Burger King Corporation and Nath Illinois Franchise Group, Inc.

6. Store 4201 – Burger King Franchise Agreement dated June 30, 2000 between Burger King Corporation and Nath Illinois Franchise Group, Inc.

7. Store 4297 – Burger King Franchise Agreement dated December 16, 2004 between Burger King Corporation and Nath Illinois Franchise Group, Inc.

## **Schedule 1.2**

## **Excluded Assets**

None.

## Schedule 2.8

## Total Consideration Allocations

To be completed on or before Closing.

# EXHIBIT D

## TO SALE MOTION

**ASSET PURCHASE AGREEMENT**

among

**HEARTLAND FOOD CORP.,**

**as "Buyer,"**

and

**DUKE AND KING ACQUISITION CORP.**

**as "Seller"**

**Dated April 11, 2011**

## TABLE OF CONTENTS

**ARTICLE I.    PURCHASE AND SALE OF THE ACQUIRED ASSETS** ...........1

Section 1.1    Transfer of Acquired Assets.........................................................1
Section 1.2    Excluded Assets. ........................................................................3
Section 1.3    Assumption of Liabilities. ............................................................4
Section 1.4    Excluded Liabilities. ...................................................................5
Section 1.5    Post-Closing Liabilities.................................................................6
Section 1.6    Buyer's Pre-Closing Right to Modify Schedules............................6

**ARTICLE II.    CONSIDERATION** .......................................................................6

Section 2.1    Purchase Price. ..........................................................................6
Section 2.2    Purchase Price Adjustment. ........................................................6
Section 2.3    Closing Payments........................................................................8
Section 2.4    Payment of Cure Costs................................................................9
Section 2.5    On-Hand Cash. ...........................................................................9
Section 2.6    On-Hand Inventory. .....................................................................9
Section 2.7    Transaction Taxes. ....................................................................10
Section 2.8    Allocation of Total Consideration................................................10

**ARTICLE III.    CLOSING AND DELIVERIES** ....................................................10

Section 3.1    Closing. ....................................................................................10
Section 3.2    Seller' Deliveries.......................................................................10
Section 3.3    Buyer's Deliveries......................................................................11

**ARTICLE IV.    REPRESENTATIONS AND WARRANTIES** .................................11

Section 4.1    Representations and Warranties of Seller. ..................................11
Section 4.2    Representations and Warranties of Buyer...................................12
Section 4.3    Warranties Are Exclusive. .........................................................14

**ARTICLE V.    COVENANTS AND OTHER AGREEMENTS** ...............................14

Section 5.1    Covenants of Seller. ..................................................................14
Section 5.2    Covenants of Buyer. ..................................................................15
Section 5.3    Other Covenants........................................................................16
Section 5.4    Confidentiality............................................................................17

**ARTICLE VI.    CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES** .......17

Section 6.1    Conditions Precedent to Performance by Seller...........................17
Section 6.2    Conditions Precedent to the Performance by Buyer. ...................18

**ARTICLE VII.    TERMINATION** .......................................................................18

Section 7.1    Conditions of Termination. .........................................................18
Section 7.2    Effect of Termination; Remedies. ...............................................19
Section 7.3    Exclusive Remedy; Waiver. ........................................................21

**ARTICLE VIII.    SURVIVAL AND INDEMNIFICATION**........................................21

Section 8.1    Survival; Indemnification............................................................21

**ARTICLE IX.    MISCELLANEOUS**................................................................................**21**

    Section 9.1      Alternative Transaction...................................................21
    Section 9.2      Further Assurances........................................................21
    Section 9.3      Successors and Assigns..................................................21
    Section 9.4      Governing Law; Jurisdiction...........................................21
    Section 9.5      Expenses.......................................................................22
    Section 9.6      Broker's and Finder's Fees. ............................................22
    Section 9.7      Severability. .................................................................22
    Section 9.8      Notices..........................................................................22
    Section 9.9      Amendments; Waivers. ..................................................23
    Section 9.10    Public Announcements...................................................23
    Section 9.11    Entire Agreement. .........................................................24
    Section 9.12    No Third Party Beneficiaries. ........................................24
    Section 9.13    Headings.......................................................................24
    Section 9.14    Counterparts; Delivery. .................................................24
    Section 9.15    Construction. ................................................................24
    Section 9.16    Bulk Sales.....................................................................25

**ARTICLE X.    DEFINITIONS** .........................................................................**25**

## EXHIBITS

Exhibit A...................................................................................Sale Procedures

Exhibit B ...............................................................Form of Deposit Escrow Agreement

Exhibit C ..............................................................................Form of Sale Order

## SCHEDULES

Schedule A....................................................................Minnesota Region Stores List

Schedule B ...................................................................Franchise Agreements List

Schedule 1.1(g) .............................................................Acquired Contracts List

Schedule 1.2(l) ...................................................................Excluded Assets List

Schedule 1.2(m)........................................................Rejected Real Property Leases

Schedule 2.8...............................................................Allocation of Purchase Price

<u>**ASSET PURCHASE AGREEMENT**</u>

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 11, 2011 (the "**Execution Date**"), is made by and between **DUKE AND KING ACQUISITION CORP.,** a Delaware corporation ("**Seller**"), and **HEARTLAND FOOD CORP.,** a Delaware corporation ("**Buyer**"). Unless otherwise set forth herein, capitalized terms used in this Agreement are defined or cross-referenced in <u>Article X</u>.

## RECITALS

WHEREAS, on December 4, 2010 (the "**Petition Date**"), Seller commenced voluntary cases (collectively, the "**Bankruptcy Case**") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**");

WHEREAS, this Agreement shall constitute the APA (as such term is defined in the Sale Procedures);

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, assign, transfer, convey and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code; and

WHEREAS, Buyer has made, or will make concurrent with the execution of this Agreement, a deposit in an amount equal to ten percent (10%) of the Unadjusted Purchase Price (the "**Deposit**") into an escrow account (the "**Deposit Escrow Account**") to be established and governed by the terms of the Deposit Escrow Agreement executed concurrently herewith.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE I.     <u>PURCHASE AND SALE OF THE ACQUIRED ASSETS</u>

**Section 1.1**    <u>**Transfer of Acquired Assets**</u>. At the Closing, and upon the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens, Claims and Interests, and Buyer shall purchase from Seller, all of Seller's right, title and interest of every kind and nature (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) in each of the Minnesota Region Stores as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, but excluding the assets, properties and rights included in the Excluded Assets pursuant to <u>Section 1.2</u> (collectively, the "**Acquired Assets**"):

(a)    Petty and other restaurant operating cash (excluding cash in-transit) on-hand at the Minnesota Region Stores on the Closing Date in the amount determined pursuant to <u>Section 2.5</u> (the "**On-Hand Cash**");

(b)    The leased real property of Seller leased pursuant to the leases included in the Acquired Contracts, to the extent assignable and transferable, including all Leasehold Improvements thereon (collectively, the "**Leased Real Property**");

(c)    All tangible personal property, including all machinery, equipment, supplies, materials, office furniture and office equipment, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, computing and telecommunications equipment and other items of personal property owned or leased by Seller for use in the Minnesota Region Stores, and all warranties and licenses thereunder or related thereto;

(d)    Prepaid expenses of Seller, but solely to the extent the benefit of such prepaid expenses accrue to Buyer post-Closing ("**Prepaid Expenses**");

(e)    All deposits, advances, prepayments, rights in respect of promotional allowances, vendor rebates and to other refunds, Claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail and other communications of the Seller (**"Acquired Deposits"**), but excluding the Rebates, Utility Deposits and Corporate Level deposits;

(f)    All advertising and promotional materials and any rights thereto possessed, or entitled to be used, by Seller;

(g)    The Contracts listed on <u>Schedule 1.1(g)</u>, to the extent assignable and transferable, other than those excluded by Buyer from the Acquired Assets pursuant to <u>Section 1.2(m)</u> hereof (if any), but including all contractual rights (including rights to indemnification, exculpation, advancement or reimbursement of expenses), Claims, causes of action, choses in action, lawsuits, demands and judgments in law or in equity, of every kind and nature, that Seller has or may have against any other Person and that are related to the Acquired Contracts, other than those excluded pursuant to <u>Section 1.2</u> (the "**Contract Claims**" and such acquired contracts, the "**Acquired Contracts**");

(h)    All Inventory (as valued pursuant to <u>Section 2.6</u>) (the "**On-Hand Inventory**") and all Supplies on-hand in the Minnesota Region Stores;

(i)    All permits, registrations, Orders, operating permits, certificates of occupancy, approvals, authorizations and licenses (collectively, the "**Permits**") issued to Seller by any Government or other third party, to the extent assignable;

(j)     All insurance benefits, rights and proceeds arising from or relating to any event or incident that affects, impacts or alters any Acquired Asset between the Execution Date and the Closing Date;

(k)     Except as otherwise excluded under Section 1.2, all rights, Claims, rights of offset, causes of action, lawsuits, judgments and other Claims or demands of any nature against any third party arising out of, and only with respect to, the Acquired Assets or Assumed Liabilities;

(l)     All books, files and records held or otherwise owned by Seller that relate to current or former employees and other personnel, including, without limitation, books, files and records that are related to medical history, medical insurance or other medical matters and to workers' compensation and to the evaluation, appraisal or performance of current or former employees and other personnel of Seller (collectively, the "**Employee Records**");

(m)     Copies of all books, files and records of sales and general business operations of the Minnesota Region Stores, and Seller's supplier lists for the Minnesota Region Stores;

(n)     All goodwill as a going concern and all other right, title and interest of Seller in and to the general intangibles incident to its business at the Minnesota Region Stores;

(o)     Any and all computer applications, software, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage, all computer operating, security or programming software, owned or licensed by the Seller, and, in each case, all source code, executable code, data, databases and related documentation of any of the foregoing and copies and tangible embodiments of any of the foregoing in whatever form or medium, except to the extent included in the Corporate Levels Assets;

(p)     All telephone numbers, fax numbers, email addresses, websites, URLs and internet domain names, except to the extent included in the Corporate Levels Assets; and

(q)     All Claims and rights of action arising under Chapter 5 of the Bankruptcy Code relating to any of the Critical Vendors, including any proceeds thereof.

**Section 1.2     Excluded Assets**.     Notwithstanding anything to the contrary in this Agreement, Seller shall retain its right, title and interest in, to and under all of its properties, assets and rights not otherwise an Acquired Asset (collectively, the "**Excluded Assets**"), including, those assets, properties and rights of Seller that are not included in or used in the operation of the Minnesota Region Stores and:

(a)     All of Seller's cash, checks, cash equivalents, and cash in-transit, but excluding On-Hand Cash;

(b)     All trade accounts receivable of Seller in existence as of the Closing Date (collectively, the "**Accounts Receivable**");

(c)     All amounts and funds (rebates and dividends) on account of, accrued by or due from The Coca-Cola Company, Dr. Pepper/Seven Up Company or Restaurant Services, Inc., or any affiliate thereof, to Seller pursuant to any agreement or arrangement with such companies for all periods prior to the Closing (collectively, the "**Rebates**");

(d)     All equity ownership interests in Seller;

(e)     All rights to refunds of, credits for, and Claims in connection with Taxes of Seller, and any records relating to Taxes of Seller;

(f)     Subject to <u>Section 1.1(j)</u>, all insurance premiums, policies, contracts and coverage obtained by Seller and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries;

(g)     Subject to <u>Section 1.1(q)</u>, all avoidance Claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related Claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing;

(h)     All rights of and benefits to Seller under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement;

(i)     Each Contract to which Seller is a party that is not an Acquired Contract and all deposits, Claims, rebates or refunds thereunder or related thereto;

(j)     All utility deposits paid by Seller prior to the Closing Date and all rights to the refund of all or any portion thereof ("**Utility Deposits**");

(k)     All Corporate Level assets, properties and right;

(l)     The assets listed on <u>Schedule 1.2</u>;

(m)    Subject to <u>Section 1.6</u>, the real property leased to Seller pursuant to the real property leases listed on <u>Schedule 1.2(m)</u>, including all Leasehold Improvements thereon (collectively, the "**Rejected Leased Real Property**"); and

(n)     Corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of Seller.

**Section 1.3     <u>Assumption of Liabilities</u>**. At the Closing, Buyer shall not assume any obligations or Liabilities from Seller other than those obligations and Liabilities expressly listed

below (all such Liabilities and obligations assumed pursuant to this Section 1.3, the "**Assumed Liabilities**"):

(a)  To the extent reflected on the Final Closing Net Working Capital Statement, all accounts payables of the Minnesota Region Stores arising in the ordinary course of business after the Petition Date (which, for clarity, does not include (i) Corporate Level accounts payable of Seller and (ii) Liabilities arising from breach of contract, breach of warranty, tort, infringement, lawsuits or violation of Law by Seller prior to the Closing Date) (collectively, the "**Accounts Payable**");

(b)  To the extent reflected on the Final Closing Net Working Capital Statement, all accrued operating expenses of the Minnesota Region Stores arising in the ordinary course of business after the Petition Date, including The Coca-Cola Company and Dr. Pepper/Seven Up Company Restaurant Operating Fund Advances (which, for clarity, does not include Corporate Level accrued expenses of Seller) ("**Accrued Expenses**");

(c)  All accrued but unpaid real estate and personal property Taxes, and other related assessments and fees, if any, related to or arising from the ownership of the Acquired Assets (the "**Property Taxes**"); and

(d)  To the extent reflected on the Final Closing Net Working Capital Statement, all accrued but unpaid wages, salaries, benefits, vacation pay, employee-related Taxes, and temporary labor Liabilities of the Minnesota Region Stores payable in the ordinary course of business as of the Closing (collectively, "**Payroll Liabilities**").

This Section 1.3 shall not limit any claims or defenses Buyer may have against any party other than the Seller. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against Buyer or the Seller as compared to the rights and remedies which such third party would have had against the Seller had Buyer not assumed such Assumed Liabilities.

**Section 1.4   Excluded Liabilities**.  Buyer is assuming only the Assumed Liabilities and is not assuming, and shall not be the successor to, any other Liability or obligation of Seller or any predecessor or Affiliate of Seller whatsoever, or any Liability or obligation related to Seller's businesses of any nature (either pre-petition or post-petition), including, any direct or indirect Indebtedness, guaranty, endorsement, Claim, loss, damage, deficiency, cost, expense, obligation or responsibility, whether fixed or unfixed, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, due or to become due, choate or inchoate, liquidated or unliquidated, secured or unsecured.  All such other Liabilities and obligations shall be retained by, and remain Liabilities and obligations of, Seller (all such Liabilities are, collectively, the "**Excluded Liabilities**").  The Parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Buyer, except where such disclosed Liability or obligation has been expressly assumed by Buyer as an Assumed Liability under Section 1.3.

**Section 1.5** **Post-Closing Liabilities**. Buyer acknowledges that Buyer shall be responsible for all Liabilities and obligations relating to Buyer's ownership or use of, or right to use, the Acquired Assets and the Assumed Liabilities after the Closing Date, including without limitation all Taxes arising out of or related to the Acquired Assets or the operation or conduct of the business acquired pursuant to this Agreement for all Tax periods beginning on or after the Closing Date.

**Section 1.6** **Buyer's Pre-Closing Right to Modify Schedules.**

At any time prior to the Closing Date, Buyer shall have the sole right, in its absolute discretion, to modify the Schedules attached to this Agreement by:

deleting up to two (2) real property leases from the Acquired Contracts listed in Schedule 1.1(g); and

adding one or both of the leases deleted pursuant to Section 1.6(a) to Schedule 1.2(m).

provided, however, that Buyer's rights under this Section 1.6 are expressly pre-conditioned upon Buyer's delivery to Seller of evidence of Franchisor's written approval of the rejection of each such real property lease. The Total Consideration will not be increased or decreased as a result of any action taken pursuant to this Section 1.6. In addition, Buyer shall at its own expense, within ten (10) days of the Closing Date, remove all Acquired Assets and all Franchisor related signs, marketing and other similar identifying marks or items from the Rejected Leased Real Property in a manner satisfactory to Seller.

## ARTICLE II. CONSIDERATION

**Section 2.1** **Purchase Price.**

The aggregate consideration for the Acquired Assets shall be: (a) an aggregate amount in cash equal to $7,161,000.00 (which cash consideration shall be paid in accordance with Section 2.3) (the "**Unadjusted Purchase Price**"), subject to post-Closing adjustment as provided in Section 2.2 (as so adjusted, the "**Final Purchase Price**"); *plus* (b) the assumption by Buyer of the Assumed Liabilities (such assumption, together with the Final Purchase Price, the "**Total Consideration**").

**Section 2.2** **Purchase Price Adjustment**.

(a)     As promptly as practicable, but in no event later than thirty (30) days after the Closing Date, Seller shall prepare and deliver to Buyer a calculation (the "**Closing Net Working Capital Statement**") of Seller's Net Working Capital associated with the Minnesota Region Stores as of the close of business on the day before the Closing Date (which, subject to Sections 2.5 and 2.6, for purposes of clarity, may extend into the Closing Date for accounting purposes due to restaurants closing after midnight) (the "**Initial Net Working Capital**"), with appropriate supporting documentation.

(b)     If Buyer disagrees with the Initial Net Working Capital, Buyer may, within fifteen (15) days after receipt of the Initial Net Working Capital, deliver a notice to Seller disagreeing with such calculation and setting forth Buyer's calculation of such amount ("**Buyer's Notice**").  Buyer's Notice shall specify in reasonable detail those items or amounts as to which Buyer disagrees.

(c)     If Buyer's Notice is duly delivered, Buyer and Seller shall work in good faith and use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Net Working Capital associated with the Minnesota Region Stores as of the close of business on the day before the Closing Date.  If Buyer and Seller are unable to reach such agreement within ten (10) days from Seller's receipt of Buyer's Notice, the Bankruptcy Court shall determine the amount of the disputed items and the final Net Working Capital for the Minnesota Region Stores, provided, the Bankruptcy Court shall not assign a value greater than the greatest value for any item in dispute claimed by either party or smaller than the smallest value for such item claimed by either party.  In making such calculation, the Bankruptcy Court shall consider only those items or amounts in the Initial Net Working Capital with which Buyer disagreed.  The fees, costs and expenses of the Bankruptcy Court's review of the Net Working Capital pursuant to this Section 2.2(c) shall be paid (i) by the Seller if the items covered thereby are resolved in favor of Buyer or (ii) by Buyer if the items covered thereby are resolved in favor of the Seller.  If the items referred to therein are resolved in part in favor of the Seller and in part in favor of Buyer, such fees, costs and expenses shall be shared by the Seller and Buyer in proportion to the aggregate dollar amount of items resolved in favor of the Seller compared to the aggregate dollar amount of items resolved in favor of Buyer.  The amount of the Net Working Capital of the Minnesota Region Stores as of the close of business on the day before the Closing Date as determined pursuant to this Section 2.2(c) or Section 2.2(e) shall be referred to as the "**Closing Net Working Capital**."  The term "**Final Closing Net Working Capital Statement**," as used in this Agreement, shall mean the definitive Closing Net Working Capital Statement accepted by Buyer or otherwise agreed to by the Seller and Buyer in accordance with Section 2.2(e) or the definitive Closing Net Working Capital Statement resulting from the determinations made by the Bankruptcy Court in accordance with this Section 2.2(c) (in addition to those items theretofore accepted by the Seller or agreed to by the Seller and Buyer).

(d)     Buyer and Seller shall, and shall cause their respective Related Persons to, cooperate and assist in the calculation of Closing Net Working Capital and in the conduct of the reviews referred to in this Section 2.2, including, making available, to the extent necessary, their respective books, records, work papers and personnel.  All amounts to be determined pursuant to this Section 2.2 shall be determined in accordance with generally accepted accounting principles in the United States consistently applied ("**GAAP**") using Seller' historical methodologies and practices (to the extent in accordance with GAAP).

(e)    The date upon which the Closing Net Working Capital shall be deemed final shall be the earlier to occur of the following: (i) Buyer's acceptance of the Initial Net Working Capital determined by Seller; (ii) Buyer's failure to provide a Buyer Notice within fifteen (15) days of its receipt of the Initial Net Working Capital from Seller; (iii) the mutual written agreement of Buyer and Seller; or (iv) a final determination by the Bankruptcy Court in accordance with Section 2.2(c) (such date, "**Final Determination Date**").

(f)    If the Target Net Working Capital is greater than the Closing Net Working Capital (such shortfall amount, the "**Overpayment Amount**"), then within three (3) Business Days of the Final Determination Date, Seller and Buyer shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to (A) pay to Buyer, by wire transfer of immediately available funds from the Working Capital Escrow Account, an amount equal to the Overpayment Amount, and (B) pay to Seller, by wire transfer of immediately available funds and as more particularly described in the Working Capital Escrow Agreement, all remaining funds, if any, in the Working Capital Escrow Account after payment to Buyer of the Overpayment Amount. If, and only if, the Overpayment Amount is greater than the amounts then held in the Working Capital Escrow Account, then, within three (3) Business Days of the Final Determination Date, Seller shall pay to Buyer, by wire transfer of immediately available funds the amount by which the Overpayment Amount is greater than the amounts then held in the Working Capital Escrow Account. For the avoidance of doubt, any amount by which the Overpayment Amount exceeds the amounts in the Working Capital Escrow Account shall be entitled to administrative expense priority under section 503(b) of the Bankruptcy Code.

(g)    If the Closing Net Working Capital exceeds the Target Net Working Capital (such excess amount, the "**Underpayment Amount**"), then within three (3) Business Days of the Final Determination Date, (i) Buyer and the Seller shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to pay to the Seller, by wire transfer of immediately available funds from the Working Capital Escrow Account and as more particularly described in the Escrow Agreement, all amounts in the Working Capital Escrow Account, and (ii) Buyer shall pay to the Seller an aggregate amount equal to the Underpayment Amount.

**Section 2.3**    **Closing Payments**    At the Closing, Buyer shall pay the Unadjusted Purchase Price as follows:

(a)    by instruction to the Escrow Agent to release $100,000 (the "**Working Capital Escrow Amount**") from the Deposit Escrow Account into an escrow account (the "**Working Capital Escrow Account**") to be established pursuant to the Working Capital Escrow Agreement;

(b)    by instruction to the Escrow Agent to release the remainder of funds in the Deposit Escrow Account (after the transfer of funds set forth in Section 2.3(a)

above), by wire transfer of immediately available funds to an account specified in writing by Seller, or by the Bankruptcy Court, as the case may be;

(c)    by wire transfer of immediately available funds directly to the appropriate counterparties to the Acquired Contracts of any Cure Costs as determined by the Bankruptcy Court in the Assignment Order;

(d)    by deposit of an amount equal to the aggregate amount of Cure Costs, if any, that remain in dispute between Seller and the appropriate counterparties as of the Closing Date (the "**Cure Costs Dispute Escrow Amount**") into an escrow account (the "**Cure Costs Dispute Escrow Account**") to be established pursuant to the Cure Costs Dispute Escrow Agreement; and

(e)    by wire transfer of immediately available funds of the remaining balance of the Unadjusted Purchase Price (after reduction pursuant to Sections 2.3(c) and 2.3(d) (if any) and after credit for the Deposit) to an account specified by Seller in writing, or the Bankruptcy Court, as the case may be.

**Section 2.4**    <u>**Payment of Cure Costs**</u>.  At the Closing, pursuant to Section 2.3 above, Buyer shall pay any Cure Costs as determined by the Bankruptcy Court in the Assignment Order directly to the appropriate counterparties to the Acquired Contracts; <u>provided, however</u>, that in the event any such cure amount remains the subject of a dispute at the Closing Date, Buyer shall deposit the Cure Cost Dispute Escrow Amount into the Cure Costs Dispute Escrow Account and shall pay each such cure amount upon the entry of an Order of the Bankruptcy Court settling such dispute from funds in the Cure Costs Dispute Escrow Account.

**Section 2.5**    <u>**On-Hand Cash**</u>.  Immediately after the close of business on the day before the Closing Date, which for purposes of this Section 2.5 shall be deemed to be a mutually agreed upon time no later than 10:00 pm local time, Seller will count the On-Hand Cash at each of Seller's Minnesota Region Stores (after depositing cash received from operations that day) and create a written summation of such On-Hand Cash, subtotaled by currency denomination. Buyer or its representatives may observe any physical count at Buyer's expense.  Copies of such summations will be promptly provided to Buyer.  For additional clarity, checks or similar cash equivalents, cash in-transit and non-operating cash are not included in "On-Hand Cash."

**Section 2.6**    <u>**On-Hand Inventory**</u>.  Immediately after the close of business on the day before the Closing Date, which for purposes of this Section 2.6 shall be deemed to be a mutually agreed upon time no later than 10:00 pm local time, Seller shall perform a physical count of all Inventory at each of Seller's Minnesota Region Stores. Buyer or its representatives may observe any physical count at Buyer's expense. Seller shall create a written summation of the amount of Inventory counted and its value, each subtotaled by restaurant and by type of Inventory.  The physical count and the Inventory valuation shall be based on and in accordance with Seller's prior practices and methodologies. A copy of the summation will be promptly provided to Buyer. If Buyer objects to the inclusion of any item or items of Inventory in the summation, Buyer shall notify Seller immediately, and Buyer and Seller shall cooperate in good faith to mutually agree upon a resolution of any such dispute.  If the parties cannot resolve such dispute by the Closing Date, such dispute shall be submitted to the Bankruptcy Court for a final, binding determination.

**Section 2.7    Transaction Taxes**.  All Taxes, including all state and local Taxes in connection with the transfer of the Acquired Assets and all recording and filing fees (collectively, "**Transaction Taxes**"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and that are not exempt under §1146(a) of the Bankruptcy Code, shall be borne by Buyer.  Buyer and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement; (b) provide all requisite exemption certificates; and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Government taxing authorities.

**Section 2.8    Allocation of Total Consideration**.  Buyer and Seller shall allocate the Total Consideration among the Acquired Assets in accordance with Schedule 2.8 (the "**Allocation**") to be mutually agreed upon by the parties prior to Closing.  The Allocation will be binding upon Buyer and Seller and their respective successors and assigns, and none of the parties to this Agreement will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation.  Buyer and Seller will report the purchase and sale of the Acquired Assets on all tax returns, including Form 8594 as provided for in section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594.


# ARTICLE III.    CLOSING AND DELIVERIES

**Section 3.1    Closing**.  The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place on the second Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article VI or on such other date or at such other time as may be mutually agreed to by the parties (the "**Closing Date**") and shall be effective as of 12:01 a.m. on the Closing Date.  Subject to such different procedures agreed upon by the parties, the Closing shall take place via a "paper" close wherein Buyer and Seller shall exchange such documents and instruments or copies thereof sufficient to effect the Closing by electronic or other means without the use of a "roundtable" closing at a particular location. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

**Section 3.2    Seller' Deliveries**.  Seller shall deliver to Buyer at or prior to the Closing or such other time as set forth in this Agreement:

(a)    A bill of sale for all of the Acquired Assets that are tangible personal property, without representation, warranty or covenant of any kind;

(b)    An agreement for the assumption of the Assumed Liabilities, without representation, warranty or covenant of any kind;

(c)     For all intangible Acquired Assets, including all Acquired Contracts, (i) an agreement of assumption and assignment, without any representation, warranty or covenant of any kind, or (ii) an Assignment Order effecting the same;

(d)     A certificate, dated the Closing Date, signed by its Secretary, certifying to the accuracy of the matters set forth in Section 6.2(a);

(e)     Each of the Working Capital Escrow Agreement and the Cure Costs Dispute Escrow Agreement, duly executed by the Seller; and

(f)     Such other agreements, documents or instruments of assignment and transfer that Buyer may reasonably request.

**Section 3.3     Buyer's Deliveries**.  Buyer shall deliver to Seller at or prior to the Closing or such other time as set forth:

(a)     The Unadjusted Purchase Price in accordance with Section 2.3;

(b)     A duly executed counterpart of Buyer to each of the documents listed in Section 3.2(b) and 3.2(c);

(c)     A certificate, dated the Closing Date, signed by its Secretary, certifying the accuracy of the matters set forth in Section 6.1(a);

(d)     Each of the Working Capital Escrow Agreement and the Cure Costs Dispute Escrow Agreement, duly executed by Buyer and Escrow Agent; and

(e)     Such other agreements, documents or instruments of assignment and transfer that Seller may reasonably request.

**ARTICLE IV.     REPRESENTATIONS AND WARRANTIES**

**Section 4.1     Representations and Warranties of Seller** Seller hereby represents and warrants to Buyer as of the Execution Date as follows:

(a)     Authorization and Validity. Subject to the Bankruptcy Court's entry of the Sale Order and the Assignment Order, (i) Seller has all requisite power and authority to enter into this Agreement and any Ancillary Agreements to which Seller is a party and to perform its obligations hereunder and thereunder; and (ii) this Agreement constitutes Seller's valid and binding obligation, enforceable against Seller in accordance with its respective terms.

(b)     No Conflict or Violation. The execution, delivery and performance by Seller of this Agreement and any Ancillary Agreement to which Seller is a party does not (i) violate or conflict with any provision of Seller's certificate of incorporation or bylaws or similar organizational documents, (ii) violate any provision of law, or any Order, judgment or decree of any court or Government applicable to Seller or any of its properties or assets; or (iii) violate or result in a material breach of or

constitute (with due notice or lapse of time or both) a default under any material Contract to which Seller is a party or by which Seller is bound and to which any of the Acquired Assets is subject.

(c)     <u>Title to Assets</u>.  Seller owns, and has good, valid, and marketable title to, all of the Acquired Assets owned by it.

(d)     <u>Reports; Financial Statements; Inventory</u>.

(i)     Attached hereto as <u>Schedule 4.1(d)</u> are true and complete copies of the internally prepared, unaudited statements of income of each of the Minnesota Region Stores for the fiscal years ended December 31, 2008, December 31, 2009 and December 31, 2010 (such financial statements, the "**Financial Statements**").  The Financial Statements present fairly, in all material respects, the results of operations of each of the Minnesota Region Stores for the respective periods set forth therein and have been prepared on a basis consistent with Seller's past practices.

(ii)     The Inventory of the Minnesota Region Stores (A) consists of materials and goods useable or saleable in the ordinary course of business (taking into account the quantity and quality of the Inventory), and (B) is not expired, spoiled or damaged.  None of the Inventory in any of the Minnesota Region Stores is subject to any consignment, bailment, warehousing or similar agreement.

(e)     <u>Title to Acquired Assets</u>. Subject to the entry of the Sale Order and the Assignment Order, at the Closing, Buyer will obtain good and marketable title to or a valid and enforceable right by Contract to use, the Acquired Assets which shall be transferred to Buyer free and clear of all Liens, Claims and Interests.  The Seller owns or leases all buildings, machinery, equipment, and other tangible assets necessary for the conduct of the Seller's operations at the Minnesota Region Stores as presently conducted.  Except for the Excluded Assets identified in <u>Sections 1.2(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(f)</u>, <u>(i)</u>, <u>(j)</u>, <u>(k)</u> and <u>(m)</u> the Acquired Assets constitute all of the assets, agreements, licenses and properties owned by them and are all assets (tangible and intangible), agreements, licenses and properties necessary to conduct the Business as presently conducted.  All of the Acquired Assets are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the ordinary course of business.

**Section 4.2     <u>Representations and Warranties of Buyer</u>** Buyer hereby represents and warrants to Seller as of the Execution Date as follows:

(a)     <u>Corporate Organization</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

(b)     <u>Qualification to Conduct Business</u>.  Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business conducted by it makes such qualification necessary.

(c)     <u>Authorization and Validity</u>.  Buyer has all requisite corporate power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is a party and the performance of Buyer's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement has been, and any Ancillary Agreement to which Buyer is a party has been duly executed by Buyer and constitutes Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms.

(d)     <u>No Conflict or Violation</u>.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is a party does not (i) violate or conflict with any provision of Buyer's certificate of incorporation or bylaws or similar organizational documents; (ii) violate any provision of Law, or any Order, judgment or decree of any court or Government applicable to Buyer or any of its properties or assets; or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

(e)     <u>Consents and Approvals</u>.  Other than the entry of the Sale Order, no consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in connection with the execution and delivery by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party or the performance by Buyer of its obligations hereunder or thereunder.

(f)     <u>Adequate Assurances Regarding Acquired Contracts</u>.  Buyer is capable of satisfying the conditions contained in sections 365(b) and 365(f) of the Bankruptcy Code with respect to the Acquired Contracts.

(g)     <u>Franchise Agreements</u>.  As of the Execution Date, Buyer has obtained, and has provided Seller with written evidence of, Franchisor's consent for the assignment to, and assumption by, Buyer of the Franchise Agreements (or alternatively, consent for the execution of new Franchise Agreements as may be required by Franchisor), wherein Buyer will become a duly authorized operator of Burger King® restaurants upon the Closing ("**Franchisor's Consent**").

(h)     <u>Litigation</u>.  There are no claims, actions, suits, proceedings or investigations pending, threatened in writing or against Buyer, or any Related Person of Buyer,

that could affect the ability of Buyer to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.

(i)  <u>Adequacy of Funds</u>.  Buyer shall have at Closing cash on hand, existing availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Unadjusted Purchase Price at Closing, and any further adjustment thereto pursuant to <u>Section 2.2</u> thereafter.

**Section 4.3**  **<u>Warranties Are Exclusive</u>**.  The parties acknowledge that the representations and warranties contained in this <u>Article IV</u> are the only representations or warranties given by the parties and that all other express or implied warranties are disclaimed and Buyer hereby expressly disclaims any other representations or warranties, whether made by it or any of its Affiliates, officers, directors, employees, agents or representatives.  Without limiting the foregoing, Buyer acknowledges that, except for the representations and warranties contained in <u>Section 4.1</u>, the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN <u>Section 4.1</u>, SELLER AND ITS RELATED PERSONS AND AFFILIATES HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING ANY (A) USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES OR (C) OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS.  Buyer acknowledges that Buyer has conducted, or has had an adequate opportunity to conduct, its due diligence investigation related to Seller's business and operations, the Acquired Assets, the Assumed Liabilities, and all matters related thereto. In proceeding with the transactions contemplated in this Agreement, except for any representations and warranties expressly set forth in <u>Section 4.1</u>, Buyer is doing so based solely upon its own due diligence and review, and Buyer has not relied upon any oral or written statements, representations or guaranties whatsoever, whether express or implied, made by Seller or its agents and representatives.

## ARTICLE V.  <u>COVENANTS AND OTHER AGREEMENTS</u>

**Section 5.1**  **<u>Covenants of Seller</u>**.  Seller covenants to Buyer that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement, and to the extent applicable to the Minnesota Region Stores:

(a)  <u>Conduct of Business Before the Closing</u>.  Unless otherwise agreed by Seller and Buyer, Seller shall use commercially reasonable efforts to conduct their business in all material respects in the manner in which it has been conducted since the Petition Date and to preserve intact their respective business or organization and relationships with third parties.

(b)     Cooperation. Seller shall use commercially reasonable efforts to (i) take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper or reasonably requested by Buyer, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; and (ii) assist Buyer's efforts to transfer any Permits required to own the Acquired Assets.

(c)     Sale Order.  Without limiting Section 5.1(b)(i), Seller shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable and in substantially the form of Exhibit C.

(d)     Access to Records and Properties.  Buyer shall be entitled, and the Seller shall permit Buyer, to conduct such investigation of the condition (financial or otherwise), businesses, assets, properties or operations of the Seller as Buyer shall reasonably deem appropriate.  The Seller shall (i) provide Buyer and its representatives access at any reasonable time during normal business hours upon at least 24 hours prior notice to all the facilities, offices and personnel of the Seller and to all of the books and records of the Seller, including, to perform field examinations and inspections of the Seller's Inventory, facilities, equipment and other assets and properties; and (B) cause the Seller' representatives to furnish Buyer with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations as Buyer shall reasonably request; provided, however, that Buyer and its representatives shall use all commercially reasonable efforts to prevent any such investigation from unreasonably interfering with the operation of the Business.  The Seller shall promptly deliver to Buyer one copy of all pleadings, motions, notices, statements, schedules, applications, reports and other papers as filed by the Seller in their Bankruptcy Case upon Buyer's reasonable request.

(e)     Notice of Certain Events.  The Seller shall promptly notify Buyer of, and furnish to Buyer any information it may reasonably request with respect to, the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to cause either (A) any of the conditions to Buyer's obligations to consummate the transaction(s) contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled or (B) directly or indirectly, any Material Adverse Effect. Notwithstanding the foregoing, the delivery of any notice pursuant to this Section 5.1(e) shall not (x) be deemed to amend or supplement any of the Schedules contemplated hereby, (y) be deemed to cure any breach or any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available to Buyer hereunder, unless Buyer proceeds to consummate the transactions contemplated by this Agreement without terminating this Agreement pursuant to Section 7.1.

**Section 5.2     Covenants of Buyer**.  Buyer covenants to Seller that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a) <u>Cooperation</u>.  Buyer shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b) <u>Communications</u>. Buyer shall use commercially reasonable efforts to keep Seller reasonably informed of the status of discussions between Buyer and Franchisor regarding Franchisor's Consent.

(c) <u>Adequate Assurances Regarding Acquired Contracts and Required Orders</u>.  With respect to each Acquired Contract, Buyer shall provide adequate assurance of the future performance of such Acquired Contract by Buyer. Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of an assumption and Assignment Order and any other Order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 5.3     <u>Other Covenants</u>**.

(a) <u>Improper Receipt of Payment</u>.  From and after the Closing, (i) Seller shall promptly forward to Buyer any and all payments received by it that constitutes part of the Acquired Assets; and (ii) Buyer shall promptly forward to Seller any and all payments received by Buyer that constitute part of the Excluded Assets.

(b) <u>Records</u>. From and after the Closing and to the extent permitted by Law, Buyer shall provide Seller, and its agents and representatives, as the case may be, access to, reasonable means of copying, i.e., provide a copy machine, or copies of, the Employee Records for use by Seller in any dispute, Claim, action or controversy regarding any employee matter, and permit Seller, to the extent permitted by Law, to either make copies or, as may be necessary to fully comply with any Law, regulation or court mandate, borrow the original Employee Records for such time as may be reasonably needed by Seller.

(c) <u>Employee Matters</u>. Immediately prior to the Closing, Seller shall terminate the employment of all employees of the Minnesota Region Stores.  Effective as of the Closing Date, Buyer shall use commercially reasonable efforts to offer employment to all employees of each of the Minnesota Region Stores on terms and conditions that are substantially similar to the terms and conditions in effect immediately prior to the Closing Date; provided, however, that nothing contained herein, express or implied: (i) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment, or (ii) is intended to confer upon any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees) any right as a third-party beneficiary of this Agreement.

**Section 5.4    Confidentiality.**  On and after the Closing Date, Seller shall, and shall cause its Affiliates to, treat and hold as confidential any proprietary information concerning the business and affairs of Buyer and the Acquired Assets and Assumed Liabilities that is not already generally available to the public (the "**Confidential Information**"), and shall, and shall cause its Affiliates to, refrain from using or disclosing any of the Confidential Information except in connection with (i) enforcing their rights under this Agreement, or (ii) their responsibility for or their ownership and use of the Excluded Assets and the Excluded Liabilities, and shall deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies, other than one copy to be kept subject to this Section 5.4 for archival and/or regulatory compliance purposes) of the Confidential Information which are in his, her or its possession or under his, her or its control.  In the event that Seller or any of its Affiliates is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Seller shall, or shall cause such Affiliate to, as the case may be, notify Buyer in writing promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 5.4.  If, in the absence of a protective order or the receipt of a waiver hereunder, Seller, or Seller's Affiliate, is advised, on the advice of counsel, to disclose any Confidential Information to any tribunal or Government, Seller, or Seller's Affiliate, as the case may be, may disclose such Confidential Information to the tribunal or Government; provided that such Seller shall, or shall cause such Seller's Affiliate to, use his, her or its commercially reasonable efforts to obtain, at the request of Buyer and at Buyer's sole expense, an order or other reasonable assurance that confidential treatment shall be accorded to such portion of the Confidential Information required to be disclosed.

# ARTICLE VI.    CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

**Section 6.1    Conditions Precedent to Performance by Seller**.  The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.1(c), may be waived by Seller, in its discretion:

(a)    Representations and Warranties of Buyer.  The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made by Buyer as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(b)    Performance of the Obligations of Buyer.  Buyer shall have performed in all material respects all obligations required under this Agreement and any Ancillary Agreement to which Buyer is party to be performed by Buyer on or before the Closing Date.

(c)     Governmental Consents and Approvals.  The Bankruptcy Court shall have entered the Sale Order and the Assignment Order, and such Orders shall be in full force and effect, and no Order staying, reversing, modifying, vacating or amending such Orders shall be in effect on the Closing Date.

(d)     Closing Deliveries.  Buyer shall have made the deliveries contemplated under Section 3.3.

**Section 6.2     Conditions Precedent to the Performance by Buyer**.  The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.2(c), may be waived by Buyer, in its discretion:

(a)     Representations and Warranties of Seller.  The representations and warranties of Seller made in Section 4.1 of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made by Seller as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(b)     Performance of the Obligations of Seller.  Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which Seller are party to be performed by Seller on or before the Closing.

(c)     Governmental Consents and Approvals.  The Bankruptcy Court shall have entered the Sale Order and the Assignment Order, and such Orders shall be in full force and effect, and no Order staying, reversing, modifying, vacating or amending such Orders shall be in effect on the Closing Date.

(d)     Closing Deliveries.  Seller shall have made the deliveries contemplated under Section 3.2.

## ARTICLE VII.    TERMINATION

**Section 7.1     Conditions of Termination**.  This Agreement may be terminated only in accordance with this Section 7.1.  This Agreement may be terminated at any time before the Closing as follows:

(a)     By mutual consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, if Seller have provided Buyer with notice of any material inaccuracy of any representation or warranty contained in Section 4.2, or of a material failure to perform any pre-Closing covenant or obligation of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and (except as to Section 3.3(a)) Buyer has failed, within ten (10) days after such notice, to remedy such inaccuracy or perform such covenant or provide

reasonably adequate assurance to Seller of Buyer's ability to remedy such inaccuracy or perform such covenant or obligation; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 7.1(b) if Seller is then in material breach of this Agreement;

(c)     By Seller, if the Bankruptcy Court dismisses the Seller's chapter 11 case or converts the chapter 11 case to a case under chapter 7 of the Bankruptcy Code; if the Bankruptcy Court confirms a chapter 11 plan in the Seller's chapter 11 case; or if the Bankruptcy Court appoints a chapter 11 trustee or a examiner with expanded powers;

(d)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with notice of any material inaccuracy of any representation or warranty of Seller contained in Section 4.1 or a material failure to perform any pre-Closing covenant of Seller contained in this Agreement or any Ancillary Agreement to which Seller is party, and Seller has failed, within ten (10) days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Seller's ability to remedy such inaccuracy or perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 7.1(d) if Buyer is then in material breach of this Agreement;

(e)     Automatically, upon the consummation of an Alternative Transaction;

(f)     By Buyer, if Seller (i) designates any Person other than Buyer as the successful bidder at the conclusion of the Group One Auction, (ii) seeks or supports Bankruptcy Court approval of an Alternative Transaction (other than to or by Buyer) or (iii) executes and delivers an agreement with any Person (other than Buyer and its Affiliates) with respect to an Alternative Transaction;

(g)     By either the Seller or Buyer, if the Bankruptcy Court has entered a Final Order approving the sale of all or substantially all of the Acquired Assets to any Person other than Buyer and such sale closes; or

(h)     By Buyer or Seller on any day on or after the one-hundred and twentieth (120th) day following the Execution Date (the "**Termination Date**"), if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Buyer and Seller in writing), unless the Closing has not occurred due to a material failure of the terminating party to perform or observe its covenants or obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date.

**Section 7.2     Effect of Termination; Remedies**.

(a)     In the event of termination pursuant to Section 7.1, this Agreement shall become null and void and have no effect (other than Article VII, Article VIII and Article IX, which shall survive termination), with no Liability on the part of Seller, Buyer, or their respective Affiliates or respective Related Persons, with

respect to this Agreement or any Ancillary Agreement, except for any Liability provided for in this Article VII.

(b)  If this Agreement is terminated pursuant to (i) Section 7.1(a) or 7.1(h) or (ii) Section 7.1(c) or Section 7.1(d), then, within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Buyer from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer.

(c)  If this Agreement is terminated pursuant to Section 7.1(b) then, within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Seller from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Seller.

(d)  If this Agreement is terminated pursuant to (i) Section 7.1(e), 7.1(f) or 7.1(g) or (ii) Section 7.1(c) or Section 7.1(d) and Seller subsequently consummates a sale transaction for or a recapitalization through a Chapter 11 plan affecting all or substantially all of the Acquired Assets, Seller shall (1) pay to Buyer (A) a break-up fee equal to three percent (3%) of the Total Consideration, which for purposes of this Section 7.2(d) shall be an amount equal to the sum of (x) the Unadjusted Purchase Price and (y) the absolute value of the Target Net Working Capital (i.e. $8,500,598) (the "**Break-Up Fee**"); and (B) Buyer's reasonable transaction expenses related to the negotiation, execution and performance of this Agreement up to one hundred fifty thousand dollars ($150,000) ("**Buyer Expenses**"), as evidenced in writing to Seller in reasonable detail and (2) together with Buyer, within two (2) Business Days of such termination, jointly instruct the Escrow Agent to distribute to Buyer the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer.  Any payments of the Break-Up Fee or Buyer Expenses under this Section 7.2(d) shall be made by Seller from the proceeds of the Alternative Transaction by wire transfer of immediately available funds to an account designated in writing by Buyer within two (2) Business Days from the closing of such Alternative Transaction.  The Break-Up Fee and Buyer Expenses shall be entitled to administrative priority (which shall be a super-priority administrative expense Claim senior to all other administrative expense Claims) under Section 364(c)(1) of the Bankruptcy Code.  The obligation to pay in full in cash when due any amount owed by Seller to Buyer under this Agreement, including the Breakup Fee and Buyer Expenses, shall not be discharged, modified or otherwise affected by any plan of reorganization or liquidation for Seller or by any other Order of the Bankruptcy Court.

(e)  Seller acknowledges that the Break-Up Fee and Buyer Expenses (or any portion thereof) are necessary and appropriate expenses for the administration of its estate, pursuant to sections 503 and 507 of the Bankruptcy Code, and that the

Break-Up Fee and Buyer Expenses (or any portion thereof) are allowed administrative expenses against its estate.

**Section 7.3    Exclusive Remedy; Waiver**. Prior to the Closing, the parties' sole and exclusive remedies for any Claim arising out of or in connection with this Agreement shall be termination in accordance with, and obtaining the remedies provided in, this <u>Article VII</u>. The failure by either Seller or Buyer to pursue or foreclose on any right or remedy against the other party, by itself, shall not constitute a waiver, and any waiver under this <u>Article VII</u> shall be effective only if made in writing.

## ARTICLE VIII.  <u>SURVIVAL AND INDEMNIFICATION</u>

**Section 8.1    Survival; Indemnification**.  None of the representations and warranties of Seller and of Buyer made in this Agreement shall survive the Closing Date, and all of such representations and warranties shall be extinguished by the Closing.  All covenants and agreements of the parties contained in this Agreement shall survive the Closing, unless otherwise expressly stated therein.  Seller shall have no monetary obligation to Buyer for breach of any covenant or agreement, except in the event of termination pursuant to <u>Sections 7.1(a)</u>, <u>7.1(c)</u>, <u>7.1(d)</u>, <u>7.1(e)</u>, <u>7.1(f)</u>, <u>7.1(g)</u>, <u>7.1(h)</u> or <u>7.1(i)</u> which obligation shall be limited as set forth in <u>Sections 7.2(b) and 7.2(d)</u> respectively. If the Closing occurs, Buyer shall, subject to <u>Section 1.3</u>, indemnify and hold harmless Seller and their respective Affiliates and Related Persons against any and all losses, Liabilities, expenses or damages that result from or arise out of the Assumed Liabilities.

## ARTICLE IX.    <u>MISCELLANEOUS</u>

**Section 9.1    Alternative Transaction**.  Notwithstanding anything herein or in any Ancillary Agreement to the contrary, but subject to the notice requirement of <u>Section 5.1(e)</u>, Seller may furnish information concerning Seller, the Acquired Assets and the Assumed Liabilities to any Person in connection with a potential Alternative Transaction and negotiate, enter into and consummate an Alternative Transaction.

**Section 9.2    Further Assurances**.  At the request and the sole expense of the requesting party, Buyer or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Buyer or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

**Section 9.3    Successors and Assigns**.  This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties hereto.  Buyer may assign its rights under this Agreement to any subsidiary or affiliate of Buyer acceptable to Franchisor.

**Section 9.4    Governing Law; Jurisdiction**.  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Seller are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably

elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

**Section 9.5    Expenses**.  Except as otherwise provided in this Agreement, Seller and Buyer shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

**Section 9.6    Broker's and Finder's Fees**.  Neither Seller nor Buyer has engaged any broker or finder in connection with any of the transactions contemplated by this Agreement other than Mastodon Ventures, Inc., whose fees and expenses shall, as between the parties, be the sole responsibility of Seller, and, insofar as such party knows, no other broker or other Person is entitled to any commission or finder's fee in connection with any of the transactions contemplated by this Agreement.

**Section 9.7    Severability**.  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as set forth on the Execution Date.

**Section 9.8    Notices**.    (a)  All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below or by electronic mail to the electronic mail address given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

> Duke and King Acquisition Corp.
> 12281 Nicollet Avenue, South
> Burnsville, MN 55337
> Attention: Becky Moldenhauer, CFO
> Email: bmoldenhauer@dukeandking.com
> Facsimile: 953.288.2327

With a copy to (which shall not constitute notice):

> McDonald Hopkins LLC
> 600 Superior Avenue, E.
> Suite 2100
> Cleveland, OH 44114

Attention:  Scott N. Opincar
Email: sopincar@mcdonaldhopkins.com
Facsimile:  216.348.5474

If to Buyer:

Heartland Food Corp.
1400 Opus Place
Suite 900
Downers Grove, IL 60515
Attention:  Christopher J. Ondrula, CEO
Facsimile: 630-598-2210
Email: condrula@heartlandfoodcorp.com

With copies to (which shall not constitute notice):
GSO CAPITAL PARTNERS LP
280 Park Avenue
New York, New York 10017
Attention: Marc Baliotti
Facsimile: 212-503-6930
Email: Marc.Baliotti@gsocap.com

and

Kirkland & Ellis, LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Robert A. Wilson
Facsimile: 312-862-2200
Email: Robert.wilson@kirkland.com

(b)     Any party may change its address, facsimile number or email address for the purpose of this <u>Section 9.8</u> by giving the other parties written notice of its new address in the manner set forth above.

**Section 9.9     <u>Amendments; Waivers</u>**.  This Agreement may only be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may only be waived, by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

**Section 9.10     <u>Public Announcements</u>**.  Promptly after the Closing, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein.  Except as provided in the foregoing sentence, no

party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without first coordinating their communications strategy with the other party, unless a press release or public announcement is required by Law, the rules of any stock exchange, or is permitted by, or required by an Order of, the Bankruptcy Court. If any such announcement or other disclosure is required by Law, the rules of any stock exchange or is permitted by, or required by an Order of, the Bankruptcy Court, the disclosing party shall use reasonable efforts to give the non-disclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure; provided, there shall be no Liability to the disclosing party for failure to notify the other party. The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and that Franchisor may provide or release its own press release or announcement without the consent or input of either Buyer or Seller.

Section 9.11 **Entire Agreement**. This Agreement and the Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. The Recitals and all Exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

Section 9.12 **No Third Party Beneficiaries**. Except with respect to Section 8.1, nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligator or Liability of any third Persons to Seller or to Buyer. This Agreement is not intended and shall not give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 9.13 **Headings**. The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 9.14 **Counterparts; Delivery**. This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute the same agreement. The signature of any of the parties may be delivered and made by facsimile, portable document format ("pdf") or other electronic means capable or creating a printable copy, and each such signature shall be treated as original signatures for all purposes.

Section 9.15 **Construction**. Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. Any reference to the singular in this Agreement shall also include the plural and vice versa. The phrase "to which Seller is a party," or similar construction, is intended to limit the applicable listing of any items, properties, assets, or Contracts to only those items that a Seller actually owns or to which Seller is actually a party, as the case may be, and is meant to exclude any listed property or Contract otherwise.

**Section 9.16   Bulk Sales**.   Buyer waives compliance with any Laws governing bulk sales, including any applicable provisions of the Uniform Commercial Code.

## ARTICLE X.   DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

**"Accrued Expenses"** has the meaning set forth in Section 1.3(b).

**"Accounts Payable"** has the meaning set forth in Section 1.3(a).

**"Accounts Receivable"** has the meanings set forth in Section 1.2(b).

**"Acquired Assets"** has the meaning set forth in Section 1.1.

**"Acquired Contracts"** has the meaning set forth in Section 1.1(g).

**"Affiliate"** means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person.

**"Agreement"** has the meaning set forth in the Preamble.

**"Allocation"** has the meaning set forth in Section 2.8.

**"Alternative Transaction"** means any transaction (regardless of the form thereof) involving a sale of or recapitalizing affecting all or any substantial portion of the Acquired Assets by Seller, or any one or more of them, to a purchaser or purchasers other than Buyer; whether such transaction is undertaken pursuant to section 363 of the Bankruptcy Code or pursuant to a Chapter 11 plan.

**"Ancillary Agreements"** means the Confidentiality Agreement, the Deposit Escrow Agreement, the Working Capital Escrow Agreement, the Cure Costs Dispute Escrow Agreement, any bill of sale, any assignment or assumption agreement, and any other related agreements by and between Seller and Buyer effecting or evidencing the transactions contemplated under this Agreement.

**"Assignment Order"** means an Order of the Bankruptcy Court pursuant to sections 105 and 365 of the Bankruptcy Code, which Order shall (i) authorize the assumption and assignment by and to Buyer of the Acquired Contracts, (ii) establish the Cure Costs relating to the Acquired Contracts, and (iii) provide that Buyer has demonstrated adequate assurance of future performance under the Acquired Contracts.

**"Assumed Liabilities"** has the meaning set forth in Section 1.3.

**"Bankruptcy Case"** has the meaning set forth in the Recitals.

**"Bankruptcy Code"** has the meaning set forth in the Recitals.

**"Bankruptcy Court"** has the meaning set forth in the Recitals.

**"Break-Up Fee"** has the meaning set forth in <u>Section 7.2(d)</u>.

**"Burger King®"** means any Person operating a Burger King® restaurant, whether Franchisor or any franchisee thereof.

**"Business"** means the business of each of the Minnesota Region Stores, as presently conducted.

**"Business Day"** means any day other than Saturday, Sunday and any day that is a federal legal holiday.

**"Buyer"** has the meaning set forth in the Preamble.

**"Buyer Expenses"** has the meaning set forth in <u>Section 7.2(d)</u>.

**"Buyer's Notice"** has the meaning set forth in <u>Section 2.2(b)</u>.

"**Claim**" has the meaning given that term in section 101(5) of the Bankruptcy Code and shall expressly include Claims arising under any theory of successor liability.

**"Closing"** has the meaning set forth in <u>Section 3.1</u>.

**"Closing Date"** has the meaning set forth in <u>Section 3.1</u>.

**"Closing Net Working Capital"** has the meaning set forth in <u>Section 2.2(c)</u>.

**"Closing Net Working Capital Statement"** has the meaning set forth in <u>Section 2.2(a)</u>

**"COBRA"** has the meaning set forth in <u>Section 1.3</u>.

**"Code"** means the Internal Revenue Code of 1986, as amended.

**"Confidentiality Agreement"** means that certain Confidentiality Agreement executed by Buyer and Seller dated January 31, 2011.

**"Confidential Information"** has the meaning set forth in <u>Section 5.4</u>.

**"Contract"** means any contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking, whether in written form or otherwise.

**"Contract Claim"** has the meaning set forth in <u>Section 1.1(g)</u>.

**"Corporate Level"** means, as applicable, any assets, properties, expenses, costs, commitments, Contracts, obligations, Liabilities or other operational activities or items conducted or owned by Seller primarily for the collective benefit of all restaurants locations in all of the Regional Groups and their employees, including, but not limited to, all Seller Employee Benefit Plans, if any, and all Liabilities and obligations of Seller thereunder.

**"Critical Vendors"** has the meaning ascribed to such term in that certain Joint Motion for Expedited Hearing and for an Order Authorizing Debtors to Pay the Prepetition Claims of

Certain Critical Vendors [Docket No. 13] that was filed in the Bankruptcy Case on December 4, 2010.

**"Cure Costs"** means all pre-petition cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Acquired Contracts.

**"Cure Costs Dispute Escrow Account"** has the meaning set forth in Section 2.3(c).

**"Cure Costs Dispute Escrow Agreement"** means that certain escrow agreement, dated as of the Closing Date, by and Buyer, Seller and Escrow Agent, in a form to be mutually agreed upon by the parties thereto.

**"Cure Costs Dispute Escrow Amount"** has the meaning set forth in Section 2.3(c).

**"Deposit"** has the meaning set forth in the Recitals.

**"Deposit Escrow Account"** has the meaning set forth in the Recitals.

**"Deposit Escrow Agreement"** means that certain escrow agreement, dated as of the Execution Date, by and among Buyer, Seller and Escrow Agent, governing the funding and disbursement of the Deposit Escrow Account.

**"Employee Records"** has the meaning set forth in Section 1.1(l).

**"Employee Benefit Plans"** means (i) all employee benefit plans as defined in section 3(3) of ERISA; (ii) all compensation, pay, severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, Contracts, programs, funds or arrangements of any kind; and (iii) all other employee benefit plans, programs, funds or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Escrow Agent"** means US Bank, N.A.

**"Excluded Assets"** has the meaning set forth in Section 1.2.

**"Excluded Contracts"** means any Contract to which a Seller is a party that is not an Acquired Contract.

**"Excluded Liabilities"** has the meaning set forth in Section 1.4.

**"Execution Date"** has the meaning set forth in the Preamble.

**"Final Closing Net Working Capital Statement"** has the meaning set forth in Section 2.2(c).

**"Final Determination Date"** has the meaning set forth in Section 2.2(e).

**"Final Order"** means an Order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which Order (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

**"Final Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

"**Financial Statements**" has the meaning set forth in <u>Section 4.1(d)</u>.

**"Franchise Agreements"** means those franchise agreements entered into between Franchisor and Seller which govern Seller's operation of the Minnesota Region Stores, set forth on <u>Schedule B</u> hereto, as Burger King restaurants.

**"Franchisor"** means Burger King Corporation, a Florida corporation, or its successors-in-interest, whether by merger, acquisition of equity or acquisition of all or substantially all of its assets.

**"Franchisor's Consent"** has the meaning set forth in <u>Section 4.2(g)</u>.

**"GAAP"** has the meaning set forth in <u>Section 2.2(d)</u>.

**"Government"** means any agency, division, subdivision or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state or territory thereof.

**"Improvements"** means the buildings, improvements and structures owned by Seller existing on the Real Property.

**"Indebtedness"** of any Person means, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations or Liabilities of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lenders under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all indebtedness secured by any Lien on property owned or acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not the obligations secured thereby have been assumed, but limited to the lower of (i) the fair market value of such property and (ii) the amount of the Indebtedness secured; (f) all capital lease obligations of such Person; (g) any commitment by which such Person assures a creditor against loss (including all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions) or other indebtedness guaranteed in any manner by such Person; (h) all uncashed checks issued by such Person that are outstanding as of the Closing Date; and (i) all contingent obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (h) above.

**"Initial Net Working Capital"** has the meaning set forth in <u>Section 2.2(a)</u>.

**"Interest"** has the meaning ascribed to such term under section 363(f) of the Bankruptcy Code.

**"Inventory"** means all of Seller's (a) consumable, unexpired food, beverages and condiments, (b) paper products and (c) premium kids products (to the extent that the promotional licenses to sell such kids products have not expired), in each case, solely to the extent such items are included in the Acquired Asset pursuant to <u>Section 2.6</u>.

**"Law"** means any law, statute, regulation, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Government.

**"Leased Real Property"** has the meaning set forth in <u>Section 1.1(b)</u>.

**"Leasehold Improvements"** means those fixtures, structures and other improvements located on any Leased Real Property used in the operation of Seller' business.

**"Liability"** means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability or infringement liability.

**"Lien"** has the meaning ascribed to such term under section 101(37) of the Bankruptcy Code and also includes any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other third party right, Tax (including foreign, federal, state and local Tax), Order of any Government, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any Claim based on any theory that any Buyer is a successor, transferee or continuation of the Seller, and (iv) any leasehold interest, license or other right, in favor of a third party or Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

**"Material Adverse Effect"** means a state of facts, event, change or effect with respect to the Acquired Assets or the Assumed Liabilities, that individually or in the aggregate results in, or could reasonably be expected to have, a material adverse effect on the value of the Acquired Assets, taken as a whole, a material increase in the amount of the Assumed Liabilities, a material impairment to the revenue or anticipated revenue of the Minnesota Region Stores, or result in a material adverse effect or change in the operation, results of operations, condition (financial or otherwise) or prospects of the Acquired Assets or the Minnesota Region Stores, taken as a whole; <u>provided</u>, <u>however</u>, that none of the following shall be or be considered in determining the existence of any "Material Adverse Effect": (a) changes in general economic conditions in the United States or any other country or region in the world, or changes in conditions in the global economy generally, to the extent such changes do not adversely affect the Seller in a disproportionate manner; (b) changes in conditions in the industries in which the Seller conducts

business, to the extent such changes do not adversely affect the Seller in a disproportionate manner relative to other participants in such industries; (c) changes in political conditions in the United States or any other country or region in the world; (d) acts of war, sabotage or terrorism (including any escalation or general worsening of any such acts of war, sabotage or terrorism) in the United States or any other country or region in the world; (e) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions and other force majeure events in the United States or any other country or region in the world; or (f) any change in Law after the Execution Date.

"**Minnesota Region Stores**" means all of Seller's restaurants located in the Minnesota Region and as more fully described on Schedule A.

"**Net Working Capital**" means an amount equal to: (a) the sum of On-Hand Cash, On-Hand Inventory, Acquired Deposits, and Prepaid Expenses, *less* (b) the sum of Accounts Payable, Payroll Liabilities, Accrued Expenses, and Property Taxes.

"**On-Hand Cash**" has the meaning set forth in Section 1.1(a).

"**On-Hand Inventory**" has the meaning set forth in Section 1.1(h).

"**Orders**" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Government.

"**Overpayment Amount**" has the meaning set forth in Section 2.2(f).

"**Permits**" has the meaning set forth in Section 1.1(i).

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Prepaid Expenses**" has the meaning set forth in Section 1.1(e).

"**Proceeding**" means any Claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or causes of action of whatever kind or character.

"**Property Taxes**" means all real estate and personal property Taxes, and other related assessments and fees, arising from the Acquired Assets.

"**Real Property Lease**" means any lease arrangement or agreement for the Leased Real Property identified and included in the Acquired Contracts.

"**Rejected Real Leased Property**" has the meaning set forth in Section 1.2(m).

**"Related Person"** means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

**"Sale Order"** means an Order of the Bankruptcy Court approving the sale and transfer of the Acquired Assets and Assumed Liabilities to Buyer pursuant to §§ 105 and 363 of the Bankruptcy Code, which Order shall be substantially in the form attached hereto as <u>Exhibit C</u> or with such changes and modifications as are reasonably acceptable to Buyer and Seller.

**"Sale Procedures"** means the Sale and Bidding Procedures approved by the Bankruptcy Court in the form attached hereto as <u>Exhibit A</u>.

**"Seller"** has the meaning set forth in the Preamble.

**"Supplies"** means (i) operating supplies, (ii) cleaning supplies, (iii) uniforms and (iv) all other items (other than Inventory) useable or saleable in the preparation of, serving or cleaning-up from meals.

**"Target Net Working Capital"** means negative one million three hundred thirty nine thousand five hundred and ninety-eight dollars (-$1,339,598).

**"Tax Return"** means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

**"Taxes"** means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

**"Termination Date"** has the meaning set forth in <u>Section 7.1(i)</u>.

**"Total Consideration"** has the meaning set forth in <u>Section 2.1</u>.

**"Transaction Taxes"** has the meaning set forth in <u>Section 2.7</u>.

**"Unadjusted Purchase Price"** has the meaning set forth in <u>Section 2.1</u>.

**"Underpayment Amount"** has the meaning set forth in <u>Section 2.2(g)</u>.

**"Working Capital Escrow Account"** has the meaning set forth in <u>Section 2.3(a)</u>.

**"Working Capital Escrow Agreement"** means that certain working capital escrow agreement, dated as of the Closing Date, by and among Buyer, Seller and Escrow Agent, in a form to be mutually agreed upon by the parties thereto.

**"Working Capital Escrow Amount"** has the meaning set forth in <u>Section 2.3(a)</u>.

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**HEARTLAND FOOD CORP.**

By:_____

Name:_____

Title:_____


**SELLER:**

**DUKE AND KING ACQUISITION CORP.**


By:_____

Name:_____

Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**HEARTLAND FOOD CORP.**

By:_____

Name:_____

Title:_____

**SELLER:**

**DUKE AND KING ACQUISTION CORP.**

By:_____

Name: ROGGER, T HEAD

Title: PRESIDENT / CEO

## **Exhibit A**

## **Sale Procedures**

Please see attached.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER APPROVING SALE AND BIDDING PROCEDURES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This case came before the Court on the Debtors' Motion for an Order Approving Sale and Bidding Procedures dated January 7, 2010 (the "Procedures Motion").[1]

Based on the Procedures Motion, all the files, records and proceedings herein, the Court being advised in the premises:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

1.     The Court has jurisdiction over the Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]   All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Procedures Motion.

[2]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. 7052.

{2575006:2}

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *01/24/2011*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

2.      The Debtors have articulated good and sufficient reasons for approving the Procedures Motion.

3.      Due and proper notice of the Procedures Motion was provided and no other or further notice need be provided.

4.      The Sale Procedures, substantially in the form attached as <u>Exhibit A</u> to this Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' assets.

5.      The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

**IT IS HEREBY ORDERED:**

1.      The Procedures Motion is granted to the extent set forth herein.

2.      All objections filed in response to the Procedures Motion are resolved as set forth herein or on the record at the hearing on the Procedures Motion, and to the extent not resolved, are hereby overruled.

3.      The Sale Procedures, in the form attached as <u>Exhibit A</u> to this Order, are hereby incorporated herein and approved in their entirety.

4.      In accordance with the terms of the Sale Procedures, the Debtors are authorized to conduct separate auctions for the sale of all or substantially all of their assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds in the same order and priority as existed at the commencement of the Debtors' chapter 11 cases, subject to a further hearing and final court approval following such auctions.

5.      As provided by Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon its entry.

2

{2575006:2}

6.    This Court shall retain jurisdiction over any matters related to or arising from the

implementation of this Order.

Dated:    January 24, 2011.

*/e/ Gregory F. Kishel*

_____
Gregory F. Kishel
United States Bankruptcy Judge

3

## EXHIBIT A

{2575006:2}

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**SALE AND BIDDING PROCEDURES**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

These sale and bidding procedures (the "Sale Procedures") shall govern the sale of substantially all of the operating assets of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. The Debtors contemplate that the composition of the sale of their assets may take various forms, including, but not limited to a sale of all the assets to one purchaser or the sales of geographic regions of assets to separate purchasers as more particularly set forth below.

By motion (the "Procedures Motion"), dated January 7, 2011, the above-captioned debtors and debtors in possession (collectively, the "Debtors") sought, among other things, approval of these Sale Procedures governing the process and procedures for the sale of substantially all of the Debtors' operating assets through two separate auctions. On January 24, 2011, the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), entered an order approving these Sale Procedures (the "Procedures Order"). Pursuant to the Procedures Order, the Bankruptcy Court has scheduled a hearing (the "Sale Hearing") **on April 14, 2011, at 9:30 a.m. (Central Time),** to consider the sales.

I.      <u>Assets to Be Sold</u>

The assets to be sold consist of the Debtors' 87 BURGER KING® franchise locations and related assets situated in the states of Minnesota, Illinois, Missouri, Wisconsin, Kansas and Iowa (each restaurant, an "Individual Restaurant" and collectively, the "Sale Assets").

Any Potential Bidder (as defined herein) may obtain a detailed description of each Individual Restaurant and the geographic regions in which such Individual Restaurants are located through the process described in Section III below entitled "Due Diligence."

{2522615:9}

The Debtors may sell Individual Restaurants in regions (Group One) or in piecemeal (Group Two) through two separate groupings described below, such decisions being made to maximize the value to be paid by the successful bidder(s) for the Sale Assets. Accordingly, subject to the Group One Restaurants/Group Two Restaurants split as set forth below, Potential Bidders may submit bids to purchase (i) one, some or all of the Group One Regions (defined below), (ii) all of the Sale Assets, or (iii) any subset of Individual Restaurants in Group Two.

The Debtors will have a form of asset purchase agreement (in each case, the "APA") to consummate the transactions contemplated. The APA will include the terms and conditions upon which the Debtors expect (subject to reasonable revisions by the Qualified Bidders (as defined herein)) the Sale Assets to be sold.

Pursuant to these Sale Procedures and 11 U.S.C. § 363, the Sale Assets will be sold free and clear of all liens, claims, encumbrances and interests, other than liabilities expressly assumed. Bank of America, N.A. ("BofA"), the Debtors' senior secured lender, has agreed not to object to any sales that are consummated in accordance with the terms of these Sale Procedures, including, without limitation, objections under 11 U.S.C. § 363(f); except that BofA reserves the right to object to any sale that, in the judgment of BofA, is (i) not consummated in accordance with these Sales Procedures, (ii) does not represent the highest and best price when compared with other bids, or (iii) is not a bona fide arms' length transaction. BofA further reserves the right to object to the Debtors' determinations regarding Qualified Bidders (as defined herein) (including, without limitation, the designation of Qualified Bidders, whether deficiencies in bids have been cured and the waiver of any condition precedent to becoming a Qualified Bid set forth in the Sale Procedures); the selection of any Stalking Horse Bidder(s) (as defined herein); the payment of any Stalking Horse Protection Fees (as defined herein); the Debtors' selection of the Baseline Bid (as defined herein); any modifications or adjournments to the Group One Auction (as defined herein); or any modification of the Sale Procedures without BofA's consent.

The Sale Assets will be sold without warranty or representation of any kind or nature, whether expressed or implied, and are being purchased by the Successful Bidder(s) (as defined herein) on an "As Is, Where Is" basis and are being sold "Without Faults."

## II.    **Segregation of Restaurant Locations**

The Sale Assets shall be split into two groups: (i) 74 Individual Restaurants located on Schedule 1 to these Sale Procedures (collectively, the "Group One Restaurants"); and (ii) 13 Individual Restaurants located on Schedule 2 to these Sale Procedures (collectively, the "Group Two Restaurants"). The Group One Restaurants will be further segregated into five separate regions for marketing and sale: Minnesota Region; Missouri Region; Davenport Region; Wisconsin Region; and Illinois Region (collectively, the "Group One Regions"), each of which are set forth on Schedule 1 to these Sale Procedures. The Group One Regions will not be marketed as Individual Restaurants, but rather, as all-inclusive regions. The Group One Regions and the Group Two Restaurants will be marketed simultaneously pursuant to these Sale Procedures.

If a Potential Bidder for the Sale Assets desires to make a bid for some or all of the Group One Regions and for all or a portion of the Group Two Restaurants, the Potential Bidder must separately designate the amount it is bidding for the Group One Regions and the Group Two Restaurants; provided, however, that any such Potential Bidder shall not submit a bid on any Group One Region that is contingent upon, tied to or in any other way a combined offer for any Group Two Restaurants.  The Group One Regions and the Group Two Restaurants will be auctioned separately and the Group One Regions will be auctioned first.

## III.   <u>Due Diligence</u>

Until the Bid Deadline (as defined below), the Debtors will afford to each interested party (i) determined by the Debtors to be reasonably likely to make a Qualified Bid (defined below), and (ii) who delivers an executed confidentiality agreement in form and substance satisfactory to the Debtors (each, a "Potential Bidder") reasonable access, during normal business hours and subject to confidentiality requirements, to the books and records of the Debtors reasonably requested by such Potential Bidder, including access to the Debtors' designated due diligence website, to the extent provision of such access or information is not prohibited by applicable law and relates to the Sale Assets.  The Debtors will furnish (subject to applicable law) as promptly as practicable to such Potential Bidder any and all such information as such Potential Bidder may reasonably request related to the Sale Assets.

Burger King Corporation ("BKC") is the Debtors' franchisor.  Potential Bidders should contact a representative of BKC in order to apply for BKC's consent and approval for its bid. The BKC representative's information is available upon request to Robert Hersch at Mastodon Ventures, Inc. ("Mastodon"), the Debtors' investment banker, by phone at 512.498.1212 or via email at <u>rhersch@mastodonventures.com</u>.

## IV.   <u>Initial Determinations by the Debtors</u>

The Debtors shall (a) determine (with the assistance of their respective financial advisors and investment banker) whether any person or entity is a Potential Bidder; (b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Sale Assets; (c) receive bids from Qualified Bidders; (d)  select a stalking horse bidder or bidders; and (e) negotiate and enter into one or more asset purchase agreements with one or more Qualified Bidder(s) (collectively, the "Bidding Process").

Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Sale Assets to any person or entity who is not a Potential Bidder and who does not comply with the participation requirements below.

## V.   <u>Bid Deadline</u>

A Qualified Bidder that desires to make a bid shall deliver written and electronic copies of such bid to the Debtors' investment banker, Mastodon Ventures, Inc., Attention: Robert Hersch,    515    Congress    Ave.,    Suite    1400,    Austin,    TX    78701,    email: <u>rhersch@mastodonventures.com</u>, so as to be received by no later than **5:00 p.m. (Central Time) on or before April 5, 2011** (the "Bid Deadline").  The Debtors' attorneys will send copies of

any bids and information submitted under Section VI below to counsel for BofA, BKC and the Official Committee of Unsecured Creditors (the "Committee") within 24 hours of receipt of such bid.

## VI.   Determination of "Qualified Bidder" Status

Any Potential Bidder desiring to participate in the Bidding Process must be deemed a "Qualified Bidder."  To be deemed a Qualified Bidder, a Potential Bidder must deliver to the Debtors (care of Mastodon) the most current audited (if available) and the latest unaudited financial statements and/or financial information evidencing the Potential Bidder's ability to close the transaction that meets the Debtors' satisfaction or such other information as reasonably determined by the Debtors to support the Potential Bidder's ability to close the transaction.

Upon the Debtors' determination that a party is a Qualified Bidder, the Debtors shall provide each Qualified Bidder with access to all relevant business and financial information necessary to enable such Qualified Bidder to evaluate the Sale Assets, for the sole purpose of submitting an offer.

## VII.   Requirements of a "Qualified Bid"

To be deemed a "Qualified Bid" that may be considered at the Group One Auction or the Group Two Auction (each as defined in Section XI and Section XII below), a bid must:

a.   be in writing;

b.   be submitted by a Qualified Bidder;

c.   identify clearly the Group One Region(s) and/or Group Two Restaurant(s) that are included in the purchase and related segregated purchase price for each Group One Region and the Group Two Restaurant(s), if applicable;

d.   provide that the purchase price shall be paid in full in cash upon closing;

e.   be accompanied by a cash deposit equal to 10% of the proposed purchase price (such cash deposit will be applied to the purchase price);

f.   confirm the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the proposed transaction;

g.   be irrevocable until the earlier of (i) the Qualified Bidder's bid being determined by the Debtors not to be a Qualified Bid, or (ii) another Qualified Bidder's bid for (some or all of) the same assets being approved by the Bankruptcy Court;

h.   be accompanied by a fully executed APA (and demonstrating any modifications as necessary) and such Qualified Bidder's terms relating to the assumption of any executory contracts or unexpired leases or operating liabilities relating to the Individual Restaurants located in the respective Group One Region(s) to be purchased and/or the Group Two Restaurants to be purchased;

i.      designate all executory contracts and unexpired leases the Qualified Bidder seeks to have assumed and assigned to it;

j.      indicate (i) whether the Debtors or the Qualified Bidder is responsible for payment of "cure costs" for executory contracts and unexpired leases to be assumed and assigned, (ii) the source of the funds for payment of such amounts, and (iii) the amount that the Qualified Bidder believes is required to be paid in order to consummate its transaction;

k.      demonstrate the capacity to provide adequate assurance of future performance under all executory contracts and unexpired leases that are being assumed and assigned;

l.      not contain any financing contingencies of any kind, and shall include (i) evidence that such Qualified Bidder (and any related guarantor) has financial resources readily available sufficient in the aggregate to finance the purchase of the Sale Assets (either some or all), (ii) evidence that such Qualified Bidder (and any related guarantor) has the ability to provide adequate assurance of future performance under any unexpired leases and executory contracts, and (iii) evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms provided in the APA;

m.      to the extent a Qualified Bidder intends to operate as a BURGER KING® franchisee, provide evidence of the BKC Approval (defined in Section VIII below) or evidence that a Request (as defined in Section VIII below) for BKC Approval remains pending; and

n.      be accompanied by an affirmative statement from such Qualified Bidder that it has and will continue to completely comply with these Sale Procedures.

For the avoidance of doubt, any party that submits a bid for one, some or all of the Group One Regions and all or a portion of the Group Two Restaurants shall provide a separate allocation for the amount of the consideration to be paid under such bid between the particular Group One Regions and the Group Two Restaurants. Such allocation shall be due no later than the Bid Deadline. Any bid for one, some or all of the Group One Regions must be a bid for all Individual Restaurants located in the particular Group One Region being bid upon. No party may submit a bid for Individual Restaurants in a particular Group One Region that does not include all Individual Restaurants in such region and any such bid will not be deemed a Qualified Bid.

The Debtors will make a determination regarding whether a bid is a Qualified Bid and shall notify all Qualified Bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (Central Time) on April 7, 2011. The Debtors reserve the right to reject any bid on any grounds. Notwithstanding anything contained in this Section VII, should a Qualified Bidder submit a bid that fails to meet the qualifications to become a Qualified Bid, the

Debtors may allow a Qualified Bidder who has failed to meet the requirements of a Qualified Bid an additional 24 hours to cure any deficiencies to such bid.

The Debtors reserve the right, subject to consultation with BofA and the Committee, to waive compliance with any identified requirement for a bid to become a Qualified Bid; provided, however, BKC's approval process set forth in Section VIII below cannot be waived or modified.

## VIII.   **BKC Approval Process**

If a Qualified Bid is contingent on the Qualified Bidder receiving approvals from BKC, then such Qualified Bidder must deliver to BKC a written request for approval to become an authorized operator of a BKC franchise in accordance with BKC's customary approval process (a "Request").  BKC agrees to provide each Qualified Bidder with notice of its approval (the "BKC Approval") or disapproval as soon as reasonably possible after the receipt of all required information from any such Qualified Bidder consistent with its normal approval process.  For purposes of disclosure in considering a Request, BKC may apply, in its sole discretion, some or all of the standards set forth on Schedule 3 to these Sale Procedures.

Nothing in these Sale Procedures shall impair, affect or waive any (i) right of first refusal available to BKC in connection with its BURGER KING® franchise agreements; and (ii) BKC's right to object to any sale and/or assumption and assignment of BKC's franchise agreements or BKC's leases, all such rights preserved to BKC through the Sale Hearing.

## IX.   **Stalking Horse Bidder(s)**

Although the Debtors have had discussions with parties interested in submitting bids to purchase the Sale Assets (both as Individual Restaurants and in total) on a stalking horse basis (in each instance, a "Potential Stalking Horse Bidder"), the Debtors have not yet determined whether they will enter into stalking horse bid arrangements or identified any specific Potential Stalking Horse Bidder(s) for any of the Sale Assets to serve as an actual stalking horse bidder for any of the Sale Assets (in each case, as identified, a "Stalking Horse Bidder").

The Debtors will continue to consider whether to enter into stalking horse bid agreements, selecting one or more Stalking Horse Bidder(s) and which parties to serve as the Stalking Horse Bidder(s).  Any party seeking such consideration should immediately contact the Debtors' investment banker, Mastodon, to express such interest.  Any party seeking designation as a Stalking Horse Bidder shall be required to (i) have received the BKC Approval, (ii) submit a bid (in each instance, a "Stalking Horse Bid"), (iii) agree to an APA memorializing the transaction such party proposes (in each instance, a "Stalking Horse APA"), and (iv) provide a list of all executory contracts and unexpired leases to be assumed and assigned.  The Debtors may name Stalking Horse Bidder(s).  To the extent that the Debtors name Stalking Horse Bidder(s), the Debtors will do so on a rolling basis as Stalking Horse Bids are submitted, negotiated and agreed to.  The Debtors will consider proposed Stalking Horse Bids initially through March 14, 2011, with the expectation of naming a Stalking Horse Bidder or Stalking Horse Bidders no later than March 21, 2011.  To the extent that any of the Sale Assets are not included in a Stalking Horse Bid, the Debtors reserve the right to identify Stalking Horse Bid(s) after March 21, 2011.  The Debtors also reserve the right to name a Stalking Horse Bidder(s) for

any Group One Region or for all of the Sale Assets (subject to the Group One and Group Two split).

Each Stalking Horse Bid, memorialized by Stalking Horse APA(s), shall be subject to higher and better bids pursuant to the terms of these Sale Procedures and applicable law. As noted in Section XI of these Sale Procedures, the Debtors may negotiate a break-up fee and reimbursement of reasonable expenses (the "Stalking Horse Protection Fee"). The Debtors shall be under no obligation to designate and name a Stalking Horse Bidder or accept any Stalking Horse Bid(s) for any or all of the Sale Assets.

## X.    Negotiation of Stalking Horse Protection Fee(s)

In the event that a Stalking Horse Bidder is named and designated, the Debtors may negotiate a reasonable Stalking Horse Protection Fee payable to such Stalking Horse Bidder in the event that such Stalking Horse Bidder are not the Successful Bidder (whether as initial Successful Bidder or as successor as a Reserve Bidder). The Stalking Horse Protection Fee shall be approved by the Bankruptcy Court. At the Group One Auction or the Group Two Auction, as the case may be, any Qualified Bidder wishing to enter a bid in excess of the Stalking Horse Bid must enter an amount equal to the Stalking Horse Bid plus the Stalking Horse Protection Fee, plus any minimum bid amount to advance their bid(s).

If a Stalking Horse Bidder is identified and named in accordance with these Sale Procedures, the Debtors shall file a motion with the Court (in each case, a "Stalking Horse Motion") naming the Stalking Horse Bidder, seeking expedited approval of the Stalking Horse APA and Stalking Horse Protection Fee. Mastodon will contact all parties that have expressed an interest (in writing or otherwise) in any portion of the Sale Assets being purchased under the respective Stalking Horse APA and provide such parties with a copy of the Stalking Horse Motion and a copy of the respective Stalking Horse APA.

## XI.    Group One Auction Process

In the event that the Debtors receive more than one Qualified Bid for one, some or all of the Group One Regions, the Debtors will conduct an auction (the "Group One Auction") for the Group One Regions. The Group One Auction will take place at **10:00 a.m. (Central Time) on April 11, 2011** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than April 7, 2011.

The Debtors will have the right to publish detailed procedures consistent with these Sale Procedures for the conduct at the Group One Auction at any time prior to the start of the Group One Auction. Parties entitled to attend the Group One Auction shall include the Debtors, BofA, the Committee, BKC, the Qualified Bidders and the Stalking Horse Bidder(s) (if any), and each of those parties' representatives. The Stalking Horse Bidder(s) (if any) and each Qualified Bidder shall appear at the Group One Auction in person, or through a representative who provides appropriate evidence of such person's authority. Only a Qualified Bidder who has timely submitted a Qualifying Bid, and the Stalking Horse Bidder(s) (if any), shall be entitled to make bids at the Group One Auction.

In the event that a Stalking Horse Bidder is not selected prior to the Group One Auction and no Stalking Horse Bid(s) are tendered, the Debtors will select the highest and best bid or bids (a "Baseline Bid") to serve as the negotiating point with the other Qualified Bidders at the Group One Auction.  There may be more than one Baseline Bid if the Debtors determine that multiple Baseline Bids for certain of the Group One Regions are higher and better than one Baseline Bid. The Debtors reserve the right to aggregate bids for separate Group One Regions and compare such aggregated bids with bids for all of the Group One Regions in determining the then current best bid.

As soon as practicable, the Debtors will provide all Qualified Bidders, BofA, BKC and the Committee with a copy of the Baseline Bid(s).  At the Group One Auction, Qualified Bidders will be permitted to revise, increase, and/or enhance their bid(s) based upon the terms of the Stalking Horse Bid or the Baseline Bid(s), as the case may be (except to the extent otherwise authorized by the Debtors).  All Qualified Bidders will have the right to make additional modifications to the APA at the Group One Auction.

The Group One Auction will be conducted in rounds and in any order the Debtors determine.  At the end of every round, the Debtors shall declare the highest and best bid or bids at that time for the assets under consideration pursuant to the Baseline Bid(s).  Each Qualified Bidder shall have the right to continue to improve its respective bid at the Group One Auction. The initial minimum overbid shall be the Baseline Bid established prior to the Group One Auction plus the lesser of 10% of the Baseline Bid or $200,000 (the "Initial Overbid"). Thereafter, Qualified Bidders may increase their Qualified Bids in any manner that they deem fit; provided, however, that each subsequent increase must include a minimum of the lesser of 5% of the Baseline Bid or $100,000 in additional consideration.  The Debtors reserve the right to approach any Qualified Bidder(s) and seek clarification to bids at any time, including without limitation, inviting Qualified Bidder(s) to communicate with other Qualified Bidder(s) if such communication would be beneficial to the Group One Auction.

The Group One Auction will continue with the Qualified Bidders until the Debtors determine, and subject to Bankruptcy Court approval, that they have received the highest and best offer for the Group One Regions (either as a whole or separately) from the Qualified Bidders or the Stalking Horse Bidder(s) (the "Successful Bid") and the next highest and best Qualified Bid submitted at the Group One Auction (a "Reserve Bid").  The Qualified Bidder(s) submitting the Successful Bid(s) shall become a "Successful Bidder(s)," and the Qualified Bidder(s) submitting the Reserve Bid(s) shall become a "Reserve Bidder(s)."  The Successful Bidder(s) and the Reserve Bidder(s) may be named for separate Group One Regions or for all of the Group One Regions, or any combination thereof, as determined by the Debtors.  In making this decision, the Debtors shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the particular groupings of Group One Regions, the Qualified Bidder's ability to close a transaction and the timing thereof, the type and nature of the APA, its requirements as to the assumption and assignment of executory contracts, licenses, and unexpired leases relating to the Individual Restaurants located in the Group One Region(s) to be purchased, and the net benefit to the Debtors' estates.

The Debtors' procedures for the Group One Auction require the following: (i) if a Stalking Horse Bidder(s) is selected prior to the Group One Auction, the initial overbid by a

Qualified Bidder(s) shall be greater than the sum of (a) the Stalking Horse Protection Fee, and (ii) the Initial Overbid.  If there is no Stalking Horse Bidder(s) selected prior to the Group One Auction, no Stalking Horse Protection Fee(s) will be awarded and the initial overbid amount will not include such an amount.

The Debtors reserve the right, in their business judgment, to make one or more modifications and/or adjournments to the Group One Auction to, among other things: (i) facilitate discussions between the Debtors, on the one hand, and individual Qualified Bidders, on the other hand; (ii) allow individual Qualified Bidders to consider how they wish to proceed; and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their business judgment may require.

In the event that a Qualified Bidder's Successful Bid or Reserve Bid changes as a result of the Group One Auction, then such Qualified Bidder may need to seek additional approvals from BKC beyond such Qualified Bidder's initial BKC Approval.   Qualified Bidders are encouraged to address any such matters with BKC as early in the process as possible.

**XII.**    **Group Two Auction Process**

In the event that the Debtors receive more than one Qualified Bids for all or a portion of the Group Two Restaurants, the Debtors will conduct an auction (the "Group Two Auction") for the Group Two Restaurants.  The Group Two Auction will take place, subject to the Debtors' discretion, either immediately following the closing of the Group One Auction or at **10:00 a.m. (Central Time) on April 12, 2011,** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than April 7, 2011.

All of the procedures set forth in Section XI of these Sales Procedures relating to the Group One Auction shall be expressly applicable to the Group Two Auction; provided, however, that a Qualified Bidder(s) bidding on one, some or all of the Group One Regions that has also submitted a Qualified Bid(s) for the Group Two Restaurants shall not withdraw such its bid for the Group Two Restaurants regardless of such Qualified Bidder's success or lack of success at the Group One Auction.

**XIII.**    **The Sale Hearing**

At the Sale Hearing, which will be held **on April 14, 2011, at 9:30 a.m. (Central Time)**, the Debtors will seek entry of an order or orders authorizing and approving the sale(s) to the Successful Bidder(s) for the Group One Regions and/or Group Two Restaurants.  No later than 11:59 p.m. (Central Time) on April 12, 2011, all objections to the relief requested at the Sale Hearing shall be filed and served in the manner prescribed in the motion to approve the sale of the Group One Regions and the Group Two Restaurants.  The Sale Hearing may be adjourned or rescheduled from time to time.   The Debtors shall provide notice of such adjournment or rescheduling to:  (i) the U.S. Trustee; (ii) counsel to BofA; (iii) counsel to the Committee; (iv) counsel to BKC; (v) all Qualified Bidders;  (vi) all parties that have filed a timely objection to the sale; (vii) all persons or entities known or reasonably believed to have asserted a lien in any of the Sale Assets; and (viii) all parties that have requested notice in the Debtors' bankruptcy cases.

## XIV.    <u>Failure to Consummate Purchase</u>

Following the Sale Hearing, if the Successful Bidder(s) fails to consummate the closing of the sale because of a breach or failure to perform on the part of such Successful Bidder(s), the Debtors will be authorized, but not required, to consummate the sale with Reserve Bidder(s) without further order of the Bankruptcy Court.  In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors.  Additionally, the Debtors shall be entitled to seek all available damages from the defaulting Successful Bidder.

## XV.    <u>Return of Deposit</u>

The deposits of the Successful Bidder(s) shall be applied to the Successful Bidder's obligations under the Successful Bid upon closing of the transactions contemplated thereby.  If a Successful Bidder fails to close the transactions contemplated by the Successful Bidder then such Successful Bidder shall forfeit its deposit (and any right to any Stalking Horse Protection Fee, if applicable).

The deposit(s) of the Reserve Bidder(s) shall be returned to the Reserve Bidder(s) upon closing of the transactions contemplated by the Successful Bidder(s); <u>provided</u>, <u>however</u>, that if a Successful Bidder fails to close the transactions when and as provided in the Successful Bid, then the deposit of the Reserve Bidder(s) shall be applied to the Reserve Bidder's obligations under the Reserve Bid upon closing of the transactions contemplated thereby.  If a Reserve Bidder fails to close the transactions contemplated by a Reserve Bid, then such Reserve Bidder shall forfeit its deposit.

All other deposits of Qualified Bidders who are not the Successful Bidder(s) or the Reserve Bidder(s) shall be returned within three business days after the conclusion of the Group One Auction or the Group Two Auction, as the case may be.

The Debtors reserve all of their rights regarding any return of deposits, and the failure by the Debtors to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

## XVI.    <u>Modification of Amended Sale Procedures</u>

The Debtors may amend these Sale Procedures, in their reasonable business judgment, at any time in any manner that will best promote the goals of the Bidding Process, including but not limited to extending or modifying any of the dates described herein.  Notwithstanding the foregoing, the Debtors may modify the requirements set forth in Section II of these Sale Procedures only (i) with the consent of both BofA and BKC or (ii) pursuant to an order of the Bankruptcy Court.

## XVII.    <u>Miscellaneous</u>

BofA shall be entitled to exercise its right under 11 U.S.C. § 363(k) at the Group One Auction or the Group Two Auction (as the case may be) to credit bid the indebtedness owed to BofA.  For the purpose of these Sale Procedures, BofA shall be deemed a Qualified Bidder and shall be entitled to participate in the Group One Auction and the Group Two Auction if BofA's

bid complies with all of the provisions of these Sale Procedures, subject to the following modifications: (i) with respect to the cash deposit required under Section VII(e) of these Sale Procedures, BofA shall deposit cash equal to 10% of the cash component (if any) of the bid; and (ii) with respect to Section VII(d) of these Sale Procedures, BofA need not provide that the credit bid portion of its purchase price be paid in cash at closing.  BofA need not provide for a cash deposit as to the credit component of its bid.  Notwithstanding anything herein to the contrary, BofA's status as a Qualified Bidder does not exempt BofA from seeking and obtaining the BKC Approval for the operation of the Sale Assets as BURGER KING® restaurants.

## XVIII.  Debtors' Consultation with Key Parties

In the context of these Sale Procedures, the Debtors will consult with BKC, BofA and the Committee with respect to issues relating to (i) designating a Qualified Bidder; (ii) determining whether a bid is a Qualified Bid; (iii) curing deficiencies to become a Qualified Bid; (iv) identifying any Stalking Horse Bid(s) and whether to accept any Stalking Horse Bid(s); (v) establishing procedures for the Group One Auction and the Group Two Auction; (vi) selecting the Baseline Bid(s); (vii) choosing the Successful Bid(s) and Reserve Bid(s); and (viii) modifying these Sale Procedures.

## SCHEDULE 1

## GROUP ONE RESTAURANTS BY REGION

| | Store # | Address | City | State |
|---|---|---|---|---|
| | **Minnesota Region** | | | |
| 1 | 04116 | 2651 County Road I | Mounds View | MN |
| 2 | 06270 | 8510 Edinburgh Center Drive | Brooklyn Park | MN |
| 3 | 07557 | 8501 Springbrook Drive NW | Coon Rapids | MN |
| 4 | 09095 | 106 Ninth Avenue Circle South | Princeton | MN |
| 5 | 09993 | 10861 University Avenue NE | Blaine | MN |
| 6 | 09994 | 318 East Kraft Drive | Melrose | MN |
| 7 | 02641 | 2011 E Main Street | Albert Lea | MN |
| 8 | 04553 | 1501 NW 7th Street | Faribault | MN |
| 9 | 06545 | 1022 E Blue Earth Avenue | Fairmont | MN |
| 10 | 06615 | 1318 Riverfront Drive | Mankato | MN |
| 11 | 07444 | 735 Bridge Street | Owatonna | MN |
| 12 | 09081 | 1409 4th Street NW | Austin | MN |
| 13 | 04009 | 14251 Nicollet Avenue | Burnsville | MN |
| 14 | 04122 | 5020 160th Street SE | Prior Lake | MN |
| 15 | 04151 | 1150 East Highway 13 | Burnsville | MN |
| 16 | 09256 | 255 Triangle Lane N Ste 2 | Jordan | MN |
| 17 | 04507 | 13840 Grove Drive | Maple Grove | MN |
| 18 | 05012 | 2025 Northdale Blvd | Coon Rapids | MN |
| 19 | 06299 | 10801 Bloomington Ferry Road | Bloomington | MN |
| 20 | 07466[1] | 330 North Garden | Bloomington | MN |
| 21 | 08224 | 5105 Edina Industrial Blvd | Edina | MN |
| 22 | 09332 | 5358 West Broadway Ave | Crystal | MN |
| 23 | 05591 | 2535 Division Street | North St Paul | MN |
| 24 | 06590 | 1215 Gun Club Road | White Bear Lake | MN |
| 25 | 08004 | 3333 Rice Street | Shoreview | MN |
| 26 | 09272 | PO 264   403 Fire Monument Road | Hinckley | MN |
| 27 | 11243 | 1560 West 4th Street | Rush City | MN |
| 28 | 11682 | 38711 Tanger Drive | North Branch | MN |
| 29 | 05713 | 1501 Weir Drive | Woodbury | MN |
| 30 | 06530 | 7051 Tenth Street North | Oakdale | MN |
| 31 | 07937 | 2411 Center Drive | Hudson | WI |
| 32 | 09934 | 120 Meridian Drive | New Richmond | WI |
| 33 | 11254 | 9896 Norma Lane | Woodbury | MN |
| 34 | 12757 | 1287 N Main St | River Falls | WI |
| 35 | 10239 | 244 Grand Avenue | St Paul | MN |
| 36 | 10284 | 695 7th Street East | St Paul | MN |
| 37 | 11284 | 1500 Stinson Blvd NE | Minneapolis | MN |
| 38 | 11535 | 8481 SE Point Douglas Road | Cottage Grove | MN |
| 39 | 12250 | 925 Washington Ave SE | Minneapolis | MN |
| 40 | 13091 | 289 57th Avenue NE | Fridley | MN |
| | **Missouri Region** | | | |
| 1 | 03232 | 3009 S. Campbell Avenue | Springfield | MO |
| 2 | 05357 | 1022 Kings Highway Street | Rolla | MO |
| 3 | 07203 | 525 S. National Avenue | Springfield | MO |
| 4 | 12281 | 2200 E. Austin Blvd | Nevada | MO |
| 5 | 11049 | 3095 Gardner Edgewood Drive | Neosho | MO |
| 6 | 12413 | 315 N. Massey Blvd | Nixa | MO |
| 7 | 12415 | 875 E. Highway 60 | Monett | MO |
| 8 | 01227 | 935 W. Kearney | Springfield | MO |
| 9 | 03475 | 2138 N. Glenstone Avenue | Springfield | MO |

---

[1] The Debtors reserve the right to exclude Restaurant # 7466 from the restaurants to be sold in the Minnesota Region.

| | Store # | Address | City | State |
|---|---|---|---|---|
| 10 | 04513 | 1077 S. Jefferson Avenue | Lebanon | MO |
| 11 | 05539 | 1101 S. Limit Avenue | Sedalia | MO |
| 12 | 08384 | 1911 S. Springfield Avenue | Bolivar | MO |
| 13 | 09331 | 1317 Preacher Roe Blvd | West Plains | MO |

**Davenport Region**

| | | | | |
|---|---|---|---|---|
| 1 | 04043 | 229 West Kimberly Road | Davenport | IA |
| 2 | 04201 | 5231 N Brady Street | Davenport | IA |
| 3 | 04297 | 4040 38th Avenue | Moline | IL |
| 4 | 06211 | 1222 Avenue of the Cities | East Moline | IL |

**Wisconsin Region**

| | | | | |
|---|---|---|---|---|
| 1 | 01764 | 2655 East Washington | Madison | WI |
| 2 | 01888 | 2624 Milton Avenue | Janesville | WI |
| 3 | 03792 | 4980 South 76th Street | Greenfield | WI |
| 4 | 04857 | 822 Windsor Street | Sun Prairie | WI |
| 5 | 09366 | 400 Center Way | Janesville | WI |

**Illinois Region**

| | | | | |
|---|---|---|---|---|
| 1 | 01752 | 723 Shooting Park | Peru | IL |
| 2 | 00111 | 18459 South Halsted Street | Glenwood | IL |
| 3 | 01747 | 209 Norris Drive | Ottawa | IL |
| 4 | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| 5 | 05879 | 1830 Southwest Avenue | Freeport | IL |
| 6 | 11877 | 504 West Blackhawk Drive | Byron | IL |
| 7 | 16573 | 2320 Route 34 | Oswego | IL |
| 8 | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| 9 | 00437 | 1138 East State Street | Rockford | IL |
| 10 | 01060 | 1450 4th Street | Beloit | WI |
| 11 | 01326 | 2434 11th Street | Rockford | IL |
| 12 | 10234 | 7510 East State Street | Rockford | IL |

## <u>SCHEDULE 2</u>

## GROUP TWO RESTAURANTS

|     | Store # | Address | City | State |
|-----|---------|---------|------|-------|
| 1   | 00106 | 901 North Lake Street | Aurora | IL |
| 2   | 01558 | 1411 S. Range Line Road | Joplin | MO |
| 3   | 04111 | 3500 South Moorland Road | New Berlin | WI |
| 4   | 04334 | 2423 Rockingham Road | Davenport | IA |
| 5   | 05960 | 2001 Center Avenue | Janesville | WI |
| 6   | 05971 | 1710 DeKalb Avenue | Sycamore | IL |
| 7   | 06030 | 1011 W. Central Avenue | Carthage | MO |
| 8   | 06609 | 3020 E. Sunshine Street | Springfield | MO |
| 9   | 07204 | 1699 W. Jackson Street | Ozark | MO |
| 10  | 08964 | 1220 E. Republic Road | Springfield | MO |
| 11  | 09744 | 1429 Main Street | Parsons | KS |
| 12  | 11191 | 2789 Milwaukee Road | Beloit | WI |
| 13  | 11751 | 808 S Illinois Avenue | Republic | MO |

## SCHEDULE 3

## DESCRIPTION OF BURGER KING CORPORATION'S APPROVAL PROCESS

a. <u>New Franchisee Approval Process</u>:  New franchisee candidates must obtain approval by all of the following:

> o <u>Operations Review</u>:  Criteria includes: directly comparable experience in a multi-unit retail environment preferably in the restaurant sector.  Candidate must pass interviews with BKC's Franchise Operations leadership.

> o <u>Legal Review</u>: Criteria include background checks.

> o <u>Credit Review</u>: Criteria include reliable credit history.

> o <u>Financial Review</u>: Criteria includes net worth of at least $1.5M or 3-5x the equity required to complete the targeted deal, whichever is greater.

> o <u>Franchising Review</u>:  Franchisee must obtain approval of BKC's franchise leadership team.  Criteria includes alignment with BKC's franchising guiding principles, including a focus on growth via organic development and an understanding of BKC's policies on maximum restaurant count and contiguous geography.

b. <u>Deal Approval</u>: Transfers of BURGER KING® restaurants are subject to case-by-case deal approval by BKC's Operations, Franchising, Legal and Finance groups.  Being approved to become a franchisee does not in any way give the approved candidate a path around this process.

c. <u>Approval Process for Existing Franchisee Acquisitions</u>:  Existing franchisees seeking to acquire any particular set of existing BURGER KING® restaurants must obtain approval by all of the following:

> o <u>Operations Review</u>:  BKC's Field Operations must support the buyer based on their operations track-record and organizational capacity.

> o <u>Financial Review</u>:  The proposed buyer must demonstrate the financial capacity to handle the transaction in addition to any required capital expenditures.  Buyers must be current in all payments due to BKC.

> o <u>Franchising Review</u>:  In general terms, the buyer must be aligned with all BKC goals and initiatives.  Check-points include whether the franchisee is compliant with all equipment and remodeling obligations in their existing business; whether the buyer has supported local marketing initiatives; and whether the buyer has developed new restaurants.  In addition, the acquisition will be reviewed for whether it is in the same geographical areas as the proposed buyer's existing base of operations; and whether it causes the buyer to be at or near the 100-restaurant ceiling.

## <u>Exhibit B</u>

## Form of Deposit Escrow Agreement

Please see attached.

# DEPOSIT ESCROW AGREEMENT

THIS DEPOSIT ESCROW AGREEMENT ("Escrow Agreement") is entered into as of April 11, 2011, by and among Duke and King Acquisition Corp., a Delaware corporation ("Seller"), Heartland Food Corp., a Delaware corporation ("Buyer"), and U.S. Bank National Association, a national banking association ("Escrow Agent").

## RECITALS

A.    Buyer has submitted a bid to Seller to purchase certain of the assets and business of Seller pursuant to the terms of certain "Sale and Bidding Procedures" issued by the United States Bankruptcy Court for the District of Minnesota pursuant to order in the case captioned *In re Duke and King Acquisition Corp.,* Case No. 10-38652 (Bankr. Minn.) (the "Sale Procedures"); and

B.    As part of that bid, Buyer has submitted to Seller an Asset Purchase Agreement, dated April 11, 2011 (the "Purchase Agreement"); and

C.    Pursuant to the Sale Procedures, to qualify as a Qualified Bidder, Buyer is required to submit a cash deposit equal to 10% of the purchase price into escrow (the "Deposit") to be disbursed in accordance with the terms of this Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.    Certain Defined Terms. Capitalized terms used but not otherwise defined herein shall have the respective meanings given such terms in the Purchase Agreement or the Sale Procedures. The Escrow agent shall be furnished copies of the Purchase Agreement and the Sale Procedures for reference purposes only, provided that the Escrow Agent shall have no duties, obligations or liabilities arising under the Purchase Agreement or Sale Procedures.

2.    Designation of the Escrow Agent. Buyer and Seller hereby designate and appoint the Escrow Agent for the purposes set forth in this Escrow Agreement. The Escrow Agent hereby accepts such appointment under the terms and conditions set forth in this Escrow Agreement.

3.    Creation of the Escrow. On even date herewith, Buyer has delivered, or shall deliver, the sum of $716,100.00 to the Escrow Agent, as the Deposit, by wire transfer of immediately available funds to be held in an escrow account specified by the Escrow Agent (the "Escrow Funds"). The escrow account name and account number are as follows: Duke & King Acq / Heartland Food 2 - # 146723000.

4.    Investment. From the date hereof until otherwise directed in writing by Buyer and Seller, the Escrow Agent shall invest the Escrow Funds in its U.S. Bank Money Market Account as described on Exhibit A attached hereto. In no event shall the Escrow Agent be liable for the results of any investment, including without limitation any loss, cost or penalty resulting from any investment made in accordance with the terms hereof.

5.     Disbursement of the Escrow Funds.   The Escrow Agent shall distribute the Escrow Funds and interest accrued thereon in accordance with the joint written instructions executed by Buyer and Seller pursuant to the terms of the Purchase Agreement ("Joint Instruction").

6.     Termination. This Escrow Agreement, and the escrow created hereby, shall terminate upon the date that the Escrow Funds are fully and finally disbursed pursuant to Joint Instruction of Buyer and Seller.

7.     Fees and Expenses. In consideration for its services hereunder, Buyer and Seller agree to equally divide the payment (1/2 paid by Seller and 1/2 paid by Buyer) of the annual administrative escrow fee of the Escrow Agent set forth in Exhibit B attached hereto, and of all other fees, costs, charges and expenses of the Escrow Agent, if any, including reasonable attorneys' fees, which are incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, provided, however, that the Escrow Agent complies with Section 8(a) of this Escrow Agreement.

8.     Conditions of the Escrow Agent's Obligations.

(a)     Legal Counsel. The Escrow Agent shall be entitled to employ legal counsel and other experts as it may deem reasonably necessary to advise it in connection with its obligations hereunder, may rely on the advice of such counsel, and may pay them reasonable compensation therefore, provided, however, that the fees of such legal counsel shall have been approved in advance by the parties hereto if reimbursement of such fees is to be sought from the parties; provided that such approval shall not be unreasonably withheld and in no event shall it be withheld if the Escrow Agent is subject to actual or threatened litigation not directly caused by its own negligence or willful misconduct .

(b)     Resignation. The Escrow Agent may resign by giving written notice thereof to Buyer and Seller. In the event of any such notice of resignation, the Escrow Agent shall refrain from taking any action with respect to the Escrow Funds until it receives joint written instructions from Buyer and Seller designating a successor depository which shall be a national bank authorized to exercise corporate trust powers, and having a combined capital and surplus of at least $5,000,000,000. Upon receipt of such joint instructions, the Escrow Agent shall promptly deliver the Escrow Funds then held by it to such successor. Any successor depository shall have all the rights, obligations, and immunities of the Escrow Agent set forth herein. If the Buyer and Seller have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation from the Escrow Agent, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

(c)     Liability Limitations. Except as to its obligation to keep the Escrow Funds safely in its custody as the Escrow Agent pursuant to the terms of this Escrow Agreement, the Escrow Agent shall be indemnified, on a several basis, by Buyer and Seller and shall not be liable to anyone whatsoever by reason of any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law or for anything which it may do or

refrain from doing in connection herewith unless caused by or arising out of its own negligence or willful misconduct. IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION, UNLESS ARISING IN WHOLE OR IN PART OUT OF ITS OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

(d)     <u>Reliance</u>. The Escrow Agent shall be entitled to rely and shall be protected in acting in reliance upon any Joint Instruction and shall be entitled to treat as genuine, and as the document it purports to be, any letter, paper or other document furnished to it and reasonably believed by it to be genuine and to have been signed and presented by the proper party or parties.

(e)     <u>Tax Matters</u>. The Escrow Agent does not have any interest in the Escrow Funds deposited hereunder but is serving only as escrow holder and having only possession thereof. All interest or other income from all investments and reinvestments of the Escrow Funds shall be paid as directed in the Joint Instruction or upon the earlier of: (i) termination of this Agreement and the escrow established hereby, or (ii) the disbursement of the Escrow Funds. For income tax purposes, income from all investments and reinvestments of the Escrow Funds shall be for the benefit of the party to whom such funds are disbursed, shall be recognized by such party and paid by such party.

(f)     <u>Disputes</u>. In the event that (i) any dispute shall arise between the parties with respect to the disposition or disbursement of any of the assets held hereunder or (ii) the Escrow Agent shall be uncertain as to how to proceed in a situation not explicitly addressed by the terms of this Agreement whether because of conflicting demands by the other parties hereto or otherwise, the Escrow Agent shall be permitted to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Funds until such dispute or conflicting demands shall have been (i) determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or (ii) settled by agreement between the conflicting parties as evidenced in a writing reasonably satisfactory to the Escrow Agent. Notwithstanding anything herein to the contrary, in no event shall the Escrow Agent be required to institute legal proceedings of any kind, or be required to defend any legal proceedings which may be instituted against it with respect to this Agreement unless requested to do so in writing by the other parties hereto and until it is indemnified by such requesting party(ies) to the sole satisfaction of the Escrow Agent, against the cost and expense of such defense, including without limitation the reasonable fees and expenses of its legal counsel.

9.     <u>Action by the Escrow Agent</u>. Nothing herein contained shall be deemed to impose upon Buyer or Seller any obligation or liability on account of the failure of the Escrow Agent to fulfill its obligations under this Escrow Agreement. The Escrow Agent will not be responsible for determining or calculating amounts to be disbursed from the escrow established hereunder.

10.     <u>Headings</u>. The headings in this Escrow Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation hereof.

11.     <u>Governing Law</u>. This Escrow Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota without giving effect to the principles of conflicts of laws thereof.

12.     <u>Notices</u>.  All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered by hand, overnight delivery service, electronic mail or facsimile transmitter (with confirmed receipt) to the physical address, electronic address or facsimile number set forth in this section, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given on the date received.

If to Buyer:            Heartland Food Corp.
                        1400 Opus Place
                        Suite 900
                        Downers Grove, IL 60515
                        Attention:  Christopher J. Ondrula, CEO
                        Facsimile: 630-598-2210
                        Email: condrula@heartlandfoodcorp.com

With copies to (which shall not constitute notice):

                        GSO CAPITAL PARTNERS LP
                        280 Park Avenue
                        New York, New York 10017
                        Attention: Marc Baliotti
                        Facsimile: 212-503-6930
                        Email: Marc.Baliotti@gsocap.com

and

                        Kirkland & Ellis, LLP
                        300 North LaSalle Street
                        Chicago, IL 60654
                        Attention: Robert A. Wilson
                        Facsimile: 312-862-2200
                        Email: Robert.wilson@kirkland.com

If to Seller:           [Duke and King Acquisition Corp.]
                        12281 Nicollet Avenue, South
                        Burnsville, MN  55337
                        Attention:     Becky Moldenhauer
                        E-Mail         bmoldenhauer@dukeandking.com
                        Facsimile:     952-288-2327

<table>
<tr><td>With a copy to</td><td>McDonald Hopkins LLC<br>600 Superior Avenue, East<br>Suite 2100<br>Cleveland, Ohio 44114<br>Attention: Scott N. Opincar<br>E-Mail sopincar@mcdonaldhopkins.com<br>Facsimile: (216) 348-5474</td></tr>
<tr><td>If to the Escrow Agent:</td><td>U.S. Bank National Association<br>Mail Code EP-MN-WS3C<br>60 Livingston Avenue<br>St. Paul, MN 55107<br>Attention Georgette Kleinbaum<br>E-Mail georgette.kleinbaum@usbank.com<br>Facsimile: 651 495-8096</td></tr>
</table>

or to such other address as may have been designated in a prior notice. Notices sent by registered or certified mail, postage prepaid, return receipt requested, shall be deemed to have been given two business days after being mailed; notices sent by a nationally recognized commercial overnight carrier shall be effective the next business day after receipted delivery to such courier specifying overnight delivery; notices sent by facsimile shall be effective upon confirmation of receipt at the number specified above otherwise, notices shall be deemed to have been given when delivered to the address specified above (or other address specified in accordance with the foregoing).  The applicable persons designated on Exhibit C attached hereto are duly authorized signatories for Buyer and Seller, respectively, and have authority on behalf of the respective parties to execute and deliver this Agreement and any Joint Instruction contemplated by this Agreement.  Any modification of such authorized signatories shall be provided by written notice delivered to the Escrow Agent.

13.     Execution in Counterparts. This Escrow Agreement and any related Joint Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

14.     Modification. This Escrow Agreement may be modified or amended only by joint written instructions to the Escrow Agent, signed by Buyer and Seller, or by a subsequent writing signed by Buyer, Seller and the Escrow Agent.

15.     Binding Effect. This Escrow Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of Buyer, Seller and the Escrow Agent, and their respective successors and assigns.

16.     Severability. If any provision of this Escrow Agreement, or the application thereof to any person or circumstance, should, for any reason and to any extent, be invalid or unenforceable, the remainder of this Escrow Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

17.     _Patriot Act Disclosure_. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each individual or entity that opens an account. Therefore, the Escrow Agent must obtain the name, address, taxpayer or other government identification number, and other information, such as date of birth for individuals, for each individual and business entity that is a party to this Escrow Agreement. For individuals signing this Escrow Agreement on their own behalf or on behalf of another, the Escrow Agent requires a copy of a driver's license, passport or other form of photo identification. For business and other entities that are parties to this Escrow Agreement, the Escrow Agent will require such documents as it deems necessary to confirm the legal existence of the entity. At the time of or prior to execution of this Escrow Agreement, any party providing a tax identification number for tax reporting purposes shall provide to the Escrow Agent a completed IRS Form W-9, and every individual executing this Agreement on behalf of party shall provide to the Agent a copy of a driver's license, passport or other form of photo identification acceptable to the Agent. The parties hereto agree to provide to the Escrow Agent such organizational documents and documents establishing the authority of any individual acting in a representative capacity as the Escrow Agent may require in order to comply with its established practices, procedures and policies. The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Funds in accordance with the Form W-9 information provided to the Escrow Agent. Buyer and Seller understand that, in the event one or more tax identification numbers are not certified to the Escrow Agent, the Internal Revenue Code, as amended from time to time, may require withholding of a portion of any interest or other income earned on the Escrow Funds

[Signature page follows.]

IN WITNESS WHEREOF, this Escrow Agreement has been executed by Buyer, Seller and the Escrow Agent on the date and year first written above.

**SELLER**

DUKE AND KING ACQUISITION CORP.

By:_____

Name:_____

Title:_____

**BUYER**

HEARTLAND FOOD CORP.

By:_____

Name:_____

Title:_____

**ESCROW AGENT**

U.S. BANK National Association

By:_____

Name:_____

Title:_____

## EXHIBIT A

## U.S. BANK NATIONAL ASSOCIATION
## MONEY MARKET ACCOUNT AUTHORIZATION
## DESCRIPTION AND TERMS

The U.S. Bank Money Market account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as Agent for its trust customers. U.S. Bank's trust department performs all account deposits and withdrawals. Deposit accounts are FDIC Insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

### AUTOMATIC AUTHORIZATION

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Account. The U.S. Bank Money Market Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

# EXHIBIT B

## ESCROW AGENT'S FEE SCHEDULE


I.     Acceptance Fee:          Waived

The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing. This is a flat one-time fee, payable at closing.

II.     Annual Administration Fee:          $1,000

Annual administration fee for performance of the routine duties of the escrow agent associated with the management of the account. Administration fees are payable in advance without pro-ration for partial years.

III.     Out-of-Pocket Expenses:          At Cost

Reimbursement of expenses associated with the performance of our duties, including but not limited to fees and expenses of legal counsel, accountants and other agents, tax preparation, reporting and filing, publications, and filing fees. Out-of-pocket expenses are subject to prior written approval by both Buyer and Seller, which approval shall not be unreasonably withheld.

IV.     Extraordinary Fees or Expenses:

Extraordinary fees are payable to the Agent for duties or responsibilities not expected to be incurred at the outset of the transaction, not routine or customary, and not incurred in the ordinary course of business, subject to prior written approval by both Buyer and Seller, which approval shall not be unreasonably withheld. Extraordinary services might include amendments, specialized reporting, use investments not automated with the Escrow Agent's trust accounting system, and actual or threatened litigation or arbitration proceedings.


IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

<u>EXHIBIT C</u>

**Authorized Signatories:**

**Buyer: HEARTLAND FOOD CORP.**

The following person(s) are hereby designated and appointed as authorized representatives of Buyer **(only one signature shall be required for any direction):**

_____
       Name                           Specimen signature

_____
       Name                           Specimen signature

_____
       Name                           Specimen signature

**Seller:**

The following person(s) are hereby designated and appointed as authorized representatives of Seller **(only one signature shall be required for any direction):**

_____
       Name                           Specimen signature

_____
       Name                           Specimen signature

_____
       Name                           Specimen signature

**<u>Exhibit C</u>**

**Form of Sale Order**

Please see attached.

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | |

Court File Nos:

(includes:
Duke and King Missouri, LLC;                   10-38653 (GFK)
Duke and King Missouri Holdings, Inc.;     10-38654 (GFK)
Duke and King Real Estate, LLC;           10-38655 (GFK)
DK Florida Holdings, Inc.)                 10-38656 (GFK)

Chapter 11 Cases
Chief Judge Gregory F. Kishel

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ORDER AUTHORIZING DEBTORS TO (I) SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) ASSUME AND ASSIGN CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (III) ESTABLISH CURE COSTS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The sale motion of above-referenced Debtors for Orders (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs; (III) Scheduling a Hearing on Stalking Horse; (IV) Approving Stalking Horse Protection Fee; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing (the "Sale Motion") came before the undersigned on May 10, 2011. [_____] (the "Buyer") has been named as the Successful Bidder[1] at the Group One Auction for the Acquired Assets that are identified in that certain asset purchase agreement dated April __, 2011, by and

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

among [_____] and [_____] (the "APA"), as attached hereto as <u>Exhibit 1</u>. Appearances were noted on the record.

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS HEREBY FOUND THAT:**[2]

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.      Venue of the Debtors' chapter 11 cases (the "Chapter 11 Cases") in this District is proper pursuant to 28 U.S.C. § 1409(a).

C.      Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N). The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

D.      This Sale Approval Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Approval Order, and expressly directs entry of judgment as set forth herein.

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. <u>See</u> Bankruptcy Rule 7052. B. To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such.

E.     A hearing on the Debtors' Motion for an Order Approving Sale and Bidding Procedures was held by this Court on January 24, 2011, and, on that date, the Court entered the Order Approving Sale and Bidding Procedures (the "Procedures Order").  The Debtors and the Buyer have complied with the Procedures Order in all respects.

F.     Pursuant to the Procedures Order, the Debtors timely received __ Qualified Bids on or before April 19, 2011, and the Group One Auction was conducted on April 26, 2011, by the Debtors, in consultation with their advisors and investment banker, Mastodon Ventures, Inc. The Sale Procedures Order (as amended)[3] set May 10, 2011 as the date of the hearing (the "Sale Approval Hearing") for an order to approve the sale (the "Sale Approval Order").

G.     On April __, 2011, the Debtors filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2).  On April __, 2011, the Debtors served the Notice of Sale and Bidding Procedures in compliance with the Sale Procedures Order.  On April __, 2011, the Debtors served the Notice Concerning Unexpired Leases and Executory Contracts and Establishing Cure Costs on the counterparties to such leases and contracts.

H.     On April __, 2011, the Court entered the Order (A) Approving Stalking Horse Bidders; (B) Approving Form of Stalking Horse Asset Purchase Agreement, and (C) Approving Stalking Horse Protection Fee, which, among other things, approved a stalking horse bidder for the Acquired Assets located in the _____ Region.

I.     Based upon the foregoing and the certificates of service and publication filed with the Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired

---

[3]  The timeline set forth in the Procedures Order was subsequently amended by stipulation.

Contracts and the proposed rejection of the contracts has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008 and in compliance with the Procedures Order and no other or further notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts or the entry of this Sale Approval Order is required or necessary.

J.      All parties in interest, including, without limitation, all parties who claim an interest in or lien upon the Acquired Assets, all shareholders of the Debtors, all federal, state and local environmental authorities, and all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the sale of Acquired Assets may have, claims, contingent or otherwise against the Debtors, have been given a reasonably opportunity to object and be heard, regarding the relief requested in the Sale Motion.   All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Approval Hearing.

K.      As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (i) the offer from the Buyer constitutes the highest and best offer for the Acquired Assets; (ii) the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Procedures Order; (iii) the auction process set forth in the Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets; and (iv) the Group One Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

L.     In accordance with the Procedures Order, the APA was deemed a Qualified Bid (as defined in the Sale Procedures) and was eligible to participate at the Group One Auction.

M.     The APA constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

N.     The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.

O.     The purchase price as set forth in the APA (the "Purchase Price") for the Acquired Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  Approval of the APA and the sale of the Acquired Assets in accordance with this Sale Approval Order and the APA are in the best interests of the Debtors' estates, creditors and other parties in interest.  The terms of the APA were negotiated at arms' length and are fair and reasonable under the circumstances.

P.     The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtors nor the Buyer is entering

into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q.     The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes for the sale of the Acquired Assets pursuant to section 363(b) of the Bankruptcy Code outside of a plan of reorganization.

R.     Each of the Debtors, as applicable, (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Acquired Assets by the Debtors has, in each case, been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.   No third-party approvals, other than those expressly provided for in the APA, if any, are required by the Debtors to consummate such transactions.

S.     The Debtors are authorized and directed to sell and transfer the Acquired Assets free and clear of all mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), judgments, demands, rights of first refusal (other than the rights of first refusal of Burger King Corporation under applicable franchise agreements) offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or

charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that term is used in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the bankruptcy case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (collectively, "Liens, Claims, Encumbrances and Interests") with such Liens, Claims, Encumbrances and Interests to attach to the consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Buyer would not enter into the APA to purchase the Acquired Assets otherwise.

T.    Those holders of Liens, Claims, Encumbrances and Interests against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the sale or the Sale Motion are deemed to have consented to the sale pursuant to section 363(f)(2) of the Bankruptcy Code.  The Debtors have met the requirements of section 363(f) with respect to all other holders of Liens, Claims, Encumbrances and Interests as such Claim holders will have their Liens, Claims, Encumbrances and Interests, if any, in each instance against the Debtors, their estates or any of the Acquired Assets, attach to the net cash proceeds of the sale

ultimately attributable to the Acquired Assets, in which such creditor alleges a Claim, in the same order of priority, with the same validity, force and effect that such Liens, Claims, Encumbrances and Interests had prior to the sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

U.     The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Acquired Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Assumed Leases and Acquired Contracts were not free and clear of all Liens, Claims, Encumbrances and Interests.

V.     The APA was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion.

W.     The Debtors have followed in good faith the procedures for notice and sale of the Acquired Assets as set forth in the Procedures Order.

X.     The Buyer is not an "insider" or "affiliate" of the Debtors (as each such term is defined in the Bankruptcy Code).  Neither the Debtors nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) of the Bankruptcy Code to the sale and the transactions contemplated by the APA. Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate price paid by Buyer for the Acquired Assets was not controlled by any agreement among the bidders.

Y.     The Buyer is entitled to the protections afforded under section 363(m) of the Bankruptcy Code because the Buyer is a good faith purchaser in that, inter alia:  (i) except as set forth in the Procedures Order, the Buyer recognized that the Debtors were free to deal with any

other party interested in acquiring the Acquired Assets; (ii) the Buyer complied with the provisions in the Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Procedures Order; (iv) the Buyer in no way induced or caused the chapter 11 filings by the Debtors; (v) all payments to be made by the Buyer in connection with the sale have been disclosed; (vi) no common identity of directors or controlling stockholders exists between the Buyer and any of the Debtors; and (vii) the negotiation and execution of the APA was at arms' length and in good faith.

Z.      In the absence of a stay pending appeal, if any, if the Closing occurs at any time after entry of this Sale Approval Order, then, with respect to the APA, the Buyer, as a purchaser in good faith of the Acquired Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Sale Approval Order or any authorization contained herein is reversed or modified on appeal.

AA.      The Debtors are the sole and lawful owners of the Acquired Assets.  Effective as of the Closing, the transfer of the Acquired Assets is or will (i) be legal, valid and effective transfers of property of the Debtors' estates to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the Debtors and the Debtors' estates in and to the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests  under sections 363(f) and 105 of the Bankruptcy Code.

BB.      The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign those Assumed Leases and Acquired Contracts, as defined in the APA and described on **[Schedules ____ and ____]** to the APA, including any amendments or modifications to such exhibits as agreed to by the Debtors and Buyer pursuant to the APA, in connection with the consummation of the sale of Acquired Assets, and the assumption and

assignment of the Assumed Leases and Acquired Contracts is in the best interests of the Debtors, their estates, their creditors and their equityholders.

CC.    The Assumed Leases and Acquired Contracts being assigned to the Buyer as set forth in the APA are an integral part of the Debtors' businesses being purchased by the Buyer and, accordingly, such assumption and assignment of Assumed Leases and Acquired Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

DD.    The Assumed Leases and Acquired Contracts are unexpired leases or executory contracts within the meaning of the Bankruptcy Code.

EE.    All amounts which are required to be paid in connection with the assumption and assignment of the Assumed Leases and Acquired Contracts that are due or owing under sections 365(b)(1)(A) and (B), and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or (ii) pay all actual or pecuniary losses that have resulted from such defaults (except with respect to those liabilities expressly assumed by the Buyer pursuant to the APA) are set forth on Exhibit 2 hereto (the "Cure Costs").

FF.    Any objections to the Cure Costs associated with such Assumed Leases and Acquired Contracts are resolved as set forth on Exhibit 2 to this Sale Approval Order.  To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Assumed Lease or Acquired Contract or (ii) the Cure Cost associated with the applicable Assumed Lease or Acquired Contract, such counterparty is deemed to have consented to such Cure Cost and the assumption and assignments of its

respective Assumed Lease or Acquired Contract to the Buyer as expressly set forth on Exhibit 2 to this Sale Approval Order.

GG.     The promises of Buyer and/or the Debtors to pay the Cure Costs and the Buyer's promise to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order that are being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

HH.     Adequate notice and opportunity to be heard was provided to counterparties to executory contracts and unexpired leases to be assumed and assigned pursuant to this Sale Approval Order.  Further, counterparties received adequate notice and an opportunity to object to the amount of any Cure Costs owed by the Debtors' estates on account of any executory contract or unexpired lease to be assumed and assigned to the Buyer under the APA.

II.     The assumption and assignment of the Assumed Leases and Acquired Contracts is integral to the APA and is in the best interests of the Debtors and their estates, creditors and equityholders and represents the exercise of the Debtors' sound business judgment.

JJ.     Any objections to the assumption and assignment of any of the Assumed Leases and Acquired Contracts to the Buyer are hereby overruled.

KK.     Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (ii) have, de facto or otherwise, merged with or into any of the Debtors; (iii) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Buyer and the Debtors); or (iv) be holding itself out to the public as a

continuation of the Debtors. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the APA with respect to the Assumed Liabilities.

LL.    The Debtors have good, valid and marketable title to all of the Acquired Assets. The Acquired Assets are to be transferred free and clear of any and all Liens, Claims, Encumbrances and Interests. All of the Acquired Assets are, or will on the Closing Date, be owned by the Debtors and will be transferred under the APA.

MM.    Other than the Assumed Liabilities, the Buyer shall have no obligations with respect to any liabilities of the Debtors, including, without limitation, the Excluded Liabilities, and the Debtors and their estates will release and forever discharge the Buyer and any of its affiliates, its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale, except for liabilities and obligations under the APA.

**IT IS HEREBY ORDERED:**

**General Provisions**

1.    The Sale Motion is hereby granted to the extent provided herein.

2.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Approval Order, are overruled on the merits.

**Approval of the APA**

3.    Each and every term of the APA (attached hereto as <u>Exhibit 1</u>) and all other ancillary documents is hereby approved.

4. The sale of the Acquired Assets to Buyer pursuant to the APA is hereby authorized under section 363(b) of the Bankruptcy Code and the entry of the Debtors into the APA is hereby approved. The proceeds from the sale of the Acquired Assets as provided in the APA shall be paid directly to **[_____]**, pending further order of the Court.

5. The Debtors, through any corporate officer, are authorized and directed to execute and deliver, and empowered to fully perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, including taking any actions that otherwise would require further approval by shareholders or their respective boards of directors (without the need of obtaining such approvals) and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations of the Debtors under the APA, including effectuating amendments to the APA in furtherance thereof. All Persons necessary to effect the transactions contemplated by the APA are hereby ordered to execute any and all documents necessary to effect such transactions. If any Person fails to comply with the provisions of this paragraph 5 prior to the Closing Date, such Person (or Persons, as the case may be) shall nonetheless be deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

6. The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy

Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Approval Order.

### Transfer of the Acquired Assets

7.     Pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Buyer, in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest the Buyer with title to the Acquired Assets, free and clear of any and all Claims, Liens, Interests and Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Claims, Liens, Interests and  Encumbrances to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Acquired Assets, subject to all claims and defenses the Debtors may possess with respect thereto.  The Sale Motion shall be deemed to provide sufficient notice as to the sale of the Acquired Assets free and clear of Claims, Liens, Interests and Encumbrances.  All such Liens, Claims, Encumbrances and Interests released, terminated and discharged as to the Acquired Assets shall attach to the sale proceeds with the same validity, force and effect which they now have as against the Debtors, the estates or the Acquired Assets.

8.     The provisions of this Sale Approval Order authorizing the sale of the Acquired Assets free and clear of Liens, Claims, Encumbrances and Interests, and the Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to

effectuate, consummate and implement the provisions of this Sale Approval Order. However, the Debtors and the Buyer, and each of their respective officers, employees and agents, so long as the same remain employed by the Debtors, are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA and this Sale Approval Order. Moreover, effective as of the Closing, the Buyer, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Buyer, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Buyer, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets, and to do all acts and things with respect to the Acquired Assets which the Buyer, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

9.     To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

10.     All persons and entities (including, but not limited to, the Debtors, creditors, equityholders, including, without limitation, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees thereof, shall be and are hereby permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquired Assets or the Buyer and its successors or assigns as alleged successor or otherwise with respect to any Liens, Claims, Encumbrances and Interests of any kind and nature with respect to the Acquired Assets other than Assumed Liabilities, except as otherwise provided in the APA.  If the proposed sale to the Buyer fails to close for any reason, then Liens, Claims, Encumbrances and Interests shall continue against the Acquired Assets unaffected by this Sale Approval Order.

11.     Except for Assumed Liabilities as set forth in the APA, the transfer of the Acquired Assets pursuant to this Sale Approval Order shall not subject the Buyer to any liability with respect to any obligations incurred in connection with, or in any way related to the Acquired Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

### Assumption and Assignment to Buyer of Assumed Leases and Acquired Contracts

12.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the APA, of the Assumed Leases and Acquired Contracts specified in this Sale Approval Order is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

13.     The Debtors are authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Assumed Leases and Acquired Contracts specified on Exhibit 2 to in this Sale Approval Order; and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Leases and Acquired Contracts specified in this Sale Approval Order.

14.     With respect to the Assumed Leases and Acquired Contracts: (a) each Assumed Lease and Acquired Contract, as applicable, is an unexpired lease or executory contract under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assumed Leases and Acquired Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assumed Lease and Acquired Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Lease or Acquired Contract that prohibit or condition the assignment of such Assumed Lease or Acquired Contract or allow the party to such Assumed Lease or Acquired Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Lease or Acquired Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Lease and Acquired Contract have been satisfied; and (e) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Lease and Acquired Contract set forth on Exhibit 2 hereto.

15.     Each of the Assumed Leases and Acquired Contracts specified on Exhibit 2 to this Sale Approval Order, upon assignment to the Buyer, shall be deemed to be valid and binding on the Buyer and in full force and effect and enforceable in accordance with their terms, and following such assignment, the Debtors and the estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, any liability for any breach of such Assumed Leases and Acquired Contracts occurring after such assignment.

16.     Each non-Debtor party to an Assumed Lease and Acquired Contract specified in this Sale Approval Order is hereby barred and enjoined from asserting against the Buyer, the Debtors or the Debtors' estates (a) any default existing as of the date of the Sale Approval Hearing if such default was not raised or asserted in a timely manner prior to the entry of this Sale Approval Order or (b) any objection to the assumption and assignment of such non-Debtor party's Assumed Leases and Acquired Contracts or the Cure Cost, if any, of which the non-Debtor party was given notice prior to the Sale Hearing.  The assignment of each such Assumed Leases and Acquired Contracts to the Buyer will not cause a default or otherwise allow the non-Debtor party thereto to terminate or adversely affect the Buyer's rights thereunder.

17.     All defaults or other obligations of the Debtors under the Assumed Leases and Acquired Contracts arising or accruing prior to the satisfaction of the terms and conditions of the APA and the closing of the transactions contemplated under the APA (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer or the Debtors (in accordance with the APA) by payment of the applicable Cure Costs (such amounts as established in accordance with this Sale Approval Order and set forth hereto on Exhibit 2) at the closing or as soon thereafter as practicable, and the Buyer shall have no liability or obligation with respect to defaults, breaches

or other obligations incurred, arising or accruing prior to the Closing Date, except as otherwise expressly provided herein or in the APA.

18. The payment of the applicable Cure Costs, in the amounts set forth on Exhibit 2 hereto and in accordance with the APA, shall (a) effect a cure of all defaults existing thereunder as of the date that such Assumed Lease or Acquired Contract is assumed and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default. To the extent that any counterparty to an Assumed Lease or Acquired Contract did not object timely to its Cure Costs in accordance with the Procedures Order, such counterparty is deemed to have consented to such Cure Cost and the assignments of its respective Assumed Lease or Acquired Contract to the Buyer.

19. There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption, assignment and/or transfer of the Assumed Leases and Acquired Contracts.

20. The Debtors' or the Buyer's (or its designated affiliate's) promise to pay the Cure Costs and to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing Date shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order being assigned to it within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

21. Notwithstanding anything to the contrary in this Sale Approval Order, no Acquired Contract or Assumed Lease shall be deemed to be assumed and assigned to the Buyer until the Closing of the sale.

22. The Cure Costs paid by Buyer shall be a use of the Cash Consideration of the Unadjusted Purchase Price payable at Closing to Debtors. Notwithstanding the sum of all Cure

Costs set forth on Exhibit 2 hereto, Buyer shall in no event be liable for an aggregate amount of Cure Costs in excess of the Unadjusted Purchase Price.

23.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Lease or Acquired Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Leases and Acquired Contracts.

### Additional Provisions

24.     The transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale to the Buyer.  The Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

25.     The consideration provided by the Buyer for the Acquired Assets under the APA (a) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of Columbia and (b) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

26.     The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise

expressly provided in the APA, and the Sale Motion contains sufficient notice of such limitation in accordance with Bankruptcy Rules and applicable law. Except to the extent the Buyer assumes the Assumed Liabilities pursuant to the APA, neither the purchase of the Acquired Assets by the Buyer or its affiliates, nor the fact that the Buyer or its affiliates are using any of the Acquired Assets previously operated by the Debtors, will cause the Buyer or any of its affiliates to be deemed a successor in any respect to the Debtors' businesses within the meaning of (i) any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), (ii) under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtors are a party, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (v) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (vi) environmental liabilities, debts, claims or obligations

arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes of any kind for any period, (viii) any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Acquired Assets prior to Closing, and (ix) any litigation.

27.     Each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release such creditor's Liens, Claims, Encumbrances and Interests in the Acquired Assets, if any, as such Liens, Claims, Encumbrances and Interests may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Liens, Claims, Encumbrances and Interests in, against or upon the Acquired Assets prior to the Closing Date of the sale, in proper form for filing and executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction, releases of all Liens, Claims, Encumbrances and Interests which the person or entity has with respect to the Acquired Assets, then on the Closing Date, or as soon as possible thereafter, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Buyer is hereby authorized on behalf of each of the Debtors' creditors, to file, register, or otherwise record a certified copy of this Sale Approval Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the

release of all Liens, Claims, Encumbrances and Interests in, against, or upon the Acquired Assets of any kind or nature whatsoever.

28.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date, or as otherwise directed by the Buyer, with the Liens, Claims, Encumbrances and Interests of such entity to be satisfied solely from the proceeds of the sale.

29.     Subject to the APA, this Sale Approval Order (a) is and shall be effective as a determination that, at Closing, all Liens, Claims, Encumbrances and Interests (except Assumed Liabilities) existing as to the Acquired Assets prior to the date of the Closing have been and hereby are unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyance described in this Sale Approval Order has been effected; (b) is and shall be effective to cause all Liens, Claims, Encumbrances and Interests (except Assumed Liabilities) to attach to and be perfected in the proceeds of the Sale of the Acquired Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, without the need to file any financing statements or other evidence of perfection; and (c) is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

30.     The Debtors or the Buyer and any agent or representative of either of them, are each hereby authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation. deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Sale Approval Order and the APA to evidence and implement this paragraph of this Sale Approval Order. All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments, modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Sale Approval Order or the APA and the various documents related thereto.

31.     This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (b) compel delivery of the Acquired Assets to the Buyer, (c) resolve any disputes arising under or related to the APA and related agreements, (d) enjoin and adjudicate the assertion of any Liens, Claims, Encumbrances and Interests against the Buyer or the Acquired Assets, and (e) interpret, implement and enforce the provisions of this Sale Approval Order.

32.     As of the Closing, all agreements and all orders of this Court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Approval Order and the APA.

33.     Nothing contained (a) in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, (b) the order of confirmation confirming any plan of reorganization (or liquidation), (c) any order dismissing the Chapter 11 Cases or converting it to a chapter 7 liquidation or (d) any order appointing an examiner or trustee in the case shall conflict with or

derogate from the provisions of the APA or the terms of this Sale Approval Order and no such plan or order shall discharge the obligations of the Debtors under this Sale Approval Order or the APA or any documents or agreements delivered in connection therewith.

34.     The terms and provisions of the APA, together with the terms and provisions of this Sale Approval Order, shall be binding in all respects upon, and inure to the benefit of, the Buyer, the Debtors, the Debtors' estates, any of Debtors' affiliates, successors and assigns, the Debtors' creditors, equityholders, including, without limitation, minority equityholders of the Debtors, and third parties, including, but not limited to persons asserting a Claim against or interest in the Debtors' estates or any of the Acquired Assets to be sold to the Buyer pursuant to the APA or any persons that are party to any Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date, and their respective successors and assigns.  If a trustee or examiner is subsequently appointed in the Chapter 11 Cases, such trustee or examiner shall likewise be bound, in all respects, to the terms and provisions of this Sale Approval Order.

35.     Notwithstanding anything to the contrary in this Sale Approval Order or the APA, to the extent any of the Acquired Assets consist of an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations), and if such interest is purchased under the APA, the Buyer shall remain subject to the claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as the Buyer would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under Bankruptcy Code section 363, as provided for in Bankruptcy Code section 363(o).

36.     The failure specifically to include any particular provisions of the APA in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

37.     To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of the Debtors' chapter 11 cases or the consummation of the transaction contemplated by the APA.

38.     Subject to the terms of the APA, the APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Buyer, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the APA and any related agreements.

39.     The provisions of this Order are non-severable and mutually dependent.

40.     The provisions of Bankruptcy Rules 6004(h) and 6006(d) staying the effectiveness of this Sale Approval Order for fourteen days are hereby waived, and this Sale Approval Order shall be effective immediately upon entry.

41.     To the extent that this Sale Approval Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Chapter 11 Cases, the terms of this Sale Approval Order shall govern.

Dated:                                          _____
                                                Gregory F. Kishel
                                                United States Chief Bankruptcy Judge

<u>**Schedule A**</u>

**Minnesota Region Stores List**

| | Restaurant # | Address | City | State |
|---|---|---|---|---|
| | **Minnesota Region** | | | |
| *1* | 04116 | 2651 County Road I | Mounds View | MN |
| *2* | 06270 | 8510 Edinburgh Center Drive | Brooklyn Park | MN |
| *3* | 07557 | 8501 Springbrook Drive NW | Coon Rapids | MN |
| *4* | 09095 | 106 Ninth Avenue Circle South | Princeton | MN |
| *5* | 09993 | 10861 University Avenue NE | Blaine | MN |
| *6* | 09994 | 318 East Kraft Drive | Melrose | MN |
| *7* | 02641 | 2011 E Main Street | Albert Lea | MN |
| *8* | 04553 | 1501 NW 7th Street | Faribault | MN |
| *9* | 06545 | 1022 E Blue Earth Avenue | Fairmont | MN |
| *10* | 06615 | 1318 Riverfront Drive | Mankato | MN |
| *11* | 07444 | 735 Bridge Street | Owatonna | MN |
| *12* | 09081 | 1409 4th Street NW | Austin | MN |
| *13* | 04009 | 14251 Nicollet Avenue | Burnsville | MN |
| *14* | 04122 | 5020 160th Street SE | Prior Lake | MN |
| *15* | 04151 | 1150 East Highway 13 | Burnsville | MN |
| *16* | 09256 | 255 Triangle Lane N Ste 2 | Jordan | MN |
| *17* | 04507 | 13840 Grove Drive | Maple Grove | MN |
| *18* | 05012 | 2025 Northdale Blvd | Coon Rapids | MN |
| *19* | 06299 | 10801 Bloomington Ferry Road | Bloomington | MN |
| *20* | 07466 | 330 North Garden | Bloomington | MN |

| | Restaurant # | Address | City | State |
|---|---|---|---|---|
| *21* | 08224 | 5105 Edina Industrial Blvd | Edina | MN |
| *22* | 09332 | 5358 West Broadway Ave | Crystal | MN |
| *23* | 05591 | 2535 Division Street | North St Paul | MN |
| *24* | 06590 | 1215 Gun Club Road | White Bear Lake | MN |
| *25* | 08004 | 3333 Rice Street | Shoreview | MN |
| *26* | 09272 | PO 264 403 Fire Monument Road | Hinckley | MN |
| *27* | 11243 | 1560 West 4th Street | Rush City | MN |
| *28* | 11682 | 38711 Tanger Drive | North Branch | MN |
| *29* | 05713 | 1501 Weir Drive | Woodbury | MN |
| *30* | 06530 | 7051 Tenth Street North | Oakdale | MN |
| *31* | 07937 | 2411 Center Drive | Hudson | WI |
| *32* | 09934 | 120 Meridian Drive | New Richmond | WI |
| *33* | 11254 | 9896 Norma Lane | Woodbury | MN |
| *34* | 12757 | 1287 N Main St | River Falls | WI |
| *35* | 10239 | 244 Grand Avenue | St Paul | MN |
| *36* | 10284 | 695 7th Street East | St Paul | MN |
| *37* | 11284 | 1500 Stinson Blvd NE | Minneapolis | MN |
| *38* | 11535 | 8481 SE Point Douglas Road | Cottage Grove | MN |
| *39* | 12250 | 925 Washington Ave SE | Minneapolis | MN |
| *40* | 13091 | 289 57th Avenue NE | Fridley | MN |

## Schedule B

### Franchise Agreements List

1.  Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated October 25, 2004 (Store #4116).

2.  Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated June 30, 2000 (Store #6270).

3.  Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated May 15, 1997 (Store #7557).

4.  Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated June 22, 2005 (Store #9095).

5.  Franchise Agreement between Burger King Corporation and Ashok Mehta, Mahendra Nath, dated August 24, 1996 (Store #9993).

6.  Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated May 15, 1997 (Store #9994).

7.  Franchise Agreement between Burger King Corporation and Nath Minnesota Franchising Group, Inc., dated June 20, 2003 (Store #2641).

8.  Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchisee Group, Inc., dated June 28, 2005 (Store #4553).

9.  Franchise Agreement between Burger King Corporation and Nath Minnesota Franchising Group, Inc., dated June 20, 2003, as modified by that certain Agreement to Extend Restaurant Franchise Agreement among Burger King Corporation, Duke and King Acquisition Corp., and Duke and King Holding, LLC, dated July 31, 2009 and that certain Second Agreement to Extend Restaurant Franchise Agreement dated July 31, 2010 (Store #6545).

10. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated June 20, 2003, as modified by that certain Agreement to Extend Restaurant Franchise Agreement among Burger King Corporation, Duke and King Acquisition Corp., and Duke and King Holding, LLC, dated July 31, 2009, as further modified by that certain Second Agreement to Extend Restaurant Franchise Agreement among Burger King Corporation, Duke and King Acquisition Corp., and Duke and King Holding, LLC, dated January 11, 2010 (Store #6615).

11. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchising Group, Inc., dated June 20, 2003 (Store #7444).

12. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchising Group, Inc., dated June 20, 2003 (Store #9081).

13. Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated June 30, 2000 (Store #4009).

14. Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated December 1, 2004 (Store #4122).

15. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated March 31, 1997 (Store #4151).

16. Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated October 24, 2005 (Store #9256).

17. Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated June 22, 2005 (Store #4507).

18. Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Operating Group, Inc., dated May 16, 2006 (Store #5012).

19. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated September 26, 2006 (Store #6299).

20. Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated June 30, 2000 (Store #7466).

21. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated May 15, 1997 (Store #8224).

22. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group II, Inc., dated September 29, 1995 (Store #9332).

23. Successor Franchise Agreement between Burger King Corporation and Nath Mn Fran Group, Inc., dated June 30, 2000 (Store #5591).

24. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated May 15, 1997, as modified by that certain Agreement to Extend Restaurant Franchise Agreement among Burger King Corporation, Duke and King Acquisition Corp., and Duke and King Holding, LLC, dated July 31, 2009, as further modified by that certain Second Agreement to Extend Restaurant Franchise Agreement among Burger King Corporation, Duke and King Acquisition Corp., and Duke and King Holding, LLC, dated January 11, 2010 (Store #6590).

25. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated May 15, 1997 (Store #8004).

26. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group II, Inc., dated July 20, 1995 (Store #9272).

27. Successor Franchise Agreement between Burger King Corporation and Duke and King Acquisition Corp., dated December 26, 2007 (Store #11243).

28. Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated June 11, 1998 (Store #11682).

29. Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated June 30, 2000 (Store #5713).

30. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated May 15, 1997, as modified by that certain Agreement to Extend Restaurant Franchise Agreement between Burger King Corporation and Duke and King Acquisition Corp., dated July 31, 2009, as further modified by that certain Second Agreement to Extend Franchise Agreement between Burger King Corporation and Duke and King Holdings, LLC, dated January 11, 2010 (Store # 6530).

31. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated May 15, 1997 (Store # 7937).

32. Burger King Restaurant Successor Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated August 16, 2006 (Store # 9934).

33. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated December 14, 1997 (Store # 11254).

34. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated October 16, 1999 (Store # 12757).

35. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated May 15, 1997 (Store # 10239).

36. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated March 18, 1999 (Store # 10284).

37. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated January 10, 1998 (Store # 11284).

38. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated February 20, 1998 (Store # 11535).

39. Burger King Restaurant Successor Franchise Agreement between Burger King Corporation and Duke and King Acquisition Corp., dated June 10, 2008 (Store # 12250).

40. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Minnesota Franchise Group, Inc., dated March 3, 2000 (Store # 13091).

## Schedule 1.1(g)

## Acquired Contracts List

**I.  Real Property Leases**:  The real property leases related to the following Minnesota Region Stores:

| | Restaurant # | Address | City | State |
|---|---|---|---|---|
| 1 | 04116 | 2651 County Road I | Mounds View | MN |
| 2 | 06270 | 8510 Edinburgh Center Drive | Brooklyn Park | MN |
| 3 | 07557 | 8501 Springbrook Drive NW | Coon Rapids | MN |
| 4 | 09095 | 106 Ninth Avenue Circle South | Princeton | MN |
| 5 | 09993 | 10861 University Avenue NE | Blaine | MN |
| 6 | 09994 | 318 East Kraft Drive | Melrose | MN |
| 7 | 02641 | 2011 E Main Street | Albert Lea | MN |
| 8 | 04553 | 1501 NW 7th Street | Faribault | MN |
| 9 | 06545 | 1022 E Blue Earth Avenue | Fairmont | MN |
| 10 | 06615 | 1318 Riverfront Drive | Mankato | MN |
| 11 | 07444 | 735 Bridge Street | Owatonna | MN |
| 12 | 09081 | 1409 4th Street NW | Austin | MN |
| 13 | 04009 | 14251 Nicollet Avenue | Burnsville | MN |
| 14 | 04122 | 5020 160th Street SE | Prior Lake | MN |
| 15 | 04151 | 1150 East Highway 13 | Burnsville | MN |
| 16 | 09256 | 255 Triangle Lane N Ste 2 | Jordan | MN |
| 17 | 04507 | 13840 Grove Drive | Maple Grove | MN |
| 18 | 05012 | 2025 Northdale Blvd | Coon Rapids | MN |
| 19 | 06299 | 10801 Bloomington Ferry Road | Bloomington | MN |
| 20 | 07466 | 330 North Garden | Bloomington | MN |
| 21 | 08224 | 5105 Edina Industrial Blvd | Edina | MN |
| 22 | 09332 | 5358 West Broadway Ave | Crystal | MN |
| 23 | 05591 | 2535 Division Street | North St Paul | MN |
| 24 | 06590 | 1215 Gun Club Road | White Bear Lake | MN |
| 25 | 08004 | 3333 Rice Street | Shoreview | MN |
| 26 | 09272 | PO 264 403 Fire Monument Road | Hinckley | MN |
| 27 | 11243 | 1560 West 4th Street | Rush City | MN |
| 28 | 11682 | 38711 Tanger Drive | North Branch | MN |
| 29 | 05713 | 1501 Weir Drive | Woodbury | MN |
| 30 | 06530 | 7051 Tenth Street North | Oakdale | MN |
| 31 | 07937 | 2411 Center Drive | Hudson | WI |
| 32 | 09934 | 120 Meridian Drive | New Richmond | WI |
| 33 | 11254 | 9896 Norma Lane | Woodbury | MN |
| 34 | 12757 | 1287 N Main St | River Falls | WI |
| 35 | 10239 | 244 Grand Avenue | St Paul | MN |
| 36 | 10284 | 695 7th Street East | St Paul | MN |
| 37 | 11284 | 1500 Stinson Blvd NE | Minneapolis | MN |
| 38 | 11535 | 8481 SE Point Douglas Road | Cottage Grove | MN |

| | Restaurant # | Address | City | State |
|---|---|---|---|---|
| *39* | 12250 | 925 Washington Ave SE | Minneapolis | MN |
| *40* | 13091 | 289 57th Avenue NE | Fridley | MN |

**II.  Billboard and Highway Agreements**:  The following contracts related to highway sign and billboard agreements with Minnesota Logos:

1.    Business Lease/Contract No. 813492 – Interstate I-35E, Exit 88B
2.    2009 Renewal Business Lease 812401, dated – Interstate I35E, Exit 88
3.    2009 Renewal Business Lease Contract No. 812415 – Interstate I35E, Exit 117
4.    2009 Renewal Business Lease Contract No. 812412– Interstate I35W, Exit 028 C
5.    2009 Renewal Business Lease Contract No. 812413– Interstate I35W, Exit 29
6.    2009 Renewal Business Lease Contract No. 812411 – Interstate I-90, Exit 102
7.    2009 Renewal Business Lease Contract No. 812410– Interstate I-90, Exit 178 A
8.    2009 Renewal Business Lease Contract No. 812402– Interstate I-494, Exit 8
9.    2009 Renewal Business Lease Contract No. 812171 - Interstate I-494, Exit 58
10.   2009 Renewal Business Lease Contract No. 813123 - Interstate I-494, Exit 59 (South)
11.   2010 Renewal Business Lease Contract No. 812122 - Interstate I-494, Exit 59 (North)
12.   2009 Renewal Business Lease Contract No. 812407 - Interstate I-694, Exit 052 AB
13.   2009 Renewal Business Lease Contract No. 812406 - Interstate I-35, Exit 57
14.   2009 Renewal Business Lease Contract No. 812427- Interstate I-135, Exit 11
15.   2009 Renewal Business Lease Contract No. 812420 - Interstate I-35, Exit 41
16.   2010 Renewal Business Lease Contract No. 813573 - Interstate I-35, Exit 55
17.   Business Lease/Contract No. 812419 - Interstate I-35, Exit 59
18.   2009 Renewal Business Lease Contract No. 812416 - Interstate I-35, Exit 183
19.   2009 Renewal Business Lease Contract No. 812409 - Interstate I-94, Exit 135
20.   2009 Renewal Business Lease Contract No. 812403 - Interstate I-94, Exit 251
21.   2010 Renewal Business Lease Contract No. 813914 - Interstate TH-10, Exit Hanson Blvd
22.   2009 Renewal Business Lease Contract No. 812405 - Interstate TH-61, Exit Jamaica Ave
23.   2009 Renewal Business Lease Contract No. 812404 - Interstate TH-100, Exit W 77th St.
24.   2010 Renewal Business Lease Contract No. 813125 - Interstate TH-169, Exit Old Shakopee Rd.
25.   2009 Renewal Business Lease Contract No. 812417 - Interstate I-35, Exit 159

**III. Franchise Agreement.**

The Franchise Agreements set forth on Schedule B.

## **Schedule 1.2(l)**

## **Excluded Assets**

None.

## **<u>Schedule 1.2(m)</u>**

## **Rejected Leased Real Property\***

\*[To be completed by Buyer prior to Closing, subject to Section 1.6]

## Schedule 2.8

## Purchase Price Allocation

[To be completed by the Parties prior to Closing pursuant to Section 2.8]

**EXHIBIT E**

**TO SALE MOTION**

**ASSET PURCHASE AGREEMENT**

**among**

**HEARTLAND FOOD CORP.,**

**as "Buyer,"**

**and**

**DUKE AND KING ACQUISITION CORP.**

**as "Seller"**

**Dated April 11, 2011**

# TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS........................................1
    Section 1.1    Transfer of Acquired Assets. ...............................................................1
    Section 1.2    Excluded Assets. ...................................................................................3
    Section 1.3    Assumption of Liabilities......................................................................4
    Section 1.4    Excluded Liabilities. ............................................................................5
    Section 1.5    Post-Closing Liabilities.........................................................................5
ARTICLE II CONSIDERATION ..................................................................................5
    Section 2.1    Purchase Price........................................................................................5
    Section 2.2    Purchase Price Adjustment. ..................................................................6
    Section 2.3    Closing Payments...................................................................................7
    Section 2.4    Payment of Cure Costs...........................................................................8
    Section 2.5    On-Hand Cash........................................................................................8
    Section 2.6    On-Hand Inventory. ...............................................................................8
    Section 2.7    Transaction Taxes. .................................................................................9
    Section 2.8    Allocation of Total Consideration.........................................................9
ARTICLE III CLOSING AND DELIVERIES ................................................................9
    Section 3.1    Closing. .................................................................................................9
    Section 3.2    Seller' Deliveries...................................................................................9
    Section 3.3    Buyer's Deliveries...............................................................................10
ARTICLE IV REPRESENTATIONS AND WARRANTIES ...........................................10
    Section 4.1    Representations and Warranties of Seller. ...........................................10
    Section 4.2    Representations and Warranties of Buyer............................................11
    Section 4.3    Warranties Are Exclusive. ...................................................................13
ARTICLE V COVENANTS AND OTHER AGREEMENTS............................................13
    Section 5.1    Covenants of Seller. ............................................................................13
    Section 5.2    Covenants of Buyer..............................................................................14
    Section 5.3    Other Covenants. .................................................................................15
    Section 5.4    Confidentiality. ...................................................................................15
ARTICLE VI CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES .................16
    Section 6.1    Conditions Precedent to Performance by Seller. .................................16
    Section 6.2    Conditions Precedent to the Performance by Buyer. ...........................16
    Section 6.3    Representations and Warranties of Seller. ...........................................16
    Section 6.4    Performance of the Obligations of Seller..............................................16
    Section 6.5    Governmental Consents and Approvals................................................16
    Section 6.6    Closing Deliveries................................................................................17
ARTICLE VII TERMINATION...................................................................................17
    Section 7.1    Conditions of Termination. ..................................................................17
    Section 7.2    Effect of Termination; Remedies. ........................................................18
    Section 7.3    Exclusive Remedy; Waiver. .................................................................19
ARTICLE VIII SURVIVAL AND INDEMNIFICATION ..................................................19
    Section 8.1    Survival; Indemnification. ...................................................................19
ARTICLE IX MISCELLANEOUS.................................................................................19
    Section 9.1    Alternative Transaction........................................................................19

Section 9.2    Further Assurances............................................................................20
Section 9.3    Successors and Assigns.......................................................................20
Section 9.4    Governing Law; Jurisdiction..............................................................20
Section 9.5    Expenses.............................................................................................20
Section 9.6    Broker's and Finder's Fees.................................................................20
Section 9.7    Severability. .......................................................................................20
Section 9.8    Notices. ..............................................................................................20
Section 9.9    Amendments; Waivers........................................................................22
Section 9.10   Public Announcements.......................................................................22
Section 9.11   Entire Agreement...............................................................................22
Section 9.12   No Third Party Beneficiaries. ............................................................22
Section 9.13   Headings. ............................................................................................22
Section 9.14   Counterparts; Delivery.......................................................................22
Section 9.15   Construction........................................................................................22
Section 9.16   Bulk Sales. .........................................................................................23
**ARTICLE X DEFINITIONS ..................................................................................23**

### EXHIBITS

Exhibit A ........................................................................................ Sale Procedures

Exhibit B ......................................................................Form of Deposit Escrow Agreement

Exhibit C .......................................................................................Form of Sale Order

### SCHEDULES

Schedule A ............................................................ Illinois-Wisconsin Region Stores List

Schedule B ........................................................................ Franchise Agreements List

Schedule 1.1(g) ...................................................................... Acquired Contracts List

Schedule 1.2(l) ..........................................................................Excluded Assets List

Schedule 1.2(m) ...........................................................Rejected Real Property Leases

Schedule 2.1 ...........................................Regional Allocation of Unadjusted Purchase Price

Schedule 2.8 ..........................................................................Allocation of Purchase Price

# ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 11, 2011 (the "**Execution Date**"), is made by and between **DUKE AND KING ACQUISITION CORP.,** a Delaware corporation ("**Seller**"), and **HEARTLAND FOOD CORP.,** a Delaware corporation ("**Buyer**"). Unless otherwise set forth herein, capitalized terms used in this Agreement are defined or cross-referenced in <u>Article X</u>.

## RECITALS

WHEREAS, on December 4, 2010 (the "**Petition Date**"), Seller commenced voluntary cases (collectively, the "**Bankruptcy Case**") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**");

WHEREAS, this Agreement shall constitute the APA (as such term is defined in the Sale Procedures);

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, assign, transfer, convey and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code; and

WHEREAS, Buyer has made, or will make concurrent with the execution of this Agreement, a deposit in an amount equal to ten percent (10%) of the Unadjusted Purchase Price (the "**Deposit**") into an escrow account (the "**Deposit Escrow Account**") to be established and governed by the terms of the Deposit Escrow Agreement executed concurrently herewith.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

**Section 1.1** <u>**Transfer of Acquired Assets.**</u> At the Closing, and upon the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens, Claims and Interests, and Buyer shall purchase from Seller, all of Seller's right, title and interest of every kind and nature (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) in each of the Illinois-Wisconsin Region Stores as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, but excluding the assets, properties and rights included in the Excluded Assets pursuant to Section 1.2 (collectively, the "**Acquired Assets**"):

(a)     Petty and other restaurant operating cash (excluding cash in-transit) on-hand at the Illinois-Wisconsin Region Stores on the Closing Date in the amount determined pursuant to <u>Section 2.5</u> (the "**On-Hand Cash**");

(b)     The leased real property of Seller leased pursuant to the leases included in the Acquired Contracts, to the extent assignable and transferable, including all Leasehold Improvements thereon (collectively, the "**Leased Real Property**");

(c)     All tangible personal property, including all machinery, equipment, supplies, materials, office furniture and office equipment, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, computing and telecommunications equipment and other items of personal property owned or leased by Seller for use in the Illinois-Wisconsin Region Stores, and all warranties and licenses thereunder or related thereto;

(d)     Prepaid expenses of Seller, but solely to the extent the benefit of such prepaid expenses accrue to Buyer post-Closing ("**Prepaid Expenses**");

(e)     All deposits, advances, prepayments, rights in respect of promotional allowances, vendor rebates and to other refunds, Claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail and other communications of the Seller (**"Acquired Deposits"**), but excluding the Rebates, Utility Deposits and Corporate Level deposits;

(f)     All advertising and promotional materials and any rights thereto possessed, or entitled to be used, by Seller;

(g)     The Contracts listed on Schedule 1.1(g), to the extent assignable and transferable, other than those excluded by Buyer from the Acquired Assets pursuant to Section 1.2(m) hereof (if any), but including all contractual rights (including rights to indemnification, exculpation, advancement or reimbursement of expenses), Claims, causes of action, choses in action, lawsuits, demands and judgments in law or in equity, of every kind and nature, that Seller has or may have against any other Person and that are related to the Acquired Contracts, other than those excluded pursuant to Section 1.2 (the "**Contract Claims**" and such acquired contracts, the "**Acquired Contracts**");

(h)     All Inventory (as valued pursuant to Section 2.6) (the "**On-Hand Inventory**") and all Supplies on-hand in the Illinois-Wisconsin Region Stores;

(i)     All permits, registrations, Orders, operating permits, certificates of occupancy, approvals, authorizations and licenses (collectively, the "**Permits**") issued to Seller by any Government or other third party, to the extent assignable;

(j)     All insurance benefits, rights and proceeds arising from or relating to any event or incident that affects, impacts or alters any Acquired Asset between the Execution Date and the Closing Date;

(k)     Except as otherwise excluded under Section 1.2, all rights, Claims, rights of offset, causes of action, lawsuits, judgments and other Claims or demands of any nature

against any third party arising out of, and only with respect to, the Acquired Assets or Assumed Liabilities;

(l)    All books, files and records held or otherwise owned by Seller that relate to current or former employees and other personnel, including, without limitation, books, files and records that are related to medical history, medical insurance or other medical matters and to workers' compensation and to the evaluation, appraisal or performance of current or former employees and other personnel of Seller (collectively, the "**Employee Records**");

(m)    Copies of all books, files and records of sales and general business operations of the Illinois-Wisconsin Region Stores, and Seller's supplier lists for the Illinois-Wisconsin Region Stores;

(n)    All goodwill as a going concern and all other right, title and interest of Seller in and to the general intangibles incident to its business at the Illinois-Wisconsin Region Stores;

(o)    Any and all computer applications, software, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage, all computer operating, security or programming software, owned or licensed by the Seller, and, in each case, all source code, executable code, data, databases and related documentation of any of the foregoing and copies and tangible embodiments of any of the foregoing in whatever form or medium, except to the extent included in the Corporate Levels Assets;

(p)    All telephone numbers, fax numbers, email addresses, websites, URLs and internet domain names, except to the extent included in the Corporate Levels Assets; and

(q)    All Claims and rights of action arising under Chapter 5 of the Bankruptcy Code relating to any of the Critical Vendors, including any proceeds thereof.

**Section 1.2**    **Excluded Assets.**    Notwithstanding anything to the contrary in this Agreement, Seller shall retain its right, title and interest in, to and under all of its properties, assets and rights not otherwise an Acquired Asset (collectively, the "**Excluded Assets**"), including, those assets, properties and rights of Seller that are not included in or used in the operation of the Illinois-Wisconsin Region Stores and:

(a)    All of Seller's cash, checks, cash equivalents, and cash in-transit, but excluding On-Hand Cash;

(b)    All trade accounts receivable of Seller in existence as of the Closing Date (collectively, the "**Accounts Receivable**");

(c)    All amounts and funds (rebates and dividends) on account of, accrued by or due from The Coca-Cola Company, Dr. Pepper/Seven Up Company or Restaurant Services, Inc., or any affiliate thereof, to Seller pursuant to any agreement or arrangement with such companies for all periods prior to the Closing (collectively, the "**Rebates**");

(d)    All equity ownership interests in Seller;

(e)     All rights to refunds of, credits for, and Claims in connection with Taxes of Seller, and any records relating to Taxes of Seller;

(f)     Subject to Section 1.1(j), all insurance premiums, policies, contracts and coverage obtained by Seller and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries;

(g)     Subject to Section 1.1(q), all avoidance Claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related Claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing;

(h)     All rights of and benefits to Seller under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement;

(i)     Each Contract to which Seller is a party that is not an Acquired Contract and all deposits, Claims, rebates or refunds thereunder or related thereto;

(j)     All utility deposits paid by Seller prior to the Closing Date and all rights to the refund of all or any portion thereof ("**Utility Deposits**");

(k)     All Corporate Level assets, properties and right;

(l)     The assets listed on Schedule 1.2;

(m)     Subject to Section 1.6, the real property leased to Seller pursuant to the real property leases listed on Schedule 1.2(m), including all Leasehold Improvements thereon (collectively, the "**Rejected Leased Real Property**"); and

(n)     Corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of Seller.

**Section 1.3     Assumption of Liabilities.**  At the Closing, Buyer shall not assume any obligations or Liabilities from Seller other than those obligations and Liabilities expressly listed below (all such Liabilities and obligations assumed pursuant to this Section 1.3, the "**Assumed Liabilities**"):

(a)     To the extent reflected on the Final Closing Net Working Capital Statement, all accounts payables of the Illinois-Wisconsin Region Stores arising in the ordinary course of business after the Petition Date (which, for clarity, does not include (i) Corporate Level accounts payable of Seller and (ii) Liabilities arising from breach of contract, breach of warranty, tort, infringement, lawsuits or violation of Law by Seller prior to the Closing Date) (collectively, the "**Accounts Payable**");

(b)     To the extent reflected on the Final Closing Net Working Capital Statement, all accrued operating expenses of the Illinois-Wisconsin Region Stores arising in the ordinary course of business after the Petition Date, including The Coca-Cola

Company and Dr. Pepper/Seven Up Company Restaurant Operating Fund Advances (which, for clarity, does not include Corporate Level accrued expenses of Seller) ("**Accrued Expenses**");

(c)     All accrued but unpaid real estate and personal property Taxes, and other related assessments and fees, if any, related to or arising from the ownership of the Acquired Assets (the **"Property Taxes"**); and

(d)     To the extent reflected on the Final Closing Net Working Capital Statement, all accrued but unpaid wages, salaries, benefits, vacation pay, employee-related Taxes, and temporary labor Liabilities of the Illinois-Wisconsin Region Stores payable in the ordinary course of business as of the Closing (collectively, "**Payroll Liabilities**").

This Section 1.3 shall not limit any claims or defenses Buyer may have against any party other than the Seller.  The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against Buyer or the Seller as compared to the rights and remedies which such third party would have had against the Seller had Buyer not assumed such Assumed Liabilities.

Section 1.4     **Excluded Liabilities.**  Buyer is assuming only the Assumed Liabilities and is not assuming, and shall not be the successor to, any other Liability or obligation of Seller or any predecessor or Affiliate of Seller whatsoever, or any Liability or obligation related to Seller's businesses of any nature (either pre-petition or post-petition), including, any direct or indirect Indebtedness, guaranty, endorsement, Claim, loss, damage, deficiency, cost, expense, obligation or responsibility, whether fixed or unfixed, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, due or to become due, choate or inchoate, liquidated or unliquidated, secured or unsecured.  All such other Liabilities and obligations shall be retained by, and remain Liabilities and obligations of, Seller (all such Liabilities are, collectively, the "**Excluded Liabilities**").  The Parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Buyer, except where such disclosed Liability or obligation has been expressly assumed by Buyer as an Assumed Liability under Section 1.3.

Section 1.5     **Post-Closing Liabilities.**  Buyer acknowledges that Buyer shall be responsible for all Liabilities and obligations relating to Buyer's ownership or use of, or right to use, the Acquired Assets and the Assumed Liabilities after the Closing Date, including without limitation all Taxes arising out of or related to the Acquired Assets or the operation or conduct of the business acquired pursuant to this Agreement for all Tax periods beginning on or after the Closing Date.

## ARTICLE II
## CONSIDERATION

Section 2.1     **Purchase Price**.  The aggregate consideration for the Acquired Assets shall be: (a) an aggregate amount in cash equal to $500,001.00 (which cash consideration shall be paid in accordance with Section 2.3 and which cash consideration shall be allocated between the Illinois-Wisconsin Region Stores as set forth on Schedule 2.1) (the "**Unadjusted Purchase Price**"), subject to post-Closing adjustment as provided in Section 2.2 (as so adjusted, the "**Final Purchase Price**"); *plus* (b) the assumption by Buyer of the Assumed Liabilities (such assumption, together with the Final Purchase Price, the "**Total Consideration**").

**Section 2.2**     **Purchase Price Adjustment.**  As promptly as practicable, but in no event later than thirty (30) days after the Closing Date, Seller shall prepare and deliver to Buyer a calculation (the "**Closing Net Working Capital Statement**") of Seller's Net Working Capital associated with the Illinois-Wisconsin Region Stores as of the close of business on the day before the Closing Date (which, subject to Sections 2.5 and 2.6, for purposes of clarity, may extend into the Closing Date for accounting purposes due to restaurants closing after midnight) (the "**Initial Net Working Capital**"), with appropriate supporting documentation.

(b)     If Buyer disagrees with the Initial Net Working Capital, Buyer may, within fifteen (15) days after receipt of the Initial Net Working Capital, deliver a notice to Seller disagreeing with such calculation and setting forth Buyer's calculation of such amount ("**Buyer's Notice**").  Buyer's Notice shall specify in reasonable detail those items or amounts as to which Buyer disagrees.

(c)     If Buyer's Notice is duly delivered, Buyer and Seller shall work in good faith and use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Net Working Capital associated with the Illinois-Wisconsin Region Stores as of the close of business on the day before the Closing Date.  If Buyer and Seller are unable to reach such agreement within ten (10) days from Seller's receipt of Buyer's Notice, the Bankruptcy Court shall determine the amount of the disputed items and the final Net Working Capital for the Illinois-Wisconsin Region Stores, provided, the Bankruptcy Court shall not assign a value greater than the greatest value for any item in dispute claimed by either party or smaller than the smallest value for such item claimed by either party.  In making such calculation, the Bankruptcy Court shall consider only those items or amounts in the Initial Net Working Capital with which Buyer disagreed.  The fees, costs and expenses of the Bankruptcy Court's review of the Net Working Capital pursuant to this Section 2.2(c) shall be paid (i) by the Seller if the items covered thereby are resolved in favor of Buyer or (ii) by Buyer if the items covered thereby are resolved in favor of the Seller.  If the items referred to therein are resolved in part in favor of the Seller and in part in favor of Buyer, such fees, costs and expenses shall be shared by the Seller and Buyer in proportion to the aggregate dollar amount of items resolved in favor of the Seller compared to the aggregate dollar amount of items resolved in favor of Buyer.  The amount of the Net Working Capital of the Illinois-Wisconsin Region Stores as of the close of business on the day before the Closing Date as determined pursuant to this Section 2.2(c) or Section 2.2(e) shall be referred to as the "**Closing Net Working Capital**."  The term "**Final Closing Net Working Capital Statement**," as used in this Agreement, shall mean the definitive Closing Net Working Capital Statement accepted by Buyer or otherwise agreed to by the Seller and Buyer in accordance with Section 2.2(e) or the definitive Closing Net Working Capital Statement resulting from the determinations made by the Bankruptcy Court in accordance with this Section 2.2(c) (in addition to those items theretofore accepted by the Seller or agreed to by the Seller and Buyer).

(d)     Buyer and Seller shall, and shall cause their respective Related Persons to, cooperate and assist in the calculation of Closing Net Working Capital and in the conduct of the reviews referred to in this Section 2.2, including, making available, to the extent necessary, their respective books, records, work papers and personnel.  All amounts

to be determined pursuant to this Section 2.2 shall be determined in accordance with generally accepted accounting principles in the United States consistently applied ("**GAAP**") using Seller' historical methodologies and practices (to the extent in accordance with GAAP).

(e)     The date upon which the Closing Net Working Capital shall be deemed final shall be the earlier to occur of the following:  (i) Buyer's acceptance of the Initial Net Working Capital determined by Seller; (ii) Buyer's failure to provide a Buyer Notice within fifteen (15) days of its receipt of the Initial Net Working Capital from Seller; (iii) the mutual written agreement of Buyer and Seller; or (iv) a final determination by the Bankruptcy Court in accordance with Section 2.2(c) (such date, "**Final Determination Date**").

(f)     If the Target Net Working Capital is greater than the Closing Net Working Capital (such shortfall amount, the "**Overpayment Amount**"), then within three (3) Business Days of the Final Determination Date, Seller and Buyer shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to (A) pay to Buyer, by wire transfer of immediately available funds from the Working Capital Escrow Account, an amount equal to the Overpayment Amount, and (B) pay to Seller, by wire transfer of immediately available funds and as more particularly described in the Working Capital Escrow Agreement, all remaining funds, if any, in the Working Capital Escrow Account after payment to Buyer of the Overpayment Amount.  If, and only if, the Overpayment Amount is greater than the amounts then held in the Working Capital Escrow Account, then, within three (3) Business Days of the Final Determination Date, Seller shall pay to Buyer, by wire transfer of immediately available funds the amount by which the Overpayment Amount is greater than the amounts then held in the Working Capital Escrow Account. For the avoidance of doubt, any amount by which the Overpayment Amount exceeds the amounts in the Working Capital Escrow Account shall be entitled to administrative expense priority under section 503(b) of the Bankruptcy Code.

(g)     If the Closing Net Working Capital exceeds the Target Net Working Capital (such excess amount, the "**Underpayment Amount**"), then within three (3) Business Days of the Final Determination Date, (i) Buyer and the Seller shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to pay to the Seller, by wire transfer of immediately available funds from the Working Capital Escrow Account and as more particularly described in the Escrow Agreement, all amounts in the Working Capital Escrow Account, and (ii) Buyer shall pay to the Seller an aggregate amount equal to the Underpayment Amount.

**Section 2.3     Closing Payments**  At the Closing, Buyer shall pay the Unadjusted Purchase Price as follows:

(a)     by instruction to the Escrow Agent to release $50,000 (the "**Working Capital Escrow Amount**") (which amount shall be allocated between the Illinois-Wisconsin Region Stores as set forth on Schedule 2.1) from the Deposit Escrow Account into an escrow account (the "**Working Capital Escrow Account**") to be established pursuant to the Working Capital Escrow Agreement;

(b)     by instruction to the Escrow Agent to release the remainder of funds in the Deposit Escrow Account (after the transfer of funds set forth in Section 2.3(a) above), by wire transfer of immediately available funds to an account specified in writing by Seller, or by the Bankruptcy Court, as the case may be;

(c)     by wire transfer of immediately available funds directly to the appropriate counterparties to the Acquired Contracts of any Cure Costs as determined by the Bankruptcy Court in the Assignment Order;

(d)     by deposit of an amount equal to the aggregate amount of Cure Costs, if any, that remain in dispute between Seller and the appropriate counterparties as of the Closing Date (the "**Cure Costs Dispute Escrow Amount**") (which amount shall be allocated between the Illinois-Wisconsin Region Stores in proportion to the Cure Costs associated with Acquired Contracts from each such region) into an escrow account (the "**Cure Costs Dispute Escrow Account**") to be established pursuant to the Cure Costs Dispute Escrow Agreement; and

(e)     by wire transfer of immediately available funds of the remaining balance of the Unadjusted Purchase Price (after reduction pursuant to Sections 2.3(c) and 2.3(d) (if any) and after credit for the Deposit) to an account specified by Seller in writing, or the Bankruptcy Court, as the case may be.

**Section 2.4     Payment of Cure Costs.**  At the Closing, pursuant to Section 2.3 above, Buyer shall pay any Cure Costs as determined by the Bankruptcy Court in the Assignment Order directly to the appropriate counterparties to the Acquired Contracts; provided, however, that in the event any such cure amount remains the subject of a dispute at the Closing Date, Buyer shall deposit the Cure Cost Dispute Escrow Amount into the Cure Costs Dispute Escrow Account and shall pay each such cure amount upon the entry of an Order of the Bankruptcy Court settling such dispute from funds in the Cure Costs Dispute Escrow Account.

**Section 2.5     On-Hand Cash.**  Immediately after the close of business on the day before the Closing Date, which for purposes of this Section 2.5 shall be deemed to be a mutually agreed upon time no later than 10:00 pm local time, Seller will count the On-Hand Cash at each of Seller's Illinois-Wisconsin Region Stores (after depositing cash received from operations that day) and create a written summation of such On-Hand Cash, subtotaled by currency denomination.  Buyer or its representatives may observe any physical count at Buyer's expense.  Copies of such summations will be promptly provided to Buyer.  For additional clarity, checks or similar cash equivalents, cash in-transit and non-operating cash are not included in "On-Hand Cash."

**Section 2.6     On-Hand Inventory.**  Immediately after the close of business on the day before the Closing Date, which for purposes of this Section 2.6 shall be deemed to be a mutually agreed upon time no later than 10:00 pm local time, Seller shall perform a physical count of all Inventory at each of Seller's Illinois-Wisconsin Region Stores. Buyer or its representatives may observe any physical count at Buyer's expense. Seller shall create a written summation of the amount of Inventory counted and its value, each subtotaled by restaurant and by type of Inventory.  The physical count and the Inventory valuation shall be based on and in accordance with Seller's prior practices and methodologies. A copy of the summation will be promptly provided to Buyer.  If Buyer objects to the inclusion of any item or items of Inventory in the summation, Buyer shall notify Seller immediately, and Buyer and Seller shall cooperate in good faith to mutually agree upon a resolution

of any such dispute. If the parties cannot resolve such dispute by the Closing Date, such dispute shall be submitted to the Bankruptcy Court for a final, binding determination.

Section 2.7 **Transaction Taxes.** All Taxes, including all state and local Taxes in connection with the transfer of the Acquired Assets and all recording and filing fees (collectively, "**Transaction Taxes**"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and that are not exempt under §1146(a) of the Bankruptcy Code, shall be borne by Buyer. Buyer and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement; (b) provide all requisite exemption certificates; and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Government taxing authorities.

Section 2.8 **Allocation of Total Consideration.** Buyer and Seller shall allocate the Total Consideration among the Acquired Assets in accordance with Schedule 2.8 (the "**Allocation**") to be mutually agreed upon by the parties prior to Closing. The Allocation will be binding upon Buyer and Seller and their respective successors and assigns, and none of the parties to this Agreement will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation. Buyer and Seller will report the purchase and sale of the Acquired Assets on all tax returns, including Form 8594 as provided for in section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594.

## ARTICLE III
## CLOSING AND DELIVERIES

Section 3.1 **Closing.** The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place on the second Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article VI or on such other date or at such other time as may be mutually agreed to by the parties (the "**Closing Date**") and shall be effective as of 12:01 a.m. on the Closing Date. Subject to such different procedures agreed upon by the parties, the Closing shall take place via a "paper" close wherein Buyer and Seller shall exchange such documents and instruments or copies thereof sufficient to effect the Closing by electronic or other means without the use of a "roundtable" closing at a particular location. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

Section 3.2 **Seller's Deliveries.** Seller shall deliver to Buyer at or prior to the Closing or such other time as set forth in this Agreement:

(a)     A bill of sale for all of the Acquired Assets that are tangible personal property, without representation, warranty or covenant of any kind;

(b)     An agreement for the assumption of the Assumed Liabilities, without representation, warranty or covenant of any kind;

(c)     For all intangible Acquired Assets, including all Acquired Contracts, (i) an agreement of assumption and assignment, without any representation, warranty or covenant of any kind, or (ii) an Assignment Order effecting the same;

(d)     A certificate, dated the Closing Date, signed by its Secretary, certifying to the accuracy of the matters set forth in Section 6.2(a);

(e)     Each of the Working Capital Escrow Agreement and the Cure Costs Dispute Escrow Agreement, duly executed by the Seller; and

(f)     Such other agreements, documents or instruments of assignment and transfer that Buyer may reasonably request.

**Section 3.3    Buyer's Deliveries.**  Buyer shall deliver to Seller at or prior to the Closing or such other time as set forth:

(a)     The Unadjusted Purchase Price in accordance with Section 2.3;

(b)     A duly executed counterpart of Buyer to each of the documents listed in Section 3.2(b) and 3.2(c);

(c)     A certificate, dated the Closing Date, signed by its Secretary, certifying the accuracy of the matters set forth in Section 6.1(a);

(d)     Each of the Working Capital Escrow Agreement and the Cure Costs Dispute Escrow Agreement, duly executed by Buyer and Escrow Agent; and

(e)     Such other agreements, documents or instruments of assignment and transfer that Seller may reasonably request.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES

**Section 4.1    Representations and Warranties of Seller.**  Seller hereby represents and warrants to Buyer as of the Execution Date as follows:

(a)     Authorization and Validity. Subject to the Bankruptcy Court's entry of the Sale Order and the Assignment Order, (i) Seller has all requisite power and authority to enter into this Agreement and any Ancillary Agreements to which Seller is a party and to perform its obligations hereunder and thereunder; and (ii) this Agreement constitutes Seller's valid and binding obligation, enforceable against Seller in accordance with its respective terms.

(b)     No Conflict or Violation. The execution, delivery and performance by Seller of this Agreement and any Ancillary Agreement to which Seller is a party does not (i) violate or conflict with any provision of Seller's certificate of incorporation or bylaws or similar organizational documents, (ii) violate any provision of law, or any Order, judgment or decree of any court or Government applicable to Seller or any of its properties or assets; or (iii) violate or result in a material breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Seller is a party or by which Seller is bound and to which any of the Acquired Assets is subject.

(c)     <u>Title to Assets</u>. Seller owns, and has good, valid, and marketable title to, all of the Acquired Assets owned by it.

(d)     <u>Reports; Financial Statements; Inventory</u>.

    (i)     Attached hereto as <u>Schedule 4.1(d)</u> are true and complete copies of the internally prepared, unaudited statements of income of each of the Illinois-Wisconsin Region Stores for the fiscal years ended December 31, 2008, December 31, 2009 and December 31, 2010 (such financial statements, the "**Financial Statements**"). The Financial Statements present fairly, in all material respects, the results of operations of each of the Illinois-Wisconsin Region Stores for the respective periods set forth therein and have been prepared on a basis consistent with Seller's past practices.

    (ii)     The Inventory of the Illinois-Wisconsin Region Stores (A) consists of materials and goods useable or saleable in the ordinary course of business (taking into account the quantity and quality of the Inventory), and (B) is not expired, spoiled or damaged. None of the Inventory in any of the Illinois-Wisconsin Region Stores is subject to any consignment, bailment, warehousing or similar agreement.

(e)     <u>Title to Acquired Assets</u>. Subject to the entry of the Sale Order and the Assignment Order, at the Closing, Buyer will obtain good and marketable title to or a valid and enforceable right by Contract to use, the Acquired Assets which shall be transferred to Buyer free and clear of all Liens, Claims and Interests. The Seller owns or leases all buildings, machinery, equipment, and other tangible assets necessary for the conduct of the Seller's operations at the Illinois-Wisconsin Region Stores as presently conducted. Except for the Excluded Assets identified in <u>Sections 1.2(a)</u>, <u>(b)</u>, <u>(c)</u>, <u>(f)</u>, <u>(i)</u>, <u>(j)</u>, <u>(k)</u> and <u>(m)</u> the Acquired Assets constitute all of the assets, agreements, licenses and properties owned by them and are all assets (tangible and intangible), agreements, licenses and properties necessary to conduct the Business as presently conducted. All of the Acquired Assets are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the ordinary course of business.

**Section 4.2**     **Representations and Warranties of Buyer**. Buyer hereby represents and warrants to Seller as of the Execution Date as follows:

(a)     <u>Corporate Organization</u>. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

(b)     <u>Qualification to Conduct Business</u>. Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the character of the properties owned or leased by it or the nature of the business conducted by it makes such qualification necessary.

(c)     <u>Authorization and Validity</u>.  Buyer has all requisite corporate power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is a party and to perform its obligations hereunder and thereunder.  The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is a party and the performance of Buyer's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement has been, and any Ancillary Agreement to which Buyer is a party has been duly executed by Buyer and constitutes Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms.

(d)     <u>No Conflict or Violation</u>.  The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is a party does not (i) violate or conflict with any provision of Buyer's certificate of incorporation or bylaws or similar organizational documents; (ii) violate any provision of Law, or any Order, judgment or decree of any court or Government applicable to Buyer or any of its properties or assets; or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

(e)     <u>Consents and Approvals</u>.  Other than the entry of the Sale Order, no consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in connection with the execution and delivery by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party or the performance by Buyer of its obligations hereunder or thereunder.

(f)     <u>Adequate Assurances Regarding Acquired Contracts</u>.  Buyer is capable of satisfying the conditions contained in sections 365(b) and 365(f) of the Bankruptcy Code with respect to the Acquired Contracts.

(g)     <u>Franchise Agreements</u>.  As of the Execution Date, Buyer has obtained, and has provided Seller with written evidence of, Franchisor's consent for the assignment to, and assumption by, Buyer of the Franchise Agreements (or alternatively, consent for the execution of new Franchise Agreements as may be required by Franchisor), wherein Buyer will become a duly authorized operator of Burger King® restaurants upon the Closing ("**Franchisor's Consent**").

(h)     <u>Litigation</u>.  There are no claims, actions, suits, proceedings or investigations pending, threatened in writing or against Buyer, or any Related Person of Buyer, that could affect the ability of Buyer to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.

(i)     <u>Adequacy of Funds</u>.  Buyer shall have at Closing cash on hand, existing availability under existing lines of credit, or other immediately available financial resources sufficient to pay the Unadjusted Purchase Price at Closing, and any further adjustment thereto pursuant to <u>Section 2.2</u> thereafter.

**Section 4.3    Warranties Are Exclusive.**    The parties acknowledge that the representations and warranties contained in this Article IV are the only representations or warranties given by the parties and that all other express or implied warranties are disclaimed and Buyer hereby expressly disclaims any other representations or warranties, whether made by it or any of its Affiliates, officers, directors, employees, agents or representatives.  Without limiting the foregoing, Buyer acknowledges that, except for the representations and warranties contained in Section 4.1, the Acquired Assets are conveyed "AS IS," "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN Section 4.1, SELLER AND ITS RELATED PERSONS AND AFFILIATES HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING ANY (A) USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES OR (C) OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS.  Buyer acknowledges that Buyer has conducted, or has had an adequate opportunity to conduct, its due diligence investigation related to Seller's business and operations, the Acquired Assets, the Assumed Liabilities, and all matters related thereto. In proceeding with the transactions contemplated in this Agreement, except for any representations and warranties expressly set forth in Section 4.1, Buyer is doing so based solely upon its own due diligence and review, and Buyer has not relied upon any oral or written statements, representations or guaranties whatsoever, whether express or implied, made by Seller or its agents and representatives.

### ARTICLE V
### COVENANTS AND OTHER AGREEMENTS

**Section 5.1    Covenants of Seller.**  Seller covenants to Buyer that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement, and to the extent applicable to the Illinois-Wisconsin Region Stores:

(a)    Conduct of Business Before the Closing.  Unless otherwise agreed by Seller and Buyer, Seller shall use commercially reasonable efforts to conduct their business in all material respects in the manner in which it has been conducted since the Petition Date and to preserve intact their respective business or organization and relationships with third parties.

(b)    Cooperation. Seller shall use commercially reasonable efforts to (i) take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper or reasonably requested by Buyer, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; and (ii) assist Buyer's efforts to transfer any Permits required to own the Acquired Assets.

(c)    Sale Order.  Without limiting Section 5.1(b)(i), Seller shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable and in substantially the form of Exhibit C.

(d)     <u>Access to Records and Properties</u>. Buyer shall be entitled, and the Seller shall permit Buyer, to conduct such investigation of the condition (financial or otherwise), businesses, assets, properties or operations of the Seller as Buyer shall reasonably deem appropriate. The Seller shall (i) provide Buyer and its representatives access at any reasonable time during normal business hours upon at least 24 hours prior notice to all the facilities, offices and personnel of the Seller and to all of the books and records of the Seller, including, to perform field examinations and inspections of the Seller's Inventory, facilities, equipment and other assets and properties; and (B) cause the Seller' representatives to furnish Buyer with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations as Buyer shall reasonably request; <u>provided</u>, <u>however</u>, that Buyer and its representatives shall use all commercially reasonable efforts to prevent any such investigation from unreasonably interfering with the operation of the Business. The Seller shall promptly deliver to Buyer one copy of all pleadings, motions, notices, statements, schedules, applications, reports and other papers as filed by the Seller in their Bankruptcy Case upon Buyer's reasonable request.

(e)     <u>Notice of Certain Events</u>. The Seller shall promptly notify Buyer of, and furnish to Buyer any information it may reasonably request with respect to, the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to cause either (A) any of the conditions to Buyer's obligations to consummate the transaction(s) contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled or (B) directly or indirectly, any Material Adverse Effect. Notwithstanding the foregoing, the delivery of any notice pursuant to this <u>Section 5.1(e)</u> shall not (x) be deemed to amend or supplement any of the Schedules contemplated hereby, (y) be deemed to cure any breach or any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available to Buyer hereunder, unless Buyer proceeds to consummate the transactions contemplated by this Agreement without terminating this Agreement pursuant to <u>Section 7.1</u>.

    **Section 5.2**     **Covenants of Buyer.** Buyer covenants to Seller that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)     <u>Cooperation</u>. Buyer shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)     <u>Communications</u>. Buyer shall use commercially reasonable efforts to keep Seller reasonably informed of the status of discussions between Buyer and Franchisor regarding Franchisor's Consent.

(c)     <u>Adequate Assurances Regarding Acquired Contracts and Required Orders</u>. With respect to each Acquired Contract, Buyer shall provide adequate assurance of the future performance of such Acquired Contract by Buyer. Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of an assumption and Assignment Order and any other

Order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 5.3    Other Covenants.**

(a)    <u>Improper Receipt of Payment</u>.  From and after the Closing, (i) Seller shall promptly forward to Buyer any and all payments received by it that constitutes part of the Acquired Assets; and (ii) Buyer shall promptly forward to Seller any and all payments received by Buyer that constitute part of the Excluded Assets.

(b)    <u>Records</u>. From and after the Closing and to the extent permitted by Law, Buyer shall provide Seller, and its agents and representatives, as the case may be, access to, reasonable means of copying, i.e., provide a copy machine, or copies of, the Employee Records for use by Seller in any dispute, Claim, action or controversy regarding any employee matter, and permit Seller, to the extent permitted by Law, to either make copies or, as may be necessary to fully comply with any Law, regulation or court mandate, borrow the original Employee Records for such time as may be reasonably needed by Seller.

(c)    <u>Employee Matters</u>. Immediately prior to the Closing, Seller shall terminate the employment of all employees of the Illinois-Wisconsin Region Stores.  Effective as of the Closing Date, Buyer shall use commercially reasonable efforts to offer employment to all employees of each of the Illinois-Wisconsin Region Stores on terms and conditions that are substantially similar to the terms and conditions in effect immediately prior to the Closing Date; provided, however, that nothing contained herein, express or implied: (i) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment, or (ii) is intended to confer upon any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees) any right as a third-party beneficiary of this Agreement.

**Section 5.4    Confidentiality.**  On and after the Closing Date, Seller shall, and shall cause its Affiliates to, treat and hold as confidential any proprietary information concerning the business and affairs of Buyer and the Acquired Assets and Assumed Liabilities that is not already generally available to the public (the "**Confidential Information**"), and shall, and shall cause its Affiliates to, refrain from using or disclosing any of the Confidential Information except in connection with (i) enforcing their rights under this Agreement, or (ii) their responsibility for or their ownership and use of the Excluded Assets and the Excluded Liabilities, and shall deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies, other than one copy to be kept subject to this <u>Section 5.4</u> for archival and/or regulatory compliance purposes) of the Confidential Information which are in his, her or its possession or under his, her or its control.  In the event that Seller or any of its Affiliates is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Seller shall, or shall cause such Affiliate to, as the case may be, notify Buyer in writing promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this <u>Section 5.4</u>.  If, in the absence of a protective order or the receipt of a waiver hereunder, Seller, or Seller's Affiliate, is advised, on the advice of counsel, to disclose any Confidential Information to

any tribunal or Government, Seller, or Seller's Affiliate, as the case may be, may disclose such Confidential Information to the tribunal or Government; provided that such Seller shall, or shall cause such Seller's Affiliate to, use his, her or its commercially reasonable efforts to obtain, at the request of Buyer and at Buyer's sole expense, an order or other reasonable assurance that confidential treatment shall be accorded to such portion of the Confidential Information required to be disclosed.

## ARTICLE VI
## CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

**Section 6.1** **Conditions Precedent to Performance by Seller.** The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.1(c), may be waived by Seller, in its discretion:

(a) Representations and Warranties of Buyer. The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made by Buyer as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(b) Performance of the Obligations of Buyer. Buyer shall have performed in all material respects all obligations required under this Agreement and any Ancillary Agreement to which Buyer is party to be performed by Buyer on or before the Closing Date.

(c) Governmental Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order and the Assignment Order, and such Orders shall be in full force and effect, and no Order staying, reversing, modifying, vacating or amending such Orders shall be in effect on the Closing Date.

(d) Closing Deliveries. Buyer shall have made the deliveries contemplated under Section 3.3.

**Section 6.2** **Conditions Precedent to the Performance by Buyer.** The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.2(c), may be waived by Buyer, in its discretion:

(a) Representations and Warranties of Seller. The representations and warranties of Seller made in Section 4.1 of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made by Seller as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.Performance of the Obligations of Seller. Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which Seller are party to be performed by Seller on or before the Closing.Governmental Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order

and the Assignment Order, and such Orders shall be in full force and effect, and no Order staying, reversing, modifying, vacating or amending such Orders shall be in effect on the Closing Date.Closing Deliveries. Seller shall have made the deliveries contemplated under Section 3.2.

## TERMINATION

**Section 7.1**     **Conditions of Termination.**   This Agreement may be terminated only in accordance with this Section 7.1. This Agreement may be terminated at any time before the Closing as follows:

(a)     By mutual consent of Seller and Buyer;

(b)     By Seller, by notice to Buyer, if Seller have provided Buyer with notice of any material inaccuracy of any representation or warranty contained in Section 4.2, or of a material failure to perform any pre-Closing covenant or obligation of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and (except as to Section 3.3(a)) Buyer has failed, within ten (10) days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Seller of Buyer's ability to remedy such inaccuracy or perform such covenant or obligation; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 7.1(b) if Seller is then in material breach of this Agreement;

(c)     By Seller, if the Bankruptcy Court dismisses the Seller's chapter 11 case or converts the chapter 11 case to a case under chapter 7 of the Bankruptcy Code; if the Bankruptcy Court confirms a chapter 11 plan in the Seller's chapter 11 case; or if the Bankruptcy Court appoints a chapter 11 trustee or a examiner with expanded powers;

(d)     By Buyer, by notice to Seller, if Buyer has previously provided Seller with notice of any material inaccuracy of any representation or warranty of Seller contained in Section 4.1 or a material failure to perform any pre-Closing covenant of Seller contained in this Agreement or any Ancillary Agreement to which Seller is party, and Seller has failed, within ten (10) days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Seller's ability to remedy such inaccuracy or perform such covenant; provided, however, that Buyer shall not have the right to terminate this Agreement under this Section 7.1(d) if Buyer is then in material breach of this Agreement;

(e)     Automatically, upon the consummation of an Alternative Transaction;

(f)     By Buyer, if Seller (i) designates any Person other than Buyer as the successful bidder at the conclusion of the Group One Auction, (ii) seeks or supports Bankruptcy Court approval of an Alternative Transaction (other than to or by Buyer) or (iii) executes and delivers an agreement with any Person (other than Buyer and its Affiliates) with respect to an Alternative Transaction;

(g)     By either the Seller or Buyer, if the Bankruptcy Court has entered a Final Order approving the sale of all or substantially all of the Acquired Assets to any Person other than Buyer and such sale closes; or

(h)     By Buyer or Seller on any day on or after the one-hundred and twentieth (120th) day following the Execution Date (the "**Termination Date**"), if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Buyer and Seller in writing), unless the Closing has not occurred due to a material failure of the terminating party to perform or observe its covenants or obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date.

**Section 7.2     Effect of Termination; Remedies.**

(a)     In the event of termination pursuant to Section 7.1, this Agreement shall become null and void and have no effect (other than Article VII, Article VIII and Article IX, which shall survive termination), with no Liability on the part of Seller, Buyer, or their respective Affiliates or respective Related Persons, with respect to this Agreement or any Ancillary Agreement, except for any Liability provided for in this Article VII.

(b)     If this Agreement is terminated pursuant to (i) Section 7.1(a) or 7.1(h) or (ii) Section 7.1(c) or Section 7.1(d), then, within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Buyer from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer.

(c)     If this Agreement is terminated pursuant to Section 7.1(b) then, within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Seller from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Seller.

(d)     If this Agreement is terminated pursuant to (i) Section 7.1(e), 7.1(f) or 7.1(g) or (ii) Section 7.1(c)  or Section 7.1(d) and Seller subsequently consummates a sale transaction for or a recapitalization through a Chapter 11 plan affecting all or substantially all of the Acquired Assets, Seller shall (1) pay to Buyer (A) a break-up fee equal to three percent (3%) of the Total Consideration, which for purposes of this Section 7.2(d) shall be an amount equal to the sum of (x) the Unadjusted Purchase Price and (y) the absolute value of the Target Net Working Capital (i.e. $1,463,229) (the "**Break-Up Fee**") (which amount shall be allocated between the Illinois-Wisconsin Region Stores as set forth on Schedule 2.1); and (B) Buyer's reasonable transaction expenses related to the negotiation, execution and performance of this Agreement up to fifty thousand dollars ($50,000) ("**Buyer Expenses**") (which amount shall be allocated between the Illinois-Wisconsin Region Stores as set forth on Schedule 2.1), as evidenced in writing to Seller in reasonable detail and (2) together with Buyer, within two (2) Business Days of such termination, jointly instruct the Escrow Agent to distribute to Buyer the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer.  Any payments of the Break-Up Fee or Buyer Expenses under this Section 7.2(d) shall be made by Seller from the proceeds of the Alternative Transaction by wire transfer of immediately available funds to an account

designated in writing by Buyer within two (2) Business Days from the closing of such Alternative Transaction. The Break-Up Fee and Buyer Expenses shall be entitled to administrative priority (which shall be a super-priority administrative expense Claim senior to all other administrative expense Claims) under Section 364(c)(1) of the Bankruptcy Code. The obligation to pay in full in cash when due any amount owed by Seller to Buyer under this Agreement, including the Breakup Fee and Buyer Expenses, shall not be discharged, modified or otherwise affected by any plan of reorganization or liquidation for Seller or by any other Order of the Bankruptcy Court. Notwithstanding the foregoing, no Break-Up Fee or Buyer Expenses shall be payable pursuant to this Section 7.2(d) if the Alternative Transaction is consummated by Bank of America pursuant to a credit bid.

(e)     Seller acknowledges that the Break-Up Fee and Buyer Expenses (or any portion thereof) are necessary and appropriate expenses for the administration of its estate, pursuant to sections 503 and 507 of the Bankruptcy Code, and that the Break-Up Fee and Buyer Expenses (or any portion thereof) are allowed administrative expenses against its estate.

**Section 7.3     Exclusive Remedy; Waiver.**   Prior to the Closing, the parties' sole and exclusive remedies for any Claim arising out of or in connection with this Agreement shall be termination in accordance with, and obtaining the remedies provided in, this Article VII. The failure by either Seller or Buyer to pursue or foreclose on any right or remedy against the other party, by itself, shall not constitute a waiver, and any waiver under this Article VII shall be effective only if made in writing.

## ARTICLE VIII
## SURVIVAL AND INDEMNIFICATION

**Section 8.1     Survival; Indemnification.**   None of the representations and warranties of Seller and of Buyer made in this Agreement shall survive the Closing Date, and all of such representations and warranties shall be extinguished by the Closing. All covenants and agreements of the parties contained in this Agreement shall survive the Closing, unless otherwise expressly stated therein. Seller shall have no monetary obligation to Buyer for breach of any covenant or agreement, except in the event of termination pursuant to Sections 7.1(a), 7.1(c), 7.1(d), 7.1(e), 7.1(f), 7.1(g), 7.1(h) or 7.1(i) which obligation shall be limited as set forth in Sections 7.2(b) and 7.2(d) respectively. If the Closing occurs, Buyer shall, subject to Section 1.3, indemnify and hold harmless Seller and their respective Affiliates and Related Persons against any and all losses, Liabilities, expenses or damages that result from or arise out of the Assumed Liabilities.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1     Alternative Transaction.**   Notwithstanding anything herein or in any Ancillary Agreement to the contrary, but subject to the notice requirement of Section 5.1(e), Seller may furnish information concerning Seller, the Acquired Assets and the Assumed Liabilities to any Person in connection with a potential Alternative Transaction and negotiate, enter into and consummate an Alternative Transaction.

**Section 9.2** **Further Assurances.** At the request and the sole expense of the requesting party, Buyer or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Buyer or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

**Section 9.3** **Successors and Assigns.** This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties hereto. Buyer may assign its rights under this Agreement to any subsidiary or affiliate of Buyer acceptable to Franchisor.

**Section 9.4** **Governing Law; Jurisdiction.** This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law. For so long as Seller are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

**Section 9.5** **Expenses.** Except as otherwise provided in this Agreement, Seller and Buyer shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

**Section 9.6** **Broker's and Finder's Fees.** Neither Seller nor Buyer has engaged any broker or finder in connection with any of the transactions contemplated by this Agreement other than Mastodon Ventures, Inc., whose fees and expenses shall, as between the parties, be the sole responsibility of Seller, and, insofar as such party knows, no other broker or other Person is entitled to any commission or finder's fee in connection with any of the transactions contemplated by this Agreement.

**Section 9.7** **Severability.** In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as set forth on the Execution Date.

**Section 9.8** **Notices.** (a) All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below or by electronic mail to the electronic mail address given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

    Duke and King Acquisition Corp.
    12281 Nicollet Avenue, South
    Burnsville, MN 55337
    Attention: Becky Moldenhauer, CFO
    Email: bmoldenhauer@dukeandking.com
    Facsimile: 953.288.2327

With a copy to (which shall not constitute notice):

    McDonald Hopkins LLC
    600 Superior Avenue, E.
    Suite 2100
    Cleveland, OH 44114
    Attention:  Scott N. Opincar
    Email: sopincar@mcdonaldhopkins.com
    Facsimile:  216.348.5474

If to Buyer:

    Heartland Food Corp.
    1400 Opus Place
    Suite 900
    Downers Grove, IL 60515
    Attention:  Christopher J. Ondrula, CEO
    Facsimile: 630-598-2210
    Email: condrula@heartlandfoodcorp.com

    With copies to (which shall not constitute notice):
    GSO CAPITAL PARTNERS LP
    280 Park Avenue
    New York, New York 10017
    Attention: Marc Baliotti
    Facsimile: 212-503-6930
    Email: Marc.Baliotti@gsocap.com

and

    Kirkland & Ellis, LLP
    300 North LaSalle Street
    Chicago, IL 60654
    Attention: Robert A. Wilson
    Facsimile: 312-862-2200
    Email: Robert.wilson@kirkland.com

(b)    Any party may change its address, facsimile number or email address for the purpose of this <u>Section 9.8</u> by giving the other parties written notice of its new address in the manner set forth above.

**Section 9.9    Amendments; Waivers.**  This Agreement may only be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may only be waived, by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the party waiving compliance.  Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

**Section 9.10    Public Announcements.**  Promptly after the Closing, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein.  Except as provided in the foregoing sentence, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without first coordinating their communications strategy with the other party, unless a press release or public announcement is required by Law, the rules of any stock exchange, or is permitted by, or required by an Order of, the Bankruptcy Court. If any such announcement or other disclosure is required by Law, the rules of any stock exchange or is permitted by, or required by an Order of, the Bankruptcy Court, the disclosing party shall use reasonable efforts to give the non-disclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure; provided, there shall be no Liability to the disclosing party for failure to notify the other party.  The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and that Franchisor may provide or release its own press release or announcement without the consent or input of either Buyer or Seller.

**Section 9.11    Entire Agreement.**  This Agreement and the Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions.  The Recitals and all Exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

**Section 9.12    No Third Party Beneficiaries.**  Except with respect to Section 8.1, nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns.  Nothing in this Agreement is intended to or shall relieve or discharge the obligator or Liability of any third Persons to Seller or to Buyer.  This Agreement is not intended and shall not give any third Persons any right of subrogation or action over or against Seller or Buyer.

**Section 9.13    Headings.**  The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

**Section 9.14    Counterparts; Delivery.**  This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute the same agreement.  The signature of any of the parties may be delivered and made by facsimile, portable document format ("pdf") or other electronic means capable or creating a printable copy, and each such signature shall be treated as original signatures for all purposes.

**Section 9.15    Construction.**  Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.  The word

"including" shall mean including without limitation. Any reference to the singular in this Agreement shall also include the plural and vice versa. The phrase "to which Seller is a party," or similar construction, is intended to limit the applicable listing of any items, properties, assets, or Contracts to only those items that a Seller actually owns or to which Seller is actually a party, as the case may be, and is meant to exclude any listed property or Contract otherwise.

**Section 9.16** **Bulk Sales.** Buyer waives compliance with any Laws governing bulk sales, including any applicable provisions of the Uniform Commercial Code.

**ARTICLE X**
**DEFINITIONS**

As used in this Agreement, the following terms have the following meanings:

**"Accrued Expenses"** has the meaning set forth in Section 1.3(b).

**"Accounts Payable"** has the meaning set forth in Section 1.3(a).

**"Accounts Receivable"** has the meanings set forth in Section 1.2(b).

**"Acquired Assets"** has the meaning set forth in Section 1.1.

**"Acquired Contracts"** has the meaning set forth in Section 1.1(g).

**"Affiliate"** means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person.

**"Agreement"** has the meaning set forth in the Preamble.

**"Allocation"** has the meaning set forth in Section 2.8.

**"Alternative Transaction"** means any transaction (regardless of the form thereof) involving a sale of or recapitalizing affecting all or any substantial portion of the Acquired Assets by Seller, or any one or more of them, to a purchaser or purchasers other than Buyer; whether such transaction is undertaken pursuant to section 363 of the Bankruptcy Code or pursuant to a Chapter 11 plan.

**"Ancillary Agreements"** means the Confidentiality Agreement, the Deposit Escrow Agreement, the Working Capital Escrow Agreement, the Cure Costs Dispute Escrow Agreement, any bill of sale, any assignment or assumption agreement, and any other related agreements by and between Seller and Buyer effecting or evidencing the transactions contemplated under this Agreement.

**"Assignment Order"** means an Order of the Bankruptcy Court pursuant to sections 105 and 365 of the Bankruptcy Code, which Order shall (i) authorize the assumption and assignment by and to Buyer of the Acquired Contracts, (ii) establish the Cure Costs relating to the Acquired Contracts, and (iii) provide that Buyer has demonstrated adequate assurance of future performance under the Acquired Contracts.

**"Assumed Liabilities"** has the meaning set forth in Section 1.3.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Break-Up Fee**" has the meaning set forth in Section 7.2(d).

"**Burger King®**" means any Person operating a Burger King® restaurant, whether Franchisor or any franchisee thereof.

"**Business**" means the business of each of the Illinois-Wisconsin Region Stores, as presently conducted.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a federal legal holiday.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer Expenses**" has the meaning set forth in Section 7.2(d).

"**Buyer's Notice**" has the meaning set forth in Section 2.2(b).

"**Claim**" has the meaning given that term in section 101(5) of the Bankruptcy Code and shall expressly include Claims arising under any theory of successor liability.

"**Closing**" has the meaning set forth in Section 3.1.

"**Closing Date**" has the meaning set forth in Section 3.1.

"**Closing Net Working Capital**" has the meaning set forth in Section 2.2(c).

"**Closing Net Working Capital Statement**" has the meaning set forth in Section 2.2(a)

"**COBRA**" has the meaning set forth in Section 1.3.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement executed by Buyer and Seller dated January 31, 2011.

"**Confidential Information**" has the meaning set forth in Section 5.4.

"**Contract**" means any contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking, whether in written form or otherwise.

"**Contract Claim**" has the meaning set forth in Section 1.1(g).

"**Corporate Level**" means, as applicable, any assets, properties, expenses, costs, commitments, Contracts, obligations, Liabilities or other operational activities or items conducted or

owned by Seller primarily for the collective benefit of all restaurants locations in all of the Regional Groups and their employees, including, but not limited to, all Seller Employee Benefit Plans, if any, and all Liabilities and obligations of Seller thereunder.

**"Critical Vendors"** has the meaning ascribed to such term in that certain Joint Motion for Expedited Hearing and for an Order Authorizing Debtors to Pay the Prepetition Claims of Certain Critical Vendors [Docket No. 13] that was filed in the Bankruptcy Case on December 4, 2010.

**"Cure Costs"** means all pre-petition cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Acquired Contracts.

**"Cure Costs Dispute Escrow Account"** has the meaning set forth in Section 2.3(c).

**"Cure Costs Dispute Escrow Agreement"** means that certain escrow agreement, dated as of the Closing Date, by and Buyer, Seller and Escrow Agent, in a form to be mutually agreed upon by the parties thereto.

**"Cure Costs Dispute Escrow Amount"** has the meaning set forth in Section 2.3(c).

**"Deposit"** has the meaning set forth in the Recitals.

**"Deposit Escrow Account"** has the meaning set forth in the Recitals.

**"Deposit Escrow Agreement"** means that certain escrow agreement, dated as of the Execution Date, by and among Buyer, Seller and Escrow Agent, governing the funding and disbursement of the Deposit Escrow Account.

**"Employee Records"** has the meaning set forth in Section 1.1(l).

**"Employee Benefit Plans"** means (i) all employee benefit plans as defined in section 3(3) of ERISA; (ii) all compensation, pay, severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, Contracts, programs, funds or arrangements of any kind; and (iii) all other employee benefit plans, programs, funds or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

**"ERISA"** means the Employee Retirement Income Security Act of 1974, as amended.

**"Escrow Agent"** means US Bank, N.A.

**"Excluded Assets"** has the meaning set forth in Section 1.2.

**"Excluded Contracts"** means any Contract to which a Seller is a party that is not an Acquired Contract.

**"Excluded Liabilities"** has the meaning set forth in Section 1.4.

**"Execution Date"** has the meaning set forth in the Preamble.

**"Final Closing Net Working Capital Statement"** has the meaning set forth in Section 2.2(c).

**"Final Determination Date"** has the meaning set forth in Section 2.2(e).

**"Final Order"** means an Order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which Order (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

**"Final Purchase Price"** has the meaning set forth in Section 2.1.

"**Financial Statements**" has the meaning set forth in Section 4.1(d).

**"Franchise Agreements"** means those franchise agreements entered into between Franchisor and Seller which govern Seller's operation of the Illinois-Wisconsin Region Stores, set forth on Schedule B hereto, as Burger King restaurants.

**"Franchisor"** means Burger King Corporation, a Florida corporation, or its successors-in-interest, whether by merger, acquisition of equity or acquisition of all or substantially all of its assets.

**"Franchisor's Consent"** has the meaning set forth in Section 4.2(g).

**"GAAP"** has the meaning set forth in Section 2.2(d).

**"Government"** means any agency, division, subdivision or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state or territory thereof.

**"Illinois Region Stores"** means all of Seller's restaurants listed under the heading Illinois Region on Schedule A hereto.

"**Illinois-Wisconsin Region Stores**" means all of Seller's restaurants located in the Illinois or Wisconsin Regions, as applicable, and as more fully described on Schedule A.

**"Improvements"** means the buildings, improvements and structures owned by Seller existing on the Real Property.

**"Indebtedness"** of any Person means, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations or Liabilities of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lenders under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all indebtedness secured by any Lien on property owned or acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not the obligations secured thereby have been assumed, but limited to the lower of (i) the fair market value of such property and (ii) the amount of the

Indebtedness secured; (f) all capital lease obligations of such Person; (g) any commitment by which such Person assures a creditor against loss (including all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions) or other indebtedness guaranteed in any manner by such Person; (h) all uncashed checks issued by such Person that are outstanding as of the Closing Date; and (i) all contingent obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (h) above.

"**Initial Net Working Capital**" has the meaning set forth in Section 2.2(a).

"**Interest**" has the meaning ascribed to such term under section 363(f) of the Bankruptcy Code.

"**Inventory**" means all of Seller's (a) consumable, unexpired food, beverages and condiments, (b) paper products and (c) premium kids products (to the extent that the promotional licenses to sell such kids products have not expired), in each case, solely to the extent such items are included in the Acquired Asset pursuant to Section 2.6.

"**Law**" means any law, statute, regulation, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Government.

"**Leased Real Property**" has the meaning set forth in Section 1.1(b).

"**Leasehold Improvements**" means those fixtures, structures and other improvements located on any Leased Real Property used in the operation of Seller' business.

"**Liability**" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability or infringement liability.

"**Lien**" has the meaning ascribed to such term under section 101(37) of the Bankruptcy Code and also includes any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other third party right, Tax (including foreign, federal, state and local Tax), Order of any Government, of any kind or nature (including (i) any conditional sale or other title retention agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any Claim based on any theory that any Buyer is a successor, transferee or continuation of the Seller, and (iv) any leasehold interest, license or other right, in favor of a third party or Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"**Material Adverse Effect**" means a state of facts, event, change or effect with respect to the Acquired Assets or the Assumed Liabilities, that individually or in the aggregate results in, or could reasonably be expected to have, a material adverse effect on the value of the Acquired Assets, taken as a whole, a material increase in the amount of the Assumed Liabilities, a material impairment to the

revenue or anticipated revenue of the Illinois-Wisconsin Region Stores, or result in a material adverse effect or change in the operation, results of operations, condition (financial or otherwise) or prospects of the Acquired Assets or the Illinois-Wisconsin Region Stores, taken as a whole; provided, however, that none of the following shall be or be considered in determining the existence of any "Material Adverse Effect": (a) changes in general economic conditions in the United States or any other country or region in the world, or changes in conditions in the global economy generally, to the extent such changes do not adversely affect the Seller in a disproportionate manner; (b) changes in conditions in the industries in which the Seller conducts business, to the extent such changes do not adversely affect the Seller in a disproportionate manner relative to other participants in such industries; (c) changes in political conditions in the United States or any other country or region in the world; (d) acts of war, sabotage or terrorism (including any escalation or general worsening of any such acts of war, sabotage or terrorism) in the United States or any other country or region in the world; (e) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions and other force majeure events in the United States or any other country or region in the world; or (f) any change in Law after the Execution Date.

"**Net Working Capital**" means an amount equal to: (a) the sum of On-Hand Cash, On-Hand Inventory, Acquired Deposits, and Prepaid Expenses, *less* (b) the sum of Accounts Payable, Payroll Liabilities, Accrued Expenses, and Property Taxes.

"**On-Hand Cash**" has the meaning set forth in Section 1.1(a).

"**On-Hand Inventory**" has the meaning set forth in Section 1.1(h).

"**Orders**" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Government.

"**Overpayment Amount**" has the meaning set forth in Section 2.2(f).

"**Permits**" has the meaning set forth in Section 1.1(i).

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Prepaid Expenses**" has the meaning set forth in Section 1.1(e).

"**Proceeding**" means any Claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or causes of action of whatever kind or character.

"**Property Taxes**" means all real estate and personal property Taxes, and other related assessments and fees, arising from the Acquired Assets.

"**Real Property Lease**" means any lease arrangement or agreement for the Leased Real Property identified and included in the Acquired Contracts.

"**Rejected Real Leased Property**" has the meaning set forth in Section 1.2(m).

**"Related Person"** means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

**"Sale Order"** means an Order of the Bankruptcy Court approving the sale and transfer of the Acquired Assets and Assumed Liabilities to Buyer pursuant to §§ 105 and 363 of the Bankruptcy Code, which Order shall be substantially in the form attached hereto as Exhibit C or with such changes and modifications as are reasonably acceptable to Buyer and Seller.

**"Sale Procedures"** means the Sale and Bidding Procedures approved by the Bankruptcy Court in the form attached hereto as Exhibit A.

**"Seller"** has the meaning set forth in the Preamble.

**"Supplies"** means (i) operating supplies, (ii) cleaning supplies, (iii) uniforms and (iv) all other items (other than Inventory) useable or saleable in the preparation of, serving or cleaning-up from meals.

**"Target Net Working Capital"** means negative nine-hundred sixty three thousand two hundred and twenty-eight dollars (-$963,228).

**"Tax Return"** means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

**"Taxes"** means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

**"Termination Date"** has the meaning set forth in Section 7.1(i).

**"Total Consideration"** has the meaning set forth in Section 2.1.

**"Transaction Taxes"** has the meaning set forth in Section 2.7.

**"Unadjusted Purchase Price"** has the meaning set forth in Section 2.1.

**"Underpayment Amount"** has the meaning set forth in Section 2.2(g).

**"Wisconsin Region Stores"** means all of Seller's restaurants listed under the heading Wisconsin Region on Schedule A hereto.

**"Working Capital Escrow Account"** has the meaning set forth in Section 2.3(a).

**"Working Capital Escrow Agreement"** means that certain working capital escrow agreement, dated as of the Closing Date, by and among Buyer, Seller and Escrow Agent, in a form to be mutually agreed upon by the parties thereto.

**"Working Capital Escrow Amount"** has the meaning set forth in Section 2.3(a).

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**HEARTLAND FOOD CORP.**

By:_____

Name:_____

Title:_____


**SELLER:**

**DUKE AND KING ACQUISITION CORP.**


By:_____

Name:_____

Title:_____

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**HEARTLAND FOOD CORP.**

By:_____

Name:_____

Title:_____

**SELLER:**

**DUKE AND KING ACQUISTION CORP.**

By:_____

Name:_____

Title:_____

## Exhibit A

## SALE PROCEDURES

Please see attached.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER APPROVING SALE AND BIDDING PROCEDURES

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

This case came before the Court on the Debtors' Motion for an Order Approving Sale and Bidding Procedures dated January 7, 2010 (the "Procedures Motion").[1]

Based on the Procedures Motion, all the files, records and proceedings herein, the Court being advised in the premises:

**IT IS HEREBY FOUND AND DETERMINED THAT:**[2]

1.    The Court has jurisdiction over the Procedures Motion pursuant to 28 U.S.C. §§ 157 and 1334, and this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

---

[1]    All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Procedures Motion.

[2]    Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Fed. R. Bankr. 7052.

{2575006:2}

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *01/24/2011*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

2.     The Debtors have articulated good and sufficient reasons for approving the Procedures Motion.

3.     Due and proper notice of the Procedures Motion was provided and no other or further notice need be provided.

4.     The Sale Procedures, substantially in the form attached as <u>Exhibit A</u> to this Order, are fair, reasonable and appropriate and represent the best method for maximizing the value of the Debtors' assets.

5.     The entry of this Order is in the best interests of the Debtors and their estates, creditors and interest holders and all other parties in interest herein.

**IT IS HEREBY ORDERED:**

1.     The Procedures Motion is granted to the extent set forth herein.

2.     All objections filed in response to the Procedures Motion are resolved as set forth herein or on the record at the hearing on the Procedures Motion, and to the extent not resolved, are hereby overruled.

3.     The Sale Procedures, in the form attached as <u>Exhibit A</u> to this Order, are hereby incorporated herein and approved in their entirety.

4.     In accordance with the terms of the Sale Procedures, the Debtors are authorized to conduct separate auctions for the sale of all or substantially all of their assets free and clear of all liens, claims, interests and encumbrances, with all such liens, claims, interests and encumbrances to attach to the sale proceeds in the same order and priority as existed at the commencement of the Debtors' chapter 11 cases, subject to a further hearing and final court approval following such auctions.

5.     As provided by Bankruptcy Rule 6004(h), this Order shall be effective and enforceable immediately upon its entry.

2

{2575006:2}

6.    This Court shall retain jurisdiction over any matters related to or arising from the

implementation of this Order.

Dated:    January 24, 2011.

*/e/ Gregory F. Kishel*

_____
Gregory F. Kishel
United States Bankruptcy Judge

3

**EXHIBIT A**

{2575006:2}

## UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

|  |  |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes:<br>Duke and King Missouri, LLC;<br>Duke and King Missouri Holdings, Inc.;<br>Duke and King Real Estate, LLC;<br>DK Florida Holdings, Inc.) | 10-38653 (GFK)<br>10-38654 (GFK)<br>10-38655 (GFK)<br>10-38656 (GFK) |
|  | Chapter 11 Cases<br>Judge Gregory F. Kishel |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## SALE AND BIDDING PROCEDURES

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

These sale and bidding procedures (the "Sale Procedures") shall govern the sale of substantially all of the operating assets of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. The Debtors contemplate that the composition of the sale of their assets may take various forms, including, but not limited to a sale of all the assets to one purchaser or the sales of geographic regions of assets to separate purchasers as more particularly set forth below.

By motion (the "Procedures Motion"), dated January 7, 2011, the above-captioned debtors and debtors in possession (collectively, the "Debtors") sought, among other things, approval of these Sale Procedures governing the process and procedures for the sale of substantially all of the Debtors' operating assets through two separate auctions. On January 24, 2011, the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court"), entered an order approving these Sale Procedures (the "Procedures Order"). Pursuant to the Procedures Order, the Bankruptcy Court has scheduled a hearing (the "Sale Hearing") **on April 14, 2011, at 9:30 a.m. (Central Time),** to consider the sales.

**I.  Assets to Be Sold**

The assets to be sold consist of the Debtors' 87 BURGER KING® franchise locations and related assets situated in the states of Minnesota, Illinois, Missouri, Wisconsin, Kansas and Iowa (each restaurant, an "Individual Restaurant" and collectively, the "Sale Assets").

Any Potential Bidder (as defined herein) may obtain a detailed description of each Individual Restaurant and the geographic regions in which such Individual Restaurants are located through the process described in Section III below entitled "Due Diligence."

{2522615:9}

The Debtors may sell Individual Restaurants in regions (Group One) or in piecemeal (Group Two) through two separate groupings described below, such decisions being made to maximize the value to be paid by the successful bidder(s) for the Sale Assets. Accordingly, subject to the Group One Restaurants/Group Two Restaurants split as set forth below, Potential Bidders may submit bids to purchase (i) one, some or all of the Group One Regions (defined below), (ii) all of the Sale Assets, or (iii) any subset of Individual Restaurants in Group Two.

The Debtors will have a form of asset purchase agreement (in each case, the "APA") to consummate the transactions contemplated. The APA will include the terms and conditions upon which the Debtors expect (subject to reasonable revisions by the Qualified Bidders (as defined herein)) the Sale Assets to be sold.

Pursuant to these Sale Procedures and 11 U.S.C. § 363, the Sale Assets will be sold free and clear of all liens, claims, encumbrances and interests, other than liabilities expressly assumed. Bank of America, N.A. ("BofA"), the Debtors' senior secured lender, has agreed not to object to any sales that are consummated in accordance with the terms of these Sale Procedures, including, without limitation, objections under 11 U.S.C. § 363(f); except that BofA reserves the right to object to any sale that, in the judgment of BofA, is (i) not consummated in accordance with these Sales Procedures, (ii) does not represent the highest and best price when compared with other bids, or (iii) is not a bona fide arms' length transaction. BofA further reserves the right to object to the Debtors' determinations regarding Qualified Bidders (as defined herein) (including, without limitation, the designation of Qualified Bidders, whether deficiencies in bids have been cured and the waiver of any condition precedent to becoming a Qualified Bid set forth in the Sale Procedures); the selection of any Stalking Horse Bidder(s) (as defined herein); the payment of any Stalking Horse Protection Fees (as defined herein); the Debtors' selection of the Baseline Bid (as defined herein); any modifications or adjournments to the Group One Auction (as defined herein); or any modification of the Sale Procedures without BofA's consent.

The Sale Assets will be sold without warranty or representation of any kind or nature, whether expressed or implied, and are being purchased by the Successful Bidder(s) (as defined herein) on an "As Is, Where Is" basis and are being sold "Without Faults."

## II.    **Segregation of Restaurant Locations**

The Sale Assets shall be split into two groups: (i) 74 Individual Restaurants located on Schedule 1 to these Sale Procedures (collectively, the "Group One Restaurants"); and (ii) 13 Individual Restaurants located on Schedule 2 to these Sale Procedures (collectively, the "Group Two Restaurants"). The Group One Restaurants will be further segregated into five separate regions for marketing and sale:  Minnesota Region; Missouri Region; Davenport Region; Wisconsin Region; and Illinois Region (collectively, the "Group One Regions"), each of which are set forth on Schedule 1 to these Sale Procedures. The Group One Regions will not be marketed as Individual Restaurants, but rather, as all-inclusive regions. The Group One Regions and the Group Two Restaurants will be marketed simultaneously pursuant to these Sale Procedures.

If a Potential Bidder for the Sale Assets desires to make a bid for some or all of the Group One Regions and for all or a portion of the Group Two Restaurants, the Potential Bidder must separately designate the amount it is bidding for the Group One Regions and the Group Two Restaurants; provided, however, that any such Potential Bidder shall not submit a bid on any Group One Region that is contingent upon, tied to or in any other way a combined offer for any Group Two Restaurants.  The Group One Regions and the Group Two Restaurants will be auctioned separately and the Group One Regions will be auctioned first.

### III.   Due Diligence

Until the Bid Deadline (as defined below), the Debtors will afford to each interested party (i) determined by the Debtors to be reasonably likely to make a Qualified Bid (defined below), and (ii) who delivers an executed confidentiality agreement in form and substance satisfactory to the Debtors (each, a "Potential Bidder") reasonable access, during normal business hours and subject to confidentiality requirements, to the books and records of the Debtors reasonably requested by such Potential Bidder, including access to the Debtors' designated due diligence website, to the extent provision of such access or information is not prohibited by applicable law and relates to the Sale Assets.  The Debtors will furnish (subject to applicable law) as promptly as practicable to such Potential Bidder any and all such information as such Potential Bidder may reasonably request related to the Sale Assets.

Burger King Corporation ("BKC") is the Debtors' franchisor.  Potential Bidders should contact a representative of BKC in order to apply for BKC's consent and approval for its bid. The BKC representative's information is available upon request to Robert Hersch at Mastodon Ventures, Inc. ("Mastodon"), the Debtors' investment banker, by phone at 512.498.1212 or via email at rhersch@mastodonventures.com.

### IV.   Initial Determinations by the Debtors

The Debtors shall (a) determine (with the assistance of their respective financial advisors and investment banker) whether any person or entity is a Potential Bidder; (b) coordinate the efforts of Potential Bidders in conducting their respective due diligence investigations regarding the Sale Assets; (c) receive bids from Qualified Bidders; (d)  select a stalking horse bidder or bidders; and (e) negotiate and enter into one or more asset purchase agreements with one or more Qualified Bidder(s) (collectively, the "Bidding Process").

Except as provided by applicable law or court order, neither the Debtors nor their representatives shall be obligated to furnish any information of any kind whatsoever relating to the Sale Assets to any person or entity who is not a Potential Bidder and who does not comply with the participation requirements below.

### V.   Bid Deadline

A Qualified Bidder that desires to make a bid shall deliver written and electronic copies of such bid to the Debtors' investment banker, Mastodon Ventures, Inc., Attention: Robert Hersch, 515 Congress Ave., Suite 1400, Austin, TX 78701, email: rhersch@mastodonventures.com, so as to be received by no later than **5:00 p.m. (Central Time) on or before April 5, 2011** (the "Bid Deadline").  The Debtors' attorneys will send copies of

any bids and information submitted under Section VI below to counsel for BofA, BKC and the Official Committee of Unsecured Creditors (the "Committee") within 24 hours of receipt of such bid.

**VI.**    **Determination of "Qualified Bidder" Status**

Any Potential Bidder desiring to participate in the Bidding Process must be deemed a "Qualified Bidder." To be deemed a Qualified Bidder, a Potential Bidder must deliver to the Debtors (care of Mastodon) the most current audited (if available) and the latest unaudited financial statements and/or financial information evidencing the Potential Bidder's ability to close the transaction that meets the Debtors' satisfaction or such other information as reasonably determined by the Debtors to support the Potential Bidder's ability to close the transaction.

Upon the Debtors' determination that a party is a Qualified Bidder, the Debtors shall provide each Qualified Bidder with access to all relevant business and financial information necessary to enable such Qualified Bidder to evaluate the Sale Assets, for the sole purpose of submitting an offer.

**VII.**   **Requirements of a "Qualified Bid"**

To be deemed a "Qualified Bid" that may be considered at the Group One Auction or the Group Two Auction (each as defined in Section XI and Section XII below), a bid must:

a.    be in writing;

b.    be submitted by a Qualified Bidder;

c.    identify clearly the Group One Region(s) and/or Group Two Restaurant(s) that are included in the purchase and related segregated purchase price for each Group One Region and the Group Two Restaurant(s), if applicable;

d.    provide that the purchase price shall be paid in full in cash upon closing;

e.    be accompanied by a cash deposit equal to 10% of the proposed purchase price (such cash deposit will be applied to the purchase price);

f.    confirm the Qualified Bidder's completion of all due diligence required by such Qualified Bidder in connection with the proposed transaction;

g.    be irrevocable until the earlier of (i) the Qualified Bidder's bid being determined by the Debtors not to be a Qualified Bid, or (ii) another Qualified Bidder's bid for (some or all of) the same assets being approved by the Bankruptcy Court;

h.    be accompanied by a fully executed APA (and demonstrating any modifications as necessary) and such Qualified Bidder's terms relating to the assumption of any executory contracts or unexpired leases or operating liabilities relating to the Individual Restaurants located in the respective Group One Region(s) to be purchased and/or the Group Two Restaurants to be purchased;

i.      designate all executory contracts and unexpired leases the Qualified Bidder seeks to have assumed and assigned to it;

j.      indicate (i) whether the Debtors or the Qualified Bidder is responsible for payment of "cure costs" for executory contracts and unexpired leases to be assumed and assigned, (ii) the source of the funds for payment of such amounts, and (iii) the amount that the Qualified Bidder believes is required to be paid in order to consummate its transaction;

k.      demonstrate the capacity to provide adequate assurance of future performance under all executory contracts and unexpired leases that are being assumed and assigned;

l.      not contain any financing contingencies of any kind, and shall include (i) evidence that such Qualified Bidder (and any related guarantor) has financial resources readily available sufficient in the aggregate to finance the purchase of the Sale Assets (either some or all), (ii) evidence that such Qualified Bidder (and any related guarantor) has the ability to provide adequate assurance of future performance under any unexpired leases and executory contracts, and (iii) evidence of authorization and approval from such Qualified Bidder's board of directors (or comparable governing body) demonstrating the authority of the Qualified Bidder to make a binding and irrevocable bid on the terms provided in the APA;

m.     to the extent a Qualified Bidder intends to operate as a BURGER KING® franchisee, provide evidence of the BKC Approval (defined in Section VIII below) or evidence that a Request (as defined in Section VIII below) for BKC Approval remains pending; and

n.      be accompanied by an affirmative statement from such Qualified Bidder that it has and will continue to completely comply with these Sale Procedures.

For the avoidance of doubt, any party that submits a bid for one, some or all of the Group One Regions and all or a portion of the Group Two Restaurants shall provide a separate allocation for the amount of the consideration to be paid under such bid between the particular Group One Regions and the Group Two Restaurants.  Such allocation shall be due no later than the Bid Deadline.  Any bid for one, some or all of the Group One Regions must be a bid for all Individual Restaurants located in the particular Group One Region being bid upon.  No party may submit a bid for Individual Restaurants in a particular Group One Region that does not include all Individual Restaurants in such region and any such bid will not be deemed a Qualified Bid.

The Debtors will make a determination regarding whether a bid is a Qualified Bid and shall notify all Qualified Bidders whether their bids have been determined to be Qualified Bids by no later than 5:00 p.m. (Central Time) on April 7, 2011.  The Debtors reserve the right to reject any bid on any grounds.  Notwithstanding anything contained in this Section VII, should a Qualified Bidder submit a bid that fails to meet the qualifications to become a Qualified Bid, the

Debtors may allow a Qualified Bidder who has failed to meet the requirements of a Qualified Bid an additional 24 hours to cure any deficiencies to such bid.

The Debtors reserve the right, subject to consultation with BofA and the Committee, to waive compliance with any identified requirement for a bid to become a Qualified Bid; provided, however, BKC's approval process set forth in Section VIII below cannot be waived or modified.

## VIII.  **BKC Approval Process**

If a Qualified Bid is contingent on the Qualified Bidder receiving approvals from BKC, then such Qualified Bidder must deliver to BKC a written request for approval to become an authorized operator of a BKC franchise in accordance with BKC's customary approval process (a "Request").  BKC agrees to provide each Qualified Bidder with notice of its approval (the "BKC Approval") or disapproval as soon as reasonably possible after the receipt of all required information from any such Qualified Bidder consistent with its normal approval process.  For purposes of disclosure in considering a Request, BKC may apply, in its sole discretion, some or all of the standards set forth on Schedule 3 to these Sale Procedures.

Nothing in these Sale Procedures shall impair, affect or waive any (i) right of first refusal available to BKC in connection with its BURGER KING® franchise agreements; and (ii) BKC's right to object to any sale and/or assumption and assignment of BKC's franchise agreements or BKC's leases, all such rights preserved to BKC through the Sale Hearing.

## IX.  **Stalking Horse Bidder(s)**

Although the Debtors have had discussions with parties interested in submitting bids to purchase the Sale Assets (both as Individual Restaurants and in total) on a stalking horse basis (in each instance, a "Potential Stalking Horse Bidder"), the Debtors have not yet determined whether they will enter into stalking horse bid arrangements or identified any specific Potential Stalking Horse Bidder(s) for any of the Sale Assets to serve as an actual stalking horse bidder for any of the Sale Assets (in each case, as identified, a "Stalking Horse Bidder").

The Debtors will continue to consider whether to enter into stalking horse bid agreements, selecting one or more Stalking Horse Bidder(s) and which parties to serve as the Stalking Horse Bidder(s).  Any party seeking such consideration should immediately contact the Debtors' investment banker, Mastodon, to express such interest.  Any party seeking designation as a Stalking Horse Bidder shall be required to (i) have received the BKC Approval, (ii) submit a bid (in each instance, a "Stalking Horse Bid"), (iii) agree to an APA memorializing the transaction such party proposes (in each instance, a "Stalking Horse APA"), and (iv) provide a list of all executory contracts and unexpired leases to be assumed and assigned.  The Debtors may name Stalking Horse Bidder(s).  To the extent that the Debtors name Stalking Horse Bidder(s), the Debtors will do so on a rolling basis as Stalking Horse Bids are submitted, negotiated and agreed to.  The Debtors will consider proposed Stalking Horse Bids initially through March 14, 2011, with the expectation of naming a Stalking Horse Bidder or Stalking Horse Bidders no later than March 21, 2011.  To the extent that any of the Sale Assets are not included in a Stalking Horse Bid, the Debtors reserve the right to identify Stalking Horse Bid(s) after March 21, 2011.  The Debtors also reserve the right to name a Stalking Horse Bidder(s) for

any Group One Region or for all of the Sale Assets (subject to the Group One and Group Two split).

Each Stalking Horse Bid, memorialized by Stalking Horse APA(s), shall be subject to higher and better bids pursuant to the terms of these Sale Procedures and applicable law. As noted in Section XI of these Sale Procedures, the Debtors may negotiate a break-up fee and reimbursement of reasonable expenses (the "Stalking Horse Protection Fee"). The Debtors shall be under no obligation to designate and name a Stalking Horse Bidder or accept any Stalking Horse Bid(s) for any or all of the Sale Assets.

## X.      Negotiation of Stalking Horse Protection Fee(s)

In the event that a Stalking Horse Bidder is named and designated, the Debtors may negotiate a reasonable Stalking Horse Protection Fee payable to such Stalking Horse Bidder in the event that such Stalking Horse Bidder are not the Successful Bidder (whether as initial Successful Bidder or as successor as a Reserve Bidder). The Stalking Horse Protection Fee shall be approved by the Bankruptcy Court. At the Group One Auction or the Group Two Auction, as the case may be, any Qualified Bidder wishing to enter a bid in excess of the Stalking Horse Bid must enter an amount equal to the Stalking Horse Bid plus the Stalking Horse Protection Fee, plus any minimum bid amount to advance their bid(s).

If a Stalking Horse Bidder is identified and named in accordance with these Sale Procedures, the Debtors shall file a motion with the Court (in each case, a "Stalking Horse Motion") naming the Stalking Horse Bidder, seeking expedited approval of the Stalking Horse APA and Stalking Horse Protection Fee. Mastodon will contact all parties that have expressed an interest (in writing or otherwise) in any portion of the Sale Assets being purchased under the respective Stalking Horse APA and provide such parties with a copy of the Stalking Horse Motion and a copy of the respective Stalking Horse APA.

## XI.      Group One Auction Process

In the event that the Debtors receive more than one Qualified Bid for one, some or all of the Group One Regions, the Debtors will conduct an auction (the "Group One Auction") for the Group One Regions. The Group One Auction will take place at **10:00 a.m. (Central Time) on April 11, 2011** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than April 7, 2011.

The Debtors will have the right to publish detailed procedures consistent with these Sale Procedures for the conduct at the Group One Auction at any time prior to the start of the Group One Auction. Parties entitled to attend the Group One Auction shall include the Debtors, BofA, the Committee, BKC, the Qualified Bidders and the Stalking Horse Bidder(s) (if any), and each of those parties' representatives. The Stalking Horse Bidder(s) (if any) and each Qualified Bidder shall appear at the Group One Auction in person, or through a representative who provides appropriate evidence of such person's authority. Only a Qualified Bidder who has timely submitted a Qualifying Bid, and the Stalking Horse Bidder(s) (if any), shall be entitled to make bids at the Group One Auction.

In the event that a Stalking Horse Bidder is not selected prior to the Group One Auction and no Stalking Horse Bid(s) are tendered, the Debtors will select the highest and best bid or bids (a "Baseline Bid") to serve as the negotiating point with the other Qualified Bidders at the Group One Auction. There may be more than one Baseline Bid if the Debtors determine that multiple Baseline Bids for certain of the Group One Regions are higher and better than one Baseline Bid. The Debtors reserve the right to aggregate bids for separate Group One Regions and compare such aggregated bids with bids for all of the Group One Regions in determining the then current best bid.

As soon as practicable, the Debtors will provide all Qualified Bidders, BofA, BKC and the Committee with a copy of the Baseline Bid(s). At the Group One Auction, Qualified Bidders will be permitted to revise, increase, and/or enhance their bid(s) based upon the terms of the Stalking Horse Bid or the Baseline Bid(s), as the case may be (except to the extent otherwise authorized by the Debtors). All Qualified Bidders will have the right to make additional modifications to the APA at the Group One Auction.

The Group One Auction will be conducted in rounds and in any order the Debtors determine. At the end of every round, the Debtors shall declare the highest and best bid or bids at that time for the assets under consideration pursuant to the Baseline Bid(s). Each Qualified Bidder shall have the right to continue to improve its respective bid at the Group One Auction. The initial minimum overbid shall be the Baseline Bid established prior to the Group One Auction plus the lesser of 10% of the Baseline Bid or $200,000 (the "Initial Overbid"). Thereafter, Qualified Bidders may increase their Qualified Bids in any manner that they deem fit; provided, however, that each subsequent increase must include a minimum of the lesser of 5% of the Baseline Bid or $100,000 in additional consideration. The Debtors reserve the right to approach any Qualified Bidder(s) and seek clarification to bids at any time, including without limitation, inviting Qualified Bidder(s) to communicate with other Qualified Bidder(s) if such communication would be beneficial to the Group One Auction.

The Group One Auction will continue with the Qualified Bidders until the Debtors determine, and subject to Bankruptcy Court approval, that they have received the highest and best offer for the Group One Regions (either as a whole or separately) from the Qualified Bidders or the Stalking Horse Bidder(s) (the "Successful Bid") and the next highest and best Qualified Bid submitted at the Group One Auction (a "Reserve Bid"). The Qualified Bidder(s) submitting the Successful Bid(s) shall become a "Successful Bidder(s)," and the Qualified Bidder(s) submitting the Reserve Bid(s) shall become a "Reserve Bidder(s)." The Successful Bidder(s) and the Reserve Bidder(s) may be named for separate Group One Regions or for all of the Group One Regions, or any combination thereof, as determined by the Debtors. In making this decision, the Debtors shall consider, without limitation, the amount of the purchase price, the form of consideration being offered, the particular groupings of Group One Regions, the Qualified Bidder's ability to close a transaction and the timing thereof, the type and nature of the APA, its requirements as to the assumption and assignment of executory contracts, licenses, and unexpired leases relating to the Individual Restaurants located in the Group One Region(s) to be purchased, and the net benefit to the Debtors' estates.

The Debtors' procedures for the Group One Auction require the following: (i) if a Stalking Horse Bidder(s) is selected prior to the Group One Auction, the initial overbid by a

Qualified Bidder(s) shall be greater than the sum of (a) the Stalking Horse Protection Fee, and (ii) the Initial Overbid.  If there is no Stalking Horse Bidder(s) selected prior to the Group One Auction, no Stalking Horse Protection Fee(s) will be awarded and the initial overbid amount will not include such an amount.

The Debtors reserve the right, in their business judgment, to make one or more modifications and/or adjournments to the Group One Auction to, among other things: (i) facilitate discussions between the Debtors, on the one hand, and individual Qualified Bidders, on the other hand; (ii) allow individual Qualified Bidders to consider how they wish to proceed; and (iii) give Qualified Bidders the opportunity to provide the Debtors with such additional evidence as the Debtors in their business judgment may require.

In the event that a Qualified Bidder's Successful Bid or Reserve Bid changes as a result of the Group One Auction, then such Qualified Bidder may need to seek additional approvals from BKC beyond such Qualified Bidder's initial BKC Approval.  Qualified Bidders are encouraged to address any such matters with BKC as early in the process as possible.

## XII.    **Group Two Auction Process**

In the event that the Debtors receive more than one Qualified Bids for all or a portion of the Group Two Restaurants, the Debtors will conduct an auction (the "Group Two Auction") for the Group Two Restaurants.  The Group Two Auction will take place, subject to the Debtors' discretion, either immediately following the closing of the Group One Auction or at **10:00 a.m. (Central Time) on April 12, 2011,** at a place as will be designated in writing by the Debtors in a notice to be given to all Qualified Bidders no later than April 7, 2011.

All of the procedures set forth in Section XI of these Sales Procedures relating to the Group One Auction shall be expressly applicable to the Group Two Auction; provided, however, that a Qualified Bidder(s) bidding on one, some or all of the Group One Regions that has also submitted a Qualified Bid(s) for the Group Two Restaurants shall not withdraw such its bid for the Group Two Restaurants regardless of such Qualified Bidder's success or lack of success at the Group One Auction.

## XIII.   **The Sale Hearing**

At the Sale Hearing, which will be held **on April 14, 2011, at 9:30 a.m. (Central Time)**, the Debtors will seek entry of an order or orders authorizing and approving the sale(s) to the Successful Bidder(s) for the Group One Regions and/or Group Two Restaurants.  No later than 11:59 p.m. (Central Time) on April 12, 2011, all objections to the relief requested at the Sale Hearing shall be filed and served in the manner prescribed in the motion to approve the sale of the Group One Regions and the Group Two Restaurants.  The Sale Hearing may be adjourned or rescheduled from time to time.  The Debtors shall provide notice of such adjournment or rescheduling to:  (i) the U.S. Trustee; (ii) counsel to BofA; (iii) counsel to the Committee; (iv) counsel to BKC; (v) all Qualified Bidders;  (vi) all parties that have filed a timely objection to the sale; (vii) all persons or entities known or reasonably believed to have asserted a lien in any of the Sale Assets; and (viii) all parties that have requested notice in the Debtors' bankruptcy cases.

## XIV.   **Failure to Consummate Purchase**

Following the Sale Hearing, if the Successful Bidder(s) fails to consummate the closing of the sale because of a breach or failure to perform on the part of such Successful Bidder(s), the Debtors will be authorized, but not required, to consummate the sale with Reserve Bidder(s) without further order of the Bankruptcy Court.  In such case, the defaulting Successful Bidder's deposit shall be forfeited to the Debtors.  Additionally, the Debtors shall be entitled to seek all available damages from the defaulting Successful Bidder.

## XV.   **Return of Deposit**

The deposits of the Successful Bidder(s) shall be applied to the Successful Bidder's obligations under the Successful Bid upon closing of the transactions contemplated thereby.  If a Successful Bidder fails to close the transactions contemplated by the Successful Bidder then such Successful Bidder shall forfeit its deposit (and any right to any Stalking Horse Protection Fee, if applicable).

The deposit(s) of the Reserve Bidder(s) shall be returned to the Reserve Bidder(s) upon closing of the transactions contemplated by the Successful Bidder(s); provided, however, that if a Successful Bidder fails to close the transactions when and as provided in the Successful Bid, then the deposit of the Reserve Bidder(s) shall be applied to the Reserve Bidder's obligations under the Reserve Bid upon closing of the transactions contemplated thereby.  If a Reserve Bidder fails to close the transactions contemplated by a Reserve Bid, then such Reserve Bidder shall forfeit its deposit.

All other deposits of Qualified Bidders who are not the Successful Bidder(s) or the Reserve Bidder(s) shall be returned within three business days after the conclusion of the Group One Auction or the Group Two Auction, as the case may be.

The Debtors reserve all of their rights regarding any return of deposits, and the failure by the Debtors to timely return any deposit(s) shall not serve as a claim for breach of any bid(s) or create any default in favor of any bidder(s).

## XVI.   **Modification of Amended Sale Procedures**

The Debtors may amend these Sale Procedures, in their reasonable business judgment, at any time in any manner that will best promote the goals of the Bidding Process, including but not limited to extending or modifying any of the dates described herein.  Notwithstanding the foregoing, the Debtors may modify the requirements set forth in Section II of these Sale Procedures only (i) with the consent of both BofA and BKC or (ii) pursuant to an order of the Bankruptcy Court.

## XVII.   **Miscellaneous**

BofA shall be entitled to exercise its right under 11 U.S.C. § 363(k) at the Group One Auction or the Group Two Auction (as the case may be) to credit bid the indebtedness owed to BofA.  For the purpose of these Sale Procedures, BofA shall be deemed a Qualified Bidder and shall be entitled to participate in the Group One Auction and the Group Two Auction if BofA's

bid complies with all of the provisions of these Sale Procedures, subject to the following modifications: (i) with respect to the cash deposit required under Section VII(e) of these Sale Procedures, BofA shall deposit cash equal to 10% of the cash component (if any) of the bid; and (ii) with respect to Section VII(d) of these Sale Procedures, BofA need not provide that the credit bid portion of its purchase price be paid in cash at closing.  BofA need not provide for a cash deposit as to the credit component of its bid.  Notwithstanding anything herein to the contrary, BofA's status as a Qualified Bidder does not exempt BofA from seeking and obtaining the BKC Approval for the operation of the Sale Assets as BURGER KING® restaurants.

**XVIII.  <u>Debtors' Consultation with Key Parties</u>**

In the context of these Sale Procedures, the Debtors will consult with BKC, BofA and the Committee with respect to issues relating to (i) designating a Qualified Bidder; (ii) determining whether a bid is a Qualified Bid; (iii) curing deficiencies to become a Qualified Bid; (iv) identifying any Stalking Horse Bid(s) and whether to accept any Stalking Horse Bid(s); (v) establishing procedures for the Group One Auction and the Group Two Auction; (vi) selecting the Baseline Bid(s); (vii) choosing the Successful Bid(s) and Reserve Bid(s); and (viii) modifying these Sale Procedures.

## SCHEDULE 1

## GROUP ONE RESTAURANTS BY REGION

| | Store # | Address | City | State |
|---|---|---|---|---|
| | **Minnesota Region** | | | |
| 1 | 04116 | 2651 County Road I | Mounds View | MN |
| 2 | 06270 | 8510 Edinburgh Center Drive | Brooklyn Park | MN |
| 3 | 07557 | 8501 Springbrook Drive NW | Coon Rapids | MN |
| 4 | 09095 | 106 Ninth Avenue Circle South | Princeton | MN |
| 5 | 09993 | 10861 University Avenue NE | Blaine | MN |
| 6 | 09994 | 318 East Kraft Drive | Melrose | MN |
| 7 | 02641 | 2011 E Main Street | Albert Lea | MN |
| 8 | 04553 | 1501 NW 7th Street | Faribault | MN |
| 9 | 06545 | 1022 E Blue Earth Avenue | Fairmont | MN |
| 10 | 06615 | 1318 Riverfront Drive | Mankato | MN |
| 11 | 07444 | 735 Bridge Street | Owatonna | MN |
| 12 | 09081 | 1409 4th Street NW | Austin | MN |
| 13 | 04009 | 14251 Nicollet Avenue | Burnsville | MN |
| 14 | 04122 | 5020 160th Street SE | Prior Lake | MN |
| 15 | 04151 | 1150 East Highway 13 | Burnsville | MN |
| 16 | 09256 | 255 Triangle Lane N Ste 2 | Jordan | MN |
| 17 | 04507 | 13840 Grove Drive | Maple Grove | MN |
| 18 | 05012 | 2025 Northdale Blvd | Coon Rapids | MN |
| 19 | 06299 | 10801 Bloomington Ferry Road | Bloomington | MN |
| 20 | 07466[1] | 330 North Garden | Bloomington | MN |
| 21 | 08224 | 5105 Edina Industrial Blvd | Edina | MN |
| 22 | 09332 | 5358 West Broadway Ave | Crystal | MN |
| 23 | 05591 | 2535 Division Street | North St Paul | MN |
| 24 | 06590 | 1215 Gun Club Road | White Bear Lake | MN |
| 25 | 08004 | 3333 Rice Street | Shoreview | MN |
| 26 | 09272 | PO 264   403 Fire Monument Road | Hinckley | MN |
| 27 | 11243 | 1560 West 4th Street | Rush City | MN |
| 28 | 11682 | 38711 Tanger Drive | North Branch | MN |
| 29 | 05713 | 1501 Weir Drive | Woodbury | MN |
| 30 | 06530 | 7051 Tenth Street North | Oakdale | MN |
| 31 | 07937 | 2411 Center Drive | Hudson | WI |
| 32 | 09934 | 120 Meridian Drive | New Richmond | WI |
| 33 | 11254 | 9896 Norma Lane | Woodbury | MN |
| 34 | 12757 | 1287 N Main St | River Falls | WI |
| 35 | 10239 | 244 Grand Avenue | St Paul | MN |
| 36 | 10284 | 695 7th Street East | St Paul | MN |
| 37 | 11284 | 1500 Stinson Blvd NE | Minneapolis | MN |
| 38 | 11535 | 8481 SE Point Douglas Road | Cottage Grove | MN |
| 39 | 12250 | 925 Washington Ave SE | Minneapolis | MN |
| 40 | 13091 | 289 57th Avenue NE | Fridley | MN |
| | **Missouri Region** | | | |
| 1 | 03232 | 3009 S. Campbell Avenue | Springfield | MO |
| 2 | 05357 | 1022 Kings Highway Street | Rolla | MO |
| 3 | 07203 | 525 S. National Avenue | Springfield | MO |
| 4 | 12281 | 2200 E. Austin Blvd | Nevada | MO |
| 5 | 11049 | 3095 Gardner Edgewood Drive | Neosho | MO |
| 6 | 12413 | 315 N. Massey Blvd | Nixa | MO |
| 7 | 12415 | 875 E. Highway 60 | Monett | MO |
| 8 | 01227 | 935 W. Kearney | Springfield | MO |
| 9 | 03475 | 2138 N. Glenstone Avenue | Springfield | MO |

---

[1] The Debtors reserve the right to exclude Restaurant # 7466 from the restaurants to be sold in the Minnesota Region.

| | Store # | Address | City | State |
|---|---|---|---|---|
| *10* | 04513 | 1077 S. Jefferson Avenue | Lebanon | MO |
| *11* | 05539 | 1101 S. Limit Avenue | Sedalia | MO |
| *12* | 08384 | 1911 S. Springfield Avenue | Bolivar | MO |
| *13* | 09331 | 1317 Preacher Roe Blvd | West Plains | MO |

**Davenport Region**

| | | | | |
|---|---|---|---|---|
| *1* | 04043 | 229 West Kimberly Road | Davenport | IA |
| *2* | 04201 | 5231 N Brady Street | Davenport | IA |
| *3* | 04297 | 4040 38th Avenue | Moline | IL |
| *4* | 06211 | 1222 Avenue of the Cities | East Moline | IL |

**Wisconsin Region**

| | | | | |
|---|---|---|---|---|
| *1* | 01764 | 2655 East Washington | Madison | WI |
| *2* | 01888 | 2624 Milton Avenue | Janesville | WI |
| *3* | 03792 | 4980 South 76th Street | Greenfield | WI |
| *4* | 04857 | 822 Windsor Street | Sun Prairie | WI |
| *5* | 09366 | 400 Center Way | Janesville | WI |

**Illinois Region**

| | | | | |
|---|---|---|---|---|
| *1* | 01752 | 723 Shooting Park | Peru | IL |
| *2* | 00111 | 18459 South Halsted Street | Glenwood | IL |
| *3* | 01747 | 209 Norris Drive | Ottawa | IL |
| *4* | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| *5* | 05879 | 1830 Southwest Avenue | Freeport | IL |
| *6* | 11877 | 504 West Blackhawk Drive | Byron | IL |
| *7* | 16573 | 2320 Route 34 | Oswego | IL |
| *8* | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| *9* | 00437 | 1138 East State Street | Rockford | IL |
| *10* | 01060 | 1450 4th Street | Beloit | WI |
| *11* | 01326 | 2434 11th Street | Rockford | IL |
| *12* | 10234 | 7510 East State Street | Rockford | IL |

## SCHEDULE 2

## GROUP TWO RESTAURANTS

|    | Store # | Address | City | State |
|----|---------|---------|------|-------|
| 1  | 00106 | 901 North Lake Street | Aurora | IL |
| 2  | 01558 | 1411 S. Range Line Road | Joplin | MO |
| 3  | 04111 | 3500 South Moorland Road | New Berlin | WI |
| 4  | 04334 | 2423 Rockingham Road | Davenport | IA |
| 5  | 05960 | 2001 Center Avenue | Janesville | WI |
| 6  | 05971 | 1710 DeKalb Avenue | Sycamore | IL |
| 7  | 06030 | 1011 W. Central Avenue | Carthage | MO |
| 8  | 06609 | 3020 E. Sunshine Street | Springfield | MO |
| 9  | 07204 | 1699 W. Jackson Street | Ozark | MO |
| 10 | 08964 | 1220 E. Republic Road | Springfield | MO |
| 11 | 09744 | 1429 Main Street | Parsons | KS |
| 12 | 11191 | 2789 Milwaukee Road | Beloit | WI |
| 13 | 11751 | 808 S Illinois Avenue | Republic | MO |

## SCHEDULE 3

**DESCRIPTION OF BURGER KING CORPORATION'S APPROVAL PROCESS**

a. <u>New Franchisee Approval Process</u>:  New franchisee candidates must obtain approval by all of the following:

    o    <u>Operations Review</u>:  Criteria includes: directly comparable experience in a multi-unit retail environment preferably in the restaurant sector.  Candidate must pass interviews with BKC's Franchise Operations leadership.

    o    <u>Legal Review</u>: Criteria include background checks.

    o    <u>Credit Review</u>: Criteria include reliable credit history.

    o    <u>Financial Review</u>: Criteria includes net worth of at least $1.5M or 3-5x the equity required to complete the targeted deal, whichever is greater.

    o    <u>Franchising Review</u>:  Franchisee must obtain approval of BKC's franchise leadership team.  Criteria includes alignment with BKC's franchising guiding principles, including a focus on growth via organic development and an understanding of BKC's policies on maximum restaurant count and contiguous geography.

b. <u>Deal Approval</u>: Transfers of BURGER KING® restaurants are subject to case-by-case deal approval by BKC's Operations, Franchising, Legal and Finance groups.  Being approved to become a franchisee does not in any way give the approved candidate a path around this process.

c. <u>Approval Process for Existing Franchisee Acquisitions</u>:  Existing franchisees seeking to acquire any particular set of existing BURGER KING® restaurants must obtain approval by all of the following:

    o    <u>Operations Review</u>:  BKC's Field Operations must support the buyer based on their operations track-record and organizational capacity.

    o    <u>Financial Review</u>:  The proposed buyer must demonstrate the financial capacity to handle the transaction in addition to any required capital expenditures.  Buyers must be current in all payments due to BKC.

    o    <u>Franchising Review</u>:  In general terms, the buyer must be aligned with all BKC goals and initiatives.  Check-points include whether the franchisee is compliant with all equipment and remodeling obligations in their existing business; whether the buyer has supported local marketing initiatives; and whether the buyer has developed new restaurants.  In addition, the acquisition will be reviewed for whether it is in the same geographical areas as the proposed buyer's existing base of operations; and whether it causes the buyer to be at or near the 100-restaurant ceiling.

{2522615:9}

## **Exhibit B**

## **Form of Deposit Escrow Agreement**

Please see attached.

# DEPOSIT ESCROW AGREEMENT

THIS DEPOSIT ESCROW AGREEMENT ("Escrow Agreement") is entered into as of April 11, 2011, by and among Duke and King Acquisition Corp., a Delaware corporation ("Seller"), Heartland Food Corp., a Delaware corporation ("Buyer"), and U.S. Bank National Association, a national banking association ("Escrow Agent").

## RECITALS

A.      Buyer has submitted a bid to Seller to purchase certain of the assets and business of Seller pursuant to the terms of certain "Sale and Bidding Procedures" issued by the United States Bankruptcy Court for the District of Minnesota pursuant to order in the case captioned *In re Duke and King Acquisition Corp.,* Case No. 10-38652 (Bankr. Minn.) (the "Sale Procedures"); and

B.      As part of that bid, Buyer has submitted to Seller an Asset Purchase Agreement, dated April 11, 2011 (the "Purchase Agreement"); and

C.      Pursuant to the Sale Procedures, to qualify as a Qualified Bidder, Buyer is required to submit a cash deposit equal to 10% of the purchase price into escrow (the "Deposit") to be disbursed in accordance with the terms of this Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

1.      Certain Defined Terms.  Capitalized terms used but not otherwise defined herein shall have the respective meanings given such terms in the Purchase Agreement or the Sale Procedures.  The Escrow agent shall be furnished copies of the Purchase Agreement and the Sale Procedures for reference purposes only, provided that the Escrow Agent shall have no duties, obligations or liabilities arising under the Purchase Agreement or Sale Procedures.

2.      Designation of the Escrow Agent. Buyer and Seller hereby designate and appoint the Escrow Agent for the purposes set forth in this Escrow Agreement. The Escrow Agent hereby accepts such appointment under the terms and conditions set forth in this Escrow Agreement.

3.      Creation of the Escrow. On even date herewith, Buyer has delivered, or shall deliver, the sum of $50,000.00 to the Escrow Agent, as the Deposit, by wire transfer of immediately available funds to be held in an escrow account specified by the Escrow Agent (the "Escrow Funds"). The escrow account name and account number are as follows: Duke & King Acq / Heartland Food 1 - # 146722000.

4.      Investment. From the date hereof until otherwise directed in writing by Buyer and Seller, the Escrow Agent shall invest the Escrow Funds in its U.S. Bank Money Market Account as described on Exhibit A attached hereto.  In no event shall the Escrow Agent be liable for the results of any investment, including without limitation any loss, cost or penalty resulting from any investment made in accordance with the terms hereof.

5.      Disbursement of the Escrow Funds.  The Escrow Agent shall distribute the Escrow Funds and interest accrued thereon in accordance with the joint written instructions executed by Buyer and Seller pursuant to the terms of the Purchase Agreement ("Joint Instruction").

6. <u>Termination</u>. This Escrow Agreement, and the escrow created hereby, shall terminate upon the date that the Escrow Funds are fully and finally disbursed pursuant to Joint Instruction of Buyer and Seller.

7. <u>Fees and Expenses</u>. In consideration for its services hereunder, Buyer and Seller agree to equally divide the payment (1/2 paid by Seller and 1/2 paid by Buyer) of the annual administrative escrow fee of the Escrow Agent set forth in <u>Exhibit B</u> attached hereto, and of all other fees, costs, charges and expenses of the Escrow Agent, if any, including reasonable attorneys' fees, which are incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, <u>provided</u>, <u>however</u>, that the Escrow Agent complies with Section 8(a) of this Escrow Agreement.

8. <u>Conditions of the Escrow Agent's Obligations</u>.

a. <u>Legal Counsel</u>. The Escrow Agent shall be entitled to employ legal counsel and other experts as it may deem reasonably necessary to advise it in connection with its obligations hereunder, may rely on the advice of such counsel, and may pay them reasonable compensation therefore, <u>provided</u>, <u>however</u>, that the fees of such legal counsel shall have been approved in advance by the parties hereto if reimbursement of such fees is to be sought from the parties; provided that such approval shall not be unreasonably withheld and in no event shall it be withheld if the Escrow Agent is subject to actual or threatened litigation not directly caused by its own negligence or willful misconduct.

b. <u>Resignation</u>. The Escrow Agent may resign by giving written notice thereof to Buyer and Seller. In the event of any such notice of resignation, the Escrow Agent shall refrain from taking any action with respect to the Escrow Funds until it receives joint written instructions from Buyer and Seller designating a successor depository which shall be a national bank authorized to exercise corporate trust powers, and having a combined capital and surplus of at least $5,000,000,000. Upon receipt of such joint instructions, the Escrow Agent shall promptly deliver the Escrow Funds then held by it to such successor. Any successor depository shall have all the rights, obligations, and immunities of the Escrow Agent set forth herein. If the Buyer and Seller have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation from the Escrow Agent, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

c. <u>Liability Limitations</u>. Except as to its obligation to keep the Escrow Funds safely in its custody as the Escrow Agent pursuant to the terms of this Escrow Agreement, the Escrow Agent shall be indemnified, on a several basis, by Buyer and Seller and shall not be liable to anyone whatsoever by reason of any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law or for anything which it may do or refrain from doing in connection herewith unless caused by or arising out of its own negligence or willful misconduct. IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION, UNLESS ARISING IN WHOLE OR IN PART OUT OF ITS OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

d.     Reliance. The Escrow Agent shall be entitled to rely and shall be protected in acting in reliance upon any Joint Instruction and shall be entitled to treat as genuine, and as the document it purports to be, any letter, paper or other document furnished to it and reasonably believed by it to be genuine and to have been signed and presented by the proper party or parties.

e.     Tax Matters. The Escrow Agent does not have any interest in the Escrow Funds deposited hereunder but is serving only as escrow holder and having only possession thereof. All interest or other income from all investments and reinvestments of the Escrow Funds shall be paid as directed in the Joint Instruction or upon the earlier of: (i) termination of this Agreement and the escrow established hereby, or (ii) the disbursement of the Escrow Funds. For income tax purposes, income from all investments and reinvestments of the Escrow Funds shall be for the benefit of the party to whom such funds are disbursed, shall be recognized by such party and paid by such party.

f.     Disputes. In the event that (i) any dispute shall arise between the parties with respect to the disposition or disbursement of any of the assets held hereunder or (ii) the Escrow Agent shall be uncertain as to how to proceed in a situation not explicitly addressed by the terms of this Agreement whether because of conflicting demands by the other parties hereto or otherwise, the Escrow Agent shall be permitted to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Funds until such dispute or conflicting demands shall have been (i) determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or (ii) settled by agreement between the conflicting parties as evidenced in a writing reasonably satisfactory to the Escrow Agent. Notwithstanding anything herein to the contrary, in no event shall the Escrow Agent be required to institute legal proceedings of any kind, or be required to defend any legal proceedings which may be instituted against it with respect to this Agreement unless requested to do so in writing by the other parties hereto and until it is indemnified by such requesting party(ies) to the sole satisfaction of the Escrow Agent, against the cost and expense of such defense, including without limitation the reasonable fees and expenses of its legal counsel.

9.     Action by the Escrow Agent. Nothing herein contained shall be deemed to impose upon Buyer or Seller any obligation or liability on account of the failure of the Escrow Agent to fulfill its obligations under this Escrow Agreement. The Escrow Agent will not be responsible for determining or calculating amounts to be disbursed from the escrow established hereunder.

10.     Headings. The headings in this Escrow Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation hereof.

11.     Governing Law. This Escrow Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota without giving effect to the principles of conflicts of laws thereof.

12.     Notices.    All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered by hand, overnight delivery service, electronic mail or facsimile transmitter (with confirmed receipt) to the physical address, electronic address or facsimile number set forth in this section, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given on the date received.

If to Buyer:          Heartland Food Corp.
                      1400 Opus Place

Suite 900
Downers Grove, IL 60515
Attention:  Christopher J. Ondrula, CEO
Facsimile: 630-598-2210
Email: condrula@heartlandfoodcorp.com

With copies to (which shall not constitute notice):

GSO CAPITAL PARTNERS LP
280 Park Avenue
New York, New York 10017
Attention: Marc Baliotti
Facsimile: 212-503-6930
Email: Marc.Baliotti@gsocap.com

and

Kirkland & Ellis, LLP
300 North LaSalle Street
Chicago, IL 60654
Attention: Robert A. Wilson
Facsimile: 312-862-2200
Email: Robert.wilson@kirkland.com

If to Seller:         Duke and King Acquisition Corp.
                      12281 Nicollet Avenue, South
                      Burnsville, MN  55337
                      Attention:    Becky Moldenhauer
                      E-Mail bmoldenhauer@dukeandking.com
                      Facsimile:    952-288-2327

With a copy to        McDonald Hopkins LLC
                      600 Superior Avenue, East
                      Suite 2100
                      Cleveland, Ohio 44114
                      Attention:    Scott N. Opincar
                      E-Mail        sopincar@mcdonaldhopkins.com
                      Facsimile:    (216) 348-5474

If to the Escrow Agent: U.S. Bank National Association
                      Mail Code EP-MN-WS3C
                      60 Livingston Avenue
                      St. Paul, MN  55107
                      Attention       Georgette Kleinbaum
                      E-Mail georgette.kleinbaum@usbank.com
                      Facsimile:    651 495-8096

or to such other address as may have been designated in a prior notice. Notices sent by registered or certified mail, postage prepaid, return receipt requested, shall be deemed to have been given two

business days after being mailed; notices sent by a nationally recognized commercial overnight carrier shall be effective the next business day after receipted delivery to such courier specifying overnight delivery; notices sent by facsimile shall be effective upon confirmation of receipt at the number specified above otherwise, notices shall be deemed to have been given when delivered to the address specified above (or other address specified in accordance with the foregoing). The applicable persons designated on Exhibit C attached hereto are duly authorized signatories for Buyer and Seller, respectively, and have authority on behalf of the respective parties to execute and deliver this Agreement and any Joint Instruction contemplated by this Agreement. Any modification of such authorized signatories shall be provided by written notice delivered to the Escrow Agent.

13. Execution in Counterparts. This Escrow Agreement and any related Joint Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

14. Modification. This Escrow Agreement may be modified or amended only by joint written instructions to the Escrow Agent, signed by Buyer and Seller, or by a subsequent writing signed by Buyer, Seller and the Escrow Agent.

15. Binding Effect. This Escrow Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of Buyer, Seller and the Escrow Agent, and their respective successors and assigns.

16. Severability. If any provision of this Escrow Agreement, or the application thereof to any person or circumstance, should, for any reason and to any extent, be invalid or unenforceable, the remainder of this Escrow Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

17. Patriot Act Disclosure. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each individual or entity that opens an account. Therefore, the Escrow Agent must obtain the name, address, taxpayer or other government identification number, and other information, such as date of birth for individuals, for each individual and business entity that is a party to this Escrow Agreement. For individuals signing this Escrow Agreement on their own behalf or on behalf of another, the Escrow Agent requires a copy of a driver's license, passport or other form of photo identification. For business and other entities that are parties to this Escrow Agreement, the Escrow Agent will require such documents as it deems necessary to confirm the legal existence of the entity. At the time of or prior to execution of this Escrow Agreement, any party providing a tax identification number for tax reporting purposes shall provide to the Escrow Agent a completed IRS Form W-9, and every individual executing this Agreement on behalf of party shall provide to the Agent a copy of a driver's license, passport or other form of photo identification acceptable to the Agent. The parties hereto agree to provide to the Escrow Agent such organizational documents and documents establishing the authority of any individual acting in a representative capacity as the Escrow Agent may require in order to comply with its established practices, procedures and policies. The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Funds in accordance with the Form W-9 information provided to the Escrow Agent. Buyer and Seller understand that, in the event one or more tax identification numbers are not certified to the Escrow Agent, the Internal Revenue Code, as amended from time to time, may require withholding of a portion of any interest or other income earned on the Escrow Funds

IN WITNESS WHEREOF, this Escrow Agreement has been executed by Buyer, Seller and the Escrow Agent on the date and year first written above.

**SELLER**

DUKE AND KING ACQUISITION CORP.

By:_____

Name:_____

Title:_____

**BUYER**

HEARTLAND FOOD CORP.

By:_____

Name:_____

Title:_____

**ESCROW AGENT**

U.S. BANK National Association

By:_____

Name:_____

Title:_____

**EXHIBIT A**

## U.S. BANK NATIONAL ASSOCIATION
## MONEY MARKET ACCOUNT AUTHORIZATION
## DESCRIPTION AND TERMS

The U.S. Bank Money Market account is a U.S. Bank National Association ("U.S. Bank") interest-bearing money market deposit account designed to meet the needs of U.S. Bank's Corporate Trust Services Escrow Group and other Corporate Trust customers of U.S. Bank. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

U.S. Bank uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates are determined at U.S. Bank's discretion, and may be tiered by customer deposit amount.

The owner of the account is U.S. Bank as Agent for its trust customers. U.S. Bank's trust department performs all account deposits and withdrawals. Deposit accounts are FDIC Insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

## AUTOMATIC AUTHORIZATION

In the absence of specific written direction to the contrary, U.S. Bank is hereby directed to invest and reinvest proceeds and other available moneys in the U.S. Bank Money Market Account. The U.S. Bank Money Market Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

# EXHIBIT B

## ESCROW AGENT'S FEE SCHEDULE

I.      Acceptance Fee:                                                    Waived

      The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing.  This is a flat one-time fee, payable at closing.

II.     Annual Administration Fee:                                         $1,000

      Annual administration fee for performance of the routine duties of the escrow agent associated with the management of the account.  Administration fees are payable in advance without pro-ration for partial years.

III.    Out-of-Pocket Expenses:                                            At Cost

Reimbursement of expenses associated with the performance of our duties, including but not limited to fees and expenses of legal counsel, accountants and other agents, tax preparation, reporting and filing, publications, and filing fees.  Out-of-pocket expenses are subject to prior written approval by both Buyer and Seller, which approval shall not be unreasonably withheld.

IV.     Extraordinary Fees or Expenses:

Extraordinary fees are payable to the Agent for duties or responsibilities not expected to be incurred at the outset of the transaction, not routine or customary, and not incurred in the ordinary course of business, subject to prior written approval by both Buyer and Seller, which approval shall not be unreasonably withheld.  Extraordinary services might include amendments, specialized reporting, use investments not automated with the Escrow Agent's trust accounting system, and actual or threatened litigation or arbitration proceedings.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT
To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.  For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

EXHIBIT C

**Authorized Signatories:**

**Buyer:  HEARTLAND FOOD CORP.**

The following person(s) are hereby designated and appointed as authorized representatives of Buyer **(only one signature shall be required for any direction):**


_____          _____
      Name                                          Specimen signature


_____          _____
      Name                                          Specimen signature


_____          _____
      Name                                          Specimen signature


**Seller:**

The following person(s) are hereby designated and appointed as authorized representatives of Seller **(only one signature shall be required for any direction):**


_____          _____
      Name                                          Specimen signature


_____          _____
      Name                                          Specimen signature


_____          _____
      Name                                          Specimen signature

## <u>Exhibit C</u>

## Form of Sale Order

Please see attached.

# UNITED STATES BANKRUPTCY COURT
# DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | |
| | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**ORDER AUTHORIZING DEBTORS TO (I) SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) ASSUME AND ASSIGN CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (III) ESTABLISH CURE COSTS**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The sale motion of above-referenced Debtors for Orders (I) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; (II) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs; (III) Scheduling a Hearing on Stalking Horse; (IV) Approving Stalking Horse Protection Fee; (V) Approving Form and Manner of Notice; and (VI) Scheduling Further Hearing (the "Sale Motion") came before the undersigned on May 10, 2011. [_____] (the "Buyer") has been named as the Successful Bidder[1] at the Group One Auction for the Acquired Assets that are identified in that certain asset purchase agreement dated April __, 2011, by and among [_____] and [_____] (the "APA"), as attached hereto as <u>Exhibit 1</u>. Appearances were noted on the record.

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS HEREBY FOUND THAT:**[2]

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.    Venue of the Debtors' chapter 11 cases (the "Chapter 11 Cases") in this District is proper pursuant to 28 U.S.C. § 1409(a).

C.    Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).  The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

D.    This Sale Approval Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Approval Order, and expressly directs entry of judgment as set forth herein.

E.    A hearing on the Debtors' Motion for an Order Approving Sale and Bidding Procedures was held by this Court on January 24, 2011, and, on that date, the Court entered the Order Approving Sale and Bidding Procedures (the "Procedures Order").  The Debtors and the Buyer have complied with the Procedures Order in all respects.

---

[2]  Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  <u>See</u> Bankruptcy Rule 7052. B.  To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such.

F.      Pursuant to the Procedures Order, the Debtors timely received __ Qualified Bids on or before April 19, 2011, and the Group One Auction was conducted on April 26, 2011, by the Debtors, in consultation with their advisors and investment banker, Mastodon Ventures, Inc.  The Sale Procedures Order (as amended)3 set May 10, 2011 as the date of the hearing (the "Sale Approval Hearing") for an order to approve the sale (the "Sale Approval Order").

G.      On April __, 2011, the Debtors filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2).  On April __, 2011, the Debtors served the Notice of Sale and Bidding Procedures in compliance with the Sale Procedures Order.  On April __, 2011, the Debtors served the Notice Concerning Unexpired Leases and Executory Contracts and Establishing Cure Costs on the counterparties to such leases and contracts.

H.      On April __, 2011, the Court entered the Order (A) Approving Stalking Horse Bidders; (B) Approving Form of Stalking Horse Asset Purchase Agreement, and (C) Approving Stalking Horse Protection Fee, which, among other things, approved a stalking horse bidder for the Acquired Assets located in the _____ Region.

I.      Based upon the foregoing and the certificates of service and publication filed with the Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts and the proposed rejection of the contracts has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008 and in compliance with the Procedures Order and no other or further notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the

---

3  The timeline set forth in the Procedures Order was subsequently amended by stipulation.

Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts or the entry of this Sale Approval Order is required or necessary.

J.      All parties in interest, including, without limitation, all parties who claim an interest in or lien upon the Acquired Assets, all shareholders of the Debtors, all federal, state and local environmental authorities, and all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the sale of Acquired Assets may have, claims, contingent or otherwise against the Debtors, have been given a reasonably opportunity to object and be heard, regarding the relief requested in the Sale Motion.  All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Approval Hearing.

K.      As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (i) the offer from the Buyer constitutes the highest and best offer for the Acquired Assets; (ii) the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Procedures Order; (iii) the auction process set forth in the Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets; and (iv) the Group One Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

L.      In accordance with the Procedures Order, the APA was deemed a Qualified Bid (as defined in the Sale Procedures) and was eligible to participate at the Group One Auction.

M.      The APA constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

N.     The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.

O.     The purchase price as set forth in the APA (the "Purchase Price") for the Acquired Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia. Approval of the APA and the sale of the Acquired Assets in accordance with this Sale Approval Order and the APA are in the best interests of the Debtors' estates, creditors and other parties in interest.  The terms of the APA were negotiated at arms' length and are fair and reasonable under the circumstances.

P.     The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtors nor the Buyer is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q.     The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes for the sale of the Acquired Assets pursuant to section 363(b) of the Bankruptcy Code outside of a plan of reorganization.

R.     Each of the Debtors, as applicable, (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Acquired Assets by the Debtors has, in each case, been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken

all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.  No third-party approvals, other than those expressly provided for in the APA, if any, are required by the Debtors to consummate such transactions.

S.      The Debtors are authorized and directed to sell and transfer the Acquired Assets free and clear of all mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), judgments, demands, rights of first refusal (other than the rights of first refusal of Burger King Corporation under applicable franchise agreements) offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or the Debtors' predecessors or affiliates, claims (as that term is used in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the bankruptcy case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (collectively, "Liens, Claims, Encumbrances and Interests") with such Liens, Claims, Encumbrances and Interests to attach

to the consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Buyer would not enter into the APA to purchase the Acquired Assets otherwise.

T.     Those holders of Liens, Claims, Encumbrances and Interests against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the sale or the Sale Motion are deemed to have consented to the sale pursuant to section 363(f)(2) of the Bankruptcy Code.  The Debtors have met the requirements of section 363(f) with respect to all other holders of Liens, Claims, Encumbrances and Interests as such Claim holders will have their Liens, Claims, Encumbrances and Interests, if any, in each instance against the Debtors, their estates or any of the Acquired Assets, attach to the net cash proceeds of the sale ultimately attributable to the Acquired Assets, in which such creditor alleges a Claim, in the same order of priority, with the same validity, force and effect that such Liens, Claims, Encumbrances and Interests had prior to the sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

U.     The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Acquired Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Assumed Leases and Acquired Contracts were not free and clear of all Liens, Claims, Encumbrances and Interests.

V.     The APA was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion.

W.     The Debtors have followed in good faith the procedures for notice and sale of the Acquired Assets as set forth in the Procedures Order.

X.     The Buyer is not an "insider" or "affiliate" of the Debtors (as each such term is defined in the Bankruptcy Code).  Neither the Debtors nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application

of section 363(n) of the Bankruptcy Code to the sale and the transactions contemplated by the APA. Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate price paid by Buyer for the Acquired Assets was not controlled by any agreement among the bidders.

Y.      The Buyer is entitled to the protections afforded under section 363(m) of the Bankruptcy Code because the Buyer is a good faith purchaser in that, inter alia:  (i) except as set forth in the Procedures Order, the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Buyer complied with the provisions in the Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Procedures Order; (iv) the Buyer in no way induced or caused the chapter 11 filings by the Debtors; (v) all payments to be made by the Buyer in connection with the sale have been disclosed; (vi) no common identity of directors or controlling stockholders exists between the Buyer and any of the Debtors; and (vii) the negotiation and execution of the APA was at arms' length and in good faith.

Z.      In the absence of a stay pending appeal, if any, if the Closing occurs at any time after entry of this Sale Approval Order, then, with respect to the APA, the Buyer, as a purchaser in good faith of the Acquired Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Sale Approval Order or any authorization contained herein is reversed or modified on appeal.

AA.     The Debtors are the sole and lawful owners of the Acquired Assets.  Effective as of the Closing, the transfer of the Acquired Assets is or will (i) be legal, valid and effective transfers of property of the Debtors' estates to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the Debtors and the Debtors' estates in and to the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests  under sections 363(f) and 105 of the Bankruptcy Code.

BB.     The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign those Assumed Leases and Acquired Contracts, as defined in the APA and described on [Schedules ____ and ____] to the APA, including any amendments or modifications to such exhibits as agreed to by the Debtors and Buyer pursuant to the APA, in connection with the consummation of the sale of Acquired Assets, and the assumption and assignment of the Assumed Leases and Acquired Contracts is in the best interests of the Debtors, their estates, their creditors and their equityholders.

CC.     The Assumed Leases and Acquired Contracts being assigned to the Buyer as set forth in the APA are an integral part of the Debtors' businesses being purchased by the Buyer and, accordingly, such assumption and assignment of Assumed Leases and Acquired Contracts is reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

DD.     The Assumed Leases and Acquired Contracts are unexpired leases or executory contracts within the meaning of the Bankruptcy Code.

EE.     All amounts which are required to be paid in connection with the assumption and assignment of the Assumed Leases and Acquired Contracts that are due or owing under sections 365(b)(1)(A) and (B), and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or (ii) pay all actual or pecuniary losses that have resulted from such defaults (except with respect to those liabilities expressly assumed by the Buyer pursuant to the APA) are set forth on Exhibit 2 hereto (the "Cure Costs").

FF.     Any objections to the Cure Costs associated with such Assumed Leases and Acquired Contracts are resolved as set forth on Exhibit 2 to this Sale Approval Order.  To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Assumed Lease or Acquired Contract or (ii) the Cure Cost associated with the applicable Assumed Lease or Acquired Contract, such counterparty is deemed to have consented to such Cure Cost and

the assumption and assignments of its respective Assumed Lease or Acquired Contract to the Buyer as expressly set forth on Exhibit 2 to this Sale Approval Order.

GG.     The promises of Buyer and/or the Debtors to pay the Cure Costs and the Buyer's promise to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order that are being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

HH.     Adequate notice and opportunity to be heard was provided to counterparties to executory contracts and unexpired leases to be assumed and assigned pursuant to this Sale Approval Order.  Further, counterparties received adequate notice and an opportunity to object to the amount of any Cure Costs owed by the Debtors' estates on account of any executory contract or unexpired lease to be assumed and assigned to the Buyer under the APA.

II.     The assumption and assignment of the Assumed Leases and Acquired Contracts is integral to the APA and is in the best interests of the Debtors and their estates, creditors and equityholders and represents the exercise of the Debtors' sound business judgment.

JJ.     Any objections to the assumption and assignment of any of the Assumed Leases and Acquired Contracts to the Buyer are hereby overruled.

KK.     Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (ii) have, de facto or otherwise, merged with or into any of the Debtors; (iii) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Buyer and the Debtors); or (iv) be holding itself out to the public as a continuation of the Debtors. The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the APA with respect to the Assumed Liabilities.

LL.     The Debtors have good, valid and marketable title to all of the Acquired Assets. The Acquired Assets are to be transferred free and clear of any and all Liens, Claims, Encumbrances and Interests.  All of the Acquired Assets are, or will on the Closing Date, be owned by the Debtors and will be transferred under the APA.

MM.    Other than the Assumed Liabilities, the Buyer shall have no obligations with respect to any liabilities of the Debtors, including, without limitation, the Excluded Liabilities, and the Debtors and their estates will release and forever discharge the Buyer and any of its affiliates, its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale, except for liabilities and obligations under the APA.

**IT IS HEREBY ORDERED:**

**General Provisions**

1.      The Sale Motion is hereby granted to the extent provided herein.

2.      All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Approval Order, are overruled on the merits.

**Approval of the APA**

3.      Each and every term of the APA (attached hereto as Exhibit 1) and all other ancillary documents is hereby approved.

4.      The sale of the Acquired Assets to Buyer pursuant to the APA is hereby authorized under section 363(b) of the Bankruptcy Code and the entry of the Debtors into the APA is hereby approved.  The proceeds from the sale of the Acquired Assets as provided in the APA shall be paid directly to [_____], pending further order of the Court.

5.      The Debtors, through any corporate officer, are authorized and directed to execute and deliver, and empowered to fully perform under, consummate, implement and close the APA,

together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, including taking any actions that otherwise would require further approval by shareholders or their respective boards of directors (without the need of obtaining such approvals) and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations of the Debtors under the APA, including effectuating amendments to the APA in furtherance thereof. All Persons necessary to effect the transactions contemplated by the APA are hereby ordered to execute any and all documents necessary to effect such transactions. If any Person fails to comply with the provisions of this paragraph 5 prior to the Closing Date, such Person (or Persons, as the case may be) shall nonetheless be deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

6.     The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Approval Order.

<u>**Transfer of the Acquired Assets**</u>

7.     Pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Buyer, in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest the Buyer with title to the Acquired Assets, free and clear of any and all Claims, Liens, Interests and Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, disputed or undisputed, or

known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Claims, Liens, Interests and Encumbrances to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Acquired Assets, subject to all claims and defenses the Debtors may possess with respect thereto. The Sale Motion shall be deemed to provide sufficient notice as to the sale of the Acquired Assets free and clear of Claims, Liens, Interests and Encumbrances. All such Liens, Claims, Encumbrances and Interests released, terminated and discharged as to the Acquired Assets shall attach to the sale proceeds with the same validity, force and effect which they now have as against the Debtors, the estates or the Acquired Assets.

8. The provisions of this Sale Approval Order authorizing the sale of the Acquired Assets free and clear of Liens, Claims, Encumbrances and Interests, and the Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Approval Order. However, the Debtors and the Buyer, and each of their respective officers, employees and agents, so long as the same remain employed by the Debtors, are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA and this Sale Approval Order. Moreover, effective as of the Closing, the Buyer, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Buyer, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof, and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Buyer, its successors and assigns, may deem proper for the

collection or reduction to possession of any of the Acquired Assets, and to do all acts and things with respect to the Acquired Assets which the Buyer, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

9.    To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

10.    All persons and entities (including, but not limited to, the Debtors, creditors, equityholders, including, without limitation, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees thereof, shall be and are hereby permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquired Assets or the Buyer and its successors or assigns as alleged successor or otherwise with respect to any Liens, Claims, Encumbrances and Interests of any kind and nature with respect to the Acquired Assets other than Assumed Liabilities, except as otherwise provided in the APA. If the proposed sale to the Buyer fails to close for any reason, then Liens, Claims, Encumbrances and Interests shall continue against the Acquired Assets unaffected by this Sale Approval Order.

11.    Except for Assumed Liabilities as set forth in the APA, the transfer of the Acquired Assets pursuant to this Sale Approval Order shall not subject the Buyer to any liability with respect to any obligations incurred in connection with, or in any way related to the Acquired Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or

indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

**Assumption and Assignment to Buyer of Assumed Leases and Acquired Contracts**

12.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the APA, of the Assumed Leases and Acquired Contracts specified in this Sale Approval Order is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

13.     The Debtors are authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Assumed Leases and Acquired Contracts specified on Exhibit 2 to in this Sale Approval Order; and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Leases and Acquired Contracts specified in this Sale Approval Order.

14.     With respect to the Assumed Leases and Acquired Contracts: (a) each Assumed Lease and Acquired Contract, as applicable, is an unexpired lease or executory contract under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assumed Leases and Acquired Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assumed Lease and Acquired Contract in accordance with sections 363 and 365 of the Bankruptcy Code, and any provisions in any Assumed Lease or Acquired Contract that prohibit or condition the assignment of such Assumed Lease or Acquired Contract or allow the party to such Assumed Lease or Acquired Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Lease or Acquired Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the

assumption by the Debtors and assignment to the Buyer of each Assumed Lease and Acquired Contract have been satisfied; and (e) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Lease and Acquired Contract set forth on Exhibit 2 hereto.

15.     Each of the Assumed Leases and Acquired Contracts specified on Exhibit 2 to this Sale Approval Order, upon assignment to the Buyer, shall be deemed to be valid and binding on the Buyer and in full force and effect and enforceable in accordance with their terms, and following such assignment, the Debtors and the estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, any liability for any breach of such Assumed Leases and Acquired Contracts occurring after such assignment.

16.     Each non-Debtor party to an Assumed Lease and Acquired Contract specified in this Sale Approval Order is hereby barred and enjoined from asserting against the Buyer, the Debtors or the Debtors' estates (a) any default existing as of the date of the Sale Approval Hearing if such default was not raised or asserted in a timely manner prior to the entry of this Sale Approval Order or (b) any objection to the assumption and assignment of such non-Debtor party's Assumed Leases and Acquired Contracts or the Cure Cost, if any, of which the non-Debtor party was given notice prior to the Sale Hearing.  The assignment of each such Assumed Leases and Acquired Contracts to the Buyer will not cause a default or otherwise allow the non-Debtor party thereto to terminate or adversely affect the Buyer's rights thereunder.

17.     All defaults or other obligations of the Debtors under the Assumed Leases and Acquired Contracts arising or accruing prior to the satisfaction of the terms and conditions of the APA and the closing of the transactions contemplated under the APA (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer or the Debtors (in accordance with the APA) by payment of the applicable Cure Costs (such amounts as established in accordance with this Sale

Approval Order and set forth hereto on Exhibit 2) at the closing or as soon thereafter as practicable, and the Buyer shall have no liability or obligation with respect to defaults, breaches or other obligations incurred, arising or accruing prior to the Closing Date, except as otherwise expressly provided herein or in the APA.

18.     The payment of the applicable Cure Costs, in the amounts set forth on Exhibit 2 hereto and in accordance with the APA, shall (a) effect a cure of all defaults existing thereunder as of the date that such Assumed Lease or Acquired Contract is assumed and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.  To the extent that any counterparty to an Assumed Lease or Acquired Contract did not object timely to its Cure Costs in accordance with the Procedures Order, such counterparty is deemed to have consented to such Cure Cost and the assignments of its respective Assumed Lease or Acquired Contract to the Buyer.

19.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption, assignment and/or transfer of the Assumed Leases and Acquired Contracts.

20.     The Debtors' or the Buyer's (or its designated affiliate's) promise to pay the Cure Costs and to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing Date shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order being assigned to it within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

21.     Notwithstanding anything to the contrary in this Sale Approval Order, no Acquired Contract or Assumed Lease shall be deemed to be assumed and assigned to the Buyer until the Closing of the sale.

22.     The Cure Costs paid by Buyer shall be a use of the Cash Consideration of the Unadjusted Purchase Price payable at Closing to Debtors.  Notwithstanding the sum of all Cure Costs

set forth on Exhibit 2 hereto, Buyer shall in no event be liable for an aggregate amount of Cure Costs in excess of the Unadjusted Purchase Price.

23.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Lease or Acquired Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Leases and Acquired Contracts.

## Additional Provisions

24.     The transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale to the Buyer.  The Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

25.     The consideration provided by the Buyer for the Acquired Assets under the APA (a) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of Columbia and (b) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

26.     The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise expressly provided in the APA, and the Sale Motion contains sufficient notice of such limitation in accordance with Bankruptcy Rules and applicable law.  Except to the extent the Buyer assumes the Assumed

Liabilities pursuant to the APA, neither the purchase of the Acquired Assets by the Buyer or its affiliates, nor the fact that the Buyer or its affiliates are using any of the Acquired Assets previously operated by the Debtors, will cause the Buyer or any of its affiliates to be deemed a successor in any respect to the Debtors' businesses within the meaning of (i) any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), (ii) under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to which the Debtors are a party, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (v) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (vi) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes of any kind for any period, (viii)

any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Acquired Assets prior to Closing, and (ix) any litigation.

27.     Each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release such creditor's Liens, Claims, Encumbrances and Interests in the Acquired Assets, if any, as such Liens, Claims, Encumbrances and Interests may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, lis pendens, or other documents or agreements evidencing any Liens, Claims, Encumbrances and Interests in, against or upon the Acquired Assets prior to the Closing Date of the sale, in proper form for filing and executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction, releases of all Liens, Claims, Encumbrances and Interests which the person or entity has with respect to the Acquired Assets, then on the Closing Date, or as soon as possible thereafter, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Buyer is hereby authorized on behalf of each of the Debtors' creditors, to file, register, or otherwise record a certified copy of this Sale Approval Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Encumbrances and Interests in, against, or upon the Acquired Assets of any kind or nature whatsoever.

28.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date, or as otherwise directed by the Buyer, with the Liens, Claims, Encumbrances and Interests of such entity to be satisfied solely from the proceeds of the sale.

29.     Subject to the APA, this Sale Approval Order (a) is and shall be effective as a determination that, at Closing, all Liens, Claims, Encumbrances and Interests (except Assumed Liabilities) existing as to the Acquired Assets prior to the date of the Closing have been and hereby

are unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyance described in this Sale Approval Order has been effected; (b) is and shall be effective to cause all Liens, Claims, Encumbrances and Interests (except Assumed Liabilities) to attach to and be perfected in the proceeds of the Sale of the Acquired Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, without the need to file any financing statements or other evidence of perfection; and (c) is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

30.     The Debtors or the Buyer and any agent or representative of either of them, are each hereby authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation. deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Sale Approval Order and the APA to evidence and implement this paragraph of this Sale Approval Order. All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments, modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Sale Approval Order or the APA and the various documents related thereto.

31.     This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (b) compel delivery of the Acquired Assets to the

Buyer, (c) resolve any disputes arising under or related to the APA and related agreements, (d) enjoin and adjudicate the assertion of any Liens, Claims, Encumbrances and Interests against the Buyer or the Acquired Assets, and (e) interpret, implement and enforce the provisions of this Sale Approval Order.

32.     As of the Closing, all agreements and all orders of this Court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Approval Order and the APA.

33.     Nothing contained (a) in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, (b) the order of confirmation confirming any plan of reorganization (or liquidation), (c) any order dismissing the Chapter 11 Cases or converting it to a chapter 7 liquidation or (d) any order appointing an examiner or trustee in the case shall conflict with or derogate from the provisions of the APA or the terms of this Sale Approval Order and no such plan or order shall discharge the obligations of the Debtors under this Sale Approval Order or the APA or any documents or agreements delivered in connection therewith.

34.     The terms and provisions of the APA, together with the terms and provisions of this Sale Approval Order, shall be binding in all respects upon, and inure to the benefit of, the Buyer, the Debtors, the Debtors' estates, any of Debtors' affiliates, successors and assigns, the Debtors' creditors, equityholders, including, without limitation, minority equityholders of the Debtors, and third parties, including, but not limited to persons asserting a Claim against or interest in the Debtors' estates or any of the Acquired Assets to be sold to the Buyer pursuant to the APA or any persons that are party to any Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date, and their respective successors and assigns.  If a trustee or examiner is subsequently appointed in the Chapter 11 Cases, such trustee or examiner shall likewise be bound, in all respects, to the terms and provisions of this Sale Approval Order.

35.     Notwithstanding anything to the contrary in this Sale Approval Order or the APA, to the extent any of the Acquired Assets consist of an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as defined in section 433.1 of title 16 of the Code of Federal Regulations), and if such interest is purchased under the APA, the Buyer shall remain subject to the claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as the Buyer would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under Bankruptcy Code section 363, as provided for in Bankruptcy Code section 363(o).

36.     The failure specifically to include any particular provisions of the APA in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

37.     To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of the Debtors' chapter 11 cases or the consummation of the transaction contemplated by the APA.

38.     Subject to the terms of the APA, the APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Buyer, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the APA and any related agreements.

39.     The provisions of this Order are non-severable and mutually dependent.

40.     The provisions of Bankruptcy Rules 6004(h) and 6006(d) staying the effectiveness of this Sale Approval Order for fourteen days are hereby waived, and this Sale Approval Order shall be effective immediately upon entry.

41.     To the extent that this Sale Approval Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Chapter 11 Cases, the terms of this Sale Approval Order shall govern.

Dated:

_____
Gregory F. Kishel
United States Chief Bankruptcy Judge

**Schedule A**

**Illinois-Wisconsin Region Stores List**

| | Restaurant # | Address | City | State |
|---|---|---|---|---|
| | **Illinois Region** | | | |
| *1* | 01752 | 723 Shooting Park | Peru | IL |
| *2* | 00111 | 901 North Lake Street | Aurora | IL |
| *3* | 01747 | 209 Norris Drive | Ottawa | IL |
| *4* | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| *5* | 05879 | 1830 Southwest Avenue | Freeport | IL |
| *6* | 11877 | 504 West Blackhawk Drive | Byron | IL |
| *7* | 16573 | 2320 Route 34 | Oswego | IL |
| *8* | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| *9* | 00437 | 1138 East State Street | Rockford | IL |
| *10* | 01060 | 1450 4th Street | Beloit | WI |
| *11* | 01326 | 2434 11th Street | Rockford | IL |
| *12* | 10234 | 7510 East State Street | Rockford | IL |
| | **Wisconsin Region** | | | |
| *1* | 01764 | 2655 East Washington | Madison | WI |
| *2* | 01888 | 2624 Milton Avenue | Janesville | WI |
| *3* | 03792 | 4980 South 76th Street | Greenfield | WI |
| *4* | 04857 | 822 Windsor Street | Sun Prairie | WI |
| *5* | 09366 | 400 Center Way | Janesville | WI |

<u>**Schedule B**</u>

**Franchise Agreements List**

1.  Burger King Restaurant Successor Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated February 23, 2006 (Store # 1752).

2.  Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated June 30, 2000 (Store # 111).

3.  Burger King Restaurant Successor Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated September 26, 2006 (Store # 1747).

4.  Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated September 15, 2004 (Store # 2160).

5.  Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated April 18, 1996 (Store # 5879).

6.  Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated September 23, 1998 (Store # 11877)

7.  Burger King Restaurant Franchise Agreement between Burger King Corporation and Duke and King Acqusition Corp., dated June 30, 2008 (Store # 16573).

8.  Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated December 20, 1996 (Store # 255).

9.  Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated December 1, 1999 (Store # 437).

10. Burger King Restaurant Successor Franchise Agreement between Burger King Corporation and Duke and King Acqusition Corp., dated November 30, 2006 (Store # 1060).

11. Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated November 30, 2004 (Store # 1326).

12. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated September 19, 1996 (Store # 10234).

13. Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Pel-Wisconsin, Inc., dated April 23, 1997 (Store # 1764).

14. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated December 31, 1996 (Store # 1888).

15. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated May 1, 2003 (Store # 3792).

16. Burger King Restaurant Franchise Agreement between Burger King Corporation and Pel-Wisconsin, Inc., dated July 31, 1996 (Store # 4857).

17. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated December 31, 1996 (Store # 9366).

<u>**Schedule 1.1.(h)**</u>

**Acquired Contracts List**

**I.  Real Property Leases**:  The real property leases related to the following Illinois-Wisconsin Region Stores:

| | **Restaurant #** | **Address** | **City** | **State** |
|---|---|---|---|---|
| *1* | 01752 | 723 Shooting Park | Peru | IL |
| *2* | 00111 | 901 North Lake Street | Aurora | IL |
| *3* | 01747 | 209 Norris Drive | Ottawa | IL |
| *4* | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| *5* | 05879 | 1830 Southwest Avenue | Freeport | IL |
| *6* | 11877 | 504 West Blackhawk Drive | Byron | IL |
| *7* | 16573 | 2320 Route 34 | Oswego | IL |
| *8* | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| *9* | 00437 | 1138 East State Street | Rockford | IL |
| *10* | 01060 | 1450 4th Street | Beloit | WI |
| *11* | 01326 | 2434 11th Street | Rockford | IL |
| *12* | 10234 | 7510 East State Street | Rockford | IL |
| *13* | 01764 | 2655 East Washington | Madison | WI |
| *14* | 01888 | 2624 Milton Avenue | Janesville | WI |
| *15* | 03792 | 4980 South 76th Street | Greenfield | WI |
| *16* | 04857 | 822 Windsor Street | Sun Prairie | WI |
| *17* | 09366 | 400 Center Way | Janesville | WI |

**II.  Billboard and Highway Agreements**:  The following contracts related to highway sign and billboard agreements related to the Illinois-Wisconsin Regions Stores:

1. Derse WHBS Contract No. 1-DANE-151-19-NSF-0113 – Exit No. 102, USH-151@STH-19, Sun Prairie, Wisconsin
2. Derse WHBS Contract No. 1-ROCK-I90-26-EWF-0113 – Exit No. 171A-B, I-90@14/26, Janesville, Wisconsin

**III.  Franchise Agreements.**

The Franchise Agreements set forth on <u>Schedule B</u>.

## Schedule 1.2(l)

### Excluded Assets

None.

**Regional Allocations**

## 1. UNADJUSTED PURCHASE PRICE

**Illinois Region Stores:**

Illinois Region Stores Unadjusted Purchase Price =  $500,000

**Wisconsin Region Stores:**

Wisconsin Region Stores Unadjusted Purchase Price =  $1

**Total Illinois-Wisconsin Region Stores:**

Illinois-Wisconsin Region Stores Unadjusted Purchase Price = $500,001

## 2. WORKING CAPITAL ESCROW AMOUNT

**Illinois Region Stores:**

Illinois Region Stores Working Capital Escrow Amount =   $35,000

**Wisconsin Region Stores:**

Wisconsin Region Stores Working Capital Escrow Amount =  $15,000

**Total Illinois-Wisconsin Region Stores:**

Illinois-Wisconsin Region Stores Working Capital Escrow Amount = $50,000

## 3. BREAK UP FEE AMOUNT

**Illinois Region Stores:**

Illinois Region Stores Break Up Fee =  3% of Total Consideration allocated to the Illinois Region Stores

**Wisconsin Region Stores:**

Wisconsin Region Stores Break Up Fee = $3% of Total Consideration allocated to the Wisconsin Region Stores

**Total Illinois-Wisconsin Region Stores:**

Illinois-Wisconsin Region Stores Break Up Fee = $1,463,229

## 4. EXPENSE REIMBURSEMENT AMOUNT

**Illinois Region Stores:**

Illinois Region Stores Expense Reimbursement = $40,000

**Wisconsin Region Stores:**

Wisconsin Region Stores Expense Reimbursement = $10,000

**Total Illinois-Wisconsin Region Stores:**

Illinois-Wisconsin Region Stores Expense Reimbursement = $50,000

## Schedule 2.8

### Purchase Price Allocation

[To be completed by the Parties prior to Closing pursuant to Section 2.8]

**EXHIBIT F**

**TO SALE MOTION**

**Duke & King Acquisition / Duke & King Missouri LLC**
**Notice Of Unexpired Leases and Executory Contracts And Cure Costs**

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Proposed Cure Amount |
|---|---|---|---|---|---|---|
| 1 | Limited License Agreement Store #04201 | Burger King Corporation | 04201 | IA | Duke & King Acquisition | 55,816.81 |
| 2 | Limited License Agreement Store #06211 | Burger King Corporation | 06211 | IA | Duke & King Acquisition | 64,062.66 |
| 3 | Limited License Agreement Store #04043 | Burger King Corporation | 04043 | IA | Duke & King Acquisition | 57,550.91 |
| 4 | Limited License Agreement Store #04297 | Burger King Corporation | 04297 | IA | Duke & King Acquisition | 69,025.55 |
| 5 | Non-Residential Real Property Lease | Christopher Keith Guthrie Trust | 04043 | IA | Duke & King Acquisition | 6,232.46 |
| 6 | Non-Residential Real Property Lease | Gabe Fazzini and Karen Fazzini | 04201 | IA | Duke & King Acquisition | 6,974.75 |
| 7 | Non-Residential Real Property Lease | Mihailo Chukalovich | 04297 | IA | Duke & King Acquisition | 8,341.67 |
| 8 | Non-Residential Real Property Lease | Vanowen Sreet, LLC | 06211 | IA | Duke & King Acquisition | 7,422.93 |
| 9 | Non-Residential Real Property Lease | 504 West Blackhawk Realty LLC | 11877 | IL | Duke & King Acquisition | 9,103.59 |
| 10 | Non-Residential Real Property Lease | Amcore Investment Group, Trustee of Trust | 01326 | IL | Duke & King Acquisition | 2,520.83 |
| 11 | Non-Residential Real Property Lease | Burger King Corporation | 16573 | IL | Duke & King Acquisition | 12,571.00 |
| 12 | Non-Residential Real Property Lease | Burger King Corporation | 00111 | IL | Duke & King Acquisition | 7,364.08 |
| 13 | Limited License Agreement Store #10234 | Burger King Corporation | 10234 | IL | Duke & King Acquisition | 46,743.92 |
| 14 | Burger King Franchise Agreement #16573 | Burger King Corporation | 16573 | IL | Duke & King Acquisition | 65,362.11 |
| 15 | Limited License Agreement Store #00437 | Burger King Corporation | 00437 | IL | Duke & King Acquisition | 51,228.03 |
| 16 | Limited License Agreement Store #00111 | Burger King Corporation | 00111 | IL | Duke & King Acquisition | 59,480.73 |
| 17 | Limited License Agreement Store #00255 | Burger King Corporation | 00255 | IL | Duke & King Acquisition | 55,068.74 |
| 18 | Limited License Agreement Store #01747 | Burger King Corporation | 01747 | IL | Duke & King Acquisition | 56,891.09 |
| 19 | Limited License Agreement Store #05879 | Burger King Corporation | 05879 | IL | Duke & King Acquisition | 55,839.03 |
| 20 | Burger King Franchise Agreement #11877 | Burger King Corporation | 11877 | IL | Duke & King Acquisition | 57,099.57 |
| 21 | Limited License Agreement Store #02160 | Burger King Corporation | 02160 | IL | Duke & King Acquisition | 65,646.95 |
| 22 | Limited License Agreement Store #01326 | Burger King Corporation | 01326 | IL | Duke & King Acquisition | 59,047.50 |
| 23 | Limited License Agreement Store #01752 | Burger King Corporation | 01752 | IL | Duke & King Acquisition | 71,879.27 |
| 24 | Burger King Franchise Agreement #01060 | Burger King Corporation | 01060 | IL | Duke & King Acquisition | 66,797.85 |
| 25 | Non-Residential Real Property Lease | Cordoza Family Trust | 05879 | IL | Duke & King Acquisition | 5,392.13 |
| 26 | Non-Residential Real Property Lease | First National Bank, Trustee | 00255 | IL | Duke & King Acquisition | 3,596.99 |
| 27 | Non-Residential Real Property Lease | Gerald E. Anderson | 02160 | IL | Duke & King Acquisition | 4,250.00 |
| 28 | Non-Residential Real Property Lease | Grub Stake Properties II a/k/a Grubbstake | 10234 | IL | Duke & King Acquisition | 4,635.19 |
| 29 | Non-Residential Real Property Lease | Loraine J Hess, Trustee for William H. Hess | 01747 | IL | Duke & King Acquisition | 3,000.00 |
| 30 | Non-Residential Real Property Lease | Mary A Kaszynski | 01752 | IL | Duke & King Acquisition | 2,593.33 |
| 31 | Non-Residential Real Property Lease | Nath Property Company Limited Partnership | 01060 | IL | Duke & King Acquisition | 8,500.00 |
| 32 | Non-Residential Real Property Lease | Triple H Properties | 00437 | IL | Duke & King Acquisition | 1,784.84 |
| 33 | Security Services | Atlas Security | | Misc | Duke & King Acquisition | 949.26 |
| 34 | Music Services | Audio Acoustics | | Misc | Duke & King Acquisition | 972.48 |
| 35 | Music Services | Business Music Ltd | | Misc | Duke & King Acquisition | 496.80 |
| 36 | Music Services | Custom Communications | | Misc | Duke & King Acquisition | - |
| 37 | Grease Removal | Darling | | Misc | Duke & King Acquisition | - |
| 38 | Advertising Sign Lease | Derse | | Misc | Duke & King Acquisition | 488.00 |
| 39 | Music Services | DMX Communications | | Misc | Duke & King Acquisition | 65.31 |
| 40 | Hood Cleaning | Enviromatic Corp Of America | | Misc | Duke & King Acquisition | 29,729.16 |
| 41 | Snow Services | Fenne's Outdoor Sevices LLC | | Misc | Duke & King Acquisition | 4,974.75 |
| 42 | Security Services | Floyd Total Securtiy | | Misc | Duke & King Acquisition | - |
| 43 | Snow Services | Golla Outdoor Services | | Misc | Duke & King Acquisition | 377.50 |
| 44 | Snow Services | High Profile Grounds Maintenance | | Misc | Duke & King Acquisition | - |
| 45 | Lease Copier/Hole Punch | Ikon | | Misc | Duke & King Acquisition | 2,585.33 |
| 46 | Lease Copier/Hole Punch | Ikon | | Misc | Duke & King Acquisition | 1,036.62 |
| 47 | Posters Contract | Labor Law Institute Auto Comply Posters | | Misc | Duke & King Acquisition | |
| 48 | Snow Services | Lefonz Lawn Service | | Misc | Duke & King Acquisition | 520.00 |
| 49 | Advertising | Mail South | | Misc | Duke & King Acquisition | 19,232.54 |
| 50 | WOTC Program Agreement | Maximus, Inc. | | Misc | Duke & King Acquisition | 7,385.24 |
| 51 | Billboards/Advertising | Minnesota Logos | | Misc | Duke & King Acquisition | 494.85 |
| 52 | Music Services | Muzak | | Misc | Duke & King Acquisition | 11,207.14 |
| 53 | Snow Services | North Field Landscape | | Misc | Duke & King Acquisition | 200.00 |
| 54 | CO2 Service Agreement | NuCO2 | | Misc | Duke & King Acquisition | |
| 55 | Contract for Pest Control | Presto X | | Misc | Duke & King Acquisition | 1,837.97 |
| 56 | Snow Services | River City Lawn | | Misc | Duke & King Acquisition | 1,185.31 |
| 57 | Contract for Postage Meter | SECAP Finance | | Misc | Duke & King Acquisition | |
| 58 | Snow Services | Sno-Mow Services | | Misc | Duke & King Acquisition | 1,405.17 |
| 59 | Snow Services | Todd's Mow and Plow | | Misc | Duke & King Acquisition | - |
| 60 | Non-Residential Real Property Lease | 735 West Bridge LLC | 07444 | MN | Duke & King Acquisition | 8,683.42 |
| 61 | Non-Residential Real Property Lease | Alkire, Inc | 09095 | MN | Duke & King Acquisition | 3,831.70 |
| 62 | Non-Residential Real Property Lease | Alois Kennedy | 11284 | MN | Duke & King Acquisition | 11,846.90 |
| 63 | Non-Residential Real Property Lease | Barque Hill Capital Partners LLC | 06270 | MN | Duke & King Acquisition | 39,050.74 |
| 64 | Non-Residential Real Property Lease | Bernard A. Worms and Maria Worms, Trustees | 12757 | MN | Duke & King Acquisition | 7,703.04 |
| 65 | Non-Residential Real Property Lease | Burger King Corporation | 06299 | MN | Duke & King Acquisition | 7,262.40 |
| 66 | Burger King Franchise Agreement #09934 | Burger King Corporation | 09934 | MN | Duke & King Acquisition | 41,581.84 |
| 67 | Burger King Franchise Agreement #12757 | Burger King Corporation | 12757 | MN | Duke & King Acquisition | 45,666.00 |
| 68 | Burger King Franchise Agreement #07557 | Burger King Corporation | 07557 | MN | Duke & King Acquisition | 40,800.66 |
| 69 | Limited License Agreement Store #06545 | Burger King Corporation | 06545 | MN | Duke & King Acquisition | 50,998.67 |
| 70 | Limited License Agreement Store #07937 | Burger King Corporation | 07937 | MN | Duke & King Acquisition | 53,274.58 |
| 71 | Burger King Franchise Agreement #04507 | Burger King Corporation | 04507 | MN | Duke & King Acquisition | 58,847.59 |
| 72 | Burger King Franchise Agreement #04151 | Burger King Corporation | 04151 | MN | Duke & King Acquisition | 62,719.45 |
| 73 | Burger King Franchise Agreement #04122 | Burger King Corporation | 04122 | MN | Duke & King Acquisition | 50,863.46 |
| 74 | Burger King Franchise Agreement #12250 | Burger King Corporation | 12250 | MN | Duke & King Acquisition | 67,942.61 |
| 75 | Burger King Franchise Agreement #09095 | Burger King Corporation | 09095 | MN | Duke & King Acquisition | 46,307.92 |
| 76 | Burger King Franchise Agreement #09256 | Burger King Corporation | 09256 | MN | Duke & King Acquisition | 54,726.66 |
| 77 | Limited License Agreement Store #09332 | Burger King Corporation | 09332 | MN | Duke & King Acquisition | 50,874.37 |
| 78 | Burger King Franchise Agreement #02641 | Burger King Corporation | 02641 | MN | Duke & King Acquisition | 47,304.52 |
| 79 | Burger King Franchise Agreement #09994 | Burger King Corporation | 09994 | MN | Duke & King Acquisition | 42,952.74 |

*Note – the limited license executed between Burger King Corporation and the Debtors operates as an amendment to each of the 52 franchise agreements subject to that limited license*

**Duke & King Acquisition / Duke & King Missouri LLC**
**Notice Of Unexpired Leases and Executory Contracts And Cure Costs**

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Proposed Cure Amount |
|---|---|---|---|---|---|---|
| 80 | Limited License Agreement Store #06590 | Burger King Corporation | 06590 | MN | Duke & King Acquisition | 70,154.27 |
| 81 | Limited License Agreement Store #10239 | Burger King Corporation | 10239 | MN | Duke & King Acquisition | 52,842.68 |
| 82 | Limited License Agreement Store #09993 | Burger King Corporation | 09993 | MN | Duke & King Acquisition | 52,432.88 |
| 83 | Burger King Franchise Agreement #06270 | Burger King Corporation | 06270 | MN | Duke & King Acquisition | 72,753.71 |
| 84 | Limited License Agreement Store #11535 | Burger King Corporation | 11535 | MN | Duke & King Acquisition | 52,580.49 |
| 85 | Burger King Franchise Agreement #04553 | Burger King Corporation | 04553 | MN | Duke & King Acquisition | 70,523.43 |
| 86 | Burger King Franchise Agreement #06299 | Burger King Corporation | 06299 | MN | Duke & King Acquisition | 61,241.80 |
| 87 | Limited License Agreement Store #06530 | Burger King Corporation | 06530 | MN | Duke & King Acquisition | 79,850.77 |
| 88 | Burger King Franchise Agreement #05713 | Burger King Corporation | 05713 | MN | Duke & King Acquisition | 77,786.87 |
| 89 | Burger King Franchise Agreement #11682 | Burger King Corporation | 11682 | MN | Duke & King Acquisition | 58,541.63 |
| 90 | Burger King Franchise Agreement #05591 | Burger King Corporation | 05591 | MN | Duke & King Acquisition | 82,897.34 |
| 91 | Limited License Agreement Store #08004 | Burger King Corporation | 08004 | MN | Duke & King Acquisition | 58,622.45 |
| 92 | Burger King Franchise Agreement #05012 | Burger King Corporation | 05012 | MN | Duke & King Acquisition | 86,346.71 |
| 93 | Burger King Franchise Agreement #07466 | Burger King Corporation | 07466 | MN | Duke & King Acquisition | 66,342.37 |
| 94 | Burger King Franchise Agreement #11243 | Burger King Corporation | 11243 | MN | Duke & King Acquisition | 64,085.36 |
| 95 | Burger King Franchise Agreement #10284 | Burger King Corporation | 10284 | MN | Duke & King Acquisition | 75,302.92 |
| 96 | Limited License Agreement Store #04116 | Burger King Corporation | 04116 | MN | Duke & King Acquisition | 72,531.32 |
| 97 | Burger King Franchise Agreement #07444 | Burger King Corporation | 07444 | MN | Duke & King Acquisition | 58,960.96 |
| 98 | Limited License Agreement Store #09081 | Burger King Corporation | 09081 | MN | Duke & King Acquisition | 61,105.07 |
| 99 | Burger King Franchise Agreement #09272 | Burger King Corporation | 09272 | MN | Duke & King Acquisition | 65,048.74 |
| 100 | Limited License Agreement Store #11284 | Burger King Corporation | 11284 | MN | Duke & King Acquisition | 77,773.12 |
| 101 | Burger King Franchise Agreement #08224 | Burger King Corporation | 08224 | MN | Duke & King Acquisition | 71,595.67 |
| 102 | Burger King Franchise Agreement #13091 | Burger King Corporation | 13091 | MN | Duke & King Acquisition | 93,240.22 |
| 103 | Limited License Agreement Store #06615 | Burger King Corporation | 06615 | MN | Duke & King Acquisition | 93,747.47 |
| 104 | Burger King Franchise Agreement #04009 | Burger King Corporation | 04009 | MN | Duke & King Acquisition | 90,318.70 |
| 105 | Burger King Franchise Agreement #11254 | Burger King Corporation | 11254 | MN | Duke & King Acquisition | 80,352.97 |
| 106 | Non-Residential Real Property Lease | Burkhardt Cooperative Association, Inc. | 09934 | MN | Duke & King Acquisition | 3,500.00 |
| 107 | Non-Residential Real Property Lease | Burnsville BK, LLC | 04151 | MN | Duke & King Acquisition | 23,905.61 |
| 108 | Non-Residential Real Property Lease | CNL APF Partners, LP | 04116 | MN | Duke & King Acquisition | 19,555.07 |
| 109 | Non-Residential Real Property Lease | Edward C. Lim and Elaine Lim | 06545 | MN | Duke & King Acquisition | 11,776.33 |
| 110 | Non-Residential Real Property Lease | Edwin J. Taylor and Diana S. Taylor | 06590 | MN | Duke & King Acquisition | 7,370.00 |
| 111 | Non-Residential Real Property Lease | Gene C. Ghisolfo | 09332 | MN | Duke & King Acquisition | 19,992.05 |
| 112 | Non-Residential Real Property Lease | Holiday Station Stores, Inc. | 11243 | MN | Duke & King Acquisition | 6,588.11 |
| 113 | Non-Residential Real Property Lease | Inland Commercial Property Management, Inc. | 06530 | MN | Duke & King Acquisition | 8,131.75 |
| 114 | Non-Residential Real Property Lease | Irving J. Sherman Revocable Trust | 11535 | MN | Duke & King Acquisition | 6,500.00 |
| 115 | Non-Residential Real Property Lease | Irving J. Sherman Revocable Trust | 09993 | MN | Duke & King Acquisition | 4,467.00 |
| 116 | Non-Residential Real Property Lease | Jeffery Scott Freeman and Kathleen Freeman | 02641 | MN | Duke & King Acquisition | 17,057.14 |
| 117 | Non-Residential Real Property Lease | John R. Piatt | 07937 | MN | Duke & King Acquisition | 8,893.51 |
| 118 | Non-Residential Real Property Lease | John Suen and Nancy Huang | 09081 | MN | Duke & King Acquisition | 16,005.02 |
| 119 | Non-Residential Real Property Lease | Laurence Kennedy | 11284 | MN | Duke & King Acquisition | 11,846.90 |
| 120 | Non-Residential Real Property Lease | Mark J. Ogren | 11254 | MN | Duke & King Acquisition | 4,628.75 |
| 121 | Non-Residential Real Property Lease | MOAC Mall Holdings LLC | 07466 | MN | Duke & King Acquisition | 20,004.28 |
| 122 | Non-Residential Real Property Lease | Nathan Lustman, Trustee of the Nathan Lustman | 09272 | MN | Duke & King Acquisition | 22,616.37 |
| 123 | Non-Residential Real Property Lease | Oreel Family Limited Partnership | 09994 | MN | Duke & King Acquisition | 12,479.12 |
| 124 | Non-Residential Real Property Lease | Oreel Family Limited Partnership | 10284 | MN | Duke & King Acquisition | 29,826.54 |
| 125 | Non-Residential Real Property Lease | P & C Rentals LLP | 04507 | MN | Duke & King Acquisition | 9,590.00 |
| 126 | Non-Residential Real Property Lease | P & C Rentals LLP | 04122 | MN | Duke & King Acquisition | 4,953.33 |
| 127 | Non-Residential Real Property Lease | Paul N. Philips and Karine T. Philips | 08004 | MN | Duke & King Acquisition | 22,852.97 |
| 128 | Non-Residential Real Property Lease | POOYA, Inc. | 11682 | MN | Duke & King Acquisition | 34,753.91 |
| 129 | Non-Residential Real Property Lease | Richard Sherwin and Dorinda Sherwin, Trustees | 07557 | MN | Duke & King Acquisition | 23,118.52 |
| 130 | Non-Residential Real Property Lease | Roger Johnson and Candice J. Johnson | 05713 | MN | Duke & King Acquisition | 24,949.42 |
| 131 | Non-Residential Real Property Lease | Ronald Gdovin and Dina Rickard | 06615 | MN | Duke & King Acquisition | 22,057.64 |
| 132 | Non-Residential Real Property Lease | Segura Investors VI, LLC and Segura Investors | 04009 | MN | Duke & King Acquisition | 10,379.07 |
| 133 | Non-Residential Real Property Lease | Segura Investors VI, LLC and Segura Investors | 08224 | MN | Duke & King Acquisition | 10,224.03 |
| 134 | Non-Residential Real Property Lease | Serramonte Westborough Associates, LLC | 05012 | MN | Duke & King Acquisition | 34,135.74 |
| 135 | Non-Residential Real Property Lease | Stadium Village Plaza, LLC | 12250 | MN | Duke & King Acquisition | 7,317.33 |
| 136 | Non-Residential Real Property Lease | The Lakes at Raintree Village, LLC | 13091 | MN | Duke & King Acquisition | 35,826.87 |
| 137 | Non-Residential Real Property Lease | Vander-Smith Properties | 05591 | MN | Duke & King Acquisition | 26,540.48 |
| 138 | Non-Residential Real Property Lease | Wakefield LLC | 04553 | MN | Duke & King Acquisition | 20,034.64 |
| 139 | Non-Residential Real Property Lease | Wendell Morre Russ and Virginia M. Russ, Russ Family Trust | 10239 | MN | Duke & King Acquisition | 23,210.94 |
| 140 | Non-Residential Real Property Lease | Yocum Oil Company, Inc. | 09256 | MN | Duke & King Acquisition | 7,002.62 |
| 141 | Non-Residential Real Property Lease | Altibano R. Parenti and Rosa M Parenti Living | 08384 | MO | Duke & King Missouri | 7,000.00 |
| 142 | Non-Residential Real Property Lease | AWWRE III, LLC | 11049 | MO | Duke & King Missouri | 6,166.67 |
| 143 | Non-Residential Real Property Lease | AWWRE III, LLC | 12281 | MO | Duke & King Missouri | 6,166.67 |
| 144 | Non-Residential Real Property Lease | Bryan E. Weiner, Alan B. Weiner and Olga M.WeinerTriex Missouri Prop LLC | 12415 | MO | Duke & King Missouri | 7,703.90 |
| 145 | Limited License Agreement Store #12413 | Burger King Corporation | 12413 | MO | Duke & King Missouri | 31,914.25 |
| 146 | Limited License Agreement Store #05539 | Burger King Corporation | 05539 | MO | Duke & King Missouri | 62,219.87 |
| 147 | Limited License Agreement Store #01227 | Burger King Corporation | 01227 | MO | Duke & King Missouri | 54,298.00 |
| 148 | Limited License Agreement Store #09331 | Burger King Corporation | 09331 | MO | Duke & King Missouri | 42,141.49 |
| 149 | Burger King Franchise Agreement #03232 | Burger King Corporation | 03232 | MO | Duke & King Missouri | 72,288.68 |
| 150 | Limited License Agreement Store #07203 | Burger King Corporation | 07203 | MO | Duke & King Missouri | 68,311.37 |
| 151 | Limited License Agreement Store #03475 | Burger King Corporation | 03475 | MO | Duke & King Missouri | 61,157.72 |
| 152 | Burger King Franchise Agreement #05357 | Burger King Corporation | 05357 | MO | Duke & King Missouri | 72,918.63 |
| 153 | Limited License Agreement Store #08384 | Burger King Corporation | 08384 | MO | Duke & King Missouri | 52,661.95 |
| 154 | Burger King Franchise Agreement #04513 | Burger King Corporation | 04513 | MO | Duke & King Missouri | 64,434.42 |
| 155 | Limited License Agreement Store #12281 | Burger King Corporation | 12281 | MO | Duke & King Missouri | 52,030.26 |
| 156 | Limited License Agreement Store #12415 | Burger King Corporation | 12415 | MO | Duke & King Missouri | 44,333.85 |
| 157 | Limited License Agreement Store #11049 | Burger King Corporation | 11049 | MO | Duke & King Missouri | 56,463.85 |
| 158 | Non-Residential Real Property Lease | Clyde Stewart, Jr. and Kathy Stewart | 09331 | MO | Duke & King Missouri | 1,331.00 |

*Note – the limited license executed between Burger King Corporation and the Debtors operates as an amendment to each of the 52 franchise agreements subject to that limited license*

**Duke & King Acquisition / Duke & King Missouri LLC**
**Notice Of Unexpired Leases and Executory Contracts And Cure Costs**

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Proposed Cure Amount |
|---|---|---|---|---|---|---|
| 159 | Non-Residential Real Property Lease | David Stewart and Joyce Stewart | 09331 | MO | Duke & King Missouri | 1,331.00 |
| 160 | Non-Residential Real Property Lease | Glen Harris Farms | 05539 | MO | Duke & King Missouri | 9,980.31 |
| 161 | Non-Residential Real Property Lease | MO.BK | 07203 | MO | Duke & King Missouri | 9,803.45 |
| 162 | Non-Residential Real Property Lease | South Campbell Street Investment Company,LLC | 03232 | MO | Duke & King Missouri | 14,077.71 |
| 163 | Non-Residential Real Property Lease | Spring Investment LLC | 01227 | MO | Duke & King Missouri | 8,346.54 |
| 164 | Non-Residential Real Property Lease | Sutter Development Corp | 04513 | MO | Duke & King Missouri | 1,823.26 |
| 165 | Non-Residential Real Property Lease | Thomas Joeseph Tacci Family Trust Johanna Lomonaco Tacci and Christopher Joh | 03475 | MO | Duke & King Missouri | 6,328.42 |
| 166 | Non-Residential Real Property Lease | University Park Development, LLC | 05357 | MO | Duke & King Missouri | 5,690.97 |
| 167 | Non-Residential Real Property Lease | Wood Family Limited Partnership | 12413 | MO | Duke & King Missouri | 3,100.00 |
| 168 | Non-Residential Real Property Lease | Burger King Corporation | 03792 | WI | Duke & King Acquisition | 5,437.50 |
| 169 | Limited License Agreement Store #04857 | Burger King Corporation | 04857 | WI | Duke & King Acquisition | 42,676.96 |
| 170 | Burger King Franchise Agreement #09366 | Burger King Corporation | 09366 | WI | Duke & King Acquisition | 45,120.44 |
| 171 | Burger King Franchise Agreement #01764 | Burger King Corporation | 01764 | WI | Duke & King Acquisition | 49,804.69 |
| 172 | Burger King Franchise Agreement #03792 | Burger King Corporation | 03792 | WI | Duke & King Acquisition | 61,169.88 |
| 173 | Limited License Agreement Store #01888 | Burger King Corporation | 01888 | WI | Duke & King Acquisition | 52,412.64 |
| 174 | Non-Residential Real Property Lease | Demetrios Spyrakos and Harriet Spyrakos | 01888 | WI | Duke & King Acquisition | 9,278.66 |
| 175 | Non-Residential Real Property Lease | Gabe Fazzini and Karen Fazzini | 09366 | WI | Duke & King Acquisition | 7,100.80 |
| 176 | Non-Residential Real Property Lease | Gregory Gus Kary a/k/a Gregory Kary and Ruby | 01764 | WI | Duke & King Acquisition | 5,000.00 |
| 177 | Non-Residential Real Property Lease | McLochlin Enterprises, Inc. | 04857 | WI | Duke & King Acquisition | 7,000.00 |

*Note – the limited license executed between Burger King Corporation and the Debtors operates as an amendment to each of the 52 franchise agreements subject to that limited license*

**Duke & King Acquisition / Duke & King Missouri LLC**
**Notice Of Unexpired Leases and Executory Contracts And Cure Costs**

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Proposed Cure Amount |
|---|---|---|---|---|---|---|
| 1 | Non-Residential Real Property Lease | Albert E. Miller Revocable Living Trust | 04334 | Group 2 | Duke & King Acquisition | 5,742.26 |
| 2 | Non-Residential Real Property Lease | Burger King Corporation | 04111 | Group 2 | Duke & King Acquisition | 5,162.00 |
| 3 | Limited License Agreement Store #05971 | Burger King Corporation | 05971 | Group 2 | Duke & King Acquisition | 56,420.46 |
| 4 | Limited License Agreement Store #05960 | Burger King Corporation | 05960 | Group 2 | Duke & King Acquisition | 46,928.21 |
| 5 | Limited License Agreement Store #04334 | Burger King Corporation | 04334 | Group 2 | Duke & King Acquisition | 53,329.49 |
| 6 | Burger King Franchise Agreement #00106 | Burger King Corporation | 00106 | Group 2 | Duke & King Acquisition | 56,788.77 |
| 7 | Burger King Franchise Agreement #04111 | Burger King Corporation | 04111 | Group 2 | Duke & King Acquisition | 44,069.07 |
| 8 | Burger King Franchise Agreement #11191 | Burger King Corporation | 11191 | Group 2 | Duke & King Acquisition | 37,626.90 |
| 9 | Non-Residential Real Property Lease | CNL Net Lease Funding 2003, LLC | 00106 | Group 2 | Duke & King Acquisition | 8,358.38 |
| 10 | Non-Residential Real Property Lease | Holden Cassidy and Jesusa Lopez Cassidy | 05960 | Group 2 | Duke & King Acquisition | 6,757.67 |
| 11 | Non-Residential Real Property Lease | LAG Property Group, LLC | 05971 | Group 2 | Duke & King Acquisition | 7,773.07 |
| 12 | Non-Residential Real Property Lease | Williams Property Management LLC | 11191 | Group 2 | Duke & King Acquisition | 14,166.66 |
| 13 | Limited License Agreement Store #06609 | Burger King Corporation | 06609 | Group 2 | Duke & King Missouri | 44,555.35 |
| 14 | Limited License Agreement Store #11751 | Burger King Corporation | 11751 | Group 2 | Duke & King Missouri | 31,323.12 |
| 15 | Limited License Agreement Store #01558 | Burger King Corporation | 01558 | Group 2 | Duke & King Missouri | 63,764.06 |
| 16 | Limited License Agreement Store #08964 | Burger King Corporation | 08964 | Group 2 | Duke & King Missouri | 39,555.80 |
| 17 | Limited License Agreement Store #09744 | Burger King Corporation | 09744 | Group 2 | Duke & King Missouri | 37,325.30 |
| 18 | Limited License Agreement Store #07204 | Burger King Corporation | 07204 | Group 2 | Duke & King Missouri | 40,685.07 |
| 19 | Limited License Agreement Store #06030 | Burger King Corporation | 06030 | Group 2 | Duke & King Missouri | 51,644.19 |
| 20 | Non-Residential Real Property Lease | First Sunrise , LLLC | 01558 | Group 2 | Duke & King Missouri | 7,742.83 |
| 21 | Non-Residential Real Property Lease | Frank H. Caspardi and Karen E. Gaspardi - Gaspardi 2002 Revocable Trust | 09744 | Group 2 | Duke & King Acquisition | 5,151.13 |
| 22 | Non-Residential Real Property Lease | Friendly Family LLC | 06030 | Group 2 | Duke & King Missouri | 6,506.05 |
| 23 | Non-Residential Real Property Lease | Joseph E. Jurnecka, TrusteeSurvivor's Trust of Ruth and Joseph Jurnecka | 11751 | Group 2 | Duke & King Missouri | 5,075.00 |
| 24 | Non-Residential Real Property Lease | Legacy Enterprises, Inc. | 08964 | Group 2 | Duke & King Missouri | 10,848.60 |
| 25 | Non-Residential Real Property Lease | Mike Minh Chi Dam and Jamie Lo Dam,TrusteesDam Family Trust | 07204 | Group 2 | Duke & King Missouri | 5,383.10 |
| 26 | Non-Residential Real Property Lease | Sunflower Square Shopping Center, LLC | 06609 | Group 2 | Duke & King Missouri | 10,290.00 |

*Note – the limited license executed between Burger King Corporation and the Debtors operates as an amendment to each of the 52 franchise agreements subject to that limited license*

**EXHIBIT G**

**TO SALE MOTION**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| **DUKE AND KING ACQUISITION CORP.,** | Court File No. 10-38652 |
| Debtors. | |
| (includes: | Court File Nos: |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## NOTICE CONCERNING UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND ESTABLISHING CURE COSTS

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

To:      The Counterparties to the Debtors' Executory Contracts and Non-Residential Real Property Leases:

**NOTICE IS HEREBY GIVEN** that the above-captioned debtors and debtors in possession (collectively, the "Debtors") have filed a motion, dated April 11, 2011 (the "Sale Motion"), for an order (i) authorizing the sale of substantially all of their assets free and clear of liens, claims, interests and encumbrances through an auction process; and (ii) approving the assumption and assignment or rejection of certain executory contracts and establishing cure costs.  A hearing to consider approval of the proposed sale (the "Sale Approval Hearing") will be held on May 10, 2011 at 9:30 a.m. (Central Time), in the United States Bankruptcy Court for the District of Minnesota, Courtroom No. 2A, United States Courthouse, 316 North Robert Street, St. Paul, Minnesota, 55415.

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Sale Motion, Debtors may to assume and assign to the successful bidder or bidders (each, a "Successful Bidder"), subject to a closing of the sale or sales of the Debtors' assets, the certain of the executory contracts and unexpired non-residential real property leases (the "Contracts and Leases") pursuant to sections 363 and 365 of the Bankruptcy Code as set forth hereto on Exhibit 1.

The Contracts and Leases set forth on Exhibit 1 hereto are subject to assumption and assignment pursuant to the Sale Motion.  The Contracts and Leases may be those presently designated by one or more of the stalking horse bidders identified in the Sale Motion (each, a "Stalking Horse Bidder").  If the Successful Bidder is a party other than the Stalking Horse Bidder, and the Successful Bidder does not intend to assume the Contracts and Leases or seeks to assume Contracts and Leases in addition to those identified herein, supplemental notice will be provided accordingly.

**PLEASE TAKE FURTHER NOTICE** that the list on Exhibit 1 sets forth the Debtors' proposed cure amounts that the Debtors believe must be paid to cure any such defaults under the particular listed Contract and Lease to which you are a counter-party (in each instance, the "Cure Cost").

**PLEASE TAKE FURTHER NOTICE** that the Debtors propose that a Successful Bidder's responsibility to perform any obligations pay the amounts arising under the Contracts and Leases after the closing of the sale constitutes adequate assurance of future performance of the assigned Contracts and Leases in accordance with section 365(f)(2)(B) of the Bankruptcy Code.

**PLEASE TAKE FURTHER NOTICE** that any party seeking (i) to object to the Cure Cost, as provided on Exhibit 1 herein, in order for such Contract or Lease to be assumed and/or assigned to a Successful Bidder, or (ii) object to

the assumption and assignment of any Contract and Lease on any other basis, must file a written objection ("Assumption/Assignment Objection") setting forth the cure amount the objector asserts to be due and the support therefor, and the basis for the Assumption/Assignment Objection. **Assumption/ Assignment Objections must be received by parties indicated in Local Rule 9013-3(b) no later than May 5, 2011 (Central Time) (the "Deadline")**, the time set for objections to the Sale Motion.

PLEASE TAKE FURTHER NOTICE that unless an Assumption/Assignment Objection is filed and served before the Deadline, all parties shall (i) be deemed to have consented to the assumption and assignment of the Contracts and Leases, (ii) be forever barred from asserting any cure or other amounts with respect to the Contracts and Leases, and (iii) be forever barred and estopped from asserting or claiming against the Debtors or Successful Bidder that any additional amounts are due beyond the amounts set forth on Exhibit 1 hereto, that any conditions to assumption and assignment remain to be satisfied under such Contracts and Leases or that there is any objection or defense to the assumption and assignment of such Contracts and Leases.

PLEASE TAKE FURTHER NOTICE that a properly filed Assumption/Assignment Objection shall reserve the objector's rights with respect to the assumption and assignment of a particular Contract and Leases but shall not constitute an objection to the relief requested in the Sale Motion. Parties otherwise wishing to object to the relief requested in the Sale Motion must do so in a separate objection filed and served as directed in the Sale Motion.

PLEASE TAKE FURTHER NOTICE that the Debtors' assumption and assignment of the Contracts and Leases to the Successful Bidder is subject to Court approval and consummation of the closing of the sales of the Debtors' assets. Further, those Contracts and Leases to be assumed and assigned are subject to change. Accordingly, the Debtors shall be deemed to have assumed and assigned each of the Contracts and Leases as of the date of and effective only on the closing of any sales of the assets and such Successful Bidder's decision to take assignment of the Contracts and Leases under the terms of its asset purchase agreement. Absent such closing, each of the Contracts and Leases shall in all respects be subject to further administration under the Bankruptcy Code. The inclusion of any document on the list of Contracts and Leases shall not constitute or be deemed to be a determination or admission by the Debtors or the Successful Bidder that such document is, in fact, an executory contract within the meaning of the Bankruptcy Code (all rights with respect thereto being expressly reserved) or that such Contract and Lease will indeed be assumed and assigned at the closing.

PLEASE TAKE FURTHER NOTICE that any inquiries regarding information contained in this Notice should be directed to counsel for the Debtors at the address listed below.

Dated: April __, 2011

FREDRIKSON & BYRON, P.A.

_____
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
ccutler@fredlaw.com
dkassebaum@fredlaw.com


-and-

McDONALD HOPKINS LLC

Shawn M. Riley (OH 0037235)
Scott N. Opincar (OH 0064027)
Michael J. Kaczka (OH 0076548)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Phone (216) 348-5400
Fax (216) 348-5474
sriley@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com


CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Proposed Cure Amount |
|---|---|---|---|---|---|---|
| 1 | Limited License Agreement Store #04201 | Burger King Corporation | 04201 | IA | Duke & King Acquisition | 55,816.81 |
| 2 | Limited License Agreement Store #06211 | Burger King Corporation | 06211 | IA | Duke & King Acquisition | 64,062.66 |
| 3 | Limited License Agreement Store #04043 | Burger King Corporation | 04043 | IA | Duke & King Acquisition | 57,550.91 |
| 4 | Limited License Agreement Store #04297 | Burger King Corporation | 04297 | IA | Duke & King Acquisition | 69,025.55 |
| 5 | Non-Residential Real Property Lease | Christopher Keith Guthrie Trust | 04043 | IA | Duke & King Acquisition | 6,232.46 |
| 6 | Non-Residential Real Property Lease | Gabe Fazzini and Karen Fazzini | 04201 | IA | Duke & King Acquisition | 6,974.75 |
| 7 | Non-Residential Real Property Lease | Mihailo Chukalovich | 04297 | IA | Duke & King Acquisition | 8,341.67 |
| 8 | Non-Residential Real Property Lease | Vanowen Sreet, LLC | 06211 | IA | Duke & King Acquisition | 7,422.93 |
| 9 | Non-Residential Real Property Lease | 504 West Blackhawk Realty LLC | 11877 | IL | Duke & King Acquisition | 9,103.59 |
| 10 | Non-Residential Real Property Lease | Amcore Investment Group, Trustee of Trust | 01326 | IL | Duke & King Acquisition | 2,520.83 |
| 11 | Non-Residential Real Property Lease | Burger King Corporation | 16573 | IL | Duke & King Acquisition | 12,571.00 |
| 12 | Non-Residential Real Property Lease | Burger King Corporation | 00111 | IL | Duke & King Acquisition | 7,364.08 |
| 13 | Limited License Agreement Store #10234 | Burger King Corporation | 10234 | IL | Duke & King Acquisition | 46,743.92 |
| 14 | Burger King Franchise Agreement #16573 | Burger King Corporation | 16573 | IL | Duke & King Acquisition | 65,362.11 |
| 15 | Limited License Agreement Store #00437 | Burger King Corporation | 00437 | IL | Duke & King Acquisition | 51,228.03 |
| 16 | Limited License Agreement Store #00111 | Burger King Corporation | 00111 | IL | Duke & King Acquisition | 59,480.73 |
| 17 | Limited License Agreement Store #00255 | Burger King Corporation | 00255 | IL | Duke & King Acquisition | 55,068.74 |
| 18 | Limited License Agreement Store #01747 | Burger King Corporation | 01747 | IL | Duke & King Acquisition | 56,891.09 |
| 19 | Limited License Agreement Store #05879 | Burger King Corporation | 05879 | IL | Duke & King Acquisition | 55,839.03 |
| 20 | Burger King Franchise Agreement #11877 | Burger King Corporation | 11877 | IL | Duke & King Acquisition | 57,099.57 |
| 21 | Limited License Agreement Store #02160 | Burger King Corporation | 02160 | IL | Duke & King Acquisition | 65,646.95 |
| 22 | Limited License Agreement Store #01326 | Burger King Corporation | 01326 | IL | Duke & King Acquisition | 59,047.50 |
| 23 | Limited License Agreement Store #01752 | Burger King Corporation | 01752 | IL | Duke & King Acquisition | 71,879.27 |
| 24 | Burger King Franchise Agreement #01060 | Burger King Corporation | 01060 | IL | Duke & King Acquisition | 66,797.85 |
| 25 | Non-Residential Real Property Lease | Cordoza Family Trust | 05879 | IL | Duke & King Acquisition | 5,392.13 |
| 26 | Non-Residential Real Property Lease | First National Bank, Trustee | 00255 | IL | Duke & King Acquisition | 3,596.99 |
| 27 | Non-Residential Real Property Lease | Gerald E. Anderson | 02160 | IL | Duke & King Acquisition | 4,250.00 |
| 28 | Non-Residential Real Property Lease | Grub Stake Properties II a/k/a Grubbstake | 10234 | IL | Duke & King Acquisition | 4,635.19 |
| 29 | Non-Residential Real Property Lease | Loraine J Hess, Trustee for William H. Hess | 01747 | IL | Duke & King Acquisition | 3,000.00 |
| 30 | Non-Residential Real Property Lease | Mary A Kaszynski | 01752 | IL | Duke & King Acquisition | 2,593.33 |
| 31 | Non-Residential Real Property Lease | Nath Property Company Limited Partnership | 01060 | IL | Duke & King Acquisition | 8,500.00 |
| 32 | Non-Residential Real Property Lease | Triple H Properties | 00437 | IL | Duke & King Acquisition | 1,784.84 |
| 33 | Security Services | Atlas Security | | Misc | Duke & King Acquisition | 949.26 |
| 34 | Music Services | Audio Acoustics | | Misc | Duke & King Acquisition | 972.48 |
| 35 | Music Services | Business Music Ltd | | Misc | Duke & King Acquisition | 496.80 |
| 36 | Music Services | Custom Communications | | Misc | Duke & King Acquisition | - |
| 37 | Grease Removal | Darling | | Misc | Duke & King Acquisition | - |
| 38 | Advertising Sign Lease | Derse | | Misc | Duke & King Acquisition | 488.00 |
| 39 | Music Services | DMX Communications | | Misc | Duke & King Acquisition | 65.31 |
| 40 | Hood Cleaning | Enviromatic Corp Of America | | Misc | Duke & King Acquisition | 29,729.16 |
| 41 | Snow Services | Fenne's Outdoor Sevices LLC | | Misc | Duke & King Acquisition | 4,974.75 |
| 42 | Security Services | Floyd Total Securtiy | | Misc | Duke & King Acquisition | - |
| 43 | Snow Services | Golla Outdoor Services | | Misc | Duke & King Acquisition | 377.50 |
| 44 | Snow Services | High Profile Grounds Maintenance | | Misc | Duke & King Acquisition | - |
| 45 | Lease Copier/Hole Punch | Ikon | | Misc | Duke & King Acquisition | 2,585.33 |
| 46 | Lease Copier/Hole Punch | Ikon | | Misc | Duke & King Acquisition | 1,036.62 |
| 47 | Posters Contract | Labor Law Institute Auto Comply Posters | | Misc | Duke & King Acquisition | - |
| 48 | Snow Services | Lefonz Lawn Service | | Misc | Duke & King Acquisition | 520.00 |
| 49 | Advertising | Mail South | | Misc | Duke & King Acquisition | 19,232.54 |
| 50 | WOTC Program Agreement | Maximus, Inc. | | Misc | Duke & King Acquisition | 7,385.24 |
| 51 | Billboards/Advertising | Minnesota Logos | | Misc | Duke & King Acquisition | 494.85 |
| 52 | Music Services | Muzak | | Misc | Duke & King Acquisition | 11,207.14 |
| 53 | Snow Services | North Field Landscape | | Misc | Duke & King Acquisition | 200.00 |
| 54 | CO2 Service Agreement | NuCO2 | | Misc | Duke & King Acquisition | - |
| 55 | Contract for Pest Control | Presto X | | Misc | Duke & King Acquisition | 1,837.97 |
| 56 | Snow Services | River City Lawn | | Misc | Duke & King Acquisition | 1,185.31 |
| 57 | Contract for Postage Meter | SECAP Finance | | Misc | Duke & King Acquisition | - |
| 58 | Snow Services | Sno-Mow Services | | Misc | Duke & King Acquisition | 1,405.17 |
| 59 | Snow Services | Todd's Mow and Plow | | Misc | Duke & King Acquisition | - |
| 60 | Non-Residential Real Property Lease | 735 West Bridge LLC | 07444 | MN | Duke & King Acquisition | 8,683.42 |
| 61 | Non-Residential Real Property Lease | Alkire, Inc | 09095 | MN | Duke & King Acquisition | 3,831.70 |
| 62 | Non-Residential Real Property Lease | Alois Kennedy | 11284 | MN | Duke & King Acquisition | 11,846.90 |
| 63 | Non-Residential Real Property Lease | Barque Hill Capital Partners LLC | 06270 | MN | Duke & King Acquisition | 39,050.74 |
| 64 | Non-Residential Real Property Lease | Bernard A. Worms and Maria Worms, Trustees | 12757 | MN | Duke & King Acquisition | 7,703.04 |
| 65 | Non-Residential Real Property Lease | Burger King Corporation | 06299 | MN | Duke & King Acquisition | 7,262.40 |
| 66 | Burger King Franchise Agreement #09934 | Burger King Corporation | 09934 | MN | Duke & King Acquisition | 41,581.84 |
| 67 | Burger King Franchise Agreement #12757 | Burger King Corporation | 12757 | MN | Duke & King Acquisition | 45,666.00 |
| 68 | Burger King Franchise Agreement #07557 | Burger King Corporation | 07557 | MN | Duke & King Acquisition | 40,800.66 |
| 69 | Limited License Agreement Store #06545 | Burger King Corporation | 06545 | MN | Duke & King Acquisition | 50,998.67 |
| 70 | Limited License Agreement Store #07937 | Burger King Corporation | 07937 | MN | Duke & King Acquisition | 53,274.58 |
| 71 | Burger King Franchise Agreement #04507 | Burger King Corporation | 04507 | MN | Duke & King Acquisition | 58,847.59 |
| 72 | Burger King Franchise Agreement #04151 | Burger King Corporation | 04151 | MN | Duke & King Acquisition | 62,719.45 |
| 73 | Burger King Franchise Agreement #04122 | Burger King Corporation | 04122 | MN | Duke & King Acquisition | 50,863.46 |
| 74 | Burger King Franchise Agreement #12250 | Burger King Corporation | 12250 | MN | Duke & King Acquisition | 67,942.61 |
| 75 | Burger King Franchise Agreement #09095 | Burger King Corporation | 09095 | MN | Duke & King Acquisition | 46,307.92 |
| 76 | Burger King Franchise Agreement #09256 | Burger King Corporation | 09256 | MN | Duke & King Acquisition | 54,726.66 |
| 77 | Limited License Agreement Store #09332 | Burger King Corporation | 09332 | MN | Duke & King Acquisition | 50,874.37 |
| 78 | Burger King Franchise Agreement #02641 | Burger King Corporation | 02641 | MN | Duke & King Acquisition | 47,304.52 |
| 79 | Burger King Franchise Agreement #09994 | Burger King Corporation | 09994 | MN | Duke & King Acquisition | 42,952.74 |

*Note – the limited license executed between Burger King Corporation and the Debtors operates as an amendment to each of the 52 franchise agreements subject to that limited license*

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Proposed Cure Amount |
|---|---|---|---|---|---|---|
| 80 | Limited License Agreement Store #06590 | Burger King Corporation | 06590 | MN | Duke & King Acquisition | 70,154.27 |
| 81 | Limited License Agreement Store #10239 | Burger King Corporation | 10239 | MN | Duke & King Acquisition | 52,842.68 |
| 82 | Limited License Agreement Store #09993 | Burger King Corporation | 09993 | MN | Duke & King Acquisition | 52,432.88 |
| 83 | Burger King Franchise Agreement #06270 | Burger King Corporation | 06270 | MN | Duke & King Acquisition | 72,753.71 |
| 84 | Limited License Agreement Store #11535 | Burger King Corporation | 11535 | MN | Duke & King Acquisition | 52,580.49 |
| 85 | Burger King Franchise Agreement #04553 | Burger King Corporation | 04553 | MN | Duke & King Acquisition | 70,523.43 |
| 86 | Burger King Franchise Agreement #06299 | Burger King Corporation | 06299 | MN | Duke & King Acquisition | 61,241.80 |
| 87 | Limited License Agreement Store #06530 | Burger King Corporation | 06530 | MN | Duke & King Acquisition | 79,850.77 |
| 88 | Burger King Franchise Agreement #05713 | Burger King Corporation | 05713 | MN | Duke & King Acquisition | 77,786.87 |
| 89 | Burger King Franchise Agreement #11682 | Burger King Corporation | 11682 | MN | Duke & King Acquisition | 58,541.63 |
| 90 | Burger King Franchise Agreement #05591 | Burger King Corporation | 05591 | MN | Duke & King Acquisition | 82,897.34 |
| 91 | Limited License Agreement Store #08004 | Burger King Corporation | 08004 | MN | Duke & King Acquisition | 58,622.45 |
| 92 | Burger King Franchise Agreement #05012 | Burger King Corporation | 05012 | MN | Duke & King Acquisition | 86,346.71 |
| 93 | Burger King Franchise Agreement #07466 | Burger King Corporation | 07466 | MN | Duke & King Acquisition | 66,342.37 |
| 94 | Burger King Franchise Agreement #11243 | Burger King Corporation | 11243 | MN | Duke & King Acquisition | 64,085.36 |
| 95 | Burger King Franchise Agreement #10284 | Burger King Corporation | 10284 | MN | Duke & King Acquisition | 75,302.92 |
| 96 | Limited License Agreement Store #04116 | Burger King Corporation | 04116 | MN | Duke & King Acquisition | 72,531.32 |
| 97 | Burger King Franchise Agreement #07444 | Burger King Corporation | 07444 | MN | Duke & King Acquisition | 58,960.96 |
| 98 | Limited License Agreement Store #09081 | Burger King Corporation | 09081 | MN | Duke & King Acquisition | 61,105.07 |
| 99 | Burger King Franchise Agreement #09272 | Burger King Corporation | 09272 | MN | Duke & King Acquisition | 65,048.74 |
| 100 | Limited License Agreement Store #11284 | Burger King Corporation | 11284 | MN | Duke & King Acquisition | 77,773.12 |
| 101 | Burger King Franchise Agreement #08224 | Burger King Corporation | 08224 | MN | Duke & King Acquisition | 71,595.67 |
| 102 | Burger King Franchise Agreement #13091 | Burger King Corporation | 13091 | MN | Duke & King Acquisition | 93,240.22 |
| 103 | Limited License Agreement Store #06615 | Burger King Corporation | 06615 | MN | Duke & King Acquisition | 93,747.47 |
| 104 | Burger King Franchise Agreement #04009 | Burger King Corporation | 04009 | MN | Duke & King Acquisition | 90,318.70 |
| 105 | Burger King Franchise Agreement #11254 | Burger King Corporation | 11254 | MN | Duke & King Acquisition | 80,352.97 |
| 106 | Non-Residential Real Property Lease | Burkhardt Cooperative Association, Inc. | 09934 | MN | Duke & King Acquisition | 3,500.00 |
| 107 | Non-Residential Real Property Lease | Burnsville BK, LLC | 04151 | MN | Duke & King Acquisition | 23,905.61 |
| 108 | Non-Residential Real Property Lease | CNL APF Partners, LP | 04116 | MN | Duke & King Acquisition | 19,555.07 |
| 109 | Non-Residential Real Property Lease | Edward C. Lim and Elaine Lim | 06545 | MN | Duke & King Acquisition | 11,776.33 |
| 110 | Non-Residential Real Property Lease | Edwin J. Taylor and Diana S. Taylor | 06590 | MN | Duke & King Acquisition | 7,370.00 |
| 111 | Non-Residential Real Property Lease | Gene C. Ghisolfo | 09332 | MN | Duke & King Acquisition | 19,992.05 |
| 112 | Non-Residential Real Property Lease | Holiday Station Stores, Inc. | 11243 | MN | Duke & King Acquisition | 6,588.11 |
| 113 | Non-Residential Real Property Lease | Inland Commercial Property Management, Inc. | 06530 | MN | Duke & King Acquisition | 8,131.75 |
| 114 | Non-Residential Real Property Lease | Irving J. Sherman Revocable Trust | 11535 | MN | Duke & King Acquisition | 6,500.00 |
| 115 | Non-Residential Real Property Lease | Irving J. Sherman Revocable Trust | 09993 | MN | Duke & King Acquisition | 4,467.00 |
| 116 | Non-Residential Real Property Lease | Jeffery Scott Freeman and Kathleen Freeman | 02641 | MN | Duke & King Acquisition | 17,057.14 |
| 117 | Non-Residential Real Property Lease | John R. Piatt | 07937 | MN | Duke & King Acquisition | 8,893.51 |
| 118 | Non-Residential Real Property Lease | John Suen and Nancy Huang | 09081 | MN | Duke & King Acquisition | 16,005.02 |
| 119 | Non-Residential Real Property Lease | Laurence Kennedy | 11284 | MN | Duke & King Acquisition | 11,846.90 |
| 120 | Non-Residential Real Property Lease | Mark J. Ogren | 11254 | MN | Duke & King Acquisition | 4,628.75 |
| 121 | Non-Residential Real Property Lease | MOAC Mall Holdings LLC | 07466 | MN | Duke & King Acquisition | 20,004.28 |
| 122 | Non-Residential Real Property Lease | Nathan Lustman, Trustee of the Nathan Lustman | 09272 | MN | Duke & King Acquisition | 22,616.37 |
| 123 | Non-Residential Real Property Lease | Oreel Family Limited Partnership | 09994 | MN | Duke & King Acquisition | 12,479.12 |
| 124 | Non-Residential Real Property Lease | Oreel Family Limited Partnership | 10284 | MN | Duke & King Acquisition | 29,826.54 |
| 125 | Non-Residential Real Property Lease | P & C Rentals LLP | 04507 | MN | Duke & King Acquisition | 9,590.00 |
| 126 | Non-Residential Real Property Lease | P & C Rentals LLP | 04122 | MN | Duke & King Acquisition | 4,953.33 |
| 127 | Non-Residential Real Property Lease | Paul N. Philips and Karine T. Philips | 08004 | MN | Duke & King Acquisition | 22,852.97 |
| 128 | Non-Residential Real Property Lease | POOYA, Inc. | 11682 | MN | Duke & King Acquisition | 34,753.91 |
| 129 | Non-Residential Real Property Lease | Richard Sherwin and Dorinda Sherwin, Trustees | 07557 | MN | Duke & King Acquisition | 23,118.52 |
| 130 | Non-Residential Real Property Lease | Roger Johnson and Candice J. Johnson | 05713 | MN | Duke & King Acquisition | 24,949.42 |
| 131 | Non-Residential Real Property Lease | Ronald Gdovin and Dina Rickard | 06615 | MN | Duke & King Acquisition | 22,057.64 |
| 132 | Non-Residential Real Property Lease | Segura Investors VI, LLC and Segura Investors | 04009 | MN | Duke & King Acquisition | 10,379.07 |
| 133 | Non-Residential Real Property Lease | Segura Investors VI, LLC and Segura Investors | 08224 | MN | Duke & King Acquisition | 10,224.03 |
| 134 | Non-Residential Real Property Lease | Serramonte Westborough Associates, LLC | 05012 | MN | Duke & King Acquisition | 34,135.74 |
| 135 | Non-Residential Real Property Lease | Stadium Village Plaza, LLC | 12250 | MN | Duke & King Acquisition | 7,317.33 |
| 136 | Non-Residential Real Property Lease | The Lakes at Raintree Village, LLC | 13091 | MN | Duke & King Acquisition | 35,826.87 |
| 137 | Non-Residential Real Property Lease | Vander-Smith Properties | 05591 | MN | Duke & King Acquisition | 26,540.48 |
| 138 | Non-Residential Real Property Lease | Wakefield LLC | 04553 | MN | Duke & King Acquisition | 20,034.64 |
| 139 | Non-Residential Real Property Lease | Wendell Morre Russ and Virginia M. Russ, Russ Family Trust | 10239 | MN | Duke & King Acquisition | 23,210.94 |
| 140 | Non-Residential Real Property Lease | Yocum Oil Company, Inc. | 09256 | MN | Duke & King Acquisition | 7,002.62 |
| 141 | Non-Residential Real Property Lease | Altibano R. Parenti and Rosa M Parenti Living | 08384 | MO | Duke & King Missouri | 7,000.00 |
| 142 | Non-Residential Real Property Lease | AWWRE III, LLC | 11049 | MO | Duke & King Missouri | 6,166.67 |
| 143 | Non-Residential Real Property Lease | AWWRE III, LLC | 12281 | MO | Duke & King Missouri | 6,166.67 |
| 144 | Non-Residential Real Property Lease | Bryan E. Weiner, Alan B. Weiner and Olga M.WeinerTriex Missouri Prop LLC | 12415 | MO | Duke & King Missouri | 7,703.90 |
| 145 | Limited License Agreement Store #12413 | Burger King Corporation | 12413 | MO | Duke & King Missouri | 31,914.25 |
| 146 | Limited License Agreement Store #05539 | Burger King Corporation | 05539 | MO | Duke & King Missouri | 62,219.87 |
| 147 | Limited License Agreement Store #01227 | Burger King Corporation | 01227 | MO | Duke & King Missouri | 54,298.00 |
| 148 | Limited License Agreement Store #09331 | Burger King Corporation | 09331 | MO | Duke & King Missouri | 42,141.49 |
| 149 | Burger King Franchise Agreement #03232 | Burger King Corporation | 03232 | MO | Duke & King Missouri | 72,288.68 |
| 150 | Limited License Agreement Store #07203 | Burger King Corporation | 07203 | MO | Duke & King Missouri | 68,311.37 |
| 151 | Limited License Agreement Store #03475 | Burger King Corporation | 03475 | MO | Duke & King Missouri | 61,157.72 |
| 152 | Burger King Franchise Agreement #05357 | Burger King Corporation | 05357 | MO | Duke & King Missouri | 72,918.63 |
| 153 | Limited License Agreement Store #08384 | Burger King Corporation | 08384 | MO | Duke & King Missouri | 52,661.95 |
| 154 | Burger King Franchise Agreement #04513 | Burger King Corporation | 04513 | MO | Duke & King Missouri | 64,434.42 |
| 155 | Limited License Agreement Store #12281 | Burger King Corporation | 12281 | MO | Duke & King Missouri | 52,030.26 |
| 156 | Limited License Agreement Store #12415 | Burger King Corporation | 12415 | MO | Duke & King Missouri | 44,333.85 |
| 157 | Limited License Agreement Store #11049 | Burger King Corporation | 11049 | MO | Duke & King Missouri | 56,463.85 |
| 158 | Non-Residential Real Property Lease | Clyde Stewart, Jr. and Kathy Stewart | 09331 | MO | Duke & King Missouri | 1,331.00 |

*Note – the limited license executed between Burger King Corporation and the Debtors operates as an amendment to each of the 52 franchise agreements subject to that limited license*

**Duke & King Acquisition / Duke & King Missouri LLC**
**Notice Of Unexpired Leases and Executory Contracts And Cure Costs**

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Proposed Cure Amount |
|---|---|---|---|---|---|---|
| 159 | Non-Residential Real Property Lease | David Stewart and Joyce Stewart | 09331 | MO | Duke & King Missouri | 1,331.00 |
| 160 | Non-Residential Real Property Lease | Glen Harris Farms | 05539 | MO | Duke & King Missouri | 9,980.31 |
| 161 | Non-Residential Real Property Lease | MO.BK | 07203 | MO | Duke & King Missouri | 9,803.45 |
| 162 | Non-Residential Real Property Lease | South Campbell Street Investment Company,LLC | 03232 | MO | Duke & King Missouri | 14,077.71 |
| 163 | Non-Residential Real Property Lease | Spring Investment LLC | 01227 | MO | Duke & King Missouri | 8,346.54 |
| 164 | Non-Residential Real Property Lease | Sutter Development Corp | 04513 | MO | Duke & King Missouri | 1,823.26 |
| 165 | Non-Residential Real Property Lease | Thomas Joeseph Tacci Family Trust Johanna Lomonaco Tacci and Christopher Joh | 03475 | MO | Duke & King Missouri | 6,328.42 |
| 166 | Non-Residential Real Property Lease | University Park Development, LLC | 05357 | MO | Duke & King Missouri | 5,690.97 |
| 167 | Non-Residential Real Property Lease | Wood Family Limited Partnership | 12413 | MO | Duke & King Missouri | 3,100.00 |
| 168 | Non-Residential Real Property Lease | Burger King Corporation | 03792 | WI | Duke & King Acquisition | 5,437.50 |
| 169 | Limited License Agreement Store #04857 | Burger King Corporation | 04857 | WI | Duke & King Acquisition | 42,676.96 |
| 170 | Burger King Franchise Agreement #09366 | Burger King Corporation | 09366 | WI | Duke & King Acquisition | 45,120.44 |
| 171 | Burger King Franchise Agreement #01764 | Burger King Corporation | 01764 | WI | Duke & King Acquisition | 49,804.69 |
| 172 | Burger King Franchise Agreement #03792 | Burger King Corporation | 03792 | WI | Duke & King Acquisition | 61,169.88 |
| 173 | Limited License Agreement Store #01888 | Burger King Corporation | 01888 | WI | Duke & King Acquisition | 52,412.64 |
| 174 | Non-Residential Real Property Lease | Demetrios Spyrakos and Harriet Spyrakos | 01888 | WI | Duke & King Acquisition | 9,278.66 |
| 175 | Non-Residential Real Property Lease | Gabe Fazzini and Karen Fazzini | 09366 | WI | Duke & King Acquisition | 7,100.80 |
| 176 | Non-Residential Real Property Lease | Gregory Gus Kary a/k/a Gregory Kary and Ruby | 01764 | WI | Duke & King Acquisition | 5,000.00 |
| 177 | Non-Residential Real Property Lease | McLochlin Enterprises, Inc. | 04857 | WI | Duke & King Acquisition | 7,000.00 |

*Note – the limited license executed between Burger King Corporation and the Debtors operates as an amendment to each of the 52 franchise agreements subject to that limited license*

**Duke & King Acquisition / Duke & King Missouri LLC**
**Notice Of Unexpired Leases and Executory Contracts And Cure Costs**

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Proposed Cure Amount |
|---|---|---|---|---|---|---|
| 1 | Non-Residential Real Property Lease | Albert E. Miller Revocable Living Trust | 04334 | Group 2 | Duke & King Acquisition | 5,742.26 |
| 2 | Non-Residential Real Property Lease | Burger King Corporation | 04111 | Group 2 | Duke & King Acquisition | 5,162.00 |
| 3 | Limited License Agreement Store #05971 | Burger King Corporation | 05971 | Group 2 | Duke & King Acquisition | 56,420.46 |
| 4 | Limited License Agreement Store #05960 | Burger King Corporation | 05960 | Group 2 | Duke & King Acquisition | 46,928.21 |
| 5 | Limited License Agreement Store #04334 | Burger King Corporation | 04334 | Group 2 | Duke & King Acquisition | 53,329.49 |
| 6 | Burger King Franchise Agreement #00106 | Burger King Corporation | 00106 | Group 2 | Duke & King Acquisition | 56,788.77 |
| 7 | Burger King Franchise Agreement #04111 | Burger King Corporation | 04111 | Group 2 | Duke & King Acquisition | 44,069.07 |
| 8 | Burger King Franchise Agreement #11191 | Burger King Corporation | 11191 | Group 2 | Duke & King Acquisition | 37,626.90 |
| 9 | Non-Residential Real Property Lease | CNL Net Lease Funding 2003, LLC | 00106 | Group 2 | Duke & King Acquisition | 8,538.38 |
| 10 | Non-Residential Real Property Lease | Holden Cassidy and Jesusa Lopez Cassidy | 05960 | Group 2 | Duke & King Acquisition | 6,757.67 |
| 11 | Non-Residential Real Property Lease | LAG Property Group, LLC | 05971 | Group 2 | Duke & King Acquisition | 7,773.07 |
| 12 | Non-Residential Real Property Lease | Williams Property Management LLC | 11191 | Group 2 | Duke & King Acquisition | 14,166.66 |
| 13 | Limited License Agreement Store #06609 | Burger King Corporation | 06609 | Group 2 | Duke & King Missouri | 44,555.35 |
| 14 | Limited License Agreement Store #11751 | Burger King Corporation | 11751 | Group 2 | Duke & King Missouri | 31,323.12 |
| 15 | Limited License Agreement Store #01558 | Burger King Corporation | 01558 | Group 2 | Duke & King Missouri | 63,764.06 |
| 16 | Limited License Agreement Store #08964 | Burger King Corporation | 08964 | Group 2 | Duke & King Missouri | 39,555.80 |
| 17 | Limited License Agreement Store #09744 | Burger King Corporation | 09744 | Group 2 | Duke & King Missouri | 37,325.30 |
| 18 | Limited License Agreement Store #07204 | Burger King Corporation | 07204 | Group 2 | Duke & King Missouri | 40,685.07 |
| 19 | Limited License Agreement Store #06030 | Burger King Corporation | 06030 | Group 2 | Duke & King Missouri | 51,644.19 |
| 20 | Non-Residential Real Property Lease | First Sunrise , LLLC | 01558 | Group 2 | Duke & King Acquisition | 7,742.83 |
| 21 | Non-Residential Real Property Lease | Frank H. Caspardi and Karen E. Gaspardi - Gaspardi 2002 Revocable Trust | 09744 | Group 2 | Duke & King Acquisition | 5,151.13 |
| 22 | Non-Residential Real Property Lease | Friendly Family LLC | 06030 | Group 2 | Duke & King Missouri | 6,506.05 |
| 23 | Non-Residential Real Property Lease | Joseph E. Jurnecka, TrusteeSurvivor's Trust of Ruth and Joseph Jurnecka | 11751 | Group 2 | Duke & King Missouri | 5,075.00 |
| 24 | Non-Residential Real Property Lease | Legacy Enterprises, Inc. | 08964 | Group 2 | Duke & King Missouri | 10,848.60 |
| 25 | Non-Residential Real Property Lease | Mike Minh Chi Dam and Jamie Lo Dam,TrusteesDam Family Trust | 07204 | Group 2 | Duke & King Missouri | 5,383.10 |
| 26 | Non-Residential Real Property Lease | Sunflower Square Shopping Center, LLC | 06609 | Group 2 | Duke & King Missouri | 10,290.00 |

*Note – the limited license executed between Burger King Corporation and the Debtors operates as an amendment to each of the 52 franchise agreements subject to that limited license*

# EXHIBIT H

## TO SALE MOTION

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**************************************************************************

In re:

DUKE AND KING ACQUISITION CORP.,

Debtors.

(includes:
Duke and King Missouri, LLC;
Duke and King Missouri Holdings, Inc.;
Duke and King Real Estate, LLC;
DK Florida Holdings, Inc.)

**JOINTLY ADMINISTERED UNDER
CASE NO. 10-38652**

Court File No. 10-38652

Court File Nos:

10-38653 (GFK)
10-38654 (GFK)
10-38655 (GFK)
10-38656 (GFK)

Chapter 11 Cases
Chief Judge Gregory F. Kishel

**************************************************************************

## NOTICE OF SALE OF SUBSTANTIALLY ALL OF THE DEBTORS' ASSETS

**************************************************************************

To:     The United States Trustee, All Creditors, All Shareholders, and Other Parties-In-Interest:

**NOTICE**:  On May 10, 2011, at 9:30 a.m. (Central Time) in Courtroom No. 2A, United States Courthouse, 316 North Robert Street, St. Paul, Minnesota, 55415, the above-captioned debtors and debtors in possession (collectively, the "Debtors") will ask the Court to approve a sale of substantially all of the Debtors' assets (collectively, the "Assets") free and clear of all liens, claims, interests and encumbrances (collectively, the "Liens"), with all such Liens to attach to the sale proceeds in the same validity, extent, priority and manner as existed prior to such sale (the "Sale Approval Hearing").  The Sale Approval Hearing may be continued from time to time without further notice, except by the announcement in open court of the time and place of such continued Sale Approval Hearing.

The Assets being sold include substantially all of the Debtors' assets, which will be sold pursuant to the Sale and Bidding Procedures (the "Sale Procedures") substantially similar to those approved by the Court on January 24, 2011, as amended.  The Sale Procedures[1] contemplate the sale of assets on a going concern basis in two separate groupings.  The Debtors have identified three "stalking horse" bidders with respect to certain groups of Assets: Strategic Restaurant Acquisition Company II, LLC ("SRAC") with respect to the Group One Missouri Region, Crown Ventures Iowa, Inc. ("Crown") with respect to the Group One Davenport Region, and Heartland Food Corp. ("Heartland," and with SRAC and Crown, the "Stalking Horse Bidders") with respect to the separate sales of (a) the Group One Minnesota Region and (b) Group One Illinois Region and Wisconsin Region.  If no higher or better bids are obtained, the Debtors will sell the Group One Regions to the respective Stalking Horse Bidders pursuant to the terms of the asset purchase agreements attached to the Sale Motion.  The Debtors will sell the Group Two Restaurants to the highest bidder(s), if any, at the Group Two Auction.

---

[1]  Capitalized terms not defined herein have the meaning ascribed to them in the Sale Motion filed on April __, 2011 [Docket No. ___].

The Sale Procedures set the following deadlines:

| | |
|---|---|
| Qualified Bids Due | April 19, 2011 at 5:00 p.m. (CST) |
| Group One Auction | April 26, 2011 at 10:00 a.m. (CST) |
| Group Two Auction | April 27, 2011 at 10:00 a.m. (CST) |
| Sale Approval Hearing | May 10, 2011 at 9:30 a.m. (CST) |

You are encouraged to review the Sale Motion, the Stalking Horse Bidders' asset purchase agreements, and other related papers, which are available on request from Debtors' counsel as set forth below.

The Debtors will give separate notice of any unexpired leases and executory contracts to be assumed and assigned by the Debtors, and the cure amounts associated with such assumptions and assignments.

**Objections to the relief to be requested must be served on the parties indicated in Local Rule 9013-3(b), including the parties below, and must also be served and filed in accordance with Local Rule 9006-1(c) no later than May 5, 2011.**

**Debtors:**

Clinton E. Cutler
Douglas W. Kassebaum
Fredrikson & Byron, P.A
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077

-and-

Shawn M. Riley
Scott N. Opincar
Michael J. Kaczka
McDonald Hopkins LLC
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Phone (216) 348-5400
Fax (216) 348-5474

**United States Trustee:**

Michael Fadlovich
U.S. Trustee Office
1015 US Courthouse
300 South Fourth St.
Minneapolis, MN 55415
Phone: (612) 334-1356
Fax: (612) 664-1350

**Committee of Unsecured Creditors**

Richard S. Lauter
Freeborn & Peters LLP
311 South Wacker Drive
Suite 3000
Chicago, IL 60606

**Bank of America, N.A.**

Stephen M. Mertz
Faegre & Benson, LLP
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Fax: (612) 766-1600

-and-

Jonathan K. Bernstein
Morgan, Lewis & Bockius LLP
225 Franklin Street
Boston, MA 02110
Fax: (617) 341-7701

Wendy S. Walker
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178
Fax: (212) 309-6001

**Burger King Corporation**

Paul J. Battista
Genovese Joblove & Battista, P.A.
100 Southeast Second Street, 44th Floor
Miami, FL 33131
Fax: (305) 349-2310

**Any objector must also appear at the Sale Approval Hearing.**

Copies of the Debtors' Sale Motion, including the respective Stalking Horse Bidders' asset purchase agreements and the Sale Procedures are available from the Debtors' undersigned counsel on request. Additional information may also be obtained on request from the Debtors' undersigned counsel.

Dated: April __, 2011
                    FREDRIKSON & BYRON, P.A.

/s/ _____
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
ccutler@fredlaw.com
dkassebaum@fredlaw.com


-and-

McDONALD HOPKINS LLC

Shawn M. Riley (OH 0037235)
Scott N. Opincar (OH 0064027)
Michael J. Kaczka (OH 0076548)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Phone (216) 348-5400
Fax (216) 348-5474
sriley@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com

CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

4908469

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | |
| | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

**MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR ORDERS (I) SCHEDULING A HEARING ON STALKING HORSE BIDS; (II) APPROVING STALKING HORSE PROTECTION FEES; (III) APPROVING FORM OF STALKING HORSE ASSET PURCHASE AGREEMENTS; (IV) APPROVING FORM AND MANNER OF SALE NOTICE AND CURE NOTICE; (V) AUTHORIZING DEBTORS TO SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; AND (VI) AUTHORIZING ASSUMPTION AND ASSIGNMENT OF UNEXPIRED LEASES AND EXECUTORY CONTRACTS AND ESTABLISHING CURE COSTS**

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

The above-captioned debtors and debtors in possession (collectively, the "Debtors") submit this Memorandum of Law in support of their motion to sell substantially all of their assets. The Debtors request that the Court enter the relief requested in the Motion for Orders (i) Scheduling a Hearing on Stalking Horse Bids; (ii) Approving Stalking Horse Protection Fees; (iii) Approving Form of Stalking Horse Asset Purchase Agreements; (iv) Approving Form and Manner of Sale Notice and Cure Notice; (v) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (vi) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs (the "Sale Motion").

## BACKGROUND

The facts in support of the relief requested are set forth in the verified Motion and in the accompanying Declaration of Robert Hersch in Support of Debtors' Sale Motion. All capitalized terms have the meaning ascribed to them in the Sale Motion.

## ARGUMENT

I.  **A GOING CONCERN SALE IS IN THE BEST INTEREST OF THE DEBTORS' ESTATES AND THEIR CREDITORS.**

A.  **The Sale is Supported by Sound Business Justifications.**

Section 363(b)(1) of the Bankruptcy Code requires court approval, after notice and hearing, for sales outside of the ordinary course of business. See 11 U.S.C. § 363(b)(1). In interpreting section 363(b)(1), courts have held that a transaction involving property of the estate generally should be approved so long as the debtor can demonstrate "some articulated business justification for using, selling, or leasing the property outside the ordinary course of business." In re Continental Airlines, Inc., 780 F.2d 1223, 1226 (5th Cir. 1986); accord Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 567, n. 16 (8th Cir. 1997); In re Lionel Corp., 722 F.2d 1063, 1071 (2d Cir. 1983); In re LeBlanc Inc., 299 B.R. 546, 557 (Bankr. N.D. Iowa 2003). A bankruptcy court should give deference to a debtor's application of its sound business judgment in the use, sale or lease of property. See In re LeBlanc, 299 B.R. at 552; In re Moore, 110 B.R. 924, 928 (Bankr. C.D. Cal. 1990); In re Canyon Partnership, 55 B.R. 520, 524 (Bankr. S.D. Cal. 1985); In re Curlew Valley Assocs., 14 B.R. 506, 513-14 (Bankr. D. Utah 1981).

Many courts have set forth factors to consider when approving a sale outside of the ordinary course, and most courts start with the factors set forth by the Second Circuit in In re Lionel. Those factors are:

the proportionate value of the asset to the estate as a whole, the amount of elapsed time since the filing, the likelihood that a plan of reorganization will be proposed and confirmed in the near future, the effect of the proposed disposition on future plans of reorganization, the proceeds to be obtained from the disposition vis-à-vis any appraisals of the property, which of the alternatives of use, sale or lease the proposal envisions and, most importantly perhaps, whether the asset is increasing or decreasing in value.

In re Lionel, 722 F.2d at 1071.

Other courts have simplified the factors to include, *inter alia*, the consideration to be paid, the financial condition and needs of the debtor, the qualifications of the buyer, and whether a risk exists that the assets proposed to be sold would decline in value if left in the debtor's possession. Equity Funding Corp. of America v. Financial Assocs. (In re Equity Funding Corp.), 492 F.2d 793, 794 (9th Cir. 1974); In re Titusville Country Club, 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991) (setting forth four elements of a "sound business purpose" test: (1) a sound business reason, (2) accurate and reasonable notice, (3) adequate price, and (4) good faith).

In light of plain language of 11 U.S.C. § 363(b)(1), which only requires "notice and hearing" before a sale and does not set out factors to consider, the Second Circuit in Lionel observed that:

A bankruptcy judge must not be shackled with unnecessarily rigid rules when exercising the undoubtedly broad administrative power granted him under the Code. As justice Holmes once said in a different context, '[s]ome play must be allowed for the joints of the machine…'.

Lionel, 722 F.2d at 1069 (quoting Missouri, Kansas & Texas Ry. Co. v. May, 194 U.S. 267 (1904)); see also Wintz v. American Freightways, Inc. (In re Wintz Cos.), 219 F.3d 807, 812 (8th Cir. 2000) ("[The] bankruptcy courts have wide discretion in structuring sales of assets.").

In the instant case, now that the Debtors have identified multiple proposed purchasers in the form of the Stalking Horse Bidders, application of the Lionel factors to the proposed sale of the Debtors' assets will lead to the conclusion that a sale should be approved. It is the Debtors'

3

business judgment that sales to the respective Stalking Horse Bidders or the ultimate successful bidders providing the highest and best offer(s) at the Group One Auction or Group Two Auction, as the case may be, represents the only alternative for realizing value beyond a forced liquidation value. Absent the proposed sales, the Debtors would be forced to liquidate on a piecemeal basis and would realize net proceeds substantially below the price to be paid by the respective Stalking Horse Bidders or the ultimate successful bidders.

The Debtors have proposed the sale of their assets after thorough consideration of all viable alternatives, and have concluded that the sale is supported by a number of sound business reasons. First, the Debtors believe, at this time, that they cannot sustain a stand-alone operational reorganization. They simply have too much debt and too little cash. Moreover, their CAPEX obligations are projected to increase over the coming months, creating a further cash drain. Unless they can find a financial partner willing to infuse capital, there is little likelihood that the Debtors will be able to meet the CAPEX mandates under their franchise agreements or other cash needs. However, that financial partner simply does not exist at this time outside the context of a sale order section 363 of the Bankruptcy Code.

Second, the longer the Debtors' cases remain in bankruptcy, the greater the costs to all parties in interest. It is in the best interests of all parties that these cases be brought to conclusion quickly. The proposed sales of assets accomplish that result. The Debtors believe that upon closing of the sales, a plan of liquidation is the best mechanism to conclude the cases.

Finally, the Debtors would be likely to encounter other financial, procedural and timing hurdles in a reorganization process, and they are unlikely to have the resources or available funding to maintain their business operations during that time. Hence, the Debtors have determined — and the primary parties in interest have agreed — that sales of their assets provide the best and most efficient means for the Debtors to maximize the value of their estates.

The proposed sales should be approved based on the factors set forth above. The Debtors have determined, after careful evaluation of their business prospects, that a sale or sales to the Stalking Horse Bidders subject to a Group One Auction (or Group Two Auction) pursuant to the Sale Procedures will yield the greatest return. The Debtors, with the assistance of Mastodon, have marketed and will continue to market the Debtors' assets to prospective buyers up to the Bid Deadline. This opportunity was previously marketed prepetition and then for an additional four months postpetition, culminating in the Missouri APA, the Davenport APA, the Minnesota APA and the IL/WI APA. The Stalking Horse Bidders maximized the value of the Debtors' estates and potential recovery of the Debtors' creditors while minimizing the estates' administrative expenses.

Generally, "the best way to determine the market value of property is to expose the property to the marketplace." In re Mama's Original Foods, Inc., 234 B.R. 500, 504 (Bankr. C.D. Cal. 1999) (citing Bank of America Nat. Trust and Sav. Ass'n v. 203 North LaSalle Street Partnership, 526 U.S. 434, 457 (1999)). The Debtors were able to negotiate the Missouri APA, the Davenport APA, the Minnesota APA and the IL/WI APA in good faith with the respective Stalking Horse Bidders. A number of potential purchasers have expressed an interest in purchasing some or all of the Debtors' assets. The Sale Procedures approved to the Court have encouraged a competitive bidding process, one that will yield the highest price possible for these assets at the conclusion of the Group One Auction (and the Group Two Auction, as the case may be). The Sale Procedures have provided an additional procedural safeguard that will test the value of the Debtors' assets and competitive bidding process and provide potentially interested parties with another opportunity to step forward and provide greater value to the Debtors. Finally, the Sale Procedures have encouraged active bidding from interested parties who possess the financial and operation capacity to purchase the Debtors' assets. As a result, the Debtors

were able to negotiate the Missouri APA, the Davenport APA, the Minnesota APA and the IL/WI APA in good faith with the respective Stalking Horse Bidders.

Although section 363 provides a clear path to the sale of the Debtors' assets, additional statutory authority exists permitting the sale of property outside of the ordinary course of business. Section 105(a) of the Bankruptcy Code permits the Court to effectuate actions not otherwise prohibited under the Bankruptcy Code. See Norwest Bank Worthington v. Ahlers, 485 U.S. 197, 206 (1988); see also Marrama v. Citizens Bank of Massachusetts, 549 U.S. 365, 382 (2007) (stating that a bankruptcy court's power under section 105(a) and inherent powers must be exercised within the confines of the code). Selling assets free and clear of liabilities involves the power of the bankruptcy courts to affect claims and essentially corresponds to the courts' power to discharge claims. Under section 1141(c) of the Bankruptcy Code, "the property dealt with by the plan is free and clear of all claims and interests of creditors" after confirmation of the debtor's plan. Accordingly, a sale of assets may be made free and clear of claims under section 105(a) of the Bankruptcy Code. See Ninth Ave. Remedial Group v. Allis-Chalmers Corp., 195 B.R. 716, 732 (Bankr. N.D. Ind. 1996); In re White Motor Credit Corp., 75 B.R. 944, 948-49 (Bankr. N.D. Ohio 1987); In re New England Fish Co., 19 B.R. 323, 327-29 (Bankr. W.D. Wash. 1982). Section 105, in other words, provides further support for the Court to approve a sale of the Debtors' assets outside of the ordinary course of business — even in a case in which the ultimate successful bidders may not be identified until after the Group One Auction or Group Two Auction.

Furthermore, this sale is proposed in good faith. Potential purchasers were and will continue to be widely solicited from entities that have already expressed an interest as well as other potential buyers. The Sale Procedures have been presented to all parties and designed to create an open bidding process that all parties in interest can monitor to ensure that the highest

possible price is received for Debtors' assets. Indeed, the Sale Procedures permit the attendance of BKC, BofA and the Committee at the Group One Auction and Group Two Auction and provide for the Debtors to consult with those parties on major sale matters. Thus, the proposed Sale Procedures allow the Debtors to conduct an auction in a controlled, fair and open fashion that will serve to dispel any doubt as to the best and highest offer reasonably available for the Debtors' assets.

The proposed sale process is supported by sound business justifications. The Sale Procedures, the Group One Auction and the Group Two Auction should result in the highest price for the assets to be sold. The sale also is consistent with progress towards confirmation of a liquidating plan, which may be proposed some time after the closing of the sales. All aspects of this transaction have been undertaken in good faith and provide for adequate disclosure to interested parties. Accordingly, the sale should be allowed to proceed under the terms outlined in the Sale Motion and the Sale Procedures.

**B. In the Event that a Going Concern Sale Is Finally Approved, the Court Should Authorize the Debtors to Assume and Assign Certain Unexpired Executory Contracts and Unexpired Leases to the Stalking Horse Bidders or Successful Bidders.**

Section 365(a) of the Bankruptcy Code provides, in relevant part, that a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." In re James Cable Partners, L.P., 27 F.3d 534, 537 (11th Cir. 1994); In re Family Snacks, Inc., 257 B.R. 884, 905 (B.A.P. 8th Cir. 2001) ("[D]ecision to assume or reject a contract or lease under section 365 must be approved by the court.") Courts routinely approve motions to assume, assume and assign, or reject executory contracts upon a showing that a debtor's decision to take such action will benefit the debtor's estate and is an exercise of sound business judgment. See In re Crystalin, L.L.C., 293 B.R. 455, 463-64 (B.A.P. 8th Cir. 2003); See also, In re Chira, 367 B.R. 888, 898 (S.D. Fla. 2007) (citing In re Orion Pictures Corp., 4 F.3d 1095, 1099 (2d Cir.

1993)).  In other words, the assumption or rejection of an executory contract by a debtor is subject to review under the business judgment standard.  If a debtor has exercised sound business judgment, a bankruptcy court should approve the proposed assumption or rejection.  As a result, courts generally will not second-guess a debtor's business judgment concerning the assumption or rejection of an executory contract or unexpired lease.  See In re Crystalin, 293 B.R. at 463-64 (holding that once a business judgment showing is made, the court "should not interfere with the debtor-in-possession's business judgment"); In re Condominium Ass'n of Plaza Towers South, Inc., 43 B.R. 18, 22 (Bankr. S.D. Fla. 1984) (when applying section 365, a court will not "second guess" a debtor's business judgment unless there is a showing that such judgment is clearly erroneous).  The "business judgment" test is not a strict standard, however; it merely requires a showing that either assumption or rejection of the executory contract or unexpired lease will benefit a debtor's estate.  See In re Crystalin, 293 B.R. 463-64 (Eighth Circuit requires a showing of a benefit to the estate); In re Prime Motors Inns, 124 B.R. 378, 381 (Bankr. S.D. Fla. 1991). "Where the trustee's request is not manifestly unreasonable or made in bad faith, the court should normally grant approval…." In re Food Barn Stores, 107 F.3d at 567, n.16.

The Debtors, in their business judgment, have determined that the assumption and assignment of the Contracts and Leases to the respective Stalking Horse Bidders or the ultimate successful bidders is in the best interests of the Debtors' estates.  Put more simply – the Debtors could not close the sale without the benefit of assuming and the assigning the Contracts and Leases because they are critical to any party's ability to continue to operate the restaurants.

In accordance with the terms of the Debtors will be required to assume and assign to the ultimate successful bidders those certain executory contracts and unexpired leases as required under the respective Stalking Horse Bidder's or ultimate successful bidder's asset purchase agreement.

It is a condition of the sale that the costs to cure any executory contracts or unexpired lease a Stalking Horse Bidder or successful bidder wishes to assume to be paid — whether directly to the counterparty to such Contract and Lease or to the Debtors, who will, in turn, pay such counterparty. In addition, pursuant to section 365(k) of the Bankruptcy Code, the Debtors' estates will have no liability under the Contracts and Leases following the assignment of the Contracts and Leases to the Stalking Horse Bidders or the successful bidders. Having the Contracts and Leases assumed and assigned is key to obtaining the highest and best price for the assets, as much of the Debtors' income arises pursuant to such Contracts and Leases. Therefore, assumption of the Contracts and Leases is necessary to sell the business assets.

Bankruptcy Code section 365(f)(2) provides the authority for the trustee, or debtor in possession, to assign executory contracts and leases as follows:

The trustee may assign any executory contract or unexpired lease of the debtor only if –

(A)    the trustee assumes such contract or lease in accordance with the provisions of this section; and

(B)    adequate assurance of future performance by the assignee of such contract or lease is provided…

11 U.S.C. § 365(f)(2).

Whether there exists "adequate assurance of future performance" as required under section 365(b)(1) of the Bankruptcy Code involves a factual inquiry, requiring case-by-case consideration. Richmond Leasing Co. v. Capital Bank, N.A., 762 F.2d 1303, 1309-10 (5th Cir. 1985). In the event the other parties to unexpired executory contracts challenge the respective Stalking Horse Bidder's or successful bidder's ability to provide adequate assurance of future performance, the respective Stalking Horse Bidder or the ultimate successful bidder will provide such parties and/or the Bankruptcy Court with supplemental evidence of its financial ability to perform under the Contracts and Leases to be assumed and assigned.

**C.      Establishment and Payment of Cure Costs**

As noted in the Sale Motion, the Cure Notice sets forth the amounts of Cure Costs in accordance with amounts listed in the Debtors' books and records.  Section 365(b)(1) of the Bankruptcy Code requires that the Debtors cure, or provide adequate assurance that they promptly will cure, any outstanding defaults under the Contracts and Leases in connection with the assumption and assignment.  See 11 U.S.C. § 365(b)(1).  Moreover, section 365(f)(2)(B) of the Bankruptcy Code requires that the assignee of an executory contract or unexpired lease must provide counterparties with adequate assurance of future performance.  See 11 U.S.C. § 365(f)(2)(B).

Accordingly, the Stalking Horse or a proposed purchaser will be responsible for providing evidence of "adequate assurance of future performance" to the extent required in connection with the assumption and assignment of the Contracts and Leases.  The meaning of "adequate assurance of future performance" for the purpose of the assumption of executory contracts and unexpired leases pursuant to section 365 of the Bankruptcy Code depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction." See In re Tama Beef Packing, Inc., 277 B.R. 407, 411 (Bankr. N.D. Iowa 2002) (citing In re Prime Motor Inns, 166 B.R. at 997).  At the Sale Approval Hearing, the Debtors will provide the Court with evidence demonstrating that all Cure Costs will be paid.  Likewise, the Debtors will demonstrate the respective Stalking Horse Bidders, or the ultimate successful bidders, will be able to provide the adequate assurance of future performance to counterparties to the Contracts and Leases.

**II.      A GOING CONCERN SALE DOES NOT CONSTITUTE A *SUB ROSA* PLAN OF REORGANIZATION**

The sale proposed by the Debtors is not a *sub rosa* plan of reorganization.  The *sub rosa* doctrine only applies when a proposed asset sale or other transaction dictates the terms of the

plan of reorganization.  Only in those instances should the sale not be approved under section 363 of the Bankruptcy Code.  <u>Stephens Indus., Inc. v. McClung</u>, 789 F.2d 386, 389-90 (6th Cir. 1986); <u>See</u>, <u>e.g.</u>, <u>Pension Benefit Guaranty Corp. v. Braniff Airways, Inc. (In re Braniff Airways, Inc.)</u>, 700 F.2d 935, 939-40 (5th Cir. 1983) <u>but see</u>, <u>In re Flight Transp. Corp. Securities Litigation</u>, 730 F.2d 1128, 1135 (8th Cir. 1984) (analyzing <u>In re Braniff Airways</u> and finding a proper sale under section 363).   Where a transaction seeks only to liquidate assets, and will not restructure rights of creditors, it is not a *sub rosa* plan and may be approved under section 363. <u>In re Work Recovery, Inc.</u> 202 B.R. 301, 304 (Bankr. D. Ariz. 1996); <u>In re Naron & Wagner, Chartered</u>, 88 B.R. 85, 88 (Bankr. D. Md. 1988).

In <u>Braniff</u>, the proposed sale terms included: (1) a requirement that a significant portion of the sale proceeds be distributed in a particular way or be forfeited, (2) a requirement that the secured creditors vote a portion of their deficiency claim in favor of any future reorganization plan approved by the majority of the unsecured creditors committee, and (3) a release of claims against numerous parties.  Therefore, the court in <u>Braniff</u> found a *sub rosa* plan.  700 F.2d at 939-41.

Unlike <u>Braniff</u>, the method of proposed sale of the Debtors' assets does not specify any term under which a reorganization plan is to be adopted.  The Sale Procedures do not bind any parties under any future plan of reorganization.  The cash received from this sale will be placed in escrow accounts to be distributed pursuant to the terms of later court orders.  In addition, the sale of the Debtors' assets maximizes the value of the Debtors' estates including by the assumption of certain liabilities.  Finally, the sale does not impair or restructure existing debt of, or equity interest in, the Debtors; impair of circumvent voting rights with respect to any future plan proposed by the Debtors; circumvent chapter 11 plan safeguards; or classify claims or equity interests.  Indeed, the Debtors have expressed a desire on multiple occasions to propose

and implement a separate plan of liquidation after the asset sales close.  Thus, the proposed sale

transaction does not constitute a *sub rosa* plan of reorganization, and should be approved under

section 363 of the Bankruptcy Code.

## III.  DEBTORS CAN SELL THE BUSINESS ASSETS FREE AND CLEAR OF LIENS

The Debtors seek to sell their assets free and clear of all liens, claims and interests of all

claimants and lienholders. Section 363(f) of the Bankruptcy Code provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of
> any interest in such property of an entity other than the estate, only if –
>
> (i)      applicable nonbankruptcy law permits sale of such property
>          free and clear of such interest;
>
> (ii)     such entity consents;
>
> (iii)    such interest is a lien and the price at which such property
>          is to be sold is greater than the aggregate value of such
>          interest;
>
> (iv)     such interest is in bona fide dispute; or
>
> (v)      such entity could be compelled, in a legal or equitable
>          proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

The Debtors submit that several of the grounds for relief under section 363(f) can be

satisfied.  First, approval of the sale of the assets to a proposed purchaser satisfies section

363(f)(2) in that all creditors asserting valid interests in or against the assets either already have

consented, or prior to the sale hearing will consent (or otherwise not object), to the sale of the

assets.  The Debtors will continue to work hard to gain the support of BofA, as well as any other

secured creditors, for approval of the sales.  To the extent, however, that any creditor asserting a

valid interest in or against the Debtors' assets does not consent to the sale, the sale may still be

approved.  Section 363(f)(4) of the Bankruptcy Code allows a sale to proceed free and clear of

any interest if such interest is in bona fide dispute.  The purpose of section 363(f)(4) is to permit

property of a bankruptcy estate to be sold free and clear of disputed interests "so that liquidation of the estate's assets need not be delayed while such disputes are being litigated." In re Durango Georgia Paper Company, 336 B.R. 594, 597 (Bankr. S.D. Ga. 2005)(quoting Moldo v. Clark (In re Clark), 266 B.R. 163, 171 (B.A.P. 9th Cir. 2001)).  Either the Debtors or the Committee may present evidence that some or all of the interests of certain secured creditors are non-existent upon a valuation of the collateral, subject to subordination and/or voidable.  Once such evidence is presented, a bona fide dispute will exist -- albeit one that will be adjudicated at a later time -- permitting a sale "free and clear" under section 363(f)(4).

Section 363(f)(5) also provides a means to sell the Debtors' assets free and clear of all interests over the objection of a party asserting a lien.[5]  Section 363(f)(5) of the Bankruptcy Code permits such a sale if the party asserting the lien and objecting to the sale "could be compelled, in a legal or equitable proceeding, to accept a money satisfaction."  Satisfaction of the standard requires only that a party *could* be compelled, not that it is being, or going to be, compelled to accept a money satisfaction.  See In re Gulf States, 285 B.R. at 508 ("the phrase 'could be compelled' only requires 'that the interest in question be subject to final satisfaction on a hypothetical basis, not that there be an actual payment in satisfaction of the interest from the proceeds of the sale in question'") (citations omitted) (citing In re Healthco Int'l, Inc., 174 B.R. 174, 176 (Bankr. D. Mass. 1994); see also In re PW, LLC, 391 B.R. 25, 43-44 (B.A.P. 9th Cir. 2008).  Some courts have construed the "money satisfaction of such interest" language in 363(f)(5) to mean a payment constituting less than the full payment of the underlying debt.  See In re Healthco Int'l, Inc., 174 B.R. at 176.  Hence, section 363(f)(5) does not require that the sale

---

[5]  The Debtors at this time will not address the provision of section 363(f)(3).  To satisfy section 363(f)(3) of the Bankruptcy Code, the purchase price for the Debtors' assets would have to be substantial enough to satisfy the interests of all existing secured claimants.  While it is too early in the sale process to determine if the Debtors' assets will yield a high enough amount, it remains a possibility that section 363(f)(3) can be satisfied if there is aggressive bidding at the respective auctions.

price for the assets to be sold exceed the value of the claims against it. See, e.g., In re Gulf States, 285 B.R. at 508 (citing In re Grand Slam, U.S.A., Inc., 178 B.R. 460, 462 (E.D. Mich. 1995)). Rather, section 363(f)(5) requires only that a mechanism exist to address extinguishing the interest without paying such interest in full. Id.

Any one of five conditions, including the "consent" of the lienholders, provides authority to sell free and clear of liens. See Citicorp Homeowners Servs., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988). To the extent a secured creditor or lienholder that receives notice does not file a written objection to the Sale Motion, such party should be deemed to have consented to the sale. See Veltman v. Whetzal, 93 F.3d 517, 521 n.5 (8th Cir. 1996); In re Congoleum Corp., Case No. 03-51524, 2007 WL 1428477, at *1 (Bankr. D.N.J. 2007).

The Debtors believe that each of the secured creditors with an interest in the assets to be sold have or will consent to such a sale. In fact, the sale process was established with input from BofA. Throughout this process, BofA has encouraged the Debtors' efforts to sell substantially of their assets. Moreover, in Section I of the Sale Procedures, BofA has waived its right to object to the sales on 363(f) grounds. In any event, the sale of Debtors' assets may occur over their objections, or any other secured creditors' objection, so long as their respective liens attached to the sale proceeds or there are sufficient sale proceeds to pay such secured claims in full.

## IV. GOOD FAITH PURCHASER DESIGNATION

Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

While the Bankruptcy Code does not define "good faith," the Third Circuit in In re Abbotts Dairies of Pennsylvania, Inc., has stated that:

> [t]he requirement that a purchaser act in good faith…speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

788 F.2d 143, 147 (3d Cir. 1986) (quoting In re Rock Indus. Machry Corp., 572 F.2d 1195, 1198 (7th Cir. 1978); see also In re Burgess, 246 B.R. 352, 356 (B.A.P. 8th Cir. 2000); In re Lorraine Brooke Assoc., Inc., Case No. 07-12641-BKC-AJC, 2007 WL 2257608, at * 4 (Bankr. S.D. Fla. 2007).  Moreover, at least one Court of Appeals has indicated that a party would have to show fraud or collusion between the buyer and the debtor in possession or trustee or other bidders in order to demonstrate a lack of good faith.  See In re Colony Hill Assocs., 111 F.3d 269, 276 (2d Cir. 1997) (finding that the moving party did not adequately show fraud or collusion).

The Debtors intend to make an appropriate showing at a sale hearing that the Missouri APA, Davenport APA, Minnesota APA, IL/WI APA or any asset purchase agreement with the ultimate successful bidders is the result of a negotiated, arms' length transaction, in which the purchaser acted in good faith.  The Debtors thus request that, upon such showing, the Court find that the respective Stalking Horse Bidder, or the ultimate successful bidder, acted in good faith within the meaning of section 363(m) of the Bankruptcy Code.

## V.     THE COURT SHOULD APPROVE THE STALKING HORSE PROTECTION FEES

Break-up fees provisions are a normal and, in many cases, a necessary component of significant sales conducted under section 363 of the Bankruptcy Code.

> Break-up fees are important tools to encourage bidding and to maximize the value of the debtor's assets…. In fact, because the… corporation ha[s] a duty to encourage bidding, break-up fees can be necessary to discharge [such] duties to maximize value.

Official Comm. of Subordinated Bondholders v. Integrated Resources, Inc. (In re Integrated Resources, Inc.), 147 B.R. 650, 659-60 (S.D.N.Y. 1992). Specifically, "breakup fees and other strategies may be 'legitimately necessary to convince a 'white knight' bidder to enter the bidding by providing some form of compensation for the risks it is undertaking.'" In re 995 Fifth Ave. Assocs., L.P., 96 B.R. 24, 28 (Bankr. S.D.N.Y. 1989) (quoting Samjens Partners I v. Burlington Indus., Inc., 663 F. Supp. 614, 624 (S.D.N.Y. 1987)); see also In re Diamonds Plus, Inc., 233 B.R. 829, 831 (Bankr. E.D. Ark. 1999) ("The fee pays the bidder for his time, the risk that the offer will be used as a stalking horse to induce other bids, and the loss of other business and investment opportunities…"); In re Integrated Resources, 147 B.R. at 660-61 (break-up fees can prompt bidders to commence negotiations and "ensure that a bidder does not retract its bid"); In re Hupp Indus. Inc., 140 B.R. 191, 194 (Bankr. N.D. Ohio 1992) ("without such fees, bidders would be reluctant to make an initial bid for fear that their first bid will be shopped around for a higher bid from another bidder who would capitalize on the initial bidder's…due diligence").

In bankruptcy cases, it is appropriate to grant protections such as breakup fees to induce prospective purchasers to enter into agreements with debtor entities. These protections encourage a potential purchaser to invest the requisite time, money and effort to negotiate with a debtor and perform the necessary due diligence attendant to the acquisition of a debtor, despite the inherent risks and uncertainties of the chapter 11 process. Historically, bankruptcy courts have approved bidding incentives such as breakup fees under the "business judgment rule" which proscribes judicial second-guessing of the actions of a corporation's board of directors taken in good faith and in the exercise of honest judgment. See, e.g., In re Tama Beef Packing, Inc., 290 B.R. 90, 96-97 (8th Cir. B.A.P. 2003).

As a consequence, courts frequently approve break-up fees provisions in connection with proposed bankruptcy sales. Courts considering the propriety of proposed break-up fees typically

evaluate "(1) whether the relationship of the parties who negotiated the fee is marked by self-dealing or manipulation; (2) whether the fee hampers, rather than encourages, bidding; (3) whether the amount of the fee is reasonable in relation to the proposed purchase price"; (4) whether the unsuccessful bidder placed the estate property in a sales configuration mode to attract other bidders; (5) whether the request for a breakup fee serves to attract or retain a potentially successful bid, establish a bid standard or minimum, or attract additional bidders; (6) whether the fee requested correlates with the maximization of value of the debtor's estate; (7) whether the principal secured creditors and of official unsecured creditors committee support the proposed fee; (8) whether there were safeguards beneficial to the debtor's estate; and (9) whether there would be a substantial adverse impact on unsecured creditors from approval of the breakup fee. Tama Beef Packing, 290 B.R. at 97 (citing In re O'Brien Environmental Energy, Inc., 181 F.3d 527 (3d Cir. 1999)). Breakup fees that stifle the bidding process are not enforceable. See In re Wintz Companies, 230 B.R. 840, 846 (8th Cir. B.A.P. 1999) (courts permit breakup fees where they create an incentive for increased bidding).

The Debtors, by proposing to pay the Stalking Horse Protection Fees, recognize the expenditures that the Stalking Horse Bidders have incurred in conducting due diligence and negotiations and the resulting value to the Debtors' sale efforts. The Debtors believe that the willingness of the respective Stalking Horse Bidders to commit to the proposed sale transaction, subject to higher and better offers, will encourage third parties to submit higher bids and will encourage customers and vendors to continue to support operations during the sale process. Also, considering the factors traditionally considered by courts analyzing proposed break-up fees prior to a sale (as set forth above), it is clear that the Stalking Horse Protection Fees set forth in the Sale Motion are proper.

As such, the Stalking Horse Protection Fees will not act as a discouragement to the bidding process. Instead, they will preserve the opportunity to sell the Debtors' assets on a going concern basis without delay to a contractually-committed bidder at a fair and reasonable price, while providing the Debtors with the opportunity of obtaining even greater benefits for the estates through a competitive bidding process. The amount of the Stalking Horse Protection Fees is not so substantial that they would provide a "chilling effect" on other potential bidders. Finally, as described in the Hersch Declaration, the Stalking Horse Protection Fees are customary in both nature and amount. Thus, the Stalking Horse Protection Fees are appropriate and reasonable under the circumstances to compensate the respective Stalking Horse Bidders for the time, effort, expense, and risk that each has incurred and will incur in negotiating, documenting, and seeking to consummate the proposed sale transaction.

## VI. WAIVER OF BANKRUPTCY RULES 6004(H) AND 6006(D)

70. The Debtors further request that the 14-day stay that would otherwise be imposed by Rules 6004(h) and 6006(d) of the Bankruptcy Rules be lifted to permit the proposed sale and related assumptions and assignments to close as soon as possible upon the entry of an order granting this Motion. Closing the proposed sale as soon as possible is an aspect of the proposed sale. Moreover, a quick closing will relieve the Debtors of various financial obligations. The Debtors request, therefore, that the Court order that the 14-day stay that would otherwise be imposed by Rules 6004(h) and 6006(d) of the Bankruptcy Rules be lifted.

## CONCLUSION

For the foregoing reasons, Debtors respectfully request that this Court enter an order granting the Debtors the relief sought in the Sale Motion.

FREDRIKSON & BYRON, P.A.

Dated:  April 11, 2011

 */e/ Douglas W.  Kassebaum*
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, MN 55402
Phone (612) 492-7000
Fax (612) 492-7077
ccutler@fredlaw.com
dkassebaum@fredlaw.com

– and –

McDONALD HOPKINS LLC

Shawn M. Riley (OH 0037235)
Scott N. Opincar (OH 0064027)
Michael J. Kaczka (OH 0076548)
600 Superior Avenue, East, Suite 2100
Cleveland, OH 44114-2653
Phone (216) 348-5400
Fax (216) 348-5474
sriley@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com

CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

In re:                                             **JOINTLY ADMINISTERED UNDER**
                                                              **CASE NO. 10-38652**

DUKE AND KING ACQUISITION CORP.,                  Court File No. 10-38652

                      Debtors.
                                                   Court File Nos:

(includes:
Duke and King Missouri, LLC;                       10-38653 (GFK)
Duke and King Missouri Holdings, Inc.;             10-38654 (GFK)
Duke and King Real Estate, LLC;                    10-38655 (GFK)
DK Florida Holdings, Inc.)                         10-38656 (GFK)

                                                   Chapter 11 Cases
                                                   Chief Judge Gregory F. Kishel

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Douglas W. Kassebaum, under penalty of perjury, states that on April 11, 2011, he caused to be served the following:

1.    Notice of Expedited Motion and Motion for Orders (I) Scheduling a Hearing on Stalking Horse Bids; (II) Approving Stalking Horse Protection Fees; (III) Approving Form of Stalking Horse Asset Purchase Agreements; (IV) Approving Form and Manner of Sale Notice and Cure Notice; (V) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims Interests and Encumbrances; and (VI) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs;

2.    Memorandum in Support of Motion for Orders (I) Scheduling a Hearing on Stalking Horse Bids; (II) Approving Stalking Horse Protection Fees; (III) Approving Form of Stalking Horse Asset Purchase Agreements; (IV) Approving Form and Manner of Sale Notice and Cure Notice; (V) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims Interests and Encumbrances; and (VI) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs;

3.    Proposed Order; and

4.    Certificate of Service

by sending true and correct copies to all parties on the attached Service List as indicated therein.

Dated:  April 11, 2011              /s/ *Douglas W. Kassebaum*
                                    Douglas W. Kassebaum

Duke and King Acquisition Corp. and Related Debtors
Bky No. 10-38652
SERVICE LIST
Served via Federal Express except those parties whose contact information includes an e-mail address were served via e-mail

### *US Trustee and Other Required Parties*

U.S. Trustee's Office
1015 US Courthouse
300 S Fourth St
Minneapolis MN 55415
ustpregion12.mn.ecf@usdoj.gov

U.S. Trustee's Office
1015 US Courthouse
300 South Fourth Street
Minneapolis MN 55415
michael.fadlovich@usdoj.gov

*Attorneys for Duke and King Acquisition Corp.*
Michael J. Kaczka
Scott N. Opincar
Shawn M. Riley
McDonald Hopkins LLC
mkaczka@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
sriley@mcdonaldhopkins.com

IRS District Counsel
380 Jackson St, Ste 650
St Paul MN 55101-4804

Internal Revenue Service
Wells Fargo Place
30 E 7th St, Mail Stop 5700
St Paul MN 55101

MN Department of Revenue
Collection Enforcement
551 Bankruptcy Section
600 North Robert Street
PO Box 64447
St Paul MN 55101-2228

US Attorney
600 US Courthouse
300 S Fourth St
Minneapolis MN 55415

Minnesota Department of Economic Security
332 Minnesota St, Ste E200
St. Paul MN 55101-1351

### *Debtors*

Duke and King Acquisition Corp.
Attn: Becky Moldenhauer
12281 Nicollet Ave S
Burnsville, MN 55337
bmoldenhauer@dukeandking.com

### *Official Committee of Unsecured Creditors*

*Local Counsel for Official Committee of Unsecured Creditors*
c/o Amy J. Swedberg
Maslon Edelman Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402
amy.swedberg@maslon.com

*Counsel for Official Committee of Unsecured Creditors*
c/o Aaron L. Hammer
Freeborn & Peters LLP
311 South Wacker Drive, #3000
Chicago, IL 60606-6677
ahammer@freebornpeters.com

### *Major Secured Creditors*

*Bank of America*
c/o Stephen M. Mertz
Michael R. Stewart
Michael F. Doty
Christopher J. Harayda
Faegre & Benson LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN 55402-3901
SMertz@faegre.com
MStewart@faegre.com
MDoty@faegre.com
CHarayda@faegre.com

*Bank of America*
c/o Wendy S. Walker
Jonathan K. Bernstein
Patrick D. Fleming
Annie C. Wells
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY 10178-0060
wwalker@morganlewis.com
jbernstein@morganlewis.com
pfleming@morganlewis.com
awells@morganlewis.com

*Meadowbrook Meat Company d/b/a MBM Corp.*
c/o Larry B. Ricke
Ricke & Sweeney, PA
325 Cedar Street
St. Paul, MN 55101
rickel@srsg.net

### *Appearance Parties*

*Burger King Corporation*
c/o Paul J. Battista
Genovese Joblove & Battista, P.A.
100 Southeast Second Street, 44th Floor
Miami, FL 33131
pbattista@gjb-law.com

*Burger King Corporation*
c/o Kenneth Corey-Edstrom
Larkin, Hoffman, Daly & Lindgren Ltd.
1500 Wells Fargo Plaza
7900 Xerxes Avenoue South
Bloomington, MN 55431-1194
kcoreyedstrom@larkinhoffman.com

*Pan-O-Gold Baking Co.*
c/o John L. Greer
Hughes Mathews, PA
110 Sixth Avenue South, #200
P.O. Box 548
St. Cloud, MN 56302-0548
jgreer@hughesmathews.com

*Bruce Swisshelm*
c/o Gordon B. Conn, Jr.
Carole Clark Isakson
Kalina, Wills, Gisvold & Clark PLLP
6160 Summit Drive, #560
Minneapolis, MN 55430
conn@kwgc-law.com
isakson@kwgc-law.com

*Reinhart Foodservice, LLC*
c/o Jeffrey D. Klobucar
Foley & Mansfield PLLP
250 Marquette Avenue, #1200
Minneapolis, MN 55401
jklobucar@foleymansfield.com

*Reinhart Foodservice, LLC*
c/o Thomas F. Blakemore
Winston & Strawn, LLP
35 West Wacker Drive
Chicago, IL 60601-9703
tblakemore@winston.com

*Missouri Department of Revenue*
c/o Steven A. Ginther
Missouri Dept. of Revenue
General Counsel's Office
301 W. High Street, Room 670
P.O. Box 475
Jefferson City, MO 65105-0475
mn@dor.mo.gov

Duke and King Acquisition Corp. and Related Debtors
Bky No. 10-38652
SERVICE LIST
Served via Federal Express except those parties whose contact information includes an e-mail address were served via e-mail

Duke Manufacturing Co.
Attn: Officer or Agent
2305 North Broadway
Saint Louis, MO 63102
Fax No. 314-231-5074

GreatAmerica Leasing Corporation
Attn: Officer or Agent
625 1st Street, SE, Suite 800
Cedar Rapids, IA 52401-2031
Fax No. 319-365-8607

Coca-Cola Financial Corporation
Attn: Amber Meyer
1410 SW Morrison St., #750
Portland, OR 97205
amber_meyer@leasedimensions.com

Warren Capital Corporation
Attn: Scott Shapiro
100 Rowland Way #205
Novato, CA 94945
Fax No. 415-892-7075

*The Lakes Adventure, LLC, f/k/a*
*The Lakes at Raintree Village, LLC*
c/o Eoin L. Kreditor
Friedman Stroffe & Gerard, P.C.
19800 MacArthur Blvd., #1100
Irvine, CA 92612
ekreditor@fsglawyers.com

*Mark and Helen Kim*
c/o Jane H. Park
John H. Kim
Mirae Law, LLC
1701 Golf Road, Suite 1-1106
Rolling Meadows, IL 60008
jane@miraelaw.com
johnkim@1012@gmail.com

*Travelers*
Travelers
Attn: Chantel Pinnock
Account Resolution
One Tower Square, 5MN
Hartford, CT 06183
Fax No. 877-399-8479

*Sunflower Square Shopping Center, LLC*
c/o Richard C. Salmen
Felhaber, Larson, Fenlon & Vogt, PA
220 South Sixth Street, #2200
Minneapolis, MN 55402
rsalmen@felhaber.com

*Angelo Cappas, Mary Cappas, Cappas*
*Family Limited Partnership and Pamela*
*Karabatsos*
c/o Steven C. Opheim
Dudley and Smith, PA
2602 US Bank Center
101 East Fifth Street
St. Paul, MN 55101
sopheim@dudleyandsmith.com

*Pooya International*
c/o Matthew R. Burton
Leonard, O'Brien, Spencer, Gale &
Sayre, Ltd.
100 South Fifth Street, #2500
Minneapolis, MN 55402
mburton@losgs.com

*Simon Roofing and Sheet Metal Corp.*
c/o Glenn R. Osborne
Friedman & Rummell, Co., LPA
132 South Broad Street, #101
Canfield, OH 44406

*Gabriel and Karen Fazzini*
c/o Michael W. Vogel
Vogel Law Firm, Ltd.
19 S. Austin Road
Janesville, WI 53548
Fax No. 608-754-5890

*South Campbell Street Investment*
*Company, LLC and*
*Legacy Enterprises Inc.*
c/o Dan R. Nelson
Lathrop & Gage, LLP
1845 S. National Avenue
P.O. Box 4288
Springfield, MO 65808-4288
dnelson@lathropgage.com

*Inland Real Estate Corporation and*
*Inland Real Estate LB1, LLC*
c/o Adam D. Maier
Leonard, Street and Deinard
150 South Fifth Street, #2300
Minneapolis, MN 55402
adam.maier@leonard.com

*Wood Family Limited Partnership*
*c/o JT Brown Realty Co.*
c/o Lee J. Viorel
Lowther Johnson, LLC
901 St. Louis Street, 20th Floor
Springfield, MO 65806
lviorel@lowtherjohnson.com

Vogel Law Firm, Ltd.
mwv@vogellawfirm.net

*Edwin J. Taylor, Diana S. Taylor and*
*The Skillman Corporation*
c/o Dennis L. Johnson
3300 Penn Avenue North
Minneapolis, MN 55412-2374
Johnsonlaw43@msn.com

Laurence R. Kennedy
Landlord and Creditor
Burger King Store, #11284
1500 Stinson Blvd. N.E.
Minneapolis, MN 55431
larrykennedy1@earthlink.net

*IKON Office Solutions*
Attn: Olivia Moody
IKON Office Solutions
3920 Arkwright Road, #400
Macon, GA 31210

*Consolidated Energy Coop.*
c/o James T. Remington
Remington Law Offices
126 South Knowles Avenue
New Richmond, WI 54017

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**********************************************************************

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes:<br>Duke and King Missouri, LLC;<br>Duke and King Missouri Holdings, Inc.;<br>Duke and King Real Estate, LLC;<br>DK Florida Holdings, Inc.) | 10-38653 (GFK)<br>10-38654 (GFK)<br>10-38655 (GFK)<br>10-38656 (GFK) |
| | Chapter 11 Cases<br>Chief Judge Gregory F. Kishel |

**********************************************************************
### ORDER (A) GRANTING EXPEDITED HEARING; (B) APPROVING STALKING HORSE BIDDERS; (C) APPROVING FORM OF STALKING HORSE ASSET PURCHASE AGREEMENTS; (D) APPROVING STALKING HORSE PROTECTION FEES; AND (E) APPROVING FORM AND MANNER OF SALE NOTICE AND CURE NOTICE
**********************************************************************

This matter came before the court on April 11, 2011, on the Motion for Orders (i) Scheduling a Hearing on Stalking Horse Bids; (ii) Approving Stalking Horse Protection Fees; (iii) Approving Form of Stalking Horse Asset Purchase Agreements; (iv) Approving Form and Manner of Sale Notice and Cure Notice; (v) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (vi) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs (the "Sale Motion"), filed by the above-captioned debtors and debtors in possession (collectively, the "Debtors"). Having reviewed the Motion and any objections and having held a hearing on the relief requested in the Sale Motion (the "Stalking Horse Hearing"), the Court has determined that the legal and factual basis set forth in the Sale Motion with respect to the relief considered at the Stalking Horse Hearing establish just cause of the relief granted herein.

**THE COURT FINDS AND DETERMINES THAT:**

A.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334 and reference from the District Court pursuant to 28 U.S.C. § 157;

B.      This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2);

C.      Service and notice of the Sale Motion and the Stalking Horse Hearing were sufficient under the circumstances; and

D.      The portion of the relief requested in the Sale Motion at the Stalking Horse Hearing is in the best interest of the Debtors, their estates, their creditors and other parties in interest.

**IT IS HEREBY ORDERED THAT:**

1.      The Debtors' motion for expedited hearing is GRANTED.

2.      The relief requested in the Sale Motion as stated on the record at the Stalking Horse Hearing is GRANTED.

3.      Any objections, to the extent not resolved by agreement, shall be, and hereby are, deemed OVERRULED.

4.      Capitalized terms used, but not otherwise defined in this Order, have the meanings given to them in the Sale Motion.

5.      The Sale Notice in the form attached to Sale Motion is hereby APPROVED.

6.      The Cure Notice in the form attached to the Sale Motion is hereby APPROVED.

7.      The form of asset purchase agreement, dated April 8, 2011, between Debtor, Duke and King Missouri, LLC and Strategic Restaurants Acquisition Corp. II, LLC ("SRAC"), or its designee (the "Missouri APA"), as attached to the Sale Motion is hereby APPROVED, as SRAC shall be the Stalking Horse Bidder for the Missouri Region.

8.      The form of asset purchase agreement, dated April 11, 2011, between Debtor, Duke and King Acquisition Corp. and Crown Ventures Iowa, Inc. ("Crown"), or its designee (the "Davenport APA"), attached to the Sale Motion is hereby APPROVED, and Crown is approved as the Stalking Horse Bidder for the Davenport Region.

9.      The form of asset purchase agreement, dated April 11, 2011, between Debtor, Duke and King Acquisition Corp. and Heartland Food Corp. ("Heartland"), or its designee (the "Minnesota APA"), attached to the Sale Motion is hereby APPROVED, and Heartland is approved as the Stalking Horse Bidder for the Minnesota Region.

10.     The form of asset purchase agreement, dated April 11, 2011, between Debtor, Duke and King Acquisition Corp. and Heartland, or its designee (the "IL/WI APA"), attached to the Sale Motion is hereby APPROVED, and Heartland is approved as the Stalking Horse Bidder for the Illinois Region and Wisconsin Region.

11.     The Debtors are authorized to establish a separate, segregated, interest bearing accounts to hold the respective Deposits, in trust, made by the respective Stalking Horse Bidders pursuant to the Missouri APA, the Davenport APA, the Minnesota APA, and the IL/WI APA, as well as one or more additional account(s) to hold other deposit(s) made by other Qualified Bidder(s).  All funds in such separate, segregated accounts, shall be held separate and apart from the Debtors' funds, and shall be free and clear of all liens, claims and interests of the Debtors' creditors; provided, however, that the Debtors are authorized to hold and disburse the respective deposits in accordance with the respective terms of the Missouri APA, Davenport APA, Minnesota APA and IL/WI APA, and any other deposits received from Qualified Bidders in accordance with the terms of the Sale Procedures.

12. The Stalking Horse Protection Fees shall be, and hereby is, APPROVED, as follows:

| Region | Stalking Horse Bidder | Sale Price | Break-Up Fee | Expense Reimbursement |
|---|---|---|---|---|
| Missouri | SRAC | $3,100,000 plus the value of on-hand cash and the value of on-hand inventory | $93,000 | Up to $100,000 |
| Davenport | Crown | $500,000 plus assumption of certain liabilities | $15,000 | Up to $20,000 |
| Minnesota | Heartland | $7,161,000 plus assumption of certain liabilities | 3% of Total Consideration (as defined in the Minnesota APA) | Up to $150,000 |
| Illinois | Heartland | $500,000 plus assumption of certain liabilities | 1.5% of Total Consideration (as defined in the IL/WI APA) | Up to $40,000 |
| Wisconsin | Heartland | $1 plus assumption of certain liabilities | 1.5% of Total Consideration (as defined in the IL/WI APA) | Up to $10,000 |

13. Heartland shall waive its Stalking Horse Protection Fee under the IL/WI APA in the event BofA exercises its credit bid rights and is the successful bidder for either the Illinois Region or the Wisconsin Region.

14. Nothing in this Order is intended to or shall, modify or amend the respective terms of the Missouri APA, the Davenport APA, the Minnesota APA, and the IL/WI APA.

15. This Order shall be effective immediately upon entry.

Dated: _____

_____
Gregory F. Kishel
United States Chief Bankruptcy Judge