# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | |
| | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## ORDER AUTHORIZING DEBTORS TO (I) SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) ASSUME AND ASSIGN CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (III) ESTABLISH CURE COSTS

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

The sale motion of above-referenced Debtors for Orders (i) Scheduling a Hearing on Stalking Horse Bids; (ii) Approving Stalking Horse Protection Fees; (iii) Approving Form of Stalking Horse Asset Purchase Agreements; (iv) Approving Form and Manner of Sale Notice and Cure Notice; (v) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (vi) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs (the "Sale Motion") came before the undersigned on May 10, 2011. Cave Enterprises Operations, LLC, (the "Buyer") has been named as the Successful Bidder[1] of the Wisconsin Region and Illinois Region for the Acquired Assets that are identified in that certain asset purchase agreement dated April 26, 2011, by and

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

{2707273:}

NOTICE OF ELECTRONIC ENTRY AND
FILING ORDER OR JUDGMENT
Filed and Docket Entry made on *05/10/2011*
Lori Vosejpka, Clerk, By JRB, Deputy Clerk

among Debtor, Duke and King Acquisition Corp. and Buyer (the "APA"), as attached hereto as Exhibit 1. Appearances were noted on the record.

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS HEREBY FOUND THAT:**[2]

A.    This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.    Venue of the Debtors' chapter 11 cases (the "Chapter 11 Cases") in this District is proper pursuant to 28 U.S.C. § 1409(a).

C.    Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N). The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

D.    This Sale Approval Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Approval Order, and expressly directs entry of judgment as set forth herein.

---

[2] Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate. See Bankruptcy Rule 7052. B. To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such. To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such.

E.     A hearing on the Debtors' Motion for an Order Approving Sale and Bidding Procedures was held by this Court on January 24, 2011, and, on that date, the Court entered the Order Approving Sale and Bidding Procedures (the "Procedures Order").  The Debtors and the Buyer have complied with the Procedures Order in all respects.

F.     Pursuant to the Procedures Order, the Debtors timely received two Qualified Bids on or before April 19, 2011 for the Wisconsin Region and Illinois Region, and, the Group One Auction was held for the Wisconsin Region and Illinois Region.  At the conclusion of the Group One Auction, the Buyer was named the Successful Bidder and Heartland Food Corp. ("Heartland") was named the Reserve Bidder.  The Sale Procedures Order (as amended)[3] set May 10, 2011 as the date of the hearing (the "Sale Approval Hearing") for an order to approve the sale.

G.     On April 11, 2011, the Debtors filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2).  On April 18, 2011, the Debtors served the Notice of Sale Approval Hearing in compliance with this Court's orders.  On April 18, 2011, the Debtors served the Notice Concerning Unexpired Leases and Executory Contracts and Establishing Cure Costs on the counterparties to such leases and contracts.

H.     On April 14, 2011, the Court entered the Order (A) Approving Stalking Horse Bidders; (B) Approving Form of Stalking Horse Asset Purchase Agreement, and (C) Approving Stalking Horse Protection Fee, which, among other things, approved Heartland as the stalking horse bidder for the Acquired Assets located in the Wisconsin Region and Illinois Region.

I.     Based upon the foregoing and the certificates of service and publication filed with the Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the

---

[3]  The timeline set forth in the Procedures Order was subsequently amended by stipulation.

Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts and the proposed rejection of the contracts has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008 and in compliance with the Procedures Order and no other or further notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts or the entry of this Sale Approval Order is required or necessary.

J.      All parties in interest, including, without limitation, all parties who claim an interest in or lien upon the Acquired Assets, all shareholders of the Debtors, all federal, state and local environmental authorities, and all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the sale of Acquired Assets may have, claims, contingent or otherwise against the Debtors, have been given a reasonably opportunity to object and be heard, regarding the relief requested in the Sale Motion.   All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Approval Hearing.

K.      As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (i) the offer from the Buyer constitutes the highest and best offer for the Acquired Assets; (ii) the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Procedures Order; (iii) the auction process set forth in the Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets; and (iv) the Group One Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

L.      In accordance with the Procedures Order, the APA was deemed a Qualified Bid (as defined in the Sale Procedures) and was eligible to participate at the Group One Auction.

M.      The APA constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

N.      The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.

O.      The purchase price as set forth in the APA (the "Purchase Price") for the Acquired Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  Approval of the APA and the sale of the Acquired Assets in accordance with this Sale Approval Order and the APA are in the best interests of the Debtors' estates, creditors and other parties in interest.  The terms of the APA were negotiated at arms' length and are fair and reasonable under the circumstances.

P.      The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtors nor the Buyer is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q.     The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes for the sale of the Acquired Assets pursuant to section 363(b) of the Bankruptcy Code outside of a plan of reorganization.

R.     Each of the Debtors, as applicable, (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Acquired Assets by the Debtors has, in each case, been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.   No third-party approvals, other than those expressly provided for in the APA, if any, are required by the Debtors to consummate such transactions.

S.     The Debtors are authorized and directed to sell and transfer the Acquired Assets free and clear of all mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), judgments, demands, rights of first refusal (other than the rights of first refusal of Burger King Corporation under applicable franchise agreements) offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or the

Debtors' predecessors or affiliates, claims (as that term is used in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the bankruptcy case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (collectively, "Liens, Claims, Encumbrances and Interests") with such Liens, Claims, Encumbrances and Interests to attach to the consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Buyer would not enter into the APA to purchase the Acquired Assets otherwise.

T.     Those holders of Liens, Claims, Encumbrances and Interests against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the sale or the Sale Motion are deemed to have consented to the sale pursuant to section 363(f)(2) of the Bankruptcy Code. The Debtors have met the requirements of section 363(f) with respect to all other holders of Liens, Claims, Encumbrances and Interests as such Claim holders will have their Liens, Claims, Encumbrances and Interests, if any, in each instance against the Debtors, their estates or any of the Acquired Assets, attach to the net cash proceeds of the sale ultimately attributable to the Acquired Assets, in which such creditor alleges a Claim, in the same order of priority, with the same validity, force and effect that such Liens, Claims, Encumbrances and Interests had prior to the sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

U.     The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Acquired Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Assumed Leases and Acquired Contracts were not free and clear of all Liens, Claims, Encumbrances and Interests.

V.     The APA was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion.

W.     The Debtors have followed in good faith the procedures for notice and sale of the Acquired Assets as set forth in the Procedures Order.

X.     The Buyer is not an "insider" or "affiliate" of the Debtors (as each such term is defined in the Bankruptcy Code).   Neither the Debtors nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) of the Bankruptcy Code to the sale and the transactions contemplated by the APA. Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate price paid by Buyer for the Acquired Assets was not controlled by any agreement among the bidders.

Y.     The Buyer is entitled to the protections afforded under section 363(m) of the Bankruptcy Code because the Buyer is a good faith purchaser in that, *inter alia*:  (i) except as set forth in the Procedures Order, the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Buyer complied with the provisions in the Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Procedures Order; (iv) the Buyer in no way induced or caused the chapter 11 filings by the Debtors; (v) all payments to be made by the Buyer in connection with the sale have been disclosed; (vi) no common identity of directors or controlling

stockholders exists between the Buyer and any of the Debtors; and (vii) the negotiation and execution of the APA was at arms' length and in good faith.

Z.       In the absence of a stay pending appeal, if any, if the Closing occurs at any time after entry of this Sale Approval Order, then, with respect to the APA, the Buyer, as a purchaser in good faith of the Acquired Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Sale Approval Order or any authorization contained herein is reversed or modified on appeal.

AA.     The Debtors are the sole and lawful owners of the Acquired Assets.  Effective as of the Closing, the transfer of the Acquired Assets is or will (i) be legal, valid and effective transfers of property of the Debtors' estates to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the Debtors and the Debtors' estates in and to the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests  under sections 363(f) and 105 of the Bankruptcy Code.

BB.     The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign those Assumed Leases and Acquired Contracts, as defined in the APA and described on Schedules B and 1.1(g) to the APA, including any amendments or modifications to such exhibits as agreed to by the Debtors and Buyer pursuant to the APA, in connection with the consummation of the sale of Acquired Assets, and the assumption and assignment of the Assumed Leases and Acquired Contracts is in the best interests of the Debtors, their estates, their creditors and their equityholders.

CC.     The Assumed Leases and Acquired Contracts being assigned to the Buyer as set forth in the APA are an integral part of the Debtors' businesses being purchased by the Buyer and, accordingly, such assumption and assignment of Assumed Leases and Acquired Contracts is

reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

DD.    The Assumed Leases and Acquired Contracts are unexpired leases or executory contracts within the meaning of the Bankruptcy Code.

EE.    All amounts which are required to be paid in connection with the assumption and assignment of the Assumed Leases and Acquired Contracts that are due or owing under sections 365(b)(1)(A) and (B), and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or (ii) pay all actual or pecuniary losses that have resulted from such defaults (except with respect to those liabilities expressly assumed by the Buyer pursuant to the APA) are set forth on Exhibit 2 hereto (the "Cure Costs").

FF.    Any objections to the Cure Costs associated with such Assumed Leases and Acquired Contracts are resolved as set forth on Exhibit 2 to this Sale Approval Order.  To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Assumed Lease or Acquired Contract or (ii) the Cure Cost associated with the applicable Assumed Lease or Acquired Contract, such counterparty is deemed to have consented to such Cure Cost and the assumption and assignments of its respective Assumed Lease or Acquired Contract to the Buyer as expressly set forth on Exhibit 2 to this Sale Approval Order.

GG.    The promises of Buyer and/or the Debtors to pay the Cure Costs and the Buyer's promise to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order that are being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

HH.    Adequate notice and opportunity to be heard was provided to counterparties to executory contracts and unexpired leases to be assumed and assigned pursuant to this Sale Approval Order.  Further, counterparties received adequate notice and an opportunity to object to the amount of any Cure Costs owed by the Debtors' estates on account of any executory contract or unexpired lease to be assumed and assigned to the Buyer under the APA.

II.    The assumption and assignment of the Assumed Leases and Acquired Contracts is integral to the APA and is in the best interests of the Debtors and their estates, creditors and equityholders and represents the exercise of the Debtors' sound business judgment.

JJ.    Any objections to the assumption and assignment of any of the Assumed Leases and Acquired Contracts to the Buyer are hereby overruled.

KK.    Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (ii) have, de facto or otherwise, merged with or into any of the Debtors; (iii) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Buyer and the Debtors); or (iv) be holding itself out to the public as a continuation of the Debtors.  The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the APA with respect to the Assumed Liabilities.

LL.    The Debtors have good, valid and marketable title to all of the Acquired Assets. The Acquired Assets are to be transferred free and clear of any and all Liens, Claims, Encumbrances and Interests.  All of the Acquired Assets are, or will on the Closing Date, be owned by the Debtors and will be transferred under the APA.

MM.    Other than the Assumed Liabilities, the Buyer shall have no obligations with respect to any liabilities of the Debtors, including, without limitation, the Excluded Liabilities, and the Debtors and their estates will release and forever discharge the Buyer and any of its affiliates, its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale, except for liabilities and obligations under the APA.

**IT IS HEREBY ORDERED:**

### General Provisions

1.    The Sale Motion is hereby granted to the extent provided herein.

2.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Approval Order, are overruled on the merits.

### Approval of the APA

3.    Each and every term of the APA (attached hereto as Exhibit 1) and all other ancillary documents is hereby approved.

4.    The sale of the Acquired Assets to Buyer pursuant to the APA is hereby authorized under section 363(b) of the Bankruptcy Code and the entry of the Debtors into the APA is hereby approved.  The proceeds from the sale of the Acquired Assets as provided in the APA shall be paid in accordance with further orders of the Court.

5.    The Debtors, through any corporate officer, are authorized and directed to execute and deliver, and empowered to fully perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, including taking any actions that otherwise would

require further approval by shareholders or their respective boards of directors (without the need of obtaining such approvals) and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations of the Debtors under the APA, including effectuating amendments to the APA in furtherance thereof. All Persons necessary to effect the transactions contemplated by the APA are hereby ordered to execute any and all documents necessary to effect such transactions. If any Person fails to comply with the provisions of this paragraph 5 prior to the Closing Date, such Person (or Persons, as the case may be) shall nonetheless be deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

6.     The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Approval Order.

### Transfer of the Acquired Assets

7.     Pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Buyer, in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest the Buyer with title to the Acquired Assets, free and clear of any and all Claims, Liens, Interests and Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured,

disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Claims, Liens, Interests and Encumbrances to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Acquired Assets, subject to all claims and defenses the Debtors may possess with respect thereto. The Sale Motion shall be deemed to provide sufficient notice as to the sale of the Acquired Assets free and clear of Claims, Liens, Interests and Encumbrances. All such Liens, Claims, Encumbrances and Interests released, terminated and discharged as to the Acquired Assets shall attach to the sale proceeds with the same validity, force and effect which they now have as against the Debtors, the estates or the Acquired Assets.

8.      The provisions of this Sale Approval Order authorizing the sale of the Acquired Assets free and clear of Liens, Claims, Encumbrances and Interests, and the Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Approval Order. However, the Debtors and the Buyer, and each of their respective officers, employees and agents, so long as the same remain employed by the Debtors, are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA and this Sale Approval Order. Moreover, effective as of the Closing, the Buyer, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Buyer, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof,

and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Buyer, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets, and to do all acts and things with respect to the Acquired Assets which the Buyer, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

9.     To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

10.     All persons and entities (including, but not limited to, the Debtors, creditors, equityholders, including, without limitation, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees thereof, shall be and are hereby permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquired Assets or the Buyer and its successors or assigns as alleged successor or otherwise with respect to any Liens, Claims, Encumbrances and Interests of any kind and nature with respect to the Acquired Assets other than Assumed Liabilities, except as otherwise provided in the APA. If the proposed sale to the Buyer fails to close for any reason, then Liens, Claims, Encumbrances and Interests shall continue against the Acquired Assets unaffected by this Sale Approval Order.

11.     Except for Assumed Liabilities as set forth in the APA, the transfer of the Acquired Assets pursuant to this Sale Approval Order shall not subject the Buyer to any liability with respect to any obligations incurred in connection with, or in any way related to the Acquired Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

**Assumption and Assignment to Buyer of Assumed Leases and Acquired Contracts**

12.     Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the APA, of the Assumed Leases and Acquired Contracts specified in this Sale Approval Order is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

13.     The Debtors are authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Assumed Leases and Acquired Contracts specified on Exhibit 2 to in this Sale Approval Order; and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Leases and Acquired Contracts specified in this Sale Approval Order.

14.     With respect to the Assumed Leases and Acquired Contracts: (a) each Assumed Lease and Acquired Contract, as applicable, is an unexpired lease or executory contract under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assumed Leases and Acquired Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assumed Lease and Acquired Contract in accordance with sections 363 and 365

of the Bankruptcy Code, and any provisions in any Assumed Lease or Acquired Contract that prohibit or condition the assignment of such Assumed Lease or Acquired Contract or allow the party to such Assumed Lease or Acquired Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Lease or Acquired Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Lease and Acquired Contract have been satisfied; and (e) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Lease and Acquired Contract set forth on Exhibit 2 hereto.

15.     Each of the Assumed Leases and Acquired Contracts specified on Exhibit 2 to this Sale Approval Order, upon assignment to the Buyer, shall be deemed to be valid and binding on the Buyer and in full force and effect and enforceable in accordance with their terms, and following such assignment, the Debtors and the estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, any liability for any breach of such Assumed Leases and Acquired Contracts occurring after such assignment.

16.     Each non-Debtor party to an Assumed Lease and Acquired Contract specified in this Sale Approval Order is hereby barred and enjoined from asserting against the Buyer, the Debtors or the Debtors' estates (a) any default existing as of the date of the Sale Approval Hearing if such default was not raised or asserted in a timely manner prior to the entry of this Sale Approval Order or (b) any objection to the assumption and assignment of such non-Debtor party's Assumed Leases and Acquired Contracts or the Cure Cost, if any, of which the non-Debtor party was given notice prior to the Sale Hearing. The assignment of each such Assumed

Leases and Acquired Contracts to the Buyer will not cause a default or otherwise allow the non-Debtor party thereto to terminate or adversely affect the Buyer's rights thereunder.

17.     All defaults or other obligations of the Debtors under the Assumed Leases and Acquired Contracts arising or accruing prior to the satisfaction of the terms and conditions of the APA and the closing of the transactions contemplated under the APA (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer or the Debtors (in accordance with the APA) by payment of the applicable Cure Costs (such amounts as established in accordance with this Sale Approval Order and set forth hereto on Exhibit 2) at the closing or as soon thereafter as practicable, and the Buyer shall have no liability or obligation with respect to defaults, breaches or other obligations incurred, arising or accruing prior to the Closing Date, except as otherwise expressly provided herein or in the APA.

18.     The payment of the applicable Cure Costs, in the amounts set forth on Exhibit 2 hereto and in accordance with the APA, shall (a) effect a cure of all defaults existing thereunder as of the date that such Assumed Lease or Acquired Contract is assumed and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.  To the extent that any counterparty to an Assumed Lease or Acquired Contract did not object timely to its Cure Costs in accordance with the Procedures Order, such counterparty is deemed to have consented to such Cure Cost and the assignments of its respective Assumed Lease or Acquired Contract to the Buyer.

19.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption, assignment and/or transfer of the Assumed Leases and Acquired Contracts.

20.     The Debtors' or the Buyer's (or its designated affiliate's) promise to pay the Cure Costs and to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing Date shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order being assigned to it within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

21.     Notwithstanding anything to the contrary in this Sale Approval Order, no Acquired Contract or Assumed Lease shall be deemed to be assumed and assigned to the Buyer until the Closing of the sale.

22.     The Cure Costs paid by Buyer shall be a use of the Cash Consideration of the Unadjusted Purchase Price payable at Closing to Debtors.  Notwithstanding the sum of all Cure Costs set forth on Exhibit 2 hereto, Buyer shall in no event be liable for an aggregate amount of Cure Costs in excess of the Unadjusted Purchase Price.

23.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Lease or Acquired Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Leases and Acquired Contracts.

**Additional Provisions**

24.     The transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale to the Buyer.  The Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

25.     The consideration provided by the Buyer for the Acquired Assets under the APA (a) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of Columbia and (b) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

26.     The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise expressly provided in the APA, and the Sale Motion contains sufficient notice of such limitation in accordance with Bankruptcy Rules and applicable law.   Except to the extent the Buyer assumes the Assumed Liabilities pursuant to the APA, neither the purchase of the Acquired Assets by the Buyer or its affiliates, nor the fact that the Buyer or its affiliates are using any of the Acquired Assets previously operated by the Debtors, will cause the Buyer or any of its affiliates to be deemed a successor in any respect to the Debtors' businesses within the meaning of (i) any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), (ii) under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to

{2707273:}

which the Debtors are a party, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (v) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (vi) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes of any kind for any period, (viii) any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Acquired Assets prior to Closing, and (ix) any litigation.

27.     Each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release such creditor's Liens, Claims, Encumbrances and Interests in the Acquired Assets, if any, as such Liens, Claims, Encumbrances and Interests may have been recorded or may otherwise exist.  If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Liens, Claims, Encumbrances and Interests in, against or upon the Acquired Assets prior to the Closing Date of the sale, in proper form for filing and

executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction, releases of all Liens, Claims, Encumbrances and Interests which the person or entity has with respect to the Acquired Assets, then on the Closing Date, or as soon as possible thereafter, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Buyer is hereby authorized on behalf of each of the Debtors' creditors, to file, register, or otherwise record a certified copy of this Sale Approval Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Encumbrances and Interests in, against, or upon the Acquired Assets of any kind or nature whatsoever.

28.     All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date, or as otherwise directed by the Buyer, with the Liens, Claims, Encumbrances and Interests of such entity to be satisfied solely from the proceeds of the sale.

29.     Subject to the APA, this Sale Approval Order (a) is and shall be effective as a determination that, at Closing, all Liens, Claims, Encumbrances and Interests (except Assumed Liabilities) existing as to the Acquired Assets prior to the date of the Closing have been and hereby are unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyance described in this Sale Approval Order has been effected; (b) is and shall be effective to cause all Liens, Claims, Encumbrances and Interests (except Assumed Liabilities) to attach to and be perfected in the proceeds of the Sale of the Acquired Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, without the need to file any financing statements or other evidence of perfection; and (c)

is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

30.     The Debtors or the Buyer and any agent or representative of either of them, are each hereby authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation. deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Sale Approval Order and the APA to evidence and implement this paragraph of this Sale Approval Order. All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments, modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Sale Approval Order or the APA and the various documents related thereto.

31.     This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (b) compel delivery of the Acquired Assets to the Buyer, (c) resolve any disputes arising under or related to the APA and related agreements, (d) enjoin and adjudicate the assertion of any Liens, Claims, Encumbrances and Interests against the Buyer or the Acquired Assets, and (e) interpret, implement and enforce the provisions of this Sale Approval Order.

32. As of the Closing, all agreements and all orders of this Court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Approval Order and the APA.

33. Nothing contained (a) in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, (b) the order of confirmation confirming any plan of reorganization (or liquidation), (c) any order dismissing the Chapter 11 Cases or converting it to a chapter 7 liquidation or (d) any order appointing an examiner or trustee in the case shall conflict with or derogate from the provisions of the APA or the terms of this Sale Approval Order and no such plan or order shall discharge the obligations of the Debtors under this Sale Approval Order or the APA or any documents or agreements delivered in connection therewith.

34. The terms and provisions of the APA, together with the terms and provisions of this Sale Approval Order, shall be binding in all respects upon, and inure to the benefit of, the Buyer, the Debtors, the Debtors' estates, any of Debtors' affiliates, successors and assigns, the Debtors' creditors, equityholders, including, without limitation, minority equityholders of the Debtors, and third parties, including, but not limited to persons asserting a Claim against or interest in the Debtors' estates or any of the Acquired Assets to be sold to the Buyer pursuant to the APA or any persons that are party to any Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date, and their respective successors and assigns. If a trustee or examiner is subsequently appointed in the Chapter 11 Cases, such trustee or examiner shall likewise be bound, in all respects, to the terms and provisions of this Sale Approval Order.

35. Notwithstanding anything to the contrary in this Sale Approval Order or the APA, to the extent any of the Acquired Assets consist of an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as defined in

section 433.1 of title 16 of the Code of Federal Regulations), and if such interest is purchased under the APA, the Buyer shall remain subject to the claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as the Buyer would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under Bankruptcy Code section 363, as provided for in Bankruptcy Code section 363(o).

36.    The failure specifically to include any particular provisions of the APA in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

37.    To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of the Debtors' chapter 11 cases or the consummation of the transaction contemplated by the APA.

38.    Subject to the terms of the APA, the APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Buyer, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the APA and any related agreements.

39.    The provisions of this Order are non-severable and mutually dependent.

40.    The provisions of Bankruptcy Rules 6004(h) and 6006(d) staying the effectiveness of this Sale Approval Order for fourteen days are hereby waived, and this Sale Approval Order shall be effective immediately upon entry.

41.     To the extent that this Sale Approval Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Chapter 11 Cases, the terms of this Sale Approval Order shall govern.

*/e/ Gregory F. Kishel*

Dated:  May 10, 2011.

_____
Gregory F. Kishel
Chief United States Bankruptcy Judge

**EXHIBIT 1**

ASSET PURCHASE AGREEMENT

among

CAVE ENTERPRISES OPERATIONS, LLC

as "Buyer,"

and

DUKE AND KING ACQUISITION CORP.

as "Seller"


Dated April 26, 2011

# TABLE OF CONTENTS

ARTICLE I PURCHASE AND SALE OF THE ACQUIRED ASSETS ......................................1
    Section 1.1    Transfer of Acquired Assets. ..........................................................1
    Section 1.2    Excluded Assets. ..............................................................................3
    Section 1.3    Assumption of Liabilities. ................................................................4
    Section 1.4    Excluded Liabilities. ........................................................................5
    Section 1.5    Post-Closing Liabilities. ..................................................................5
ARTICLE II CONSIDERATION ...........................................................................................5
    Section 2.1    Purchase Price. ................................................................................5
    Section 2.2    Purchase Price Adjustment. ............................................................5
    Section 2.3    Closing Payments. ...........................................................................7
    Section 2.4    Payment of Cure Costs. ...................................................................8
    Section 2.5    On-Hand Cash. .................................................................................8
    Section 2.6    On-Hand Inventory. .........................................................................8
    Section 2.7    Transaction Taxes. ..........................................................................9
    Section 2.8    Allocation of Total Consideration. ..................................................9
ARTICLE III CLOSING AND DELIVERIES .......................................................................9
    Section 3.1    Closing. ............................................................................................9
    Section 3.2    Seller' Deliveries. ............................................................................9
    Section 3.3    Buyer's Deliveries. ........................................................................10
ARTICLE IV REPRESENTATIONS AND WARRANTIES ...............................................10
    Section 4.1    Representations and Warranties of Seller. .....................................10
    Section 4.2    Representations and Warranties of Buyer. .....................................11
    Section 4.3    Warranties Are Exclusive. .............................................................13
ARTICLE V COVENANTS AND OTHER AGREEMENTS ...............................................13
    Section 5.1    Covenants of Seller. .......................................................................13
    Section 5.2    Covenants of Buyer. .......................................................................14
    Section 5.3    Other Covenants. ...........................................................................15
    Section 5.4    Confidentiality. ..............................................................................15
ARTICLE VI CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES..............16
    Section 6.1    Conditions Precedent to Performance by Seller. ...........................16
    Section 6.2    Conditions Precedent to the Performance by Buyer. .....................16
    Section 6.3    Representations and Warranties of Seller. .....................................17
    Section 6.4    Performance of the Obligations of Seller. ......................................17
    Section 6.5    Governmental Consents and Approvals. ........................................17
    Section 6.6    Closing Deliveries. ........................................................................17
ARTICLE VII TERMINATION ..........................................................................................17
    Section 7.1    Conditions of Termination. ............................................................17
    Section 7.2    Effect of Termination; Remedies. ..................................................18
    Section 7.3    Exclusive Remedy; Waiver. ..........................................................18
ARTICLE VIII SURVIVAL AND INDEMNIFICATION ...................................................19
    Section 8.1    Survival; Indemnification. .............................................................19
ARTICLE IX MISCELLANEOUS .......................................................................................19
    Section 9.1    Alternative Transaction. .................................................................19

Section 9.2    Further Assurances. ................................................................. 19
Section 9.3    Successors and Assigns. ............................................................ 19
Section 9.4    Governing Law; Jurisdiction. ...................................................... 19
Section 9.5    Expenses. ................................................................................. 19
Section 9.6    Broker's and Finder's Fees. ........................................................ 19
Section 9.7    Severability. ............................................................................. 20
Section 9.8    Notices. .................................................................................... 20
Section 9.9    Amendments; Waivers. ............................................................. 21
Section 9.10   Public Announcements ............................................................. 21
Section 9.11   Entire Agreement. .................................................................... 21
Section 9.12   No Third Party Beneficiaries. .................................................... 21
Section 9.13   Headings. ................................................................................ 22
Section 9.14   Counterparts; Delivery. ............................................................ 22
Section 9.15   Construction. ........................................................................... 22
Section 9.16   Bulk Sales. .............................................................................. 22
**ARTICLE X DEFINITIONS** ..................................................................... **22**

## EXHIBITS

Exhibit A ............................................................................... Sale Procedures
Exhibit B ............................................................... Form of Deposit Escrow Agreement
Exhibit C .................................................................................... Form of Sale Order

## SCHEDULES

Schedule A ....................................................... Illinois-Wisconsin Region Stores List
Schedule B ............................................................... Franchise Agreements List
Schedule 1.1(g) ...................................................................... Acquired Contracts List
Schedule 1.2(l) ............................................................................ Excluded Assets List
Schedule 1.2(m) ................................................................ Rejected Real Property Leases
Schedule 2.1 ........................................ Regional Allocation of Unadjusted Purchase Price
Schedule 2.8 .................................................................... Allocation of Purchase Price

<u>ASSET PURCHASE AGREEMENT</u>

THIS ASSET PURCHASE AGREEMENT (this "**Agreement**"), dated as of April 26, 2011 (the "**Execution Date**"), is made by and between **DUKE AND KING ACQUISITION CORP.**, a Delaware corporation ("**Seller**"), and **CAVE ENTERPRISES OPERATIONS, LLC**, a Delaware limited liability company ("**Buyer**"). Unless otherwise set forth herein, capitalized terms used in this Agreement are defined or cross-referenced in Article X.

## RECITALS

WHEREAS, on December 4, 2010 (the "**Petition Date**"), Seller commenced voluntary cases (collectively, the "**Bankruptcy Case**") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "**Bankruptcy Code**") in the United States Bankruptcy Court for the District of Minnesota (the "**Bankruptcy Court**");

WHEREAS, this Agreement shall constitute the APA (as such term is defined in the Sale Procedures);

WHEREAS, Buyer desires to purchase the Acquired Assets and assume the Assumed Liabilities from Seller, and Seller desires to sell, assign, transfer, convey and deliver to Buyer the Acquired Assets together with the Assumed Liabilities, all in the manner and subject to the terms and conditions set forth in this Agreement and the Sale Order and in accordance with sections 105, 363, 365, 1146 and all other applicable provisions of the Bankruptcy Code; and

WHEREAS, Buyer has made, or will make concurrent with the execution of this Agreement, a deposit in an amount equal to ten percent (10%) of the Unadjusted Purchase Price (the "**Deposit**") into an escrow account (the "**Deposit Escrow Account**") to be established and governed by the terms of the Deposit Escrow Agreement executed concurrently herewith.

NOW, THEREFORE, in consideration of the foregoing and their respective representations, warranties, covenants and agreements herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Seller and Buyer hereby agree as follows:

## ARTICLE I
## PURCHASE AND SALE OF THE ACQUIRED ASSETS

**Section 1.1** <u>**Transfer of Acquired Assets.**</u> At the Closing, and upon the terms and conditions set forth herein, Seller shall sell, assign, transfer, convey and deliver to Buyer free and clear of all Liens, Claims and Interests, and Buyer shall purchase from Seller, all of Seller's right, title and interest of every kind and nature (including indirect and other forms of beneficial ownership) in and to all of the properties, assets and rights (contractual or otherwise) in each of the Illinois-Wisconsin Region Stores as of the Closing Date, whether tangible or intangible, real or personal and wherever located and by whomever possessed, but excluding the assets, properties and rights included in the Excluded Assets pursuant to Section 1.2 (collectively, the "**Acquired Assets**"):

(a)     Petty and other restaurant operating cash (excluding cash in-transit) on-hand at the Illinois-Wisconsin Region Stores on the Closing Date in the amount determined pursuant to Section 2.5 (the "**On-Hand Cash**");

(b)     The leased real property of Seller leased pursuant to the leases included in the Acquired Contracts, to the extent assignable and transferable, including all Leasehold Improvements thereon (collectively, the "**Leased Real Property**");

(c)     All tangible personal property, including all machinery, equipment, supplies, materials, office furniture and office equipment, computers, mobile phones, personal digital assistants, fixtures, trade fixtures, computer equipment, hardware, peripherals, information technology infrastructure, telephone systems, computing and telecommunications equipment and other items of personal property owned or leased by Seller for use in the Illinois-Wisconsin Region Stores, and all warranties and licenses thereunder or related thereto;

(d)     Prepaid expenses of Seller, but solely to the extent the benefit of such prepaid expenses accrue to Buyer post-Closing ("**Prepaid Expenses**");

(e)     All deposits, advances, prepayments, rights in respect of promotional allowances, vendor rebates and to other refunds, Claims, causes of action, rights of recovery, rights under warranties and guaranties, rights of set-off and rights of recoupment of every kind and nature (whether or not known or unknown or contingent or non-contingent), and the right to receive and retain mail and other communications of the Seller ("**Acquired Deposits**"), but excluding the Rebates, Utility Deposits and Corporate Level deposits;

(f)     All advertising and promotional materials and any rights thereto possessed, or entitled to be used, by Seller;

(g)     The Contracts listed on Schedule 1.1(g), to the extent assignable and transferable, other than those excluded by Buyer from the Acquired Assets pursuant to Section 1.2(m) hereof (if any), but including all contractual rights (including rights to indemnification, exculpation, advancement or reimbursement of expenses), Claims, causes of action, choses in action, lawsuits, demands and judgments in law or in equity, of every kind and nature, that Seller has or may have against any other Person and that are related to the Acquired Contracts, other than those excluded pursuant to Section 1.2 (the "**Contract Claims**" and such acquired contracts, the "**Acquired Contracts**");

(h)     All Inventory (as valued pursuant to Section 2.6) (the "**On-Hand Inventory**") and all Supplies on-hand in the Illinois-Wisconsin Region Stores;

(i)     All permits, registrations, Orders, operating permits, certificates of occupancy, approvals, authorizations and licenses (collectively, the "**Permits**") issued to Seller by any Government or other third party, to the extent assignable;

(j)     All insurance benefits, rights and proceeds arising from or relating to any event or incident that affects, impacts or alters any Acquired Asset between the Execution Date and the Closing Date;

(k)     Except as otherwise excluded under Section 1.2, all rights, Claims, rights of offset, causes of action, lawsuits, judgments and other Claims or demands of any nature

against any third party arising out of, and only with respect to, the Acquired Assets or Assumed Liabilities;

(l)     All books, files and records held or otherwise owned by Seller that relate to current or former employees and other personnel, including, without limitation, books, files and records that are related to medical history, medical insurance or other medical matters and to workers' compensation and to the evaluation, appraisal or performance of current or former employees and other personnel of Seller (collectively, the "**Employee Records**");

(m)     Copies of all books, files and records of sales and general business operations of the Illinois-Wisconsin Region Stores, and Seller's supplier lists for the Illinois-Wisconsin Region Stores;

(n)     All goodwill as a going concern and all other right, title and interest of Seller in and to the general intangibles incident to its business at the Illinois-Wisconsin Region Stores;

(o)     Any and all computer applications, software, owned or licensed, whether for general business usage (e.g., accounting, word processing, graphics, spreadsheet analysis, etc.) or specific, unique-to-the-business usage, all computer operating, security or programming software, owned or licensed by the Seller, and, in each case, all source code, executable code, data, databases and related documentation of any of the foregoing and copies and tangible embodiments of any of the foregoing in whatever form or medium, except to the extent included in the Corporate Levels Assets;

(p)     All telephone numbers, fax numbers, email addresses, websites, URLs and internet domain names, except to the extent included in the Corporate Levels Assets; and

(q)     All Claims and rights of action arising under Chapter 5 of the Bankruptcy Code relating to any of the Critical Vendors, including any proceeds thereof.

**Section 1.2     Excluded Assets.** Notwithstanding anything to the contrary in this Agreement, Seller shall retain its right, title and interest in, to and under all of its properties, assets and rights not otherwise an Acquired Asset (collectively, the "**Excluded Assets**"), including, those assets, properties and rights of Seller that are not included in or used in the operation of the Illinois-Wisconsin Region Stores and:

(a)     All of Seller's cash, checks, cash equivalents, and cash in-transit, but excluding On-Hand Cash;

(b)     All trade accounts receivable of Seller in existence as of the Closing Date (collectively, the "**Accounts Receivable**");

(c)     All amounts and funds (rebates and dividends) on account of, accrued by or due from The Coca-Cola Company, Dr. Pepper/Seven Up Company or Restaurant Services, Inc., or any affiliate thereof, to Seller pursuant to any agreement or arrangement with such companies for all periods prior to the Closing (collectively, the "**Rebates**");

(d)     All equity ownership interests in Seller;

(e)     All rights to refunds of, credits for, and Claims in connection with Taxes of Seller, and any records relating to Taxes of Seller;

(f)     Subject to <u>Section 1.1(j)</u>, all insurance premiums, policies, contracts and coverage obtained by Seller and all rights to insurance proceeds or other Contracts of insurance or indemnity (or similar agreement) recoveries;

(g)     Subject to <u>Section 1.1(q)</u>, all avoidance Claims and causes of action arising under Chapter 5 of the Bankruptcy Code and any related Claims and causes of action under applicable non-bankruptcy law arising out of the same set of facts, and the proceeds from any of the foregoing;

(h)     All rights of and benefits to Seller under this Agreement, the Ancillary Agreements or any other agreements or instruments otherwise delivered, executed or made in connection with this Agreement;

(i)     Each Contract to which Seller is a party that is not an Acquired Contract and all deposits, Claims, rebates or refunds thereunder or related thereto;

(j)     All utility deposits paid by Seller prior to the Closing Date and all rights to the refund of all or any portion thereof ("**Utility Deposits**");

(k)     All Corporate Level assets, properties and right;

(l)     The assets listed on <u>Schedule 1.2</u>;

(m)     Subject to <u>Section 1.6</u>, the real property leased to Seller pursuant to the real property leases listed on <u>Schedule 1.2(m)</u>, including all Leasehold Improvements thereon (collectively, the "**Rejected Leased Real Property**"); and

(n)     Corporate seals, minute books, charter documents, stock transfer records, record books, original Tax and financial records and such other files, books and records relating to any of the Excluded Assets or to the organization, existence or capitalization of Seller.

     **Section 1.3     Assumption of Liabilities.** At the Closing, Buyer shall not assume any obligations or Liabilities from Seller other than those obligations and Liabilities expressly listed below (all such Liabilities and obligations assumed pursuant to this <u>Section 1.3</u>, the "**Assumed Liabilities**"):

(a)     To the extent reflected on the Final Closing Net Working Capital Statement, all accounts payables of the Illinois-Wisconsin Region Stores arising in the ordinary course of business after the Petition Date (which, for clarity, does not include (i) Corporate Level accounts payable of Seller and (ii) Liabilities arising from breach of contract, breach of warranty, tort, infringement, lawsuits or violation of Law by Seller prior to the Closing Date) (collectively, the "**Accounts Payable**");

(b)     To the extent reflected on the Final Closing Net Working Capital Statement, all accrued operating expenses of the Illinois-Wisconsin Region Stores arising in the ordinary course of business after the Petition Date, including The Coca-Cola

Company and Dr. Pepper/Seven Up Company Restaurant Operating Fund Advances (which, for clarity, does not include Corporate Level accrued expenses of Seller) ("**Accrued Expenses**");

(c)    All accrued but unpaid real estate and personal property Taxes, and other related assessments and fees, if any, related to or arising from the ownership of the Acquired Assets (the "**Property Taxes**"); and

(d)    To the extent reflected on the Final Closing Net Working Capital Statement, all accrued but unpaid wages, salaries, benefits, vacation pay, employee-related Taxes, and temporary labor Liabilities of the Illinois-Wisconsin Region Stores payable in the ordinary course of business as of the Closing (collectively, "**Payroll Liabilities**").

This Section 1.3 shall not limit any claims or defenses Buyer may have against any party other than the Seller. The transactions contemplated by this Agreement shall in no way expand the rights or remedies of any third party against Buyer or the Seller as compared to the rights and remedies which such third party would have had against the Seller had Buyer not assumed such Assumed Liabilities.

Section 1.4    **Excluded Liabilities.**  Buyer is assuming only the Assumed Liabilities and is not assuming, and shall not be the successor to, any other Liability or obligation of Seller or any predecessor or Affiliate of Seller whatsoever, or any Liability or obligation related to Seller's businesses of any nature (either pre-petition or post-petition), including, any direct or indirect Indebtedness, guaranty, endorsement, Claim, loss, damage, deficiency, cost, expense, obligation or responsibility, whether fixed or unfixed, known or unknown, asserted or unasserted, absolute or contingent, accrued or unaccrued, due or to become due, choate or inchoate, liquidated or unliquidated, secured or unsecured. All such other Liabilities and obligations shall be retained by, and remain Liabilities and obligations of, Seller (all such Liabilities are, collectively, the "**Excluded Liabilities**"). The Parties acknowledge and agree that disclosure of any Liability on any Schedule to this Agreement shall not create an Assumed Liability or other Liability of Buyer, except where such disclosed Liability or obligation has been expressly assumed by Buyer as an Assumed Liability under Section 1.3.

Section 1.5    **Post-Closing Liabilities.**  Buyer acknowledges that Buyer shall be responsible for all Liabilities and obligations relating to Buyer's ownership or use of, or right to use, the Acquired Assets and the Assumed Liabilities after the Closing Date, including without limitation all Taxes arising out of or related to the Acquired Assets or the operation or conduct of the business acquired pursuant to this Agreement for all Tax periods beginning on or after the Closing Date.

## ARTICLE II
## CONSIDERATION   995,000

Section 2.1    **Purchase Price.**  The aggregate consideration for the Acquired Assets shall be: (a) an aggregate amount in cash equal to $~~643,898~~ (which cash consideration shall be paid in accordance with Section 2.3 and which cash consideration shall be allocated between the Illinois-Wisconsin Region Stores as set forth on Schedule 2.1) (the "**Unadjusted Purchase Price**"), subject to post-Closing adjustment as provided in Section 2.2 (as so adjusted, the "**Final Purchase Price**"); *plus* (b) the assumption by Buyer of the Assumed Liabilities (such assumption, together with the Final Purchase Price, the "**Total Consideration**").

**Section 2.2**    <u>Purchase Price Adjustment</u>.

(a)    As promptly as practicable, but in no event later than thirty (30) days after the Closing Date, Seller shall prepare and deliver to Buyer a calculation (the "**Closing Net Working Capital Statement**") of Seller's Net Working Capital associated with the Illinois-Wisconsin Region Stores as of the close of business on the day before the Closing Date (which, subject to <u>Sections 2.5</u> and <u>2.6</u>, for purposes of clarity, may extend into the Closing Date for accounting purposes due to restaurants closing after midnight) (the "**Initial Net Working Capital**"), with appropriate supporting documentation.

(b)    If Buyer disagrees with the Initial Net Working Capital, Buyer may, within fifteen (15) days after receipt of the Initial Net Working Capital, deliver a notice to Seller disagreeing with such calculation and setting forth Buyer's calculation of such amount ("**Buyer's Notice**"). Buyer's Notice shall specify in reasonable detail those items or amounts as to which Buyer disagrees.

(c)    If Buyer's Notice is duly delivered, Buyer and Seller shall work in good faith and use their commercially reasonable efforts to reach agreement on the disputed items or amounts in order to determine, as may be required, the amount of Net Working Capital associated with the Illinois-Wisconsin Region Stores as of the close of business on the day before the Closing Date. If Buyer and Seller are unable to reach such agreement within ten (10) days from Seller's receipt of Buyer's Notice, the Bankruptcy Court shall determine the amount of the disputed items and the final Net Working Capital for the Illinois-Wisconsin Region Stores, provided, the Bankruptcy Court shall not assign a value greater than the greatest value for any item in dispute claimed by either party or smaller than the smallest value for such item claimed by either party. In making such calculation, the Bankruptcy Court shall consider only those items or amounts in the Initial Net Working Capital with which Buyer disagreed. The fees, costs and expenses of the Bankruptcy Court's review of the Net Working Capital pursuant to this <u>Section 2.2(c)</u> shall be paid (i) by the Seller if the items covered thereby are resolved in favor of Buyer or (ii) by Buyer if the items covered thereby are resolved in favor of the Seller. If the items referred to therein are resolved in part in favor of the Seller and in part in favor of Buyer, such fees, costs and expenses shall be shared by the Seller and Buyer in proportion to the aggregate dollar amount of items resolved in favor of the Seller compared to the aggregate dollar amount of items resolved in favor of Buyer. The amount of the Net Working Capital of the Illinois-Wisconsin Region Stores as of the close of business on the day before the Closing Date as determined pursuant to this <u>Section 2.2(c)</u> or <u>Section 2.2(e)</u> shall be referred to as the "**Closing Net Working Capital**." The term "**Final Closing Net Working Capital Statement**," as used in this Agreement, shall mean the definitive Closing Net Working Capital Statement accepted by Buyer or otherwise agreed to by the Seller and Buyer in accordance with <u>Section 2.2(e)</u> or the definitive Closing Net Working Capital Statement resulting from the determinations made by the Bankruptcy Court in accordance with this <u>Section 2.2(c)</u> (in addition to those items theretofore accepted by the Seller or agreed to by the Seller and Buyer).

(d)    Buyer and Seller shall, and shall cause their respective Related Persons to, cooperate and assist in the calculation of Closing Net Working Capital and in the conduct of the

reviews referred to in this Section 2.2, including, making available, to the extent necessary, their respective books, records, work papers and personnel. All amounts to be determined pursuant to this Section 2.2 shall be determined in accordance with generally accepted accounting principles in the United States consistently applied ("GAAP") using Seller' historical methodologies and practices (to the extent in accordance with GAAP).

(e)     The date upon which the Closing Net Working Capital shall be deemed final shall be the earlier to occur of the following: (i) Buyer's acceptance of the Initial Net Working Capital determined by Seller; (ii) Buyer's failure to provide a Buyer Notice within fifteen (15) days of its receipt of the Initial Net Working Capital from Seller; (iii) the mutual written agreement of Buyer and Seller; or (iv) a final determination by the Bankruptcy Court in accordance with Section 2.2(c) (such date, "**Final Determination Date**").

(f)     If the Target Net Working Capital is greater than the Closing Net Working Capital (such shortfall amount, the "**Overpayment Amount**"), then within three (3) Business Days of the Final Determination Date, Seller and Buyer shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to (A) pay to Buyer, by wire transfer of immediately available funds from the Working Capital Escrow Account, an amount equal to the Overpayment Amount, and (B) pay to Seller, by wire transfer of immediately available funds and as more particularly described in the Working Capital Escrow Agreement, all remaining funds, if any, in the Working Capital Escrow Account after payment to Buyer of the Overpayment Amount. If, and only if, the Overpayment Amount is greater than the amounts then held in the Working Capital Escrow Account, then, within three (3) Business Days of the Final Determination Date, Seller shall pay to Buyer, by wire transfer of immediately available funds the amount by which the Overpayment Amount is greater than the amounts then held in the Working Capital Escrow Account. For the avoidance of doubt, any amount by which the Overpayment Amount exceeds the amounts in the Working Capital Escrow Account shall be entitled to administrative expense priority under section 503(b) of the Bankruptcy Code.

(g)     If the Closing Net Working Capital exceeds the Target Net Working Capital (such excess amount, the "**Underpayment Amount**"), then within three (3) Business Days of the Final Determination Date, (i) Buyer and the Seller shall deliver joint written instructions to the Escrow Agent to cause the Escrow Agent to pay to the Seller, by wire transfer of immediately available funds from the Working Capital Escrow Account and as more particularly described in the Escrow Agreement, all amounts in the Working Capital Escrow Account, and (ii) Buyer shall pay to the Seller an aggregate amount equal to the Underpayment Amount.

**Section 2.3**     **Closing Payments** At the Closing, Buyer shall pay the Unadjusted Purchase Price as follows:

(a)     by instruction to the Escrow Agent to release $50,000 (the "**Working Capital Escrow Amount**") (which amount shall be allocated between the Illinois-Wisconsin Region Stores as set forth on Schedule 2.1) from the Deposit Escrow Account into an

escrow account (the "**Working Capital Escrow Account**") to be established pursuant to the Working Capital Escrow Agreement;

(b)    by instruction to the Escrow Agent to release the remainder of funds in the Deposit Escrow Account (after the transfer of funds set forth in Section 2.3(a) above), by wire transfer of immediately available funds to an account specified in writing by Seller, or by the Bankruptcy Court, as the case may be;

(c)    by wire transfer of immediately available funds directly to the appropriate counterparties to the Acquired Contracts of any Cure Costs as determined by the Bankruptcy Court in the Assignment Order;

(d)    by deposit of an amount equal to the aggregate amount of Cure Costs, if any, that remain in dispute between Seller and the appropriate counterparties as of the Closing Date (the "**Cure Costs Dispute Escrow Amount**") (which amount shall be allocated between the Illinois-Wisconsin Region Stores in proportion to the Cure Costs associated with Acquired Contracts from each such region) into an escrow account (the "**Cure Costs Dispute Escrow Account**") to be established pursuant to the Cure Costs Dispute Escrow Agreement; and

(e)    by wire transfer of immediately available funds of the remaining balance of the Unadjusted Purchase Price (after reduction pursuant to Sections 2.3(c) and 2.3(d) (if any) and after credit for the Deposit) to an account specified by Seller in writing, or the Bankruptcy Court, as the case may be.

Section 2.4    **Payment of Cure Costs.** At the Closing, pursuant to Section 2.3 above, Buyer shall pay any Cure Costs as determined by the Bankruptcy Court in the Assignment Order directly to the appropriate counterparties to the Acquired Contracts; provided, however, that in the event any such cure amount remains the subject of a dispute at the Closing Date, Buyer shall deposit the Cure Cost Dispute Escrow Amount into the Cure Costs Dispute Escrow Account and shall pay each such cure amount upon the entry of an Order of the Bankruptcy Court settling such dispute from funds in the Cure Costs Dispute Escrow Account.

Section 2.5    **On-Hand Cash.** Immediately after the close of business on the day before the Closing Date, which for purposes of this Section 2.5 shall be deemed to be a mutually agreed upon time no later than 10:00 pm local time, Seller will count the On-Hand Cash at each of Seller's Illinois-Wisconsin Region Stores (after depositing cash received from operations that day) and create a written summation of such On-Hand Cash, subtotaled by currency denomination. Buyer or its representatives may observe any physical count at Buyer's expense. Copies of such summations will be promptly provided to Buyer. For additional clarity, checks or similar cash equivalents, cash in-transit and non-operating cash are not included in "On-Hand Cash."

Section 2.6    **On-Hand Inventory.** Immediately after the close of business on the day before the Closing Date, which for purposes of this Section 2.6 shall be deemed to be a mutually agreed upon time no later than 10:00 pm local time, Seller shall perform a physical count of all Inventory at each of Seller's Illinois-Wisconsin Region Stores. Buyer or its representatives may observe any physical count at Buyer's expense. Seller shall create a written summation of the amount of Inventory counted and its value, each subtotaled by restaurant and by type of Inventory. The physical count and the Inventory valuation shall be based on and in accordance with Seller's prior

practices and methodologies. A copy of the summation will be promptly provided to Buyer. If Buyer objects to the inclusion of any item or items of Inventory in the summation, Buyer shall notify Seller immediately, and Buyer and Seller shall cooperate in good faith to mutually agree upon a resolution of any such dispute. If the parties cannot resolve such dispute by the Closing Date, such dispute shall be submitted to the Bankruptcy Court for a final, binding determination.

Section 2.7    **Transaction Taxes.**    All Taxes, including all state and local Taxes in connection with the transfer of the Acquired Assets and all recording and filing fees (collectively, "**Transaction Taxes**"), that may be imposed by reason of the sale, transfer, assignment and delivery of the Acquired Assets, and that are not exempt under §1146(a) of the Bankruptcy Code, shall be borne by Buyer. Buyer and Seller shall cooperate to (a) determine the amount of Transaction Taxes payable in connection with the transactions contemplated under this Agreement; (b) provide all requisite exemption certificates; and (c) prepare and file any and all required Tax Returns for or with respect to such Transaction Taxes with any and all appropriate Government taxing authorities.

Section 2.8    **Allocation of Total Consideration.**    Buyer and Seller shall allocate the Total Consideration among the Acquired Assets in accordance with Schedule 2.8 (the "**Allocation**") to be mutually agreed upon by the parties prior to Closing. The Allocation will be binding upon Buyer and Seller and their respective successors and assigns, and none of the parties to this Agreement will take any position (whether in returns, audits or otherwise) that is inconsistent with the Allocation. Buyer and Seller will report the purchase and sale of the Acquired Assets on all tax returns, including Form 8594 as provided for in section 1060 of the Code, in accordance with the Allocation and will cooperate in timely filing with the Internal Revenue Service their respective Forms 8594.    *BJM*

### ARTICLE III
### CLOSING AND DELIVERIES — *the entry of the Sale Order, subject to*

Section 3.1    **Closing.**    The consummation of the transactions contemplated by this Agreement (the "**Closing**") shall take place on the ~~second~~ Business Day following the satisfaction or waiver by the appropriate party of all the conditions contained in Article VI or on such other date or at such other time as may be mutually agreed to by the parties (the "**Closing Date**") and shall be effective as of 12:01 a.m. on the Closing Date. Subject to such different procedures agreed upon by the parties, the Closing shall take place via a "paper" close wherein Buyer and Seller shall exchange such documents and instruments or copies thereof sufficient to effect the Closing by electronic or other means without the use of a "roundtable" closing at a particular location. All proceedings to be taken and all documents to be executed and delivered by all parties at the Closing shall be deemed to have been taken and executed simultaneously and no proceedings shall be deemed to have been taken nor documents executed or delivered until all have been taken, executed and delivered.

Section 3.2    **Seller's Deliveries.**    Seller shall deliver to Buyer at or prior to the Closing or such other time as set forth in this Agreement:

(a)    A bill of sale for all of the Acquired Assets that are tangible personal property, without representation, warranty or covenant of any kind;

(b)    An agreement for the assumption of the Assumed Liabilities, without representation, warranty or covenant of any kind;

(c)     For all intangible Acquired Assets, including all Acquired Contracts, (i) an agreement of assumption and assignment, without any representation, warranty or covenant of any kind, or (ii) an Assignment Order effecting the same;

(d)     A certificate, dated the Closing Date, signed by its Secretary, certifying to the accuracy of the matters set forth in <u>Section 6.2(a)</u>;

(e)     Each of the Working Capital Escrow Agreement and the Cure Costs Dispute Escrow Agreement, duly executed by the Seller; and

(f)     Such other agreements, documents or instruments of assignment and transfer that Buyer may reasonably request.

**Section 3.3     <u>Buyer's Deliveries</u>.**  Buyer shall deliver to Seller at or prior to the Closing or such other time as set forth:

(a)     The Unadjusted Purchase Price in accordance with <u>Section 2.3</u>;

(b)     A duly executed counterpart of Buyer to each of the documents listed in <u>Section 3.2(b)</u> and <u>3.2(c)</u>;

(c)     A certificate, dated the Closing Date, signed by its Secretary, certifying the accuracy of the matters set forth in <u>Section 6.1(a)</u>;

(d)     Each of the Working Capital Escrow Agreement and the Cure Costs Dispute Escrow Agreement, duly executed by Buyer and Escrow Agent; and

(e)     Such other agreements, documents or instruments of assignment and transfer that Seller may reasonably request.

**ARTICLE IV**
**REPRESENTATIONS AND WARRANTIES**

**Section 4.1     <u>Representations and Warranties of Seller</u>.**  Seller hereby represents and warrants to Buyer as of the Execution Date as follows:

(a)     <u>Authorization and Validity</u>. Subject to the Bankruptcy Court's entry of the Sale Order and the Assignment Order, (i) Seller has all requisite power and authority to enter into this Agreement and any Ancillary Agreements to which Seller is a party and to perform its obligations hereunder and thereunder; and (ii) this Agreement constitutes Seller's valid and binding obligation, enforceable against Seller in accordance with its respective terms.

(b)     <u>No Conflict or Violation</u>. The execution, delivery and performance by Seller of this Agreement and any Ancillary Agreement to which Seller is a party does not (i) violate or conflict with any provision of Seller's certificate of incorporation or bylaws or similar organizational documents, (ii) violate any provision of law, or any Order, judgment or decree of any court or Government applicable to Seller or any of its properties or assets; or (iii) violate or result in a material breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which

Seller is a party or by which Seller is bound and to which any of the Acquired Assets is subject.

(c)      Title to Assets. Seller owns, and has good, valid, and marketable title to, all of the Acquired Assets owned by it.

(d)      Reports; Financial Statements; Inventory.

         (i)      Attached hereto as Schedule 4.1(d) are true and complete copies of the internally prepared, unaudited statements of income of each of the Illinois-Wisconsin Region Stores for the fiscal years ended December 31, 2008, December 31, 2009 and December 31, 2010 (such financial statements, the "**Financial Statements**"). The Financial Statements present fairly, in all material respects, the results of operations of each of the Illinois-Wisconsin Region Stores for the respective periods set forth therein and have been prepared on a basis consistent with Seller's past practices.

         (ii)      The Inventory of the Illinois-Wisconsin Region Stores (A) consists of materials and goods useable or saleable in the ordinary course of business (taking into account the quantity and quality of the Inventory), and (B) is not expired, spoiled or damaged. None of the Inventory in any of the Illinois-Wisconsin Region Stores is subject to any consignment, bailment, warehousing or similar agreement.

(e)      Title to Acquired Assets. Subject to the entry of the Sale Order and the Assignment Order, at the Closing, Buyer will obtain good and marketable title to or a valid and enforceable right by Contract to use, the Acquired Assets which shall be transferred to Buyer free and clear of all Liens, Claims and Interests. The Seller owns or leases all buildings, machinery, equipment, and other tangible assets necessary for the conduct of the Seller's operations at the Illinois-Wisconsin Region Stores as presently conducted. Except for the Excluded Assets identified in Sections 1.2(a), (b), (c), (f), (i), (j), (k) and (m) the Acquired Assets constitute all of the assets, agreements, licenses and properties owned by them and are all assets (tangible and intangible), agreements, licenses and properties necessary to conduct the Business as presently conducted. All of the Acquired Assets are in good operating condition and repair (ordinary wear and tear excepted) and are fit for use in the ordinary course of business.

**Section 4.2**      **Representations and Warranties of Buyer.** Buyer hereby represents and warrants to Seller as of the Execution Date as follows:

(a)      Corporate Organization. Buyer is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware and has all requisite corporate power and authority to own its properties and assets and to conduct its business as now conducted.

(b)      Qualification to Conduct Business. Buyer is duly qualified to do business as a foreign corporation and is in good standing in every jurisdiction in which the

character of the properties owned or leased by it or the nature of the business conducted by it makes such qualification necessary.

(c) <u>Authorization and Validity</u>. Buyer has all requisite corporate power and authority to enter into this Agreement and any Ancillary Agreement to which Buyer is a party and to perform its obligations hereunder and thereunder. The execution and delivery of this Agreement and any Ancillary Agreement to which Buyer is a party and the performance of Buyer's obligations hereunder and thereunder have been, or on the Closing Date will be, duly authorized by all necessary corporate action of Buyer, and no other corporate proceedings on the part of Buyer are necessary to authorize such execution, delivery and performance. This Agreement has been, and any Ancillary Agreement to which Buyer is a party has been duly executed by Buyer and constitutes Buyer's valid and binding obligations, enforceable against it in accordance with their respective terms.

(d) <u>No Conflict or Violation</u>. The execution, delivery and performance by Buyer of this Agreement and any Ancillary Agreement to which Buyer is a party does not (i) violate or conflict with any provision of Buyer's certificate of incorporation or bylaws or similar organizational documents; (ii) violate any provision of Law, or any Order, judgment or decree of any court or Government applicable to Buyer or any of its properties or assets; or (iii) violate or result in a breach of or constitute (with due notice or lapse of time or both) a default under any material Contract to which Buyer is party or by which Buyer is bound or to which any of Buyer's properties or assets is subject.

(e) <u>Consents and Approvals</u>. Other than the entry of the Sale Order, no consent, waiver, authorization or approval of any Person or declaration, filing or registration with any Government is required in connection with the execution and delivery by Buyer of this Agreement or any Ancillary Agreement to which Buyer is a party or the performance by Buyer of its obligations hereunder or thereunder.

(f) <u>Adequate Assurances Regarding Acquired Contracts</u>. Buyer is capable of satisfying the conditions contained in sections 365(b) and 365(f) of the Bankruptcy Code with respect to the Acquired Contracts.

(g) <u>Franchise Agreements</u>. As of the Execution Date, Buyer has obtained, and has provided Seller with written evidence of, Franchisor's consent for the assignment to, and assumption by, Buyer of the Franchise Agreements (or alternatively, consent for the execution of new Franchise Agreements as may be required by Franchisor), wherein Buyer will become a duly authorized operator of Burger King® restaurants upon the Closing ("**Franchisor's Consent**").

(h) <u>Litigation</u>. There are no claims, actions, suits, proceedings or investigations pending, threatened in writing or against Buyer, or any Related Person of Buyer, that could affect the ability of Buyer to consummate the transactions contemplated by this Agreement and each Ancillary Agreement.

(i) <u>Adequacy of Funds</u>. Buyer shall have at Closing cash on hand, existing availability under existing lines of credit, or other immediately available financial resources

sufficient to pay the Unadjusted Purchase Price at Closing, and any further adjustment thereto pursuant to Section 2.2 thereafter.

**Section 4.3** **Warranties Are Exclusive.** The parties acknowledge that the representations and warranties contained in this Article IV are the only representations or warranties given by the parties and that all other express or implied warranties are disclaimed and Buyer hereby expressly disclaims any other representations or warranties, whether made by it or any of its Affiliates, officers, directors, employees, agents or representatives. Without limiting the foregoing, Buyer acknowledges that, except for the representations and warranties contained in Section 4.1, the Acquired Assets are conveyed "AS IS", "WHERE IS" and "WITH ALL FAULTS" and that all warranties of merchantability or fitness for a particular purpose are disclaimed. WITHOUT LIMITING THE FOREGOING, BUYER ACKNOWLEDGES THAT, EXCEPT FOR THE REPRESENTATIONS AND WARRANTIES CONTAINED IN Section 4.1, SELLER AND ITS RELATED PERSONS AND AFFILIATES HAVE MADE NO REPRESENTATION OR WARRANTY CONCERNING ANY (A) USE TO WHICH THE ACQUIRED ASSETS MAY BE PUT, (B) FUTURE REVENUES, COSTS, EXPENDITURES, CASH FLOW, RESULTS OF OPERATIONS, FINANCIAL CONDITION OR PROSPECTS THAT MAY RESULT FROM THE OWNERSHIP, USE OR SALE OF THE ACQUIRED ASSETS OR THE ASSUMPTION OF THE ASSUMED LIABILITIES OR (C) OTHER INFORMATION OR DOCUMENTS MADE AVAILABLE TO BUYER OR ITS AFFILIATES OR RELATED PERSONS. Buyer acknowledges that Buyer has conducted, or has had an adequate opportunity to conduct, its due diligence investigation related to Seller's business and operations, the Acquired Assets, the Assumed Liabilities, and all matters related thereto. In proceeding with the transactions contemplated in this Agreement, except for any representations and warranties expressly set forth in Section 4.1, Buyer is doing so based solely upon its own due diligence and review, and Buyer has not relied upon any oral or written statements, representations or guaranties whatsoever, whether express or implied, made by Seller or its agents and representatives.

## ARTICLE V
## COVENANTS AND OTHER AGREEMENTS

**Section 5.1** **Covenants of Seller.** Seller covenants to Buyer that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement, and to the extent applicable to the Illinois-Wisconsin Region Stores:

(a) Conduct of Business Before the Closing. Unless otherwise agreed by Seller and Buyer, Seller shall use commercially reasonable efforts to conduct their business in all material respects in the manner in which it has been conducted since the Petition Date and to preserve intact their respective business or organization and relationships with third parties.

(b) Cooperation. Seller shall use commercially reasonable efforts to (i) take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper or reasonably requested by Buyer, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby; and (ii) assist Buyer's efforts to transfer any Permits required to own the Acquired Assets.

(c)     <u>Sale Order</u>. Without limiting <u>Section 5.1(b)(i)</u>, Seller shall use commercially reasonable efforts to obtain entry of the Sale Order by the Bankruptcy Court as soon as reasonably practicable and in substantially the form of <u>Exhibit C</u>.

(d)     <u>Access to Records and Properties</u>. Buyer shall be entitled, and the Seller shall permit Buyer, to conduct such investigation of the condition (financial or otherwise), businesses, assets, properties or operations of the Seller as Buyer shall reasonably deem appropriate. The Seller shall (i) provide Buyer and its representatives access at any reasonable time during normal business hours upon at least 24 hours prior notice to all the facilities, offices and personnel of the Seller and to all of the books and records of the Seller, including, to perform field examinations and inspections of the Seller's Inventory, facilities, equipment and other assets and properties; and (B) cause the Seller' representatives to furnish Buyer with such financial and operating data and other information with respect to the condition (financial or otherwise), businesses, assets, properties or operations as Buyer shall reasonably request; <u>provided</u>, <u>however</u>, that Buyer and its representatives shall use all commercially reasonable efforts to prevent any such investigation from unreasonably interfering with the operation of the Business. The Seller shall promptly deliver to Buyer one copy of all pleadings, motions, notices, statements, schedules, applications, reports and other papers as filed by the Seller in their Bankruptcy Case upon Buyer's reasonable request.

(e)     <u>Notice of Certain Events</u>. The Seller shall promptly notify Buyer of, and furnish to Buyer any information it may reasonably request with respect to, the occurrence or nonoccurrence of any event or condition or the existence of any fact that would reasonably be expected or likely to cause either (A) any of the conditions to Buyer's obligations to consummate the transaction(s) contemplated by this Agreement or by any Ancillary Agreement not to be fulfilled or (B) directly or indirectly, any Material Adverse Effect. Notwithstanding the foregoing, the delivery of any notice pursuant to this <u>Section 5.1(e)</u> shall not (x) be deemed to amend or supplement any of the Schedules contemplated hereby, (y) be deemed to cure any breach or any representation, warranty covenant or agreement or to satisfy any condition or (z) limit or otherwise affect the remedies available to Buyer hereunder, unless Buyer proceeds to consummate the transactions contemplated by this Agreement without terminating this Agreement pursuant to <u>Section 7.1</u>.

**Section 5.2**     **Covenants of Buyer.** Buyer covenants to Seller that, during the period from the Execution Date through and including the Closing Date or the earlier termination of this Agreement:

(a)     <u>Cooperation</u>. Buyer shall use commercially reasonable efforts to take, or cause to be taken, all action and to do, or cause to be done, all things necessary or proper, consistent with applicable Law, to consummate and make effective as soon as possible the transactions contemplated hereby.

(b)     <u>Communications</u>. Buyer shall use commercially reasonable efforts to keep Seller reasonably informed of the status of discussions between Buyer and Franchisor regarding Franchisor's Consent.

(c)     Adequate Assurances Regarding Acquired Contracts and Required Orders. With respect to each Acquired Contract, Buyer shall provide adequate assurance of the future performance of such Acquired Contract by Buyer. Buyer shall promptly take such actions as may be reasonably requested by Seller to assist Seller in obtaining the Bankruptcy Court's entry of an assumption and Assignment Order and any other Order of the Bankruptcy Court reasonably necessary to consummate the transactions contemplated by this Agreement.

**Section 5.3     Other Covenants.**

(a)     Improper Receipt of Payment. From and after the Closing, (i) Seller shall promptly forward to Buyer any and all payments received by it that constitutes part of the Acquired Assets; and (ii) Buyer shall promptly forward to Seller any and all payments received by Buyer that constitute part of the Excluded Assets.

(b)     Records. From and after the Closing and to the extent permitted by Law, Buyer shall provide Seller, and its agents and representatives, as the case may be, access to, reasonable means of copying, i.e., provide a copy machine, or copies of, the Employee Records for use by Seller in any dispute, Claim, action or controversy regarding any employee matter, and permit Seller, to the extent permitted by Law, to either make copies or, as may be necessary to fully comply with any Law, regulation or court mandate, borrow the original Employee Records for such time as may be reasonably needed by Seller.

(c)     Employee Matters. Immediately prior to the Closing, Seller shall terminate the employment of all employees of the Illinois-Wisconsin Region Stores. Effective as of the Closing Date, Buyer shall use commercially reasonable efforts to offer employment to all employees of each of the Illinois-Wisconsin Region Stores on terms and conditions that are substantially similar to the terms and conditions in effect immediately prior to the Closing Date; provided, however, that nothing contained herein, express or implied: (i) is intended to confer upon any current or former employee any right to employment or continued employment for any period of time by reason of this Agreement, or any right to a particular term or condition of employment, or (ii) is intended to confer upon any individual (including employees, retirees, or dependents or beneficiaries of employees or retirees) any right as a third-party beneficiary of this Agreement.

(d)     Group Two Restaurants. After the Closing, Buyer will give special consideration to purchasing and operating any Group Two Restaurants located in the state of Illinois that remain unsold after the Group Two Auction. This Section 5.3(d) does not obligate or require Seller to continue to operate any of the Group Two Restaurants for any period of time.

**Section 5.4     Confidentiality.** On and after the Closing Date, Seller shall, and shall cause its Affiliates to, treat and hold as confidential any proprietary information concerning the business and affairs of Buyer and the Acquired Assets and Assumed Liabilities that is not already generally available to the public (the "**Confidential Information**"), and shall, and shall cause its Affiliates to, refrain from using or disclosing any of the Confidential Information except in connection with (i) enforcing their rights under this Agreement, or (ii) their responsibility for or their ownership and use

of the Excluded Assets and the Excluded Liabilities, and shall deliver promptly to Buyer or destroy, at the request and option of Buyer, all tangible embodiments (and all copies, other than one copy to be kept subject to this Section 5.4 for archival and/or regulatory compliance purposes) of the Confidential Information which are in his, her or its possession or under his, her or its control. In the event that Seller or any of its Affiliates is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, Seller shall, or shall cause such Affiliate to, as the case may be, notify Buyer in writing promptly of the request or requirement so that Buyer may seek an appropriate protective order or waive compliance with the provisions of this Section 5.4. If, in the absence of a protective order or the receipt of a waiver hereunder, Seller, or Seller's Affiliate, is advised, on the advice of counsel, to disclose any Confidential Information to any tribunal or Government, Seller, or Seller's Affiliate, as the case may be, may disclose such Confidential Information to the tribunal or Government; provided that such Seller shall, or shall cause such Seller's Affiliate to, use his, her or its commercially reasonable efforts to obtain, at the request of Buyer and at Buyer's sole expense, an order or other reasonable assurance that confidential treatment shall be accorded to such portion of the Confidential Information required to be disclosed.

### ARTICLE VI
### CONDITIONS PRECEDENT TO PERFORMANCE BY PARTIES

**Section 6.1    Conditions Precedent to Performance by Seller.** The obligation of Seller to consummate the transactions contemplated by this Agreement is subject to the fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.1(c), may be waived by Seller, in its discretion:

(a)    Representations and Warranties of Buyer. The representations and warranties of Buyer made in Section 4.2 of this Agreement, in each case, shall be true and correct in all material respects as of the Execution Date and as of the Closing Date as though made by Buyer as of the Closing Date, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.

(b)    Performance of the Obligations of Buyer. Buyer shall have performed in all material respects all obligations required under this Agreement and any Ancillary Agreement to which Buyer is party to be performed by Buyer on or before the Closing Date.

(c)    Governmental Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order and the Assignment Order, and such Orders shall be in full force and effect, and no Order staying, reversing, modifying, vacating or amending such Orders shall be in effect on the Closing Date.

(d)    Closing Deliveries. Buyer shall have made the deliveries contemplated under Section 3.3.

**Section 6.2    Conditions Precedent to the Performance by Buyer.**    The obligations of Buyer to consummate the transactions contemplated by this Agreement are subject to the

fulfillment, at or before the Closing, of the following conditions, any one or more of which, other than the condition contained in Section 6.2(c), may be waived by Buyer, in its discretion:

(a) Representations and Warranties of Seller. The representations and warranties of Seller made in Section 4.1 of this Agreement shall be true and correct in all material respects as of the Execution Date and as of the Closing as though made by Seller as of the Closing, except to the extent such representations and warranties expressly relate to an earlier date, in which case such representations and warranties shall be true and correct in all material respects on and as of such earlier date.Performance of the Obligations of Seller. Seller shall have performed in all material respects all obligations required under this Agreement or any Ancillary Agreement to which Seller are party to be performed by Seller on or before the Closing.Governmental Consents and Approvals. The Bankruptcy Court shall have entered the Sale Order and the Assignment Order, and such Orders shall be in full force and effect, and no Order staying, reversing, vacating or amending such Orders shall be in effect on the Closing Date.Closing Deliveries. Seller shall have made the deliveries contemplated under Section 3.2.

**ARTICLE VII**
**TERMINATION**

**Section 7.1    Conditions of Termination.**    This Agreement may be terminated only in accordance with this Section 7.1. This Agreement may be terminated at any time before the Closing as follows:

(a) By mutual consent of Seller and Buyer;

(b) By Seller, by notice to Buyer, if Seller have provided Buyer with notice of any material inaccuracy of any representation or warranty contained in Section 4.2, or of a material failure to perform any pre-Closing covenant or obligation of Buyer contained in this Agreement or any Ancillary Agreement to which Buyer is party, and (except as to Section 3.3(a)) Buyer has failed, within ten (10) days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Seller of Buyer's ability to remedy such inaccuracy or perform such covenant or obligation; provided, however, that Seller shall not have the right to terminate this Agreement under this Section 7.1(b) if Seller is then in material breach of this Agreement;

(c) By Seller, if the Bankruptcy Court dismisses the Seller's chapter 11 case or converts the chapter 11 case to a case under chapter 7 of the Bankruptcy Code; if the Bankruptcy Court confirms a chapter 11 plan in the Seller's chapter 11 case; or if the Bankruptcy Court appoints a chapter 11 trustee or an examiner with expanded powers;

(d) By Buyer, by notice to Seller, if Buyer has previously provided Seller with notice of any material inaccuracy of any representation or warranty of Seller contained in Section 4.1 or a material failure to perform any pre-Closing covenant of Seller contained in this Agreement or any Ancillary Agreement to which Seller is party, and Seller has failed, within ten (10) days after such notice, to remedy such inaccuracy or perform such covenant or provide reasonably adequate assurance to Buyer of Seller's ability to remedy such inaccuracy or perform such covenant; provided, however, that

Buyer shall not have the right to terminate this Agreement under this Section 7.1(d) if Buyer is then in material breach of this Agreement;

(e)     Automatically, upon the consummation of an Alternative Transaction;

(f)     By Buyer, if Seller (i) designates any Person other than Buyer as the successful bidder at the conclusion of the Group One Auction for either the Illinois Region Stores, the Wisconsin Region Stores or the Illinois-Wisconsin Region Stores, (ii) seeks or supports Bankruptcy Court approval of an Alternative Transaction (other than to or by Buyer) or (iii) executes and delivers an agreement with any Person (other than Buyer and its Affiliates) with respect to an Alternative Transaction;

(g)     By either the Seller or Buyer, if the Bankruptcy Court has entered a Final Order approving the sale of all or substantially all of the Acquired Assets to any Person other than Buyer and such sale closes; or

(h)     By Buyer or Seller on any day on or after the one-hundred and twentieth (120th) day following the Execution Date (the "**Termination Date**"), if the Closing shall not have been consummated by such date (or by such later date as shall be mutually agreed to by Buyer and Seller in writing), unless the Closing has not occurred due to a material failure of the terminating party to perform or observe its covenants or obligations as set forth in this Agreement required to be performed or observed by it on or before the Closing Date.

**Section 7.2     Effect of Termination; Remedies.**

(a)     In the event of termination pursuant to Section 7.1, this Agreement shall become null and void and have no effect (other than Article 0, Article VIII and Article IX, which shall survive termination), with no Liability on the part of Seller, Buyer, or their respective Affiliates or respective Related Persons, with respect to this Agreement or any Ancillary Agreement, except for any Liability provided for in this Article 0.

(b)     If this Agreement is terminated pursuant to any provision in Section 7.1 except Section 7.1(b), then, within two (2) Business Days after such termination or the consummation of the sale, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Buyer from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Buyer.

(c)     If this Agreement is terminated pursuant to Section 7.1(b) then, within two (2) Business Days after such termination, Buyer and Seller shall jointly instruct the Escrow Agent to distribute to Seller from the Deposit Escrow Account the Deposit, together with interest earned thereon, by wire transfer of immediately available funds to an account designated in writing by Seller.

**Section 7.3     Exclusive Remedy; Waiver.**     Prior to the Closing, the parties' sole and exclusive remedies for any Claim arising out of or in connection with this Agreement shall be termination in accordance with, and obtaining the remedies provided in, this Article 0. The failure by either Seller or Buyer to pursue or foreclose on any right or remedy against the other party, by itself,

shall not constitute a waiver, and any waiver under this Article VII shall be effective only if made in writing.

## ARTICLE VIII
## SURVIVAL AND INDEMNIFICATION

**Section 8.1    Survival; Indemnification.**  None of the representations and warranties of Seller and of Buyer made in this Agreement shall survive the Closing Date, and all of such representations and warranties shall be extinguished by the Closing.  All covenants and agreements of the parties contained in this Agreement shall survive the Closing, unless otherwise expressly stated therein.  Seller shall have no monetary obligation to Buyer for breach of any covenant or agreement, except in the event of termination pursuant to Sections 7.1(a), 7.1(c), 7.1(d), 7.1(e), 7.1(f), 7.1(g) or 7.1(h) which obligation shall be limited as set forth in Section 7.2(b).  If the Closing occurs, Buyer shall, subject to Section 1.3, indemnify and hold harmless Seller and their respective Affiliates and Related Persons against any and all losses, Liabilities, expenses or damages that result from or arise out of the Assumed Liabilities.

## ARTICLE IX
## MISCELLANEOUS

**Section 9.1    Alternative Transaction.**   Notwithstanding anything herein or in any Ancillary Agreement to the contrary, but subject to the notice requirement of Section 5.1(e), Seller may furnish information concerning Seller, the Acquired Assets and the Assumed Liabilities to any Person in connection with a potential Alternative Transaction and negotiate, enter into and consummate an Alternative Transaction.

**Section 9.2    Further Assurances.**  At the request and the sole expense of the requesting party, Buyer or Seller, as applicable, shall execute and deliver, or cause to be executed and delivered, such documents as Buyer or Seller, as applicable, or their respective counsel may reasonably request to effectuate the purposes of this Agreement and the Ancillary Agreements.

**Section 9.4    Successors and Assigns.**  This Agreement shall inure to the benefit of and shall be binding upon the successors and assigns of the parties hereto.  Buyer may assign its rights under this Agreement to any subsidiary or affiliate of Buyer acceptable to Franchisor.

**Section 9.5    Governing Law; Jurisdiction.**  This Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota (without giving effect to the principles of conflicts of laws thereof), except to the extent that the laws of such State are superseded by the Bankruptcy Code or other applicable federal law.  For so long as Seller are subject to the jurisdiction of the Bankruptcy Court, the parties irrevocably elect, as the sole judicial forum for the adjudication of any matters arising under or in connection with the Agreement, and consent to the exclusive jurisdiction of, the Bankruptcy Court.

**Section 9.6    Expenses.**  Except as otherwise provided in this Agreement, Seller and Buyer shall pay their own expenses in connection with this Agreement and the transactions contemplated hereby, including, any legal and accounting fees, whether or not the transactions contemplated hereby are consummated.

**Section 9.7    Broker's and Finder's Fees.**  Neither Seller nor Buyer has engaged any broker or finder in connection with any of the transactions contemplated by this Agreement other than Mastodon Ventures, Inc., whose fees and expenses shall, as between the parties, be the sole

responsibility of Seller, and, insofar as such party knows, no other broker or other Person is entitled to any commission or finder's fee in connection with any of the transactions contemplated by this Agreement.

      **Section 9.8**    **Severability.**  In the event that any part of this Agreement is declared by any court or other judicial or administrative body to be null, void or unenforceable, said provision shall survive to the extent it is not so declared, and all of the other provisions of this Agreement shall remain in full force and effect only if, after excluding the portion deemed to be unenforceable, the remaining terms shall provide for the consummation of the transactions contemplated hereby in substantially the same manner as set forth on the Execution Date.

      **Section 9.9**    **Notices.**  (a) All notices, requests, demands, consents and other communications under this Agreement shall be in writing and shall be deemed to have been duly given: (i) on the date of service, if served personally on the party to whom notice is to be given; (ii) on the day of transmission, if sent via facsimile transmission to the facsimile number given below or by electronic mail to the electronic mail address given below; (iii) on the day after delivery to Federal Express or similar overnight courier or the Express Mail service maintained by the United States Postal Service addressed to the party to whom notice is to be given; or (iv) on the fifth day after mailing, if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid and properly addressed, to the party as follows:

If to Seller:

    Duke and King Acquisition Corp.
    12281 Nicollet Avenue, South
    Burnsville, MN 55337
    Attention: Becky Moldenhauer, CFO
    Email: bmoldenhauer@dukeandking.com
    Facsimile: 953.288.2327

With a copy to (which shall not constitute notice):

    McDonald Hopkins LLC
    600 Superior Avenue, E.
    Suite 2100
    Cleveland, OH 44114
    Attention:  Scott N. Opincar
    Email: sopincar@mcdonaldhopkins.com
    Facsimile:  216.348.5474

If to Buyer:

    Cave Enterprises Operations, LLC
    1624 West 18th Street
    Chicago, IL 60608
    Attention:  Adam Velarde, Managing Member
    Facsimile: ___-___-____
    Email: adam.velarde@comcast.net

With copies to (which shall not constitute notice):

Greiman, Rome & Griesmeyer, P.C.
200 West Madison, Suite 755
Chicago, Illinois 60606
Attention: Adam B. Rome, Esq.
Facsimile: (312) 332-2781
Email: arome@grglegal.com

(b)    Any party may change its address, facsimile number or email address for the purpose of this <u>Section 9.8</u> by giving the other parties written notice of its new address in the manner set forth above.

**Section 9.10    Amendments; Waivers.** This Agreement may only be amended or modified, and any of the terms, covenants, representations, warranties or conditions hereof may only be waived, by a written instrument executed by Buyer and Seller, or in the case of a waiver, by the party waiving compliance. Any waiver by any party of any condition, or of the breach of any provision, term, covenant, representation or warranty contained in this Agreement, in any one or more instances, shall not be deemed to be or construed as a furthering or continuing waiver of any such condition, or of the breach of any other provision, term, covenant, representation or warranty of this Agreement.

**Section 9.11    Public Announcements.** Promptly after the Closing, the parties shall make a joint press release in form and substance reasonably satisfactory to both of them regarding the transactions contemplated herein. Except as provided in the foregoing sentence, no party shall make any press release or public announcement concerning the transactions contemplated by this Agreement without first coordinating their communications strategy with the other party, unless a press release or public announcement is required by Law, the rules of any stock exchange, or is permitted by, or required by an Order of, the Bankruptcy Court. If any such announcement or other disclosure is required by Law, the rules of any stock exchange or is permitted by, or required by an Order of, the Bankruptcy Court, the disclosing party shall use reasonable efforts to give the non-disclosing party or parties prior notice of, and an opportunity to comment on, the proposed disclosure; <u>provided</u>, there shall be no Liability to the disclosing party for failure to notify the other party. The parties acknowledge that Seller shall file this Agreement with the Bankruptcy Court in connection with obtaining the Sale Order and that Franchisor may provide or release its own press release or announcement without the consent or input of either Buyer or Seller.

**Section 9.12    Entire Agreement.** This Agreement and the Ancillary Agreements contain the entire understanding between the parties with respect to the transactions contemplated hereby and supersede and replace all prior and contemporaneous agreements and understandings, oral or written, with regard to such transactions. The Recitals and all Exhibits and Schedules hereto and any documents and instruments delivered pursuant to any provision hereof are expressly made a part of this Agreement as fully as though completely set forth herein.

**Section 9.13    No Third Party Beneficiaries.** Except with respect to <u>Section 8.1</u>, nothing in this Agreement is intended to or shall confer any rights or remedies under or by reason of this Agreement on any Persons other than Seller and Buyer and their respective successors and permitted assigns. Nothing in this Agreement is intended to or shall relieve or discharge the obligator or Liability of any third Persons to Seller or to Buyer. This Agreement is not intended and shall not give any third Persons any right of subrogation or action over or against Seller or Buyer.

Section 9.14    **Headings.**    The article and section headings in this Agreement are for reference purposes only and shall not affect the meaning or interpretation of this Agreement.

Section 9.15    **Counterparts; Delivery.**    This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute the same agreement. The signature of any of the parties may be delivered and made by facsimile, portable document format ("pdf") or other electronic means capable or creating a printable copy, and each such signature shall be treated as original signatures for all purposes.

Section 9.16    **Construction.**    Any reference to any Law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise. The word "including" shall mean including without limitation. Any reference to the singular in this Agreement shall also include the plural and vice versa. The phrase "to which Seller is a party," or similar construction, is intended to limit the applicable listing of any items, properties, assets, or Contracts to only those items that a Seller actually owns or to which Seller is actually a party, as the case may be, and is meant to exclude any listed property or Contract otherwise.

Section 9.17    **Bulk Sales.**    Buyer waives compliance with any Laws governing bulk sales, including any applicable provisions of the Uniform Commercial Code.

# ARTICLE X
# DEFINITIONS

As used in this Agreement, the following terms have the following meanings:

"**Accrued Expenses**" has the meaning set forth in Section 1.3(b).

"**Accounts Payable**" has the meaning set forth in Section 1.3(a).

"**Accounts Receivable**" has the meanings set forth in Section 1.2(b).

"**Acquired Assets**" has the meaning set forth in Section 1.1.

"**Acquired Contracts**" has the meaning set forth in Section 1.1(g).

"**Affiliate**" means, with respect to any Person, any other Person directly or indirectly controlling, controlled by or under direct or indirect common control with such Person.

"**Agreement**" has the meaning set forth in the Preamble.

"**Allocation**" has the meaning set forth in Section 2.8.

"**Alternative Transaction**" means any transaction (regardless of the form thereof) involving a sale of or recapitalizing affecting all or any substantial portion of the Acquired Assets by Seller, or any one or more of them, to a purchaser or purchasers other than Buyer; whether such transaction is undertaken pursuant to section 363 of the Bankruptcy Code or pursuant to a Chapter 11 plan.

"**Ancillary Agreements**" means the Confidentiality Agreement, the Deposit Escrow Agreement, the Working Capital Escrow Agreement, the Cure Costs Dispute Escrow Agreement, any bill of sale, any assignment or assumption agreement, and any other related agreements by and

between Seller and Buyer effecting or evidencing the transactions contemplated under this Agreement.

"**Assignment Order**" means an Order of the Bankruptcy Court pursuant to sections 105 and 365 of the Bankruptcy Code, which Order shall (i) authorize the assumption and assignment by and to Buyer of the Acquired Contracts, (ii) establish the Cure Costs relating to the Acquired Contracts, and (iii) provide that Buyer has demonstrated adequate assurance of future performance under the Acquired Contracts.

"**Assumed Liabilities**" has the meaning set forth in Section 1.3.

"**Bankruptcy Case**" has the meaning set forth in the Recitals.

"**Bankruptcy Code**" has the meaning set forth in the Recitals.

"**Bankruptcy Court**" has the meaning set forth in the Recitals.

"**Burger King®**" means any Person operating a Burger King® restaurant, whether Franchisor or any franchisee thereof.

"**Business**" means the business of each of the Illinois-Wisconsin Region Stores, as presently conducted.

"**Business Day**" means any day other than Saturday, Sunday and any day that is a federal legal holiday.

"**Buyer**" has the meaning set forth in the Preamble.

"**Buyer's Notice**" has the meaning set forth in Section 2.2(b).

"**Claim**" has the meaning given that term in section 101(5) of the Bankruptcy Code and shall expressly include Claims arising under any theory of successor liability.

"**Closing**" has the meaning set forth in Section 3.1.

"**Closing Date**" has the meaning set forth in Section 3.1.

"**Closing Net Working Capital**" has the meaning set forth in Section 2.2(c).

"**Closing Net Working Capital Statement**" has the meaning set forth in Section 2.2(a)

"**COBRA**" has the meaning set forth in Section 1.3.

"**Code**" means the Internal Revenue Code of 1986, as amended.

"**Confidentiality Agreement**" means that certain Confidentiality Agreement executed by Buyer and Seller dated January 31, 2011.

"**Confidential Information**" has the meaning set forth in Section 5.4.

"**Contract**" means any contract, agreement, lease or sublease, license or sublicense, instrument, indenture, commitment or undertaking, whether in written form or otherwise.

"**Contract Claim**" has the meaning set forth in Section 1.1(g).

"**Corporate Level**" means, as applicable, any assets, properties, expenses, costs, commitments, Contracts, obligations, Liabilities or other operational activities or items conducted or owned by Seller primarily for the collective benefit of all restaurants locations in all of the Regional Groups and their employees, including, but not limited to, all Seller Employee Benefit Plans, if any, and all Liabilities and obligations of Seller thereunder.

"**Critical Vendors**" has the meaning ascribed to such term in that certain Joint Motion for Expedited Hearing and for an Order Authorizing Debtors to Pay the Prepetition Claims of Certain Critical Vendors [Docket No. 13] that was filed in the Bankruptcy Case on December 4, 2010.

"**Cure Costs**" means all pre-petition cure costs required to be paid pursuant to section 365 of the Bankruptcy Code in connection with the assumption and assignment of the Acquired Contracts.

"**Cure Costs Dispute Escrow Account**" has the meaning set forth in Section 2.3(c).

"**Cure Costs Dispute Escrow Agreement**" means that certain escrow agreement, dated as of the Closing Date, by and Buyer, Seller and Escrow Agent, in a form to be mutually agreed upon by the parties thereto.

"**Cure Costs Dispute Escrow Amount**" has the meaning set forth in Section 2.3(c).

"**Deposit**" has the meaning set forth in the Recitals.

"**Deposit Escrow Account**" has the meaning set forth in the Recitals.

"**Deposit Escrow Agreement**" means that certain escrow agreement, dated as of the Execution Date, by and among Buyer, Seller and Escrow Agent, governing the funding and disbursement of the Deposit Escrow Account.

"**Employee Records**" has the meaning set forth in Section 1.1(l).

"**Employee Benefit Plans**" means (i) all employee benefit plans as defined in section 3(3) of ERISA; (ii) all compensation, pay, severance pay, salary continuation, bonus, incentive, stock option, retirement, pension, profit sharing or deferred compensation plans, Contracts, programs, funds or arrangements of any kind; and (iii) all other employee benefit plans, programs, funds or arrangements (whether written or oral, qualified or nonqualified, funded or unfunded, foreign or domestic, currently effective or terminated, and whether or not subject to ERISA) and any trust, escrow or similar agreement related thereto, whether or not funded.

"**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

"**Escrow Agent**" means U.S. Bank National Association.

"**Excluded Assets**" has the meaning set forth in Section 1.2.

"**Excluded Contracts**" means any Contract to which a Seller is a party that is not an Acquired Contract.

"**Excluded Liabilities**" has the meaning set forth in Section 1.4.

"**Execution Date**" has the meaning set forth in the Preamble.

"**Final Closing Net Working Capital Statement**" has the meaning set forth in Section 2.2(c).

"**Final Determination Date**" has the meaning set forth in Section 2.2(e).

"**Final Order**" means an Order or judgment of the Bankruptcy Court, or other court of competent jurisdiction, the implementation, operation or effect of which has not been stayed and as to which Order (or any revision, modification or amendment thereof) the time to appeal or seek review, rehearing or writ of certiorari has expired and as to which no appeal or petition for review, reconsideration, rehearing or certiorari has been taken and is pending.

"**Final Purchase Price**" has the meaning set forth in Section 2.1.

"**Financial Statements**" has the meaning set forth in Section 4.1(d).

"**Franchise Agreements**" means those franchise agreements entered into between Franchisor and Seller which govern Seller's operation of the Illinois-Wisconsin Region Stores, set forth on Schedule B hereto, as Burger King restaurants.

"**Franchisor**" means Burger King Corporation, a Florida corporation, or its successors-in-interest, whether by merger, acquisition of equity or acquisition of all or substantially all of its assets.

"**Franchisor's Consent**" has the meaning set forth in Section 4.2(g).

"**GAAP**" has the meaning set forth in Section 2.2(d).

"**Government**" means any agency, division, subdivision or governmental or regulatory authority, or any adjudicatory body thereof, of the United States or any state or territory thereof.

"**Group Two Auction**" means that certain "Group Two Auction" as defined under the Sale Procedures.

"**Group Two Restaurants**" means those certain "Group Two Restaurants" as defined under the Sale Procedures.

"**Illinois Region Stores**" means all of Seller's restaurants listed under the heading Illinois Region on Schedule A hereto.

"**Illinois-Wisconsin Region Stores**" means all of Seller's restaurants located in the Illinois or Wisconsin Regions, as applicable, and as more fully described on Schedule A.

"**Improvements**" means the buildings, improvements and structures owned by Seller existing on the Real Property.

"**Indebtedness**" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or advances; (b) all obligations or Liabilities of such Person evidenced by bonds, debentures, notes, loan agreements or similar instruments; (c) all obligations of such Person under conditional sale or other title retention agreements relating to property purchased by such Person (even though the rights and remedies of the seller or lenders under such agreement in the event of default are limited to repossession or sale of such property); (d) all obligations of such Person issued or assumed as part of the deferred purchase price of property or services (excluding trade accounts payable and accrued obligations incurred in the ordinary course of business on normal trade terms and not overdue by more than 90 days); (e) all indebtedness secured by any Lien on property owned or acquired by such Person (including indebtedness arising under conditional sales or other title retention agreements), whether or not the obligations secured thereby have been assumed, but limited to the lower of (i) the fair market value of such property and (ii) the amount of the Indebtedness secured; (f) all capital lease obligations of such Person; (g) any commitment by which such Person assures a creditor against loss (including all obligations of such Person for the reimbursement of any obligor in respect of letters of credit, letters of guaranty, bankers' acceptances and similar credit transactions) or other indebtedness guaranteed in any manner by such Person; (h) all uncashed checks issued by such Person that are outstanding as of the Closing Date; and (i) all contingent obligations of such Person in respect of Indebtedness or obligations of others of the kinds referred to in clauses (a) through (h) above.

"**Initial Net Working Capital**" has the meaning set forth in Section 2.2(a).

"**Interest**" has the meaning ascribed to such term under section 363(f) of the Bankruptcy Code.

"**Inventory**" means all of Seller's (a) consumable, unexpired food, beverages and condiments, (b) paper products and (c) premium kids products (to the extent that the promotional licenses to sell such kids products have not expired), in each case, solely to the extent such items are included in the Acquired Asset pursuant to Section 2.6.

"**Law**" means any law, statute, regulation, code, decree, constitution, ordinance, treaty, rule of common law, or Order of, administered or enforced by or on behalf of, any Government.

"**Leased Real Property**" has the meaning set forth in Section 1.1(b).

"**Leasehold Improvements**" means those fixtures, structures and other improvements located on any Leased Real Property used in the operation of Seller' business.

"**Liability**" means any liability (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due and regardless of when asserted), including any liability for Taxes, product liability or infringement liability.

"**Lien**" has the meaning ascribed to such term under section 101(37) of the Bankruptcy Code and also includes any lien (statutory or otherwise), hypothecation, encumbrance, security interest, interest, mortgage, pledge, restriction, charge, instrument, license, preference, priority, security agreement, easement, covenant, encroachment, option, right of recovery, right of pre-emption, right of first refusal or other third party right, Tax (including foreign, federal, state and local Tax), Order of any Government, of any kind or nature (including (i) any conditional sale or other title retention

agreement and any lease having substantially the same effect as any of the foregoing, (ii) any assignment or deposit arrangement in the nature of a security device, (iii) any Claim based on any theory that any Buyer is a successor, transferee or continuation of the Seller, and (iv) any leasehold interest, license or other right, in favor of a third party or Seller, to use any portion of the Acquired Assets), whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, material or non-material, known or unknown.

"**Material Adverse Effect**" means a state of facts, event, change or effect with respect to the Acquired Assets or the Assumed Liabilities, that individually or in the aggregate results in, or could reasonably be expected to have, a material adverse effect on the value of the Acquired Assets, taken as a whole, a material increase in the amount of the Assumed Liabilities, a material impairment to the revenue or anticipated revenue of the Illinois-Wisconsin Region Stores, or result in a material adverse effect or change in the operation, results of operations, condition (financial or otherwise) or prospects of the Acquired Assets or the Illinois-Wisconsin Region Stores, taken as a whole; provided, however, that none of the following shall be or be considered in determining the existence of any "Material Adverse Effect": (a) changes in general economic conditions in the United States or any other country or region in the world, or changes in conditions in the global economy generally, to the extent such changes do not adversely affect the Seller in a disproportionate manner; (b) changes in conditions in the industries in which the Seller conducts business, to the extent such changes do not adversely affect the Seller in a disproportionate manner relative to other participants in such industries; (c) changes in political conditions in the United States or any other country or region in the world; (d) acts of war, sabotage or terrorism (including any escalation or general worsening of any such acts of war, sabotage or terrorism) in the United States or any other country or region in the world; (e) earthquakes, hurricanes, tsunamis, tornadoes, floods, mudslides, wild fires or other natural disasters, weather conditions and other force majeure events in the United States or any other country or region in the world; or (f) any change in Law after the Execution Date.

"**Net Working Capital**" means an amount equal to: (a) the sum of On-Hand Cash, On-Hand Inventory, Acquired Deposits, and Prepaid Expenses, *less* (b) the sum of Accounts Payable, Payroll Liabilities, Accrued Expenses, and Property Taxes.

"**On-Hand Cash**" has the meaning set forth in Section 1.1(a).

"**On-Hand Inventory**" has the meaning set forth in Section 1.1(h).

"**Orders**" means any award, decision, decree, order, injunction, ruling, judgment, or consent of or entered, issued, made or rendered by any Government.

"**Overpayment Amount**" has the meaning set forth in Section 2.2(f).

"**Permits**" has the meaning set forth in Section 1.1(i).

"**Person**" means any individual, corporation, partnership, limited liability company, joint venture, association, joint-stock company, trust, unincorporated organization or Government.

"**Petition Date**" has the meaning set forth in the Recitals.

"**Prepaid Expenses**" has the meaning set forth in Section 1.1(e).

"**Proceeding**" means any Claim, charge, complaint, dispute, demand, grievance, action, litigation, audit, investigation, review, inquiry, arbitration, suit in equity or at Law, administrative, regulatory or quasi-judicial proceeding, account, cost, expense, setoff, contribution, attorney's fee or causes of action of whatever kind or character.

"**Property Taxes**" means all real estate and personal property Taxes, and other related assessments and fees, arising from the Acquired Assets.

"**Real Property Lease**" means any lease arrangement or agreement for the Leased Real Property identified and included in the Acquired Contracts.

"**Rejected Real Leased Property**" has the meaning set forth in Section 1.2(m).

"**Related Person**" means, with respect to any Person, all past, present and future directors, officers, members, managers, stockholders, employees, controlling persons, agents, professionals, attorneys, accountants, lenders, investment bankers or representatives of any such Person.

"**Sale Order**" means an Order of the Bankruptcy Court approving the sale and transfer of the Acquired Assets and Assumed Liabilities to Buyer pursuant to §§ 105 and 363 of the Bankruptcy Code, which Order shall be substantially in the form attached hereto as Exhibit C or with such changes and modifications as are reasonably acceptable to Buyer and Seller.

"**Sale Procedures**" means the Sale and Bidding Procedures approved by the Bankruptcy Court in the form attached hereto as Exhibit A.

"**Seller**" has the meaning set forth in the Preamble.

"**Supplies**" means (i) operating supplies, (ii) cleaning supplies, (iii) uniforms and (iv) all other items (other than Inventory) useable or saleable in the preparation of, serving or cleaning-up from meals.

"**Target Net Working Capital**" means negative nine-hundred sixty three thousand two hundred and twenty-eight dollars (-$963,228).

"**Tax Return**" means any report, return, information return, filing or other information, including any schedules, exhibits or attachments thereto, and any amendments to any of the foregoing required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Taxes (including estimated Taxes).

"**Taxes**" means all taxes, however denominated, including any interest, penalties or additions to tax that may become payable in respect thereof, imposed by any Government, whether payable by reason of contract, assumption, transferee liability, operation of law or Treasury Regulation section 1.1502-6(a) (or any predecessor or successor thereof or any analogous or similar provision under state, local or foreign law), which taxes shall include all income taxes, payroll and employee withholding, unemployment insurance, social security (or similar), sales and use, excise, franchise, gross receipts, occupation, real and personal property, stamp, transfer, workmen's compensation, customs duties, registration, documentary, value added, alternative or add-on minimum, estimated, environmental (including taxes under section 59A of the Code) and other assessments or obligations of the same or a similar nature, whether arising before, on or after the Closing Date.

**"Termination Date"** has the meaning set forth in Section 7.1(h).

**"Total Consideration"** has the meaning set forth in Section 2.1.

**"Transaction Taxes"** has the meaning set forth in Section 2.7.

**"Unadjusted Purchase Price"** has the meaning set forth in Section 2.1.

**"Underpayment Amount"** has the meaning set forth in Section 2.2(g).

**"Wisconsin Region Stores"** means all of Seller's restaurants listed under the heading Wisconsin Region on Schedule A hereto.

**"Working Capital Escrow Account"** has the meaning set forth in Section 2.3(a).

**"Working Capital Escrow Agreement"** means that certain working capital escrow agreement, dated as of the Closing Date, by and among Buyer, Seller and Escrow Agent, in a form to be mutually agreed upon by the parties thereto.

**"Working Capital Escrow Amount"** has the meaning set forth in Section 2.3(a).

[Signature Page Follows]

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

BUYER:

**CAVE ENTERPRISES OPERATIONS, LLC**

By: _____

Name: _____

Title: _____

SELLER:

**DUKE AND KING ACQUISITION CORP.**

By: _____

Name: Becky Moldenhauer

Title: VP + CFO

IN WITNESS WHEREOF, the parties hereto have caused this Asset Purchase Agreement to be executed as of the Execution Date.

**BUYER:**

**CAVE ENTERPRISES OPERATIONS, LLC**

By:_____
Name:_____
Title:_____

**SELLER:**

**DUKE AND KING ACQUISITION CORP.**

By:_____
Name:_____
Title:_____

## Exhibit A

## SALE PROCEDURES

Please see attached.

## Exhibit B

### Form of Deposit Escrow Agreement

Please see attached.

# DEPOSIT ESCROW AGREEMENT

THIS DEPOSIT ESCROW AGREEMENT ("Escrow Agreement") is entered into as of April __, 2011, by and among Duke and King Acquisition Corp., a Delaware corporation ("Seller"), Cave Enterprises Operations, LLC, a Delaware limited liability company ("Buyer"), and _____ ("Escrow Agent").

## RECITALS

A.    Buyer has submitted a bid to Seller to purchase certain of the assets and business of Seller pursuant to the terms of certain "Sale and Bidding Procedures" issued by the United States Bankruptcy Court for the District of Minnesota pursuant to order in the case captioned *In re Duke and King Acquisition Corp.*, Case No. 10-38652 (Bankr. Minn.) (the "Sale Procedures"); and

B.    As part of that bid, Buyer has submitted to Seller an Asset Purchase Agreement, dated on or about the date hereof (the "Purchase Agreement"); and

C.    Pursuant to the Sale Procedures, to qualify as a Qualified Bidder, Buyer is required to submit a cash deposit equal to 10% of the purchase price into escrow (the "Deposit") to be disbursed in accordance with the terms of this Escrow Agreement.

NOW, THEREFORE, in consideration of the mutual premises contained herein and other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the parties agree as follows:

   1.    Certain Defined Terms.  Capitalized terms used but not otherwise defined herein shall have the respective meanings given such terms in the Purchase Agreement or the Sale Procedures.  The Escrow agent shall be furnished copies of the Purchase Agreement and the Sale Procedures for reference purposes only, provided that the Escrow Agent shall have no duties, obligations or liabilities arising under the Purchase Agreement or Sale Procedures.

   2.    Designation of the Escrow Agent. Buyer and Seller hereby designate and appoint the Escrow Agent for the purposes set forth in this Escrow Agreement. The Escrow Agent hereby accepts such appointment under the terms and conditions set forth in this Escrow Agreement.

   3.    Creation of the Escrow. On even date herewith, Buyer has delivered, or shall deliver, the sum of $64,389.89 to the Escrow Agent, as the Deposit, by wire transfer of immediately available funds to be held in an escrow account specified by the Escrow Agent (the "Escrow Funds"). The escrow account name and account number are as follows: _____.

   4.    Investment. From the date hereof until otherwise directed in writing by Buyer and Seller, the Escrow Agent shall invest the Escrow Funds in its U.S. Bank Money Market Account as described on Exhibit A attached hereto.  In no event shall the Escrow Agent be liable for the results of any investment, including without limitation any loss, cost or penalty resulting from any investment made in accordance with the terms hereof.

   5.    Disbursement of the Escrow Funds.  The Escrow Agent shall distribute the Escrow Funds and interest accrued thereon in accordance with the joint written instructions executed by Buyer and Seller pursuant to the terms of the Purchase Agreement ("Joint Instruction").

6. <u>Termination</u>. This Escrow Agreement, and the escrow created hereby, shall terminate upon the date that the Escrow Funds are fully and finally disbursed pursuant to Joint Instruction of Buyer and Seller.

7. <u>Fees and Expenses</u>. In consideration for its services hereunder, Buyer and Seller agree to equally divide the payment (1/2 paid by Seller and 1/2 paid by Buyer) of the annual administrative escrow fee of the Escrow Agent set forth in <u>Exhibit B</u> attached hereto, and of all other fees, costs, charges and expenses of the Escrow Agent, if any, including reasonable attorneys' fees, which are incurred by the Escrow Agent in connection with the performance of its duties and obligations hereunder, <u>provided</u>, <u>however</u>, that the Escrow Agent complies with Section 8(a) of this Escrow Agreement.

8. <u>Conditions of the Escrow Agent's Obligations</u>.

a. <u>Legal Counsel</u>. The Escrow Agent shall be entitled to employ legal counsel and other experts as it may deem reasonably necessary to advise it in connection with its obligations hereunder, may rely on the advice of such counsel, and may pay them reasonable compensation therefore, <u>provided</u>, <u>however</u>, that the fees of such legal counsel shall have been approved in advance by the parties hereto if reimbursement of such fees is to be sought from the parties; provided that such approval shall not be unreasonably withheld and in no event shall it be withheld if the Escrow Agent is subject to actual or threatened litigation not directly caused by its own negligence or willful misconduct.

b. <u>Resignation</u>. The Escrow Agent may resign by giving written notice thereof to Buyer and Seller. In the event of any such notice of resignation, the Escrow Agent shall refrain from taking any action with respect to the Escrow Funds until it receives joint written instructions from Buyer and Seller designating a successor depository which shall be a national bank authorized to exercise corporate trust powers, and having a combined capital and surplus of at least $5,000,000,000. Upon receipt of such joint instructions, the Escrow Agent shall promptly deliver the Escrow Funds then held by it to such successor. Any successor depository shall have all the rights, obligations, and immunities of the Escrow Agent set forth herein. If the Buyer and Seller have failed to appoint a successor escrow agent prior to the expiration of thirty (30) days following receipt of the notice of resignation from the Escrow Agent, the Escrow Agent may petition any court of competent jurisdiction for the appointment of a successor escrow agent or for other appropriate relief, and any such resulting appointment shall be binding upon all of the parties hereto.

c. <u>Liability Limitations</u>. Except as to its obligation to keep the Escrow Funds safely in its custody as the Escrow Agent pursuant to the terms of this Escrow Agreement, the Escrow Agent shall be indemnified, on a several basis, by Buyer and Seller and shall not be liable to anyone whatsoever by reason of any error of judgment or for any act done or step taken or omitted by it in good faith or for any mistake of fact or law or for anything which it may do or refrain from doing in connection herewith unless caused by or arising out of its own negligence or willful misconduct. IN NO EVENT SHALL THE ESCROW AGENT BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY SPECIAL, INDIRECT, PUNITIVE OR CONSEQUENTIAL LOSSES OR DAMAGES OF ANY KIND WHATSOEVER (INCLUDING BUT NOT LIMITED TO LOST PROFITS), EVEN IF THE ESCROW AGENT HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION, UNLESS ARISING IN WHOLE OR IN PART OUT OF ITS OWN NEGLIGENCE OR WILLFUL MISCONDUCT.

d. <u>Reliance</u>. The Escrow Agent shall be entitled to rely and shall be protected in acting in reliance upon any Joint Instruction and shall be entitled to treat as genuine, and as the document it purports to be, any letter, paper or other document furnished to it and reasonably believed by it to be genuine and to have been signed and presented by the proper party or parties.

e. <u>Tax Matters</u>. The Escrow Agent does not have any interest in the Escrow Funds deposited hereunder but is serving only as escrow holder and having only possession thereof. All interest or other income from all investments and reinvestments of the Escrow Funds shall be paid as directed in the Joint Instruction or upon the earlier of: (i) termination of this Agreement and the escrow established hereby, or (ii) the disbursement of the Escrow Funds. For income tax purposes, income from all investments and reinvestments of the Escrow Funds shall be for the benefit of the party to whom such funds are disbursed, shall be recognized by such party and paid by such party.

f. <u>Disputes</u>. In the event that (i) any dispute shall arise between the parties with respect to the disposition or disbursement of any of the assets held hereunder or (ii) the Escrow Agent shall be uncertain as to how to proceed in a situation not explicitly addressed by the terms of this Agreement whether because of conflicting demands by the other parties hereto or otherwise, the Escrow Agent shall be permitted to refuse to comply with any and all claims, demands or instructions with respect to the Escrow Funds until such dispute or conflicting demands shall have been (i) determined by a final order, judgment or decree of a court of competent jurisdiction, which order, judgment or decree is not subject to appeal, or (ii) settled by agreement between the conflicting parties as evidenced in a writing reasonably satisfactory to the Escrow Agent. Notwithstanding anything herein to the contrary, in no event shall the Escrow Agent be required to institute legal proceedings of any kind, or be required to defend any legal proceedings which may be instituted against it with respect to this Agreement unless requested to do so in writing by the other parties hereto and until it is indemnified by such requesting party(ies) to the sole satisfaction of the Escrow Agent, against the cost and expense of such defense, including without limitation the reasonable fees and expenses of its legal counsel.

9. <u>Action by the Escrow Agent</u>. Nothing herein contained shall be deemed to impose upon Buyer or Seller any obligation or liability on account of the failure of the Escrow Agent to fulfill its obligations under this Escrow Agreement. The Escrow Agent will not be responsible for determining or calculating amounts to be disbursed from the escrow established hereunder.

10. <u>Headings</u>. The headings in this Escrow Agreement are intended solely for convenience of reference and shall be given no effect in the construction or interpretation hereof.

11. <u>Governing Law</u>. This Escrow Agreement shall be construed, performed and enforced in accordance with, and governed by, the laws of the State of Minnesota without giving effect to the principles of conflicts of laws thereof.

12. <u>Notices</u>. All notices, approvals, consents, requests, and other communications hereunder shall be in writing and shall be delivered by hand, overnight delivery service, electronic mail or facsimile transmitter (with confirmed receipt) to the physical address, electronic address or facsimile number set forth in this section, or to such other address as each party may designate for itself by like notice, and shall be deemed to have been given on the date received.

If to Buyer:          Cave Enterprises Operations, LLC
                      1624 West 18th Street

Chicago, IL 60608
Attention: Adam Velarde, Managing Member
Facsimile: ___-___-____
Email: adam.velarde@comcast.net

With copies to (which shall not constitute notice):

Greiman, Rome & Griesmeyer, P.C.
200 West Madison, Suite 755
Chicago, Illinois 60606
Attention: Adam B. Rome, Esq.
Facsimile: (312) 332-2781
Email: arome@grglegal.com

If to Seller:        Duke and King Acquisition Corp.
12281 Nicollet Avenue, South
Burnsville, MN 55337
Attention:      Becky Moldenhauer
E-Mail bmoldenhauer@dukeandking.com
Facsimile:     952-288-2327

With a copy to      McDonald Hopkins LLC
600 Superior Avenue, East
Suite 2100
Cleveland, Ohio 44114
Attention:      Scott N. Opincar
E-Mail         sopincar@mcdonaldhopkins.com
Facsimile:      (216) 348-5474

If to the Escrow Agent: _____
_____
_____
_____

or to such other address as may have been designated in a prior notice. Notices sent by registered or certified mail, postage prepaid, return receipt requested, shall be deemed to have been given two business days after being mailed; notices sent by a nationally recognized commercial overnight carrier shall be effective the next business day after receipted delivery to such courier specifying overnight delivery; notices sent by facsimile shall be effective upon confirmation of receipt at the number specified above otherwise, notices shall be deemed to have been given when delivered to the address specified above (or other address specified in accordance with the foregoing). The applicable persons designated on Exhibit C attached hereto are duly authorized signatories for Buyer and Seller, respectively, and have authority on behalf of the respective parties to execute and deliver this Agreement and any Joint Instruction contemplated by this Agreement. Any modification of such authorized signatories shall be provided by written notice delivered to the Escrow Agent.

     13.   Execution in Counterparts. This Escrow Agreement and any related Joint Instruction may be executed in multiple counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same document.

14.   Modification. This Escrow Agreement may be modified or amended only by joint written instructions to the Escrow Agent, signed by Buyer and Seller, or by a subsequent writing signed by Buyer, Seller and the Escrow Agent.

15.   Binding Effect. This Escrow Agreement and all of the provisions hereof shall be binding upon and inure to the benefit of Buyer, Seller and the Escrow Agent, and their respective successors and assigns.

16.   Severability. If any provision of this Escrow Agreement, or the application thereof to any person or circumstance, should, for any reason and to any extent, be invalid or unenforceable, the remainder of this Escrow Agreement and the application of such provision to other persons or circumstances shall not be affected thereby, but rather shall be enforced to the greatest extent permitted by law.

17.   Patriot Act Disclosure. To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each individual or entity that opens an account. Therefore, the Escrow Agent must obtain the name, address, taxpayer or other government identification number, and other information, such as date of birth for individuals, for each individual and business entity that is a party to this Escrow Agreement. For individuals signing this Escrow Agreement on their own behalf or on behalf of another, the Escrow Agent requires a copy of a driver's license, passport or other form of photo identification. For business and other entities that are parties to this Escrow Agreement, the Escrow Agent will require such documents as it deems necessary to confirm the legal existence of the entity. At the time of or prior to execution of this Escrow Agreement, any party providing a tax identification number for tax reporting purposes shall provide to the Escrow Agent a completed IRS Form W-9, and every individual executing this Agreement on behalf of party shall provide to the Agent a copy of a driver's license, passport or other form of photo identification acceptable to the Agent. The parties hereto agree to provide to the Escrow Agent such organizational documents and documents establishing the authority of any individual acting in a representative capacity as the Escrow Agent may require in order to comply with its established practices, procedures and policies. The Escrow Agent is authorized and directed to report all interest and other income earned on the Escrow Funds in accordance with the Form W-9 information provided to the Escrow Agent. Buyer and Seller understand that, in the event one or more tax identification numbers are not certified to the Escrow Agent, the Internal Revenue Code, as amended from time to time, may require withholding of a portion of any interest or other income earned on the Escrow Funds

IN WITNESS WHEREOF, this Escrow Agreement has been executed by Buyer, Seller and the Escrow Agent on the date and year first written above.

**SELLER**

DUKE AND KING ACQUISITION CORP.

By:_____

Name:_____

Title:_____

**BUYER**

CAVE ENTERPRISES OPERATIONS, LLC

By:_____

Name:_____

Title:_____

**ESCROW AGENT**

_____

By:_____

Name:_____

Title:_____

## EXHIBIT A

## MONEY MARKET ACCOUNT AUTHORIZATION
### DESCRIPTION AND TERMS

The _____ account is a _____ interest-bearing money market deposit account designed to meet the needs of _____'s Corporate Trust Services Escrow Group and other Corporate Trust customers of _____. Selection of this investment includes authorization to place funds on deposit and invest with U.S. Bank.

_____ uses the daily balance method to calculate interest on this account (actual/365 or 366). This method applies a daily periodic rate to the principal balance in the account each day. Interest is accrued daily and credited monthly to the account. Interest rates are determined at _____'s discretion, and may be tiered by customer deposit amount.

The owner of the account is _____ as Agent for its trust customers. _____'s trust department performs all account deposits and withdrawals. Deposit accounts are FDIC Insured per depositor, as determined under FDIC Regulations, up to applicable FDIC limits.

## AUTOMATIC AUTHORIZATION

In the absence of specific written direction to the contrary, _____ is hereby directed to invest and reinvest proceeds and other available moneys in the _____ Money Market Account. The _____ Money Market Account is a permitted investment under the operative documents and this authorization is the permanent direction for investment of the moneys until notified in writing of alternate instructions.

## EXHIBIT B
### ESCROW AGENT'S FEE SCHEDULE

I.    Acceptance Fee:                                       Waived

        The acceptance fee includes the administrative review of documents, initial set-up of the account, and other reasonably required services up to and including the closing. This is a flat one-time fee, payable at closing.

II.    Annual Administration Fee:                    $_____

        Annual administration fee for performance of the routine duties of the escrow agent associated with the management of the account. Administration fees are payable in advance without pro-ration for partial years.

III.    Out-of-Pocket Expenses:                       At Cost

Reimbursement of expenses associated with the performance of our duties, including but not limited to fees and expenses of legal counsel, accountants and other agents, tax preparation, reporting and filing, publications, and filing fees. Out-of-pocket expenses are subject to prior written approval by both Buyer and Seller, which approval shall not be unreasonably withheld.

IV.    Extraordinary Fees or Expenses:

Extraordinary fees are payable to the Agent for duties or responsibilities not expected to be incurred at the outset of the transaction, not routine or customary, and not incurred in the ordinary course of business, subject to prior written approval by both Buyer and Seller, which approval shall not be unreasonably withheld. Extraordinary services might include amendments, specialized reporting, use investments not automated with the Escrow Agent's trust accounting system, and actual or threatened litigation or arbitration proceedings.

IMPORTANT INFORMATION ABOUT PROCEDURES FOR OPENING A NEW ACCOUNT

To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account. For a non-individual person such as a business entity, a charity, a Trust or other legal entity we will ask for documentation to verify its formation and existence as a legal entity. We may also ask to see financial statements, licenses, identification and authorization documents from individuals claiming authority to represent the entity or other relevant documentation.

## EXHIBIT C

**Authorized Signatories:**

**Buyer: CAVE ENTERPRISES OPERATIONS, LLC.**

The following person(s) are hereby designated and appointed as authorized representatives of Buyer **(only one signature shall be required for any direction):**

| | |
|---|---|
| _____ | _____ |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |

**Seller:**

The following person(s) are hereby designated and appointed as authorized representatives of Seller **(only one signature shall be required for any direction):**

| | |
|---|---|
| _____ | _____ |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |
| _____ | _____ |
| Name | Specimen signature |

## Exhibit C

### Form of Sale Order

Please see attached.

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**********************************************************************

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER**<br>**CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes:<br>Duke and King Missouri, LLC;<br>Duke and King Missouri Holdings, Inc.;<br>Duke and King Real Estate, LLC;<br>DK Florida Holdings, Inc.) | 10-38653 (GFK)<br>10-38654 (GFK)<br>10-38655 (GFK)<br>10-38656 (GFK) |
| | Chapter 11 Cases<br>Chief Judge Gregory F. Kishel |

**********************************************************************

## ORDER AUTHORIZING DEBTORS TO (I) SELL ASSETS FREE AND CLEAR OF LIENS, CLAIMS, INTERESTS AND ENCUMBRANCES; (II) ASSUME AND ASSIGN CERTAIN UNEXPIRED LEASES AND EXECUTORY CONTRACTS; AND (III) ESTABLISH CURE COSTS

**********************************************************************

The sale motion of above-referenced Debtors for Orders (i) Scheduling a Hearing on Stalking Horse Bids; (ii) Approving Stalking Horse Protection Fees; (iii) Approving Form of Stalking Horse Asset Purchase Agreements; (iv) Approving Form and Manner of Sale Notice and Cure Notice; (v) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (vi) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs (the "Sale Motion") came before the undersigned on May 10, 2011. Cave Enterprises Operations, LLC, (the "Buyer") has been named as the Successful Bidder[1] of the Wisconsin Region and Illinois Region for the Acquired Assets that are identified in that certain asset purchase agreement dated April 26, 2011, by and

---

[1] All capitalized terms used but not otherwise defined herein shall have the meanings ascribed to them in the Sale Motion or the APA, as applicable.

among Debtor, Duke and King Acquisition Corp. and Buyer (the "APA"), as attached hereto as Exhibit 1.  Appearances were noted on the record.

Based on the Sale Motion, the arguments of counsel, all the files, records and proceedings herein, the Court being advised in the premises, and for those reasons stated orally and recorded in open court following the close of evidence:

**IT IS HEREBY FOUND THAT:**[2]

A.      This Court has jurisdiction to hear and determine the Sale Motion pursuant to 28 U.S.C. §§ 157 and 1334 and Local Rule 1070-1.

B.      Venue of the Debtors' chapter 11 cases (the "Chapter 11 Cases") in this District is proper pursuant to 28 U.S.C. § 1409(a).

C.      Determination of the Sale Motion is a core proceeding under 28 U.S.C. § 157(b)(2)(A) and (N).  The statutory predicates for the relief requested herein are sections 105(a), 363(b), (f) and (m), and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004 and 6006.

D.      This Sale Approval Order constitutes a final order within the meaning of 28 U.S.C. § 158(a).  Notwithstanding Bankruptcy Rules 6004(h) and 6006(d), and to any extent necessary under Bankruptcy Rule 9014 and Rule 54(b) of the Federal Rules of Civil Procedure, as made applicable by Bankruptcy Rule 7054, the Court expressly finds that there is no just reason for delay in the implementation of this Sale Approval Order, and expressly directs entry of judgment as set forth herein.

---

[2]   Findings of fact shall be construed as conclusions of law and conclusions of law shall be construed as findings of fact when appropriate.  See Bankruptcy Rule 7052. B.  To the extent any of the findings of fact contained herein constitute conclusions of law, they are adopted as such.  To the extent any of the conclusions of law contained herein constitute findings of fact, they are adopted as such.

E.     A hearing on the Debtors' Motion for an Order Approving Sale and Bidding Procedures was held by this Court on January 24, 2011, and, on that date, the Court entered the Order Approving Sale and Bidding Procedures (the "Procedures Order").  The Debtors and the Buyer have complied with the Procedures Order in all respects.

F.     Pursuant to the Procedures Order, the Debtors timely received two Qualified Bids on or before April 19, 2011 for the Wisconsin Region and Illinois Region, and, the Group One Auction was held for the Wisconsin Region and Illinois Region.  At the conclusion of the Group One Auction, the Buyer was named the Successful Bidder and Heartland Food Corp. ("Heartland") was named the Reserve Bidder.  The Sale Procedures Order (as amended)[3] set May 10, 2011 as the date of the hearing (the "Sale Approval Hearing") for an order to approve the sale.

G.     On April 11, 2011, the Debtors filed the Sale Motion and served copies of the Sale Motion in compliance with Local Rule 9013-3(a)(2).  On April 18, 2011, the Debtors served the Notice of Sale Approval Hearing in compliance with this Court's orders.  On April 18, 2011, the Debtors served the Notice Concerning Unexpired Leases and Executory Contracts and Establishing Cure Costs on the counterparties to such leases and contracts.

H.     On April 14, 2011, the Court entered the Order (A) Approving Stalking Horse Bidders; (B) Approving Form of Stalking Horse Asset Purchase Agreement, and (C) Approving Stalking Horse Protection Fee, which, among other things, approved Heartland as the stalking horse bidder for the Acquired Assets located in the Wisconsin Region and Illinois Region.

I.     Based upon the foregoing and the certificates of service and publication filed with the Court, due, proper, timely, adequate and sufficient notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the

---

[3]   The timeline set forth in the Procedures Order was subsequently amended by stipulation.

Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts and the proposed rejection of the contracts has been provided in accordance with sections 102(1), 363(b) and 365 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, 6006, 9007 and 9008 and in compliance with the Procedures Order and no other or further notice of the Sale Motion, the initial hearing on the Sale Motion, the Group One Auction, the Sale Approval Hearing, the sale of the Acquired Assets, the proposed assumption and assignment of the Assumed Leases and Acquired Contracts or the entry of this Sale Approval Order is required or necessary.

J.      All parties in interest, including, without limitation, all parties who claim an interest in or lien upon the Acquired Assets, all shareholders of the Debtors, all federal, state and local environmental authorities, and all U.S. or foreign federal, state and local governmental taxing authorities who have, or as a result of the sale of Acquired Assets may have, claims, contingent or otherwise against the Debtors, have been given a reasonably opportunity to object and be heard, regarding the relief requested in the Sale Motion.  All objections to the Sale Motion were resolved, withdrawn or overruled at the Sale Approval Hearing.

K.      As demonstrated by the testimony or other evidence proffered or adduced at the Sale Approval Hearing: (i) the offer from the Buyer constitutes the highest and best offer for the Acquired Assets; (ii) the Debtors conducted an auction process in accordance with, and have otherwise complied in all respects with, the Procedures Order; (iii) the auction process set forth in the Procedures Order afforded a full, fair, and reasonable opportunity for any person or entity to make a higher or otherwise better offer to purchase the Acquired Assets; and (iv) the Group One Auction was duly noticed and conducted in a non-collusive, fair, and good faith manner and a reasonable opportunity has been given to any interested party to make a higher and better offer for the Acquired Assets.

L.     In accordance with the Procedures Order, the APA was deemed a Qualified Bid (as defined in the Sale Procedures) and was eligible to participate at the Group One Auction.

M.     The APA constitutes the highest and best offer for the Acquired Assets, and will provide a greater recovery for the Debtors' estates than would be provided by any other available alternative.  The Debtors' determination that the APA constitutes the highest and best offer for the Acquired Assets constitutes a valid and sound exercise of the Debtors' business judgment.

N.     The APA represents a fair and reasonable offer to purchase the Acquired Assets under the circumstances of the Chapter 11 Cases.  No other person or entity or group of entities has offered to purchase the Acquired Assets for greater economic value to the Debtors' estates than the Buyer.

O.     The purchase price as set forth in the APA (the "Purchase Price") for the Acquired Assets is fair and reasonable, and constitutes reasonable consideration and reasonably equivalent value (as those terms are defined in each of the Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and section 548 of the Bankruptcy Code) under the Bankruptcy Code and under the laws of the United States, any state, territory, possession or the District of Columbia.  Approval of the APA and the sale of the Acquired Assets in accordance with this Sale Approval Order and the APA are in the best interests of the Debtors' estates, creditors and other parties in interest.  The terms of the APA were negotiated at arms' length and are fair and reasonable under the circumstances.

P.     The APA was not entered into for the purpose of hindering, delaying or defrauding creditors under the Bankruptcy Code or under the laws of the United States, any state, territory, possession or the District of Columbia. Neither the Debtors nor the Buyer is entering into the transactions contemplated by the APA fraudulently for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims.

Q.    The Debtors have demonstrated compelling circumstances and good, sufficient and sound business purposes for the sale of the Acquired Assets pursuant to section 363(b) of the Bankruptcy Code outside of a plan of reorganization.

R.    Each of the Debtors, as applicable, (i) has full corporate or other power to execute, deliver and perform its obligations under the APA and all other documents contemplated thereby or entered into in connection therewith, and the Sale of the Acquired Assets by the Debtors has, in each case, been duly and validly authorized by all necessary corporate or similar action, and (ii) has taken all action necessary to authorize and approve the APA and such other documents contemplated thereby and the consummation by them of the transactions contemplated thereby or entered into connection therewith.    No third-party approvals, other than those expressly provided for in the APA, if any, are required by the Debtors to consummate such transactions.

S.    The Debtors are authorized and directed to sell and transfer the Acquired Assets free and clear of all mortgages, restrictions, hypothecations, charges, indentures, loan agreements, instruments, leases, licenses, options, deeds of trust, security interests, conditional sale or other title retention agreements, pledges, liens (including, without limitation, mechanics', materialmens' and other consensual and non-consensual liens and statutory liens), judgments, demands, rights of first refusal (other than the rights of first refusal of Burger King Corporation under applicable franchise agreements) offsets, contracts, recoupment, rights of recovery, claims for reimbursement, contribution, indemnity, exoneration, products liability, alter-ego, environmental, or tax, decrees of any court or foreign or domestic governmental entity, or charges of any kind or nature, if any, including, but not limited to, any restriction on the use, voting, transfer, receipt of income or other exercise of any attributes of ownership, debts arising in any way in connection with any agreements, acts, or failures to act, of the Debtors or the

Debtors' predecessors or affiliates, claims (as that term is used in the Bankruptcy Code), reclamation claims, obligations, liabilities, demands, guaranties, options, rights, contractual or other commitments, restrictions, interests and matters of any kind and nature, whether known or unknown, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, perfected or unperfected, allowed or disallowed, contingent or non-contingent, liquidated or unliquidated, matured or unmatured, material or non-material, disputed or undisputed, whether arising prior to or subsequent to the commencement of the bankruptcy case, and whether imposed by agreement, understanding, law, equity or otherwise, including claims otherwise arising under doctrines of successor liability (collectively, "Liens, Claims, Encumbrances and Interests") with such Liens, Claims, Encumbrances and Interests to attach to the consideration to be received by the Debtors in the same priority and subject to the same defenses and avoidability, if any, as before the Closing, and Buyer would not enter into the APA to purchase the Acquired Assets otherwise.

T.      Those holders of Liens, Claims, Encumbrances and Interests against the Debtors, their estates or any of the Acquired Assets who did not object, or who withdrew their objections, to the sale or the Sale Motion are deemed to have consented to the sale pursuant to section 363(f)(2) of the Bankruptcy Code. The Debtors have met the requirements of section 363(f) with respect to all other holders of Liens, Claims, Encumbrances and Interests as such Claim holders will have their Liens, Claims, Encumbrances and Interests, if any, in each instance against the Debtors, their estates or any of the Acquired Assets, attach to the net cash proceeds of the sale ultimately attributable to the Acquired Assets, in which such creditor alleges a Claim, in the same order of priority, with the same validity, force and effect that such Liens, Claims, Encumbrances and Interests had prior to the sale, subject to any claims and defenses the Debtors and their estates may possess with respect thereto.

U.     The Buyer would not have entered into the APA and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors, their estates and their creditors, if the sale of the Acquired Assets to the Buyer, the assumption of liabilities and obligations as set forth in the APA by the Buyer and the assignment of the Assumed Leases and Acquired Contracts were not free and clear of all Liens, Claims, Encumbrances and Interests.

V.     The APA was negotiated, proposed and entered into by the parties in good faith, from arms' length bargaining positions and without collusion.

W.     The Debtors have followed in good faith the procedures for notice and sale of the Acquired Assets as set forth in the Procedures Order.

X.     The Buyer is not an "insider" or "affiliate" of the Debtors (as each such term is defined in the Bankruptcy Code).  Neither the Debtors nor the Buyer have engaged in any conduct that would prevent the application of section 363(m) of the Bankruptcy Code or cause the application of section 363(n) of the Bankruptcy Code to the sale and the transactions contemplated by the APA. Specifically, the Buyer has not acted in a collusive manner with any person and the aggregate price paid by Buyer for the Acquired Assets was not controlled by any agreement among the bidders.

Y.     The Buyer is entitled to the protections afforded under section 363(m) of the Bankruptcy Code because the Buyer is a good faith purchaser in that, *inter alia*:  (i) except as set forth in the Procedures Order, the Buyer recognized that the Debtors were free to deal with any other party interested in acquiring the Acquired Assets; (ii) the Buyer complied with the provisions in the Procedures Order; (iii) the Buyer agreed to subject its bid to the competitive bidding procedures set forth in the Procedures Order; (iv) the Buyer in no way induced or caused the chapter 11 filings by the Debtors; (v) all payments to be made by the Buyer in connection with the sale have been disclosed; (vi) no common identity of directors or controlling

stockholders exists between the Buyer and any of the Debtors; and (vii) the negotiation and execution of the APA was at arms' length and in good faith.

Z.    In the absence of a stay pending appeal, if any, if the Closing occurs at any time after entry of this Sale Approval Order, then, with respect to the APA, the Buyer, as a purchaser in good faith of the Acquired Assets, shall be entitled to the protections of section 363(m) of the Bankruptcy Code if this Sale Approval Order or any authorization contained herein is reversed or modified on appeal.

AA.    The Debtors are the sole and lawful owners of the Acquired Assets.  Effective as of the Closing, the transfer of the Acquired Assets is or will (i) be legal, valid and effective transfers of property of the Debtors' estates to the Buyer, as more particularly set forth in the APA, and (ii) vest the Buyer with all right, title, and interest of the Debtors and the Debtors' estates in and to the Acquired Assets free and clear of all Liens, Claims, Encumbrances and Interests  under sections 363(f) and 105 of the Bankruptcy Code.

BB.    The Debtors have demonstrated that it is an exercise of their sound business judgment to assume and assign those Assumed Leases and Acquired Contracts, as defined in the APA and described on Schedules B and 1.1(g) to the APA, including any amendments or modifications to such exhibits as agreed to by the Debtors and Buyer pursuant to the APA, in connection with the consummation of the sale of Acquired Assets, and the assumption and assignment of the Assumed Leases and Acquired Contracts is in the best interests of the Debtors, their estates, their creditors and their equityholders.

CC.    The Assumed Leases and Acquired Contracts being assigned to the Buyer as set forth in the APA are an integral part of the Debtors' businesses being purchased by the Buyer and, accordingly, such assumption and assignment of Assumed Leases and Acquired Contracts is

reasonable, enhances the value of the Debtors' estates, and does not constitute unfair discrimination.

DD. The Assumed Leases and Acquired Contracts are unexpired leases or executory contracts within the meaning of the Bankruptcy Code.

EE. All amounts which are required to be paid in connection with the assumption and assignment of the Assumed Leases and Acquired Contracts that are due or owing under sections 365(b)(1)(A) and (B), and 365(f)(2)(A) of the Bankruptcy Code to (i) cure any defaults under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order or (ii) pay all actual or pecuniary losses that have resulted from such defaults (except with respect to those liabilities expressly assumed by the Buyer pursuant to the APA) are set forth on Exhibit 2 hereto (the "Cure Costs").

FF. Any objections to the Cure Costs associated with such Assumed Leases and Acquired Contracts are resolved as set forth on Exhibit 2 to this Sale Approval Order. To the extent that any counterparty failed to timely object to (i) the proposed assumption and assignment of the applicable Assumed Lease or Acquired Contract or (ii) the Cure Cost associated with the applicable Assumed Lease or Acquired Contract, such counterparty is deemed to have consented to such Cure Cost and the assumption and assignments of its respective Assumed Lease or Acquired Contract to the Buyer as expressly set forth on Exhibit 2 to this Sale Approval Order.

GG. The promises of Buyer and/or the Debtors to pay the Cure Costs and the Buyer's promise to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order that are being assigned to it within the meaning of sections 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

HH.    Adequate notice and opportunity to be heard was provided to counterparties to executory contracts and unexpired leases to be assumed and assigned pursuant to this Sale Approval Order.  Further, counterparties received adequate notice and an opportunity to object to the amount of any Cure Costs owed by the Debtors' estates on account of any executory contract or unexpired lease to be assumed and assigned to the Buyer under the APA.

II.    The assumption and assignment of the Assumed Leases and Acquired Contracts is integral to the APA and is in the best interests of the Debtors and their estates, creditors and equityholders and represents the exercise of the Debtors' sound business judgment.

JJ.    Any objections to the assumption and assignment of any of the Assumed Leases and Acquired Contracts to the Buyer are hereby overruled.

KK.    Neither the Buyer nor its affiliates shall be deemed, as a result of any action taken in connection with the purchase of the Acquired Assets, to: (i) be a successor (or other such similarly situated party) to any of the Debtors (other than with respect to the Assumed Liabilities as expressly stated in the APA); (ii) have, de facto or otherwise, merged with or into any of the Debtors; (iii) be a mere continuation of the Debtors or their estates (and there is no continuity of enterprise between the Buyer and the Debtors); or (iv) be holding itself out to the public as a continuation of the Debtors.  The Buyer is not acquiring or assuming any liability, warranty or other obligation of the Debtors, except as expressly set forth in the APA with respect to the Assumed Liabilities.

LL.    The Debtors have good, valid and marketable title to all of the Acquired Assets. The Acquired Assets are to be transferred free and clear of any and all Liens, Claims, Encumbrances and Interests.  All of the Acquired Assets are, or will on the Closing Date, be owned by the Debtors and will be transferred under the APA.

MM.    Other than the Assumed Liabilities, the Buyer shall have no obligations with respect to any liabilities of the Debtors, including, without limitation, the Excluded Liabilities, and the Debtors and their estates will release and forever discharge the Buyer and any of its affiliates, its successors and assigns from any and all claims, causes of action, obligations, liabilities, demands, losses, costs and expenses of any kind, character or nature whatsoever, known or unknown, fixed or contingent, relating to the sale, except for liabilities and obligations under the APA.

**IT IS HEREBY ORDERED:**

**General Provisions**

1.    The Sale Motion is hereby granted to the extent provided herein.

2.    All objections to the Sale Motion or the relief requested therein that have not been withdrawn, waived, or settled, including all reservations of rights included therein, which are not otherwise provided for by this Sale Approval Order, are overruled on the merits.

**Approval of the APA**

3.    Each and every term of the APA (attached hereto as Exhibit 1) and all other ancillary documents is hereby approved.

4.    The sale of the Acquired Assets to Buyer pursuant to the APA is hereby authorized under section 363(b) of the Bankruptcy Code and the entry of the Debtors into the APA is hereby approved.  The proceeds from the sale of the Acquired Assets as provided in the APA shall be paid in accordance with further orders of the Court.

5.    The Debtors, through any corporate officer, are authorized and directed to execute and deliver, and empowered to fully perform under, consummate, implement and close the APA, together with all additional instruments and documents that may be reasonably necessary or desirable to implement such agreements, including taking any actions that otherwise would

require further approval by shareholders or their respective boards of directors (without the need of obtaining such approvals) and to take all further actions as may be reasonably requested by the Buyer for the purpose of assigning, transferring, granting, conveying and conferring to the Buyer, or reducing to possession, any or all of the Acquired Assets, or as may be necessary or appropriate to the performance of the obligations of the Debtors under the APA, including effectuating amendments to the APA in furtherance thereof. All Persons necessary to effect the transactions contemplated by the APA are hereby ordered to execute any and all documents necessary to effect such transactions. If any Person fails to comply with the provisions of this paragraph 5 prior to the Closing Date, such Person (or Persons, as the case may be) shall nonetheless be deemed bound to any and all documents necessary to effect the transactions contemplated under the APA.

6.      The Buyer shall not be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the APA or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the preceding sentence and the other provisions of this Sale Approval Order.

## Transfer of the Acquired Assets

7.      Pursuant to Sections 105(a), 363(b) and 363(f) of the Bankruptcy Code, the Acquired Assets shall be transferred to the Buyer, in accordance with the APA, and such transfer shall constitute a legal, valid, binding, and effective transfer of such Acquired Assets and shall vest the Buyer with title to the Acquired Assets, free and clear of any and all Claims, Liens, Interests and Encumbrances and other liabilities and claims, whether secured or unsecured, choate or inchoate, filed or unfiled, scheduled or unscheduled, noticed or unnoticed, recorded or unrecorded, contingent or non-contingent, liquidated or unliquidated, matured or unmatured,

disputed or undisputed, or known or unknown, whether arising prior to or subsequent to the Petition Date, whether imposed by agreement, understanding, law, equity or otherwise, with all such Claims, Liens, Interests and Encumbrances to attach only to the proceeds of the sale with the same priority, validity, force, and effect, if any, as they now have in or against the Acquired Assets, subject to all claims and defenses the Debtors may possess with respect thereto. The Sale Motion shall be deemed to provide sufficient notice as to the sale of the Acquired Assets free and clear of Claims, Liens, Interests and Encumbrances. All such Liens, Claims, Encumbrances and Interests released, terminated and discharged as to the Acquired Assets shall attach to the sale proceeds with the same validity, force and effect which they now have as against the Debtors, the estates or the Acquired Assets.

8.      The provisions of this Sale Approval Order authorizing the sale of the Acquired Assets free and clear of Liens, Claims, Encumbrances and Interests, and the Assumed Liabilities, shall be self-executing, and neither the Debtors nor the Buyer shall be required to execute or file releases, termination statements, assignments, consents, or other instruments in order to effectuate, consummate and implement the provisions of this Sale Approval Order. However, the Debtors and the Buyer, and each of their respective officers, employees and agents, so long as the same remain employed by the Debtors, are hereby authorized and empowered to take all actions and execute and deliver any and all documents and instruments that either the Debtors or the Buyer deem necessary or appropriate to implement and effectuate the terms of the APA and this Sale Approval Order. Moreover, effective as of the Closing, the Buyer, its successors and assigns, shall be designated and appointed the Debtors' true and lawful attorney and attorneys, with full power of substitution, in the Debtors' name and stead, on behalf and for the benefit of the Buyer, its successors and assigns, to demand and receive any and all of the Acquired Assets and to give receipts and releases for and in respect of the Acquired Assets, or any part thereof,

and from time to time to institute and prosecute in the Debtors' name, for the benefit of the Buyer, its successors and assigns, any and all proceedings at law, in equity or otherwise, which the Buyer, its successors and assigns, may deem proper for the collection or reduction to possession of any of the Acquired Assets, and to do all acts and things with respect to the Acquired Assets which the Buyer, its successors and assigns, shall deem desirable. The foregoing powers are coupled with an interest and are and shall be irrevocable by the Debtors.

9.      To the greatest extent available under applicable law, the Buyer shall be authorized, as of the Closing Date, to operate under any license, permit, registration and governmental authorization or approval of the Debtors with respect to the Acquired Assets, and all such licenses, permits, registrations and governmental authorizations and approvals are deemed to have been, and hereby are, directed to be transferred to the Buyer as of the Closing Date.

10.      All persons and entities (including, but not limited to, the Debtors, creditors, equityholders, including, without limitation, employees, former employees and shareholders, administrative agencies, governmental departments, secretaries of state, federal, state and local officials) and their respective successors or assigns and any trustees thereof, shall be and are hereby permanently and forever barred, restrained and enjoined from commencing or continuing in any manner any action or other proceeding of any kind against the Acquired Assets or the Buyer and its successors or assigns as alleged successor or otherwise with respect to any Liens, Claims, Encumbrances and Interests of any kind and nature with respect to the Acquired Assets other than Assumed Liabilities, except as otherwise provided in the APA. If the proposed sale to the Buyer fails to close for any reason, then Liens, Claims, Encumbrances and Interests shall continue against the Acquired Assets unaffected by this Sale Approval Order.

11. Except for Assumed Liabilities as set forth in the APA, the transfer of the Acquired Assets pursuant to this Sale Approval Order shall not subject the Buyer to any liability with respect to any obligations incurred in connection with, or in any way related to the Acquired Assets, prior to the date of Closing or by reason of such transfer under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, based, in whole or in part, directly or indirectly, on any theory of law or equity, including, without limitation, any theory of equitable subordination or successor or transferee liability.

**Assumption and Assignment to Buyer of Assumed Leases and Acquired Contracts**

12. Pursuant to sections 105(a) and 365 of the Bankruptcy Code, and subject to and conditioned upon the Closing of the Sale, the Debtors' assumption and assignment to the Buyer, and the Buyer's assumption on the terms set forth in the APA, of the Assumed Leases and Acquired Contracts specified in this Sale Approval Order is approved, and the requirements of section 365(b)(1) of the Bankruptcy Code with respect thereto are deemed satisfied.

13. The Debtors are authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to (a) assume and assign to Buyer, effective upon the Closing of the Sale, the Assumed Leases and Acquired Contracts specified on Exhibit 2 to in this Sale Approval Order; and (b) execute and deliver to the Buyer such documents or other instruments as may be necessary to assign and transfer the Assumed Leases and Acquired Contracts specified in this Sale Approval Order.

14. With respect to the Assumed Leases and Acquired Contracts: (a) each Assumed Lease and Acquired Contract, as applicable, is an unexpired lease or executory contract under section 365 of the Bankruptcy Code; (b) the Debtors may assume each of the Assumed Leases and Acquired Contracts in accordance with section 365 of the Bankruptcy Code; (c) the Debtors may assign each Assumed Lease and Acquired Contract in accordance with sections 363 and 365

of the Bankruptcy Code, and any provisions in any Assumed Lease or Acquired Contract that prohibit or condition the assignment of such Assumed Lease or Acquired Contract or allow the party to such Assumed Lease or Acquired Contract to terminate, recapture, impose any penalty, condition renewal or extension, or modify any term or condition upon the assignment of such Assumed Lease or Acquired Contract, constitute unenforceable anti-assignment provisions which are void and of no force and effect; (d) all other requirements and conditions under sections 363 and 365 of the Bankruptcy Code for the assumption by the Debtors and assignment to the Buyer of each Assumed Lease and Acquired Contract have been satisfied; and (e) upon Closing, in accordance with sections 363 and 365 of the Bankruptcy Code, the Buyer shall be fully and irrevocably vested in all right, title and interest of each Assumed Lease and Acquired Contract set forth on Exhibit 2 hereto.

15.     Each of the Assumed Leases and Acquired Contracts specified on Exhibit 2 to this Sale Approval Order, upon assignment to the Buyer, shall be deemed to be valid and binding on the Buyer and in full force and effect and enforceable in accordance with their terms, and following such assignment, the Debtors and the estates shall be relieved, pursuant to section 365(k) of the Bankruptcy Code, any liability for any breach of such Assumed Leases and Acquired Contracts occurring after such assignment.

16.     Each non-Debtor party to an Assumed Lease and Acquired Contract specified in this Sale Approval Order is hereby barred and enjoined from asserting against the Buyer, the Debtors or the Debtors' estates (a) any default existing as of the date of the Sale Approval Hearing if such default was not raised or asserted in a timely manner prior to the entry of this Sale Approval Order or (b) any objection to the assumption and assignment of such non-Debtor party's Assumed Leases and Acquired Contracts or the Cure Cost, if any, of which the non-Debtor party was given notice prior to the Sale Hearing.  The assignment of each such Assumed

Leases and Acquired Contracts to the Buyer will not cause a default or otherwise allow the non-Debtor party thereto to terminate or adversely affect the Buyer's rights thereunder.

17.     All defaults or other obligations of the Debtors under the Assumed Leases and Acquired Contracts arising or accruing prior to the satisfaction of the terms and conditions of the APA and the closing of the transactions contemplated under the APA (without giving effect to any acceleration clauses or any default provisions of the kind specified in section 365(b)(2) of the Bankruptcy Code) shall be cured by the Buyer or the Debtors (in accordance with the APA) by payment of the applicable Cure Costs (such amounts as established in accordance with this Sale Approval Order and set forth hereto on Exhibit 2) at the closing or as soon thereafter as practicable, and the Buyer shall have no liability or obligation with respect to defaults, breaches or other obligations incurred, arising or accruing prior to the Closing Date, except as otherwise expressly provided herein or in the APA.

18.     The payment of the applicable Cure Costs, in the amounts set forth on Exhibit 2 hereto and in accordance with the APA, shall (a) effect a cure of all defaults existing thereunder as of the date that such Assumed Lease or Acquired Contract is assumed and (b) compensate for any actual pecuniary loss to such non-Debtor party resulting from such default.  To the extent that any counterparty to an Assumed Lease or Acquired Contract did not object timely to its Cure Costs in accordance with the Procedures Order, such counterparty is deemed to have consented to such Cure Cost and the assignments of its respective Assumed Lease or Acquired Contract to the Buyer.

19.     There shall be no rent accelerations, assignment fees, increases or any other fees charged to the Buyer or the Debtors as a result of the assumption, assignment and/or transfer of the Assumed Leases and Acquired Contracts.

20.     The Debtors' or the Buyer's (or its designated affiliate's) promise to pay the Cure Costs and to perform the obligations under the Assumed Leases and Acquired Contracts after the Closing Date shall constitute adequate assurance of its future performance under the Assumed Leases and Acquired Contracts specified in this Sale Approval Order being assigned to it within the meaning of section 365(b)(1)(C) and (f)(2)(B) of the Bankruptcy Code.

21.     Notwithstanding anything to the contrary in this Sale Approval Order, no Acquired Contract or Assumed Lease shall be deemed to be assumed and assigned to the Buyer until the Closing of the sale.

22.     The Cure Costs paid by Buyer shall be a use of the Cash Consideration of the Unadjusted Purchase Price payable at Closing to Debtors.  Notwithstanding the sum of all Cure Costs set forth on Exhibit 2 hereto, Buyer shall in no event be liable for an aggregate amount of Cure Costs in excess of the Unadjusted Purchase Price.

23.     The failure of the Debtors or the Buyer to enforce at any time one or more terms or conditions of any Assumed Lease or Acquired Contract shall not be a waiver of such terms or conditions, or of the Debtors' and Buyer's rights to enforce every term and condition of the Assumed Leases and Acquired Contracts.

### Additional Provisions

24.     The transaction contemplated by the APA is undertaken by the Buyer in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and accordingly, the reversal or modification on appeal of the authorization provided herein to consummate the sale shall not affect the validity of the sale to the Buyer.  The Buyer is a purchaser in good faith of the Acquired Assets, and is entitled to all of the protections afforded by section 363(m) of the Bankruptcy Code.

25.     The consideration provided by the Buyer for the Acquired Assets under the APA (a) shall be deemed to constitute reasonably equivalent value and fair consideration under the Bankruptcy Code, Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act and under the other laws of the United States, any state, territory, possession or the District of Columbia and (b) is fair and reasonable and may not be avoided under section 363(n) or any other provision of the Bankruptcy Code, or otherwise.

26.     The Buyer is not a "successor" to the Debtors or their estates by reason of any theory of law or equity, and the Buyer shall not assume, nor be deemed to assume, or in any way be responsible for any liability or obligation of any of the Debtors and/or their estates including, but not limited to, any bulk sales law, successor liability, liability or responsibility for any claim against the Debtors or against an insider of the Debtors, or similar liability except as otherwise expressly provided in the APA, and the Sale Motion contains sufficient notice of such limitation in accordance with Bankruptcy Rules and applicable law.  Except to the extent the Buyer assumes the Assumed Liabilities pursuant to the APA, neither the purchase of the Acquired Assets by the Buyer or its affiliates, nor the fact that the Buyer or its affiliates are using any of the Acquired Assets previously operated by the Debtors, will cause the Buyer or any of its affiliates to be deemed a successor in any respect to the Debtors' businesses within the meaning of (i) any foreign, federal, state or local revenue, pension, ERISA, tax, labor, employment, antitrust, environmental, or other law, rule or regulation (including without limitation filing requirements under any such laws, rules or regulations), (ii) under any products liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, or under any product warranty liability law or doctrine with respect to the Debtors' liability under such law, rule or regulation or doctrine, (iii) any employment or labor agreements, consulting agreements, severance arrangements, change-in-control agreements or other similar agreement to

which the Debtors are a party, (iv) any pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, including, without limitation, any pension plan of the Debtors, (v) the cessation of the Debtor's operations, dismissal of employees, or termination of employment or labor agreements or pension, welfare, compensation or other employee benefit plans, agreements, practices and programs, obligations that might otherwise arise from or pursuant to the Employee Retirement Income Security Act of 1974, as amended, the Fair Labor Standard Act, Title VII of the Civil Rights Act of 1964, the Age Discrimination and Employment Act of 1967, the Federal Rehabilitation Act of 1973, the National Labor Relations Act, the Consolidated Omnibus Budget Reconciliation Act of 1985, COBRA, or the Worker Adjustment and Retraining Notification Act, (vi) environmental liabilities, debts, claims or obligations arising from conditions first existing on or prior to Closing (including, without limitation, the presence of hazardous, toxic, polluting, or contaminating substances or wastes), which may be asserted on any basis, including, without limitation, under the Comprehensive Environmental Response, Compensation and Liability Act, 42 U.S.C. § 9601 et seq., (vii) any liabilities, debts or obligations of or required to be paid by, the Debtors for any taxes of any kind for any period, (viii) any liabilities, debts, commitments or obligations for any taxes relating to the operation of the Acquired Assets prior to Closing, and (ix) any litigation.

27. Each of the Debtors' creditors is hereby authorized and directed to execute such documents and take all other actions as may be necessary to release such creditor's Liens, Claims, Encumbrances and Interests in the Acquired Assets, if any, as such Liens, Claims, Encumbrances and Interests may have been recorded or may otherwise exist. If any person or entity that has filed financing statements, mortgages, mechanic's liens, *lis pendens*, or other documents or agreements evidencing any Liens, Claims, Encumbrances and Interests in, against or upon the Acquired Assets prior to the Closing Date of the sale, in proper form for filing and

executed by the appropriate parties, and has not executed termination statements, instruments of satisfaction, releases of all Liens, Claims, Encumbrances and Interests which the person or entity has with respect to the Acquired Assets, then on the Closing Date, or as soon as possible thereafter, (a) the Debtors are hereby authorized and directed to execute and file such statements, instruments, releases and other documents on behalf of the person or entity with respect to the Acquired Assets and (b) the Buyer is hereby authorized on behalf of each of the Debtors' creditors, to file, register, or otherwise record a certified copy of this Sale Approval Order, which, once filed, registered or otherwise recorded, shall constitute conclusive evidence of the release of all Liens, Claims, Encumbrances and Interests in, against, or upon the Acquired Assets of any kind or nature whatsoever.

28.    All entities that are presently, or on the Closing Date may be, in possession of some or all of the Acquired Assets are hereby directed to surrender possession of the Acquired Assets to the Buyer on the Closing Date, or as otherwise directed by the Buyer, with the Liens, Claims, Encumbrances and Interests of such entity to be satisfied solely from the proceeds of the sale.

29.    Subject to the APA, this Sale Approval Order (a) is and shall be effective as a determination that, at Closing, all Liens, Claims, Encumbrances and Interests (except Assumed Liabilities) existing as to the Acquired Assets prior to the date of the Closing have been and hereby are unconditionally released, discharged and terminated as to the Acquired Assets, and that the conveyance described in this Sale Approval Order has been effected; (b) is and shall be effective to cause all Liens, Claims, Encumbrances and Interests (except Assumed Liabilities) to attach to and be perfected in the proceeds of the Sale of the Acquired Assets, in the order of their priority, with the same validity, force and effect which they now have as against the Acquired Assets, without the need to file any financing statements or other evidence of perfection; and (c)

is and shall be binding upon and govern the acts of all entities including without limitation, all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, and local officials, and all other persons and entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments, or who may be required to report or insure any title or state of title in or to any of the Acquired Assets.

30.    The Debtors or the Buyer and any agent or representative of either of them, are each hereby authorized and empowered to serve upon all filing and recording officers a notice when filing or recording any instruments of transfer (including, without limitation. deeds, leases, and assignments, modifications and terminations of leases) in accordance with this Sale Approval Order and the APA to evidence and implement this paragraph of this Sale Approval Order. All filing and recording officers are hereby directed to accept, file and record all instruments of transfer including, without limitation, deeds, leases, and assignments, modifications and terminations of leases (if any) to be filed and recorded pursuant to and in accordance with this Sale Approval Order or the APA and the various documents related thereto.

31.    This Court retains exclusive jurisdiction to (a) enforce and implement the terms and provisions of the APA, all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith, (b) compel delivery of the Acquired Assets to the Buyer, (c) resolve any disputes arising under or related to the APA and related agreements, (d) enjoin and adjudicate the assertion of any Liens, Claims, Encumbrances and Interests against the Buyer or the Acquired Assets, and (e) interpret, implement and enforce the provisions of this Sale Approval Order.

32.     As of the Closing, all agreements and all orders of this Court entered prior to the date hereof shall be deemed amended or modified solely to the extent required to permit the consummation of the transactions contemplated by this Sale Approval Order and the APA.

33.     Nothing contained (a) in any plan of reorganization (or liquidation) confirmed in the Chapter 11 Cases, (b) the order of confirmation confirming any plan of reorganization (or liquidation), (c) any order dismissing the Chapter 11 Cases or converting it to a chapter 7 liquidation or (d) any order appointing an examiner or trustee in the case shall conflict with or derogate from the provisions of the APA or the terms of this Sale Approval Order and no such plan or order shall discharge the obligations of the Debtors under this Sale Approval Order or the APA or any documents or agreements delivered in connection therewith.

34.     The terms and provisions of the APA, together with the terms and provisions of this Sale Approval Order, shall be binding in all respects upon, and inure to the benefit of, the Buyer, the Debtors, the Debtors' estates, any of Debtors' affiliates, successors and assigns, the Debtors' creditors, equityholders, including, without limitation, minority equityholders of the Debtors, and third parties, including, but not limited to persons asserting a Claim against or interest in the Debtors' estates or any of the Acquired Assets to be sold to the Buyer pursuant to the APA or any persons that are party to any Assumed Leases and Acquired Contracts specified in this Sale Approval Order or in a separate order of even date, and their respective successors and assigns.  If a trustee or examiner is subsequently appointed in the Chapter 11 Cases, such trustee or examiner shall likewise be bound, in all respects, to the terms and provisions of this Sale Approval Order.

35.     Notwithstanding anything to the contrary in this Sale Approval Order or the APA, to the extent any of the Acquired Assets consist of an interest in a consumer credit transaction subject to the Truth in Lending Act or an interest in a consumer credit contract (as defined in

section 433.1 of title 16 of the Code of Federal Regulations), and if such interest is purchased under the APA, the Buyer shall remain subject to the claims and defenses that are related to such consumer credit transaction or such consumer credit contract, to the same extent as the Buyer would be subject to such claims and defenses of the consumer had such interest been purchased at a sale not under Bankruptcy Code section 363, as provided for in Bankruptcy Code section 363(o).

36.     The failure specifically to include any particular provisions of the APA in this Sale Approval Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the APA be authorized and approved in its entirety.

37.     To the extent permitted by Bankruptcy Code section 525, no governmental unit may revoke or suspend any permit or license relating to the operation of the Acquired Assets sold, transferred or conveyed to the Buyer on account of the filing or pendency of the Debtors' chapter 11 cases or the consummation of the transaction contemplated by the APA.

38.     Subject to the terms of the APA, the APA and any related agreements may be waived, modified, amended, or supplemented by agreement of the Debtors and the Buyer, without further action or order of the Court; provided, however, that any such waiver, modification, amendment, or supplement is not material and substantially conforms to, and effectuates, the APA and any related agreements.

39.     The provisions of this Order are non-severable and mutually dependent.

40.     The provisions of Bankruptcy Rules 6004(h) and 6006(d) staying the effectiveness of this Sale Approval Order for fourteen days are hereby waived, and this Sale Approval Order shall be effective immediately upon entry.

41.     To the extent that this Sale Approval Order is inconsistent with any prior order or pleading with respect to the Sale Motion in the Chapter 11 Cases, the terms of this Sale Approval Order shall govern.

Dated:                                                    _____
                                                          Gregory F. Kishel
                                                          United States Chief Bankruptcy Judge

## Schedule A

### Illinois-Wisconsin Region Stores List

| | Restaurant # | Address | City | State |
|---|---|---|---|---|
| **Illinois Region** | | | | |
| 1 | 01752 | 723 Shooting Park | Peru | IL |
| 2 | 00111 | 901 North Lake Street | Aurora | IL |
| 3 | 01747 | 209 Norris Drive | Ottawa | IL |
| 4 | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| 5 | 05879 | 1830 Southwest Avenue | Freeport | IL |
| 6 | 11877 | 504 West Blackhawk Drive | Byron | IL |
| 7 | 16573 | 2320 Route 34 | Oswego | IL |
| 8 | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| 9 | 00437 | 1138 East State Street | Rockford | IL |
| 10 | 01060 | 1450 4th Street | Beloit | WI |
| 11 | 01326 | 2434 11th Street | Rockford | IL |
| 12 | 10234 | 7510 East State Street | Rockford | IL |
| **Wisconsin Region** | | | | |
| 1 | 01764 | 2655 East Washington | Madison | WI |
| 2 | 01888 | 2624 Milton Avenue | Janesville | WI |
| 3 | 03792 | 4980 South 76th Street | Greenfield | WI |
| 4 | 04857 | 822 Windsor Street | Sun Prairie | WI |
| 5 | 09366 | 400 Center Way | Janesville | WI |

## Schedule B

### Franchise Agreements List

1. Burger King Restaurant Successor Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated February 23, 2006 (Store # 1752).

2. Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated June 30, 2000 (Store # 111).

3. Burger King Restaurant Successor Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated September 26, 2006 (Store # 1747).

4. Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated September 15, 2004 (Store # 2160).

5. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated April 18, 1996 (Store # 5879).

6. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated September 23, 1998 (Store # 11877)

7. Burger King Restaurant Franchise Agreement between Burger King Corporation and Duke and King Acqusition Corp., dated June 30, 2008 (Store # 16573).

8. Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated December 20, 1996 (Store # 255).

9. Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated December 1, 1999 (Store # 437).

10. Burger King Restaurant Successor Franchise Agreement between Burger King Corporation and Duke and King Acqusition Corp., dated November 30, 2006 (Store # 1060).

11. Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated November 30, 2004 (Store # 1326).

12. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated September 19, 1996 (Store # 10234).

13. Successor Burger King Restaurant Franchise Agreement between Burger King Corporation and Pel-Wisconsin, Inc., dated April 23, 1997 (Store # 1764).

14. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated December 31, 1996 (Store # 1888).

15. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated May 1, 2003 (Store # 3792).

16. Burger King Restaurant Franchise Agreement between Burger King Corporation and Pel-Wisconsin, Inc., dated July 31, 1996 (Store # 4857).

17. Burger King Restaurant Franchise Agreement between Burger King Corporation and Nath Illinois Franchise Group, Inc., dated December 31, 1996 (Store # 9366).

<u>Schedule 1.1.(h)</u>

**Acquired Contracts List**

**I.  Real Property Leases**:  The real property leases related to the following Illinois-Wisconsin Region Stores:

|    | Restaurant # | Address | City | State |
|----|--------------|---------|------|-------|
| 1  | 01752 | 723 Shooting Park | Peru | IL |
| 2  | 00111 | 901 North Lake Street | Aurora | IL |
| 3  | 01747 | 209 Norris Drive | Ottawa | IL |
| 4  | 02160 | 1385 Douglas Avenue | Montgomery | IL |
| 5  | 05879 | 1830 Southwest Avenue | Freeport | IL |
| 6  | 11877 | 504 West Blackhawk Drive | Byron | IL |
| 7  | 16573 | 2320 Route 34 | Oswego | IL |
| 8  | 00255 | 913 West Lincoln Highway | DeKalb | IL |
| 9  | 00437 | 1138 East State Street | Rockford | IL |
| 10 | 01060 | 1450 4th Street | Beloit | WI |
| 11 | 01326 | 2434 11th Street | Rockford | IL |
| 12 | 10234 | 7510 East State Street | Rockford | IL |
| 13 | 01764 | 2655 East Washington | Madison | WI |
| 14 | 01888 | 2624 Milton Avenue | Janesville | WI |
| 15 | 03792 | 4980 South 76th Street | Greenfield | WI |
| 16 | 04857 | 822 Windsor Street | Sun Prairie | WI |
| 17 | 09366 | 400 Center Way | Janesville | WI |

**II.  Billboard and Highway Agreements**:  The following contracts related to highway sign and billboard agreements related to the Illinois-Wisconsin Regions Stores:

1. Derse WHBS Contract No. 1-DANE-151-19-NSF-0113 – Exit No. 102, USH-151@STH-19, Sun Prairie, Wisconsin
2. Derse WHBS Contract No. 1-ROCK-I90-26-EWF-0113 – Exit No. 171A-B, I-90@14/26, Janesville, Wisconsin

**III.  Franchise Agreements.**

The Franchise Agreements set forth on <u>Schedule B</u>.

<u>Schedule 1.2(l)</u>

**Excluded Assets**

None.

<u>Schedule 2.1</u>

**<u>Regional Allocations</u>**

## 1. UNADJUSTED PURCHASE PRICE

**<u>Illinois Region Stores</u>:**

Illinois Region Stores Unadjusted Purchase Price = $643,897.80

**<u>Wisconsin Region Stores</u>:**

Wisconsin Region Stores Unadjusted Purchase Price = $1.10

**<u>Total Illinois-Wisconsin Region Stores</u>:**

Illinois-Wisconsin Region Stores Unadjusted Purchase Price = $643,898.90

## 2. WORKING CAPITAL ESCROW AMOUNT

Illinois-Wisconsin Region Stores Working Capital Escrow Amount = $64,389.89

## Schedule 2.8

### Purchase Price Allocation

[To be completed by the Parties prior to Closing pursuant to Section 2.8]

# EXHIBIT 2

| | Type of Contract/Lease | Counter Party | Store # | Region | Debtor | Agreed Cure Amount |
|---|---|---|---|---|---|---|
| 1 | Limited License Agreement Store #01752 | Burger King Corporation | 01752 | IL | Duke & King Acquisition | 71,879.27 |
| 2 | Non-Residential Real Property Lease | Mary A Kaszynski | 01752 | IL | Duke & King Acquisition | 18,499.87 |
| 3 | Limited License Agreement Store #00111 | Burger King Corporation | 00111 | IL | Duke & King Acquisition | 59,480.73 |
| 4 | Non-Residential Real Property Lease | Burger King Corporation | 00111 | IL | Duke & King Acquisition | 7,364.08 |
| 5 | Limited License Agreement Store #01747 | Burger King Corporation | 01747 | IL | Duke & King Acquisition | 56,891.09 |
| 6 | Non-Residential Real Property Lease | Loraine J Hess, Trustee for William H. Hess | 01747 | IL | Duke & King Acquisition | 3,000.00 |
| 7 | Limited License Agreement Store #02160 | Burger King Corporation | 02160 | IL | Duke & King Acquisition | 65,646.95 |
| 8 | Non-Residential Real Property Lease | Gerald E. Anderson | 02160 | IL | Duke & King Acquisition | 4,250.00 |
| 9 | Limited License Agreement Store #05879 | Burger King Corporation | 05879 | IL | Duke & King Acquisition | 55,839.03 |
| 10 | Non-Residential Real Property Lease | Cordoza Family Trust | 05879 | IL | Duke & King Acquisition | 5,392.13 |
| 11 | Burger King Franchise Agreement #11877 | Burger King Corporation | 11877 | IL | Duke & King Acquisition | 57,099.57 |
| 12 | Non-Residential Real Property Lease | 504 West Blackhawk Realty LLC | 11877 | IL | Duke & King Acquisition | 9,103.59 |
| 13 | Burger King Franchise Agreement #16573 | Burger King Corporation | 16573 | IL | Duke & King Acquisition | 65,362.11 |
| 14 | Non-Residential Real Property Lease | Burger King Corporation | 16573 | IL | Duke & King Acquisition | 12,571.00 |
| 15 | Limited License Agreement Store #00255 | Burger King Corporation | 00255 | IL | Duke & King Acquisition | 55,068.74 |
| 16 | Non-Residential Real Property Lease | First National Bank, Trustee | 00255 | IL | Duke & King Acquisition | 3,596.99 |
| 17 | Limited License Agreement Store #00437 | Burger King Corporation | 00437 | IL | Duke & King Acquisition | 51,228.03 |
| 18 | Non-Residential Real Property Lease | Triple H Properties | 00437 | IL | Duke & King Acquisition | 1,784.84 |
| 19 | Burger King Franchise Agreement #01060 | Burger King Corporation | 01060 | IL | Duke & King Acquisition | 66,797.85 |
| 20 | Non-Residential Real Property Lease | L.H. Meltzer, LLC | 01060 | IL | Duke & King Acquisition | 10,070.00 |
| 21 | Limited License Agreement Store #01326 | Burger King Corporation | 01326 | IL | Duke & King Acquisition | 59,047.50 |
| 22 | Non-Residential Real Property Lease | Amcore Investment Group, Trustee of Trust | 01326 | IL | Duke & King Acquisition | 2,520.83 |
| 23 | Limited License Agreement Store #10234 | Burger King Corporation | 10234 | IL | Duke & King Acquisition | 46,743.92 |
| 24 | Non-Residential Real Property Lease | Grub Stake Properties II a/k/a Grubbstake | 10234 | IL | Duke & King Acquisition | 4,635.19 |
| 25 | Burger King Franchise Agreement #01764 | Burger King Corporation | 01764 | WI | Duke & King Acquisition | 49,804.69 |
| 26 | Non-Residential Real Property Lease | Gregory Gus Kary a/k/a Gregory Kary and Ruby | 01764 | WI | Duke & King Acquisition | 9,012.61 |
| 27 | Limited License Agreement Store #01888 | Burger King Corporation | 01888 | WI | Duke & King Acquisition | 52,412.64 |
| 28 | Non-Residential Real Property Lease | Demetrios Spyrakos and Harriet Spyrakos | 01888 | WI | Duke & King Acquisition | 9,278.66 |
| 29 | Burger King Franchise Agreement #03792 | Burger King Corporation | 03792 | WI | Duke & King Acquisition | 61,169.88 |
| 30 | Non-Residential Real Property Lease | Burger King Corporation | 03792 | WI | Duke & King Acquisition | 5,437.50 |
| 31 | Limited License Agreement Store #04857 | Burger King Corporation | 04857 | WI | Duke & King Acquisition | 42,676.96 |
| 32 | Non-Residential Real Property Lease | McLochlin Enterprises, Inc. | 04857 | WI | Duke & King Acquisition | 11,986.59 |
| 33 | Burger King Franchise Agreement #09366 | Burger King Corporation | 09366 | WI | Duke & King Acquisition | 45,120.44 |
| 34 | Non-Residential Real Property Lease | Gabe Fazzini and Karen Fazzini | 09366 | WI | Duke & King Acquisition | 7,100.80 |