**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MINNESOTA**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**DEBTORS' OBJECTION TO MOTION TO DISMISS**
**OR CONVERT CASE TO CHAPTER 7**

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## INTRODUCTION

The above-captioned debtors and debtors in possession (collectively, the "Debtors") hereby object to the United States Trustee's Motion to Dismiss or Convert Case to Chapter 7 (the "Motion") and submit this memorandum in opposition to the Motion. The United States Trustee ("UST") has not met his burden of proving "cause" under the applicable bankruptcy statute, and in light of the facts and circumstances of the Debtors' cases, cause to convert does not exist. Rather, the Debtors' estates will be wound down in a more efficient manner and creditors will receive a quicker and better distribution under a chapter 11 liquidating plan than in a chapter 7. Therefore, the Motion should be denied in its entirety.

## PRELIMINARY STATEMENT

Before addressing the substantive merits of the Motion, the Debtors must place the filing of the Motion into context. As the Court is aware, the Debtors' chapter 11 cases have been

wrought with many challenges and complexities. Despite those obstacles, the Debtors worked diligently with their key constituencies — Burger King Corp. ("BKC"), Bank of America, N.A. ("BofA"), the Official Committee of Unsecured Creditors (the "Committee"), and The Coca-Cola Company ("Coke") — to achieve a Court-approved global settlement[1] of the major issues in the cases, which in turn, provided the framework for a joint liquidating chapter 11 plan proposed by both the Debtors and the Committee. After all of the work the major case parties have put into resolving the contested matters to provide value for all creditor constituencies, the UST effectively seeks to undo the bargain approved by the Court.

The UST bases his argument, in large part, on specious facts and unsubstantiated allegations of gross mismanagement by the Debtors and their management team. The Debtors strenuously disagree with the UST's characterizations in the Motion of the actions of management – that very same management team that attended every major hearing, provided timely reporting throughout the cases, and worked hard on an exit strategy to protect employees and preserve as many jobs as possible even though it was clear from the beginning of the chapter 11 cases that equity would receive no distribution and that management would be losing control of the restaurant assets through a sale and/or store closings. Simply put, the Debtors believe that the allegations set forth by the UST in the Motion are false and have no probative value to support the Motion.

## FACTS

The Debtors each filed their voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), on December 4, 2010 (the "Petition Date"). The Debtors operated 87 separate BURGER KING® franchise restaurants

---

[1] On May 10, 2011, the Court entered the Order Granting Motion for (A) Expedited Hearing and (B) an Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019 Approving Comprehensive Settlement, Docket No. 294 (the "Global Settlement").

in Minnesota, Missouri, Illinois, Wisconsin, Iowa, and Kansas.  The Debtors filed their chapter 11 cases in order to preserve the going concern value of their businesses.  As described in the so-called "first day motions" and subsequent pleadings, the Debtors entered the chapter 11 cases in a very precarious financial situation.  They owed BofA over $11,000,000 and were significantly in arrears to BKC for royalty and advertising payments, among other obligations.

The Debtors conducted a thorough and heavily negotiated sale process.  On January 7, 2011, they filed a Motion for an Order Approving Sale and Bidding Procedures, Docket No. 106, seeking approval of sale procedures for the sale of substantially all of the Debtors' assets (the "Procedures Motion").  On January 24, 2011, the Court approved the Procedures Motion, which established the process for a sale of substantially all of the Debtors' assets (the "Sale Procedures").  On April 11, 2011, the Debtors filed the Motion for Orders (i) Scheduling a Hearing on Stalking Horse Bids; (ii) Approving Stalking Horse Protection Fees; (iii) Approving Form of Stalking Horse Asset Purchase Agreements; (iv) Approving Form and Manner of Sale Notice and Cure Notice; (v) Authorizing Debtors to Sell Assets Free and Clear of Liens, Claims, Interests and Encumbrances; and (vi) Authorizing Assumption and Assignment of Unexpired Leases and Executory Contracts and Establishing Cure Costs, Docket No. 214 (the "Sale Motion").  The Court, on April 14, 2011, approved the portion of the relief requested in the Sale Motion relating to stalking horse bids and stalking horse protection fees.

On April 26, 2011, the Debtors named Successful Bidders[2] for the restaurants in the Minnesota Region, the Missouri Region (except restaurant #12413), the Davenport Region, the Illinois Region and the Wisconsin Region – all of the Group One Regions under the Sale

---

[2]  Capitalized terms not defined herein have the meaning ascribed to them in the Sale Motion.

Procedures – as well as certain Group Two Restaurants. On May 10, 2011, the Court approved the sales to the Successful Bidders. The sales closed on May 26, 2011.

At different stages of the chapter 11 cases, the Debtors, BKC, BofA and the Committee each established positions that would have led to a contested hearing on the Sale Motion, with additional litigation that would follow regarding lien rights and exit strategy. After extensive negotiations held all the way up to the commencement of the auctions, the parties finally resolved all material issues related to the sale of assets, distribution of proceeds, determination of secured and unsecured claims, establishment of BKC cure costs, the closing of restaurants, and related matters.

As the Debtors have made clear to the Court on the record at multiple hearings and in the motion to approve the Global Settlement, the parties bargained for a liquidating plan to be the mechanism for resolving remaining case issues and making distributions to creditors. Therefore, based on the Global Settlement and after the closing of the sales of the Debtors' operating assets, the Debtors (in conjunction with the Committee) are now in the position to file the Joint Plan of Liquidation of the Debtors and Official Committee of Unsecured Creditors (the "Plan") and the corresponding Disclosure Statement for Joint Plan of Liquidation of the Debtors and Official Committee of Unsecured Creditors (the "Disclosure Statement") within six and a half months from the Petition Date.[3] Confirmation of the Plan will provide a tidy conclusion the Debtors' chapter 11 cases that appeared highly contested from the outset.

## ARGUMENT

## I.    THERE IS NO CAUSE TO CONVERT THE CHAPTER 11 CASES

The UST fails to establish "cause" for the conversion of the Debtors' chapter 11 cases pursuant to the factors set forth in section 1112(b) of the Bankruptcy Code. The theme of the

---

[3] The Debtors anticipate that the Plan and Disclosure Statement will be filed on June 13, 2011, but in no event later than the hearing on the Motion.

Motion appears to be twofold: (1) that liquidation has no place under chapter 11 and (2) the Debtors' management has grossly mismanaged the estates. The UST's position is inconsistent with both the facts of the Debtors' cases and the Bankruptcy Code.

## A.  Chapter 11 Liquidations Are Supported by the Bankruptcy Code and Case Law

Chapter 11 liquidating plans are amply supported by the Bankruptcy Code and an established line of case law.  Indeed, section 1123 of the Bankruptcy Code permits plans that sell and distribute all the property of the estate.  See 11 U.S.C. § 1123(a)(5)(D); see also 5 Lawrence P. King et al., Collier Bankruptcy Practice Guide ¶ 90.04[5] ("Chapter 11 permits a plan . . . to provide for the sale of all or substantially all of the property of the estate.").  Whether a debtor sells assets under section 363 and then files a liquidating plan or whether assets are sold through a plan section 1123 yields precisely the same result – the liquidation of those assets and distribution of proceeds.  As Collier's makes clear, there are several benefits to doing a liquidating plan in chapter 11, instead of through chapter 7.  For instance, a liquidating chapter 11 plan may enable the debtor to avoid substantial costs "such as the payment of the trustee's fees and the fees of the professionals which would have been employed by the trustee."  Id.

Courts have long held that liquidation under chapter 11 is both perfectly permissible and, in some circumstances, more desirable than a chapter 7 liquidation.  See, e.g., In re Copy Crafters Quickprint, Inc., 92 B.R. 973, 986 (Bankr. N.D.N.Y. 1988) ("In certain instances, a Chapter 11 liquidating plan is preferable to a Chapter 7 proceeding because the disposition of assets will be conducted in a less expensive, swifter and more orderly manner by a debtor-in-possession, as opposed to a trustee, who, while disinterested, is still a third party unfamiliar with the property of the estate.").[4]  Importantly, in dicta, the Eight Circuit has clearly acknowledged

---

[4]  Various other courts have consistently recognized the permissibility and appropriateness of chapter 11 plans of liquidation.  See, e.g., In re Ionosphere Clubs, Inc., 184 B.R. 648, 654 (S.D.N.Y. 1995) ("Section 1123(b)(4) provides for the sale of all of the property of the estate, as well as the distribution of the proceeds of such sales to

that chapter 11 liquidating plans are permissible under the Bankruptcy Code. See Loop Corp. v. U.S. Trustee, 379 F.3d 511, 517 n.3 (8th Cir. 2004) ("In any event, we have not located any appellate court cases prohibiting liquidation in Chapter 11 proceedings, and the clear weight of authority permits such liquidation.").

The Debtors and the Committee have negotiated a Plan and Disclosure Statement that provides for an efficient wrap-up of the chapter 11 cases – namely, through the establishment of a liquidating trust (the "Liquidating Trust") that will hold cash, certain causes of action, rights to insurance proceeds, and any unsold estate property. An independent third party – William Kaye, the chair of the Committee – is proposed to serve as the liquidating trustee and will administer the Liquidating Trust. Mr. Kaye is more familiar with the Debtors' affairs and industry than any chapter 7 trustee could be and the Debtors believe that a conversion to chapter 7 will delay the timing and diminish distributions to creditors. Thus a liquidation pursuant to the Plan is the correct way to conclude these bankruptcy cases.

**B. The United States Trustee Has Not Met His Burden**

The UST has the burden of proving cause for conversion or dismissal under section 1112(b)(1). A motion by a party in interest (including the United States Trustee) under 11 U.S.C. § 1112(b)(1) to dismiss or convert a chapter 11 case can be granted only if the proponent establishes cause – sixteen examples of which are set forth in section 1112(b)(4) of the Bankruptcy Code. In the Motion, however, the UST invokes only two examples: "(A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation," and "(B) gross mismanagement of the estate." See Motion, ¶ 27

---

creditors, by means of a liquidating plan."); In re Jartran, Inc., 886 F.2d 859, 867 (7th Cir. 1989) (stating that liquidating chapter 11 plans if filed in good faith are permissible); Matter of Sandy Ridge Dev. Corp., 881 F.2d 1346, 1352 (5th Cir. 1989) (noting that a distribution under a liquidating plan of reorganization is not per se improper under the Code and a reorganization may result in the liquidation of a debtor); In re Travelstead, 227 B.R. 638, 651 (D. Md. 1998) ("A plan does not fail the feasibility test if there is a possibility, or even a probability, of a liquidation under the plan, so long as the means for a liquidation 'is proposed in the plan.'" quoting In re Cellular Info. Sys., Inc., 171 B.R. 926, 945 (Bankr. S.D.N.Y.1994)).

(quoting 11 U.S.C. § 1112(b)(4)(A)); Motion, ¶ 34 (referring to no reasonable likelihood for rehabilitation"). Of course, "[t]he initial burden lies with the Movant to establish 'cause' for conversion." In re Products International Company, 395 B.R. 101, 109 (Bankr. D. Ariz. 2008) (citing 11 U.S.C. § 1112(b)(1)). Moreover, "bankruptcy judges have wide discretion to determine whether cause exists to…convert a case under section 1112(b)." See In re BH S&B Holdings, LLC, 439 B.R. 342, 346 (Bankr. S.D.N.Y. 2010). Here, the UST has not met his burden and the Court should summarily determine that the Debtors' chapter 11 cases should not be converted.

Although he attempts to cite examples, the UST does not establish that there is a "substantial or continuing loss to or diminution of the estate," which is a factor for determining "cause" under 11 U.S.C. § 1112(b)(4)(A). The UST provides inaccurate facts and conclusory statements in the Motion to support a finding of loss or diminution of the estates, including the following: the "chapter 11 plan of distribution [sic] would be grossly inefficient insofar as it would cause the incurrence of unnecessary professional fees and expenses and would instead simply waste estate assets…"; the "costs of drafting, circulating, mailing, travel by professionals to St. Paul…would run up substantial additional expenses with no corresponding value to creditors"; the "costs of such a [liquidating plan] process would easily reach hundreds of thousands of dollars"; "there are continuing costs of U.S. Trustee fees, costs of preparing monthly operating reports…"; and "with a conversion there will be only one independent professional…charging hourly…." See Motion, ¶¶ 35, 36, 37.

With respect to the foregoing allegations, the UST misinterprets the facts or does not rely on any evidence to support the allegations. First, the Debtors and the Committee (along with other parties to the Global Settlement) bargained for the establishment of a liquidating trust as part of the negotiations to resolve the major issues and allow the going concern sales to go

forward. As part of those negotiations, the Debtors prepared cash flow statements that establish the amounts to be allocated from sale proceeds and operations to BofA, BKC, Coke, other secured and tax claims, administrative and professional fee expenses, and general unsecured creditors. Accordingly, the Disclosure Statement can project a distribution to general unsecured creditors of between 18-31% depending on the ultimate resolution of certain claims and the outcome of any causes of action or other recoveries. The liquidation analysis attached hereto as Exhibit 1 (the "Liquidation Analysis") demonstrates that there should be no detriment to those recoveries under a liquidating plan. The Plan provides the central mechanism for distribution and related matters. Therefore, there are no gross inefficiencies as the UST imagines.

Second, the costs of drafting the Plan will not be as costly as the UST baselessly asserts. Once the Global Settlement was approved and the sales of the operating assets closed, the Debtors and Committee split up the responsibilities for drafting the Plan, Disclosure Statement and Liquidating Trust and did their best to streamline the process over a very compressed timeframe (approximately three weeks). Even with costs of mailing included, the total costs of the Plan and Disclosure Statement will be nowhere near "hundreds of thousands of dollars" that the UST suggests.

Third, Mr. Kaye, the proposed party to serve as the liquidating trustee under the Plan, has been intimately involved with the bankruptcy cases as the chair of the Committee and has gained significant knowledge of the creditor body, the Debtors, their businesses and affairs, and the sale process. He is better suited than any chapter 7 trustee (or trustee's counsel) to liquidate the Debtors remaining assets and pursue causes of action because he has obtained knowledge of the cases as chair of the Committee that (1) would not be available to a chapter 7 trustee entering the cases at the end, (2) will not need to spend any time or resources familiarizing himself with the cases, and (3) will, upon information and belief, serve at no cost to the Liquidating Trust.

Administration of the Liquidating Trust will be cheaper and more efficient that a chapter 7 liquidation.

Fourth, Mr. Kaye is independent from management. In his role as liquidating trustee, Mr. Kaye will exercise his fiduciary duty to maximize value for general unsecured creditors, as he has done until now as chair of the Committee, without regard to the interests of management.

Finally, the UST ignores all of the work that still needs to be accomplished to wrap up the chapter 11 cases, work that will be more quickly and cheaply completed by the Debtors, their professionals, and the liquidating trustee. It is inconceivable to think that a chapter 7 trustee can take over the estates, and in an efficient amount of time with limited costs, completely understand the business of 87 separate Burger King operations and the various claims and constituencies related thereto. For example, the Debtors' professionals have been working since the closings on finalizing proration estimates, preparing a cash flow model to track funds, and drafting a closing funds flow presented to each buyer. Without direct and historical knowledge of the transactions, the store level and regional level detail, and historical working capital calculations, a chapter 7 trustee would not have had the knowledge or understanding of the Debtors' businesses to complete the analysis effectively or accurately. In addition, the Debtors' management and their financial advisors have worked diligently on the completion of the "Net Working Capital" analysis and variance report which will be presented to and reviewed by each buyer as required under the various asset purchase agreements. Per those agreements, the "Net Working Capital" analysis is due to the buyers within 21 days of closing; therefore the estates could not and did not have time to delay completing this analysis. Given the "Net Working Capital" analysis must be presented by regions sold, the calculation requires a thorough understanding of the store level balance sheets, which a court-appointed chapter 7 trustee simply would not have.

If a chapter 7 trustee is appointed, there would be no assurance that the above tasks could continue to be completed. While a chapter 7 trustee may seek to employ the Debtors' existing management and the various estate professionals to complete this work, there is no guaranty that they may simply move on to other matters while leaving a chapter 7 trustee with an even more expensive burden as he would have to retain new professionals who would duplicate tasks and delay the process.

Other than the incorrect allegations described above, the UST provides no evidence to demonstrate losses to or diminution of the estates. Without any significant evidence, the UST argues that remaining in chapter 11 will incur significant and unnecessary expenses for the plan confirmation process, substantial administrative expenses, avoidance causes of action, professional fees, and management costs, but provides no evidence to show that such costs result in ongoing losses and a diminution of the estates exceeding the costs of chapter 7 liquidation. See Motion ¶¶ 34-38; UST's Memorandum of Law in Support of Expedited Motion to Convert or Dismiss, pp. 3-4. It is as if the UST believes there are no costs in winding up the bankruptcy cases under chapter 7, which is obviously not true. One cannot merely assume that the costs for a chapter 7 trustee are lower than a chapter 11 liquidation in every case. The attached Liquidation Analysis demonstrates that maintaining these cases in chapter 11 will be at least as cost-effective as a conversion to chapter 7 and the Debtors believe the Plan will more quickly provide distributions to creditors and closure of the case.

Because the UST has not provided any credible evidence to support his burden of demonstrating cause, the Motion should be denied.

**C.**     **There Is No Gross Mismanagement of the Estates**

The UST places a great deal of emphasis on the fact that the Debtors are seeking to enrich "insiders" to the detriment of creditors to a level that constitutes gross mismanagement.

For example, the UST cites the relief requested in the Motion for an Order Authorizing the Debtors to Sell De Minimis Assets Pursuant to Section 363(b), Docket No. 327 (the "De Minimis Sale Motion"), as evidence that the Debtors are using the bankruptcy process for the gain of other non-debtor businesses operated by the Debtors' management. Those assertions could not be further from the truth.

In the Motion, the UST cites the proposed sale of a 1999 "Lexus to bd's Mongolian Grill for a sum that appears to be about $10,000 less than the fair market value." See Motion ¶ 25. The UST also suggests that the proposed sale of "office equipment, computers, computer servers, furniture and fixtures…to that same insider [sic] company bd's Mongolian Grill" is evidence of gross mismanagement. See Motion ¶ 29. Moreover, the UST contends that the proposed sale of 15 laptop computers to former employees raises concerns of mismanagement. See Motion ¶ 30. Finally, the UST mistakenly believes that $97,082 in payments to bd's Mongolian Grill for "services" and for "corporate costs" are not an arms' length transaction. See Motion ¶ 31.

None of the UST's allegations rises to the level of "gross mismanagement," a term that is not defined in the Bankruptcy Code. However, specific conduct found to rise to the level of gross mismanagement has been: "failure to maintain an effective corporate management team," including insufficient personnel to comply with the debtor's fiduciary duties (In re Gateway Access Solutions, Inc., 374 B.R. 556, 564-65 (Bankr. M.D. Pa. 2007) (citing In re Broad Creek Edgewater L.P., 371 B.R. 752 (Bankr. D.S.C. 2007)); bouncing checks and incurring unnecessary bank fees (In re Keven, A. McKenna, P.C., 2011 U.S. Dist. LEXIS 57985, *18 (D.R.I. May 31, 2011)), In re Plaza de Retiro, Inc., 417 B.R. 632, 643 (Bankr. D.N.M. 2009)); paying professional fees, obtaining postpetition financing, and paying prepetition debts without court approval (In re Wallace, 2011 U.S. Dist. LEXIS 34750, *6-7 (D. Idaho Mar. 30, 2011)); (In re Tucker, 411 B.R. 530, 533 n.6 (Bankr. S.D. Ga. 2009) (taking loans without court approval));

filing late and incomplete monthly operating reports (In re Domiano, 442 B.R. 97, 105-106 (Bankr. M.D. Pa. 2010)), (In re Halal 4 U LLC, 2010 Bankr. LEXIS 3335, 11 (Bankr. S.D.N.Y. Sept. 24, 2010)); management's ignorance of the debtor's business, failure to invoice and collect accounts receivable, unapproved and unauthorized corporate borrowings on oral terms, ignorance of the debtor's computer systems, "failure to account for post-petition rent, failure to list the liability for [a significant asset] on its books or bankruptcy schedules, and Debtor's apparent lack of understanding of what assets it owned, leased, or used" (In re ARS Analytical, LLC, 433 B.R. 848, 864-65 (Bankr. D.N.M. 2010)); and poor quality financial statements, failure to collect receivables, unauthorized use of cash collateral (In re Fall, 405 B.R. 863, 868-69 (Bankr. N.D. Ohio 2009)). The actions of Debtors' management are not even in the same league as the discretions referenced-above that constituted gross mismanagement.

Moreover, the Debtors believe that the UST's evidentiary basis is sorely lacking. With respect to the 1999 Lexus LX7, office equipment, computers and related items set forth in the De Minimis Sale Motion referred by the UST, the Debtors have filed a separate response contemporaneous with this Objection.[5] Without repeating that response verbatim, the Debtors will demonstrate that the "de minimis" asset sales were conducted in a fair manner that falls wildly short of any reasonable interpretation of "gross mismanagement." For example, the 1999 Lexus LX7 has 175,000 miles rather than 100,000 miles (as the UST contends) and it is in fair condition. A subsequent review by the Debtors of the Kelley Blue Book pricing shows that the trade-in value of a fair condition 1999 Lexus is $8,450 – which is substantially closer to the $5,000 price offered by bd's Mongolian Grill. Second, regarding the sale of the used furniture and computers and servers, the Debtors submit that after the thorough marketing process

---

[5] See Response to U.S. Trustee's Objection to Debtors' Motion for Authority to Sell De Minimis Assets.

described in the Procedures Motion, no parties were interested in the Debtors' corporate-level assets.

Strangely, the UST also questions why the Debtors did not hire an auctioneer or appraiser for the office equipment. See Motion, fn. 4. The reason is that the Debtors did not believe it to be a cost-effective exercise to spend additional time and money on assets that no parties wanted in the first instance. The Debtors' discretion to not waste estate resources on retaining additional professionals for assets with minimal value was anything but gross mismanagement. In fact, the Debtors would be prepared to walk away from the sales and allow those assets to be included in the Liquidating Trust. Moreover, the proposed sale of the laptops to former employees does not include any insiders and, more importantly, only one of those former employees has decided to purchase a laptop.

Finally, with respect to the payments in the budget to "BDs", those amounts were part of the Court-approved use of cash collateral and, in part, subject to the Order Authorizing Debtors to Pay (I) Certain Contract Employee and (II) Bonuses to Certain Non-Insiders, Docket No. 293 ("Employee Order"). Because the Debtors have shut down operations, all of the employees have either transitioned to the various purchasers or lost their jobs. The Debtors offered to retain certain former employees as contract employees. In addition, the Debtors and bd's Mongolian Grill have a management agreement whereby certain corporate-level employees are leased by the Debtors to work on the post-closing sale issues and the related corporate and operational wind down functions. No party objected to the relief approved by the Employee Order and such payments were authorized. In addition, the Debtors vetted this arrangement with the Committee, BofA, and BKC, and none of those parties had any objection. Therefore, there is no need for an independent trustee to verify these transactions.

## II. THE CASES SHOULD NOT BE CONVERTED BECAUSE THE DEBTORS' CHAPTER 11 LIQUIDATION IS IN THE BEST INTERESTS OF THE CREDITORS

Even if cause for conversion or dismissal is shown, denial of a motion to convert or dismiss is appropriate "if the Court specifically finds and identifies special circumstances upon which it determines that dismissal is not in the best interests of the creditors and the estate." See In re 15375 Memorial Corporation, 386 B.R. 548, 552 (Bankr. D. Del. 2008) (citing 11 U.S.C. § 1112(b)(1)) (discussing dismissal). In 15375 Memorial, the court examined the particular circumstances and the context of the debtors' liquidating chapter 11 bankruptcy cases. The court found that the debtors did not incur ongoing losses from operations and during the bankruptcy case and that the debtors gathered and preserved assets, both of which favored creditors and the estate. Id. at 553-54.

The Debtors similarly believe that the context surrounding the chapter 11 cases does not currently warrant a conversion. The Debtors currently hold and will transfer to the Liquidating Trust (under the Plan) cash from the restaurant sales, operating assets, cash flow from operations, certain rights to insurance proceeds, certain unencumbered assets, and potential recoveries from causes of action. Allowing Debtors and the Liquidating Trustee to continue the wind down and liquidation process and confirm the Plan will provide the best and fastest recovery for the creditors and the estates.

### A. The Unsecured Creditors Will Recover At Least the Same Percentage of Their Claims under Chapter 11 as In Chapter 7

In the instant case, the Plan provides at least as good of a return as a chapter 7 liquidation because the Debtors will realize as much for the assets at a lower cost. Courts have found that where a case would proceed identically under either chapter 7 or chapter 11, except for administrative expenses, and where administrative expenses would be greater under chapter 7 because of duplication of certain legal work, the case would not be converted. See, e.g., In re All

American of Ashburn, Inc., 40 B.R. 104 (Bankr. N.D. Ga. 1984).  In the instant case, a chapter 7 trustee (and any counsel he retains) will duplicate work that has already been performed at a higher cost to the estates.

As referenced in the Liquidation Analysis, the chapter 11 liquidation costs will be lower overall than those of a chapter 7 trustee.  To be sure, many expenses will be the same regardless of a liquidation conducted by the Liquidating Trust or a chapter 7 trustee:  professional fees to prepare and file taxes returns; review the Debtors' books for potential avoidance actions; evaluate and pursue claims objections and potential preferences; and commissions for brokers or auctioneers to sell assets (if any are retained).

In other ways, the liquidating trustee will be more efficient and less costly to the estates. Mr. Kaye will not spend time becoming oriented in the cases because he understands the Debtors' businesses, the fast food industry[6], and the primary challenges faced in the chapter 11 cases, all of which qualify him to raise objections to claims and to pursue causes of action. Hiring Mr. Kaye preserves case knowledge and provides efficiency in a chapter 11 liquidation. In addition, upon information and belief, Mr. Kaye will act as liquidating trustee at no cost.

In contrast, a chapter 7 trustee would require a great deal of time and incur higher costs to learn about the cases, the Debtors' business and composition of the creditors and their claims. Most significantly, the Debtors project that the chapter 7 trustee himself will receive up to a maximum fee of $75,438 under 11 U.S.C. § 326(a) that alone exceeds all liquidating trustee's fees under a chapter 11 liquidation.

Moreover, additional claims against the Debtors' estates may arise as a result of the establishment of a new bar date for the filing of claims in chapter 7 cases.  Any such additional

---

[6] Mr. Kaye's curriculum vitae is attached as an exhibit to the Committee's objection to the Motion.

claims would further diminish the Debtors' estates and represents another reason to deny the Motion.

Finally, the additional time afforded the Debtors during the plan solicitation process may further increase the value of the estates. In preparing the Liquidation Analysis, the Debtors project a conservative collection value on several receivables that could yield higher returns if collected by the Debtors. Specifically, prior to plan confirmation, the estates will receive soda and RSI rebates for past sales. The Debtors' understanding of the calculation of these rebates and the ability to quickly and accurately reconcile rebate amounts with their sales will ensure that the maximum rebate amounts are received. Under the best circumstances, the Debtors believe they may be able to collect as much as $55,000 more than they have projected. Furthermore, under the Plan, the Debtors will provide to the liquidating trustee a claims list identifying which claims may be disputed, which will lead to efficient claims administration as well as increase the likelihood that meritless claims do not increase the pool of unsecured claims.

**B.      The Unsecured Creditors Would Be Paid Sooner in a Chapter 11 Liquidation**

In addition to the simple math that shows the unsecured creditors would fare at least as well under chapter 11 as chapter 7, the secured, administrative, and unsecured creditors would also likely receive distributions sooner under the Plan than in chapter 7. The Plan will provide that holders of secured and administrative claims will be paid as soon as practical after the Effective Date. The Plan will further provide that the liquidating trustee will make a preliminary distribution to unsecured creditors within 180 days of the Effective Date, subject to extension by future Court order. Thereafter, the liquidating trustee will make distributions at least one time per year.

In contrast, distributions under a chapter 7 liquidation would most likely take longer. As described above, a chapter 7 trustee would need to became familiar with the Debtors' books and

records, and generally come up to speed on the Debtors' business. Moreover, as noted above, the trustee would need to take steps to engage professionals, such that there could be substantial time spent by outside professionals learning about the Debtors' business. Each of these tasks would slow down the administration of the Debtors' estates.

While chapter 7 trustees have the authority to make interim distributions, in counsel's experience and as shown on the Court's dockets in converted chapter 11 cases, they seldom do, and when it happens it is often years after the conversion. Further, unlike under a plan of liquidation, a chapter 7 trustee cannot be compelled to make interim distributions. This delay may be attributable the length of time chapter 7 trustees take to object to claims and bring avoidance actions, which usually approaches the statutory time limits to do so. In contrast, the Plan will call for claims objections to be commenced within 90 days of the Effective Date.

Whatever the reason, experience in this District demonstrates the relatively long period of time cases converted from chapter 11 linger in chapter 7 before distributions are made:

- In <u>In re Ciprico, Inc.</u> (08-43731), the order converting the case was entered on May 7, 2009. As of the filing of this Objection, the chapter 7 trustee has filed no claims objections or preference actions and made no distributions to claim holders.

- In <u>In re Apex IT, Inc.</u> (08-36633), the order converting the case was entered on April 15, 2009. The chapter 7 trustee commenced adversary proceedings to avoid preferences on December 15, 2010, and has proposed no distributions to claim holders as of the filing of this Objection.

- In <u>In re Seasonal Concepts, Inc.</u> (07-43618), the order converting the case was entered on March 14, 2008. The chapter 7 trustee commenced preference actions

on October 8, 2009. To date, the chapter 7 trustee has proposed no distributions to claim holders.

- In In re Newmans Manufacturing, Inc. (07-30032), the debtor commenced avoidance actions in December 2008 and January 2009 prior to case conversion on April 7, 2009. To date, the chapter 7 trustee has proposed no distributions to claim holders.

- In In re Dakota Arms, Inc. (06-41315), the order converting the case was entered on May 30, 2007. The chapter 7 trustee filed her final report and proposed distribution on May 24, 2011.

- In In re Hyman Freightways, Inc. (97-45175), the order converting the case was entered on November 12, 1997, and the chapter 7 trustee proposed a first interim distribution in June 2006. The case was finally closed in July 2008.

In contrast the these drawn-out chapter 7 liquidations, the Plan provides for payment of secured and administrative claims as soon as practical after the Effective Date, and regular distributions to unsecured creditors starting no later that 180 days after the Effective Date. Not only will unsecured creditors enjoy a larger recovery under the Plan, they will start to enjoy it much sooner.

## NOTICE OF WITNESS

Pursuant to Local Rule 9013-2(c), the Debtors may call Becky Moldenhauer and Michael Hausman to testify regarding facts in this Objection.

## CONCLUSION

For all the foregoing reasons, the Debtors request that the Motion be denied in its entirety.

FREDRIKSON & BYRON, P.A.

Dated: June 10, 2011
         */e/ Douglas W. Kassebaum*
         Clinton E. Cutler (#158094)
         Douglas W. Kassebaum (#386802)
         200 South Sixth Street, Suite 4000
         Minneapolis, MN 55402
         Phone (612) 492-7000
         Fax (612) 492-7077
         ccutler@fredlaw.com
         dkassebaum@fredlaw.com

         – and –

         McDONALD HOPKINS LLC

         Shawn M. Riley (OH 0037235)
         Scott N. Opincar (OH 0064027)
         Michael J. Kaczka (OH 0076548)
         600 Superior Avenue, East, Suite 2100
         Cleveland, OH 44114-2653
         Phone (216) 348-5400
         Fax (216) 348-5474
         sriley@mcdonaldhopkins.com
         sopincar@mcdonaldhopkins.com
         mkaczka@mcdonaldhopkins.com

         CO-COUNSEL FOR DEBTORS
         AND DEBTORS IN POSSESSION

## <u>VERIFICATION</u>

I, Becky Moldenhauer, am the Chief Financial Officer of Duke and King Acquisition Corp. and Duke and King Missouri, LLC. Based upon my personal information and belief, I declare under penalty of perjury that the facts set forth in the preceding Objection are true and correct, according to the best of my knowledge, information and belief.

Dated: June 10, 2011

Signed: _Becky Moldenhauer_
Becky Moldenhauer

{2732804:2}

## <u>VERIFICATION</u>

I, Michael Hausman, am a Managing Director of Conway MacKenzie, Inc., the Debtors'

financial advisor. Based upon my personal information and belief, I declare under penalty of

perjury that the facts set forth in the preceding Liquidation Analysis are true and correct,

according to the best of my knowledge, information and belief.

Dated: June 10, 2011                Signed: _Michael Hausman_
                                             Michael Hausman

**<u>Exhibit 1</u>**


**Liquidation Analysis**

**Duke & King Acquisitions**
**Liquidation Of Estate Assets Analysis**
*(Dollars In Actuals)*

| Description: | Chapter 11 Estimated Mid Value | Chapter 7 Estimated Mid Value |
|---|---|---|
| **Current Assets:** | | |
| Cash on Hand At Closing | $ 3,101,351 | $ 3,101,351 |
| Other Cash Accounts | 496,927 | 496,927 |
| Total Current Assets | 3,598,278 | 3,598,278 |
| | | |
| **Other Assets:** | | |
| Insurance Proceeds | - | - |
| Rebates | 407,844 | 407,844 |
| Utility Deposits - Pre/Post Petition | 96,053 | 96,053 |
| Workers Compensation Refunds | 50,000 | 50,000 |
| LOC Release From Wells Fargo | 54,858 | 54,858 |
| MBM Refunds | 56,847 | 56,847 |
| Corporate Asset Sales | 15,000 | 15,000 |
| Professional Fee Retainers | 275,000 | 275,000 |
| Total Fixed Assets | 955,602 | 955,602 |
| | | |
| **Gross Proceeds** | **4,553,880** | **4,553,880** |
| | | |
| **Less Estimated Admin Costs of Liquidation:** | | |
| Professional Fees Already Incurred Through Sale/Closing Date | 639,546 | 639,546 |
| Group 2 Liabilities | 504,161 | 504,161 |
| Warren Capital Debt | 280,018 | 280,018 |
| Sales Tax Obligation Outstanding | 330,813 | 330,813 |
| Coke Debt | 166,196 | 166,196 |
| Success Plan | 162,750 | 162,750 |
| Corporate Payroll/Benefits/Vacation | 150,000 | 150,000 |
| 503(B)(9) Claims | 139,430 | 139,430 |
| Corporate Payables | 123,945 | 123,945 |
| Wind Down Of Estate: | | |
| Costs Incurred Before June 18, 2011: [1] | | |
| Debtor Advisors | 96,750 | 96,750 |
| UCC Advisors | 22,500 | 22,500 |
| US Trustee | 9,533 | 9,533 |
| Liquidating Trustee - Chapter 11 | - | - |
| Company Payroll & Services | 69,205 | 69,205 |
| Sub Total Costs Before June 18, 2011 | 197,989 | 197,989 |
| Costs Incurred After June 18, 2011: | | |
| Debtor Advisors | 51,750 | - |
| UCC Advisors | 18,000 | - |
| US Trustee | 4,767 | 4,767 |
| Liquidation Professional Fees (claim objections, avoidance actions) | 50,000 | 50,000 |
| Liquidating Trustee - Chapter 7 | - | 75,438 |
| Company Payroll & Services | 42,875 | 42,875 |
| Tax Returns, Bank Fees, Etc. | 71,800 | 71,800 |
| Sub Total Costs After June 18, 2011 | 239,192 | 244,880 |
| **Total Estimated Admin Costs of Liquidation** | **2,934,040** | **2,939,727** |
| **Net Estimated Proceeds Available To Unsecured Claims** | **1,619,841** | **1,614,153** |
| | | |
| **Estimated Unsecured Claims Pool** | 6,499,706 | 6,499,706 |
| | | |
| ***Estimated Percentage Recovery To Unsecured Claims*** | ***25%*** | ***25%*** |

*(1) This analysis assumes all approved professional fees in the chapter 11 will be paid prior to conversion*

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**********************************************************************************

In re:                                                    **JOINTLY ADMINISTERED UNDER**
                                                          **CASE NO. 10-38652**

DUKE AND KING ACQUISITION, CORP.,                         Court File No. 10-38652

                        Debtors.          Court File Nos:

(includes:
Duke and King Missouri, LLC;                              10-38653 (GFK)
Duke and King Missouri Holdings, Inc.;                    10-38654 (GFK)
Duke and King Real Estate, LLC;                           10-38655 (GFK)
DK Florida Holdings, Inc.)                                10-38656 (GFK)

                                                          Chapter 11 Cases
                                                          Judge Gregory F. Kishel

**********************************************************************************

## CERTIFICATE OF SERVICE

**********************************************************************************

      Douglas W. Kassebaum, under penalty of perjury, states that on May 26, 2011, he caused to be served the following:

1.      Debtors' Objection to Motion to Dismiss or Convert Case to Chapter 7;

2.      Proposed Order;

3.      Debtors' Response to U.S. Trustee's Objection to Debtors' Motion for Authority to Sell *De Minimis* Assets;

4.      Unsworn Declaration of Becky Moldenhauer in Support of Debtors' Response to U.S. Trustee's Objection to Debtors' Motion for Authority to Sell *De Minimis* Assets; and

5.      Certificate of Service

by sending true and correct copies via ECF and by U.S. Mail to the parties listed in the attached service list.

Dated:  May 26, 2011                          */e/ Douglas W. Kassebaum*
                                              Douglas W. Kassebaum

4935022_1/062204.0888

Duke and King Acquisition Corp. and Related Debtors
Bky No. 10-38652
SERVICE LIST

**_US Trustee and Other Required Parties_**

U.S. Trustee's Office
1015 US Courthouse
300 S Fourth St
Minneapolis MN 55415
ustpregion12.mn.ecf@usdoj.gov

U.S. Trustee's Office
1015 US Courthouse
300 South Fourth Street
Minneapolis MN 55415
michael.fadlovich@usdoj.gov

_Attorneys for Duke and King Acquisition Corp._
Michael J. Kaczka
Scott N. Opincar
Shawn M. Riley
McDonald Hopkins LLC
mkaczka@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
sriley@mcdonaldhopkins.com

IRS District Counsel
380 Jackson St, Ste 650
St Paul MN 55101-4804

Internal Revenue Service
Wells Fargo Place
30 E 7th St, Mail Stop 5700
St Paul MN 55101

MN Department of Revenue
Collection Enforcement
551 Bankruptcy Section
600 North Robert Street
PO Box 64447
St Paul MN 55101-2228

US Attorney
600 US Courthouse
300 S Fourth St
Minneapolis MN 55415

Minnesota Department of Economic Security
332 Minnesota St, Ste E200
St. Paul MN 55101-1351

**_Debtors_**

Duke and King Acquisition Corp.
Attn: Becky Moldenhauer
12281 Nicollet Ave S
Burnsville, MN  55337

**_Official Committee of Unsecured Creditors_**

_Local Counsel for Official Committee of Unsecured Creditors_
c/o Amy J. Swedberg
Maslon Edelman Borman & Brand, LLP
3300 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN  55402
amy.swedberg@maslon.com

_Counsel for Official Committee of Unsecured Creditors_
c/o Aaron L. Hammer
Freeborn & Peters LLP
311 South Wacker Drive, #3000
Chicago, IL  60606-6677
ahammer@freebornpeters.com

**_Major Secured Creditors_**

_Bank of America_
c/o Stephen M. Mertz
Michael R. Stewart
Michael F. Doty
Christopher J. Harayda
Faegre & Benson LLP
2200 Wells Fargo Center
90 South 7th Street
Minneapolis, MN  55402-3901
SMertz@faegre.com
MStewart@faegre.com
MDoty@faegre.com
CHarayda@faegre.com

_Bank of America_
c/o Wendy S. Walker
Jonathan K. Bernstein
Patrick D. Fleming
Annie C. Wells
Morgan, Lewis & Bockius LLP
101 Park Avenue
New York, NY  10178-0060
wwalker@morganlewis.com
awells@morganlewis.com

_Wells Fargo Bank, N.A._
c/o Mark D. Stephenson
Stephenson, Sanford & Thone, PLC
1905 East Wayzata Boulevard, #220
Wayzata, MN  55391
marks@stephenson-sanford.com

_Meadowbrook Meat Company d/b/a MBM Corp._
c/o Larry B. Ricke
Ricke & Sweeney, PA
325 Cedar Street
St. Paul, MN  55101
rickel@srsg.net

**_Appearance Parties_**

_Burger King Corporation_
c/o Paul J. Battista
Genovese Joblove & Battista, P.A.
100 Southeast Second Street, 44th Floor
Miami, FL  33131
pbattista@gjb-law.com

_Burger King Corporation_
c/o Kenneth Corey-Edstrom
Larkin, Hoffman, Daly & Lindgren Ltd.
1500 Wells Fargo Plaza
7900 Xerxes Avenue South
Bloomington, MN  55431-1194
kcoreyedstrom@larkinhoffman.com

_Pan-O-Gold Baking Co._
c/o John L. Greer
Hughes Mathews, PA
110 Sixth Avenue South, #200
P.O. Box 548
St. Cloud, MN  56302-0548
jgreer@hughesmathews.com

_Bruce Swissheim_
c/o Gordon B. Conn, Jr.
Carole Clark Isakson
Kalina, Wills, Gisvold & Clark PLLP
6160 Summit Drive, #560
Minneapolis, MN  55430
conn@kwgc-law.com
isakson@kwgc-law.com

_Reinhart Foodservice, LLC_
c/o Jeffrey D. Klobucar
Foley & Mansfield PLLP
250 Marquette Avenue, #1200
Minneapolis, MN  55401
jklobucar@foleymansfield.com

_Reinhart Foodservice, LLC_
c/o Thomas F. Blakemore
Winston & Strawn, LLP
35 West Wacker Drive
Chicago, IL  60601-9703

_Missouri Department of Revenue_
c/o Steven A. Ginth
Missouri Dept. of Revenue
General Counsel's Office
301 W. High Street, Room 670
P.O. Box 475
Jefferson City, MO  65105-0475
mn@dor.mo.gov

Duke Manufacturing Co.
Attn: Officer or Agent
2305 North Broadway
Saint Louis, MO  63102
Fax No. 314-231-5074

GreatAmerica Leasing Corporation
Attn: Officer or Agent
625 1st Street, SE, Suite 800
Cedar Rapids, IA  52401-2031
Fax No. 319-365-8607

Coca-Cola Financial Corporation
Attn: Amber Meyer
1410 SW Morrison St., #750
Portland, OR  97205

_The Lakes Adventure, LLC, f/k/a The Lakes at Raintree Village, LLC_
c/o Eoin L. Kreditor
Friedman Stroffe & Gerard, P.C.
19800 MacArthur Blvd., #1100
Irvine, CA  92612
ekreditor@fsglawyers.com

_Mark and Helen Kim_
c/o Jane H. Park
John H. Kim
Mirae Law, LLC
1701 Golf Road, Suite 1-1106
Rolling Meadows, IL  60008

*Travelers*
Travelers
Attn: Chantel Pinnock
Account Resolution
One Tower Square, 5MN
Hartford, CT 06183
Fax No. 877-399-8479

*Sunflower Square Shopping Center, LLC*
c/o Richard C. Salmen
Felhaber, Larson, Fenlon & Vogt, PA
220 South Sixth Street, #2200
Minneapolis, MN 55402
rsalmen@felhaber.com

*Angelo Cappas, Mary Cappas, Cappas Family
Limited Partnership and Pamela Karabatsos*
c/o Steven C. Opheim
Dudley and Smith, PA
2602 US Bank Center
101 East Fifth Street
St. Paul, MN 55101
sopheim@dudleyandsmith.com

*Barque Hill Capital Partners LLC*
c/o Steven C. Opheim
Dudley and Smith, P.A.
101 East Fifth Street, #2602
St. Paul, MN 55101
sopheim@dudleyandsmith.com

*Ramsey L. Cronfel and Ellen K. Cronfel as
Co-Trustees of the Ramsey L. Cronfel
Revocable Trust*
c/o Steven C. Opheim
Dudley and Smith, PA
101 East Fifth Street, #2602
St. Paul, MN 55101
sopheim@dudleyandsmith.com

*Pooya Incorporated*
c/o Matthew R. Burton
Leonard, O'Brien, Spencer, Gale & Sayre,
Ltd.
100 South Fifth Street, #2500
Minneapolis, MN 55402
mburton@losgs.com

*Simon Roofing and Sheet Metal Corp.*
c/o Glenn R. Osborne
Friedman & Rummell, Co., LPA
132 South Broad Street, #101
Canfield, OH 44406

*Gabriel and Karen Fazzini*
c/o Michael W. Vogel
Vogel Law Firm, Ltd.
19 S. Austin Road
Janesville, WI 53548
mwv@vogellawfirm.net

*South Campbell Street Investment
    Company, LLC and
Legacy Enterprises Inc.*
c/o Dan R. Nelson
Lathrop & Gage, LLP
1845 S. National Avenue
P.O. Box 4288
Springfield, MO 65808-4288
dnelson@lathropgage.com

*Inland Real Estate Corporation and Inland
Real Estate LB1, LLC*
c/o Adam D. Maier
Leonard, Street and Deinard
150 South Fifth Street, #2300
Minneapolis, MN 55402
adam.maier@leonard.com

*Wood Family Limited Partnership
c/o JT Brown Realty Co.*
c/o Lee J. Viorel
Lowther Johnson, LLC
901 St. Louis Street, 20th Floor
Springfield, MO 65806
lviorel@lowtherjohnson.com

*Edwin J. Taylor, Diana S. Taylor and The
Skillman Corporation*
c/o Dennis L. Johnson
3300 Penn Avenue North
Minneapolis, MN 55412-2374
Johnsonlaw43@msn.com

Laurence K. Kennedy
Landlord and Creditor
Burger King Store, #11284
1500 Stinson Blvd. N.E.
Minneapolis, MN 55431

*IKON Office Solutions*
Attn: Olivia Moody
IKON Office Solutions
3920 Arkwright Road, #400
Macon, GA 31210

*Consolidated Energy Coop.*
c/o James T. Remington
Remington Law Offices
126 South Knowles Avenue
New Richmond, WI 54017

*Strategic Restaurants Acquisition Company II,
LLC*
c/o Robert A. Trodella, Jr.
Jones Day
555 California Street, 26th Floor
San Francisco, CA 94104
rtrodella@jonesday.com

*Nath Entities*
c/o Lara O. Glaesman
Adine S. Momoh
Leonard Street and Deinard, PA
150 South Fifth Street, #2300
Minneapolis, MN 55402
lara.glaesman@leonard.com
adine.momoh@leonard.com

*Legacy Enterprises, Inc.*
c/o Richard D. Anderson
Briggs and Morgan, PA
2200 IDS Center
80 South 8th Street
Minneapolis, MN 55402
randerson@briggs.com

*Strategic Restaurants Acquisition Company II,
LLC*
c/o Robert T. Kugler
Leonard, Street and Deinard, PA
150 South Fifth Street, #2300
Minneapolis, MN 55402
robert.kugler@leonard.com

*Warren Capital Corporation*
c/o James M. Jorissen
Leonard, Street and Deinard, PA
150 South Fifth Street, #2300
Minneapolis, MN 55402
jjorissen@losgs.com

*LAG Property Group, LLC*
3716 N Lakewood
Chicago, IL 60613

*LAG Property Group, LLC*
5808 Prairie Ln
Palatine, IL 60067

*First Sunrise, LLC*
2679 E 66th St
Brooklyn, NY 11234

*IKON Financial Services, Inc.*
Bankruptcy Admin
PO Box 13708
Macon, GA 31208

*IKON Financial Services, Inc.*
PO Box 650016
Dallas, TX 75265

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**************************************************************************

In re:

DUKE AND KING ACQUISITION CORP.,

Debtors.

(includes:
Duke and King Missouri, LLC;
Duke and King Missouri Holdings, Inc.;
Duke and King Real Estate, LLC;
DK Florida Holdings, Inc.)

**JOINTLY ADMINISTERED UNDER CASE NO. 10-38652**

Court File No. 10-38652

Court File Nos:

10-38653 (GFK)
10-38654 (GFK)
10-38655 (GFK)
10-38656 (GFK)

Chapter 11 Cases
Chief Judge Gregory F. Kishel

**************************************************************************

## ORDER DENYING MOTION TO CONVERT OR DISMISS

**************************************************************************

This case came before the court on the United States Trustee's Motion to Dismiss or Convert Cases to Chapter 7. Based on the motion, the objections, and all the files, records, and proceedings,

IT IS ORDERED,

The motion is denied.

Dated: _____

Gregory F. Kishel
United States Chief Bankruptcy Judge