# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**********************************************************************************

In re:                                              **JOINTLY ADMINISTERED UNDER**
                                                    **CASE NO. 10-38652**

DUKE AND KING ACQUISITION CORP.,                    Court File No. 10-38652

                Debtors.            Court File Nos:

(includes:
Duke and King Missouri, LLC;                        10-38653 (GFK)
Duke and King Missouri Holdings, Inc.;              10-38654 (GFK)
Duke and King Real Estate, LLC;                     10-38655 (GFK)
DK Florida Holdings, Inc.)                          10-38656 (GFK)

                  Chapter 11 Cases
                Chief Judge Gregory F. Kishel

**********************************************************************************

## SECOND AMENDED DISCLOSURE STATEMENT FOR THE
## SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS
## AND OFFICIAL COMMITTEE OF UNSECURED CREDITORS

**********************************************************************************

August 8, 2011

McDONALD HOPKINS LLC                    FREEBORN & PETERS LLP
Shawn M. Riley (OH 0037235)             Aaron L. Hammer (IL 6243069)
Scott N. Opincar (OH 0064027)           Richard S. Lauter (IL 6182859)
Michael J. Kaczka (OH 0076548)          311 South Wacker Drive, Suite 3000
600 Superior Avenue, East, Suite 2100   Chicago, Illinois 60606-6677
Cleveland, Ohio 44114-2653              Telephone: (312) 360-6000
Telephone: (216) 348-5400               Facsimile: (312) 360-6995
Facsimile: (216) 348-5474               ahammer@freebornpeters.com
sriley@mcdonaldhopkins.com              rlauter@freebornpeters.com
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com
                                        -and-
-and-

FREDRIKSON & BYRON, P.A.                 MASLON EDELMAN BORMAN &
Clinton E. Cutler (#158094)             BRAND, LLP
Douglas W. Kassebaum (#386802)          Amy J. Swedberg (#271019)
200 South Sixth Street, Suite 4000      330 Wells Fargo Center
Minneapolis, Minnesota 55402            90 South Seventh Street
Telephone: (612) 492-7000               Minneapolis, Minnesota 55402-4140
Facsimile: (612) 492-7077               Telephone: (612) 672-8200
ccutler@fredlaw.com                     Facsimile: (612) 672-8397
dkassebaum@fredlaw.com                  amy.swedberg@maslon.com

CO-COUNSEL FOR DEBTORS                   CO-COUNSEL FOR OFFICIAL COMMITTEE
AND DEBTORS IN POSSESSION                OF UNSECURED CREDITORS

{2822324:}

**TABLE OF CONTENTS**

I.      INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS
        AND INTEREST .................................................................................................... 1

II.     SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN ............................ 3

        A.      Introduction ..................................................................................................... 3

        B.      Explanation of Chapter 11 .............................................................................. 3

        C.      Preliminary Statement and Summary of Recoveries ...................................... 3

        D.      Overview of Treatment .................................................................................... 4

                1.      Summary of Classification and Treatment Under the Plan ................... 4

        E.      Who Is Entitled To Vote on the Plan .............................................................. 6

III.    THE DEBTORS AND THE CHAPTER 11 CASES .................................................. 6

        A.      Business Overview and History ....................................................................... 6

        B.      Prepetition Structure ....................................................................................... 7

        C.      Boards of Managers and Executive Officers .................................................. 8

        D.      Prepetition Debt Structure ............................................................................... 8

                **1.**    Bank of America's Secured Credit Facilities ........................................ 8
                **2.**    Warren Capital Corporation .................................................................. 9
                **3.**    The Coca-Cola Company ....................................................................... 9
                **4.**    Duke Manufacturing Company .............................................................. 9
                **5.**    Meadowbrook Meat Company, Inc. ..................................................... 10
                **6.**    Burger King Corporation ..................................................................... 10

IV.     ACTIVITIES WITHIN THE CHAPTER 11 CASES ............................................... 10

        A.      Reasons for Chapter 11 Filing ...................................................................... 10

        B.      The Chapter 11 Cases ................................................................................... 11

                1.      First Day Relief ................................................................................... 11
                2.      The Debtors' Professional Advisors .................................................... 11
                3.      Appointment of the Creditors' Committee ......................................... 11
                4.      Exclusivity .......................................................................................... 11
                5.      Bar Dates ............................................................................................ 12
                6.      Administrative Bar Date ...................................................................... 12
                7.      Postpetition Operations ....................................................................... 12
                8.      Postpetition Grant of Adequate Protection Liens ............................... 12
                9.      Sale and Marketing Efforts ................................................................. 12
                10.     Asset Sale ............................................................................................ 12

        C.      Executory Contracts and Unexpired Leases .................................................. 14

                1.      Assumption of Contracts and Leases ................................................... 14
                2.      Rejection of Contracts and Leases ...................................................... 14

        D.      Global Settlement .......................................................................................... 14

        E.      Distributions Prior to Effective Date ............................................................ 15

F.     Avoidance Actions ........................................................................................ 16

V.     SUMMARY OF THE PLAN OF LIQUIDATION ................................................ 16

    A.     Overview ........................................................................................................ 16

    B.     Overall Structure of the Plan ......................................................................... 16

    C.     Classification and Treatment of Claims ........................................................ 16

       1.     Payment of Administrative Claims ................................................... 16
       2.     Payment of Priority Tax Claims ....................................................... 18
       3.     Class 1: Secured Claims – Unimpaired ............................................ 18
       4.     Class 2: Other Priority Claims – Unimpaired .................................. 18
       5.     Class 3: General Unsecured Claims – Impaired ............................... 19
       6.     Class 4: Interests in Debtors - Impaired ........................................... 19
       7.     Special Provisions Relating to the Rights of Setoff of Creditors ...... 19

    D.     Means for Implementation of the Plan ........................................................... 19

       1.     The Sale Generally ........................................................................... 19
       2.     Confirmation Exhibits ...................................................................... 19
       3.     Winddown of the Debtors ................................................................. 20
       4.     Liquidating Trust .............................................................................. 20
       5.     Funding of and Transfer of Assets into the Liquidating Trust .......... 21
       6.     Liquidating Trustee .......................................................................... 21
       7.     Liquidating Trust Agreement ............................................................ 22
       8.     Reports To Be Filed by the Liquidating Trustee .............................. 22
       9.     Fees and Expenses of the Liquidating Trust ..................................... 22
       10.     Indemnification ................................................................................ 22
       11.     Tax Treatment .................................................................................. 22
       12.     Disposition of Assets by Liquidating Trust ..................................... 23
       13.     Settlement of Causes of Actions and Disputed Claims ..................... 23
       14.     De Minimis Distributions ................................................................. 23

    E.     Special Provisions ......................................................................................... 23

       1.     Limitations on Amounts To Be Distributed to Holders of Allowed Insured
          Claims .............................................................................................. 23
       2.     Preservation of Causes of Action; Avoidance Actions ..................... 23
       3.     Effectuating Documents; Further Transactions; Exemption from Certain
          Transfer Taxes .................................................................................. 24
       4.     Comprehensive Settlement of Claims and Controversies .................. 24

    F.     Executory Contracts and Unexpired Leases ................................................... 24

       1.     Assumption and Assignment ............................................................ 24
       2.     Cure of Defaults ............................................................................... 24
       3.     Bar Date for Rejection Damage Claims ............................................ 24
       4.     Approval of Rejection ...................................................................... 25

    G.     Substantive Consolidation ............................................................................. 25

       **1.**     Consolidation for Certain Purposes .................................................. 25
       **2.**     Order Granting Consolidation ........................................................... 25
       **3.**     Rationale for Consolidation .............................................................. 25

    H.     Confirmation of the Plan ............................................................................... 26

| | | |
|---|---|---|
| | 1. | Conditions Precedent to Confirmation..................................................26 |
| | 2. | Conditions Precedent to the Effective Date..........................................26 |
| | 3. | Waiver of Conditions to Confirmation or Effective Date.......................27 |
| | 4. | Cramdown.............................................................................................27 |
| | 5. | Effect of Nonoccurrence of Conditions to the Effective Date................27 |
| | 6. | Effect of Confirmation of the Plan.......................................................27 |
| | 7. | Request for Waiver of Stay of Confirmation Order...............................28 |
| I. | | Retention of Jurisdiction ...................................................................................29 |
| **VI.** | | **MISCELLANEOUS PROVISIONS**...................................................................30 |
| | A. | Summary of Other Provisions of the Plan ..........................................................30 |
| | B. | Modification of the Plan .....................................................................................30 |
| | C. | Revocation of the Plan .......................................................................................30 |
| | D. | Severability of Plan Provisions..........................................................................30 |
| | E. | Dissolution of Creditors' Committee ..................................................................31 |
| | F. | Successors and Assigns .......................................................................................31 |
| | G. | Section 1125(e) Good Faith Compliance.............................................................31 |
| | H. | Governing Law ....................................................................................................31 |
| **VII.** | | **RISK FACTORS TO BE CONSIDERED**...........................................................31 |
| | A. | Failure to Satisfy Vote Requirement...................................................................31 |
| | B. | Non-Confirmation or Delay of Confirmation of the Plan....................................32 |
| | C. | Non-Consensual Confirmation ............................................................................32 |
| | D. | Risk of Non-Occurrence of the Effective Date....................................................32 |
| | E. | Classification and Treatment of Claims..............................................................32 |
| | F. | Warren Capital's Claim ......................................................................................33 |
| | G. | Coca-Cola's Claim ..............................................................................................33 |
| | H. | Claim Objections and Reconciliation ..................................................................33 |
| | I. | Sale of Unencumbered Assets .............................................................................33 |
| | J. | Recovery of Insurance Premiums ........................................................................33 |
| | K. | Resolution of Joplin, Missouri Insurance Recovery ...........................................33 |
| **VIII.** | | **CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN**....34 |
| | A. | U.S. Federal Income Tax Consequences to Holders of Claims ............................34 |
| | | 1. General Treatment of Holders of Claims................................................35 |
| | | 2. Bad Debt Deduction................................................................................35 |
| | B. | Federal Income Tax Treatment of Liquidating Trust and Disputed Claims Reserve...............................................................................................................36 |
| | | 1. Establishment of the Liquidating Trust..................................................36 |
| | | 2. Taxation of Holders of Beneficial Interests in the Liquidating Trust.................36 |

    C.      Information Reporting and Backup Withholding ............................................................. 37

    D.      Importance of Obtaining Professional Tax Assistance ..................................................... 37

IX.      FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS.............................. 37

    A.      Feasibility of the Plan .................................................................................................... 37

    B.      Acceptance of the Plan ................................................................................................... 37

    C.      Best Interests Test .......................................................................................................... 38

    D.      Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation ......................................................................................................... 38

    E.      Confirmation Without Acceptance of All Impaired Classes:  The "Cramdown" Alternative ..................................................................................................................... 38

X.       ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN.............. 39

XI.      THE SOLICITATION; VOTING PROCEDURE ......................................................................... 39

    A.      Parties in Interest Entitled To Vote ............................................................................... 39

    B.      Voting Procedures.......................................................................................................... 39

    C.      Waivers of Defects, Irregularities, Etc........................................................................... 39

    D.      Withdrawal of Ballots; Revocation................................................................................ 40

    E.      Further Information; Additional Copies ......................................................................... 40

XII.     CONCLUSION AND RECOMMENDATION........................................................................... 41

## TABLE OF APPENDICES

| **Appendix** | **Name** |
| --- | --- |
| Appendix A | DEBTORS' SECOND AMENDED JOINT CHAPTER 11 PLAN OF LIQUIDATION |
| Appendix B | DISCLOSURE STATEMENT ORDER |
| Appendix C | LIQUIDATION ANALYSIS |

## I. INTRODUCTION, DISCLAIMER AND SUMMARY OF TREATMENT OF CLAIMS AND INTEREST

Duke and King Acquisition Corp., Duke and King Missouri, LLC, Duke and King Missouri Holdings, Inc., Duke and King Real Estate LLC, and DK Florida Holdings, Inc. (collectively, the "Debtors") the chapter 11 cases 10-38652 through 10-38656, jointly administered under Case No. 10-38652 (the "Chapter 11 Cases") pending in the United States Bankruptcy Court for the District of Minnesota (the "Bankruptcy Court") under chapter 11 of the United States Bankruptcy Code, 11 U.S.C. §§ 101-1532 (the "Bankruptcy Code"), provide this second amended disclosure statement (the "Disclosure Statement") pursuant to section 1125 of the Bankruptcy Code, for use in the solicitation of votes on the Debtors' Second Amended Joint Chapter 11 Plan of Liquidation (the "Plan"). The Plan is being jointly proposed by the Debtors and the Official Committee of Unsecured Creditors (the "Creditors Committee," and with the Debtors, the "Plan Proponents") and was filed with the Bankruptcy Court on August 8, 2011. A copy of the Plan is attached as <u>Appendix A</u> to this Disclosure Statement.

The Plan generally provides for the liquidation of the Debtors' remaining assets and distribution of proceeds to creditors in accordance with the Bankruptcy Code. **THE PLAN PROPONENTS RECOMMEND ACCEPTANCE OF THE PLAN AND URGE CREDITORS ENTITLED TO VOTE ON THE PLAN TO VOTE TO ACCEPT IT.**

Except as otherwise provided herein, capitalized terms used, but not otherwise defined in this Disclosure Statement, have the meanings ascribed to them in the Plan. Unless otherwise noted herein, all dollar amounts provided in this Disclosure Statement and in the Plan are given in United States dollars.

On August 8, 2011, after notice and a hearing, the Bankruptcy Court entered the Disclosure Statement Order approving this Disclosure Statement as containing adequate information of a kind and in sufficient detail to enable a hypothetical, reasonable investor typical of the Debtors' creditors and interest holders to make an informed judgment whether to accept or reject the Plan. APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE BANKRUPTCY COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE AND RULE 3016 OF THE FEDERAL RULES OF BANKRUPTCY PROCEDURE.

The Disclosure Statement Order, a copy of which is attached as <u>Appendix B</u>, sets forth deadlines for voting to accept or reject the Plan, procedures to be followed to object to confirmation of the Plan, and the record date for voting purposes. A Ballot for the acceptance or rejection of the Plan is enclosed with each Disclosure Statement submitted to a holder of a Claim that is entitled to vote to accept or reject the Plan. **THE BANKRUPTCY COURT HAS SCHEDULED A HEARING ON SEPTEMBER 26, 2011 AT 1:30 P.M. (CENTRAL TIME) TO CONSIDER WHETHER TO CONFIRM THE PLAN.**

This Disclosure Statement sets forth certain information regarding the Debtors' prepetition operating and financial history, the need to seek chapter 11 protection, significant events that have occurred during the Debtors' Chapter 11 Cases, the closing of the sale of substantially all of Debtors' operating assets to multiple purchasers, and the global settlement agreement as further described herein. This Disclosure Statement also describes terms and provisions of the Plan, certain effects of confirmation of the Plan, and the manner in which distributions will be made under the Plan. In addition, this Disclosure Statement discusses the confirmation process and the voting procedures that holders of claims entitled to vote under the Plan must follow for their votes to be counted.

FOR A COMPLETE UNDERSTANDING OF THE PLAN, YOU SHOULD READ THIS DISCLOSURE STATEMENT, THE PLAN, AND THE EXHIBITS, APPENDICES, AND SCHEDULES THERETO IN THEIR ENTIRETY. IF ANY INCONSISTENCY EXISTS BETWEEN THE PLAN AND THIS DISCLOSURE STATEMENT, THE TERMS OF THE PLAN CONTROL.

NO PERSON IS AUTHORIZED BY ANY OF THE DEBTORS IN CONNECTION WITH THE PLAN OR THE SOLICITATION OF ACCEPTANCES OF THE PLAN TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION REGARDING THIS DISCLOSURE STATEMENT OR THE PLAN OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT AND THE EXHIBITS, APPENDICES, AND/OR SCHEDULES ATTACHED HERETO OR INCORPORATED BY REFERENCE OR REFERRED TO HEREIN, AND, IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MAY NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY ANY OF THE DEBTORS.

THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY CREDITOR DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH ITS OWN ADVISORS.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT ARE MADE AS OF THE DATE HEREOF UNLESS ANOTHER TIME IS SPECIFIED HEREIN, AND THE DELIVERY OF THIS DISCLOSURE STATEMENT WILL NOT CREATE AN IMPLICATION THAT THERE HAS NOT BEEN ANY CHANGE IN THE INFORMATION STATED SINCE THE DATE HEREOF.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING THE INFORMATION REGARDING THE HISTORY, BUSINESS, AND OPERATIONS OF THE DEBTORS AND THE HISTORICAL FINANCIAL INFORMATION REGARDING THE DEBTORS IS INCLUDED FOR PURPOSES OF SOLICITING ACCEPTANCES OF THE PLAN BUT, AS TO CONTESTED MATTERS AND ADVERSARY PROCEEDINGS, IS NOT TO BE CONSTRUED AS AN ADMISSION OR A STIPULATION BUT RATHER AS A STATEMENT MADE IN SETTLEMENT NEGOTIATIONS.

THIS DISCLOSURE STATEMENT MAY NOT BE RELIED ON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER TO VOTE TO ACCEPT OR TO REJECT THE PLAN, AND NOTHING STATED HEREIN WILL CONSTITUTE AN ADMISSION OF ANY FACT OR LIABILITY BY ANY PARTY, OR BE ADMISSIBLE IN ANY PROCEEDING INVOLVING THE DEBTORS OR ANY OTHER PARTY, OR BE DEEMED A REPRESENTATION OF THE TAX OR OTHER LEGAL EFFECTS OF THE PLAN ON THE DEBTORS OR HOLDERS OF CLAIMS. CERTAIN OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT, BY NATURE, ARE FORWARD LOOKING AND CONTAIN ESTIMATES AND ASSUMPTIONS. THERE CAN BE NO ASSURANCE THAT SUCH STATEMENTS WILL BE REFLECTIVE OF ACTUAL OUTCOMES. ALL HOLDERS OF CLAIMS SHOULD CAREFULLY READ AND CONSIDER THIS DISCLOSURE STATEMENT AND THE PLAN IN THEIR ENTIRETY, INCLUDING ARTICLE VII, "RISK FACTORS TO BE CONSIDERED," OF THIS DISCLOSURE STATEMENT, BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

EXCEPT AS OTHERWISE EXPRESSLY SET FORTH HEREIN, ALL INFORMATION CONTAINED HEREIN HAS BEEN PROVIDED BY THE DEBTORS.

## II. SUMMARY OF TREATMENT OF CLAIMS UNDER THE PLAN

### A. Introduction

The Plan Proponents are distributing this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to provide the Debtors' creditors with adequate information so that they can make an informed judgment on whether to accept or reject the Plan. Please read the Disclosure Statement and Plan carefully and follow the instructions on how to vote on the Plan.

### B. Explanation of Chapter 11

Pursuant to chapter 11 of the Bankruptcy Code, a debtor may reorganize or liquidate its assets for the benefit of its creditors and interest holders. In a chapter 11 case, the debtor typically remains in control of the estate as the "debtor in possession." Upon a filing a petition for chapter 11 relief and during the pendency of a case, the Bankruptcy Code imposes an automatic stay on certain actions against the debtor or its assets. The automatic stay provisions of section 362 of the Bankruptcy Code, unless modified by court order, will generally prohibit or restrict attempts by creditors to collect or enforce any claims that arose prior to the commencement of the chapter 11 case against the debtor.

The Bankruptcy Code provides for the formation of an official committee of unsecured creditors in a chapter 11 case to represent the interests of creditors in the case. On December 29, 2010, the United States Trustee appointed the Creditors' Committee.

The provisions of the Bankruptcy Code are designed to encourage the parties in interest in a chapter 11 proceeding to negotiate the terms of the plan of reorganization or liquidation so that it may be confirmed. A chapter 11 plan is the vehicle for satisfying or otherwise addressing the claims against a debtor. After the chapter 11 case has been filed, the holders of the claims against or interests in a debtor, whose claims or interests are impaired under the plan, may vote to accept or reject the plan. Section 1125 of the Bankruptcy Code requires a debtor, before soliciting acceptances of the proposed plan, to prepare a disclosure statement containing adequate information of the kind, and in such detail, as to enable a hypothetical reasonable investor to make an informed judgment on the plan.

### C. Preliminary Statement and Summary of Recoveries

On December 4, 2010 (the "Petition Date"), each of the Debtors filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court. Pursuant to sections 1107 and 1108 of the Bankruptcy Code, the Debtors continued in the management and possession of their property as debtors in possession.

The primary objective of the Plan is to provide a mechanism for completing the liquidation of the Debtors' remaining assets, including investigating and filing any Causes of Action held by or in favor of the Debtors, administering certain Unencumbered Assets, reconciling and fixing the Claims asserted against the Debtors and distributing the net liquidation proceeds in conformity with the distribution scheme provided by the Bankruptcy Code. As described below, a substantial portion of Debtors' operating assets were sold (collectively, the "Sales") to Cave Enterprises Operations, LLC ("Cave"); Crown Ventures Iowa, Inc. ("Crown"); Heartland Midwest, LLC ("Heartland"); and Strategic Restaurants Acquisition Company II, LLC ("SRAC" and with Cave, Crown and Heartland, the "Purchasers"), respectively, pursuant to multiple Orders of the Bankruptcy Court issued on May 10, 2011. The Sales closed on May 26, 2011. Certain assets were excluded from the Sales, including but not limited to Cash, insurance recoveries, certain Causes of Action and other corporate-level assets. The Debtors have ceased operations as BURGER KING® franchisees and have continued to wind down their affairs. Because the

Plan is a plan of liquidation, pursuant to section 1141(d)(3) of the Bankruptcy Code, the Debtors will not receive a discharge, and will not engage in business after a final decree has been entered and their Chapter 11 Cases have been closed. The Allowed Claims of general unsecured creditors will not be paid in full under the Plan due to insufficient funds from liquidation of the Debtors' assets.

### D.     Overview of Treatment

As contemplated by the Bankruptcy Code, Administrative Claims and Priority Tax Claims (as defined in the Plan) are not classified under the Plan. Allowed Administrative Claims and Allowed Priority Tax Claims will be paid in full in Cash on the later of the Effective Date or as soon as practicable after the relevant claim is Allowed. See Article V, Section C hereof for a more detailed discussion of treatment of Administrative Claims and Priority Tax Claims.

The table below summarizes the classification and treatment of the prepetition Claims and Interests under the Plan. For certain classes of Claims, estimated percentage recoveries are also set forth below. Estimated percentage recoveries have been calculated based upon a number of assumptions for purposes of the Plan, as discussed below. See Article V, Section C hereof for a more detailed description of treatment of classified Claims and Interests.

The Plan Proponents intend to seek to consummate the Plan and cause the Effective Date to occur as quickly as practicable. The Debtors believe that the Plan provides distributions to all Classes of Claims that reflect an appropriate resolution of the Claims, taking into account the differing nature and priority of such Claims.

### 1.     Summary of Classification and Treatment Under the Plan

The recoveries listed below for Class 3 General Unsecured Claims depend on the amount of Cash available for distribution. It is not possible at this time to definitively state that amount, as it depends on: (a) the liquidated value of the Debtors' remaining assets; (b) the amount of Allowed Secured Claims, Allowed Administrative Claims, Allowed Priority Tax Claims and Allowed Other Priority Claims; and (c) the amount of post-Effective Date Liquidating Trust Expenses. The Debtors have made a good faith estimate of that amount, which is used to calculate the estimated recoveries. In making that estimate, no value was ascribed to any Causes of Action.

| Description and Class of Claims | Estimated Allowed Amount[1] | Summary of Treatment | Estimated Projected Recovery |
|---|---|---|---|
| **Class 1 Secured Claims**<br><br>Class 1A consists of Warren Capital's Secured Claims and is Unimpaired.<br><br>Class 1B consists of Coca-Cola's Secured Claims and is Unimpaired. | **$300,000 – $550,000** | Each holder of an Allowed Secured Claim will receive, at the option of the Debtors:<br>1. The net proceeds of the sale of the property securing such Claim, up to the Allowed amount of the Claim;<br>2. Return of the property securing the Claim; or<br>3. Cash equal to the value of the property securing the Claim, up to the Allowed amount of such Claim. | **100%** |
| **Class 2 Other Priority Claims**<br><br>Class 2 consists of all Other Priority Claims and is Unimpaired. | **$1,000** | Each holder of an Allowed Other Priority Claim will receive Cash in the amount of its Allowed Claim. | **100%** |
| **Class 3 General Unsecured Claims**<br><br>Class 3 consists of all General Unsecured Claims and is Impaired. | **$6,000,000 – $7,500,000** | Each holder of an Allowed General Unsecured Claim will receive a Pro Rata share of the net proceeds of the Liquidating Trust Assets after the payment of all Allowed Fee Claims, Administrative Claims, Priority Tax Claims, Other Priority Claims, and Secured Claims, and the payment of all costs and expenses of the Liquidating Trust. | **19% - 38%** |

---

[1]  The dollar amounts included in the following table are estimates only and do not constitute an admission by the Debtors as to the validity or amount of any particular Claim.  The Plan Proponents reserve all rights to dispute the validity or amount of any Claim that has not already been established by the Bankruptcy Court.  The summary of estimated distributions under the Plan set forth below lists both the estimated allowed amount of Claims in each Class and an estimated percentage recovery for such Class.  The estimated aggregate amounts of all Classes of Claims are based on the Debtors' good faith estimates of the aggregate amount of such claims upon resolution of all such Claims that are Disputed Claims, based on all currently known information.  Certain of those Disputed Claims are material, and the total asserted amount of all such Claims, including Disputed Claims, is materially in excess of the total amount of Allowed Claims assumed in the estimates listed below.  The amount of any Disputed Claim that is ultimately allowed by the Bankruptcy Court may be significantly more or less than the estimated allowed amount of such Claim.  For these reasons, no representation can be or is being made with respect to whether the estimated allowed amount of Claims in each Class will be accurate or whether the estimated percentage recoveries shown on the table below will be realized by the holder of an Allowed Claim in any particular Class.

| Description and Class of Claims | Estimated Allowed Amount[1] | Summary of Treatment | Estimated Projected Recovery |
|---|---|---|---|
| **Class 4 Interests in Debtors**<br><br>Class 4 consists of Debtor Interests and is Impaired. | **$0.00** | No distributions will be made on account of Interests. | **0%** |

**THE PLAN PROPONENTS HAVE APPROVED THE PLAN AND THE TRANSACTIONS CONTEMPLATED THEREBY AND RECOMMEND THAT ALL CREDITORS WHOSE VOTES ARE BEING SOLICITED SUBMIT BALLOTS TO ACCEPT THE PLAN.**

### E. Who Is Entitled To Vote on the Plan

Only impaired classes receiving a distribution under the Plan are entitled to vote on the Plan. Accordingly, the Holders of General Unsecured Claims (Class 3) are the only creditors entitled to vote on the Plan. Holders of Debtor Interests (Class 4) are not entitled to vote because no distributions will be paid under the Plan to Holders of Interests and they are deemed to reject the Plan. Holders of Secured Claims (Class 1) and Other Priority Claims (Class 2) are unimpaired and are deemed to accept the Plan.

### III. THE DEBTORS AND THE CHAPTER 11 CASES

The following overview is a general summary only, which is qualified in its entirety by, and should be read in conjunction with, the more detailed discussions, information, and financial statements and notes thereto appearing elsewhere in this Disclosure Statement and the Plan.

### A. Business Overview and History

Duke and King Acquisition Corp. ("Duke Acquisition") was formed in November 2006, to acquire 88 BURGER KING® franchise restaurants from the Nath Companies ("Nath"). The acquisition was funded by approximately $11.2 million in equity contributions from Kinderhook Capital Fund I and $17 million of debt provided by Bank of America, N.A. ("BofA"). At the time of the acquisition, Burger King Corporation ("BKC") and Kinderhook Industries ("Kinderhook") recognized that the stores being purchased were significantly behind on both successor and capital expenditures ("CAPEX") commitments. Notwithstanding the significant CAPEX requirements, Duke Acquisition decided to move forward with the Nath acquisition. The Nath acquisition also included 12 restaurants in Florida which Duke Acquisition planned on divesting shortly after closing the transaction so that it could focus on its core Midwest market. In July 2007, Duke Acquisition sold four of the 12 Florida restaurants purchased as part of the Nath acquisition.

Shortly after the Nath acquisition, Duke Acquisition formed Duke and King Missouri, LLC ("Duke Missouri" and with Duke Acquisition, the "Company") to purchase 24 restaurants in Missouri, known at the time as the Swisshelm Group ("Swisshelm"). Like the Nath restaurants, the Swisshelm assets were in relatively poor condition and were also in need of significant operational and capital improvements. For example, in the first six months following the Swisshelm acquisition, 20 of the 23 general managers and three of the four area managers were replaced in that market. This high turnover, while ultimately improving on-going operations, initially hurt productivity and added significant replacement and training costs. Additionally, the CAPEX required to bring the stores to acceptable conditions exceeded original estimates by over 140%. If Duke Missouri had not purchased the Swisshelm

locations, there was a high probability that the majority of the 24 stores would have been closed or converted to another concept.

After the Swisshelm acquisition, the Company continued to seek additional growth opportunities in an effort to "average in" low CAPEX and "clean EBITDA" to bolster the overall strength and value of its portfolio. In May 2007, the Company signed a letter of intent to purchase 66 restaurants from Simmonds Restaurants in the Omaha and Des Moines markets. However, BKC did not approve the Company's purchase of the Omaha and Des Moines markets. This development set back the Company's business plan and handcuffed its ability to add better-conditioned stores with advantageous operating results. The Company's plan to use cash flow from stronger locations to fund CAPEX at older restaurants could not, as a result, work. The Company was left with increasingly troubled assets requiring high CAPEX dollars without the ability to leverage better performing stores.

The need to spend CAPEX dollars was a constant drain on the Company. Since its inception and prior to the bankruptcy, the Company had reinvested all of the excess cash flow into the restaurants and spent over $8.75 million on CAPEX ($4.0 million in 2007, $1.9 million in 2008, $2.3 million in 2009 and approximately $600 thousand in 2010). Moreover, to meet additional CAPEX obligations, the Company performed sale-leasebacks of all of its real property holdings – 10 stores in 2008 and 3 stores in 2009 — generating approximately $13.3 million in cash. Of that amount, approximately $10.5 million was used to pay down debt and approximately $2.8 million was reinvested in the restaurants.

### B. Prepetition Structure

The ownership structure of the Debtors is relatively straightforward:

- Duke and King Acquisition Corp., a Delaware corporation, is the 100% owner of both Duke and King Missouri Holdings, Inc. and DK Florida Holdings, Inc.

- Duke and King Missouri, LLC, a Delaware limited liability company, operates restaurants in Missouri and Kansas.

- Duke and King Missouri Holdings, Inc., a Delaware corporation, wholly owns Duke Missouri.

- DK Florida Holdings, Inc., a Delaware corporation, serves as a holding company that formerly owned 100% of DK Florida, LLC (which was cancelled in September 2009).

- Duke and King Real Estate, LLC, a Delaware limited liability company, used to own real estate in fee for certain locations, but divested itself of those holdings as of 2009.

A chart depicting the Debtors' organizational structure is as follows:



*Duke and King Acquisition Corp. is 100% owned by Duke and King Holdings, Inc.

### C.    Boards of Managers and Executive Officers

The following is the current list of the board of directors for the Debtors.

| Duke and King Acquisition Corp. | | | |
|---|---|---|---|
| | **Name** | **Title** | **Company** |
| 1. | Rodger Head | Chief Executive Officer, President, Director | All Debtors |
| 2. | Becky Moldenhauer | Chief Financial Officer, Secretary | All Debtors |
| 3. | Paul Cifelli | Director | All Debtors |
| 4. | Clyde Culp | Director | All Debtors |
| 5. | Christian P. Michalik | Director | All Debtors |

### D.    Prepetition Debt Structure

#### 1.    Bank of America's Secured Credit Facilities

Duke Acquisition, and Duke and King Florida, LLC ("Duke Florida" and sometimes together with Duke Acquisition referred to herein as the "Original BofA Borrowers"), as borrowers, entered into a Credit Agreement dated as of November 1, 2006, with BofA, as Lender and Administrative Agent (the "Credit Agreement"). The original commitment amount under the Credit Agreement was $23.5 million, consisting of: (i) a term loan in the initial principal amount of $15 million ("Term Loan A"); (ii) a term loan in the initial principal amount of $1 million ("Term Loan B"); and (iii) an acquisition note in the initial principal amount of $7.5 million (the "Acquisition Note," and collectively with Term Loan A and Term Loan B, the "Original BofA Notes"). The maturity date of each of the Original BofA Notes is November 1, 2011.

On March 1, 2007, the Original BofA Borrowers, Duke and King Real Estate, LLC ("Duke Real Estate"), and Duke Missouri (and with the Original BofA Borrowers and D&K Real Estate, these parties

are collectively referred to herein as the "BofA Borrowers"), entered into a First Amendment to Credit Agreement with BofA (the "First Amendment"). The commitment amount under the Credit Agreement, as amended by the First Amendment, was increased to $33.262 million, consisting of: (i) Term Loan A in the initial principal amount of $15 million; (ii) Term Loan B in the initial principal amount of $1 million; (iii) a reduction in the principal amount of the Acquisition Note to $3.5 million; (iv) a new term loan in the initial principal amount of $5.826 million ("Term Loan C"); and (v) a new term loan in the initial principal amount of $7.936 million ("Term Loan D"). Term Loan A, Term Loan B, Term Loan C, Term Loan D and the Acquisition Note are collectively referred to herein as the "BofA Notes."

On February 24, 2009, the BofA Borrowers and BofA entered into a Second Amendment to Credit Agreement. On December 17, 2009, the BofA Borrowers and BofA entered into a Third Amendment to Credit Agreement. As part of these amendments, BofA consented to the sale and leaseback of certain real property and the sale of certain restaurants located in Florida.

As of December 1, 2010, according to the books and records of the Debtors, the BofA Borrowers' outstanding obligations to BofA under the BofA Notes total approximately: (i) $9,247,144 on Term Loan A; (ii) $0.00 on Term Loan B; (iii) $1,655,283 on Term Loan C; and (iv) $24,037 in principal, $280.60 in interest and $272.19 in late charges, on the Acquisition Note. Term Loan D was paid in full. In addition, D&K Acquisition and BofA were parties to an ISDA Master Agreement and Schedule dated November 10, 2006 pursuant to which D&K Acquisition and BofA have entered into three swap transactions, as evidenced by a confirmation dated as of March 2, 2007 and two confirmations dated as of March 6, 2007.

In the Credit Agreement, as amended and modified, the BofA Borrowers granted BofA a security interest in certain of the Debtors' assets, which were those assets listed on an exhibit to the Debtors' Motion for (I) Expedited Relief, and (II) Interim and Final Orders (A) Authorizing Debtors' Use of Unencumbered Cash or, in the Alternative, Cash Collateral and (B) Granting Adequate Protection, Docket No. 138 (the "Final Cash Collateral Order").

## 2. Warren Capital Corporation

In 2009 and 2010, D&K Acquisition and D&K Missouri entered into various equipment financing agreements with Warren Capital Corporation ("Warren"). Warren has claimed a security interest in the equipment and proceeds of such equipment.

## 3. The Coca-Cola Company

In 2008 and 2009, D&K Acquisition entered into various security agreements and notes with the Coca-Cola Company ("Coca-Cola") to finance the purchase of certain post-mix beverage dispensing equipment, icemakers, ice dispensers, and other related equipment (collectively, the "Coca-Cola Equipment"). Coca-Cola has claimed a security interest in the Coca-Cola Equipment and proceeds thereof.

## 4. Duke Manufacturing Company

In 2009, D&K Acquisition entered into various equipment agreements with Duke Manufacturing Co. ("Duke") to purchase certain kitchen equipment. Duke had claimed a purchase money security interest in the Duke equipment and the proceeds thereof, but the Debtors had paid for the Duke equipment in full as of the Petition Date.

5. **Meadowbrook Meat Company, Inc.**

In 2006, Meadowbrook Meat Company, Inc. ("MBM") filed a financing statement covering all of D&K Acquisition's right, title and interest in all current and after-acquired inventory at restaurants located in the State of Missouri. MBM claimed a security interest in D&K Acquisition's food and supply inventory and the product and proceeds thereof located at those Missouri restaurants.

6. **Burger King Corporation**

Duke Acquisition and Duke Missouri (together, the "BKC Licensees") have entered into various BURGER KING® Restaurant Franchise Agreements with BKC. As noted above, the BKC Licensees operated 87 BURGER KING® restaurants in Iowa, Illinois, Kansas, Minnesota, Missouri and Wisconsin. Of those 87 restaurants, the franchise agreements for 52 of them had been modified by the terms of a Limited License Agreement with BKC (as subsequently amended).

## IV.    ACTIVITIES WITHIN THE CHAPTER 11 CASES

### A.    Reasons for Chapter 11 Filing

The Debtors' chapter 11 filings were driven by both macroeconomic factors and acute short-term liquidity problems. The Debtors found themselves in a situation in which their growth opportunities were limited by economic reality and their agreements with BKC. The prolonged recession had greatly reduced customer traffic in their stores, driving down cash flow. In short, the Debtors' year-to-date financials fell short of projections. For the eleven periods[2] ended November 4, 2010, sales were $81.7 million, which was $5.4 million short of projections. Through the fiscal year prior to the filing, the BKC system experienced same store sales declines for the past several quarters. Furthermore, through period eleven, the Debtors' same store sales were down 4.0% from 2009. Restaurant margins had come under increased pressure with the impacts of winter weather, value promotions such as the "$1 Double Cheeseburger" and fluctuations in commodity prices, which contributed to a decline in EBITDAR (Earnings before Interest, Taxes, Depreciation, Amortization and Rent) of over 9% in the past two years. Although the Debtors continued to maintain a high level of operating efficiency, and 90% of their restaurants had received "excellent" or "good" ratings from BKC, operating margins were not sufficient to meet the restaurants' required CAPEX.

Earlier in 2010, as they addressed their liquidity problems, the Debtors were sued by BKC for breach of post-termination obligations under certain of BKC's franchise agreements. The litigation was resolved by the Debtors executing a Limited License Agreement with BKC, which, among other things, required a sale of 52 of the Company's franchise locations on or before December 30, 2010. After that date, the Debtors' rights under 52 of their BKC franchise agreements were set to terminate, absent an extension from BKC.

In October, 2010, the Debtors began working on a short-term solution of their liquidity issues with BKC, as well as a long-term plan that would align the Debtors with BKC's new vision for improving the BURGER KING® brand name. The Debtors also reached out to BofA to discuss the Debtors' financial condition. The Debtors, BKC and BofA (and their respective advisors) had several discussions and meetings leading up to the Petition Date. As a result of those discussions and meeting, the parties agreed to a deferral of principal and interest payments to BofA and the deferral of franchise, advertising and royalty fees to BKC. Among other conditions, and similar to the requirement of the Limited License Agreement, the Debtors were required to engage the services of an investment banker to market assets

---

[2] The Debtors used "periods" rather than "months" in their financial reporting. A "period" is equal to 4 weeks.

and sell the businesses. Through the parties' collaborative efforts, the Debtors were able to continue to operate until a consensual long-term deal could be finalized. However, the Debtors' acute cash needs — obligations to BofA, BKC, landlords and vendors — coupled with lagging revenues and the beginning of the Debtors' slow season, necessitated a filing under chapter 11 of the Bankruptcy Code in order to preserve the value of their businesses. The filing provided time and liquidity to market and sell their businesses.

## B.     The Chapter 11 Cases

After evaluating their alternatives and consulting with their advisors, the Debtors determined that the interests of their creditors, franchisor and employees were best served by availing themselves of the protections of the Bankruptcy Code. On the Petition Date, as authorized and directed by the respective boards of directors of the Debtors, the Debtors each filed a voluntary petition for relief under the Bankruptcy Code in the Bankruptcy Court in an effort to preserve and maximize the value of their businesses and assets. At that time, all actions and proceedings against the Debtors and all acts to obtain property from the Debtors were stayed under section 362 of the Bankruptcy Code. The Debtors continued to operate their businesses and manage their properties as debtors in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

On the Petition Date, Duke Acquisition had assets of approximately $11,920,000 and liabilities of approximately $21,183,000; and Duke Missouri had assets of approximately $2,258,000 and liabilities of approximately $12,599,000. The non-operating Debtors had no assets as of the Petition Date and were jointly and severally liable as either co-obligors or guarantors of certain secured debt.

### 1.     First Day Relief

On the Petition Date, the Debtors filed "first day" motions with the Bankruptcy Court seeking certain relief in order to continue uninterrupted operations, including payment of prepetition wages, trust fund taxes and the acquisition of the use of cash, among other things. Such relief helped to facilitate the administration of the Chapter 11 Cases.

### 2.     The Debtors' Professional Advisors

The Debtors have been advised by the following: McDonald Hopkins LLC and Fredrikson & Byron, P.A., as the Debtors' chapter 11 co-counsel; Conway MacKenzie, Inc., as the Debtors' financial advisor; and Mastodon Ventures Inc., as the Debtors' investment banker.

### 3.     Appointment of the Creditors' Committee

The Office of the United States Trustee appointed the Creditors' Committee on December 29, 2010. On January 14, 2011, the Bankruptcy Court entered orders approving the retention of Freeborn & Peters LLP and Maslon Edelman Borman & Brand, LLP, as co-counsel to the Creditors' Committee; and Mesirow Financial Consulting, LLC, as the financial advisor to the Creditors' Committee.

### 4.     Exclusivity

The Debtors filed their Motion for an Order Pursuant to 11 U.S.C. § 1121(d) Extending the Time Periods During Which the Debtors Have the Exclusive Right To File a Plan and To Solicit Acceptances Thereto (the "Exclusivity Motion"), Docket No. 225 on February 25, 2011. After a hearing on March 14, 2011, the Court entered an order, Docket No. 178, (i) extending the Debtors' exclusive period to file a chapter 11 plan of reorganization under section 1121(d) of the Bankruptcy Code to July 2, 2011 and

(ii) extending the Debtors' exclusive period to solicit acceptances for such plan pursuant to section 1121(c) of the Bankruptcy Code to August 31, 2011.

### 5. Bar Dates

The Bankruptcy Court established a bar date for filing proofs of Claim. Generally, proofs of Claim were required to be filed no later than April 18, 2011, except that proofs of Claim for any governmental units were required to be filed no later than June 2, 2011, Docket No. 68.

### 6. Administrative Bar Date

The Bankruptcy Court established an Administrative Claims Bar Date of May 30, 2011, Docket No. 202. The Administrative Claims Bar Date applies to each and every administrative expense claim incurred or arising on or before May 10, 2011 with the exception of the following: (i) professionals pursuant to sections 330, 331 and 503(b) of the Bankruptcy Code; (ii) claims of the U.S. Trustee under section 28 U.S.C. § 1930(a)(6); and (iii) any administrative expense previously approved by the Court. The Plan provides for a bar date on Administrative Claims arising after May 10, 2011.

### 7. Postpetition Operations

Immediately following the Petition Date, the majority of the Debtors' time was spent on stabilizing their business operations and completing the transition to operating as chapter 11 debtors in possession. The Debtors worked diligently with various key parties to achieve these tasks through various means, including: (i) implementing various forms of relief granted by the Bankruptcy Court on the Petition Date to allow the Debtors to maintain business as usual to the fullest extent possible; (ii) negotiating for the use of cash generated by the Debtors' businesses; (iii) analyzing various issues relating to executory contracts and unexpired leases; (iv) working with certain critical vendors; and (e) formulating an overall restructuring strategy, or in the alternative, a sale of substantially all assets.

### 8. Postpetition Grant of Adequate Protection Liens

In accordance with the terms of that certain Final Cash Collateral Order, as the same has been supplemented and amended from time to time, the Debtors granted certain replacement liens in substantially all of the Debtors' assets, for the benefit of BofA and MBM, as adequate protection during the pendency of these Chapter 11 Cases, subject to certain challenge rights from the Creditors' Committee.

### 9. Sale and Marketing Efforts

The Debtors engaged Mastodon as their investment banker. Mastodon was charged with assisting the Debtors in pursuing a sale of substantially all of their assets. Mastodon spent significant time identifying and contacting potential bidders, soliciting bids, and helping the Debtors select lead bidders for the sales of the Debtors' assets.

### 10. Asset Sale

The Debtors sought offers for the sale of two sets of assets. The "Group One Restaurants" consisted of 74 BURGER KING® restaurant locations, broken down by region, in Minnesota, Missouri, Iowa, Illinois and Wisconsin. The "Group Two Restaurants" consisted of 13 BURGER KING® restaurant locations, listed on an individual restaurant basis. After extensive negotiations, on or about April 11, 2011, the Debtors, in consultation with their counsel, their financial advisors and Mastodon,

finalized four separate asset purchase agreements and selected the following parties to serve as "Stalking Horse Bidders" for the respective regions:

- SRAC for the Missouri Region;

- Crown for the Davenport Region; and

- Heartland for the Minnesota Region and, separately, the Wisconsin Region/Illinois Region (collectively, the "Group One Regions").

On April 14, 2011, a hearing was held and the Bankruptcy Court subsequently entered the Order (A) Granting Expedited Hearing; (B) Approving Stalking Horse Bidders; (C) Approving Form of Stalking Horse Asset Purchase Agreements; (D) Approving Stalking Horse Protection Fees: and (E) Approving Form and Manner of Sale Notice and Cure Notice, Docket No 217 (the "Stalking Horse Order"), approving, among other things, (i) the sale and bidding procedures (the "Sale Procedures") and (ii) SRAC, Crown and Heartland to serve as the respective Stalking Horse Bidders for the Debtors' assets located in the Group One Regions.

Following the entry of the Stalking Horse Order, Mastodon continued the marketing process, seeking out additional potential buyers to compete in the auction for the Group One Regions (the "Group One Auction") or auction for the Group Two Restaurants (the "Group Two Auction"), and facilitating their due diligence. Pursuant to the Sale Procedures (as amended by stipulation on March 25, 2011), all bids were due on April 19, 2011 (the "Bid Deadline"). As of the Bid Deadline, the Debtors received one qualified competing bid for the Wisconsin Region/Illinois Region, also a combined bid (the "Cave Bid") from the Cave Enterprises Operations, LLC ("Cave") and no qualified competing bids for any of the other Group One Regions.

On April 21, 2011, the Debtors, in consultation with BKC, BofA and the Creditors' Committee, informed SRAC, Crown and Heartland that (i) no other qualified bids were received by the Bid Deadline for the Missouri Region, Davenport Region, and Minnesota Region, respectively; and (ii) no Group One Auction would be conducted with respect to the Missouri Region, Davenport Region, and Minnesota Region. In addition, on April 21, 2011, SRAC was informed that it was the named the successful bidder for the Missouri Region; Crown was informed that it was the named the successful bidder for the Davenport Region; and Heartland was informed that it was the named the successful bidder for the Minnesota Region.

On April 21, 2011, the Debtors, in consultation with BKC, BofA, and the Creditors' Committee, determined that the Cave Bid satisfied the requirements set forth in the Sale Procedures and was a Qualified Bid. The Debtors informed Heartland and Cave that the Group One Auction would be conducted for the Wisconsin Region/Illinois Region on April 26, 2011.

On April 26, 2011, the Group One Auction was conducted at the offices of Fredrikson & Byron, P.A., the Debtors' bankruptcy co-counsel. The Group One Auction began with the Baseline Bid by Cave for the combined Wisconsin Region/Illinois Region. At the Group One Auction, Heartland presented an overbid and, following receipt of multiple bids and counter-bids by Heartland and Cave, Cave submitted its final bid for the Wisconsin Region/Illinois Region (the "Final Cave Bid"). Upon completion of the bidding, the Debtors, in consultation with counsel to BKC, BofA, and the Creditors' Committee, ultimately determined that the Final Cave Bid was the highest and best bid for the Wisconsin Region/Illinois Region. The Debtors' determined that the Final Cave Bid, and the asset purchase agreement between the Debtors and Cave memorializing the terms of the Final Cave Bid, constituted the highest and best offer for the Wisconsin Region/Illinois Region.

At the conclusion of the Group One Auction, on April 26, 2011, the Debtors commenced the Group Two Auction. The Debtors determined, after consultation with BKC, BofA and the Creditors' Committee, that there were no Group Two Restaurants for which more than one Qualified Bidder expressed an interest and that the Group Two Auction would immediately conclude.

The Debtors, after consultation with BKC, BofA and the Creditors' Committee, presented a form of asset purchase agreement (substantially similar to the form the Debtors used for the sale of the Group One Regions) to each party that had expressed an interest in a Group Two Restaurant.

The respective asset purchase agreements executed by (i) Heartland (for the Missouri Region); (ii) Crown (for the Davenport Region); (iii) SRAC (for the Missouri Region); (iv) Cave (for the Wisconsin Region/Illinois Region); (v) SRAC (for Group Two Restaurants ##6030, 7204, 1558); (vi) Crown (for Group Two Restaurant #4334); and (vii) Cave (for Group Two Restaurants ##11911, and 106) constituted the highest and best offers (respectively) for the Debtors' assets from qualified bidders. On May 10, 2011, the Court entered multiple Sale Orders approving the Asset Purchase Agreements. On May 26, 2011, the Debtors closed the sales to the Purchasers pursuant to the Asset Purchase Agreements.

## C. Executory Contracts and Unexpired Leases

### 1. Assumption of Contracts and Leases

In conjunction with the Sale Motion, the Debtors also identified certain contracts material to the operation of the business that may be assumed and assigned pursuant to section 365 of the Bankruptcy Code. The related orders concerning the sales also approved the assumption and assignment of contracts and leases, but did not direct the Debtors to assume and assign the applicable agreements to the Purchasers. In accordance with the Sale Orders, all necessary cure costs as part of the assumption and assignment of the assigned executory contracts were paid.

### 2. Rejection of Contracts and Leases

The Debtors reviewed various executory contracts and unexpired leases and concluded that certain contracts and leases were not beneficial to the estates. The costs associated with maintaining and/or marketing such contracts and leases, in addition to the cure amounts, that would be required to be paid if the contracts and leases were to be assumed and assigned, would be significantly greater than any potential value that might be realized by any future sale or sublease of such contracts and leases. All executory contracts of the Debtors other than contracts previously assumed will be rejected pursuant to the Plan.

## D. Global Settlement

After extensive negotiations held all the way up to the commencement of the Group One Auction, the parties agreed to the terms of a settlement resolving all material issues related to the sale of assets, distribution of proceeds, determination of secured and unsecured claims, establishment of BKC cure costs, the closing of restaurants, and related matters (the "Global Settlement"). Pursuant to the terms of a term sheet, which was attached to the Global Settlement Motion (defined below) as Exhibit A, the parties agreed to not object to the asset sales and permit them to go forward on a consensual basis so long as certain conditions were met.

On May 10, 2011, the Bankruptcy Court entered the Order granting Motion for (A) Expedited Hearing and (B) and Order Pursuant to Section 105(a) of the Bankruptcy Code and Bankruptcy Rule 9019

Approving Comprehensive Settlement, Docket No. 294, which approved the Global Settlement (the "Global Settlement Motion").

The salient provisions pertaining to each of the parties that are signatories to the Global Settlement are set forth as follows:

- The Debtors would (i) receive the consent of the parties to close the Sales; (ii) make certain agreed-upon payments to BofA and BKC out of sale proceeds; (iii) waive claims against BofA and BKC; and (iv) not object to the agreement to share cure costs between BKC and BofA (the "Cure Agreement").

- BofA would (i) receive $5,000,000 plus 75% of the net incremental value of any Group One or Group Two overbids (over and above the Stalking Horse Bids) or favorable working capital adjustments (if any) in excess of $500,000, subject to an agreed upon formula; (ii) receive the lesser of (a) 25% of BKC's cure costs or (b) $1,000,000 subject to the Cure Agreement; (iii) waive all credit bid rights, including against the Wisconsin Region, Illinois Region and Group Two Restaurants; (iv) waive all deficiency claims against the estates; and (v) not object to the Debtors' employee incentive motion (the "Employee Motion").

- BKC would (i) receive (a) $4,730,918 for payment of cure costs under its franchise agreements, (b) pro-rated real estate taxes for certain locations in which BKC is the landlord, and (c) retain certain funds held in a building improvement fund; (ii) waive all other claims against the estates (other than those set forth the Term Sheet); (iii) waive collection and enforcement of third party guaranties related to the Debtors or their managers; (iv) agree to the closure of any unsold Group Two Restaurants; and (v) not object to the Employee Motion.

- The Committee would (i) not object to the sale of any Group One Region or Group Two Restaurants; (ii) dismiss, with prejudice, the Adversary Proceeding; (iii) not object to the Employee Motion; and (iv) realize the benefit of any upside from additional sources of cash and cost savings achieved by the Debtors.

- Coke would (i) pay the Debtors the net rebates outstanding as practicably as possible; and (ii) deliver a waiver of third party guaranties relating to the Debtors.

The Global Settlement established the framework for the filing of the Plan.

### E.      Distributions Prior to Effective Date

As discussed above, prior to the Effective Date, substantially all of the Debtors' operating assets will have been liquidated and converted to Cash for ultimate distribution in a manner described in the Plan. Through the Closing Date of the Sales, the Debtors continued to pay postpetition obligations in the ordinary course of business. Subsequent to the Closing Date, the Debtors have been winding down operations.

The creditors whose prepetition claims were paid during the pendency of the chapter 11 cases include (1) the Debtors' payroll, payroll taxes and sales taxes that were approved as part of the "first day" relief (Docket No. 37); (2) BofA and BKC in accordance with the terms of the Global Settlement (Docket No. 273); (3) the critical vendors, other than MBM, that received payment pursuant to the Order Granting Expedited Relief and Authorizing Debtors to Pay the Prepetition Claims of Certain Critical

Vendors, Docket No. 38 (Alpha Baking Company, Earthgrains Co., Flowers Baking Company, Pan-O-Gold Baking Co., NuCO2, Reinhart Foodservice, LLC, and SICOM Systems, Inc.); and (4) all landlords or counterparties to executory contracts whose leases or contracts were assumed and assigned to the Buyers in accordance with the Sales (which are set forth on Plan Confirmation Exhibit 4.1).

## F.    Avoidance Actions

The Liquidating Trustee will conduct an analysis of potential avoidance actions that are available to the Debtors under chapter 5 of the Bankruptcy Code or otherwise. Where appropriate, such actions will be commenced in order to recover avoidable prepetition transfers (or achieve potential Claim reductions under section 502(d) of the Bankruptcy Code). The recoveries from these avoidance actions may increase cash available for the benefit of the Debtors' unsecured creditors.

## V.    SUMMARY OF THE PLAN OF LIQUIDATION

### A.    Overview

The Plan provides for the assets of all Debtors to be transferred to the Liquidating Trust and distributed to creditors. The assets will be contributed to the Liquidating Trust, which will complete the liquidation of all assets and distribute the available cash to creditors in accordance with the priority scheme of the Bankruptcy Code.

THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT INCLUDE SUMMARIES OF THE PROVISIONS CONTAINED IN THE PLAN AND IN DOCUMENTS REFERRED TO THEREIN. THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT DO NOT PURPORT TO BE PRECISE OR COMPLETE STATEMENTS OF ALL THE TERMS AND PROVISIONS OF THE PLAN OR DOCUMENTS REFERRED TO THEREIN, AND REFERENCE IS MADE TO THE PLAN AND TO SUCH DOCUMENTS FOR THE FULL AND COMPLETE STATEMENTS OF SUCH TERMS AND PROVISIONS.

### B.    Overall Structure of the Plan

The Plan follows the closing of a Sale of most of the Debtors' operating assets to the Purchasers and contemplates the liquidation of the unsold assets and distribution of all proceeds pursuant to the Plan. The Debtors believe that the Plan provides the highest, best and most timely possible recovery to the Debtors' Claim holders. Under the Plan, Claims against the Debtors are divided into different Classes. If the Plan is confirmed by the Bankruptcy Court and consummated, at certain times thereafter as Claims are resolved, liquidated or otherwise allowed, the Debtors and/or the Liquidating Trustee will make distributions to certain Classes of Claims as provided in the Plan. The Classes of Claims against and Interests in the Debtors created under the Plan, the treatment of those Classes under the Plan and distributions, if any, to be made under the Plan are described below.

Under the Plan, there are two classes of Impaired Claims (Class 3 General Unsecured Claims and Class 4 Debtor Interests). All other Claims are unimpaired; Holders of Class 1 Secured Claims and Class 2 Other Priority Claims will be unimpaired by the Plan.

### C.    Classification and Treatment of Claims

#### 1.    Payment of Administrative Claims

a.    Administrative Claims in General

Except as otherwise specified in Section 2.1 of the Plan, and subject to the Bar Date provisions in the Plan, unless an order of the Bankruptcy Court provides otherwise, each holder of an Allowed Administrative Claim will receive, in full satisfaction of its Administrative Claim, Cash equal to the amount of such Allowed Administrative Claim on the later of (i) as soon as practical after the Effective Date or (ii) the date on which such Administrative Claim becomes an Allowed Administrative Claim.

The Debtors estimate there to be approximately $2,900,000 of Allowed Administrative Claims, which will receive a 100% distribution.

b.      Statutory Fees

On or before the Effective Date, Administrative Claims for fees payable pursuant to 28 U.S.C. § 1930 with respect to the periods ending on or before the Effective Date will be paid in Cash equal to the amount of such Allowed Administrative Claims. With respect to any Chapter 11 Case not converted, closed or dismissed in accordance with the provisions of Section 2.1.1.b of the Plan, all fees payable pursuant to 28 U.S.C. § 1930 after the Effective Date will be paid by the Liquidating Trust until the earlier of the conversion or dismissal of the applicable Chapter 11 Case under section 1112 of the Bankruptcy Code, or the closing of the applicable Chapter 11 Case pursuant to section 350(a) of the Bankruptcy Code.

c.      Bar Date for Administrative Claims

(i)      General Administrative Claim Bar Date Provisions

Except as otherwise provided in the Plan or an order of the Bankruptcy Court, requests for payment of Administrative Claims must have been Filed pursuant to the procedures specified in the Administrative Bar Date Order. Holders of Administrative Claims that did not File and serve such a request by the Administrative Bar Date are forever barred from asserting such Administrative Claims against the Debtors, the Liquidating Trust or their respective property, and any such alleged Administrative Claims will be deemed discharged as of the Effective Date. Objections to such requests must be Filed by the Claims Objection Bar Date.

(ii)      Bar Dates for Professional Compensation

All unpaid Fee Claims incurred by Professionals prior to the Effective Date will be subject to final allowance or disallowance upon application to the Bankruptcy Court pursuant to sections 328, 330 or 503(b)(4) of the Bankruptcy Code. Final applications for allowance of Fee Claims for services rendered in connection with the Chapter 11 Cases will be Filed with the Bankruptcy Court no later than 45 days after the Effective Date. Objections to any Fee Claims must be filed and served on the Notice Parties and the requesting party in accordance with the applicable Bankruptcy Rules. To the extent necessary, the Confirmation Order will amend and supersede any previously entered order of the Bankruptcy Court regarding the payment of Fee Claims.

The Debtors will estimate and segregate the Fee Carveout prior to transferring the remaining assets to the Liquidating Trust. To the extent that the Fee Carveout is greater than the total amount of the Allowed Fee Claims, the excess amounts will be transferred to the Liquidating Trust. To the extent that the Fee Carveout is less than the total amount of the Allowed Fee Claims, the deficiency amounts will be paid from the Liquidating Trust.

### 2. Payment of Priority Tax Claims

#### a. Priority Tax Claims

Each holder of an Allowed Priority Tax Claim will receive, in full satisfaction of its Priority Tax Claim, Cash equal to the amount of such Allowed Priority Tax Claim, on the later of (a) as soon as practical after the Effective Date or (b) the date on which such Priority Tax Claim becomes an Allowed Priority Tax Claim.

The Debtors estimate there to be approximately $1,000 of Allowed Priority Tax Claims, which will receive a 100% distribution.

#### b. Other Provisions Concerning Treatment of Priority Tax Claims

Notwithstanding the provisions of Section 2.1.2.a of the Plan, the holder of an Allowed Priority Tax Claim will not be entitled to receive any payment on account of any penalty arising with respect to or in connection with the Allowed Priority Tax Claim. Any such Claim or demand for any such penalty will be subject to treatment in Class 3 (General Unsecured Claims), as applicable, if not subordinated to Class 3 Claims pursuant to an order of the Bankruptcy Court. The holder of an Allowed Priority Tax Claim will not assess or attempt to collect such penalty from the Debtors, the Liquidating Trust or their respective property (other than as a holder of a Class 3 Claim).

### 3. Class 1: Secured Claims – Unimpaired

The Debtors estimate there to be between approximately $300,000 and $550,000 of Allowed Secured Claims, which will receive a 100% distribution.

#### a. Class 1A – Warren Capital Secured Claim

Unless Warren and the applicable Debtor or the Liquidating Trustee agree to a different treatment, 30 days after the later of (a) the Effective Date and (b) the date on which the Claim is Allowed, in full satisfaction of its Allowed Claim, Warren will receive: (a) the net proceeds of the sale of the property securing such Claim, up to the Allowed amount of such Claim; (b) the return of property securing such Claim; or (c) Cash equal to the value of the property securing such Claim, up to the value of the Allowed Secured Claim.

#### b. Class 1B – Coca-Cola Secured Claim

Unless Coca-Cola and the applicable Debtor or the Liquidating Trustee agree to a different treatment, 30 days after the later of (a) the Effective Date and (b) the date on which the Claim is Allowed, in full satisfaction of its Allowed Claim, Coca-Cola will receive: (a) the net proceeds of the sale of the property securing such Claim, up to the Allowed amount of such Claim; (b) the return of property securing such Claim; or (c) Cash equal to the value of the property securing such Claim, up to the value of the Allowed Secured Claim.

### 4. Class 2: Other Priority Claims – Unimpaired

Each Holder of an Allowed Other Priority Claim will receive, in full satisfaction of its Other Priority Claim, Cash equal to the amount of such Allowed Other Priority Claim on the later of (a) as soon

as practical after the Effective Date or (b) the date on which such Other Priority Claim becomes an Allowed Other Priority Claim.

The Debtors estimate there to be approximately $1,000 of Allowed Other Priority Claims, which will receive a 100% distribution.

### 5. Class 3: General Unsecured Claims – Impaired

On one or more Distribution Dates, each Holder of an Allowed General Unsecured Claim will receive a Pro Rata share of the net proceeds of the Liquidating Trust Assets after the payment of all Allowed Fee Claims, Allowed Administrative Claims, Allowed Priority Tax Claims, Allowed Other Priority Claims, and Allowed Secured Claims, and the payment of all costs and expenses of the Liquidating Trust.

The obligations to Holders of Allowed General Unsecured Claims will be governed by the Liquidating Trust Agreement.

The Debtors estimate there to be approximately $6,000,000-$7,500,000 of Allowed General Unsecured Claims, which will receive a 19-38% distribution.

### 6. Class 4: Interests in Debtors - Impaired

On the Effective Date, all Interests in the Debtors, except for those in Duke Acquisition and Duke Missouri, will be deemed automatically cancelled, will be of not further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtors thereunder or in any way related thereto will be discharged. All Interests are not entitled to any distributions under the Plan. Holders of Class 4 Claims are conclusively deemed to have rejected the Plan, and the votes of Holders of Class 4 Claims therefore will not be solicited.

### 7. Special Provisions Relating to the Rights of Setoff of Creditors

Nothing in the Plan will expand or enhance a creditor's right of setoff, which will be determined as of the Petition Date. Nothing in the Plan is intended to, or will be interpreted to, approve any creditor's effectuation of a post-Petition Date setoff without the consent of the Debtors unless prior Bankruptcy Court approval has been obtained.

### D. Means for Implementation of the Plan

### 1. The Sale Generally

On May 26, 2011, the closing of the purchase and sale of the acquired assets and assumption of the assumed liabilities occurred. On the Closing Date, the Debtors and Purchasers executed and delivered all applicable documents simultaneously. Immediately following the closing of the Sales, a portion of the proceeds was wired to BKC and BofA pursuant to the Global Settlement. The remaining proceeds of the Sale will be distributed in accordance with the terms of the Plan and by the Liquidating Trustee.

### 2. Confirmation Exhibits

All Confirmation Exhibits to the Plan will be filed with the Bankruptcy Court no later than 10 days before the Confirmation Hearing.

### 3.    Winddown of the Debtors

As soon as practicable after the Effective Date and except as otherwise provided in the Plan, each of the Debtors will take all necessary steps to effect their winddown and dissolution and the authority, power and incumbency of the Persons then acting as directors and officers of the Debtors will be terminated and such directors and officers will be deemed to have resigned or to have been removed without cause; provided, however, that Duke Acquisition and Duke Missouri will not dissolve under state law until (i) the Claim of Coca-Cola has been resolved and the Coke Claim Retainer will be funded for such resolution and subsequent dissolution; and (ii) all Insurance recoveries have been resolved, to the extent the corporate existence of Duke Acquisition and Duke Missouri need to be maintained for such resolution.

### 4.    Liquidating Trust

On or prior to the Effective Date, the Liquidating Trust, attached as Confirmation Exhibit 3.3.1, will be established pursuant to the Liquidating Trust Agreement for the purpose of liquidating remaining Assets and distributing the proceeds thereof to Holders of Allowed General Unsecured Claims (Class 3 Claims) in accordance with the terms of the Plan. Subject to and to the extent set forth in the Plan, the Confirmation Order, the Liquidating Trust Agreement or other agreement (or any other order of the Bankruptcy Court entered pursuant to or in furtherance hereof), the Liquidating Trust (and the Liquidating Trustee) will possess the rights of the Debtors for all matters pertaining to the Cases and be empowered to: (a) effect all actions and execute all agreements, instruments and other documents necessary to implement the Liquidating Trust provisions of the Plan; (b) accept, preserve, receive, collect, manage, invest, supervise, prosecute, settle and protect the Liquidating Trust Assets (directly or through its professionals, in accordance with the Plan); (c) sell, liquidate, transfer, distribute or otherwise dispose of the Liquidating Trust Assets (directly or through its professionals) or any part thereof or any interest in the Plan upon such terms as the Liquidating Trustee determines to be necessary, appropriate or desirable; (d) calculate and make distributions to holders of Allowed Claims pursuant to the procedures for allowing Claims and making distributions prescribed in the Plan; (e) comply with the Plan and exercise the Liquidating Trustee's rights and fulfill his obligations thereunder; (f) review, reconcile or object to Claims and resolve such objections as set forth in the Plan; (g) represent the Estates in pursuit of Causes of Action (including Avoidance Actions) that may be retained and enforced by the Liquidating Trust, if any, to the extent that their pursuit would likely result in an economic benefit to holders of Claims; (h) retain and compensate professionals to represent the Liquidating Trustee with respect to his or her responsibilities; (i) establish and maintain a Disputed Claims Reserve; (j) file appropriate Tax returns and other reports on behalf of the Liquidating Trust and pay Taxes or other obligations owed by the Liquidating Trust; (k) exercise such other powers as may be vested in the Liquidating Trustee under the Liquidating Trust Agreement or the Plan, or as deemed by the Liquidating Trustee to be necessary and proper to implement the provisions of the Plan and the Liquidating Trust Agreement; (l) object to the amount of any Claim on any Schedule if the Liquidating Trustee determines in good faith that the Claim is invalid or has previously been paid or satisfied; (m) pay any and all residual statutory fees of any Debtors as provided in Section 2.1.1.b of the Plan; (n) dissolve the Liquidating Trust in accordance with the terms of the Liquidating Trust Agreement; (o) appear and be heard on matters brought before the Bankruptcy Court or other courts of competent jurisdiction; (p) have the right to obtain records of, or related to, a Debtor (including, without limitation, bank statements and cancelled checks); (q) be entitled to notice and opportunity for hearing; (r) be entitled to participate in all matters brought before the Bankruptcy Court, including, but not limited to, adversary proceedings; (s) have exclusive standing to commence Causes of Action; and (t) be entitled to request entry of a final decree closing the Chapter 11 Cases. Notwithstanding anything to the contrary in this Section, the Liquidating Trust's primary purpose is liquidating the assets transferred to it by the Debtors and making distributions of the assets of the Liquidating Trust to holders of Allowed Claims.

## 5.     Funding of and Transfer of Assets into the Liquidating Trust

a.     On the Effective Date, the Debtors will transfer the Liquidating Trust Assets to the Liquidating Trust.  The Liquidating Trust Assets will vest in the Liquidating Trust on the Effective Date free and clear of all Claims, liens, encumbrances, charges and other interests, except as otherwise provided in the Plan.  All property held for distribution pursuant to the Plan will be held by the Liquidating Trust in trust for the Holders of Allowed Claims and will not be deemed property of the Debtors.  Nothing in the Plan, however, will preclude payment of:  (i) statutory fees under 28 U.S.C. § 1930 to the extent unpaid on the Effective Date; and (ii) the Liquidating Trust Expenses in accordance with the Plan and the Liquidating Trust Agreement from the Liquidating Trust Assets.  The Debtors are authorized to take such steps as may be necessary or appropriate to confirm such transfer and contribution of the Liquidating Trust Assets to the Liquidating Trust, subject to oversight from the Liquidating Trustee.

b.     The Liquidating Trustee will have the authority to create sub-accounts or sub-trusts within the Liquidating Trust, and into which the Liquidating Trustee may deposit any Unliquidated Assets, including real or personal property pending its liquidation.  The Liquidating Trustee, as trustee of such sub-accounts or sub-trusts may hold legal title to such property.  Once liquidated, any Cash proceeds of such sub-accounts or sub-trusts will be deposited directly into the primary trust account.

c.     The act of transferring assets and rights to the Liquidating Trustee of the Liquidating Trust, as authorized by the Plan, will not be construed to destroy or limit any such assets or rights or be construed as a waiver of any right, and such rights may be asserted by the Liquidating Trust as if the asset or right was still held by the applicable Debtor.

## 6.     Liquidating Trustee

a.     The initial Liquidating Trustee will be William Kaye.

b.     The powers, rights and responsibilities of the Liquidating Trustee will be specified in the Liquidating Trust Agreement and will include the authority and responsibility to fulfill the items identified in the Plan.  Other rights and duties of the Liquidating Trustee and the beneficiaries of the Liquidating Trust will be as set forth in the Liquidating Trust Agreement.

c.     The Liquidating Trustee will not be compensated in his capacity as trustee of the Liquidating Trust.

d.     The Liquidating Trustee will have the authority to retain certain professionals to assist in performing his duties and obligations as trustee of the Liquidating Trust.  The Liquidating Trustee may engage JLL Consultants, Inc., of which the Liquidating Trustee is a managing director, at the monthly rate of (i) $10,000.00 for the first four months of employment, (ii) $7,500.00 for the six months immediately following, and (iii) $5,000.00 for each month of employment thereafter.  It is contemplated that JLL Consultants, Inc. will perform all non-legal services necessary to assist the Liquidating Trustee as trustee of the Liquidating Trust, including, without limitation, performing avoidance action defense analyses; negotiations and analysis with respect to claims objections; administrative functions with respect to claims reconciliation; assistance with the liquidation and distribution of Liquidating Trust Assets; issue or file any necessary tax returns, statements or other documentation; assistance with distributions to the Beneficiaries of the Liquidating Trust; and to perform such other services necessary to preserve and administer the Liquidating Trust Assets.

e.　　The Liquidating Trustee may hire Becky Moldenhauer (who is an "insider" of the Debtors as that term is defined in the Bankruptcy Code) for post-confirmation services at a rate of $100 per hour.

### 7.　　Liquidating Trust Agreement

The Liquidating Trust Agreement generally will provide for, among other things: (a) the payment of reasonable compensation to the Liquidating Trustee; (b) the payment of other expenses of the Liquidating Trust, including the cost of pursuing the claims, rights and causes of action assigned to the Liquidating Trust; (c) the retention of counsel, accountants, financial advisors or other professionals and the payment of their compensation; (d) the investment of Cash by the Liquidating Trustee within certain limitations; (e) the preparation and filing of appropriate Tax returns and other reports on behalf of the Liquidating Trust and the payment of Taxes or other obligations owed by the Liquidating Trust; (f) the orderly liquidation of the Liquidating Trust's assets; and (g) the litigation, settlement, abandonment or dismissal of any claims, rights or Causes of Action assigned to the Liquidating Trust.

### 8.　　Reports To Be Filed by the Liquidating Trustee

The Liquidating Trustee, on behalf of the Liquidating Trust, will File with the Bankruptcy Court (and provide to any other party entitled to receive any such report pursuant to the Liquidating Trust Agreement), no later than 30 days after June 30 and December 31 of each calendar year, a semi-annual report regarding the administration of property subject to its ownership and control pursuant to the Plan, distributions made by it, and other matters relating to the implementation of the Plan.

### 9.　　Fees and Expenses of the Liquidating Trust

Except as otherwise ordered by the Bankruptcy Court, the reasonable and necessary fees and expenses of the Liquidating Trust (including the reasonable and necessary fees and expenses of any professionals assisting the Liquidating Trustee in carrying out its duties under the Plan) will be exclusively funded by the Liquidating Trust Assets in accordance with the Liquidating Trust Agreement without further order from the Bankruptcy Court.　The Liquidating Trust provides for a lien on the Liquidating Trust Assets to secure such reasonable and necessary fees and expenses of professionals assisting the Liquidating Trustee in accordance with applicable law.

### 10.　　Indemnification

The Liquidating Trust Agreement may include reasonable and customary indemnification provisions for the benefit of the Liquidating Trustee and/or other parties.　Any such indemnification will be the sole responsibility of the Liquidating Trust and payable solely from the Liquidating Trust Assets.

### 11.　　Tax Treatment

As more fully set forth in the Liquidating Trust Agreement, the Liquidating Trust is intended to qualify as a "liquidating trust" under the Internal Revenue Code of 1986 and the regulations promulgated thereunder, specifically Treas. Reg. § 301.7701-4(d), and as such is a "grantor trust" for federal income tax purposes with the Beneficiaries (as defined in the Liquidating Trust Agreement) treated as the grantors and owners of the Liquidating Trust Assets.　Structuring the Liquidating Trust as a "grantor trust" for federal income tax purposes avoids double taxation at both the Liquidating Trust and Beneficiaries levels.

### 12. Disposition of Assets by Liquidating Trust

On the Effective Date, the Debtors will transfer to the Liquidating Trust all of the Liquidating Trust Assets. The Liquidating Trustee may conduct any sales or liquidations of Unliquidated Assets from the Liquidating Trust in any manner authorized under the terms of the Plan, the Liquidating Trust Agreement or otherwise approved by the Bankruptcy Court.

### 13. Settlement of Causes of Actions and Disputed Claims

The Liquidating Trustee may settle, compromise, abandon or withdraw any Cause of Action, including any Avoidance Action, in any manner approved by the Bankruptcy Court. The Liquidating Trustee may settle or compromise any Disputed Claims in any manner approved by the Bankruptcy Court.

### 14. De Minimis Distributions

The Liquidating Trustee will not be required to make any payment of less than twenty-five dollars ($25.00) with respect to any Allowed Claim of a General Unsecured Creditor. To the extent that any interim distribution is not paid to a General Unsecured Creditor on the grounds that it amounts to less than twenty-five dollars ($25.00), the amount of such withheld distribution will be reserved for addition to any future distribution or as the final distribution to such General Unsecured Creditor, and may be made at that time if the total distribution is at least twenty-five dollars ($25.00).

Based on the lower estimated percentage of the proposed distribution to General Unsecured Creditors, Holders of General Unsecured Claims under $132.00 will not receive a distribution.

### E. Special Provisions

### 1. Limitations on Amounts To Be Distributed to Holders of Allowed Insured Claims

Distributions under the Plan to each Holder of an Allowed Insured Claim will be in accordance with the treatment provided under the Plan for the Class in which such Allowed Insured Claim is classified, but solely to the extent that such Allowed Claim is not satisfied from proceeds payable to the Holder thereof under any pertinent Insurance Contracts and applicable law. Nothing in Section 3.4.1 of the Plan constitutes a waiver of any claims, obligations, suits, judgments, damages, demands, debts, rights, causes of action or liabilities that any entity may hold against any other entity, including the Debtors' Insurers.

### 2. Preservation of Causes of Action; Avoidance Actions

On the Effective Date, the Debtors will transfer to the Liquidating Trust, as the representative of the Estates under section 1123(b) of the Bankruptcy Code, all Causes of Action, including Avoidance Actions, and the Liquidating Trustee may enforce any Causes of Action that the Debtors or the Estates may hold against any entity to the extent not expressly released under the Plan or by any Final Order of the Bankruptcy Court, including but not limited to those items identified on Confirmation Exhibit 3.4.2. The Liquidating Trust will also control any privilege rights of the Debtors, including but not limited to the attorney/client privilege, related to the Causes of Action.

### 3. Effectuating Documents; Further Transactions; Exemption from Certain Transfer Taxes

The Chief Financial Officer of each Debtor and the Liquidating Trustee, as the case may be, will be authorized to execute, deliver, file or record such contracts, instruments, releases and other agreements or documents and take such actions as may be necessary or appropriate to effectuate and implement the provisions of the Plan. Pursuant to section 1146(a) of the Bankruptcy Code, the following will not be subject to any stamp Tax, real estate transfer Tax, mortgage recording Tax, sales or use Tax or similar Tax: (a) the creation of any mortgage, deed of trust, lien or other security interest; (b) the making or assignment of any lease or sublease; or (c) the making or delivery of any deed or other instrument of transfer under, in furtherance of or in connection with the Plan, including any merger agreements, agreements of consolidation, restructuring, disposition, liquidation or dissolution, deeds, bills of sale or assignments executed in connection with any of the foregoing or pursuant to the Plan.

### 4. Comprehensive Settlement of Claims and Controversies

Pursuant to Bankruptcy Rule 9019 and in consideration for the distributions and other benefits provided under the Plan, the provisions of the Plan, including the releases set forth in Article V, will constitute a good faith compromise and settlement of all claims or controversies relating to the rights that a Holder of a Claim or Interest may have with respect to any Allowed Claim or Allowed Interest or any distribution to be made pursuant to the Plan on account of any Allowed Claim or Allowed Interest. The entry of the Confirmation Order will constitute the Bankruptcy Court's approval, as of the Effective Date, of the compromise or settlement of all such claims or controversies and the Bankruptcy Court's finding that such compromise or settlement is in the best interests of the Debtors, their Estates and their respective property and Claim and Interest Holders and is fair, equitable and reasonable.

## F. Executory Contracts and Unexpired Leases

### 1. Assumption and Assignment

Each Executory Contract, Unexpired Lease or other agreement listed on Confirmation Exhibit 4.1 will be or has been assumed and assigned to one of the Purchasers as of the Effective Date. All other Executory Contracts, Unexpired Leases or other agreements not already rejected by Order of the Bankruptcy Court will be deemed rejected as of the Effective Date.

### 2. Cure of Defaults

Upon information and belief, all Cure Amount Claims have been satisfied in accordance with the terms and procedures of the Sales, the related process and the Sale Orders; provided, however, that in the event a Cure Amount Claim remains due and owing, such payments will be made by the Liquidating Trust. The Liquidating Trust will retain all the rights to contest any outstanding Cure Amount Claims.

### 3. Bar Date for Rejection Damage Claims

To the extent not previously rejected in accordance with an Order of the Bankruptcy Court, Claims arising out of the rejection of an Executory Contract or Unexpired Lease pursuant to Section 4.1 must be Filed with the Bankruptcy Court and served on the Debtors or, on and after the Effective Date, the Liquidating Trustee, by no later than 30 days after the later of (a) notice of entry of an order approving the rejection of such Executory Contract or Unexpired Lease, (b) notice of the entry of Confirmation Order or (c) notice of an amendment to Confirmation Exhibit 4.1, and upon allowance, will be an

Allowed General Unsecured Claim. Any Claims not Filed within such applicable time periods will be forever barred from receiving a distribution from the Debtors, the Estates, or the Liquidating Trust.

### 4. Approval of Rejection

Entry of the Confirmation Order will constitute, pursuant to sections 365 and 1123 of the Bankruptcy Code, the approval of the rejection of all Executory Contracts and Unexpired Leases pursuant to Section 4.1 to the extent not previously assumed or rejected by order of the Bankruptcy Court.

## G. Substantive Consolidation

### 1. Consolidation for Certain Purposes

The Plan Proponents are requesting that the Bankruptcy Court approve the Debtors' election to substantively consolidate the Estates. Accordingly, for purposes of implementing the Plan, pursuant to such order: (a) all assets and liabilities of the Debtors will be pooled; and (b) with respect to any guarantees by one Debtor of the obligations of any Debtor, and with respect to any joint or several liability of any Debtor, the Holder of any Claims for such obligations will receive a single recovery on account of any such joint obligations of the Debtors, in each case except to the extent otherwise provided in the Plan.

Such election to treat the Estates as if they were consolidated solely for the purpose of implementing will Plan will not affect: (a) the legal and corporate structures of the Debtors to the extent not dissolved; and (b) distributions from any Insurance Contracts or proceeds of such policies. In addition, such election to treat the Estates as consolidated for the purpose of implementing the Plan will not constitute a waiver of the mutuality requirement for setoff under section 553 of the Bankruptcy Code, except to the extent otherwise expressly waived by the Debtors.

### 2. Order Granting Consolidation

The Plan serves as a motion seeking entry of an order consolidating the Debtors as described in Section 5.1 of the Plan. Upon a proper evidentiary showing at the Confirmation Hearing by the Plan Proponents, the consolidation order (which may be the Confirmation Order) will be entered by the Bankruptcy Court.

The Debtors submit that a substantive consolidation of the estates is appropriate under applicable law given the facts and circumstances of the cases. The Debtors are so interrelated that substantive consolidation is the best and most efficient way to make distributions under the Plan. Creditors will not be harmed by substantive consolidating and may actually be prejudiced by the estates not substantively consolidating.

### 3. Rationale for Consolidation

The preparation of multiple liquidation analyses would be an extremely burdensome task given the fact the Debtors have always operated on a consolidated basis for accounting purposes. For example, all cash receipts and disbursements were made by a single company without intercompany tracking. The task would require the creation of accounting records that are currently not available, further, information to create such accounting records would be burdensome and time consuming to collect and analyze. Separate liquidation analyses for each of the five Debtor entities would require a balance sheet for each company be available, including allocation of debt. Since the Debtors operated as a consolidated company, balance sheets for each Debtor were not prepared and are not available. Therefore, an

integrated balance sheet, cash flow and income statement would have to be prepared since acquisition of each Debtor in order to properly determine each company's respective cash balance available to creditors.

Approximately $3.6 million of the $4.7 million (approximately 76%) of the estimated gross available proceeds available for liquidation expenses and creditors is cash on hand. This cash balance cannot simply be segregated by looking at historical sales levels and cash collections by entity, this cash balance would have to be segregated by entity based on historical operations, asset purchases, allocation of corporate debt and other liabilities based on past performance of the entity and sale proceeds, not simply on sales and collections

The segregation of sale proceeds between Debtor, Duke Missouri, and the other Debtors can be determined given that the assets of Duke Missouri were sold as a separate region. However, the debt balance attributable to Duke Missouri is not known; therefore, the resulting cash balance available to creditors from the sale proceeds after payment of the Duke Missouri debt is not known. Unless balance sheets and segregated accounting records were prepared in order to ascertain the debt balances and resulting cash available, any allocation of debt to Debtor, Duke Missouri and the other four Debtors would be done on an arbitrary basis that would be speculative.

The historical lack of separate accounting records by entity would require the Debtors to create integrated financial statements in order to prepare separate liquidation analyses to estimate and determine the actual cash available to creditors of each company. As noted above, information was not prepared and tracked for the purpose of preparing segregated financial statements, therefore resulting in a speculative, burdensome and expensive process that would unduly harm creditors.

## H.    Confirmation of the Plan

### 1.    Conditions Precedent to Confirmation

The following conditions are conditions to the entry of the Confirmation Order unless such conditions, or any of them, have been satisfied or duly waived pursuant to Section 6.3 of the Plan:

a.    The Confirmation Order will be reasonably acceptable in form and substance to the Plan Proponents.

b.    The Plan will not have been materially amended, altered or modified from the version as Filed on August 8, 2011, unless such material amendment, alteration or modification has been made in accordance with Section 8.1 of the Plan.

c.    All Confirmation Exhibits to the Plan are in form and substance reasonably satisfactory to the Plan Proponents.

### 2.    Conditions Precedent to the Effective Date

The Effective Date will not occur, and the Plan will not be consummated, unless and until each of the following conditions have been satisfied or duly waived pursuant to Section 6.3 of the Plan:

a.    The Bankruptcy Court will have entered the Confirmation Order, and the Confirmation Order will be a Final Order.

b.    No stay of the Confirmation Order will then be in effect.

c. The Liquidating Trust Agreement will be executed, the Liquidating Trust will be created and the Liquidating Trustee will have been appointed and will have accepted such appointment.

d. The Plan and all Confirmation Exhibits to the Plan will not have been materially amended, altered or modified from the Plan as confirmed by the Confirmation Order, unless such material amendment, alteration or modification has been made in accordance with Section 8.1 of the Plan.

### 3. Waiver of Conditions to Confirmation or Effective Date

The conditions to Confirmation and the conditions to the Effective Date may be waived in whole or in part at any time by the unanimous consent of the Plan Proponents without an order of the Bankruptcy Court.

### 4. Cramdown

The Plan Proponents request Confirmation under section 1129(b) of the Bankruptcy Code with respect to any impaired Class that has not accepted or is deemed not to have accepted the Plan pursuant to section 1126 of the Bankruptcy Code.

### 5. Effect of Nonoccurrence of Conditions to the Effective Date

If each of the conditions to the Effective Date is not satisfied or duly waived in accordance with Section 6.3 of the Plan, then upon the successful adjudication of an adversary proceeding by the Debtors made before the time that each of such conditions has been satisfied and upon notice to such parties in interest as the Bankruptcy Court may direct, the Confirmation Order will be vacated by the Bankruptcy Court; provided, however, that, notwithstanding the Filing of such adversary proceeding, the Confirmation Order may not be vacated if each of the conditions to the Effective Date is satisfied or waived before the Bankruptcy Court enters an order granting such motion. If the Confirmation Order is vacated pursuant to Section 6.5 of the Plan: (1) the Plan will be null and void in all respects, including with respect to the releases described in Section 6.6.2 of the Plan; (2) nothing contained in the Plan will (a) constitute a waiver or release of any Claims by or against any Debtor or (b) prejudice in any manner the rights of the Debtors or any other party in interest; and (3) the Liquidating Trust, if already created, will be promptly dissolved.

### 6. Effect of Confirmation of the Plan

a. Limitation of Rights of Holders of Claims

Pursuant to section 1141(d)(3) of the Bankruptcy Code, Confirmation will not discharge Claims against the Debtors; provided, however, that no holder of a Claim against the Debtors may, on account of such Claim, seek or receive any payment or other distribution from, or seek recourse against, the Debtors, the Liquidating Trustee, or property of the Estates, except as expressly provided in the Plan.

b. Releases

Except as otherwise provided in the Global Settlement Order, each and every entity voting to accept the Plan on account of its Allowed Claim or Interest will be deemed to forever release and waive all claims, demands, debts, rights, causes of action, and liabilities in connection with or related to any of the Debtors, the Creditors' Committee, the Chapter 11 Cases, or the Plan, whether liquidated or

unliquidated, fixed or contingent, matured or unmatured, known or unknown, foreseen or unforeseen, then existing or thereafter arising, that are based in whole or in part on any act, omission, or other occurrence taking place on or prior to the Effective Date, against the Released Parties to the fullest extent permitted under applicable law. In addition, the Debtors will be deemed to release any and all such claims, demands, debts, rights, causes of action, and liabilities against the Released Parties other than themselves. Notwithstanding anything in the Plan or in the releases set forth above to the contrary, nothing herein will be construed to release, and the Plan Proponents do not hereby release, any rights of the Plan Proponents or the Liquidating Trustee: (a) to enforce the Plan and the contracts, instruments, releases, indentures, and other agreements or documents delivered thereunder; (b) to litigate Disputed Claims, including without limitation to make any claim, or demand or allege and prosecute any cause of action against any Holder of any Disputed Claims; and (c) to litigate claims and causes of action not specifically released herein, including claims and Causes of Action contained in any adversary complaint filed during the pendency of the Chapter 11 Cases that have not been withdrawn or dismissed prior to the Confirmation Date.

c.      Injunction

Except as provided in the Plan or the Confirmation Order, as of the Confirmation Date, all entities that have held, currently hold, or may hold a Claim or other debt or liability against the Debtors or an Interest or other right of an equity security holder are permanently enjoined from taking any of the following actions on account of any such Claims, debts, liabilities, Interests or rights: (a) commencing or continuing in any manner any action or other proceeding against the Released Parties or their property; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against the Released Parties or their property; (c) creating, perfecting, or enforcing any lien or encumbrance against the Released Parties or their property; (d) asserting a right of subordination of any kind against any debt, liability, or obligation due to the Released Parties or their property; and (e) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan.

d.      Exculpation

Subject to the occurrence of the Effective Date, none of the Exculpated Parties will have or incur any liability to any holder of a Claim or Interest for any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases and the Plan, the solicitation of the Plan, the pursuit of confirmation of the Plan, the consummation of the Plan or the administration of the Plan or the property to be distributed under the Plan; provided, however, that the Exculpated Parties will be entitled to rely upon the advice of counsel with respect to their duties and responsibilities under the Plan; provided further that nothing in the Plan will, or will be deemed to, release the Exculpated Parties, or exculpate the Exculpated Parties with respect to, their respective obligations or covenants arising pursuant to the Plan.

**7.**      **Request for Waiver of Stay of Confirmation Order**

The Plan will serve as a motion seeking a waiver of the stay of the Confirmation Order imposed by Bankruptcy Rule 3020(e). Any objection to this request for waiver will be Filed with the Bankruptcy Court and served on the parties listed in Exhibit B to the Plan on or before the Voting Deadline, or such other date as may be fixed by the Bankruptcy Court. In the event any such objections are timely Filed, a hearing with respect thereto will occur at the Confirmation Hearing.

### I.       Retention of Jurisdiction

Notwithstanding the entry of the Confirmation Order and the occurrence of the Effective Date, the Bankruptcy Court will retain such jurisdiction over the Chapter 11 Cases after the Effective Date as is legally permissible, including jurisdiction to:

1.       Allow, disallow, determine, liquidate, reduce, classify, re-classify, estimate or establish the priority or secured or unsecured status of any Claim, including the resolution of any request for payment of any Administrative Claim and the resolution of any objections to the amount, allowance, priority or classification of Claims;

2.       Resolve any issues arising under the Asset Purchase Agreements or the Sale Orders;

3.       Either grant or deny any applications for allowance of compensation or reimbursement of expenses authorized pursuant to the Bankruptcy Code or the Plan for periods ending on or before the Effective Date;

4.       Resolve any matters related to the assumption, assumption and assignment or rejection of any Executory Contract or Unexpired Lease to which any Debtor is a party or with respect to which any Debtor may be liable and to hear, determine and, if necessary, liquidate any Claims arising therefrom, including any Cure Amount Claims;

5.       Ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan;

6.       Decide or resolve any motions, adversary proceedings, contested or litigated matters and any other matters and either grant or deny any applications involving any Debtor that may be pending on the Effective Date or brought thereafter;

7.       Enter such orders as may be necessary or appropriate to implement or consummate the provisions of the Plan and all contracts, instruments, releases and other agreements or documents entered into or delivered in connection with the Plan, the Liquidating Trust Agreement, the Disclosure Statement or the Confirmation Order;

8.       Resolve any cases, controversies, suits or disputes that may arise in connection with the consummation, interpretation or enforcement of the Plan, the Liquidating Trust Agreement or any contract, instrument, release or other agreement or document that is entered into or delivered pursuant to the Plan, the Liquidating Trust Agreement or any entity's rights arising from or obligations incurred in connection with the Plan, the Liquidating Trust Agreement or such documents;

9.       Modify the Plan before or after the Effective Date pursuant to section 1127 of the Bankruptcy Code; modify the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order; or remedy any defect or omission or reconcile any inconsistency in any Bankruptcy Court order, the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into, delivered or created in connection with the Plan, the Disclosure Statement or the Confirmation Order, in such manner as may be necessary or appropriate to consummate the Plan;

10.       Issue injunctions, enforce the injunctions contained in the Plan and the Confirmation Order, enter and implement other orders or take such other actions as may be necessary or appropriate to

restrain interference by any entity with consummation, implementation or enforcement of the Plan or the Confirmation Order;

11. Enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason or in any respect modified, stayed, reversed, revoked or vacated or distributions pursuant to the Plan are enjoined or stayed;

12. Determine any other matters that may arise in connection with or relate to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan, the Disclosure Statement or the Confirmation Order;

13. Enforce or clarify any orders previously entered by the Bankruptcy Court in the Chapter 11 Cases;

14. Enter a final decree or decrees closing the Chapter 11 Cases;

15. Determine matters concerning state, local and federal Taxes in accordance with sections 346, 505 and 1146 of the Bankruptcy Code, including any Disputed Claims for Taxes;

16. Hear all matters arising out of the consummation of the Sales;

17. Recover all assets of the Debtors and their Estates, wherever located; and

18. Hear any other matter not inconsistent with the Bankruptcy Code.

## VI. MISCELLANEOUS PROVISIONS

### A. Summary of Other Provisions of the Plan

The following paragraphs summarize certain other significant provisions of the Plan. The Plan should be referred to for the complete text of these and other provisions of the Plan.

### B. Modification of the Plan

Subject to the restrictions on alteration, amendment and modification set forth in section 1127 of the Bankruptcy Code, the Plan Proponents reserve the right to alter, amend or modify the Plan before the Effective Date.

### C. Revocation of the Plan

The Plan Proponents reserve the right to revoke or withdraw the Plan prior to the Confirmation Date. If the Plan Proponents revoke or withdraw the Plan, or if Confirmation does not occur, then the Plan will be null and void in all respects, and nothing contained in the Plan will: (a) constitute a waiver or release of any Claims by or against any Debtor; (b) prejudice in any manner the rights of the Debtors (or any of them), any Debtor or any other party in interest; or (c) constitute an admission of any sort by the Debtors (or any of them), any Debtor or any other party in interest.

### D. Severability of Plan Provisions

If, prior to Confirmation, any term or provision of the Plan is held by the Bankruptcy Court to be invalid, void or unenforceable, the remainder of the terms and provisions of the Plan will remain in full

force and effect and will in no way be affected, impaired or invalidated by such holding, alteration or interpretation. The Confirmation Order will constitute a judicial determination and will provide that each term and provision of the Plan, as it may have been altered or interpreted in accordance with the foregoing, is valid and enforceable pursuant to its terms.

### E.    Dissolution of Creditors' Committee

On the Effective Date, the Creditors' Committee and any other official committees appointed in the Chapter 11 Cases will dissolve, and the members of the Creditors' Committee and their respective Professionals will cease to have any duty, obligation or role arising from or related to the Chapter 11 Cases. The Professionals retained by the Creditors' Committee and the respective members thereof will not be entitled to assert any Fee Claim whatsoever for any services rendered or expenses incurred after the Effective Date in their capacity as professionals for the Creditors' Committee, except to the extent necessary to File, prepare and defend any fee application.

### F.    Successors and Assigns

The rights, benefits and obligations of any entity named or referred to in the Plan will be binding on, and will inure to the benefit of, any heir, executor, administrator, successor or assign of such entity.

### G.    Section 1125(e) Good Faith Compliance

The Debtors, the Creditors' Committee and its individual members, and each of their respective Representatives, will be deemed to have acted in "good faith" under section 1125(e) of the Bankruptcy Code.

### H.    Governing Law

Except to the extent that the Bankruptcy Code or Bankruptcy Rules apply, and subject to the provisions of any contract, instrument, release, or other agreement or document entered into in connection herewith, the rights and obligations arising hereunder will be governed by, and construed and enforced in accordance with, the laws of the state of Delaware, without giving effect to the principles of conflict of laws thereof.

## VII.    RISK FACTORS TO BE CONSIDERED

HOLDERS OF CLAIMS AGAINST THE DEBTORS SHOULD READ AND CONSIDER CAREFULLY THE INFORMATION SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT (AND THE DOCUMENTS DELIVERED TOGETHER HEREWITH AND/OR INCORPORATED BY REFERENCE), PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN.  THIS INFORMATION, HOWEVER, SHOULD NOT BE REGARDED AS THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND/OR ITS IMPLEMENTATION.

### A.    Failure to Satisfy Vote Requirement

If the Plan Proponents obtain the requisite votes to accept the Plan in accordance with the requirements of the Bankruptcy Code, the Plan Proponents intend, as promptly as practicable thereafter, to seek confirmation of the Plan.  In the event that sufficient votes are not received, the Debtors may be forced to pursue an alternative plan of liquidation or to convert the cases to a chapter 7 liquidation.

**B.     Non-Confirmation or Delay of Confirmation of the Plan**

In the event a party objects to the Plan, it is possible that the Bankruptcy Court does not approve confirmation of the Plan.

**C.     Non-Consensual Confirmation**

In the event any impaired Class of Claims does not accept a plan, the Bankruptcy Court may nevertheless confirm such plan at the proponent's request if at least one impaired class of claims has accepted the plan (with such acceptances being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan of liquidation "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes.  These requirements must be satisfied with respect to Class 3.  The Plan Proponents believe that the Plan satisfies these requirements.

**D.     Risk of Non-Occurrence of the Effective Date**

Although the Plan Proponents believe that the Effective Date will occur reasonably soon after the Confirmation Date, there can be no assurance as to such timing or as to whether it will occur.

**E.     Classification and Treatment of Claims**

Section 1122 of the Bankruptcy Code requires that the Plan classify Claims against the Debtors. The Bankruptcy Code also provides that the Plan may place a Claim in a particular Class only if such Claim is substantially similar to the other Claims of such Class.  The Plan Proponents believe that all Claims have been appropriately classified in the Plan.

To the extent that the Bankruptcy Court finds that a different classification is required for the Plan to be confirmed, the Plan Proponents presently anticipate that they would seek (i) to modify the Plan to provide for whatever classification might be required for confirmation and (ii) to use the acceptances received from any creditor pursuant to this solicitation for the purpose of obtaining the approval of the Class or Classes of which such creditor ultimately is deemed to be a member.  Any such reclassification of creditors, although subject to the notice and hearing requirements of the Bankruptcy Code, could adversely affect the Class in which such creditor was initially a member, or any other Class under the Plan, by changing the composition of such Class and the vote required for approval of the Plan.  There can be no assurance that the Bankruptcy Court, after finding that a classification was inappropriate and requiring a reclassification, would approve the Plan based upon such reclassification.  Except to the extent that modification of classification in the Plan requires resolicitation, the Plan Proponents will, in accordance with the Bankruptcy Code and the Bankruptcy Rules, seek a determination by the Bankruptcy Court that acceptance of the Plan of any holder of Claims pursuant to this solicitation will constitute a consent to the Plan's treatment of such Holder regardless of the Class as to which such holder is ultimately deemed to be a member.  The Plan Proponents believe that under the Federal Rules of Bankruptcy Procedure, the Plan Proponents would be required to resolicit votes for or against the Plan only when a modification adversely affects the treatment of the Claim of any creditor.

The Bankruptcy Code also requires that the Plan provide the same treatment for each Claim of a particular Class unless the holder of a particular Claim agrees to a less favorable treatment of its Claim. The Plan Proponents believe that they have complied with the requirement of equal treatment.  To the extent that the Bankruptcy Court finds that the Plan does not satisfy such requirement, the Bankruptcy Court could deny confirmation of the Plan.

Issues or disputes relating to classification and/or treatment could result in a delay in the Confirmation and consummation of the Plan and could increase the risk that the Plan will not be consummated.

### F.  Warren Capital's Claim

The Plan Proponents and Warren dispute the value of the collateral securing Warren's liens.  The Plan Proponents and Warren entered into the Stipulation Related to Sale of Assets Free and Clear of Liens, Docket No. 305, whereby the Debtors set aside $373,375 into a segregated account, subject to further resolution of the value of the collateral.  The distribution to Class 3 will be impacted by the ultimate settlement of Warren's Claims.

### G.  Coca-Cola's Claim

The Debtors and Coca-Cola are in the process of resolving Coca-Cola's Secured Claim.  The distribution to Class 3 will be impacted by the ultimate settlement of Coca-Cola's Claim.  The Debtors anticipate that the Coca-Cola's Claim will be resolved prior to the Effective Date of the Plan.  **In the event however, that Coca-Cola's Claim is not resolved prior to the Effective Date, the Plan Proponents disclose that William Kaye, the proposed party to serve as the Liquidating Trustee, is a representative of Coca-Cola.  To the extent Mr. Kaye makes a payment to Coca-Cola in his capacity as Liquidating Trustee, that amount will reduce the funds available for General Unsecured Creditors.**

### H.  Claim Objections and Reconciliation

The potential recovery to Class 3 depends on, among other things, the outcome of the Claims reconciliation and objection process.  Therefore, as described in more detail in the Liquidating Trust, the distribution to Class 3 may increase or decrease depending on the resolution of outstanding Claims.

### I.  Sale of Unencumbered Assets

There are certain assets still retained by the Debtors that will be transferred to the Liquidating Trust on the Effective Date.  The value of these Unencumbered Assets is unknown.  The resulting liquidation of the Unencumbered Assets may increase or decrease depending on the sale values, thus impacting distributions to Class 3.

### J.  Recovery of Insurance Premiums

The Debtors used Travelers Insurance ("Travelers") as their primary insurer, including workers compensation claims.  Currently, Travelers is holding approximately $960,764 in Cash for premiums paid by the Debtors.  The Liquidating Trustee will retain the right to pursue the recovery of any restricted premiums held by Travelers.  The success of the Liquidating Trustee on this recovery will impact distributions to Class 3.

### K.  Resolution of Joplin, Missouri Insurance Recovery

Group Two Restaurant #1558 in Joplin, Missouri, was unfortunately destroyed by a tornado on May 22, 2011.  An Insurance claim has been submitted.  The resolution of this insurance claim will impact the distributions to Class 3.

## VIII.    CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

**SUBSTANTIAL UNCERTAINTY EXISTS WITH RESPECT TO MANY OF THE TAX ISSUES DISCUSSED BELOW.  THEREFORE, EACH HOLDER OF A CLAIM IS URGED TO CONSULT ITS OWN TAX ADVISOR REGARDING THE FEDERAL, STATE, AND OTHER TAX CONSEQUENCES OF THE PLAN.  NO RULINGS HAVE BEEN REQUESTED FROM THE INTERNAL REVENUE SERVICE WITH RESPECT TO ANY OF THE TAX ASPECTS OF THE PLAN.**

The discussion below summarizes certain anticipated U.S. Federal income tax consequences of the Plan to the Debtors and certain holders of Claims.  This summary is provided for information purposes only and is based on the Internal Revenue Code of 1986, as amended (the "Tax Code"), Treasury regulations promulgated thereunder, judicial authorities, and current administrative rulings and practice, all as in effect as of the date hereof and all of which are subject to change, possibly with retroactive effect, that could adversely affect the U.S. Federal income tax consequences described below.

This summary does not address all aspects of U.S. Federal income taxation that may be relevant to a particular holder of a Claim in light of its particular facts and circumstances or to certain types of holders of Claims subject to special treatment under the Tax Code (for example, non-U.S. taxpayers, financial institutions, broker-dealers, life insurance companies, tax-exempt organizations, real estate investment trusts, regulated investment companies, grantor trusts, persons holding a Claim as part of a "hedging," "integrated," or "constructive" sale or straddle transaction, persons holding claims through a partnership or other pass-through entity, persons that have a "functional currency" other than the U.S. dollar, and persons who have acquired an equity interest or a security in a Debtor in connection with the performance of services).  In addition, this summary does not discuss any aspects of state, local, or non-U.S. taxation.

A substantial amount of time may elapse between the date of this Disclosure Statement and the receipt of a final distribution or transfer under the Plan.  Events occurring after the date of this Disclosure Statement, such as additional tax legislation, court decisions, or administrative changes, could affect the U.S. Federal income tax consequences of the Plan and the transactions contemplated thereby.  There can be no assurance that the Internal Revenue Service (the "IRS") will not take a contrary view with respect to one or more of the issues discussed below.  No ruling will be sought from the IRS with respect to any of the tax aspects of the Plan, and no opinion of counsel has been or will be obtained by the Debtors with respect thereto.

**TO ENSURE COMPLIANCE WITH TREASURY DEPARTMENT CIRCULAR 230, EACH HOLDER IS HEREBY NOTIFIED THAT: (A) ANY DISCUSSION OF U.S. FEDERAL TAX ISSUES IN THIS DISCLOSURE STATEMENT IS NOT INTENDED OR WRITTEN TO BE RELIED UPON, AND CANNOT BE RELIED UPON, BY ANY HOLDER FOR THE PURPOSE OF AVOIDING PENALTIES THAT MAY BE IMPOSED ON A HOLDER UNDER THE TAX CODE; (B) SUCH DISCUSSION IS INCLUDED HEREBY BY THE DEBTORS IN CONNECTION WITH THE PROMOTION OR MARKETING (WITHIN THE MEANING OF CIRCULAR 230) BY THE DEBTORS OF THE TRANSACTIONS OR MATTERS ADDRESSED HEREIN; AND (C) EACH HOLDER SHOULD SEEK ADVICE BASED ON ITS PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.**

### A.    U.S. Federal Income Tax Consequences to Holders of Claims

The U.S. Federal income tax consequences to Holders of Claims arising from the distributions to be made in satisfaction of their Claims pursuant to the Plan may vary, depending upon, among other

things: (a) the type of consideration received by the holder of a Claim in exchange for the Claim; (b) the nature of the indebtedness owed to it; (c) whether the holder has previously claimed a bad debt or worthless security deduction in respect of its Claim against the corporation; (d) whether such Claim constitutes a security; (e) whether the holder of a Claim is a citizen or resident of the United States for tax purposes, or otherwise subject to U.S. Federal income tax on a net income basis; (f) whether the holder of a Claim reports income on the accrual or cash basis; and (g) whether the holder of a Claim receives distributions under the Plan in more than one taxable year. For tax purposes, the modification of a Claim may represent an exchange of the Claim for a new Claim, even though no actual transfer takes place. In addition, where gain or loss is recognized by a holder of a Claim, the character of such gain or loss as long-term or short-term capital gain or loss or as ordinary income or loss will be determined by a number of factors, including the tax status of the holder, whether the Claim constitutes a capital asset in the hands of the holder and how long the Claim has been held or is treated as having been held, whether the Claim was acquired at a market discount, and whether and to what extent the holder previously claimed a bad debt or worthless stock or securities deduction with respect to the underlying Claim. A holder who purchased its Claim from a prior holder at a market discount may be subject to the market discount rules of the Tax Code. Under those rules, assuming that the holder has made no election to amortize the market discount into income on a current basis with respect to any market discount instrument, any gain recognized on the exchange of its Claim (subject to a *de minimis* rule) generally would be characterized as ordinary income to the extent of the accrued market discount on such Claim as of the date of the exchange.

### 1. General Treatment of Holders of Claims

Pursuant to the Plan, the Debtors will transfer assets of the Debtors, either directly or indirectly, to Holders of Allowed Claims in satisfaction of such Claims. Holders of such Claims will likely recognize gain or loss equal to the amount realized under the Plan in respect of their Claims less their respective tax bases in their Claims. The amount realized for this purpose will generally equal the sum of the cash and the fair market value of any other consideration received under the Plan in respect of their Claims. Any gain or loss recognized in the exchange will be capital or ordinary depending on the status of the Claim in the Holder's hands.

To the extent that cash received or deemed received by a holder of a Claim is attributable to accrued interest on the Claim, the Cash will be deemed made in payment of such interest. The federal income tax laws are unclear on how much consideration will be deemed attributable to accrued interest when partial payments are made on a debt on which both principal and interest are owed. To the extent that the Holder of a Claim has not yet included the accrued interest in gross income, the cash deemed received in payment of such interest will generally be included in the Holder's gross income for federal income tax purposes. To the extent the Holder has previously included accrued interest on the Claim in gross income, the cash deemed received in payment of such interest generally will not be included in gross income. The Holder of an Allowed Claim may be able to claim a deductible loss if the cash deemed received for the accrued interest is less than the amount the Holder had previously included in gross income.

### 2. Bad Debt Deduction

The Holder of an Allowed Claim who under the Plan will receive in respect of a Claim an amount less than the Holder's tax basis in such Claim may be entitled to a bad debt deduction in some amount under section 166(a) of the Tax Code. The rules regarding the ability of a taxpayer, who believes that a debt owed to it will not be collected in full, to take a deduction related to such debt's partial or total worthlessness are very complex, as are rules relating to whether such deduction, if allowed, is a capital or ordinary loss. Moreover, the application and impact of such rules vary greatly depending upon a

taxpayer's individual circumstances, including the facts and circumstances of the holder, the obligor, and the instrument with respect to which a deduction is claimed. Holders of Claims are therefore urged to consult their tax advisors with respect to their ability to take such deduction.

### B. Federal Income Tax Treatment of Liquidating Trust and Disputed Claims Reserve

The Liquidating Trust will be organized for the primary purpose of liquidating the assets transferred to it with no objective to continue or engage in the conduct of a trade or business, except to the extent reasonably necessary to, and consistent with, the liquidating purpose of the Liquidating Trust. The Liquidating Trust is intended to be treated for U.S. federal income tax purposes in part as a liquidating trust described in Treasury Regulation § 301.7701-4(d) and in part as one or more disputed claims reserves treated as disputed ownership funds described in Treasury Regulation § 1.468B-9. The Liquidating Trust Agreement will contain certain provisions to comply with IRS guidance for trusts treated as liquidating trusts. Among other things, the agreement will (a) require that the Liquidating Trust terminate no later than five years after the Effective Date, subject to extension with Bankruptcy Court approval, (b) limit the Liquidating Trustee's investment powers, (c) limit the business operations carried on by the Liquidating Trust to activities reasonably necessary to and consistent with the trust's liquidating purpose, (d) prohibit the Liquidating Trust from receiving or retaining Cash or Cash equivalents in excess of an amount reasonably necessary to meet Claims and contingent liabilities or to maintain the value of the trust assets during liquidation and (e) distribute at least annually to the holders of Allowed Claims the Liquidating Trust's net income and the net proceeds from the sale of Liquidating Trust assets (excluding assets and income of any Disputed Claims Reserve) in excess of an amount reasonably necessary to meet Claims and contingent liabilities and to maintain the value of the Liquidating Trust assets. No Holder of a Claim will be treated as the grantor or deemed owner of an asset allocated to a Disputed Claims Reserve until such holder receives or is allocated an interest in such asset. The Liquidating Trustee will file all tax returns on a basis consistent with the treatment of the Liquidating Trust in part as a liquidating trust (and grantor trust pursuant to Treasury Regulation § 1.671-1(a)) and in part as one or more disputed claims reserves taxed as disputed ownership funds. All income of the Liquidating Trust and of any Disputed Claims Reserve taxable thereto will be subject to income tax on a current basis and the Liquidating Trustee will pay such tax from the Liquidating Trust or Disputed Claims Reserve that generated income.

### 1. Establishment of the Liquidating Trust

For federal income tax purposes, the transfer of assets by the Debtors to the Liquidating Trust will be treated in part as the transfer of assets by the Debtors to the Holders of Allowed Claims, subject to any liabilities of the Debtors or the Liquidating Trust payable from the proceeds of such assets, followed by the transfer of such assets (subject to such liabilities) by such holders to the Liquidating Trust in exchange for interests in the trust, and in part as the transfer of assets by the Debtors to one or more disputed claims reserves.

### 2. Taxation of Holders of Beneficial Interests in the Liquidating Trust

The holders of Allowed Claims will be treated for federal income tax purposes as the grantors and deemed owners of their respective shares of the assets in the Liquidating Trust excluding any Disputed Claims Reserve (subject to such liabilities), depending on their rights to distributions under the Plan. As grantors and deemed owners of such assets, the Holders of Allowed Claims will be required to include in income their respective shares of the income, deductions, gains, losses and credits attributable to the Liquidating Trust excluding any Disputed Claims Reserve. The holders of Allowed Claims will be required to use the values assigned to such assets by the Liquidating Trustee for all federal tax purposes, including the recognition of income, deduction, gain or loss with respect to their Allowed Claims and any gain or loss recognized on the subsequent disposition of an asset in which the holder holds an interest.

### C. Information Reporting and Backup Withholding

Certain payments, including the payments with respect to Claims pursuant to the Plan, may be subject to information reporting to the IRS. Moreover, under certain circumstances, holders of Claims may be subject to "backup withholding" with respect to payments made pursuant to the Plan, unless such holder either (i) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates this fact, or (ii) provides a correct United States taxpayer identification number and certifies under penalty of perjury that the holder is a United States person, the taxpayer identification number is correct and the taxpayer is not subject to backup withholding because of a failure to report all dividend and interest income.

Backup withholding is not an additional tax. Amounts withheld under the backup withholding rules may be credited against a holder of a Claim's U.S. Federal income tax liability, and such holder may obtain a refund of any excess amounts withheld under the backup withholding rules by filing an appropriate claim for refund with the IRS (generally, a U.S. Federal income tax return).

In addition, Treasury regulations generally require disclosure by a taxpayer on its U.S. Federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer claiming a loss in excess of specified thresholds. Each holder of a Claim is strongly urged to consult its tax advisor regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on such taxpayer's tax returns.

### D. Importance of Obtaining Professional Tax Assistance

**THE FOREGOING DISCUSSION IS INTENDED ONLY AS A SUMMARY OF CERTAIN POTENTIAL TAX CONSEQUENCES OF THE PLAN AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING WITH A TAX PROFESSIONAL. THE ABOVE DISCUSSION IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE. THE TAX CONSEQUENCES OF THE PLAN ARE IN MANY CASES COMPLEX, UNCLEAR AND UNCERTAIN AND MAY VARY DEPENDING ON A NUMBER OF DIFFERENT FACTORS, INCLUDING A CLAIMHOLDER'S PARTICULAR CIRCUMSTANCES. ACCORDINGLY, CLAIMHOLDERS ARE URGED TO CONSULT THEIR TAX ADVISORS ABOUT THE FEDERAL, STATE AND LOCAL, AND APPLICABLE FOREIGN INCOME AND OTHER TAX CONSEQUENCES OF THE PLAN.**

## IX. FEASIBILITY OF THE PLAN AND BEST INTEREST OF CREDITORS

### A. Feasibility of the Plan

The Bankruptcy Code requires that the Bankruptcy Court determine that confirmation of a Plan is not likely to be followed by further liquidation or financial reorganization of the Debtors. The Plan contemplates that the Debtors will liquidate their remaining assets and will distribute all proceeds pursuant to further Court order. As a result, the Plan satisfies section 1129(a)(ii) of the Bankruptcy Code.

### B. Acceptance of the Plan

As a condition to confirmation, the Bankruptcy Code requires that each Class of Impaired Claims vote to accept the Plan, except under certain circumstances.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two thirds (2/3) in dollar amount and more than one half (1/2) in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the Plan. For example, Class 3 General Unsecured Creditors votes to accept the Plan only if two thirds (2/3) in amount and a majority in number actually voting in such Class cast their Ballots in favor of acceptance. Holders of Claims who fail to vote are not counted as either accepting or rejecting a plan.

### C. Best Interests Test

Even if a plan is accepted by the holders of each class of claims, the Bankruptcy Code requires a Bankruptcy Court to determine that the plan is in the best interests of all holders of claims that are impaired by the plan and that have not accepted the plan. The "best interests" test, as set forth in section 1129(a)(7) of the Bankruptcy Code, requires a Bankruptcy Court to find either that all members of an impaired class of claims have accepted the plan or that the plan will provide a member who has not accepted the plan with a recovery of property of a value, as of the effective date of the plan, that is not less than the amount that such holder would recover if the debtor were liquidated under chapter 7 of the Bankruptcy Code.

### D. Application of the "Best Interests" of Creditors Test to the Liquidation Analysis and the Valuation

In this case, the Debtors sold substantially all of their assets, with the remaining assets to be liquidated and distributed. Liquidation under chapter 7 would accomplish the same result but with the additional cost of administering and proceeding with a chapter 7 case. The recovery available in a chapter 7 liquidation to creditors in each Class in these Chapter 11 Cases would be substantially less because of the additional administrative costs associated with a chapter 7 trustee and professionals not familiar with the Debtors' Chapter 11 Cases. Accordingly, the Plan Proponents believe that the "best interests" test of section 1129 of the Bankruptcy Code is satisfied because the members of each Impaired Class will receive greater or equal value under the Plan than they would in a chapter 7 liquidation. A copy of the liquidation analysis is attached hereto as <u>Appendix C</u>.

### E. Confirmation Without Acceptance of All Impaired Classes: The "Cramdown" Alternative

In view of a potential rejection of the Plan by certain Classes of Claims, the Plan Proponents may have to seek confirmation of the Plan pursuant to the "cramdown" provisions of the Bankruptcy Code. Specifically, section 1129(b) of the Bankruptcy Code provides that a plan can be confirmed even if the plan is not accepted by all impaired classes, as long as at least one impaired class of claims has accepted it. The Bankruptcy Court may confirm a plan at the request of the debtors if the plan "does not discriminate unfairly" and is "fair and equitable" as to each impaired class that has not accepted the plan. A plan does not discriminate unfairly within the meaning of the Bankruptcy Code if a dissenting class is treated equally with respect to other classes of equal rank.

The Plan Proponents believe the Plan does not discriminate unfairly with respect to holders of Class 3 and Class 4.

A plan is fair and equitable as to a class of unsecured claims which rejects a plan if the plan provides (i) for each holder of a claim included in the rejecting class to receive or retain on account of that claim property that has a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (ii) that the holder of any claim or interest that is junior to the claims of such class will not receive or retain on account of such junior claim or interest any property at all.

A plan is fair and equitable as to a class of interest which rejects a plan if the plan provides (i) for each holder of an interest included in the rejecting class to receive or retain on account of that interest, property that has a value, as of the effective date of the plan, equal to the allowed amount of any fixed liquidation preference to which such holder is entitled, or the value of the interest; or (ii) that the holder of any interest that is junior to the class of such interests will not receive or retain on account of such junior interest any property at all.

The Plan Proponents believe that they will meet the "fair and equitable" requirements of section 1129(b) of the Bankruptcy Code with respect to holders of Classes 3 and 4. The Plan Proponents understand, however, that the Plan may not be confirmable with respect to such Classes if any such Class does not vote in favor of the Plan.

## X. ALTERNATIVES TO CONFIRMATION AND CONSUMMATION OF THE PLAN

The Plan Proponents believe that the Plan affords holders of Claims the potential for the greatest recovery and, therefore, is in the best interests of such holders. If, however, the requisite acceptances are not received, or the Plan is not confirmed and consummated, the theoretical alternatives include: (i) formulation of an alternative plan of liquidation or (ii) liquidation of the Debtors under chapter 7 of the Bankruptcy Code.

## XI. THE SOLICITATION; VOTING PROCEDURE

### A. Parties in Interest Entitled To Vote

Under section 1124 of the Bankruptcy Code, a class of claims is deemed to be "impaired" under a plan unless (i) the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or (ii) notwithstanding any legal right to an accelerated payment of such claim, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy) and reinstates the maturity of such claim as it existed before the default.

In general, a holder of a claim may vote to accept or to reject a plan if (i) the claim is "allowed," which means generally that no party in interest has objected to such claim, and (ii) the claim is impaired by the plan. If, however, the holder of an impaired claim will not receive or retain any distribution under the plan on account of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan, and, accordingly, holders of such claims do not actually vote on the plan. If a claim is not impaired by the plan, the Bankruptcy Code deems the holder of such claim to have accepted the plan and, accordingly, holders of such claims are not entitled to vote on the plan. Claims in Classes 1 and 2 are Unimpaired under the Plan, and holders of such Claims are deemed to accept the Plan and therefore not entitled to vote. Class 4 will not receive any distributions on account of the Interests and is deemed to reject the Plan. Accordingly, only Holders of Claims in Class 3 are entitled to vote on the Plan.

### B. Voting Procedures

Detailed Voting Procedures are set forth in the Disclosure Statement Order.

### C. Waivers of Defects, Irregularities, Etc.

All questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of Ballots will be determined by the Bankruptcy Court, which determination will be final and binding. The Plan Proponents reserve the absolute right to contest the validity of any such withdrawal. The Plan Proponents also reserve the right to reject any and all Ballots not in proper

form, the acceptance of which would, in the opinion of the Plan Proponents or their counsel, be unlawful. The Plan Proponents further reserve the right to waive any defects or irregularities or conditions of delivery as to any particular Ballot. The interpretation (including the Ballot and the respective instructions thereto) by the Bankruptcy Court will be final and binding on all parties. Unless waived, any defects or irregularities in connection with deliveries of Ballots must be cured within such time as the Plan Proponents (or the Bankruptcy Court) determine. Neither the Plan Proponents nor any other person will be under any duty to provide notification of defects or irregularities with respect to deliveries of Ballots nor will any of them incur any liabilities for failure to provide such notification. Unless otherwise directed by the Bankruptcy Court, delivery of such Ballots will not be deemed to have been made until such irregularities have been cured or waived. Ballots previously furnished (and as to which any irregularities have not theretofore been cured or waived) will be invalidated.

### D. Withdrawal of Ballots; Revocation

Any party who has delivered a valid Ballot for the acceptance or rejection of the Plan may withdraw such acceptance or rejection by delivering a written notice of withdrawal to Fredrikson & Byron, PA ("Fredrikson") the address set forth in Section E of this Article at any time prior to the Voting Deadline. A notice of withdrawal, to be valid, must (i) contain the description of the Claim(s) to which it relates and the aggregate principal amount represented by such Claim(s), (ii) be signed by the withdrawing party in the same manner as the Ballot being withdrawn, (iii) contain a certification that the withdrawing party owns the Claim(s) and possesses the right to withdraw the vote sought to be withdrawn and (iv) be received by Fredrikson in a timely manner at the address set forth below. The Plan Proponents will determine whether any withdrawals of Ballots were received and whether the requisite acceptances of the Plan have been received. As stated above, the Plan Proponents expressly reserve the absolute right to contest the validity of any such withdrawals of Ballots.

Unless otherwise directed by the Bankruptcy Court, a purported notice of withdrawal of Ballots which is not received in a timely manner by Fredrikson will not be effective to withdraw a previously cast Ballot.

Any party who has previously submitted to a properly completed Ballot prior to the Voting Deadline may revoke such Ballot and change his or its vote by submitting to the Clerk of Court prior to the Voting Deadline a subsequent properly completed Ballot for acceptance or rejection of the Plan. In the case where more than one timely, properly completed Ballot is received, only the Ballot which bears the latest date of receipt by the Clerk of Court will be counted for purposes of determining whether the requisite acceptances have been received.

### E. Further Information; Additional Copies

If you have any questions or require further information about the voting procedure for voting your Claim or about the packet of material you received, or if you wish to obtain an additional copy of the Plan, this Disclosure Statement, or any exhibits or appendices to such documents (at your own expense, unless otherwise specifically required by Bankruptcy Rule 3017(d)), please contact Fredrikson & Byron PA: 200 South Sixth Street, Suite 4000, Minneapolis, MN 55402, Attn: Douglas W. Kassebaum.

**[This space intentionally left blank.]**

## XII.    CONCLUSION AND RECOMMENDATION

The Plan Proponents believe that confirmation and implementation of the Plan is preferable to any of the alternatives described above because it will result in the greatest recoveries to holders of Claims. Other alternatives would involve significant delay, uncertainty and substantial additional administrative costs.

August 8, 2011

/e/ Scott N. Opincar_____
McDONALD HOPKINS LLC
Shawn M. Riley (OH 0037235)
Scott N. Opincar (OH 0064027)
Michael J. Kaczka (OH 0076548)
600 Superior Avenue, East, Suite 2100
Cleveland, Ohio 44114-2653
Telephone: (216) 348-5400
Facsimile: (216) 348-5474
sriley@mcdonaldhopkins.com
sopincar@mcdonaldhopkins.com
mkaczka@mcdonaldhopkins.com

-and-

FREDRIKSON & BYRON, P.A.
Clinton E. Cutler (#158094)
Douglas W. Kassebaum (#386802)
200 South Sixth Street, Suite 4000
Minneapolis, Minnesota 55402
Telephone: (612) 492-7000
Facsimile: (612) 492-7077
ccutler@fredlaw.com
dkassebaum@fredlaw.com

CO-COUNSEL FOR DEBTORS
AND DEBTORS IN POSSESSION

/e/ Aaron L. Hammer_____
FREEBORN & PETERS LLP
Aaron L. Hammer (IL 6243069)
Richard S. Lauter (IL 6182859)
311 South Wacker Drive, Suite 3000
Chicago, Illinois 60606-6677
Telephone: (312) 360-6000
Facsimile: (312) 360-6995
ahammer@freebornpeters.com
rlauter@freebornpeters.com

-and-

MASLON EDELMAN BORMAN &
BRAND, LLP
Amy J. Swedberg (#271019)
330 Wells Fargo Center
90 South Seventh Street
Minneapolis, Minnesota 55402-4140
Telephone: (612) 672-8200
Facsimile: (612) 672-8397
amy.swedberg@maslon.com

CO-COUNSEL FOR OFFICIAL COMMITTEE OF
UNSECURED CREDITORS

# APPENDIX A

**JOINT CHAPTER 11 PLAN OF LIQUIDATION OF THE DEBTORS AND
OFFICIAL COMMITTEE OF UNSECURED CREDITORS**

**APPENDIX B**


**DISCLOSURE STATEMENT ORDER**

# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MINNESOTA

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

| | |
|---|---|
| In re: | **JOINTLY ADMINISTERED UNDER CASE NO. 10-38652** |
| DUKE AND KING ACQUISITION CORP., | Court File No. 10-38652 |
| Debtors. | |
| | Court File Nos: |
| (includes: | |
| Duke and King Missouri, LLC; | 10-38653 (GFK) |
| Duke and King Missouri Holdings, Inc.; | 10-38654 (GFK) |
| Duke and King Real Estate, LLC; | 10-38655 (GFK) |
| DK Florida Holdings, Inc.) | 10-38656 (GFK) |
| | |
| | Chapter 11 Cases |
| | Chief Judge Gregory F. Kishel |

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

## ORDER AND NOTICE FOR HEARING ON CONFIRMATION OF PLAN

**\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

A Second Amended Disclosure Statement under Chapter 11 of the Bankruptcy Code has been filed by **the DEBTORS and the OFFICIAL COMMITTEE OF UNSECURED CREDITORS**, the proponents, on <u>August 8, 2011</u>, referring to a Second Amended Joint Chapter 11 Plan of Liquidation filed on <u>August 8, 2011</u>.

The court has determined that the Second Amended Disclosure Statement contains adequate information. Therefore,

**IT IS ORDERED, AND NOTICE IS HEREBY GIVEN, THAT:**

1.      ***Approval of Disclosure Statement***. The Second Amended Disclosure Statement of the proponents dated <u>August 8, 2011</u>, regarding the Second Amended Joint Chapter 11 Plan of Liquidation of the proponents dated <u>August 8, 2011</u>, is approved.

2.      ***Confirmation Hearing***. A hearing to consider confirmation of the First Modified Plan will be held on **<u>September 26, 2011 at 1:30 p.m.</u>,** in Courtroom 2A, U.S. Courthouse, 316 North Robert Street, St. Paul, MN 55101. The hearing may be continued by notice at the hearing, without further written notice.

3.      ***Objections to Confirmation***. Seven days prior to the confirmation hearing is fixed as the last day to timely deliver an objection to confirmation of the plan, and ten days prior to the hearing is the last day to timely mail an objection. Under Loc. R. Bankr. P. (D. Minn.) 3020-1,

objections shall be made by motion. The objection must be filed not later than one day after service.

4.    ***Ballots to Accept or Reject Plan***. Five days prior to the confirmation hearing is fixed as the last day to timely file ballots to accept or reject the proponent's plan. Unless otherwise ordered, the proponent's attorney and the unsecured creditors' committee's attorney shall jointly count the ballots and file a report of tabulation not later than 24 hours before the confirmation hearing.

5.    ***Mailing of Notice, Copies and Ballots***. Not less than twenty eight (28) days prior to the confirmation hearing, the proponents under supervision of their attorneys shall prepare and mail pursuant to Loc. R. Bankr. P. (D. Minn.) 3017-1(a) - (b), and in accordance with the clerk's instructions, appropriate copies of this order and notice, letters of transmittal if any, the approved official form ballot, the approved disclosure statement, and the plan, to the entities specified in Loc. R. Bankr. P. (D. Minn.) 9013-3, all creditors, all equity security holders, and all other parties in interest.  The proponents are authorized to serve the approved disclosure statement and plan in an electronic format on a compact disk.

BY THE COURT:

_____
GREGORY F. KISHEL
CHIEF UNITED STATES BANKRUPTCY JUDGE

4967876/1

**APPENDIX C**


**LIQUIDATION ANALYSIS**

**Duke & King Acquisitions**
**Liquidation Of Estate Assets Analysis**
*(Dollars In Actuals)*

| Description: | Chapter 11 Estimated Mid Value | Chapter 7 Estimated Mid Value |
|---|---|---|
| **Current Assets:** | | |
| Cash on Hand At Closing | $ 3,101,351 | $ 3,101,351 |
| Other Cash Accounts | 496,927 | 496,927 |
| Total Current Assets | 3,598,278 | 3,598,278 |
| | | |
| **Other Assets:** | | |
| Rebates | 407,844 | 407,844 |
| Professional Fee Retainers | 275,000 | 275,000 |
| Insurance Proceeds [1] | 150,000 | 150,000 |
| Utility Deposits - Pre/Post Petition | 96,053 | 96,053 |
| Workers Compensation Refunds [2] | 50,000 | 50,000 |
| LOC Release From Wells Fargo | 54,858 | 54,858 |
| MBM Refunds | 56,847 | 56,847 |
| Corporate Asset Sales | 15,000 | 15,000 |
| Miscellanous Other Assets | 10,000 | |
| Total Fixed Assets | 1,115,602 | 1,105,602 |
| | | |
| **Gross Proceeds** | **4,713,880** | **4,703,880** |
| | | |
| **Less Estimated Admin Costs of Liquidation:** | | |
| Professional Fees Already Incurred Through Sale/Closing Date | 639,546 | 639,546 |
| Group 2 Liabilities [3] | 504,161 | 504,161 |
| Warren Capital Debt | 280,018 | 280,018 |
| Sales Tax Obligation Outstanding | 330,813 | 330,813 |
| Coke Debt | 166,196 | 166,196 |
| Success Plan | 162,750 | 162,750 |
| Corporate Payroll/Benefits/Vacation | 150,000 | 150,000 |
| 503(B)(9) Claims | 139,430 | 139,430 |
| Corporate Payables | 123,945 | 123,945 |
| Wind Down Of Estate: | | |
| Costs Incurred Before June 18, 2011: | | |
| Debtor Advisors | 96,750 | 96,750 |
| UCC Advisors | 22,500 | 22,500 |
| US Trustee | 9,533 | 9,533 |
| Liquidating Trustee - Chapter 11 | - | |
| Company Payroll & Services | 69,205 | 69,205 |
| Sub Total Costs Before June 18, 2011 | 197,989 | 197,989 |
| Costs Incurred After June 18, 2011: | | |
| Debtor Advisors | 51,750 | - |
| UCC Advisors | 18,000 | - |
| US Trustee | 4,767 | 4,767 |
| Liquidation Professional Fees (claim objections, avoidance actions) | 50,000 | 50,000 |
| Liquidating Trustee - Chapter 7 | - | 79,938 |
| Company Payroll & Services | 42,875 | 42,875 |
| Tax Returns, Bank Fees, Etc. | 71,800 | 71,800 |
| Sub Total Costs After June 18, 2011 | 239,192 | 249,380 |
| **Total Estimated Admin Costs of Liquidation** | **2,934,040** | **2,944,227** |
| **Net Estimated Proceeds Available To Priority Claims** | **1,779,841** | **1,759,653** |
| | | |
| **Less Estimated Priority Claims:** | | |
| Other Priority Claims | 1,000 | 1,000 |
| Tax Claims | 1,000 | 1,000 |
| **Total Estimated Priority Claims** | **2,000** | **2,000** |
| | | |
| **Net Estimated Proceeds Available To Unsecured Claims** | **1,777,841** | **1,757,653** |
| | | |
| **Estimated Unsecured Claims Pool** | 6,499,706 | 6,499,706 |
| | | |
| ***Estimated Percentage Recovery To Unsecured Claims*** | *27%* | *27%* |

*(1) Proceeds related to the Joplin, MO insurance claim are still to be determined*
*(2) Proceeds related to the workers compensation will be based on actual number and amount of claims filed*
*(3) Consists of payments for stores that were not sold; items include AP, property taxes, payroll, accrued liabilities and closure costs*